**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; and **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.**, <br><br> **Plaintiffs,** <br><br> vs. <br><br> **KEVIN K. McALEENAN**, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; **KENNETH T. CUCCINELLI II,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; and **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency, <br><br> **Defendants.** | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTORY ALLEGATIONS ........................................................................1

JURISDICTION AND VENUE .............................................................................5

PARTIES ...............................................................................................................5

LEGAL AND FACTUAL BACKGROUND .........................................................6

I.    CURRENT STATUTORY FRAMEWORK AND THE HISTORY OF PUBLIC
CHARGE. ...................................................................................................7

    A.    The History Of Public Charge:  Public Charge Has Been Defined As
Primarily And Permanently Dependent On Government Assistance For
Well Over A Century. ........................................................................8

    B.    The Immigration Naturalization Act Of 1952 Codified The Existing Public
Charge Definition................................................................................9

    C.    For Decades, Congress Has Affirmed The Narrow Meaning Of Public
Charge And Rejected Efforts To Change It.......................................10

    D.    INS, State Department, Board of Immigration Appeals, And Department
Of Justice Have Consistently Understood Public Charge To Refer To
Someone Primarily And Permanently Dependent On Government
Assistance. ........................................................................................12

    E.    Congress Has Extended Non-Cash Benefits To Immigrants Subject To
The Public Charge Rule. ...................................................................14

    F.    Federal Agency Guidance Conforms With Congress's Intentions With
Respect To The Use Of Public Benefits By Immigrant Communities. .................15

II.    THE PROPOSED RULE. ..........................................................................17

III.    THE FINAL PUBLIC CHARGE RULE ABANDONS THE ESTABLISHED
MEANING OF PUBLIC CHARGE IN CONTRAVENTION OF THE LAW
AND CONGRESSIONAL INTENT. ........................................................17

    A.    The Final Rule Abandons The Primarily And Permanently Dependent
Standard. ...........................................................................................18

    B.    The Final Rule Is Contrary To Law Because It Greatly Expands The
Public Benefits To Be Considered For A Public Charge Determination...............20

    C.    The Final Rule Alters The Totality Of Circumstances Test In A Manner
That Is Unlawful And Contrary To Congressional Intent. ..................21

    D.    The Final Rule Unlawfully Discriminates Against People With Disabilities
By Asserting That Their Disability Alone Makes Them A Public Charge. ..........22

IV.     HARMS AS A RESULT OF THE PUBLIC CHARGE FINAL RULE. .........................23

     A.     The Final Rule Will Have A Broad Chilling Effect On Public Benefits Enrollment...............................................................................................................23

     B.     The Final Rule's Chilling Effect Will Harm Public Health. ...............................25

     C.     The Final Rule's Chilling Effect Will Directly Harm Cook County.....................27

     D.     The Final Rule's Chilling Effect Frustrates The Mission Of Plaintiff ICIRR And Its Member Organizations And Requires Them To Divert Resources To Address Its Harms.........................................................................34

     E.     The Final Rule's Weighted Circumstances Test Discriminates Against Immigrants Of Color.........................................................................................42

LEGAL CLAIMS .........................................................................................................................44

JURY DEMAND ...........................................................................................................................55

PRAYER FOR RELIEF ................................................................................................................55

Plaintiffs **COOK COUNTY, ILLINOIS** (the "County" or "Cook County"), and the **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.** ("ICIRR"), by their respective undersigned counsel, allege as follows for their Complaint for Declaratory and Injunctive Relief against Defendants **KEVIN K. McALEENAN**, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY**, a federal agency; **KENNETH T. CUCCINELLI II**, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; and **U.S. CITIZENSHIP AND IMMIGRATION SERVICES**, a federal agency.

## INTRODUCTORY ALLEGATIONS

1.      For centuries, the United States has viewed itself as a beacon offering opportunity and refuge to those in search of it. *See, e.g.*, EMMA LAZARUS, THE NEW COLOSSUS (1883) (welcoming "your tired, your poor, your huddled masses"). Federal immigration law has reflected this identity and the values embodied in it, including by allowing exclusion of those seeking status here only in established and narrow circumstances. One circumstance in which the federal immigration code has permitted exclusion is when an immigrant is deemed a "public charge." Reflecting our nation's values, the law has long defined "public charge" to refer only to an immigrant who is likely to be *primarily* and *permanently* dependent on the federal government for long-term subsistence. By contrast, the law has never deemed someone a public charge merely because they received some non-cash public benefits; indeed, the law welcomes those simply needing to avail themselves of supplemental benefits to find their footing.

2.      But the Department of Homeland Security ("DHS") has now attempted to rewrite the immigration statute. DHS recently adopted a Final Rule that redefines "public charge" and radically changes long-settled and regularly affirmed precedent. *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (the "Final Rule," to be codified at 8

C.F.R. pt. 103, 212, 213, 214, 245, 248). If allowed to go into effect, this Final Rule will undermine our national identity, contravene the law, and discriminate against racial minorities and people with disabilities.

3. This case concerns the Trump administration's systematic efforts to: (1) use the administrative rulemaking process to reverse well-settled history and law; and (2) vilify, shame, and exclude certain (predominantly non-white) immigrants. By promulgating arbitrary and discriminatory regulations that change the meaning of the term "public charge" as used in the Immigration and Nationality Act of 1952 ("INA"), DHS has attempted to eviscerate 100 years of settled immigration law and practice. It would do so in a manner that exceeds its legal authority, is contrary to Congress' intent, is arbitrary and capricious, and, as alleged by ICIRR in Count IV, violates Constitutional prohibitions against racial discrimination and statutory prohibitions against discrimination against people with disabilities. DHS issued the Final Rule without sufficient regard for more than 250,000 comments submitted during the rulemaking process— comments that demonstrate the myriad ways in which the Final Rule is inconsistent with the law and historical practice, and would cause substantial, irreparable harm to millions of vulnerable people in the United States.

4. The meaning of "public charge" has remained essentially the same for more than 100 years. Initially codified in agency guidance from the former Immigration and Nationality Service ("INS"),[1] and consistent with its plain meaning, courts, Congress, and federal agencies all have defined "public charge" to apply to instances where the person in question was "primarily dependent" on the government for long-term subsistence, as evidenced by the receipt of cash assistance or long-term institutionalization at government expense.

---

[1] INS ceased to exist as of March 1, 2003. The agency is now the U.S. Citizenship and Immigration Services ("USCIS").

5.      With its Final Rule, DHS takes this narrow and established restriction on admission and redefines "public charge" beyond any legal or common sense understanding to include anyone who ever has used, or is considered likely to use, certain public benefits, regardless of the amount and their *de minimis* use.  Specifically, the Final Rule denies admission and change in status to lawful permanent resident to immigrants receiving any number of health, nutrition, and housing benefits, even though Congress regularly excludes such benefits from public charge consideration.  If allowed to go into effect, the Final Rule will have a chilling effect upon immigrant communities, causing individuals to forgo critical public benefits—an impact that will cause devastating, irreparable harm to children, families, and public health in Cook County and throughout Illinois.

6.      This chilling effect will lead to disenrollment and non-enrollment in health, nutrition, and other assistance programs, making many working class immigrant families less healthy, less productive, more reliant on County-paid emergency medical care, and more likely to experience economic dislocation and homelessness, which will result in increased strain on County agencies and programs.  The chilling effect likewise will burden County's administration of both federal and state benefits programs.  And direct costs to the County will result from immigrants who shift from federal programs to County programs that do not qualify as "public benefits" under the Final Rule.

7.      Defendants' radical reversal of longstanding law, practice, and policy violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et. seq.*  First, Defendants' exceeded their statutory authority by redefining the statutory term "public charge."  Second, the Regulation contravenes existing law by considering public benefits programs that Congress has explicitly and repeatedly chosen to exclude from public charge determinations.  For example, Congress

expressly declined to include for public charge consideration such public benefit programs when it passed the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. §§ 1182, 1183, 1624, as well as when it passed the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104–193, 110 Stat. 2105 (1996) ("PRWORA" or "Welfare Reform Act"), 8 U.S.C. §§ 1161-1163, 1621-1622, 1641. The Final Rule also contradicts settled law by discriminating against people with disabilities in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Third, the Final Rule is arbitrary and capricious in a host of ways, including: (1) Defendants' failure to reasonably justify their departure from decades of settled practice; (2) Defendants' failure to adequately consider the Final Rule's varied and extensive harms; and (3) the Final Rule's vague and complex nature, which will lead to arbitrary and inconsistent enforcement.

8.      In the absence of adequate agency reasoning and without legitimate policy ends, the Final Rule should be struck down.

9.      The Final Rule and actions taken prior to its issuance harm Cook County's economic and proprietary interests, and will continue to cause injury unless and until the Final Rule is vacated.  The Final Rule also harms ICIRR because it frustrates ICIRR's mission to help immigrants become full and contributing members of society, and further directly harms ICIRR and its member agencies, which rely on compensation they earn for their work supporting immigrants' access to these necessary benefits.   As a result, ICIRR and its members have diverted and will continue to have to divert precious resources that would have been spent on other valuable activities to halt Defendants' actions and to calm the fears of immigrant communities throughout Illinois.  Plaintiffs bring this action to stop Defendants' unlawful and

discriminatory conduct, and to redress the harm they have suffered and will continue to suffer as a direct result of Defendants' actions absent relief.

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(e) because the Defendants are agencies and officers of the United States.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

11.     Defendants' publication of the Final Rule in the Federal Register on August 14, 2019 constitutes final agency action and is therefore judicially reviewable within the meaning of the APA, 5 U.S.C. §§ 704, 706.

12.     Venue is proper in this district because Defendants are agencies and officers of the United States, the County is a resident of this judicial district, ICIRR is a non-profit organization incorporated in Chicago, Illinois and a resident of Illinois, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

13.     Plaintiff Cook County is an Illinois governmental entity with its principal place of business in Chicago, Cook County, Illinois.  The County is the second largest county in the United States by population.

14.     ICIRR is a non-profit, member-based organization located in Chicago, Illinois, and incorporated in Illinois.  ICIRR promotes the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life in Illinois and beyond.  ICIRR has nearly 100 member organizations throughout Illinois.  Member organizations include community health centers, health and nutrition programs, social service providers, and other

organizations that work to ensure immigrants receive the support they need for their families to be successful.

15. Defendant Kevin K. McAleenan is Acting Secretary of DHS and is sued in his official capacity. In his capacity as the Acting Secretary of DHS, Defendant McAleenan issued the Final Rule challenged by this lawsuit. He directs each of the component agencies of DHS.

16. Defendant United States Department of Homeland Security is a cabinet-level department of the United States federal government. DHS is made up of U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

17. Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS and is sued in his official capacity.

18. Defendant USCIS is a sub-agency of DHS that is primarily responsible for the immigration services functions of the United States, including the administration of applications by foreign nationals in the United States for the adjustment of status to lawful permanent residency, immigrant and nonimmigrant visas, change of status to a different visa category, or extension of stay.

## LEGAL AND FACTUAL BACKGROUND

19. This case concerns changes by the Defendants to the interpretation and application of the "public charge" ground for inadmissibility included in section 212(a)(4) of the Immigration and Nationality Act, 8 U.S.C. §1182(a)(4). Defendants made these changes in violation of law and in an attempt to deter immigrants, particularly those from majority non-white countries, from gaining admission to the U.S. and from seeking help to assure their families' basic health, nutrition, and housing needs are met.

## I. CURRENT STATUTORY FRAMEWORK AND THE HISTORY OF PUBLIC CHARGE.

20.     Under the Immigration and Nationality Act ("INA"), an individual seeking admission to the United States or applying to become a lawful permanent resident may be denied admission or adjustment of status if he or she, "at the time of application for admission or adjustment of status, is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A).

21.     The statute directs the adjudicator to consider the following factors in determining the likelihood that a person is or is likely to become a public charge: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. 8 U.S.C. §1184(a)(4)(B).   In considering these factors, the adjudicator must apply a "totality of the circumstances" test, a nuanced test that broadly considers an applicant's circumstances. *Id.*[2]

22.     For more than 130 years, courts, Congress and federal agencies have interpreted the term "public charge" consistently to mean an individual who is likely to become *primarily or permanently* dependent on the government in the long term.  Consistent with its plain meaning, Congress, over several decades, has repeatedly rejected numerous attempts to expand the legal definition of public charge beyond this established and narrow definition.  Contrary to the Final Rule, the term has never been understood to apply to all individuals of moderate or low income, or all individuals in receipt of, or likely to use, some non-cash and supplemental public benefits, or to apply to individuals using a modest amount of public benefits in limited duration.

---

[2] The standard for adjudicating inadmissibility under INA §212(a)(4) has been developed in several Immigration and Naturalization Service, ("INS"), BIA, and Attorney General decisions and has been codified in the INS regulations implementing the legalization provisions of the Immigration Reform and Control Act of 1986. These decisions and regulations, and §212(a)(4) itself, create a "totality of the circumstances" test.

A. **The History Of Public Charge: Public Charge Has Been Defined As Primarily And Permanently Dependent On Government Assistance For Well Over A Century.**

23.     The term "public charge" first appeared in federal immigration law in the 1882 Immigration Act, and its definition largely mirrored those found in several pre-existing local and state statutes. Gerald L. Neuman, *The Lost Century of American Immigration Law* (1776-1875), 93 COLUM. L. REV. 1833, 1850 (1993) (citing Act of Feb. 26, 1794, ch. 32, §§ 15, 1794 Mass. Acts & Laws 375, 385). It barred admission to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." *An Act to Regulate Immigration*, ch. 376, § 2, 22 Stat. 214 (1882). Like its state and local predecessors, the federal statute did not exclude as public charges individuals who could work.

24.     Congress passed another immigration statute in 1907 that included a similar bar against admission for:

> All idiots, imbeciles, feeble-minded persons, epileptics, insane persons, and persons who have been insane within five years previous; persons who have had two or more attacks of insanity at any time previously; paupers; persons likely to become a public charge; professional beggars; persons afflicted with tuberculosis or with a loathsome or dangerous contagious disease . . . .

*An Act to Regulate the Immigration of Aliens to the United States.* Pub. L. No. 59-96, § 2, 34 Stat. 898, 898–99 (1907).

25.     Congress amended the Immigration Act of 1907 in 1910 and maintained a consistent use of the term "public charge." *See* Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 899 (1907) (amended by Act of Mar. 26, 1910, ch. 128, § 1, 36 Stat. 263, 263 (1910)). These federal statutes consistently affirmed the prevailing understanding of a public charge as someone who needed to rely primarily and permanently on the government to live and was unable to work, *i.e.*, someone who is a charge of the public.

26.     In 1915, the Supreme Court affirmed this understanding.  In *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915), the Court held that a public charge determination should be based solely on "permanent personal objections."  Listed in the 1907 statute, these permanent personal objections included: (1) a long-term history of poverty ("paupers and professional beggars"); (2) disability ("idiots" and those with "a mental or physical defect");[3] (3) a history of criminality ("convicted felons, prostitutes"); or (4) "persons dangerously diseased."  *Id.*  Thus, simply being poor or unemployed was insufficient to be considered a "likely public charge."  Rather, a "likely public charge" determination required a permanent condition of dependence.

27.     Based upon this reasoning, an individual could be considered a public charge only if he or she were found likely to rely *primarily* and *permanently* on government assistance to live.  In other words, applicants who arrived in the United States could rely upon non-cash and supplemental public benefits or other benefits of limited duration without a risk of being considered a public charge.  In fact, the acceptance of immigrants of limited means into the U.S. was, and remains, core to our country's identity as the land of opportunity.

**B.     The Immigration Naturalization Act Of 1952 Codified The Existing Public Charge Definition.**

28.     In 1952, Congress passed the INA, which includes a provision identifying public charge as a ground of inadmissibility.  Section 212(a)(4) of the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4).

29.     The statute requires a public charge determination for applicants seeking to adjust their status to become lawful permanent residents (*i.e.*, green card holders) and for individuals

---

[3] Understandings of disability and its impact on a person's ability to work, as well as legal protections afforded to people with disabilities, have changed greatly since this decision.

seeking entry to the United States.  In enacting the INA, Congress did not alter the long-standing legal definition of public charge as someone primarily and permanently dependent on government resources.   Act of June 27, 1952, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1182).

### C.  For Decades, Congress Has Affirmed The Narrow Meaning Of Public Charge And Rejected Efforts To Change It.

30.    Since the passage of the INA in 1952, Congress has consistently affirmed the narrow meaning of public charge.  Despite passing multiple, sweeping changes to immigration laws over the course of decades, Congress consistently maintained the same "public charge" test.  Act of Oct. 3, 1965, 79 Stat. 917 (codified as amended at 8 U.S.C. § 1182); Act of Nov. 6, 1986, 100 Stat. 3359 (codified as amended at 8 U.S.C. § 1182); Act of Nov. 29, 1990, 104 Stat. 4978 (codified as amended at 8 U.S.C. § 1182).

31.     In early-1996, Congress considered and rejected a bill that would have drastically changed the definition of "public charge" along the lines proposed in DHS's Final Rule.  The Immigration Control and Financial Responsibility Act ("ICFRA") would have expressly altered the well-established meaning of "public charge" to encompass a non-citizen who used almost any public benefit program for more than one year, with limited exceptions for certain emergency medical and childhood nutrition services.  H.R. REP. NO.104-469, at 266-67 (1996). Specifically, the ICFRA would have changed the existing statutory definition of "public charge" to now encompass "any alien who receives benefits . . . for an aggregate period of more than 12 months" from:

> (i) the aid to families with dependent children program, (ii) Medicaid, (iii) the food stamp program, (iv) the supplemental security income ("SSI") program, (v) any state general assistance program, or (vi) "any other program of assistance funded, in whole or in part, by the Federal Government or any State or local

> government entity, for which eligibility for benefits is based on
> need.

H.R. 2202 §202(a)(5)(C)(ii); §202(a)(5)(D) (1996). The proposed legislation containing this new definition of "public charge" was not enacted.

32.     Instead, that same year Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which made no changes to the existing definition of public charge. Rather than change the statutory definition, IIRIRA left it unmodified—and expressly codified the "totality of circumstances" test, which had been developed in case law and administrative policies concerning the "public charge" adjudication. 8 U.S.C. § 1182(a)(4)(B)(i).   As it did with the ICFRA bill, during the drafting of IIRIRA Congress specifically chose to reject a provision similar to the Final Rule.  The provision would have redefined public charge to include individuals who received "federal public benefits for an aggregate of 12 months over a period of 7 years."  42 CONG. REC. S11872 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl).  Once again, Congress made its intent clear:  a person should not be considered a public charge simply because he or she uses public benefits.

33.     As recently as 2013, Congress rejected yet another attempt to change the definition of public charge. A proposed amendment to the Border Security, Economic Opportunity, and Immigration Modernization Act of 2013 ("Border Security Act") would have altered the meaning of public charge to include individuals likely "to qualify even for non-cash employment supports" such as Medicaid and the Supplemental Nutrition Assistance Program ("SNAP").  S. 744, 113th Cong. (2013); S. Rep. No. 113- 40, at 42 (2013).  A report of the Judiciary Committee noted that Senators opposing the amendment "cited the strict benefit restrictions and requirements" as a basis for their opposition.  *Id.*

**D.  INS, State Department, Board of Immigration Appeals, And Department Of Justice Have Consistently Understood Public Charge To Refer To Someone Primarily And Permanently Dependent On Government Assistance.**

34.    The federal agencies and divisions responsible for implementing federal immigration law have issued guidance consistent with the narrow statutory definition of public charge.  For example, an INS rule adopted in 1987 stated that an applicant would not be subject to exclusion on public-charge grounds if "the applicant demonstrates a history of employment in the United States evidencing self-support without the receipt of *public cash assistance*." *Adjustment of Status for Certain Aliens*, 52 Fed. Reg. 16,205, 16,211 (May 1, 1987) (emphasis added).  INS defined "public cash assistance" as "income or needs-based monetary assistance . . . designed to meet subsistence levels."  *Id.* at 16,209.  INS specifically excluded "assistance in kind, such as food stamps, public housing, or other non-cash benefits" from those benefits that could render an individual a public charge.  *Id.*

35.    For decades, the State Department's Foreign Affairs Manual prohibited officials from considering an individual's use of non-cash benefits, stating that "[n]either the past nor possible future receipt of such non-cash supplemental assistance may be considered in determining whether an alien is likely to become a public charge." 9 F.A.M. § 302.8-2(B)(1). It distinguished the food stamp program from those programs that would be considered in public-charge determinations because the food stamp program's purpose is:

> essentially supplementary in nature, in the sense of providing training, services, food, etc. to augment the standard of living, rather than to undertake directly the support of the recipients does not fall within the scope of INA 212(a)(4).

9 FAM § 40.41, N 9.1; see also 64 Fed. Reg. 28,678.

36.    Following IIRIRA amendments to the INA, INS issued guidance that the statute "has not altered the standards used to determine the likelihood of an alien to become a public

charge nor has it significantly changed the criteria to be considered in determining such a likelihood." Dep't of Justice, Immigr. & Naturalization Serv., Memorandum on Public Charge: INA Sections 212(A)(4) and 237(A)(5)—Duration of Departure for LPRs and Repayment of Public Benefits (Dec. 16, 1997).

37.     These federal agencies also have expressly acknowledged that federal law presumes that individuals can and will find work upon entry into the United States.  In 1998, for example, the State Department stated that IIRIRA's amendments to the INA did "not change[] the long-standing legal presumption that an able-bodied, employable individual will be able to work upon arrival in the United States" and thus not become a public charge. Dep't of State, Cable on I-864 Affidavit of Support: Update No. 14—Commitment to Provide Assistance, (June 8, 1998).  The Department of State explained that "[t]he presumption that the applicant will find work coupled with the fact that the [affidavit of support] is a legally enforceable contract will provide in most cases a sufficient basis to accept a sponsor's . . . technically sufficient [affidavit] as overcoming the public charge ground."  *Id.*

38.     The Board of Immigration Appeals ("BIA") has specifically held that "[t]he fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge."  *In re Perez*, 15 I. & N. Dec. 134, 137 (BIA 1974).  And in the government's appeal from a BIA decision overturning a public charge determination, then-Attorney General Robert F. Kennedy reaffirmed the point, noting that the INA "requires more than a showing of a possibility that the alien will require public support." *In re Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (BIA 1962; AG 1964).

39.     Instead, the public charge determination "should be a prospective evaluation based on the alien's age, health, income, and vocation."  8 C.F.R. § 245a.3(g)(4)(i).  And even

where an immigrant's "income may be below the poverty level," he is "not excludable" as a public charge if he "has a consistent employment history which shows the ability to support himself." *Id.* at § 245a.3(g)(4)(iii).

40.      Though a noncitizen's past acceptance of "public cash assistance" may "enter into this decision," the 1989 DOJ rule, U.S. Dep't of Justice, Final Rule: Adjustment of Status for Certain Aliens, 54 Fed. Reg. 29,442 (July 12, 1989), codified in relevant part at 8 C.F.R. §§ 245a.2(k)(4), 245a.3(g)(4)(iii), 245a.4(b)(1)(iv)(C), does not provide for consideration of non-cash public benefits. *Id.*

41.      This rule reaffirmed the understanding of a public charge as a person permanently and primarily dependent on government for survival.

**E.    Congress Has Extended Non-Cash Benefits To Immigrants Subject To The Public Charge Rule.**

42.      In 1996, Congress passed the PRWORA.  PRWORA excluded non-citizens from many federal and state cash public benefits programs, 8 U.S.C. §§ 1611(a), 1621(a), but it also ensured that non-citizens would remain eligible for numerous non-cash benefits, including emergency medical assistance, disaster relief, immunization services, and public housing and the Section 8 program, 8 U.S.C. §§ 1611(b), 1621(b).

43.      Congress subsequently took steps to ensure that certain immigrant households had access to food and nutrition programs.  For example, as a part of the reauthorization of the omnibus Farm Security and Rural Investment Act of 2002, Congress rolled back PRWORA restrictions to restore access to supplemental nutrition benefits for many non-citizen children and non-citizens receiving disability benefits. Pub. L. No. 107–171, § 4401, 116 Stat. 134 (2002). The reauthorization also provided that non-citizens who had resided in the country for more than five years would be eligible for supplemental nutrition benefits.  *Id.*

44.     Seven years later, Congress passed The Children's Health Insurance Program ("CHIP") Reauthorization Bill, which further expanded access to benefits for non-citizens, allowing states to provide Medicaid and CHIP coverage to lawfully residing non-citizen children and pregnant women during their first five years in the country.  CHIP Reauthorization Act of 2009, Pub. L. No. 111-3, § 214, 123 Stat. 8 (2009).

45.     Importantly, when repeatedly given the opportunity to alter the definition of "public charge," Congress has declined.  This left intact the understanding that these benefits are not included in its auspices.  Recent efforts to enact new laws denying immigrant access to non-cash benefits have likewise failed.  For example, the Reforming American Immigration for Strong Employment (RAISE) Act of 2017 proposed sweeping changes to the INA, including a point-based visa system. S. 1720, 115th Cong. (2017).  A substantially identical bill of the same title was introduced in 2019. S. 1103, 116th Cong. (2019).  Both bills would have restricted parents of citizen children to obtaining only temporary immigrant visas and barred them from receiving any federal, state, or local public benefits.  S. 1720 § 4(d)(2)(s)(2)(b); S. 1103 § 4(d)(2)(s)(2)(b).  Congress has not acted on either bill.

### F.     Federal Agency Guidance Conforms With Congress's Intentions With Respect To The Use Of Public Benefits By Immigrant Communities.

46.     In 1999, INS proposed a rule and issued field guidance clarifying how and when immigrants can access public benefits without being rendered a public charge.  *Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 ("1999 NPRM"); *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (May 26, 1999) ("Field Guidance").  INS published the 1999 NPRM and Field Guidance to "summarize longstanding law with respect to public charge and provide new guidance on public charge determinations."  Field Guidance at 28,689.

-15-

47.     Both the INS Field Guidance and the 1999 NPRM affirmed that "public charge"
refers to an individual "who is likely to become . . . *primarily dependent* on the Government for
subsistence, as demonstrated by either the receipt of public cash assistance for income
maintenance or institutionalization for long-term care at Government expense." 1999 NPRM at
28,677 (emphasis added).

48.     The 1999 NPRM observed that the "primary dependence model of public
assistance was the backdrop against which the 'public charge' concept in immigration law
developed in the late 1800s," and "[h]istorically, individuals who became dependent on the
Government were institutionalized in asylums or placed in 'almshouses' . . . long before the array
of limited-purpose public benefits now available existed." *Id.* at 28,677. Although DOJ never
published a final public charge rule, the Field Guidance's public charge definition and policies
were "adopt[ed] . . . immediately" and have guided DOJ—and, later, DHS—policy ever since.
*Id.* at 28,689.

49.     In 2009, DOJ issued a Public Charge Fact Sheet ("DOJ Fact Sheet"), which
confirmed the Field Guidance's definition of "public charge" to mean "an individual who is likely
to become 'primarily dependent on the government for subsistence.'" U.S. Dep't of Justice,
Public Charge Fact Sheet, 2009 WL 3453730 (Oct. 29, 2011) (quoting "Field Guidance on
Deportability and Inadmissibility on Public Charge Grounds," 64 Fed. Reg. 28689 (May 26,
1999)). The DOJ Fact sheet reiterated that "a number of factors must be considered," in the
public charge determination, "including age, health, family status, assets, resources, financial
status, education, and skills." *Id.* It also made clear that "[n]o single factor—other than the
lack of an affidavit of support, if required—will determine whether an individual is a public
charge." *Id.*

50.     The DOJ Fact Sheet makes abundantly clear that: (1) the definition of "public charge," as understood by federal agencies, has been unambiguous; (2) a public charge is an individual who is permanently and primarily dependent on government for survival; and (3) certain public benefit programs (including Medicaid and SNAP) are irrelevant to public charge determinations.

## II.     THE PROPOSED RULE.

51.     On October 10, 2018, DHS published a Notice of Proposed Rulemaking regarding the public charge ground for inadmissibility in the Federal Register.  83 Fed. Reg. 51,114-51,296.

52.     More than 250,000 comments were submitted on the Proposed Rule, "the vast majority of which opposed the rule."  84 Fed. Reg. 41,297.  Commenters comprehensively and vigorously opposed changes to: (1) the definition of "public charge"; (2)  the benefits that would be newly considered and the manner in which they would be considered;  and (3) the totality of the circumstances test, which was overhauled and made unclear by the introduction of the weighted factors.  *Id.*  Commenters also pointed out the great harms that the Proposed Rule would exact, including the public health and economic harms that would result from dramatically decreased usage of the vital programs now included for consideration.  *Id.*

53.     Numerous commenters also pointed out that the Proposed Rule would target vulnerable and protected classes, including people with disabilities, the elderly, and people of color. *Id.*

## III.     THE FINAL PUBLIC CHARGE RULE ABANDONS THE ESTABLISHED MEANING OF PUBLIC CHARGE IN CONTRAVENTION OF THE LAW AND CONGRESSIONAL INTENT.

54.     On August 14, 2019, DHS published the Final Rule in the Federal Register.  The Final Rule changes both the definition of "public charge" and the manner in which DHS makes

public charge determinations. 84 Fed. Reg. 41,292-508. Specifically, the Final Rule eliminates the "primarily dependent" definition of public charge, considers the use of non-cash benefits, and introduces weighted and heavily weighted factors to the totality of circumstances test. *Id.* at 41,294-95. Each change reflects no relationship to established, plain language understandings of what it means to be a "public charge." In fact, the Final Rule expands the definition of public charge so radically and unreasonably that approximately one-third of all U.S. born citizens would be deemed a public charge.[4]

### A. The Final Rule Abandons The Primarily And Permanently Dependent Standard.

55. The Final Rule redefines "public charge" to include an immigrant "who receives one or more public benefits" for more than 12 months in any 36-month period. 84 Fed. Reg. 41,501. In making a public charge determination, the Final Rule expands to count non-cash benefits including SNAP nutritional assistance, Medicaid, and housing assistance. *Id.* Where an individual receives more than one of these benefits in a given month, the Final Rule would consider each benefit as a separate month of receipt for purposes of determining whether the 12-month threshold has been met. *Id.* at 41,295-97. The Final Rule gives no consideration to the value of the benefit received, *id.* at 41,355, and includes no consideration of whether the receipt of benefits evidences a likelihood of long-term government dependence, or serves as a temporary measure to address immediate, short-term needs. As a result, for example, an individual could be deemed a public charge if they were to go through a temporary, four-month period of unemployment during which they sought housing, food, and Medicaid assistance. And this would be true even if the assistance obtained was of minimal value.

---

[4] Danilo Trisi, *One-Third of U.S.-Born Citizens Would Struggle to Meet Standard of Extreme Trump Rule for Immigrants*, Ctr. For Budget and Pol'y Priorities (Sept. 27, 2018), https://www.cbpp.org/blog/one-third-of-us-born-citizens-would-struggle-to-meet-standard-of-extreme-trump-rule-for.

56.     In the Final Rule, DHS acknowledges that "[s]ince 1999, the prevailing approach to public charge inadmissibility has been dictated primarily by the [Field Guidance] … Under that approach, 'public charge' has been interpreted to mean a person who is 'primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense.'" 84 Fed. Reg. 41,294-95.  DHS' drastic redefinition of public charge contradicts long-established and narrow definitions under the INA and contradicts Congress' clear intent that a person is a public charge only if he or she is primarily, and permanently, dependent on government support for subsistence, as discussed above.  In adopting this redefinition, DHS has exceeded its statutory authority and controverted well-established law.  DHS offers no rational basis for its new public charge definition and provides no evidence that this limited use of public benefits indicates long-term dependence, that is, whether the recipient will likely become a charge of the public.

57.     Defendants cited no data showing that either citizen or non-citizen immigrants use benefits at a higher rate than birthright citizens to defend this expansion. In fact, the only data Defendants cited shows non-citizens using both SNAP and Medicaid benefits at a lower level than native-born citizens. 83 Fed. Reg. 51,161. Nor do Defendants find that naturalized immigrants become dependent on public benefits at a disproportionate rate after naturalization or becoming citizens. *Id.*. Defendants do concede that the Final Rule will result in $2.27 billion less transfers from Federal to State governments due to disenrollment. *Id.* at 51,117.

58.     DHS offers no rational basis for its new public charge definition and provides no evidence that this limited use of public benefits indicates long-term dependence, that is, whether the recipient will likely become a charge of the public.

**B.    The Final Rule Is Contrary To Law Because It Greatly Expands The Public Benefits To Be Considered For A Public Charge Determination.**

59.    The Final Rule dramatically expands the scope of benefits considered for determining a public charge.  In line with well-established precedent, the Field Guidance has focused the public charge analysis on an applicant's long-term dependence on cash benefits (*e.g.*, Temporary Assistance for Needy Families ["TANF"], also known as cash welfare, and Supplemental Security Income) and institutional care and it explicitly prohibited DHS officials from considering non-cash benefits—benefits that "are by their nature supplemental and [that] do not, alone or in combination, provide sufficient resources to support an individual or family." Field Guidance at 28,692.  Without reason or authority, the Final Rule abandons this precedent and dramatically expands the list of benefits considered, with no consideration of whether the benefit used is a supplemental support or evidence of a long-term dependence on government support.

60.    By adding non-cash benefits to the public charge determination, DHS has exceeded its statutory authority to rewrite the U.S. Code.  Receipt of in-kind benefits does not make an individual a "public charge" within any reasonable definition of the statutory term.  In fact, Congress has specified that SNAP may *not* be considered against recipients as income or resources under any federal, state, or local law. *See* 7 U.S.C. § 2017(b). While Congress has repeatedly considered changing the statutory definition of public-charge inadmissibility to consider non-cash benefits like SNAP, Medicaid, and housing assistance, it has rejected every such proposal. This history demonstrates Congress's understanding that a *statutory* change would be necessary to achieve the radical revision of immigration laws that the Final Rule contemplates; the Final Rule's new interpretation of "public charge" cannot be reconciled with the plain meaning of the statute that Congress enacted.

### C. The Final Rule Alters The Totality Of Circumstances Test In A Manner That Is Unlawful And Contrary To Congressional Intent.

61.     Section 212(a)(4) of the INA requires DHS to look at an individual's "totality of circumstances" when considering whether they are inadmissible on public charge grounds, specifying at a minimum that the agency consider the individual's "age; health; family status; assets, resources, and financial status; and education and skills."  8 U.S.C. § 1182(a)(4).   In requiring this comprehensive assessment, the INA requires a case-by-case assessment of each applicant, and prohibits using the "existence or absence of a particular factor" as the "sole criterion" for determining whether an individual is likely to become a public charge.  *See* Field Guidance at 28,690.

62.     The Final Rule impermissibly dictates that certain specific factors, including factors not found in the law, be afforded great, functionally prescriptive weight, ignoring the statutory mandate of a totality of the circumstances analysis.   Specifically, the Final Rule identifies factors that are to be given negative, heavily negative, positive and heavily positive weights in determining the likelihood of an applicant "becoming a public charge at any time in the future," *i.e.*, "whether the alien is more likely than not at any time in the future to receive one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period."  84 Fed. Reg. 41,502-04.

63.     Factors to be weighed negatively include: (1) age, specifically if the individual is under 18 or over 62; (2) health, including any medical condition that will interfere with the individual's ability to work or attend school at any time in the future; (3) income below 125 percent of the Federal Poverty Guideline; (4) assets and resources, including whether the individual may have medical costs that they cannot cover without Medicaid; (5) if the individual has "applied for, been certified to receive, or received public benefits"; (6) skills, including

whether the individual is not proficient in English; and (7) if the individual has a large family. *Id.*

64.     Factors that the Final Rule requires to be given "heavily negative" weight include: (1) lack of employment; (2) receipt or approval for one or more public benefits for more than 12 months within the 36 months preceding an application (with each benefit received counting separately for purposes of calculating the 12 months); (3) diagnosis with a medical condition that will "interfere with" the individual's ability to work or attend school where the individual does not have private insurance; and (4) a previous finding of inadmissibility. 84 Fed. Reg. 41,504.

65.     Heavily weighted positive factors simply include income, assets, resources and support in excess of 250 percent of the Federal Poverty Guideline, and private health insurance, provided that the insurance does not include tax credits provided under the Patient Protection and Affordable Care Act. *Id.* All combined, these weighted factors create a web of complexities that in many cases will lead to inconsistent and arbitrary enforcement.

**D.     The Final Rule Unlawfully Discriminates Against People With Disabilities By Asserting That Their Disability Alone Makes Them A Public Charge.**

66.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits federal agencies and entities that receive federal funding from discriminating against people with disabilities, regardless of whether the discriminatory impact is intended. Thus, Section 504 reaches government action that, either through purpose or effect, discriminates against individuals with disabilities.

> A recipient [of federal funds] may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons . . . .") (emphasis added).

28 C.F.R. § 41.51(b)(3).[5]

67.     In violation of Section 504, the Final Rule assigns heavy negative weight to medical conditions that "will interfere with" an individual's ability to work or attend school. 8 C.F.R. § 212.22(b)(2)(i). In so doing, however, the Final Rule gives no consideration to the fact that many people with disabilities successfully work and attend school with reasonable accommodations. *See generally id.*

68.     The Final Rule also violates Section 504 by assigning heavily negative weight to the receipt of Medicaid. For many people with disabilities, Medicaid is essential because it is the only insurance that provides sufficient coverage for certain forms of vital care and medical equipment for people with disabilities seeking independence and self-sufficiency.[6] This is true regardless of income. Thus, the Final Rule discriminates against people with disabilities both by virtue of their disability and for their use of the only available health care insurance that meets their needs – Medicaid. Together, these would count as two heavily negative factors and make a finding of inadmissibility highly likely for people with disabilities.

## IV.     HARMS AS A RESULT OF THE PUBLIC CHARGE FINAL RULE.

### A.     The Final Rule Will Have A Broad Chilling Effect On Public Benefits Enrollment.

69.     As a direct result of the Final Rule, and fear that they will be labeled a public charge, or labeled as likely to become a public charge, millions of immigrants including many Cook County residents, ICIRR clients, and ICIRR member organization clients will be confused and frightened about the consequences of using benefits and will disenroll from them or forgo

---

[5] The Rehabilitation Act, 29 U.S.C. § 701, et seq., applies to federal government agencies as well as organizations that receive federal funds. *See, e.g.*, Wis. Cmty. Servs. V. City of Milwaukee, 465 F.3d 737, 746 (7th Cir. 2006).
[6] See *Medicaid Works for People with Disabilities*, CTR. ON BUDGET AND POL'Y PRIORITIES (Aug. 29, 2017), https://www.cbpp.org/sites/default/files/atoms/files/8-29-17health.pdf.

them altogether.[7]  This is in significant part due to the fact that the Final Rule is contradictory and complex, and thus impermissibly invites arbitrary and discriminatory enforcement by immigration officials.

70.     Many of these immigrant families will not in fact be subject to the public charge inquiry, but nonetheless will disenroll due to fear or lack of understanding as to how the Final Rule operates, forgoing benefits that their tax dollars support and to which they are legally entitled.

71.     DHS is well aware that the Final Rule will have a substantial chilling effect on enrollment in benefits programs. DHS estimates that the Final Rule will lead to a 2.5 percent disenrollment from SNAP, Medicaid, and housing assistance, programs it explicitly now covers. 84 Fed. Reg. 41,463.  In absolute numbers, DHS estimates that "324,438 individuals who are members of households with foreign-born non-citizens and about 9,632 households with at least one foreign born non-citizen will choose to disenroll from or forego [sic] enrollment in a public benefits program."  84 Fed. Reg. 41,463.

72.     While the harms of this level of disenrollment would be massive, DHS significantly underestimates the Final Rule's chilling effect, *i.e.*, its impact on forgone benefits. Independent experts predict that disenrollment actually will occur at a rate of between 15 and 35 percent, *i.e.*, a rate 6 to 14 times greater than DHS predicts.[8]  Such an impact will be devastating to those families that use benefits programs, as well as to Plaintiffs.

---

[7] Samantha Artiga, Rachel Garfield, & Anthony Damico, *Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid*, THE HENRY J. KAISER FAM. FOUND. (Oct. 11, 2018), https://www.kff.org/disparities-policy/issue-brief/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and-medicaid/;  "*Only Wealthy Immigrants Need Apply": How a Trump Rule's Chilling Effect Will Harm the U.S.*, FISCAL POL'Y INST. (Oct. 10, 2018), http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf.

[8] Samantha Artiga, et. Al., *Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid*, The Henry J. Kaiser Fam. Found. (Oct, 18, 2018), https://www.kff.org/disparities-policy/issue-brief/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and-medicaid/; :*Only Wealthy Immigrants Need Apply*":

73.     Immigrants will likely forgo public benefits because it is simply too hard to ascertain the risk of using public benefits from the plain reading of the Final Rule.

74.     Indeed, this chilling effect has already begun. The City of Chicago Department of Public Health has documented a decrease in patients at its immunization clinics since the publication of the Proposed Rule.[9]  This has corresponded with a decrease in patients with Medicaid and an increase in uninsured patients.  Id.

75.     According to press reports, health centers, physician practices, and other agencies have also seen patients requesting disenrollment from benefits due to concerns about DHS's changes to the public charge doctrine.[10]

76.     If it is allowed to go into effect on October 15, 2019, the Final Rule will exacerbate this chilling effect and the number of immigrants forgoing critical and sometimes life-saving public benefits will increase.

**B.     The Final Rule's Chilling Effect Will Harm Public Health.**

77.     The Final Rule will endanger health insurance coverage and access to nutritional, housing, and other important supports for a substantial number of Cook County residents and ICIRR member organization clients, causing significant harm to the public health.

---

*How a Trump Rule's Chilling Effect Will Harm the U.S.* Fiscal Pol'y Inst. (Oct, 10, 2018), http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf;

[9] City of Chicago, Comment Letter on Proposed Final Rule on Inadmissibility on Public Charge Grounds, 10-11 (Dec. 10, 2018), https://www.regulations.gov/document?D=USCIS-2010-0012-50648.

[10] Illinois Chapter of the American Academy of Pediatrics, Comment Letter on Proposed Final Rule on Inadmissibility on Public Charge Grounds (Dec. 10, 2018), https://www.regulations.gov/document?D=USCIS-2010-0012-63585. Health Justice Project, Beazley Institute, Loyola University Chicago School of Law, Comment Letter on Proposed Final Rule on Inadmissibility on Public Charge Grounds, 2 (Dec. 10, 2018), ttps://www.regulations.gov/document?D=USCIS-2010-0012-54996. Prairie State Legal Services, Comment Letter on Proposed Final Rule on Inadmissibility on Public Charge Grounds, 1 (Dec. 10, 2018), https://www.regulations.gov/document?D=USCIS-2010-0012-45064. (citing Schencker, Lisa. Chicago Tribune. "Illinois doctors say Trump immigration proposal already scaring away patients." Dec. 2, 2018, available at https://www.chicagotribune.com/business/ct-biz-immigration-proposal-scaring-people-from-medicaid-1202-story.html).

78. By deterring participation in Medicaid, CHIP, and other health insurance programs made available by federal law the Final Rule also undermines Cook County's interest in improving both short- and long-term health and advancing public health interests for both immigrants and citizens, because it will decrease preventative primary care access among immigrant communities.

79. Lack of access to primary care not only puts the health and well-being of non-citizens at risk, but it also jeopardizes the County's ability to provide for the well-being of its communities. Because uninsured persons are less likely to receive immunizations,[11] there is an increased risk of vaccine-preventable diseases to the entire community. Additionally, Cook County is concerned that residents will fail to seek testing and treatment for communicable diseases, leading to poor health outcomes and increasing the risk of disease transmission.

80. The Final Rule's inclusion of housing assistance programs and its overall chilling effect on seeking public assistance will discourage individuals and families from participating in affordable housing programs. Individuals deterred from participating in housing programs because of the Final Rule will face substantial challenges in finding affordable housing and avoiding homelessness.

81. Specifically, once an individual forgoes housing because of the Final Rule, it will be very difficult for such an individual to reenroll in housing programs to receive the benefits they once had. For example, all federal housing programs in Cook County have waiting lists, and once individuals terminate their housing benefits, they may not be able to return to their old apartment or neighborhood.[12]

---

[11] Lu, P. J., O'Halloran, A., Williams, W. W., Impact of health insurance status on vaccination coverage among adult populations. American Journal of Preventive Medicine, Vol. 48 Issue 6, 647-61 (2015).
[12] *See, e.g.*, Housing Authority of Cook County, *Housing Choice Voucher Program Administrative Plan*, 58–65 (2018), *available at* http://thehacc.org/wp-content/uploads/2016/06/HACC-Admin-Plan-2018-Final.pdf.

82.     Further, housing insecurity creates negative health impacts. Scarce affordable housing can cause families to cohabitate in crowded, multi-family households, which can have negative health effects from overcrowding and stress.[13] It is significantly more expensive to provide health care for individuals who are housing insecure.  Housing insecure individuals make more frequent use of emergency departments, have long stays when admitted and have higher rates of readmission, all of which lead to increased health care costs.[14]

**C.     The Final Rule's Chilling Effect Will Directly Harm Cook County.**

83.     The Final Rule's chilling effect will, in particular, directly harm Plaintiff Cook County.

84.     For over 180 years, Cook County has provided care to all county residents regardless of their ability to pay, insurance status, or immigration status.  Cook County Health ("CCH") is one of the largest public hospital systems in the nation, serving the residents of the second most populous county in America.

85.     Pursuant to the "Ordinance Establishing the Cook County Health and Hospital Systems" (the "Enabling Ordinance"), CCH "*shall*: (1) Provide integrated health services with dignity and respect, regardless of a patient's ability to pay…" Ord. No. 08-O-35, 5-20-2008, Sec. 38-71(a)(1) (emphasis added).

86.     Patient services are delivered at CCH hospitals, regional outpatient centers, and community-based health centers located throughout Cook County; a comprehensive HIV and

---

[13] Megan Sandel et al., Unstable Housing and Caregiver and Child Health in Renter Families, 141 Pediatrics 1 (2018), http://pediatrics.aappublications.org/content/141/2/e20172199; *see also* Will Fischer, Research Shows Housing Vouchers Reduce Hardship and Provide Platform for Long-Term Gains Among Children, Center on Budget and Policy Priorities (October 7, 2015), https://www.cbpp.org/research/housing/research-shows-housing-vouchers-reduce-hardship-and-provide-platform-for-long-term; Linda Giannarelli et al., Reducing Child Poverty in the US: Costs and Impacts of Policies Proposed by the Children's Defense Fund (Jan. 2015), http://www.childrensdefense.org/library/PovertyReport/assets/ReducingChildPovertyintheUSCostsandImpactsofPoliciesProposedbytheChildrensDefenseFund.pdf.

[14] Kushel, M. B., Vittinghoff, E., Haas, J. S. (2001). Factors Associated with the Health Care Utilization of Homeless Persons. *Journal of the American Medical Association*, 285(2), 200-206. doi: 10.1001/jama.285.2.200.

infectious disease center; and correctional health facilities at the Cook County Jail and Juvenile Temporary Detention Center. CCH also includes the Cook County Department of Public Health, which serves most of suburban Cook County, and CountyCare, the largest Medicaid managed care plan serving Cook County Medicaid beneficiaries.

87.     CCH is the largest safety-net provider of health care in the region, providing care for hundreds of thousands of patients. In fiscal year 2018, patient volumes at CCH included 142,735 Emergency Department visits; 29,117 inpatient observation visits; 873,822 outpatient registrations including 217,152 primary care visits and 334,901 specialty care/diagnostic procedure visits; and 93,435 correctional health visits.

88.     CCH is the largest provider of care to uninsured and underinsured individuals in Illinois, providing $500 million in uncompensated care each year. In 2018, 42.5 percent of its patients were uninsured. Only 4.4 percent of its patients were commercially insured, while 35.4 percent used Medicaid, and 15.9 percent used Medicare. CCH also operates CareLink, a program that provides access to high quality health care for un-insured and underinsured Cook County residents who are not otherwise eligible for public or affordable health insurance. As of June 30, 2019, CareLink had 33,037 enrollees.

89.     The Final Rule's frightening, confusing, and unpredictable application will lead to disenrollment from benefits, harm to public health, harm to the Cook County economy, and increased direct and administrative costs to the County and its agencies. Specifically, Plaintiff Cook County will suffer harm from: (1) loss of revenue to CCH and the CountyCare insurance plan, as well as increased uncompensated care costs to CCH, jeopardizing the fiscal stability of the health system and threatening the healthcare safety net serving the entire County; (2)

increased burden on its Health Department and Housing Authority, and (3) fiscal losses due to reduction in federal funds supporting the County economy.

90.     CCH frontline staff members have reported that clients have disenrolled from or expressed reluctance to enroll in public benefits and services due to fear of changes in the public charge definition and determination.[15]  Immigrants have already expressed concern and hesitancy to CCH staff when applying for Medicaid and other public benefit programs, including programs that are not part of the final rule, such as the Women, Infant and Children (WIC) program and the AIDS Drug Assistance Program.

91.     In fact, comparing the first eight months of 2018 with the same period of time in 2019:

    i.    there has been an across-the-board increase in ambulatory, observation, emergency and inpatient patients who are "self-pay" instead of covered by a third party payment source, such as private or public insurance;

    ii.   there has been a corresponding increase in the percentage of uninsured patients; and

    iii.  there has been a corresponding decrease in the percentage of Medicaid-covered patients.

92.     Increases in disenrollment will further strain CCH finances through a loss in Medicaid reimbursement and an increase in uncompensated care costs.  CountyCare is the largest provider of Medicaid-managed care within Cook County, with its membership constituting approximately one-third of all Medicaid managed care members in the County.  Thus, statistically, one-third of all eligible persons who disenroll or elect not to enroll in Medicaid

---

[15] John Jay Shannon, Comment Letter on Proposed Rule on Inadmissibility on Public Charge Grounds, 5 (Dec. 7, 2018), https://www.regulations.gov/document?D=USCIS-2010-0012-38001.

managed care would be CountyCare members, and CCH will lose the per member/per month capitation payment from the State for those members.

93.        As CCH also provides approximately 50% of all charity care in Cook County, there is a 50% chance uninsured patients will seek their medical care from CCH, with no reasonable ability to pay for it.  Thus, CCH will lose revenue from not being able to enroll those members, and will still wind up expending funds to treat a significant portion of those patients without having a source to reimburse it for their care.

94.        CCH estimates that if 20 percent of potentially affected Medicaid enrollees were to drop their health insurance, over 7,300 individuals who receive their care or coverage from CCH would become uninsured and CCH would face a significant financial loss as a result in the first year of the Final Rule being in effect, both from a loss in Medicaid reimbursement and an increase in uncompensated care expenses.

95.        By the end of the current fiscal year, which ends on November 30, 2019, CCH estimates that it will spend $544 million on uncompensated care, which is an 8% increase from the last fiscal year, a 73% increase from 2014, and the highest expenditure since early expansion of Medicaid in Cook County began in 2012/2013.

96.        CCH's ability to provide high-quality care to **all** is inextricably connected to its ability to bill patients who have insurance for services. A decrease in the number of insured patients, combined with an increase in the number of uninsured patients, will damage the financial stability CCH has achieved as a result of the Affordable Care Act and Medicaid expansion, and jeopardize its ability to continue serving its mission, including the operation of and recent enhancements to the CareLink program.

97.     Based on an analysis that was prepared on behalf of America's Essential Hospitals and other trade associations by Manatt Health,[16] and per CCH's subsequent discussions with America's Essential Hospitals, the effects of the Final Rule and the accompanying chilling effects are estimated to result in an annual loss of $30 million in Medicaid reimbursement to CCH.[17]

98.     Accordingly, the Final Rule will shift the costs of health care from the federal government to Cook County. Moreover, the health care costs Cook County will bear will increase overall and cause significant financial strain on its institutions. Because individuals without health insurance wait longer to seek care, the care they eventually receive from emergency rooms is more costly.

99.     If the Final Rule is implemented, CCH also expects to face increased costs for clinic services resulting from uncompensated care due to its obligation to provide certain types of care regardless of a patient's ability to pay; this may be compounded by an influx of uninsured patients.

100.     Because Medicaid and other health insurance programs offered through the marketplace have made health insurance more affordable, the number of uninsured residents of Cook County has decreased. In 2012, the uninsured rate was 19 percent—in 2018, the rate was 10 percent. The Final Rule will reverse this progress.

101.     Cook County will also be responsible for the substantial financial burden of increased health care costs associated with the decline in SNAP and WIC usage.  Nearly 14% of

---

[16] Cindy Mann, April Grady, & Allison Orris, *Medicaid Payments at Risk for Hospitals Under the Public Charge Proposed Rule,* MANATT HEALTH 1, 19 (November 2018) *available at* (https://www.manatt.com/Manatt/media/Documents/Articles/Medicaid-Payments-at-Risk-for-Hospitals-Under-the-Public-Charge-Proposed-Rule_Manatt-Health_Nov-2018.PDF).

[17] America's Essential Hospitals & Manatt Health, *Projected Impact of Public Charge Proposal on Hospital Payments* (November 2018).

CCH's adult primary care patients report food insecurity. Cook County has close to 200,000 households with at least one immigrant receiving benefits that provide them with proper nutrition; access to education and job training programs; ability to care for their children; and adequate housing.[18] Children who grow up with resulting higher rates of disease and malnutrition will likely need to rely on health care provided by state governments, and thus care provided by CCH, to treat these long-term issues.

102. The Final Rule will reduce the overall economic output of Cook County, as reduced access to healthcare makes the workforce less healthy and productive. Access to affordable health insurance helps workers to enter and remain in the workforce.[19] Workers with health insurance miss approximately 75% fewer work days and are more productive at work than their uninsured peers.[20]

103. Cook County's tax revenues are also likely to decrease substantially as a result of the Final Rule, as eligible immigrants will disenroll from public benefit programs, which in turn will limit their full participation in the workforce and economy. On average, an immigrant in the United States currently pays $900 more per individual in tax revenue than they collect in public expenditures.[21] Cook County will be forced to provide additional support to immigrants as a result of the Final Rule with significantly less money due to reduced tax revenues.

---

[18] https://www.regulations.gov/document?D=USCIS-2010-0012-56024 (Cook County President public comment).
[19] Larisa Antonisse and Rachel Garfield, The Relationship Between Work and Health: Findings from a Literature Review, Kaiser Fam. Found. (Aug. 7, 2018), https://tinyurl.com/KKFRelationship-work-health.
[20] Allan Dizioli and Roberto Pinheiro, Health Insurance as a Productive Factor, 40 Labour Econ. 1-24, (June 2016), https://www.sciencedirect.com /science/article/abs/pii/S0927537116300021
[21] Nat'l Academies. Sci., Engineering, Med., The Economic and Fiscal Consequences of Immigration, 524 (2017), https://doi.org/10.17226/23550; Sang V. Nguyen and Alice Zawacki, Health Insurance and Productivity: Evidence from the Manufacturing Sector, Ctr. for Econ. Studies, U.S. Census Bureau, Working Papers (Jan. 2009), https://tinyurl.com/Health-Insur-Productivity.

104.     The Final Rule will also impose significant additional programmatic and administrative burdens on Cook County agencies that administer many of the programs that are included in the public charge analysis or will be implicated by the Final Rule's chilling effect.

105.     These agencies will no longer be able to consistently rely on systems in which they have invested to streamline benefits enrollment to ensure individuals can enroll in the variety of programs for which they are eligible.

106.     Moreover, these agencies will have to expend time to process increased disenrollment requests and to process fear-based disenrollment followed by subsequent re-enrollment.

107.     Cook County will also need to undertake significant efforts to train staff and educate the public on the complexities of the Final Rule. CCH has already directed resources to better understanding the rule and creating education materials for staff and patients. Indeed, although DHS significantly underestimates the costs of familiarizing individuals with the Final Rule, it acknowledges these costs exist. 84 Fed. Reg. 41,467 & 41,488.

108.     Specific costs CCH will incur to implement the Final Rule include costs for staff training, outreach, preparation of materials, and additional financial counseling and legal services to support its patients. CountyCare, the managed care plan owned by CCH, will similarly experience a negative financial impact related to decreased enrollment and the cost of implementation.

109.     The Final Rule creates unnecessary and unwelcome tension between immigrant patients and CCH as a health care provider.  It will create fear of registering for programs and reporting to appointments, thereby causing many immigrants to avoid seeking treatment for cases other than emergencies. Inspiring fear and distrust among immigrant communities will

wreak havoc on one of the country's largest public hospital systems. The likely decline in preventive treatment and increase in costly emergency services will have detrimental effects on the health system for immigrants and non-immigrants alike, including the U.S. citizen minor children of immigrants and these effects will endure for many years to come.

### D. The Final Rule's Chilling Effect Frustrates The Mission Of Plaintiff ICIRR And Its Member Organizations And Requires Them To Divert Resources To Address Its Harms.

110. The Final Rule's destructive and discriminatory consequences also will directly and in particular frustrate ICIRR's and its member organizations' missions to provide health and social services to immigrant Illinoisans.

111. ICIRR is a membership-based organization representing nonprofit organizations and social and health service providers throughout Illinois that deliver and seek to protect access to health care, nutrition, housing, and other services for immigrants, including immigrants of color, regardless of their immigration status or financial means.

112. For example, in partnership with the Illinois Department of Human Services, ICIRR operates the Immigrant Family Resource Program, working with 53 partner organizations to educate immigrants about their public benefit eligibility, assist with interpretation at public aid offices, and manage cases of immigrant families who apply for benefits. ICIRR's partner organizations in this Program are paid by reimbursement depending upon what case management and benefits enrollment they are able to offer immigrants.

113. ICIRR also operates the Immigrant Healthcare Access Initiative ("IHAI"), which works to increase access to care and improve health literacy for tens of thousands of low-income uninsured immigrants in Illinois, in order to reduce reliance on emergency room care and to improve overall public health. As a part of that initiative, ICIRR leads the Illinois Alliance for Welcoming Healthcare, where more than 25 providers and 20 organizations throughout the state

convene to track, discuss, and create health-related best practices in an immigrant context for health providers including hospitals and clinics. ICIRR also leads the Healthy Communities Cook County ("HC3") coalition, which seeks to address and mitigate the barriers to accessing healthcare for the uninsured, regardless of immigration status, through policy and systems change.

114. In the Spring of 2018, in direct response to the anticipated threat of the Proposed and Final Rule and the growing fear and confusion within immigrant communities, ICIRR co-founded the Protecting Immigrant Families-Illinois coalition ("PIF-IL"). PIF-IL was created specifically to: (1) resist the proposed harmful changes to the public charge test; and (2) provide assistance and accurate information to immigrant communities seeking to safely make use of public benefits for which they are eligible. In addition to serving on PIF-IL's Steering and Executive Committees, ICIRR co-chairs its Outreach Subcommittee. As a PIF-IL founding member, ICIRR devotes substantial resources to, among other efforts, educating individuals, service providers, elected officials, and other constituencies about the public charge test and the related rule. ICIRR has also dedicated substantial resources to urging units of local government to adopt resolutions that call upon DHS to immediately withdraw the proposed changes to the rule because of the great harms they have created, and will continue to create.

115. In response to the Final Rule, ICIRR staff have had to re-direct their work planning, budgets, and staff time — amounting to more than 235 hours — away from their proactive mission and towards defensive PIF-IL activities to: (1) educate immigrant communities about the Final Rule in an attempt to prevent immigrant households from foregoing benefits and services out of fear and misunderstanding of the Final Rule; (2) expand their outreach and education to immigrant communities to encourage people unaffected by the Final Rule to

continue to enroll in TANF, SNAP and Medicaid benefits for which they are eligible; and (3) to train IFRP case managers on public charge so that they can provide accurate information to people concerning the potential impact of public benefits on their potential to adjust. ICIRR estimates a total diversion of staff time and resources to public charge activities in the amount of $100,000 to date, including unplanned overtime, over 50 trainings and other community events. ICIRR will continue to divert a comparable amount of resources in the future to mitigate the harm caused by the Final Rule once implemented.

116.     In this manner, the Final Rule has already forced, and will continue to force, ICIRR and its members to divert resources from planned work.  As a direct result of the Final Rule, ICIRR was forced to abandon planned activities and divert those resources to educating immigrant communities about the Final Rule and ensuring that immigrant households do not unduly forgo critical services.  ICIRR has also provided overtime pay to staff who give public education trainings so that the communities ICIRR serves receive sufficient and accurate information about the Final Rule.

117.     Immigrant families who are served by ICIRR and its members have been disenrolling from public benefit programs, such as TANF, SNAP, and Medicaid, since the initial leaks about the proposed Final Rule began in January 2017, based on fears that using those programs, made available to them by federal law, will affect their future immigration relief options. Individuals have refrained and will continue to refrain from seeking health services, food, and other programs for themselves and their children, based on fears that using those benefits will prevent them from adjusting status. If the Final Rule is implemented, ICIRR expects even more immigrants to refrain from seeking Medicaid and other necessary health services, food, and other programs for themselves and their children, based on fears that using those

benefits will prevent them from adjusting status. Losing access to critical health and nutrition services will have long-term harms for the clients of ICIRR and its member organizations, frustrating the mission of ICIRR and its member organizations.

118.    Plaintiff ICIRR and its members also will be forced to continue expending their limited resources to address the broad chilling effect on public benefits enrollment that the Final Rule is designed to have. As a direct result of the Final Rule, ICIRR staff work plans have had to change, and staff have spent considerable time developing fact sheets, slide presentations, and other materials for community members, service providers, immigration attorneys, and other constituencies. ICIRR staff have also spent significant time coordinating with partners to ensure that immigrant families and the agencies that serve them are educated about the Final Rule and to respond to questions about the Final Rule and concerns about enrolling in or remaining enrolled in public benefits. ICIRR has had to forgo time spent on healthcare trainings that inform immigrants about their rights to health care and other public benefits such as SNAP, and has diminished ability to provide individualized assistance to immigrants seeking health care and SNAP consistent with its mission. ICIRR has had to spend time and resources fundraising to support its work responding to the Final Rule, and has had to reallocate existing resources to cover the costs of these new activities in response to the Final Rule, including paying certain staff overtime pay.

119.    ICIRR expects this diversion of resources to continue, and likely increase, should the Final Rule go into effect. ICIRR will have to continue to divert considerable resources to responding to concerns of members and immigrant households about the Final Rule because it provides virtually no guidance on difficult decisions such as: (1) whether to pursue public benefits to meet their needs; (2) how to mitigate the Final Rule's negative view of an individual

who has a medical condition and/or disability; (3) how to mitigate the Final Rule's negative treatment of an individual of limited English proficiency; (4) how to mitigate the Final Rule's negative treatment of an individual who, despite working full-time, has household income less than 125 percent of the federal poverty guideline; (5) whether to spend money on necessities or to allocate earnings to asset building; (6) whether to choose to leave the United States or live apart from their spouse as a result of the public charge's new weighted factors of the public charge test;[22] or even (7) whether to have another child or welcome a family member into their household since adding the financial responsibility of an additional family member under the Final Rule may jeopardize their ability to pursue a permanent place in the United States.

120.    The amount of resources marshaled to this issue are causing and will continue to cause ICIRR and its members to serve fewer clients and work less on issues connected to their mission, and instead spend time and resources challenging and responding to the harmful effects of the Final Rule.

121.    Indeed, within ICIRR's Immigrant Family Resource Program, declines in immigrant public benefits enrollment have already occurred.  These declines have in turn strained the resources of the Program because it is funded on a reimbursement model.  ICIRR and the Immigrant Family Resource Program are at the same time facing an overwhelming increase in requests for assistance with disenrollment.

122.    Additionally, because Plaintiff ICIRR receives a portion of the grant funding and its partner organizations receive per person funding for enrollment and case management in TANF, SNAP, and Medicaid, they face the loss of reimbursement as a result of declining

---

[22] In the analysis of one public commenter, 54% of foreign-born spouses who are currently eligible for green cards would become ineligible under the Rule's higher income threshold. Paul Hughes, Boundless Immigration Inc., Comment Letter on Proposed Final Rule on Inadmissibility on Public Charge Grounds, 48 (Dec. 10, 2018), https://www.regulations.gov/document?D=USCIS-2010-0012-50974.

enrollment directly caused by the Final Rule. Additionally, case managers at ICIRR and its member organizations have had to increase their outreach and education to immigrant communities to still encourage them to enroll in TANF, SNAP, and Medicaid. ICIRR and its members also have had to train case managers on public charge so that they can provide accurate information to clients concerned that the receipt of public benefits will deem them a public charge.

123.     In June 2019, ICIRR conducted a survey of its members to document the impact of the Final Rule on its members and the individuals they serve. From responses to that survey, ICIRR ascertained the substantial harms of the Final Rule for ICIRR and its members.  These harms are evidenced in the experiences of the Immigrant Migrant Council, a member of ICIRR that works to enroll immigrants in public benefits programs. On a monthly basis, the Immigrant Migrant Council has seen 21 to 30 of its clients disenroll from SNAP, Medicaid, and WIC out of fear that proposed changes to the public charge doctrine will harm their immigration status and options.  To deal with the fallout from the Final Rule's promulgation, the Immigrant Migrant Council has had to devote three staff members to spending ten hours per week on public charge.

124.     YWCA Northwestern Illinois is another member of ICIRR that has experienced and will continue to experience direct harm due to the chilling effect of the Final Rule and prior proposals. YWCA Northwestern Illinois assists clients with public benefits such as TANF, SNAP, and Medicaid.  On a monthly basis, the YMCA has had clients withdraw from or choose not to apply for public benefits as a result of proposed public charge changes. To deal with this fallout, staff members at YWCA Northwestern Illinois have had to spend additional time explaining public charge to their clients and have faced additional difficulties when assisting

immigrants who wish to access public benefits to improve their chances to gain or sustain employment.

125.    Erie Neighborhood House is a member of ICIRR that has experienced and will continue to experience direct harm due to the chilling effect of the Final Rule.  Erie Neighborhood House assists clients with public benefits such as SNAP and Medicaid and, on a monthly basis, has had clients withdraw from or choose not to apply for SNAP or Medicaid (for themselves and their children) as a result of proposed public charge changes.  Erie Neighborhood House has had five staff members devote approximately five hours per week to dealing with the fallout from the Final Rule and prior proposals, for a total of about 1,000 staff hours thus far.

126.    HANA Center is another member of ICIRR that has experienced and will continue to experience direct harm due to the Final Rule.  HANA Center's mission is to empower Korean American, immigrant, and multi-ethnic communities through social services, education, culture, and community organizing to advance human rights.  HANA Center assists clients with benefits enrollment issues including for SSI, WIC, SNAP, Medicaid, CHIP, MSP, LIS, LIHEAP, Weatherization, and Unemployment Compensation.  On a monthly basis, HANA Center  clients have been withdrawing from or choosing not to enroll in benefits.  Because of the Final Rule, the HANA Center has had to cut programs and services, such as its Breast Cancer Early Detection Program, so that its staff can spend more time working to address client concerns about the Final Rule. Additionally, in the HANA Center's Senior Health and Public Benefit Department, staff workloads have increased by 20% due to time spent in trainings and meetings, and answering client questions regarding the Final Rule.

127.    Hispanic American Community Education and Services ("HACES") is a member of ICIRR that has experienced and will continue to experience direct harm due to the

promulgation of the Final Rule. HACES's mission as an organization is to assist immigrant community members with achieving their individual and collective goals to foster their prosperity and harmony with the larger community as a whole. HACES assists clients with public benefits programs and has seen 11 to 20 clients each month disenroll from or choose not to enroll in Medicaid, SNAP, WIC, TANF, or subsidized housing due to proposed public charge changes. To deal with the fallout from the Final Rule's promulgation, HACES has had to have at least three staff members spend extra time conducting outreach and educational sessions to inform the community about the Final Rule.

128.     The Final Rule will frustrate ICIRR's mission by directly restricting the number of immigrants from majority non-white countries who will be able to adjust to lawful permanent resident status or maintain or change their non-immigrant immigration status due to the public charge test, thus eliminating essential pathways for this population to obtain lawful permanent resident status.

129.     ICIRR also has clients who receive Medicaid, SNAP, and other public benefits. ICIRR will be forced to divert its resources to combat the chilling effects and discriminatory message of the Regulation, forcing the organization to spend less time on its other areas of work and to reduce the overall number of projects the organization can take on.

130.     As a direct result of Defendants' actions, ICIRR has had to withdraw staff resources from its Healthy Communities Cook County coalition to address the harmful effects of the Final Rule, reducing the progress the coalition has been able to make in expanding access to health coverage in Cook County. ICIRR expects this resource re-direction to continue in the future.

131.     ICIRR has also had to withdraw staff resources from the Alliance from Welcoming Healthcare in order to deploy those resources to combat the impact of the Final Rule and expects this diversion to continue in the future.

### E.     The Final Rule's Weighted Circumstances Test Discriminates Against Immigrants Of Color.

132.     The Final Rule will disproportionately disqualify non-white immigrants from adjusting their status. In 2016, 25.9 million non-citizen immigrants earned less than 250 percent of the federal poverty guidelines.[23]   Of those, just under 90 percent were non-white (23.3 million).[24] The disproportional impact is even clearer when examining the percentage of each race or ethnicity that earns more than 250 percent of the federal poverty guidelines, a heavily weighted positive factor under the Final Rule.  White non-citizen immigrants had the highest percentage at 58.5 percent attaining or exceeding 250 percent of the federal poverty guideline. Asian immigrants followed at 56.3 percent, then Black immigrants at 38.8 percent, and Latinos immigrants at 24.9 percent. *Id.*

133.     In 2017, under the Field Guidance, DHS reported that approximately 50.8 percent of people gaining legal permanent resident status through family re-unification bases came from majority-non-white regions.  The Final Rule will overwhelmingly harm non-white immigrants. Of the 25.9 million immigrants who will be affected by the Final Rule, 23.3 million are non-white.

---

[23] Office of Immigration Statistics, U.S. Dep't of Homeland Sec., 2017 Yearbook of Immigration Statistics 27 tbl. 10 (July 2019), https://www.dhs.gov/sites/default/files/publications/yearbook_immigration_statistics_2017_0.pdf
[24] Custom Tabulation by Manatt Phelps & Philips LLP, Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard, (Oct. 11, (2018), https://www.manatt.com/Insights/Articles/2018/Public- Charge-Rule-Potentially-Chilled-Population (using 2012-2016 5-Year American Community Survey Public Use Microdata Sample (ACS/PUMS); 201220162012-201620162016 5-Year American Community Survey (ACS) estimates accessed via American FactFinder; Missouri Census Data Center (MCDC) MABLE PUMA-County Crosswalk
[24] Randy Capps, Mark Greenberg, Michael Fix & Jie Zong, Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration, MIGRATION POL'Y INST., 9 (Nov. 2018), https://www.migrationpolicy.org/research/impactdhs-public-charge-rule-immigration

134.     Cook County residents are racially diverse. Of its over 5 million people, 1.2 million are African American, 1.3 million are Latino, and about 500,000 are Asian, American Indian, or multiracial. Cook County is home to more than one million immigrants, integrated in every city, township, neighborhood and community. As with the rest of Illinois, the most common origins of these residents are Mexico and India.

135.     CCH patients likewise represent the demographics of the County. CCH's diverse patient body identifies as approximately 51 percent African-American/Black and 32 percent Hispanic/Latino.

136.     The Final Rule's weighted circumstances test favors white immigrants, and thus disfavors non-white immigrants. Sixty percent of green card applicants from Mexico and Central America and 41 percent from Asia between 2014 and 2016 had two or more negative factors, whereas only 27 percent of immigrants from Europe, Canada, and Oceania (primarily Australia and New Zealand) have two or more negative factors.[25] Immigrants from Europe, Canada, and Oceania are the least likely to be affected by the Final Rule's changes to public charge because they are generally wealthier, more educated, and more likely to speak English. Of the seven countries with the highest rates of English proficiency, six are in Europe and none is in Latin America or Africa. Conversely, none of the 24 countries with the lowest rates of English proficiency is in Europe, while all but one are in Latin America, Africa, or the Middle East.[26] In fact, immigrants from regions with predominantly white populations have the highest proportion of recent lawful permanent residents with family income above 250 percent of the federal poverty guideline.

---

[25] Randy Capps, Mark Greenberg, Michael Fix & Jie Zong, Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration, MIGRATION POL'Y INST., 9 (Nov. 2018), https://www.migrationpolicy.org/research/impactdhs-public-charge-rule-immigration

[26] Education First, *EF English Proficiency Index* at 6–7 (2018), https://www.ef.edu/__/~/media/centralefcom/epi/downloads/full-reports/v8/ef-epi-2018-english.pdf.

137.     Through their actions described above, Defendants have acted in contravention of federal law.

138.     Defendants' actions have caused and will continue to create a severe hardship for Plaintiffs.

139.     Plaintiffs have no adequate remedy at law.

## LEGAL CLAIMS

### COUNT I -VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706 EXCEEDS STATUTORY AUTHORITY

### (Plaintiffs Cook County and ICIRR against all Defendants)

140.     Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

141.     The Administrative Procedure Act prohibits agency action that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

142.     Defendants may only exercise the authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

143.     Defendants have exceeded their statutory authority as follows.

144.     First, the Final Rule exceeds its authorizing statute, section 212 of the INA, 8 U.S.C. §1182. The Final Rule's novel and expanded definition of "public charge" is contrary to the unambiguous, plain, and well-settled meaning of that phrase as Congress, federal courts, and federal agencies have interpreted and applied it since 1882.  As a result of this rewriting of the definition of "public charge," the Final Rule impermissibly prevents from adjusting their status immigrants that are not subject to exclusion under the statutory definition of "public charge." The INA does not expressly or impliedly permit DHS to expand its authority in this regard. Similarly, the Final Rule's adoption of a weighted circumstances test contradicts with the INA's

requirement that an adjudicator consider an individual's "totality of circumstances" when making a public charge determination.

145.     Second, the Final Rule exceeds Defendants' statutory authority by mandating consideration of an applicants' use of non-cash benefits programs as permitted by Federal law, such as food supplements, public health insurance, and housing assistance in a public charge determination in contradiction of Congressional intent.

146.     Because the Final Rule exceeds its statutory jurisdiction, authority, and limitations, and falls short of providing the rights the relevant statutes provide, it is invalid and prohibited by the APA, 5 U.S.C. § 706(2)(C).

147.     Defendants' violation is causing ongoing harm to Plaintiffs.

**COUNT II - VIOLATION OF ADMINISTRATIVE PROCEDURE ACT,
5 U.S.C. §706
NOT IN ACCORDANCE WITH LAW**

**(Plaintiffs Cook County and ICIRR against all Defendants)**

148.     Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

149.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

150.     The Final Rule's public charge definition and weighted circumstances test contravenes Section 504 of the Rehabilitation Act of 1973 which says that no person with a disability shall, on the basis of disability, "be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. §794(a).

151.     The Final Rule's novel and broad public charge definition contravenes the PRWORA by placing qualifications on LRP and immigrant access to Federal public benefits specifically permitted by the PRWORA. The PRWORA specifically provides that "a State is authorized to determine the eligibility of an alien . . . for any designated Federal program." 8 U.S.C. § 1612(b)(1).

152.     The Final Rule's public charge definition is also contrary to the IIRIRA, specifically sections 531 and 551, as evidenced by Congress' consideration and rejection of provisions very similar to the Final Rule when passing the Act. 8 U.S.C. §1182, 1183(a).

153.     The Final Rule violates the SNAP statute which prohibits Defendants from considering SNAP benefits as "income or resources for any purpose under any Federal…laws…." 7 U.S.C. § 2017(b).

154.     The Final Rule is prohibited by the APA because it contravenes the statutes listed in this Count in addition to the INA itself. The term public charge in the INA reflects the original meaning of the term as one who is "primarily and permanently dependent" on the government for subsistence. The Final Rule's redefinition of public charge contravenes INA sections 212(a)(4), 202(a)(1), and 212 (a)(1). 8 U.S.C. § 1152, 1182 (a)(1), (4).

155.     Defendants' violation is causing ongoing harm to Plaintiffs.

## COUNT III – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 ARBITRARY AND CAPRICIOUS

### (Plaintiffs Cook County and ICIRR against all Defendants)

156.     Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

157.     The APA states that a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(C).

158.     The Final Rule is arbitrary and capricious because Defendants have failed to meet their burden to reasonably justify the unprecedented definition of Public Charge which departs from decades of prior law and settled practice.  When an agency substantially alters a position, it must "supply a reasoned analysis for the change," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 30, 42 (1983), and may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

159.     The Final Rule is arbitrary and capricious because Defendants have not provided a reasoned response to significant public comments regarding extensive public health, economic, and other economic harms.  *State Farm*, 463 U.S. at 42.  DHS must consider the advantages and disadvantages of a proposal before issuing a final rule.

160.     The Final Rule is arbitrary and capricious because it does not quantify harm to public health, state or local economies, or other administrative burdens or adequately address the harms alleged in the record.

161.     The Final Rule is arbitrary and capricious because despite receiving overwhelming evidence of its extensive chilling effect, Defendants failed to make any changes that would reduce disenrollment of individuals who are not subject to the rule including citizens and humanitarian immigrants.

162.     The Final Rule is arbitrary and capricious because it rejects Congress' established immigration policy of promoting family unity in favor of policies Congress has already rejected.

163.     The Final Rule is arbitrary and capricious because it relies on factors Congress intended that Defendant DHS should not consider, including non-cash benefits, and disregards material facts and evidence.

164.     The Final Rule is arbitrary and capricious because it discriminates against individuals with disabilities and does not address the Rule's conflict with Section 504 of the Rehabilitation Act.

165.     The Final Rule is arbitrary and capricious because it impermissibly overhauls the statutory "totality of the circumstances" test with a "weighted factors" test that is vague, arbitrary, unsupported by the evidence and that will inevitably lead to inconsistent, arbitrary and discriminatory public charge determinations.

166.     The Final Rule is arbitrary and capricious because it is pretext for discrimination. While the Final Rule purports to identify individuals who will be public charges, its adoption of factors that bear no reasonable relationship to that inquiry demonstrates Defendants' intent to reduce immigration by immigrants of color.

167.     The Final Rule is arbitrary and capricious because Defendants have failed to consider the racially disparate impact of the Regulation.

168.     Defendants' actions are thus arbitrary and capricious, within the meaning proscribed by 5 U.S.C. §§ 705 and 706.

169.     Defendants' violation is causing ongoing harm to Plaintiffs.

## COUNT IV– VIOLATION OF THE FIFTH AMENDMENT,
## EQUAL PROTECTION, U.S. CONST. AMEND. V
## DISCRIMINATION AGAINST NON-WHITE IMMIGRANTS

### (Plaintiff ICIRR against All Defendants)

170.     Plaintiff ICIRR repeats and incorporates by reference each allegation contained in the preceding paragraphs of this Complaint.

171.     The Due Process Clause of the Fifth Amendment prohibits the Defendants from denying equal protection of laws to persons residing in the United States. The Fifth Amendment also prohibits Defendants from acting with an intent or purpose of racial animus even if Defendants' action is facially neutral.

172.     Defendants were motivated by "discriminatory purpose" to disparately impact immigrants of color and Latinos when they promulgated the Final Rule. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

173.     Defendants not only knew of that disparate impact, but that impact is also consistent with the intent made plain by the Administration's repeated public statements in support of a broader agenda to vilify immigrants from majority non-white countries and to suppress immigration and those seeking citizenship from those countries.  This agenda has manifested in other forms such as repeated statements that Haiti, El Salvador, and unspecified African nations are "s***hole countries."[27]  President Trump has described Mexican immigrants as "drug dealers, criminals, rapists"[28] and migrants from Central America as "animals,"[29] claimed

---

[27] Clark Mindock, *Donald Trump referred to Haitians and Africans as coming from s***hole countries,' says report*, INDEPENDENT (Jan. 11 2018) *available at* https://www.independent.co.uk/news/world/americas/us-politics/trump-shithole-countries-haiti-africa-latest-report-comments-a8154666.html.

[28] Alexander Burns, *Choice Words From Donald Trump, Presidential Candidate*, N.Y. TIMES (June 16, 2015), https://www.nytimes.com/politics/first-draft/2015/06/16/choice-words-from-donald-trump-presidential-candidate.

[29] Gregory Korte & Alan Gomez, *Trump ramps up rhetoric on undocumented immigrants: 'These aren't people. These are animals.'* USA TODAY, https://www.usatoday.com/story/news/politics/2018/05/16/trump-immigrants-animals-mexico-democrats-sanctuary-cities/617252002/ (last updated May 17, 2018).

that 15,000 recent immigrants "all have AIDS,"[30] and stated that 40,000 Nigerians would never "go back to their huts" in Africa after seeing the United States.[31]

174.     Other senior officials within the administration and at DHS, including the officials responsible for implementing the Final Rule, have expressed similar statements.  On August 13, 2019, one day after announcing the Final Rule, Defendant Cuccinelli stated that the Emma Lazarus quote on the Statue of Liberty, welcoming immigrants to the U.S. (addressing "your tired, your poor, Your huddled masses yearning to breathe free"), was only meant to refer to "people coming from Europe."[32]

175.     On October 23, 2018, Defendant Cuccinelli has also described immigrants crossing the southern border, immigrants who are overwhelming Latino and of color, as "an invasion."[33]

176.     In January 2019, Acting Director of U.S. Immigration and Customs Enforcement Mark Morgan re-enforced Defendants' vilification of immigrants of color as "criminals" when he said of children detained at the southern border, "I've been to detention facilities where I've walked up to these individuals that are so-called minors, 17 or under. I've looked at them I've looked at their eyes … and I've said that is a soon-to-be MS-13 gang member. It's unequivocal."[34]

---

[30] Michael Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. TIMES (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.
[31] *Id.*
[32] Zeke Miller & Ashley Thomas, *Trump official: Statue of Liberty poem refers to Europeans*, ASSOCIATED PRESS (Aug. 14, 2019), https://www.msn.com/en-nz/news/world/trump-official-statue-of-liberty-poem-refers-to-europeans/ar-AAFMp57.
[33] John Binder, *Exclusive--Ken Cucinelli: States Can Stop Migrant Caravan 'Invasion' with Constitutional 'War Powers,'* Breitbart (October 23, 2018) *available at* https://www.breitbart.com/politics/2018/10/23/exclusive-ken-cuccinelli-states-can-stop-migrant-caravan-invasion-with-constitutional-war-powers/.
[34] Ted Hesson, *Trump's pick for ICE Director: I can tell which migrant children will become gang members by looking into their eyes,* Politico (May 16, 2019) *available at* https://www.politico.com/story/2019/05/16/mark-morgan-eyes-ice-director-1449570.

177.     In further denigration of immigrants of color, President Trump and the Defendants have also repeatedly and falsely characterized this class of immigrants as a poor, welfare-reliant, drain on society.

178.     On June 21, 2017, President Trump demanded the need for "new immigration rules which say those seeking admission into our country must be able to support themselves financially and should not use welfare for a period of at least five years…" even though immigrants are already held to this standard.[35]

179.     Speaking in support of the RAISE Act, a bill that would decrease the population of Latino immigrants and other immigrants of color in the United States by restricting family-based visas, President Trump stated that the bill would ensure that immigrants were "not going to come in and just immediately go and collect welfare."[36]

180.     During a press conference on August 2, 2017, President Trump's Senior Policy Advisor on immigration and the alleged architect of the Final Rule, Stephen Miller, falsely charged that "roughly half of immigrant head of households in the United States receive some type of welfare benefit."[37] But research has shown that poor immigrant household use less welfare than poor non-immigrant households.[38] At the same press conference, Miller went on to falsely state that the United States "issue[s] a million green cards to foreign nationals from all the

---

[35] Michelle Mark, *Trump called for legislation blocking immigrants from receiving welfare for 5 years -- but it already exists,* Business Insider, (June 22, 2017) *available at* https://www.businessinsider.com/trump-called-for-legislation-blocking-immigrants-from-receiving-welfare-for-5-years-but-it-already-exists-2017-6;     8     U.S.C.S. §1612.

[36] Alexia Fernandez Campbell, *Poor immigrants are the least likely group to use welfare, despite Trump's claims,* VOX  (Aug. 4, 2017) *available at* https://www.vox.com/policy-and-politics/2017/8/4/16094684/trump-immigrants-welfare.

[37] Press Briefing, White House, Press Briefing by Press Secretary Sarah Sanders and Senior Policy Advisor Stephen Miller (Aug. 2, 2017) *available at* https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-senior-policy-advisor-stephen-miller-080217/.

[38] Alex Nowrasteh, *CIS Exaggerates the Cost of Immigration Welfare Use,* CATO Inst. (May 10, 2016), https://www.cato.org/blog/cis-exaggerates-immigrant-welfare-use.

countries of the world" without regard to "whether they can pay their own way or be reliant on welfare."[39]

181.    Defendants have also adopted a long list of policies aimed at discriminating against and excluding immigrants of color and Latino immigrants, including:

- Ended the Deferred Action for Childhood Arrivals Program, which protects approximately 800,000 individuals, predominantly from Latin American countries, from deportation proceedings;[40]

- Attempted to bar people arriving at the Southern border from claiming asylum in violation of United States law;[41]

- Terminated special protections from removal for migrants from nations experiencing war and natural disasters, including Nicaragua, Honduras, Haiti and El Salvador;[42]

---

[39] Press Briefing, *supra,* note 44.

[40] Mike Lillis, Rafael Bernal, and Rebecca Savransky, *Trump rescinding DACA program*, The Hill (Sep. 5, 2017) *available at* https://thehill.com/latino/348848-sessions-says-DACA-to-end-in-six-months. *See* Statement on the Deferred Action for Childhood Arrivals Policy, Daily Comp. Pres. Doc. 201700 (Sept. 5, 2017), *available at* https://www.govinfo.gov/content/pkg/DCPD-201700609/pdf/DCPD-201700609.pdf.

[41] Richard Gonzales, *Trump Administration Faces 2 Legal Challenges For Asylum Restrictions*, NPR (Nov. 19, 2018) *available at* https://www.npr.org/2018/11/19/668824846/trump-administration-faces-2-legal-challenges-for-asylum-restrictions; Daniella Silva, Julia Ainsley, Pete Williams, & Geoff Bennett, *Trump administration moves to end asylum protections for most Central American migrants,* NBC NEWS, https://www.nbcnews.com/news/us-news/trump-administration-moves-end-asylum-protections-most-central-american-migrants-n1029866 (last updated July 15, 2019, 9:51 AM); Ted Hesson & Josh Gerstein, *DOJ restricts asylum claims based on family relations,* POLITICO, https://www.politico.com/story/2019/07/29/doj-asylum-claims-family-relations-1624028 (last updated July 29, 2019, 3:49 PM); Katie Benner & Caitlin Dickerson, *Sessions Says Domestic and Gang Violence Are Not Grounds for Asylum,* N.Y. TIMES (June 11, 2018), https://www.nytimes.com/2018/06/11/us/politics/sessions-domestic-violence-asylum.html.

[42] Alan Gomez, *The six countries 300,000 immigrants must return to with end of TPS program,* USA Today (Oct. 15, 2018) *available at* https://www.usatoday.com/story/news/world/2018/10/15/six-countries-300-000-immigrants-must-return-end-tps/1112581002/. *See* Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2,654 (Jan. 18, 2018); Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2,648 (Jan. 18, 2018); Termination of the Designation of Honduras for Temporary Protected Status, 83 Fed. Reg. 26,074 (June 5, 2018); Termination of the Designation of Nepal for Temporary Protected Status, 83 Fed. Reg. 23,705 (May 22, 2018); Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Red. Reg. 59,636 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228 (Oct. 11, 2017).

- Sought to suspend or terminate federal funding to jurisdictions who offered sanctuary to undocumented immigrants and refused to participate in federal immigration enforcement efforts;[43]

- Diverted federal funds, including Federal Emergency Management Agency dollars needed to respond to an increasing number of natural disasters, to fund border security programs;[44]

- Adopted policies that separate minor children from their families who enter the United States at the U.S. - Mexico border;[45]

- Argued in court that the federal government should not be required to give detained migrant children toothbrushes, soap, towels, showers, or beds inside Border Patrol detention facilities;[46] and

- Proposed a rule that would block households with undocumented members from obtaining federally subsidized housing assistance.[47]

182.    On information and belief, Defendants knew that the Final Rule would have a disparate impact on Latino immigrants and immigrants of color, based at a minimum on comments provided on the Proposed Rule. Defendants intend to target Latino immigrants and

---

[43] Martin Kaste, *Trump Threatens 'Sanctuary' Cities With Loss of Federal Funds,* NPR (Jan. 26, 2017) *available at* https://www.npr.org/sections/thetwo-way/2017/01/26/511899896/trumps-threatens-sanctuary-cities-with-loss-of-federal-funds.

[44] Catilin Emma, *DHS to siphon $155M in disaster aid to bolster immigration enforcement,* Politico (Aug. 27, 2019) *available at* https://www.politico.com/story/2019/08/27/dhs-disaster-aid-immigration-1686247.

[45] Julie Hirschfield Davis and Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant Families,* NY Times (June 16, 2018) *available at* https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html. *See also* Michael Scherer & Josh Dawsey, *Trump cites as a negotiating tool his policy of separating immigrant children from their parents,* Washington Post (June 15, 2018), https://www.washingtonpost.com/politics/trump-cites-as-a-negotiating-tool-his-policy-of-separating-immigrant-children-from-their-parents/2018/06/15/ade82b80-70b3-11e8-bf86-a2351b5ece99_story.html?noredirect=on.

[46] Meagan Flynn, *Detained migrant children got no toothbrush, no soap, no sleep. It's no problem, government argues,* Washington Post (June 21, 2019) *available at* https://www.washingtonpost.com/nation/2019/06/21/detained-migrant-children-no-toothbrush-soap-sleep/.

[47] Katy O'Donnell, *HUD moves to crack down on undocumented immigrants in public housing,* Politico (Apr. 18, 2019) *available at* https://www.politico.com/story/2019/04/18/hud-immigrants-public-housing-1367559.

immigrants of color with the Final Rule, as part of their broader effort to reduce immigration by people of color into the United States.

183.     Defendants use facially neutral but pre-textual concerns about self-sufficiency in an effort to cloak their discriminatory intent against non-white people.  Although people of color account for approximately 36% of the total U.S. population, approximately 90% of those chilled from seeking public services would be immigrants of color (70% of whom are Latino).[48]

184.     The purpose of the Final Rule is to discriminate against non-white immigrants. Defendants knew that the Final Rule would have a targeted, disproportionate impact on people from non-white countries. The Final Rule departs from rulemaking history and procedure as part of a pattern and practice of discriminatory animus towards non-European immigrants.

185.     Thus, the Final Rule violates the right to equal protection under the law of non-citizen immigrants of color and Latino immigrants from majority non-white countries.

186.     ICIRR has a central interest in promoting and fully integrating immigrants into society, which the Final Rule and the Defendants' actions and statements dramatically undermine and frustrate. The majority of immigrant communities ICIRR serves in Illinois are immigrants of color and Latino immigrants from majority non-white countries.

187.     Due to the broad agenda of this administration to discriminate against and instill fear in Latino immigrants and immigrants from majority non-white countries, immigrants likely impacted by the Final Rule are not only chilled from accessing public benefits they may be entitled to, but to challenging the Final Rule. The interests of directly impacted immigrants of color and Latino immigrants are however closely aligned with ICIRR.

188.     Defendants' violation is causing ongoing harm to ICIRR.

---

[48] *Public Charge Proposed Rule: Potentially Chilled Population Data*, Manatt, Phelps & Phillips, LLP (Oct. 11, 2018).

## JURY DEMAND

Plaintiff Illinois Coalition for Immigrant and Refugee Rights demands a jury trial on Count IV.

## PRAYER FOR RELIEF

WHEREFORE, with respect to Counts I-III, Plaintiffs Cook County, Illinois, and Illinois Coalition for Immigrant and Refugee Rights pray that this Court:

1. Declare that the actions of the Defendants are arbitrary, capricious, and otherwise not in accordance with the law and without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

2. Declare the Final Rule unlawful and invalid as a violation of the Administrative Procedure Act, of section 504 of the Rehabilitation Act.

3. Enter a preliminary and permanent injunction, without bond, enjoining Defendants, their officials, agents, employees, and assigns from implementing or enforcing the Final Rule in the State of Illinois.

4. Stay the implementation or enforcement of the Final Rule in the State of Illinois.

5. Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

6. Order such other relief as the Court deems just and equitable.

With respect to Count IV, Plaintiff Illinois Coalition for Immigrant and Refugee Rights prays that this Court:

1. Declare the Final Rule unlawful and invalid as a violation of the Fifth Amendment of the United States Constitution.

2. Enter a permanent injunction, without bond, enjoining Defendants, their officials, agents, employees, and assigns from implementing or enforcing the Final Rule in the State of Illinois.

3. Stay the implementation or enforcement of the Final Rule in the State of Illinois.

4. Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

5. Order such other relief as the Court deems just and equitable.

Dated:  September 23, 2019              Respectfully submitted,

KIMBERLY M. FOXX                       COOK COUNTY, ILLINOIS
*Cook County Illinois State's*
*Attorney*

                                       By   */s/ Jessica M. Scheller*
                                            Jessica M. Scheller, Assistant State's Attorney
                                            Chief; Advice, Business & Complex Litigation Division
                                            Lauren Miller, Special Assistant State's Attorney
                                            Civil Actions Bureau
                                            500 W. Richard J. Daley Center Place, Suite 500
                                            Chicago, IL 60602
                                            Phone: (312) 603-6934
                                            Phone: (312) 603-4320
                                            Jessica.Scheller@cookcountyil.gov
                                            Lauren.Miller@cookcountyil.gov

                                            */s/ David E. Morrison*
                                            David E. Morrison
                                            Steven A. Levy
                                            A. Colin Wexler
                                            Takayuki  Ono
                                            Juan C. Arguello
                                            Goldberg Kohn Ltd.
                                            Special Assistant State's Attorneys
                                            55 E. Monroe St., Suite 3300
                                            Chicago, IL 60603
                                            Phone:    (312) 201-4000
                                            Fax:  (312) 332-2196
                                            david.morrison@goldbergkohn.com
                                            steven.levy@goldbergkohn.com
                                            colin.wexler@goldbergkohn.com
                                            takayuki.ono@goldbergkohn.com
                                            juan.arguello@goldbergkohn.com

                                       *Counsel for Cook County, Illinois*

ILLINOIS COALITION FOR IMMIGRANT AND
REFUGEE RIGHTS, INC.


By  */s/ David A. Gordon*
    David A. Gordon
    Tacy F. Flint
    Sidley Austin LLP
    One South Dearborn Street
    Chicago, IL 60603
    (312) 853-7000 (Telephone)
    (312) 853-7036 (Facsimile)
    dgordon@sidley.com
    tflint@sidley.com

    Yvette Ostolaza (*pro hac vice forthcoming*)
    Texas Bar No. 00784703
    Robert S. Velevis (*pro hac vice forthcoming*)
    Texas Bar No. 24047032
    SIDLEY AUSTIN LLP
    2021 McKinney Ave, Suite 2000
    Dallas, Texas 75201
    (214) 981-3300 (Telephone)
    (214) 981-3400 (Facsimile)
    Yvette.ostolaza@sidley.com
    rvelevis@sidley.com


    Caroline Chapman
    Meghan P. Carter
    Shelmun Dashan
    LEGAL COUNCIL FOR HEALTH JUSTICE
    17 N. State, Suite 900
    Chicago, IL 60602
    Phone: (312) 605-1958
    Fax: 312-427-8419
    cchapman@legalcouncil.org
    mcarter@legalcouncil.org
    sdashan@legalcouncil.org

Katherine E. Walz
Gavin M. Kearney
Andrea Kovach
Militza M. Pagan
SHRIVER CENTER ON POVERTY LAW
67 E. Madison, Suite 2000
Chicago, IL 60603
Phone:     (312) 368-2679
Fax:        (312) 263-3846
katewalz@povertylaw.org
gavinkearney@povertylaw.org
andreakovach@povertylaw.org
militzapagan@povertylaw.org

*Counsel for Illinois Coalition For Immigrant and Refugee Rights, Inc.*