**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; and **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.**, <br><br> **Plaintiffs,** <br><br> vs. <br><br> **KEVIN K. McALEENAN,** in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; **KENNETH T. CUCCINELLI II,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; and **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency, <br><br> **Defendants.** | Case No. 19 cv 6334 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR TEMPORARY RESTRAINING ORDER
<u>AND/OR PRELIMINARY INJUNCTION OR STAY PURSUANT TO 5 U.S.C. § 705</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND AND FACTS ................................................................................... 3

I.    Current Statutory Framework And Historical Understanding Of A Public Charge In The Immigration Context. ....................................................................... 3

    A.    For More Than 130 Years, Only Those Immigrants Who Are Primarily And Permanently Dependent On Government Assistance Have Been Determined To Be "Public Charges." ...................................... 5

    B.    Congress Codified The Common Law Understanding Of A Public Charge Through The Immigration Naturalization Act Of 1952, And The U.S. Justice Department Consistently Explained The Meaning Of Public Charge. ......................................................................... 5

    C.    Congress Has Expressly Rejected All Attempts To Expand The Definition Of "Public Charge." .................................................................... 6

    D.    Various Executive Agencies Including The INS And State Department Have Consistently Understood The Term Public Charge To Refer Exclusively To An Individual Primarily Dependent On Government Assistance. ...................................................... 7

    E.    Congress Has Authorized The Extension Of Non-Cash Benefits To Immigrants Subject To The Public Charge Rule. ...................................... 8

    F.    As With The Meaning Of Public Charge, Federal Agency Guidance Continues To Conform To Congress' Expressed Intent That Non-Citizens Retain The Ability To Access Non-Cash Benefits. .................................................................................................. 9

    G.    The Proposed Rule Dramatically Changed The Fundamental Principles Of United States Immigration Law By Redefining The Term "Public Charge" To Include People Who Are Minimally Reliant On Public Services. ................................................................... 10

II.    The Final Public Charge Rule Abandons The Established, Historical Meaning Of Public Charge In Contravention Of Congressional Intent And Over 130 Years Of Legal Precedent. .................................................................... 10

III.    The Illegal Final Rule Irreparably Harms Plaintiffs. ........................................... 12

i

A.      The Chilling Effect Generated By The Final Rule Imposes An Incalculable Cost On Cook County And The Health Of Cook County Residents. ..................................................................... 12

B.      The Final Rule Frustrates The Core Mission Of ICIRR And Requires The Significant Diversion Of Resources To Address The Final Rule, As Well As Decreases The Ability Of ICIRR To Provide Vital Services. ........................................................... 14

C.      Defendants Concede That The Final Rule Will Inflict Incalculable Economic Harm On The Plaintiffs And Residents Of Cook County. ................................................................................ 16

SUMMARY OF ARGUMENT ............................................................... 18

STANDARD OF REVIEW ...................................................................... 19

ARGUMENT ........................................................................................... 21

I.     Plaintiffs Are Likely To Succeed On The Merits. ................................... 21

A.      Plaintiffs Have Article III Standing To Challenge the Implementation Of The Final Rule. ......................................... 22

1.     Cook County Has An Actual And Imminent Threat Of Suffering Injury In Fact Due To Defendants' Conduct. ............... 22

2.     ICIRR Has An Actual And Imminent Threat Of Suffering Injury In Fact Due To Defendants' Conduct. ................................ 25

3.     Plaintiffs Are Within The Zone Of Interests Regulated By The Final Rule. ............................................................... 28

B.      Plaintiffs Have A Likelihood Of Success On The Merits Of Their Claims Under The APA. ..................................................... 31

1.     DHS' New Definition Of "Public Charge" Deviates From The Plain Meaning Of The Statutory Language And Congress' Clear Intent, And Is Invalid. ......................................... 31

2.     Even If The Court Were To Find Ambiguity In The INA's Definition Of "Public Charge," The Final Rule Is Arbitrary, Capricious, And Manifestly Contrary To The Statute. ................. 35

a.     DHS Neither Meaningfully Addressed Nor Identified Offsetting Justifications For The Final Rule's Many Devastating Harms. ....................................... 37

b.     The Final Rule's Benefit-Use Threshold, Factors, And Weighing Scheme Are Unsupported, Irrational And At Odds With The Final Rule's Purported Purpose..............................................................42

3.     The Final Rule Contravenes Several Statutes And Therefore Is Not In Accordance With The Law. ..........................44

a.     The Rehabilitation Act. ......................................................44

b.     The Welfare Reform Act. ..................................................45

c.     SNAP. ................................................................................46

II.     In The Absence Of A Stay And/Or Injunctive Relief, Plaintiffs, And The Communities They Serve, Will Suffer Irreparable Harm. ....................................46

A.     The Chilling Effect Of The Final Rule Will Inflict Irreparable Harm On Cook County Based On Forgone Public Benefits, Mass Disenrollment, And The Resulting Financial Impact On The County.....................................................................................................48

1.     The Final Rule Will Irreparably Harm The Public Health. ..........49

2.     The Final Rule Will Generate Food Insecurity Resulting In Irreparable Harm. ...........................................................................50

3.     The Final Rule And The Disenrollment And Forgone Benefits It Engenders Will Create An Economic Ripple Effect Causing Sweeping Detrimental Impacts To The Local Cook County Economy......................................................51

B.     The Chilling Effect Created By The Final Rule Inflicts Irreparable Harm To ICIRR And Its Member Organizations. ....................................52

III.     The Balance Of Equities Favors The Issuance Of A Stay And/Or Preliminary Injunction, And Issuing An Injunction Would Serve The Public Interest. ....................................................................................................53

CONCLUSION..............................................................................................................54

# TABLE OF AUTHORITIES

Page(s)

Cases

*Air Courier Conference v. American Postal Workers Union,*
498 U.S. 517 (1991) .................................................................................................. 29

*Albermarle Paper Co. v. Moody,*
422 U.S. 405 (1975) .................................................................................................. 34

*Am. Wild Horse Pres. Campaign v. Perdue,*
873 F.3d 914 (D.C. Cir. 2017) ................................................................................. 37

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,*
397 U.S. 150 (1970) .................................................................................................. 28

*Auto. Parts & Accessories Ass'n v. Boyd,*
407 F.2d 330 (D.C. Cir. 1968) ................................................................................. 37

*Bankers Life & Cas. Co. v. United States,*
142 F.3d 973 (7th Cir. 1998) .................................................................................... 32

*Bauer v. DeVos,*
325 F. Supp. 3d 74 (D.D.C. 2018) ........................................................................... 20

*Bunker v. Ficke,*
6 Ohio Dec. Reprint 978, 1880 WL 5770 (Ohio Dist. 1880) ................................... 33

*California v. U.S. Bureau of Land Mgmt.,*
277 F. Supp. 3d. 1106 (N.D. Cal. 2017) .................................................................. 36

*Catskill Mountains Chapter of Trout v. E.P.A.,*
846 F.3d 492 (2d Cir. 2017) .................................................................................... 33

*Cent. United Life, Inc. v. Burwell,*
128 F. Supp. 3d 321 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ............... 53

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................................................ 18, 31

*City & Cty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ................................................................................. 35

*City of Boston v. Capen,*
61 Mass. 116 (1851) ................................................................................................. 33

iv

*City of Milwaukee v. Saxbe*,
   546 F.2d 693 (7th Cir. 1976) ......................................................................... 22

*City of N. Chi. v. Hanovnikian*,
   No. 06 C 0962, 2006 WL 1519578 (N.D. Ill. May 30, 2006) ..................................... 22

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ................................................................... 22, 23

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)........................................................................................ 29

*Common Cause Ind. v. Lawson*,
   No. 18-2491, 2019 WL 4022177 (7th Cir. Aug. 27, 2019) ................................. 22, 25

*Crawford v. Marion Cty. Election Bd.*,
   472 F.3d 949 (7th Cir. 2007) ......................................................................... 26

*Cronin v. U.S. Dep't of Agric.*,
   919 F.2d 439 (7th Cir. 1990) ......................................................................... 20

*Cty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017*), recoconsideration denied,*
   *267 F. Supp. 3d 1201 (2017), reconsideration denied*, 267 F. Supp. 3d 1201 (2017.............. 22

*D.F. ex rel. L.M.P. v. Leon Cty. Sch. Bd.*,
   No. 4:13CV3-RH/CAS, 2014 WL 28798 (N.D. Fla. Jan. 2, 2014) ......................... 45

*East Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018) ....................................................................... 30

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)............................................................................ 36, 38

*Ex Parte Hosaye Sakaguchi v. White*,
   277 F. 913 (9th Cir. 1922) ............................................................................ 33

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)....................................................................................... 36

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120, 147 (2000)............................................................................... 35

*Fischer v. Meader*,
   111 A. 503 (N.J. 1920) .................................................................................. 33

*Fred Meyer Stores, Inc. v. NLRB*,
   F.3d 630 (D.C. Cir. 2017).............................................................................. 39

*Gegiow v. Uhl*,
239 U.S. 3 (1915) ........................................................................................ 5, 33, 34

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*,
549 F. 3d 1079 (7th Cir. 2008) ............................................................................ 21

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) ........................................................................ 38-39

*H.P. v. Naperville Cmty. Unit Sch. Dist. #203*,
910 F.3d 957 (7th Cir. 2018) ............................................................................... 45

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ....................................................................................... 25, 26

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*,
582 F.3d 721 (7th Cir. 2009) ............................................................................... 21

*Howe v. United States*,
247 F. 292 (2d Cir. 1917) ...................................................................................... 5

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ............................................................................................ 27

*In re Harutunian*,
14 I. & N. Dec. 583 (BIA 1974) ............................................................................ 6

*In re Martinez-Lopez*,
10 I. & N. Dec. 409 (BIA 1962; AG 1964) ............................................................ 6

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ............................................................................................ 35

*Int'l Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983) ............................................................................. 39

*Iwata v. Intel Corp.*,
349 F. Supp. 2d 135 (D. Mass. 2004) ................................................................... 45

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
559 U.S. 573 (2010) ............................................................................................ 34

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988) ............................................................................................ 32

*Keep Chicago Livable v. City of Chi.*,
913 F.3d 618 (7th Cir. 2019) ......................................................................... 26, 27

*League of Women Voters of United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................... 53

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ......................................................................... 29

*Lujan v. Nat'l. Wildlife Federation,*
   497 U.S. 871 (1990) ......................................................................... 29

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ......................................................................... 29

*MCI Telecomms Corp. v. Am. Telephone & Telegraph Co.,*
   512 U.S. 218 (1994) ......................................................................... 35

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015) .................................................................... 38

*Michigan v. U.S. Army Corps of Eng'rs,*
   667 F.3d 765 (7th Cir. 2011) ........................................................... 21

*Mingo Logan Coal Co. v. E.P.A.,*
   829 F.3d 710 (D.C. Cir. 2016) ......................................................... 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .............................................................. 36, 42, 43

*National Wildlife Federation v. Costle,*
   629 F.2d 118 (D.C. Cir. 1980) ......................................................... 40

*Nat'l Ass'n of Home Builders v. E.P.A.,*
   682 F.3d 1032 (D.C. Cir. 2012) ....................................................... 37

*Nken v. Holder,*
   556 U.S. 418 (2009) ......................................................................... 53

*Regents of the Univ. of Cal. v. U.S. State Dept.,*
   908 F.3d 476 (9th Cir. 2018) ........................................................... 36

*Rotenberry v. Comm'r Internal Rev.,*
   847 F.2d 229 (5th Cir. 1988) ........................................................... 45

*Sorenson Commc'ns Inc. v. F.C.C.,*
   755 F.3d 702 (D.C. Cir. 2014) ......................................................... 40

*St. James Hosp. v. Heckler,*
   760 F.2d 1460 (7th Cir. 1985) ......................................................... 37

*Stewart v. Azar*,
    313 F. Supp. 3d 237 (D.D.C. 2018) ........................................................ 37

*Ty, Inc. v. Jones Grp., Inc.*,
    237 F.3d 891 (7th Cir. 2001) ................................................................. 21

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) ................................................................................ 32

*United States v. Nova Scotia Food Products Corp.*,
    568 F.2d 240 (2nd Cir. 1977) ................................................................ 41

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ................................................................................ 21

*Util. Air Regulatory Grp. v. E.P.A.*,
    573, U.S. 302 (2014) ............................................................................... 32

*Valencia v. City of Springfield, Illinois*,
    883 F. 3d 959 (7th Cir. 2018) ............................................................... 20

*Vencor, Inc. v. Webb*,
    33 F.3d 840 (7th Cir. 1994) ................................................................... 20

*Vill. of Bellwood v. Dwivedi*,
    895 F.2d 1521 (7th Cir. 1990) .............................................................. 26

*Vill. of Riverdale v. 138th St. Joint Venture*,
    527 F. Supp. 2d 760 (N.D. Ill. 2007) ................................................... 22

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ................................................................ 53

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................... 20, 46

Statutes

5 U.S.C. § 702 ............................................................................................... 29

5 U.S.C. § 705 ....................................................................................... 20, 21

5 U.S.C. § 706(2)(A) ............................................................................. 36, 44

7 U.S.C. § 2017(b) ....................................................................................... 46

8 U.S.C. § 1182(a)(4) ................................................................................ 4, 5

8 U.S.C. § 1182(a)(4)(A) .............................................................................. 4

8 U.S.C. § 1182(a)(4)(B) .................................................................................................. 7

8 U.S.C. § 1182(a)(4)(B)(ii) ............................................................................................ 4

8 U.S.C. § 1183(a)(1)(A) ................................................................................................. 4

8 U.S.C. § 1255a(d)(2)(iii) ............................................................................................... 6

8 U.S.C. § 1443(h) ......................................................................................................... 30

8 U.S.C. §§ 1611(a), (b), 1621(a), (b) ............................................................................ 8

29 U.S.C. § 794(a) ......................................................................................................... 44

42 U.S.C. § 1396n(i) ...................................................................................................... 45

Personal Responsibility and Work Opportunity Reconciliation Act,
   Pub. L. No. 104-193, 110 Stat. 2105 (1996) ............................................................ 8

Farm Security and Rural Investment Act of 2002, Pub. L. No. 107–171, § 4401, 116 Stat.
   134 (2002) ................................................................................................................. 8

Immigration Act of 1882, ch. 376, § 2, 22 Stat. 214 (1882) .......................................... 5

Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 899 (1907) ................................ 5

Immigration Act of March 26, 1910, ch. 128, § 1, 36 Stat. 263, 263 (1910) ................. 5

Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 531(a), 110
   Stat. 3009-546, 3009-674–75 (1996) ..................................................................... 35

Rules

Federal Rule Civil Procedure 65 ............................................................................. 19, 21

Regulations

8 C.F.R. § 212.21(a) ...................................................................................................... 11

8 C.F.R. § 212.22 ........................................................................................................... 11

8 C.F.R. § 212.22(b)(2), (4), (6) .................................................................................... 11

8 C.F.R. § 212.22(c)(1)(iii)(A) ...................................................................................... 44

8 C.F.R. §§ 212.21(b)(5), 212.22(b)(4)(i)(E) ............................................................... 45

*Inadmisibility on Public Charge Grounds*
   83 Fed. Reg. 51,114 .......................................................................................... passim

*Adjustment of Status for Certain Aliens*,
  52 Fed. Reg. 16,205 (May 1, 1987) ........................................................... 1, 7

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*,
  64 Fed. Reg. 28,689 (May 26, 1999) ......................................................... passim

*Inadmissibility and Deportability on Public Charge Grounds*,
  64 Fed. Reg. 28,676 (May 26, 1999) ............................................................. 9

*Inadmissibility on Public Charge Grounds*,
  84 Fed. Reg. 41,292 (Aug. 14, 2019) ....................................................... passim

Other

*Immigration and Naturalization Serv., Dep't of Justice, Public Charge: INA Sections
  212(A)(4) and 237(A)(5)—Duration of Departure for LPRs and Repayment of Public
  Benefits* (Dec. 16, 23, 1997) ..................................................................... 4

H.R. Rep. 104-469, at 266-67 (1996) .............................................................. 6

H.R. Rep. No. 104-828 ........................................................................... 35

9 F.A.M. § 302.8-2(B)(1) ........................................................................ 8

S. Rep. No. 113-40, at 42 (2013) ................................................................ 34

142 Cong. Rec. 24425-27 (Sept. 24, 1996) ..................................................... 34-35

Dep't of State, Cable on I-864 Affidavit of Support: Update No. 14—Commitment to
  Provide Assistance (June 8, 1998) ............................................................... 8

Attorney General's Manual on the Administrative Procedure Act 105 (1947), available at
  https://tinyurl.com/y3engujs ....................................................................... 20

Memorandum from Andrew Bremberg on Executive Order on Protecting Taxpayer
  Resources by Ensuring Our Immigration Laws Promote Accountability &
  Responsibility (Jan. 23, 2017), *available at* https://cdn3.vox-
  cdn.com/uploads/chorus_asset/file/7872571/Protecting_Taxpayer_Resources_by_Ensu
  ring_Our_Immigration_Laws_Promote_Accountability_and_Responsibility.0.pdf ............... 24

Randy Capps and Michael Fix, *Leaked Draft of Possible Trump Executive Order on
  Public Benefits Would Spell Chilling Effects for Legal Immigrants,* MIGRATION POL'Y.
  INST. (February 2017), https://www.migrationpolicy.org/news/leaked-draft-possible-
  trump-executive-order-public-benefits-would-spell-chilling-effects-legal ..................... 24

*Charge*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/charge ............... 32

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776–1875)*,
  93 Colum. L. Rev. 1833, 1848–59 (1993) ...................................................... 33

## INTRODUCTION

This case concerns an attempt by Defendant Department of Homeland Security ("DHS") to rewrite long-standing federal law regarding when immigrants may be prevented from entering the United States, or changing their immigration status, on the grounds that they may become a "public charge." Consistent with the plain meaning of the statutory term "public charge," the determination of when an immigrant will be excluded on public charge grounds has, for well over a century, been based solely on the likelihood that the immigrant is or is likely to become *primarily and permanently dependent* on the government for survival and subsistence—that is, a "charge" or ward of the state. By contrast, Congress and immigration authorities have repeatedly declined to exclude immigrants who receive temporary or limited "assistance in kind, such as food stamps, public housing, or other *non-cash* benefits." *Adjustment of Status for Certain Aliens*, 52 Fed. Reg. 16,205, 16,209 (May 1, 1987) (emphasis added). Congress has recognized that receipt of such limited benefits does not render an immigrant a ward of the state and has consistently rejected legislative proposals to exclude such immigrants as "public charges."

By promulgating the *Inadmissibility on Public Charge Grounds* rule, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (the "Final Rule"), DHS upends the long-established meaning of "public charge" in direct opposition to Congressional intent and in violation of the Administrative Procedure Act ("APA"). Under the Final Rule, DHS would consider an immigrant a "public charge" if he or she uses, or is judged *likely to use* in the future, a wide variety of benefits specifically designed to promote the public health and well-being of the public, including programs such as Supplemental Nutrition Assistance Program ("SNAP") and Medicaid. Consideration of such

supportive benefits—in amounts as low as $180 annually[1]—would abandon the "primarily dependent on the government for subsistence" standard that has governed the public charge analysis for decades. Indeed, if applied to the general population, the Final Rule would deem nearly one-third of all U.S.-born citizens public charges. *See* Declaration of David E. Morrison ("Morrison Decl."), attached hereto as Exhibit 1, Ex. A.

DHS' effort to rewrite the United States Code to declare recipients of non-cash benefits to be "public charges" flies in the face of the plain meaning of the federal statutes governing immigration, Congress' clear directives, and decades of case law and guidance from federal agencies—and effectively undermines Congress' family-based immigration system. Even more troubling, DHS' misguided effort to circumvent the statutorily-mandated immigration scheme entirely failed to account for the sweeping detrimental impact the Final Rule would cause by deterring non-citizen residents and even citizens, including those who would otherwise be unaffected by the Final Rule, from using critical public benefits. Finally, DHS failed to take into account that both its predecessor agencies and, more importantly, Congress, concluded that DHS' stated goals underlying the Final Rule—to improve the health, welfare, and self-sufficiency of non-citizen residents—would be better served by non-citizens accessing certain public benefits.

DHS' Final Rule would wreak havoc on the health and safety-net systems administered by Plaintiff Cook County, Illinois (the "County"), as well as the County's finances, which are of vital importance to the County. By forcing residents to forgo life-saving benefits, the Final Rule will strip the County of millions of dollars in federal funds while at the same time increasing the healthcare costs borne by the County; residents without access to public benefits will likely delay care, requiring the County to administer more costly, and uncompensated, emergency treatments.

---

[1] FOOD AND NUTRITION SERVICES, DEP'T OF AGRICULTURE, MEMORANDUM ON SNAP – FISCAL YEAR 2018 COST-OF-LIVING ADJUSTMENTS (July 28, 2017).

Further, as has been extensively documented, increases in uninsured residents will likely create substantial health risks to the broader community as the risk of infectious and vaccine-preventable diseases rises, causing significant and preventable consequences to the County's public health.

Similarly, Plaintiff Illinois Coalition for Immigrant and Refugee Rights, Inc. ("ICIRR") and its member organizations *already* have faced significantly increased costs as demands for their services increase in the wake of the fear and uncertainty created by the Final Rule among the Illinois immigrant communities these organizations serve. These skyrocketing costs require ICIRR to scale back on its primary mission of providing critical care to support the health, safety, and well-being of these communities. Moreover, ICIRR has been forced to reduce its public advocacy efforts and shift resources away from providing critical services to immigrant Illinoisans to enable it to provide necessary guidance to immigrant communities in the face of the Final Rule. And ICIRR members who receive reimbursement for their work in supporting individuals' enrollment in public benefits programs have seen decreased reimbursement as a result of the Final Rule. The long-term detriment suffered by ICIRR and its member organizations from even a temporary implementation of the Final Rule would be effectively incalculable. Only the issuance of a stay and/or injunctive relief within the State of Illinois will put a stop to these irreparable harms that are already being inflicted on Plaintiffs and the communities they serve.

## **BACKGROUND AND FACTS**

### I. **Current Statutory Framework And Historical Understanding Of A Public Charge In The Immigration Context.**

Section 1182(a)(4) of the Immigration and Nationality Act ("INA") allows the federal government to deny admission or adjustment of immigration status to any non-citizens "likely at

any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). As set forth below, for over 130 years, Congress and the federal agencies administering the INA have interpreted the term "public charge" to apply to an exceedingly narrow category of non-citizens—those who are likely to become *primarily and permanently dependent* on the government for *subsistence*.

The assessment of whether an immigrant should be deemed a "public charge" is a forward-looking inquiry based on the totality of the circumstances. 8 U.S.C. § 1182(a)(4). Section 1182 identifies five criteria governing this inquiry: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. *Id.* Additionally, the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), authorizes an adjudicator to consider affidavits of support when reaching a public charge determination. 8 U.S.C. § 1182(a)(4)(B)(ii). An affidavit of support is a legally enforceable contract between the immigrant's sponsor and the United States promising that the sponsor will accept financial responsibility for maintaining the sponsored immigrant "at an annual income that is not less than 125 percent of the Federal poverty line." 8 U.S.C. § 1183(a)(1)(A). The former Immigration and Nationality Service ("INS"),[2] following the IIRIRA amendments, issued additional clarification that the "statute has not altered standards used to determine the likelihood of an alien to become a public charge nor has it significantly changed the criteria in determining such a likelihood." *Immigration and Naturalization Serv., Dep't of Justice, Public Charge: INA Sections 212(A)(4) and 237(A)(5)—Duration of Departure for LPRs and Repayment of Public Benefits* (Dec. 16, 23, 1997).

---

[2] INS ceased to exist as of March 1, 2003. The agency is now the U.S. Citizenship and Immigration Services ("USCIS").

A.    **For More Than 130 Years, Only Those Immigrants Who Are Primarily And Permanently Dependent On Government Assistance Have Been Determined To Be "Public Charges."**

The term "public charge" first appeared in the federal immigration statute in 1882, barring admission to "any person unable to take care of himself or herself without becoming a public charge."  Immigration Act of 1882, ch. 376, § 2, 22 Stat. 214 (1882).  Significantly, this language did not exclude as public charges individuals who were able to work—*i.e.*, those who might currently lack means, but who would be able to support themselves in the future through employment.  The more modern "likely to become a public charge" language was first added to the immigration statute in 1907, and Congress retained this language when it amended the Immigration Act of 1907 in 1910.  *See* Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 899 (1907); amended by Act of March 26, 1910, ch. 128, § 1, 36 Stat. 263, 263 (1910).  Subsequently, in *Gegiow v. Uhl*, the Supreme Court held that the public charge determination should be based on "permanent personal objections."  239 U.S. 3, 10 (1915).  That is, simply being poor or unemployed was insufficient; the person was deemed "likely to become a public charge" only if he or she had a *primary and permanent* dependence on government assistance for subsistence.  *Id.*  Federal courts have repeatedly affirmed this understanding.  *See, e.g., Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917) (explaining that "Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future").

B.    **Congress Codified The Common Law Understanding Of A Public Charge Through The Immigration Naturalization Act Of 1952, And The U.S. Justice Department Consistently Explained The Meaning Of Public Charge.**

In 1952, Congress passed the INA, retaining the "likely at any time to become a public charge" language and thereby codifying its well-established common law definition.  8 U.S.C. § 1182(a)(4).  Following the INA's passage, the U.S. Attorney General and the U.S. Department of

Justice Bureau of Immigration Appeals ("BIA") have continued to rely on the narrow historical understanding of "public charge". For example, then U.S. Attorney General Robert F. Kennedy affirmed a decision of the BIA, finding that the INA "requires more than a showing of a possibility that the alien will require public support" to be excluded on this ground. *In re Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (BIA 1962; AG 1964). Accordingly, the ordinary meaning of "public charge" remains an individual who relies primarily on government support for a long period of time—"a money charge upon or an expense to the public for support and care, the alien being destitute." *In re Harutunian*, 14 I. & N. Dec. 583, 586 (BIA 1974).

### C. Congress Has Expressly Rejected All Attempts To Expand The Definition Of "Public Charge."

Since the passage of the INA in 1952, Congress has repeatedly considered and uniformly rejected proposals to expand or otherwise alter the settled meaning of "public charge" and the statutory scheme governing that determination. For example, in 1986 Congress enacted the Immigration Reform and Control Act ("IRCA"), in which Congress again retained the "public charge" language from the INA. In fact, rather than expanding the definition of public charge, Congress, through the IRCA, further limited the category of immigrants to be excluded as "public charges" by providing additional grounds for a non-citizen classified as a public charge to seek a waiver of the exclusion. *Immigration Reform and Control Act*, Pub. L. No. 99–603, 100 Stat 3359 (1986) (codified at 8 U.S.C. § 1255a(d)(2)(iii)).

Similarly, in 1996, Congress considered and rejected the Immigration Control and Financial Responsibility Act ("ICFRA"), which would have drastically expanded the number of immigrants subject to exclusion as "public charges." The ICFRA would have defined "public charge" to encompass non-citizens who used almost any public benefit program for more than one year, including non-cash benefit programs. H.R. Rep. 104-469, at 266-67 (1996). Instead of

changing the definition of "public charge," however, Congress adopted the IIRIRA, a law that retained the accepted meaning of "public charge." IIRIRA further codified the totality-of-the circumstances test used to determine which immigrants were or were likely to become "public charges," as it had previously functioned only under common law, and authorized the consideration of affidavits of support in this context. 8 U.S.C. §§ 1182(a)(4)(B). Notably, as part of the IIRIRA drafting process, Congress considered and rejected a proposed definition of "public charge" that would have covered those who received "federal public benefits for an aggregate of 12 months over a period of 7 years"—language strikingly similar to the definition adopted in the Final Rule. *See* 142 Cong. Rec. S11872 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl).

Again, in 2013, Congress rejected yet another attempt, by then-Senator Sessions, to amend the definition of "public charge" to exclude immigrants as "public charges" if they were likely to qualify "even for non-cash employment supports." S. 744, 113th Cong. (2013); S. Rep. No. 113-40, at 42 (2013). Congress declined to accept the proposed amendment, retaining instead the definition of "public charge" that had been part of the immigration statutes and employed by immigration authorities and federal courts for well over 100 years.

**D.    Various Executive Agencies Including The INS And State Department Have Consistently Understood The Term Public Charge To Refer Exclusively To An Individual Primarily Dependent On Government Assistance.**

The federal agencies responsible for implementing federal immigration law have repeatedly issued guidance consistent with the courts' and Congress' historical interpretation of the term "public charge." For example, in 1987 the INS adopted a rule providing that the public charge exclusion was inapplicable if "the applicant demonstrates a history of employment in the United States evidencing self-support without the receipt of *public cash assistance.*" Adjustment of Status for Certain Aliens, 52 Fed. Reg. 16,205, 16,211 (May 1, 1987) (emphasis added). The

INS made clear that receipt of non-cash assistance—that is, "assistance in kind, such as food stamps, public housing, or other non-cash benefits"—did not render an individual a public charge of the state. *Id.* at 16,209. Likewise, the State Department's Foreign Affairs Manual has for decades prohibited officials from considering an individual's use of non-cash benefits, stating that "[n]either the past nor possible future receipt of such non-cash supplemental assistance may be considered in determining whether an alien is likely to become a public charge." 9 F.A.M. § 302.8-2(B)(1). Indeed, as described by the State Department, "the long-standing legal presumption [is] that an able-bodied, employable individual will be able to work upon arrival in the United States," and thus the public charge exclusion does not apply even if such individuals receive food stamp benefits, now called SNAP. Dep't of State, Cable on I-864 Affidavit of Support: Update No. 14—Commitment to Provide Assistance (June 8, 1998).

**E.** **Congress Has Authorized The Extension Of Non-Cash Benefits To Immigrants Subject To The Public Charge Rule.**

In recent years, Congress has taken steps to ensure that non-citizens subject to the public charge rule remain eligible for non-cash benefits. For example, in 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, 110 Stat. 2105 (1996) ("PRWORA" or "Welfare Reform Act"), which excluded non-citizens from many federal and state cash public benefits programs, but ensured that immigrants remained eligible for numerous non-cash benefits, including emergency medical assistance, disaster relief, immunization services, and public housing and the Section 8 program. 8 U.S.C. §§ 1611(a), (b), 1621(a), (b). Subsequently, Congress rolled back portions of the PRWORA to allow non-citizens that fall into certain categories to qualify for supplemental nutrition benefits and to authorize Medicaid and children's health insurance for non-citizen children and pregnant women. *Farm Security and Rural Investment Act of 2002*, Pub. L. No. 107–171, § 4401, 116 Stat. 134

(2002). Despite numerous opportunities to change the statutory course, Congress has uniformly acted to preserve the ability of non-citizens to access non-cash benefits without becoming subject to the public charge exclusion.

> **F.    As With The Meaning Of Public Charge, Federal Agency Guidance Continues To Conform To Congress' Expressed Intent That Non-Citizens Retain The Ability To Access Non-Cash Benefits.**

In 1999, INS proposed a rule and issued field guidance to clarify how and when immigrants could access public benefits without becoming a public charge. *Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 (May 26, 1999) ("1999 NPRM"); *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (May 26, 1999) ("Field Guidance"). INS issued the 1999 NPRM and Field Guidance following extensive consultation with benefit-granting agencies—including the Departments of Health and Human Services, Department of Agriculture, and the Social Security Administration—with the intent to summarize "longstanding law with respect to public charge and provide new guidance on public charge determinations." Field Guidance at 28,689. The 1999 NPRM stated that "receipt of *cash assistance for income maintenance*" is the best evidence of primary dependence on the Government" because "non-cash benefits generally provide supplementary support ... to low-income working families to sustain and improve their ability to remain self-sufficient." 1999 NPRM at 28,677-28,678 (emphasis added). Accordingly, INS recognized that "past receipt of *non-cash* benefits" and even "past receipt of special-purpose cash benefits" should not be taken into account in the public charge determination, Field Guidance at 28,690 (emphasis added), let alone establish that a recipient is "likely" to become a public charge.

G.     **The Proposed Rule Dramatically Changed The Fundamental Principles Of United States Immigration Law By Redefining The Term "Public Charge" To Include People Who Are Minimally Reliant On Public Services.**

On October 10, 2018, DHS published in the Federal Register a Notice of Proposed Rulemaking ("Proposed Rule") regarding the public charge ground for inadmissibility.  83 Fed. Reg. at 51,114-51, 51,296. The Proposed Rule dramatically expanded the definition of public charge and the process used by DHS to determine whether an applicant is likely to become a public charge.  Among its many changes, the Proposed Rule redefined "public charge" from someone who is "primarily dependent" on the government for their long-term support and subsistence, to someone who is likely to receive public benefits such that their cumulative value exceeds 15 percent of the Federal Poverty Guideline during any 12-month period.  83 Fed. Reg. at 51,164.  The Proposed Rule also expanded the benefits considered by DHS when making the public charge determination to include non-cash benefits like SNAP, Medicaid, and housing assistance, and assigned a specific weight to various factors considered by DHS in the public charge context.  *Id*. at 51,165.  DHS received over 250,000 comments in response to the Proposed Rule, "the vast majority of which opposed the rule."  84 Fed. Reg. at 41,297. These comments highlighted the economic, public health, and safety drawbacks flowing from implementation of the Proposed Rule, as well as the fact that the Proposed Rule targeted vulnerable and protected classes, including people with disabilities, the elderly, and people of color.

II.    **The Final Public Charge Rule Abandons The Established, Historical Meaning Of Public Charge In Contravention Of Congressional Intent And Over 130 Years Of Legal Precedent.**

Despite the overwhelmingly negative response to the Proposed Rule, and over 130 years of settled law consistently defining "public charge," DHS published the Final Rule in the Federal Register altering both the definition of public charge and the manner in which the public charge

determination is reached.  84 Fed. Reg. at 41,292-508.  Indeed, DHS acknowledges that the Final

Rule "redefines" the accepted meaning of "public charge":

> Since 1999, the prevailing approach to public charge inadmissibility has been
> dictated primarily by the [Field Guidance] … Under that approach, "public
> charge" has been interpreted to mean a person who is "primarily dependent on the
> Government for subsistence, as demonstrated by either the receipt of public cash
> assistance for income maintenance or institutionalization for long-term care at
> Government expense."  As a consequence, an alien's reliance on or receipt of non-
> cash benefits such as the Supplemental Nutrition Assistance Program (SNAP), or
> food stamps; Medicaid; and housing vouchers and other housing subsidies are not
> currently considered by DHS in determining whether an alien is deemed likely at
> any time to become a public charge.
>
> *DHS is revising its interpretation of "public charge" to incorporate consideration
> of such benefits*, and to better ensure that aliens subject to the public charge
> inadmissibility ground are self-sufficient, *i.e.*, do not depend on public resources
> to meet their needs, but rather rely on their own capabilities, as well as the
> resources of family members, sponsors and private organizations.  *This rule
> redefines the term "public charge" to mean an alien who received one or more
> designated public benefits for more than 12 months in the aggregate within any
> 36-month period ….*

84 Fed. Reg. at 41,294-95 (emphasis added).

The Final Rule makes the following sweeping changes, among others:

- The Final Rule eliminates the "primarily dependent" language from the definition of
  public charge in favor of defining public charge as any non-citizen who "receives one
  or more public benefits" even for a limited duration.  8 C.F.R. § 212.21(a).  This
  drastic redefinition of public charge contradicts Congress' clear intent, as described
  above. DHS exceeds its statutory authority by adopting this standard without
  evidence that a limited use of public benefits constitutes a "likely" long-term
  dependence on the government.

- The Final Rule authorizes the consideration of non-cash benefits, in any amount, with
  respect to the public charge determination.  8 C.F.R. § 212.22(b)(2), (4), (6).  DHS
  failed to provide an adequate statutory basis in deriving the vast increase of benefits
  considered in the Final Rule's public charge assessment, and provided no justification
  for its extreme departure from express Congressional direction.

- The Final Rule increases the statutory factors an immigration official must consider
  when making a public charge determination to include family size, English-language
  proficiency, and simply applying for an enumerated benefit.  8 C.F.R. § 212.22.  This
  approach ignores Congress' express directions to weigh the "totality of

circumstances" with respect to the statutory factors properly bearing on the public charge determination, and thus exceeds DHS' authority. In requiring a comprehensive assessment, the INA explicitly requires a case-by-case assessment of each applicant, and prohibits using the "existence or absence of a particular factor" as the "sole criterion" for determining whether an individual is likely to become a public charge. *See* 64 Fed. Reg. at 28,690. The Final Rule's differential weighing of specific factors ignores Congress' statutory mandate.

Under the above criteria, approximately one-third of all United States citizens would likely be considered public charges. (Morrison Decl., Ex. A.) While DHS claims that the Final Rule will result in savings for federal and state government, this position ignores the overwhelming evidence of economic, public health, and other harms flowing from the Final Rule's imposition, all of which will lead to much higher costs for local governments. *See* Declaration of Grace B. Hou, Secretary for the Illinois Department of Human Services ("Hou Decl."), attached hereto as Exhibit 2, at ¶¶ 8, 18, 19, 24.

**III.    The Illegal Final Rule Irreparably Harms Plaintiffs.**

**A.    The Chilling Effect Generated By The Final Rule Imposes An Incalculable Cost On Cook County And The Health Of Cook County Residents.**

Plaintiff Cook County, through the Cook County Health and Hospitals System ("CCH"), operates one of the largest public hospital systems in America, serving the residents of the nation's second most populous county. *See* Declaration of Katherine Chan, CCH Director of Policy ("Chan Decl."), attached hereto as Exhibit 3, at ¶ 5. CCH delivers its patient services at a number of different locations, including hospitals, regional outpatient centers, community-based health centers, a comprehensive HIV and infectious disease center, and the Cook County Jail and Juvenile Temporary Detention Center. (Chan Decl. at ¶ 8.) CCH also includes the Cook County Department of Public Health, which serves most of suburban Cook County, and CountyCare, the largest Medicaid managed care plan serving Cook County Medicaid beneficiaries, with 330,278 enrollees. (*Id.* at ¶¶ 8, 13.)

In 2018, CCH saw 142,735 visits in its Emergency Department, 29,117 visits for inpatient services, 873,822 visits for outpatient services including 217,152 primary care provider visits and 334,901 specialty care/diagnostic procedure provider visits, and 93,435 visits for correctional health. (Chan Decl. at ¶ 10.) Furthermore, in fiscal year 2018, 42.5 percent of CCH patients were uninsured, while only 4.4 percent of its patients were commercially insured. (Chan Decl. at ¶ 12.) Medicaid covered 35.4 percent of CCH patients and Medicare covered another 15.9 percent. (Chan Decl. at ¶ 12.)

Because of the uncertainty flowing from the Final Rule's confusing and arbitrary application, implementation of the Final Rule will lead to broad disenrollment from benefits and harm to public health. (Chan Decl. at ¶¶ 20, 25, 30, 37; Morrison Decl. Ex. B.) Individuals have refrained and will continue to refrain from seeking health services, food, and other programs for themselves and their children, based on fears that using those benefits will prevent them from adjusting status. If the Final Rule is implemented, even more immigrants will refrain from seeking Medicaid and other necessary health services, food, and other programs for themselves and their children, based on fears that using those benefits will prevent them from adjusting status. *See* Declaration of Lawrence Benito, Executive Director of ICIRR ("Benito Decl."), attached hereto as Exhibit 4, at ¶ 20-23. As a result, Cook County and its agencies will be exposed to increased direct and administrative costs from: (1) loss of revenue to CCH and the CountyCare insurance plan, jeopardizing the fiscal stability of the health system and threatening the healthcare safety net serving the entire County; (2) increased financial and administrative burden on CCH; and (3) fiscal losses due to reduction in federal funds supporting the County economy. (Chan Decl. at ¶¶ 30, 41, 42; Hou Decl. at ¶ 24.) At minimum, CCH anticipates an

annual loss of $30 million in Medicaid reimbursements, which does not take into account long-term cost increases CCH and the County will experience. (Chan Decl. at ¶¶ 7, 40.)

Indeed, the chilling effect described above with respect to enrollment in benefits programs is well known to DHS, which has estimated that the Final Rule will lead to a 2.5 percent disenrollment from those programs it now covers explicitly—SNAP, Medicaid, and housing assistance. 84 Fed. Reg. at 41,463. In absolute numbers, DHS estimates that "324,438 individuals who are members of households with foreign-born non-citizens and about 9,632 households with at least one foreign born non-citizen will choose to disenroll from or forego [sic] enrollment in a public benefits program." 84 Fed. Reg. at 41,463. Although a disenrollment of even this magnitude would have devastating consequences, DHS likely underestimates the chilling effect of its final rule. Independent experts have predicted that disenrollment will actually occur at a rate of between 15 and 35 percent, *i.e.*, a rate 6 to 14 times greater than DHS predicts. (Morrison Decl. Exs. C, D.) A chilling effect of this magnitude would have devastating consequences to Cook County both in terms of an increased burden on Cook County Hospitals and a general deterioration in public health. (Chan Decl. at ¶¶ 20, 37, 40-43; Declaration of John Peller, President and CEO of AIDS Foundation of Chicago ("Peller Decl."), attached hereto as Exhibit 5, at ¶¶ 29-39.)

### B. The Final Rule Frustrates The Core Mission Of ICIRR And Requires The Significant Diversion Of Resources To Address The Final Rule, As Well As Decreases The Ability Of ICIRR To Provide Vital Services.

Similarly, the destructive consequences of the Final Rule frustrate ICIRR and its member organizations' core mission of providing health and social services to immigrant Illinoisans. *See* Benito Decl. at ¶¶ 3-18, 23, 28, 38-42. ICIRR is a membership-based organization that represents nonprofit organizations and social and health service providers throughout Illinois that deliver and seek to protect access to health care, nutrition, housing, and other services for

immigrants regardless of their financial means or immigration status. (*Id.* at ¶¶ 3-10.) In direct response to the threat of the Proposed Rule and Final Rule and the growing fear and confusion within immigrant communities, ICIRR co-founded the Protecting Immigrant Families-Illinois coalition ("PIF-IL"). (*Id.* at ¶¶ 11-12.) PIF-IL was created specifically to resist the proposed harmful changes to the public charge test and provide assistance and accurate information to immigrant communities seeking to safely make use of public benefits for which they are eligible. (*Id.* at ¶¶ 11-12.) As a PIF-IL founding member, ICIRR has had to devote substantial resources to, among other things, educating individuals, service providers, and other constituencies about the public charge rule and the Proposed and Final Rules through numerous trainings and briefing. (*Id.* at ¶¶ 12-18.)

The Final Rule has already forced, and will continue to force, ICIRR and its members to divert resources from their planned work. (*Id.* at ¶¶ 14-18, 21-22; 24, 27-28, 31, 33-37, 39-42.) This diversion of resources has required ICIRR to forgo planned advocacy activities so that it can divert resources to educating immigrant communities about the Final Rule and ensuring that immigrant households continue to lawfully access the critical services that lead to healthy, productive, and successful lives. (*Id.* at ¶¶ 14-18, 21-22, 39-42.) The increased strain on its resources resulting from the confusion and uncertainty over the Final Rule has also forced ICIRR to provide overtime pay to staff who provide public education trainings so that the communities ICIRR serves receive sufficient and accurate information about the Final Rule. (*Id.* at ¶¶ 15, 17, 22.)

Moreover, ICIRR and its members are also affected by the chilling effect of the Final Rule on enrollment in important non-cash benefit programs. (*Id.* at ¶¶ 19-37.) Individuals have refrained and will continue to refrain from seeking health services, food, and other programs for

15

themselves and their children, based on fears that using those benefits will prevent them from adjusting their immigration status. (*Id*. at ¶¶ 19-20, 23, 33, 35-37.) In order to combat these problems, ICIRR and its members will be forced to expend their limited resources to coordinate with its clients and partners to ensure that immigrant families and the agencies that serve them are educated about the Final Rule. (*Id*. at ¶¶ 12, 16, 18, 23-24, 33-37.) This has necessitated a diversion of resources from ICIRR's core mission of providing individualized assistance to immigrants seeking health care and SNAP. (*Id*. at ¶¶ 12-18, 21-22, 28, 31, 40-41.) Overall, the resources required to respond to the benefit enrollment issues created by the Final Rule will continue to cause ICIRR and its members to serve fewer clients and to spend less time advancing their core mission. (*Id*. at ¶¶ 13-14, 19, 23, 25-27, 33-37.) Moreover, as ICIRR and its members receive reimbursement from the state for facilitating enrollment in public benefits, declining enrollment directly affects ICIRR and its members expected income and the quality of services ICIRR and its members can afford to supply. (*Id*. at ¶¶ 29-30.)

### C. Defendants Concede That The Final Rule Will Inflict Incalculable Economic Harm On The Plaintiffs And Residents Of Cook County.

The Final Rule will significantly harm public health by endangering health insurance coverage, access to nutritional, housing, and other important supports for a substantial number of Plaintiffs' residents and member organization clients. (Chan Decl. at ¶¶ 25, 28, 36-39; Benito Decl. at ¶¶ 19-20, 23, 30, 33, 35-37; Peller Decl. at ¶¶ 29-39.) Significantly, DHS concedes that the Final Rule will increase food insecurity and reduce public health while imposing increased costs on states and localities. 84 Fed. Reg. at 41,313 ("DHS appreciates … the potential nexus between public benefit enrollment reduction and food insecurity, housing scarcity, public health and vaccinations, education health-based services, reimbursement to health providers and increase costs to states and localities."). For example, Cook County alone

16

has more than 1,096,150 foreign-born residents from all over the world, and an estimated 13% of its overall population, 658,000 people, could be affected by the Final Rule. (Morrison Decl. Ex. E.) As members of the population disenroll from public health services or use those services less, downstream costs for high-severity medical services will increase. (Chan Decl. at ¶¶ 21, 32, 49.)

The financial effects of this public charge rule are estimated to result in an annual loss of $30 million in Medicaid reimbursement to CCH. (Chan Decl. at ¶ 40.) Furthermore, CCH provides approximately 50 percent of all charity care in Cook County, and if the Final Rule is implemented, CCH expects its share of charity care to increase. (Chan Decl. at ¶¶ 42, 43.) By the end of the current fiscal year, which ends on November 30, 2019, CCH estimates that it will spend $544 million on uncompensated care, which amounts to an eight percent increase from the preceding fiscal year, a 73% increase from 2014, and the highest expenditure since early expansion of Medicaid in Cook County began in 2012/2013. (Chan Decl. at ¶ 45.)

Moreover, an increase in uninsured residents will significantly impact the health of Cook County residents and create a sicker and less productive population. (Chan Decl. at ¶¶ 20, 21, 48, 50.) Among other things, uninsured persons are less likely to receive immunization, thereby increasing the risk of vaccine-preventable diseases to the entire community and are less likely to seek diagnostic testing, thereby increasing the potential for communicable diseases like HIV/AIDS to spread through the community. (Chan Decl. at ¶ 33; Peller Decl. at ¶¶ 29, 32.)

The Final Rule similarly threatens to undermine other Cook County programs devoted to promote resident health and safety. For example, the Final Rule will: (1) increase food insecurity by decreasing participation in SNAP and related food assistance programs; and (2) harm Cook County's economic interests by reducing federal benefits flowing from these lost

benefits. (Chan Decl. at ¶¶ 37, 38, 41-43; Benito Decl. at ¶¶ 19-20, 23, 30, 33-37.) Moreover, Cook County will be forced to shoulder the burden of administering many of the programs implicated by the Final Rule's chilling effect. (Chan Decl. at ¶¶ 30, 42.) Cook County will need to both train its staff to respond to the significant changes introduced by the Final Rule across the variety of benefit programs it administers, and process increased disenrollment, thus diverting resources from its core mission: providing critical services to its residents. (*See* Chan Decl. at ¶¶ 30, 42; Declaration of Catherine Nicole Longkumer, Managing Attorney for the Individual Rights and Social Justice Practice Group at the Legal Aid Society ("Longkumer Decl."), attached hereto as Exhibit 6, at ¶ 22.) The overall harms flowing from the Final Rule's implementation to the public health, safety, and economic well-being of the Plaintiffs are effectively incalculable.

## SUMMARY OF ARGUMENT

Plaintiffs seek an immediate stay and/or injunctive relief to prevent DHS from implementing a Final Rule that thwarts Congressional intent, runs counter to the evidence in the administrative record, and would have devastating impacts on the health and welfare of the communities that Plaintiffs serve, as well as Plaintiffs' ability to continue to provide services to those communities. As an initial matter, DHS' actions plainly violate the requirements imposed by the APA. First, given Congress' clear intent and the widespread understanding of the term "public charge" as referring to primary dependence on public assistance for subsistence, which has been well-settled for over a century, DHS lacks the discretionary authority to redefine the term through administrative rulemaking. As explained by the Supreme Court, if "Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). Here, Congress has repeatedly legislated against the backdrop of the settled meaning of "public

charge," and has rejected, at every opportunity, legislation that seeks to expand the public charge category, as the Final Rule seeks to do here.

Second, even if DHS retains the authority to amend the understanding of "public charge" through rulemaking, the Final Rule it seeks to promulgate is arbitrary, capricious, and represents an abuse of discretion that must be set aside. It is well settled that when an agency changes course from a well-established prior policy, it must provide a reasoned explanation for setting that prior policy aside. Here, DHS received over 250,000 comments regarding the Final Rule, the vast majority of which were negative. Yet DHS failed to specifically address or even evaluate the significant harms these commenters identified. Indeed, the administrative record fails to provide a reasoned justification for the sweeping policy change enacted by the Final Rule. Moreover, the Final Rule promotes the consideration of factors entirely unrelated to and at times directly at odds with its purported purpose. Finally, it violates a host of other statutory regimes, including the prohibition on discrimination against disabled individuals that is set forth in Section 504 of the Rehabilitation Act.

Not only are Plaintiffs likely to prevail on the merits of their APA claim, but the implementation of the Final Rule will inflict incalculable harm on public health, well-being, and the Cook County economy. Because the public interest weighs strongly in favor of requiring administrative agencies to follow the law, and the Defendants will not be harmed by an injunction preventing them from changing the *status quo* that has been in place for decades, this Court should enter a stay and/or immediate injunctive relief within the State of Illinois to allow for the full evaluation of the Final Rule without the looming specter of irreparable injury.

## STANDARD OF REVIEW

This Court has the power under Federal Rule Civil Procedure 65 to enjoin the implementation of the Final Rule in the State of Illinois, and/or under Section 705 of the APA to

stay the implementation of the Final Rule within the State of Illinois, pending judicial review. *See* 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."). The purpose of Section 705 is to allow courts "to maintain the status quo …. [t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 105–07 (D.D.C. 2018) (quoting APA, Pub. L. 1944-46, S. Doc. No. 248, at 277 (1946)); *see also* Attorney General's Manual on the Administrative Procedure Act 105 (1947), available at https://tinyurl.com/y3engujs ("The function of such a power is, as heretofore, to make judicial review effective.").

The same traditional equitable factors that govern a motion for a preliminary injunction apply to an application for a Section 705 stay: (1) likelihood of success on the merits; (2) irreparable injury; (3) the balance of equities; and (4) the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990) ("The standard is the same whether a preliminary injunction against agency action ... or a stay of that action is being sought ...."). As elsewhere, "[t]he 'sliding scale' approach followed in [the Seventh] [C]ircuit balances the degree of likelihood of success on the merits against the irreparable harms. Thus, the more likely the moving party will succeed on the merits, the less the element of irreparable harm must weigh in its favor." *Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994); *see also Valencia v. City of Springfield, Illinois*, 883 F. 3d 959, 966 (7th Cir. 2018) ("the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win,

the more need it weigh in his favor.'") (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F. 3d 1079, 1086 (7th Cir. 2008)). "'Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest).'" *Id.* (quoting *Girl Scouts*, 549 F.3d at 1086 and *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

Whether pursuant to a Rule 65 injunction or a Section 705 stay, the implementation of the Final Rule within the State of Illinois should be barred pending further judicial review.

## ARGUMENT

### I. Plaintiffs Are Likely To Succeed On The Merits.

In order to demonstrate a likelihood of success on the merits, a plaintiff must demonstrate "a plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co*., 582 F.3d 721, 725 (7th Cir. 2009). Courts should not "improperly equat[e] 'likelihood of success' with 'success.'" *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1981)). "[T]he threshold for establishing likelihood of success is low." *Id.* A plaintiff need "only to present a claim plausible enough that (if the other preliminary injunction factors cut in their favor) the entry of a preliminary injunction would be an appropriate step." *Id.* at 783. Here, Plaintiffs have standing to assert, and have a likelihood of success on the merits on, their claims under the APA (Complaint, Counts I-III).[3]

---

[3] Plaintiffs are limiting their request for a stay or for injunctive relief to their claims brought under the APA.

A.    **Plaintiffs Have Article III Standing To Challenge the Implementation Of The Final Rule.**

To establish Article III standing to seek judicial redress as a result of Defendants' threatened action in implementing the Final Rule to the non-citizen residents of Illinois, Plaintiffs must show that: (1) "they are under an actual or imminent threat of suffering a concrete and particularized 'injury in fact;'" (2) "this injury is fairly traceable to the defendant's conduct;" and (3) "it is likely that a favorable judicial decision will prevent or redress the injury." *Common Cause Ind. v. Lawson*, No. 18-2491, 2019 WL 4022177, at *3 (7th Cir. Aug. 27, 2019). Here, Plaintiffs carry this burden because they are faced with the concrete, particularized and direct economic harm caused by the implementation of the Final Rule, which will cause tens of thousands of residents to forgo critical public benefits to the detriment of themselves and Plaintiffs.

1.    **Cook County Has An Actual And Imminent Threat Of Suffering Injury In Fact Due To Defendants' Conduct.**

Seventh Circuit precedent provides that a unit of local government like Cook County may demonstrate standing in cases where it alleges an injury to itself or where it acts as a representative vindicating the injuries to its residents. *City of Milwaukee v. Saxbe*, 546 F.2d 693, 698 (7th Cir. 1976); *see also City of N. Chi. v. Hanovnikian*, No. 06 C 0962, 2006 WL 1519578, at *2 (N.D. Ill. May 30, 2006). Courts have routinely acknowledged that municipalities have standing to sue to protect interests that "are as varied as the municipalities' responsibilities, powers and assets." *Vill. of Riverdale v. 138th St. Joint Venture*, 527 F. Supp. 2d 760, 764 (N.D. Ill. 2007); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004); *see also Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 526 (N.D. Cal. 2017*), reconsideration denied*, 267 F. Supp. 3d 1201 (2017) (holding that counties had standing where proposed federal law would result in loss of federal funds).

In *Sausalito*, a city brought suit to enjoin the federal government from implementing a plan to develop and rehabilitate a former military base near the city. *Sausalito*, 386 F.3d at 1194. The city contended that the federal government's plan violated numerous federal statutes, including the APA, and would harm the city's tourism industry and local property and sales tax revenue. *Id.* at 1198. The Ninth Circuit held that the city met its burden of establishing concrete "injury in fact" to its proprietary interests, relying on the declaration of its city manager attesting, in relevant part, that:

> Sausalito expends millions of dollars annually on the maintenance and management of [City's public facilities and infrastructure], and on the provision of public services including ... enforcement of land use plans and zoning regulations.
>
> Sausalito and its citizens and employees would be harmed by implementation of the [proposed plan] and the 2,700 daily visitors it would unleash in numerous significant respects including, but not limited to: congested streets, parks, parking lots, and sidewalks, increased crime, noise and trash, impaired and impeded use of streets for fire, police and other emergency services and for the City's natural gas shuttle bus service, impaired air quality, particularly along major thoroughfares, lost property and sales tax revenue due to impaired vehicular movement and commerce rendering [the City] less attractive to business.
>
> The [proposed plan] will harm Sausalito's tourism industry because added traffic congestion and crowded streets will destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes. The City's tourism industry and dependent property and sales tax revenues would also suffer because the City's marina, parks, trails and shoreline would be less attractive and ecologically healthy ....

*Id*.

Here, Cook County has an actual and imminent threat of suffering a concrete and particularized "injury in fact" that is just as certain, and far more impactful, than the potential harms the city manager described in *Sausalito.* There is no dispute that the Final Rule will cause individuals to disenroll from, or refrain from enrolling in, critical public benefits out of fear of receiving a public charge classification and the consequences such a classification might have on their immigration status. (Chan Decl. at ¶¶ 25, 30.) DHS concedes that the Final Rule will cause

members of mixed-status households, including U.S. citizens, to disenroll from benefits. 84 Fed. Reg. at 41,300. In fact, Cook County residents already started to disenroll from these public benefits after the concept of the Proposed Rule was contained in a draft Executive Order, which was leaked to a news site in January 2017, and in anticipation of the implementation of the announced Final Rule—making the impact of the agency action even more foreseeable, certain, and concrete than those predicted by the city manager in *Sausalito*.[4] (*See* Chan Decl. at ¶ 45.) If the Final Rule is implemented, its chilling effect would impose significant, direct costs on Cook County, including: (1) loss of revenue to the Cook County Health System and the CountyCare insurance plan—both institutions operated by the County—due to reduction in Medicaid reimbursements; and (2) diversion of limited resources due to: (a) the increased burden on CCH as it offers assistance, resources, and training to help mitigate the negative impact of the Final Rule; and (b) the increased amount of uncompensated care CCH will be required to provide. (Chan Decl. at ¶¶ 30, 41-45.) Based on an analysis that was prepared on behalf of America's Essential Hospitals and other trade associations by Manatt Health, and per CCH's subsequent discussions with America's Essential Hospitals, the public charge rule is estimated to cause an annual loss of $30 million in Medicaid reimbursement to CCH. (Chan Decl. at ¶ 40.)

These harms to Cook County, which are described in extensive detail in the Chan declaration and the sections that follow, are "fairly traceable"—indeed, they are directly traceable—to Defendants' conduct and, therefore, a ruling in Plaintiffs' favor would remedy such

---

[4] Memorandum from Andrew Bremberg on Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability & Responsibility (Jan. 23, 2017), *available at* https://cdn3.vox-cdn.com/uploads/chorus_asset/file/7872571/Protecting_Taxpayer_Resources_by_Ensuring_Our_Immigration_Laws_Promote_Accountability_and_Responsibility.0.pdf; Randy Capps and Michael Fix, *Leaked Draft of Possible Trump Executive Order on Public Benefits Would Spell Chilling Effects for Legal Immigrants,* MIGRATION POL'Y. INST. (February 2017), https://www.migrationpolicy.org/news/leaked-draft-possible-trump-executive-order-public-benefits-would-spell-chilling-effects-legal.

harm. *See Common Cause Ind.*, 2019 WL 4022177, at *3. First, non-citizen residents disenrolling from or refraining from enrolling in public benefits directly causes, and will continue to cause, the County's healthcare system to lose significant revenue. (Chan Decl. at ¶¶ 42-44.) Second, with respect to the County's diversion of its limited resources, the Seventh Circuit has articulated that courts must focus on whether the plaintiff's activities were "undertaken because of the challenged law, not whether they are voluntarily incurred or not." *Common Cause Ind.*, 2019 WL 4022177, at *9. The resource-related harms here, in the form of the County's technical assistance and training efforts, "arise from the organization's need to counteract the defendants' allegedly illegal practices [the Final Rule], making that drain simply another manifestation of the injury" to the County. *Id.*; (Chan Decl. at ¶ 30). Indeed, the Seventh Circuit instructs that the fact that a law may "create more work for" the County is "sufficient not only for causation but for the redressability element of standing, since without [the law] there will be less drain on their resources." *Common Cause Ind.*, 2019 WL 4022177, at *9.

Accordingly, Cook County has sufficiently shown an actual and imminent, concrete and particularized harm to itself as a result of Defendants' threatened implementation of the Final Rule sufficient to demonstrate its standing.

> ## 2. ICIRR Has An Actual And Imminent Threat Of Suffering Injury In Fact Due To Defendants' Conduct.

An organization may assert that it has standing in a representative capacity—on behalf of its members—or that it has standing in its own right as an organization. *Havens Realty v. Coleman*, 455 U.S. 363, 378 (1982). An organization may demonstrate organizational standing when can it show a "concrete and demonstrable injury [that is fairly traceable to the defendant's actions] to the organization's activities—with the consequent drain on the organization's

resources." *Keep Chicago Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372 (U.S. 1982)). An organization can prove injury by demonstrating that the alleged conduct has frustrated its mission and has caused it to divert resources from its other activities in order to combat a defendant's conduct. *Havens Realty Corp.*, 455 U.S. at 379. Moreover, even a minimal showing of injury is sufficient. *Crawford v. Marion Cty. Election Bd.,* 472 F.3d 949, 951 (7th Cir. 2007). In the Seventh Circuit, a party need only show that it must "devote resources" to oppose a government action instead of using those resources to the benefit of the groups it supports. *See id.* (finding that democratic party had standing to challenge a voter ID law); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("*Havens* makes clear, however, that the only injury which need be shown to confer standing on [an agency] is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.").

ICIRR's mission is to promote the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of Illinois' diverse society and beyond. (Benito Decl. at ¶¶ 4.) In furtherance of its mission, ICIRR's programing includes:

- The New Americans Initiative, which has helped 534,000 people gain access to citizenship and assisted 105,394 immigrants prepare applications for citizenship; helping immigrants prepare applications for citizenship;

- The Immigrant Family Resource Project ("IFRP") (1999), which connected more than 500,000 individuals and families to safety net services;

- The Immigrant Healthcare Access Initiative ("IHAI"), which works to increase access to care and improve health literacy for tens of thousands of low-income uninsured immigrants in Illinois, in order to reduce their reliance on hospital emergency rooms and to improve the overall public health of the community;

- The Illinois Alliance for Welcoming Healthcare, an alliance comprised of 25 healthcare providers including clinics and hospitals, and 20 community-based organizations, convened to create and share best practices in the provision of healthcare services to immigrants and their families; and

26

- Healthy Communities Cook County ("HC3") coalition, which seeks to address and mitigate barriers to accessing healthcare for the uninsured, regardless of immigration status, through policy and systems change.

(*Id*. at ¶¶ 8-10.)

In direct response to the threat of the Proposed and Final Rule and the growing fear and confusion within immigrant communities, ICIRR's mission has been frustrated and as a result, ICIRR has been forced to divert its resources to combatting the adverse effects of the Proposed and Final Rule. Among other steps detailed above, ICIRR was compelled to devote resources to co-founding the PIF-IL coalition in order to respond to and educate the immigrant community about the Proposed and Final Rule. ICIRR estimates that the value of staff time and resources diverted to date to public charge activities—through PIF-IL and the other steps described above—amounts to $100,000 to date, including the costs of paying unplanned overtime; conducting over 50 trainings; and holding other community education events. (*Id.* at ¶ 15.)

As a member-based organization, ICIRR also meets the standing requirement through associational standing. To sue in a representative capacity, plaintiff must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in their lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)*; Keep Chi. Livable*, 913 F.3d at 625.

ICIRR satisfies the first prong of the associational standing test set forth in *Hunt*. ICIRR members have standing to sue in their own right because they will continue to be directly harmed by the Final Rule. With ICIRR as the administrator, multiple ICIRR members work to enroll immigrants in public benefits programs. (Benito Decl. at ¶¶ 29-30, 32-37.) As a direct result of the threat of public charge, ICIRR members have seen a decrease in public benefits enrollment. (*Id*. at ¶¶ 33-37.) Like ICIRR, ICIRR members have also had to divert resources to address their

clients' concerns regarding the Final Rule. (*Id*.)  For example, the Illinois Migrant Council has had to devote three staff members to spend twenty hours per week to address client concerns regarding the Final Rule. (*Id.* at ¶ 33.) As well, Erie Neighborhood House has had to devote a total of about 1,000 hours thus far to deal with the fallout from the Final Rule.  (*Id.* at ¶ 35.) ICIRR members have also had to cut programs and services. For example, the HANA Center has had to cut programs and services, including its Breast Cancer Early Detection Program, so that its staff can spend more time working to address client concerns about the Final Rule. (*Id.* at ¶ 36.)

ICIRR also satisfies the second prong of the *Hunt* test. ICIRR's purpose is to promote the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life in Illinois and beyond. (*Id.* at ¶ 4.) In furtherance of its mission, ICIRR works to expand healthcare access to uninsured immigrants. (*Id.* at ¶¶ 8-10.)  ICIRR's actions here to stop the Final Rule from reducing public benefit use among immigrant communities is therefore directly germane to ICIRR's purpose. (*Id.* at ¶¶ 8-10, 19.)

Lastly, ICIRR satisfies the third prong of the *Hunt* test. None of the claims asserted or the relief requested require the participation of individual ICIRR members.

### 3.    Plaintiffs Are Within The Zone Of Interests Regulated By The Final Rule.

In addition to establishing Article III standing, Plaintiffs satisfy the requirement that their APA causes of action are "arguably within the zone of interests to be protected or regulated by the statute." *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970).  In the APA context, the Supreme Court has acknowledged that this prudential standing test is not meant to be "especially demanding," and that the Court has "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).

The APA allows judicial review of a relevant statute initiated by "[a] person ... adversely affected or aggrieved" by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Where the cause of action is brought under the APA, courts are required to "apply the [zone of interests] test in keeping with Congress' 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Patchak*, 567 U.S. at 225. A plaintiff falls outside the zone when its "interest[s] are ... marginally related to or inconsistent with the purposes implicit in the statute," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), but there is no requirement of "any indication of congressional purpose to benefit the would-be plaintiff," *Patchak*, 567 U.S. at 225 (citing *Clarke*, 479 U.S. at 399). As the Supreme Court held in *Air Courier Conference v. American Postal Workers Union,* for the zone of interests test, "the relevant statute [under the APA] of course, is the statute whose violation is the gravamen of the complaint." *See* 498 U.S. 517, 529 (1991) (quoting *Lujan v. Nat'l. Wildlife Federation*, 497 U.S. 871, 886 (1990)). The gravamen of Plaintiffs' Complaint concerns the Final Rule's changes to INA §1182's grounds for inadmissibility.

As a unit of local government with approximately 658,000 residents that could be affected by the Final Rule and that will be directly affected financially, Cook County falls directly within the zone of interests regulated by the Final Rule. When those affected residents inevitably forgo public services in an attempt to mitigate the Final Rule's impact on their immigration status, Cook County will be forced to shoulder the burden of administering many of the programs that are no longer providing necessary services to those residents. (Chan Decl. at ¶ 41.) This immense administrative burden, and the other serious monetary and public health

impacts outlined throughout this Memorandum and the attached Chan Declaration, inextricably relate to the interests of those residents seeking relief from the Final Rule's detrimental effects on their immigration status, health, and financial well-being.

ICIRR also falls within the zone of interests to be protected or regulated by the INA. Within the INA, Congress gave institutions like ICIRR a role in helping immigrants navigate the immigration process. *See e.g.,* 8 U.S.C. § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process). *See also East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1243-45 (9th Cir. 2018) (holding that immigrant rights organizations met the zone of interest test for their APA challenge to rulemaking on grams of asylum). ICIRR and its members provide health care, nutrition, housing, and other services for immigrants, including help gaining access to citizenship and assisting in access health coverage and food support, among other programs. (Benito Decl. at ¶¶ 8-10, 33-37.) ICIRR and its members have relied on INA §1182 in its current form and interpretation to guide their assistance of the immigrant communities they serve.

Additionally, because the INA has historically designated members of the immigrant community as public charges only when the person would be primarily and permanently dependent on government assistance, ICIRR and its members' missions focus on assisting immigrants in applying for non-cash supplemental assistance. (*Id.* at ¶¶ 8-10, 33-37.) ICIRR and many of its member organizations are funded by the State of Illinois to help immigrants enroll in these benefits. (*Id.* at ¶ 29). The INA's current protections aid ICIRR in fulfilling their mission of ensuring immigrants become full and contributing members of society by helping them integrate economically and socially into Illinois communities. If DHS attaches an inadmissibility determination to the receipt of this expanded list of benefits and disenrollment

30

occurs to the extent projected by experts, ICIRR and its member organizations will be negatively economically impacted by the change. (*Id.* at ¶¶ 29-37). The APA violations ICIRR and its member organizations assert are thus within the zone of interests regulated by INA §1182.

**B.     Plaintiffs Have A Likelihood Of Success On The Merits Of Their Claims Under The APA.**

Plaintiffs have a likelihood of success on the merits on their claims that the Final Rule violates the APA. (Complaint, Counts I-III.) *First*, the Final Rule's expansive new definition of "public charge"—on which the entirety of the Final Rule is premised—deviates from the plain meaning of the statutory language and Congress' clear intent, and therefore must be invalidated at step one of the *Chevron* analysis. *See Chevron*, 467 U.S. at 842. *Second* and alternatively, the Final Rule is arbitrary and capricious because it fails to address evidence of the harm it inflicts on vulnerable people, and includes factors in its public charge test that are unrelated to—and at times at odds with—its purported purpose. (Chan Decl. at ¶ 50.) *Third* and alternatively, the Final Rule is otherwise not in accordance with law because its public charge redefinition and associated weighted circumstances test contravenes a number of other statutes, including: (1) the Rehabilitation Act, (2) the Welfare Reform Act, and (3) SNAP.

**1.     DHS' New Definition Of "Public Charge" Deviates From The Plain Meaning Of The Statutory Language And Congress' Clear Intent, And Is Invalid.**

In *Chevron*, 467 U.S. at 843 n.9, the Supreme Court directed that if "Congress had an intention on the precise question at issue, that intention is the law and must be given effect." The Supreme Court went on to note that where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," *id.* at 843, which is step two of the *Chevron* framework. A

reviewing court does not reach *Chevron*'s step two, however, where the threshold step one inquiry of Congressional intent is determinative.

Under *Chevron*'s first step, the Court should ask whether the statute is ambiguous by "examin[ing] the text of the statute," *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998), and "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).) "A statutory 'provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'" *Util. Air Regulatory Grp. v. E.P.A.*, 573, U.S. 302, 321 (2014) (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988)).

Here, the Court need proceed no further than *Chevron*'s step one and the language of the statute, because both the statutory text and the history of Congress legislating in this area lead to a single conclusion: an immigrant is a "public charge" only if he or she relies primarily and permanently on the state for subsistence. The plain meaning of "public charge" is a person who is primarily dependent on the state for his or her needs. A "charge" is defined as "a person or thing *committed into the care of another*." *Charge*, Merriam-Webster, https://www.merriam-webster.com/dictionary/charge (emphasis added). A "public charge" is thus a person "committed into the care" of the state. A person who receives temporary or incidental benefits, such as SNAP benefits, cannot be said to be "committed into the care" of the state. The Final Rule thus departs from the plain meaning of the statutory text.

Unsurprisingly in light of the text's clear meaning, there has been a consistent understanding among courts and regulators that a public charge is one who requires long-term, primary dependence on long-term subsistence, as evidenced by the receipt of long-term

institutionalization at government expense or cash assistance. This understanding traces back to the 1882 Act to Regulate Immigration, in which Congress authorized immigration officers to refuse entry to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." (1882 Act). *See Catskill Mountains Chapter of Trout v. E.P.A.*, 846 F.3d 492, 515 (2d Cir. 2017) (finding the "'interpretive clues [speak] almost unanimously,' making Congress's intent 'clear beyond reasonable doubt'"). Congress based this definition on the concept of "public charge" already used in several state and local laws, which described people "incompetent to maintain themselves," who "might become a heavy and long continued charge to the city, town or state," "not merely destitute persons, who, on their arrival here, have no visible means of support." *City of Boston v. Capen*, 61 Mass. 116, 121–22 (1851); *Bunker v. Ficke*, 6 Ohio Dec. Reprint 978, 979, 1880 WL 5770 (Ohio Dist. 1880) ("The obvious intention of the framers of the constitution being to regard insane persons as the wards of the state, to be under the fostering and protecting charge of the state"); *Fischer v. Meader*, 111 A. 503, 504 (N.J. 1920) ("abandoned child" in "legal effect … became a public charge, and a ward of the state as *parens patriae*"); *see also* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776–1875)*, 93 Colum. L. Rev. 1833, 1848–59 (1993).

In the years following the initial statutory creation of public charge exclusion, courts interpreted this language consistent with its plain meaning. *See Gegiow v. Uhl*, 239 U.S. 3, 9–10 (1915) (stating that, based on statutory context, individuals "likely to become a public charge" were those akin to "paupers and professional beggars"—those requiring long-term public aid— and rejecting an interpretation in which those who are currently poor but have the ability to work would be deemed a "public charge"); *Ex Parte Hosaye Sakaguchi v. White*, 277 F. 913, 916 (9th Cir. 1922) (determining that a person is likely to become a public charge when "the burden of

supporting the [person] is likely to be cast upon the public"). And Congress re-codified that common law definition as it repeatedly re-adopted the well-understood term "public charge" without modification. For example, Congress employed the same term, for the same purpose, when it enacted the INA in 1952 and expanded various welfare programs throughout the twentieth century. In 2013, Congress squarely considered and rejected a proposed change to the meaning of public charge that is substantially identical to parts of the Final Rule. The proposal would have required immigrants applying for legal permanent resident status "to show they were not likely to qualify even for non-cash employment supports" such as Medicaid and SNAP. S. Rep. No. 113-40, at 42 (2013); *see also id.* at 63 (showing that the rejected amendment "would have expanded the definition of 'public charge' such that people who received non-cash benefits could not become legal permanent residents.") Congress rejected the amendment. *Id*. The law bars DHS from enacting a Final Rule that Congress has squarely rejected. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 414 n. 8 (1975) (the Court rejected an agency's construction of a statute that Conference Committee rejected); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 589-90 (2010) ("We have often observed that when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.") (citations, internal quotation marks, and ellipsis omitted).

Indeed, Congress did not merely remain silent on the topic, but instead repeatedly rejected attempts to expand the meaning of public charge. As discussed above, during legislative efforts that ultimately resulted in the IIRIR, certain legislators proposed expanding the definition of "public charge" much as the Final Rule does now—to mean a non-citizen who receives specified means-tested benefits "for an aggregate period of at least 12 months." 142 Cong. Rec.

24425-27 (Sept. 24, 1996), https://perma.cc/BD5X-4A7W (reprinting H.R. Rep. No. 104-828 (proposing to define "public charge" and "means-tested public benefit" in the deportability context through secs. 532 and 551 of H.R. 2202)).  But Congress rejected the proposal and ultimately enacted an immigration reform bill that made no change to the long-established meaning of the term "public charge."  *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546, 3009-674–75 (1996); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 441–43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

In sum, the statutory text is unambiguous, and Congress' history of legislating on this topic confirms that the statute should be read to mean what it says. DHS may not co-opt Congress' power to legislate through the guise of "interpretation" of an unambiguous term.  *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).  *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147 (2000) (holding that FDA lacks authority to regulate tobacco products as customarily marketed and noting that "before enacting the FCLAA in 1965, Congress considered and rejected several proposals to give the FDA the authority to regulate tobacco").  Accordingly, DHS' attempt to do so is *ultra vires* and unlawful. *MCI Telecomms Corp. v. Am. Telephone & Telegraph Co.,* 512 U.S. 218 (1994). Because the Final Rule is contrary to Congress' intended definition of "public charge," it fails *Chevron*'s step one review and is invalid.

> **2.**  **Even If The Court Were To Find Ambiguity In The INA's Definition Of "Public Charge," The Final Rule Is Arbitrary, Capricious, And Manifestly Contrary To The Statute.**

Even if the language of a statute is found to be ambiguous so that the court must engage in a *Chevron* step two analysis, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion ...."

35

5 U.S.C. § 706(2)(A). A regulation is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, where, as here, an agency changes course from a well-established prior policy, it must provide a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)). This is because a settled course of behavior "embodies the agency's informed judgment" and creates at least "a presumption that th[e] policies [committed to the agency by Congress] will be carried out best if the settled rule is adhered to." *State Farm*, 463 U.S. at 42. A change in administration does not authorize an unreasoned reversal of course. *See Regents of the Univ. of Cal. v. U.S. State Dept.*, 908 F.3d 476, 510 (9th Cir. 2018); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d. 1106, 1123 (N.D. Cal. 2017). Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars*, 136 S. Ct. at 2126. Here, DHS has failed adequately to explain its inconsistency and change from a policy that has been in place for over 100 years.

DHS received over 250,000 comments, the "vast majority" of which opposed the Final Rule and provided compelling evidence of devastating harms likely to result from its implementation. 84 Fed. Reg. at 41,304. DHS largely ignored these concerns and instead chose to finalize, without sufficiently reasoned justification, a Rule that all but admits that it will inflict the many harms warned of by commenters. Where DHS did address concerns, it largely brushed

them aside, stating in conclusory fashion that it did not intend to cause the harms at issue or the purported goal of the Final Rule merited the trade-off. 84 Fed. Reg. at 41,312-43,313 ("But regardless, DHS declines to limit the effect of the rulemaking to avoid the possibility that individuals subject to this rule may disenroll or choose not to enroll, as self-sufficiency is the rule's ultimate aim."). The Final Rule is arbitrary and capricious for two primary reasons: (1) DHS failed to address, justify, or even meaningfully evaluate the many significant harms identified by commenters; and (2) the Final Rule promotes the consideration of factors entirely unrelated to, and at times directly at odds with, its purported purpose.

> **a. DHS Neither Meaningfully Addressed Nor Identified Offsetting Justifications For The Final Rule's Many Devastating Harms.**

As a general rule, "the costs imposed by the agency's action" are a relevant factor that the agency must consider before deciding whether to act. *Mingo Logan Coal Co. v. E.P.A.*, 829 F.3d 710, 732-33 (D.C. Cir. 2016). And where, as here, "an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. E.P.A.,* 682 F.3d 1032, 1039-40 (D.C. Cir. 2012). Although an agency need not respond to every fact or contention raised by the comments submitted, the rule's "basis and purpose statement must identify 'what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.'" *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1469 (7th Cir. 1985) (quoting *Auto. Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C. Cir. 1968)). Thus, if an agency seeks to avoid a finding that a given action is arbitrary or capricious, it "must 'examine all relevant factors and record evidence." *Stewart v. Azar*, 313 F. Supp. 3d 237, 259 (D.D.C. 2018) (quoting *Am, Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017)).

In the Final Rule, DHS either ignores or fails to meaningfully consider financial and other harms the Final Rule will cause, while merely speculating about benefits the Final Rule will allegedly create. This falls well short of DHS' obligation to offer a "satisfactory explanation" for its decision and a "reasoned explanation" for its departure from longstanding guidance and renders the Final Rule invalid. *See Encino Motorcars*, 136 S. Ct. at 2125-26.

Despite conceding that the Final Rule will cause members of mixed-status households, including U.S. citizens, to disenroll from benefits, 84 Fed. Reg. at 41,300, DHS refused to consider and reasonably address the harm associated with such disenrollment, stating: "DHS believes that it would be unwarranted for U.S. citizens and aliens exempt from public charge inadmissibility to disenroll from a public benefit program or forgo enrollment in response to this rule when such individuals are not subject to this rule. DHS will not alter this rule to account for such unwarranted choices." *Id*. at 41,313 (emphasis added). DHS' statement amounts to a disclaimer of duties Congress has imposed on it. DHS is not free to ignore an undisputed impact of the Final Rule simply because DHS believes the impact is "unwarranted." The harms of widespread disenrollment remain harms that DHS itself anticipates and the law requires DHS to consider the harms of disenrollment. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (agency must "pay[] attention to the advantages and the disadvantages of [its] decisions.") Defendants' failure to reasonably address substantial widespread harms they admit will occur renders the Final Rule arbitrary and capricious.

DHS dismissed overwhelming evidence about the chilling effect, claiming that it is "difficult to predict the rule's disenrollment impacts." 84 Fed. Reg. at 41,312. However, when an agency is uncertain about the effects of its action, it may not rely on "'substantial uncertainty' as a justification for its actions." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028

(9th Cir. 2011) (citation omitted). *See also Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821–22 (D.C. Cir. 1983) (vacating agency action that did not give "sufficient consideration to factors that may be highly relevant" and rejecting agency's reliance on "predictive nature of the judgment"); *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (agency must "reflect upon the information contained in the record and grapple with contrary evidence").

Furthermore, numerous commenters warned that the Final Rule would detrimentally impact the public health generally, as well as vulnerable and protected populations specifically, including children, the elderly, and individuals with disabilities. 84 Fed. Reg. at 41,311. *See also* Morrison Decl., Ex. F at 1 ("[W]e oppose the regulation because of how it will exacerbate food insecurity of children."); Morrison Decl., Ex. F at 1 ("The rule would increase poverty, hunger, ill health, and housing insecurity by discouraging enrollment in programs that improve health, food security, nutrition, and economic security, with profound consequences for seniors and their families' well-being and long-term success."); Morrison Decl., Ex. G at 8 ("Medicare is a lifeline for most seniors … Medicaid is critical for long-term services and supports…"). DHS has failed to address drastic harms that the Final Rule will cause, including to public health generally and to vulnerable populations.

DHS received compelling evidence and comments warning that the Final Rule was likely to cause significant public health crises. By deterring participation in Medicaid, the Final Rule would result in decreased vaccinations and a corresponding increase in the transmission of communicable diseases. 84 Fed Reg. at 41,384 (noting comments stating that "uninsured individuals are much less likely to be vaccinated," and that "even a five percent reduction in vaccine coverage could trigger a significant measles outbreak"). Individuals without health

insurance are nearly three times less likely to be vaccinated in comparison to those who are insured, which could drastically reduce the number of vaccinated individuals beyond a five percent reduction. (Morrison Decl., Ex. H.) DHS acknowledged the Final Rule may lead to these public health crises. *See, e.g.*, 83 Fed. Reg. at 51,270 ("[D]isenrollment or forgoing enrollment in public benefits program by [otherwise eligible] aliens" may result in, among other things, increased obesity, malnutrition, and transmission of communicable diseases). Nevertheless, DHS still has not conducted an adequate analysis to measure the public health effects on the American public.

DHS nakedly asserts that the Rule will improve public health, 84 Fed. Reg. at 41,314, without reconciling its assertion with overwhelming public comments to the contrary. The law bars DHS from disregarding this evidence because its failure to adequately consider substantial public health harms constitutes a reversal of its predecessor agency's reasoned expert position. In the 1999 Field Guidance, INS stated that disenrollment from public benefits had "an adverse impact not just on the potential recipients, but on public health and the general welfare." Field Guidance, 64 Fed. Reg. at 28,689. The law also requires an agency's predictive judgments to be based on logic and evidence. DHS has not done so, ignoring both the overwhelming evidence in the record and its predecessor's predictive judgement that was based on logic and evidence. *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 708 (D.C. Cir. 2014) (citations and alterations omitted) ("an agency's predictive judgments about the likely economic effects of a rule are entitled to deference, [but] deference to such judgments must be based on some logic and evidence, not sheer speculation."); *see also Nat'l Wildlife Fed'n v. Costle,* 629 F.2d 118, 134 (D.C. Cir. 1980) ("'[i]t is not in keeping with the rational process to leave vital questions, raised

by comments which are of cogent materiality, completely unanswered' ") (quoting *United States v. Nova Scotia Food Prods. Corp.,* 568 F.2d 240, 252 (2nd Cir. 1977)).

The change DHS made to the Proposed Rule to address these concerns is wholly inadequate, arbitrary, and capricious on its face. Specifically, the Final Rule—in a change from the Proposed Rule—exempts from consideration receipt of Medicaid benefits only for pregnant women and individuals under 21 years of age. *See* 84 Fed. Reg. at 41,384 (asserting, without evidentiary support, that these exemptions "should address a substantial portion, though not all, of the vaccinations issue"). DHS' dismissive response to the public health crises identified as likely to result from the Final Rule underscores the Final Rule's arbitrary and capricious nature. *See* 84 Fed. Reg. at 41,384 (arguing without analysis that, in lieu of Medicaid, unidentified "local health centers and state health departments may provide certain health services addressing substance abuse and mental disorders").

DHS also received many comments detailing the discriminatory and harmful effects the Final Rule will have on individuals with disabilities. *See, e.g.*, 84 Fed. Reg. at 41,367. For example, commenters noted that counting an individual's disability as a negative health factor was discriminatory and would overlap with receipt of other public benefits—a particularly concerning calculation given that where an individual receives more than one non-cash benefit in a given month, the Final Rule considers each benefit as a separate month of receipt for purposes of determining whether the 12-month threshold has been met. *See* Morrison Decl., Ex. I at 3, 4 ("This standard is broad enough to sweep in virtually every person with any type of significant disability and…many individuals with disabilities that are less significant. Some might even read it to apply to any child with an Individualized Education Plan (IEP), or any person who needs reasonable accommodations to work."). *See also* 84 Fed. Reg. 41, 295-97.

Further, many of the services on which people with disabilities rely are available only through Medicaid, meaning that the Final Rule will separate these already-vulnerable individuals from the very services that assist them in reaching DHS' purported goal of "self-sufficiency." DHS conceded the potentially "outsized impact" the Final Rule might have on specific vulnerable populations, including individuals with disabilities.  84 Fed. Reg. at 41,368.  DHS largely dismissed such concerns, however, noting that "it is not the intent, nor is it the effect of this rule to find a person a public charge *solely* based on his disability."  *Id.* (emphasis added). But, as commenters noted, DHS' selection of arbitrary, poorly defined, and overlapping factors will not only inflict severe harm on this already vulnerable population, but will also give immigration officials unfettered discretion to deem them public charges.  *See* Morrison Decl., Ex. I at 6  ("[T]he proposed formula effectively authorizes blanket determinations that anyone with a significant disability is likely to become a public charge.").  DHS' disregard for the evidence it received, as well as its refusal to meaningfully address the discriminatory and lasting harms on individuals with disabilities, further underscores the arbitrary and capricious nature of the Final Rule.  *See State Farm*, 463 U.S. at 43 ("[A]n agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency").

> **b.** **The Final Rule's Benefit-Use Threshold, Factors, And Weighing Scheme Are Unsupported, Irrational And At Odds With The Final Rule's Purported Purpose.**

DHS' multifactor test is itself arbitrary and capricious.  As set forth below, DHS has radically broadened the public charge definition to include even *de minimis* use of non-cash benefits, relies on factors that are inconsistent, and often directly at odds, with the Final Rule's purported purpose, and created an opaque weighing scheme that is unpredictable and unworkable, further demonstrating the lack of any "rational connection between the facts found

and the choice made." *State Farm*, 463 U.S. at 43. The Final Rule's benefit-use threshold would consider an applicant a public charge based on 12 months of even a minimal amount of benefit usage within a 36-month period. This calculation is irrational. Under the Final Rule, a person who received less than 50 cents per day in food assistance—a standard SNAP benefit amount for recipients at the higher end of income eligibility—would be judged a public charge. A person receiving that level of benefit could receive less than 1% of their annual income from the federal government, but still be deemed a public charge under the Final Rule. *Id.* DHS has offered no justification for a change that flies in the face of the plain meaning of the word "charge."

Second, the fact that such *de minimis* use of benefits could render someone a public charge is even less rational when considered alongside the income thresholds at which a non-citizen's income is a positive factor under the Final Rule. For example, the Final Rule states that "the minimum income threshold to be considered a positive factor in the totality of the circumstances is generally 125 percent of the Federal Poverty Guideline." 84 Fed. Reg. at 41,323. But individuals whose incomes far exceed that threshold qualify for many of the non-cash benefits that, if used, would render an individual a public charge. For example, Illinois offers SNAP to households with incomes as high as 200% of the Federal Poverty Guideline.

Third, DHS added a host of new factors to the public charge assessment, and many of them are irrational and even antithetical to the Final Rule's stated purpose. For example, while the Final Rule considers large family size as a negative factor in a public charge assessment, DHS' own data indicates that non-cash benefit use is higher among families of three (22.3%) than families of four (20.7%), and that non-citizens' use of cash benefits *decreases* as family size grows. 84 Fed. Reg. at 41,395. It is also irrational for the Final Rule to consider the mere *application* for benefits in the public charge determination. The fact of an application for benefits

43

does not indicate a non-citizen is actually financially and otherwise eligible for the benefit or will decide to *use* the benefit. Commenters raised all these issues with these factors, but DHS disregarded those comments without providing a reasoned explanation for doing so. *See* 84 Fed. Reg. at 41,395 (family size); *id.* at 41,424-25 (fee waiver); *id.* at 41,424 (consideration of application for benefits). Accordingly, the Final Rule's mechanism for determining who constitutes a public charge fails to conform with the Final Rule's purported goal of self-sufficiency.

### 3. The Final Rule Contravenes Several Statutes And Therefore Is Not In Accordance With The Law.

Also under *Chevron*'s second step, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... otherwise not in accordance with law ...." 5 U.S.C. § 706(2)(A). The Final Rule contradicts multiple statutes, all of which establish that the federal statutory scheme is designed to ensure that immigrants *may* obtain non-cash benefits. Because the Final Rule penalizes immigrants who access the very benefits that Congress has made clear are available to them, it is inconsistent with the statutory scheme and therefore invalid.

#### a. The Rehabilitation Act.

The Final Rule is contrary to Section 504 of the Rehabilitation Act, which prohibits "any program or activity receiving Federal financial assistance" or "any program or activity conducted by any Executive agency" from excluding, denying benefits to, or discriminating against persons with disabilities. 29 U.S.C. § 794(a). The Final Rule violates this provision by requiring officials to consider an applicant's "medical condition"—including a "disability diagnosis"—to weigh in favor of a public charge determination. *See* 8 C.F.R. § 212.22(c)(1)(iii)(A); 84 Fed. Reg. at 41,407–08. Such facially discriminatory treatment will be exacerbated by the

consideration of other negative factors related to a disability, such as receipt of Medicaid home and community-based services. *See* 8 C.F.R. §§ 212.21(b)(5), 212.22(b)(4)(i)(E); 84 Fed. Reg. at 41,367–68; *see also* 42 U.S.C. § 1396n(i). Because the Final Rule's overlapping criteria operate in such a way that an applicant's disability will often be the "but for" cause of a public charge determination, it violates Section 504. *See, e.g.*, *H.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960-61 (7th Cir. 2018) (explaining that regardless of a plaintiff's theory of liability, the Rehabilitation Act requires proof of causation, *i.e.* that "but for" a disability, a plaintiff "would have been able to access the services or benefits desired"); *D.F. ex rel. L.M.P. v. Leon Cty. Sch. Bd.*, No. 4:13CV3-RH/CAS, 2014 WL 28798, at *2 (N.D. Fla. Jan. 2, 2014) (noting that under the Rehabilitation Act, a plaintiff's disability must be a "but for" cause of the denial of services, but the disability need not be the "sole" cause).

### b.     The Welfare Reform Act.

The Final Rule's focus on immigrants' use of non-cash public benefits—with the effect of depriving immigrants the ability to remain in the United States—also contradicts the Welfare Reform Act, which expressly allows qualified immigrants to receive, after five years of entry, many forms of federal public benefits included in the Final Rule. In legislating statutes, "it seems unlikely that Congress intend[s] to create a bait-and-switch." *See Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 147 (D. Mass. 2004) (rejecting interpretation of statute that would allow for a "bait-and-switch" where a person would be covered by the Americans with Disabilities Act up until the point she needs the benefits of the Act and reasoning that statute "must be interpreted to give effect to the rights [it] has created"); *see also Rotenberry v. Comm'r Internal Rev.*, 847 F.2d 229, 233 (5th Cir. 1988) ("Congress did not intend that the Secretary set a trap for the unwary."). The Welfare Reform Act did not change the "longstanding" law governing public charge in admissibility, and as discussed above, the INS issued the Field Guidance for public charge

45

determinations to further eliminate any possibility of confusion. *Field Guidance*, 64 Fed. Reg. at 28,689-01. As such, the Final Rule can only be seen as arbitrary, capricious and unlawful when it *disqualifies* immigrants for accessing the very benefits that Congress previously *approved* the immigrants to use

### c.     SNAP.

The Final Rule also violates the SNAP statute, which prohibits Defendants from considering SNAP benefits as income or resources for "*any purpose* under any Federal . . . laws . . . ." 7 U.S.C. § 2017(b) (emphasis added). The Final Rule deems some immigrants who make use of SNAP benefits to be charges of the state and plainly treats SNAP benefits as "income or resources" furnished by the state, in direct contradiction to the provisions of the SNAP statute.

## II.     In The Absence Of A Stay And/Or Injunctive Relief, Plaintiffs, And The Communities They Serve, Will Suffer Irreparable Harm.

Absent court intervention, the Final Rule will imminently and irreparably harm Plaintiffs and the communities they serve. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As discussed above, the Final Rule virtually requires non-citizens who intend to adjust their status to forgo critical public benefits at great cost to their well-being and to the significant detriment of local economies, public health, and various safety-net programs administered by Plaintiffs. (Chan Decl. at ¶¶ 20, 21, 25, 40-42; *see* Hou Decl. at ¶¶ 8, 15, 18.) Indeed, these harms are already being felt as Plaintiffs have registered declines in enrollment for certain public benefits (Chan Decl. at ¶ 31(b), (c); Benito Decl. at ¶¶ 30, 33-37; Peller Decl. at ¶¶ 34-36, 38), a trend that will only accelerate once the Final Rule takes effect. For example, within the first eight months of 2019 (after the Proposed Rule was published in October 2018), CCH has seen "across-the-board increase[s] in ambulatory, observation, emergency and inpatients" who are

46

"self-pay[ing]" patients as compared to the same months in 2018. (Chan Decl. at ¶ 31(a).) This is not a coincidence; at the same time there has been a marked decrease in the percentage of Medicaid-covered patients and an increase in the percentage of uninsured and underinsured patients. (*Id.* at ¶ 31.) As Plaintiffs explain above, reductions in adequate health insurance coverage require CCH to provide more uncompensated, and ultimately costly, care to Cook County residents, and thus directly increases its operating costs. (*Id.* at ¶¶ 32, 42-44; *see* Hou Decl. at ¶ 19.)

The Final Rule's complicated, unclear definition of "public charge" will cause individuals, including naturalized citizens and non-citizens not subject to public charge assessments, to disenroll from or refrain from enrolling in public benefits because of a fear of the potential immigration consequences associated with receiving a public charge classification. (Chan Decl. at ¶ 25; Hou Decl. at ¶¶ 8, 15, 25; Peller Decl. at ¶ 10; Longkumer at ¶ 27) In fact, when Congress passed welfare reform legislation related to immigration eligibility in 1996, participation in Medicaid by those who were eligible decreased by three percent, while SNAP enrollment for households with at least one U.S. citizen child dropped by nearly 50 percent. (Chan Decl. at ¶ 27.)

It is no surprise, then, that even DHS' own projections establish that 2.5% of "individuals who are members of households with foreign-born non-citizens" will disenroll from programs expressly covered by the newly implemented Final Rule. 84 Fed. Reg. at 41,463. Astonishingly, DHS recognized that this may occur, yet made no effort to address the issue in the Final Rule. *See* 84 Fed. Reg. at 41,313. Even at this relatively low level of disenrollment, harm to the community and the Plaintiffs would be substantial, and available evidence suggests that DHS' estimate dramatically understates the Final Rule's effects. (Morrison Decl., Exs. B, D.) But

47

independent experts have predicted that disenrollment will actually occur at a rate of between 15 and 35 percent, *i.e.*, a rate 6 to 14 times greater than DHS predicts. (*Id.*, Exs. C, D.) These higher estimated rates are coming to fruition based on the chilling effects that expert studies have observed even before the Final Rule takes effect. (*Id.*, Exs. B, D.) Nor are the chilling effects flowing from the Final Rule limited to categories of public benefits that the Final Rule identifies. Rather, the fear and confusion caused by the Final Rule have already resulted in disenrollment from benefits such as Women, Infants, and Children ("WIC") benefits and subsidized childcare, none of which fall under the Final Rule's newly proposed public charge analysis. (*See* Chan Decl. at ¶ 30; Morrison Decl., Ex. J; Longkumer Decl. at ¶ 22.) Nevertheless, this result is inevitable given the complexity of the Final Rule and the difficulty of deciphering its requirements absent the assistance of legal counsel.

### A. The Chilling Effect Of The Final Rule Will Inflict Irreparable Harm On Cook County Based On Forgone Public Benefits, Mass Disenrollment, And The Resulting Financial Impact On The County.

As an initial matter, declining enrollment flowing from the Final Rule's coercive effects will create significant financial burdens on the life-saving health and safety-net programs provided by Cook County. (Chan Decl. at ¶¶ 40, 41, 51.) Mass disenrollment will create a significant loss in federal funds flowing to the County at the same time the County is asked to provide additional health and emergency services to its residents, thereby imposing effectively incalculable economic harms on the County. (Chan Decl. at ¶¶ 40-43, 46, 50; *see* Hou Decl. at ¶¶ 19, 24.) At minimum, CCH anticipates an annual loss of $30 million in Medicaid reimbursements. This figure does not take into account the long-term increases in cost that CCH and the County will experience as the County's public health declines. (Chan Decl. at ¶ 40.) Moreover, the decline in public benefits will result in a sicker, less stable population and result in a host of public health harms not easily quantified. (Chan Decl. at ¶¶ 20, 36, 37, 50.) Cook

County has already begun to experience these effects and, absent immediate injunctive relief, these harms will only intensify. (Chan. Decl. at ¶¶ 30, 31; Peller Decl. at ¶¶ 34-38.)

### 1. The Final Rule Will Irreparably Harm The Public Health.

As the second-most populous county in the United States, Cook County has more than 1,096,150 foreign-born residents living and working within its communities. As explained above, many of these individuals, regardless of whether their immigration status would be affected by a public charge determination, are likely to forgo or disenroll from benefits such as Medicaid, SNAP, and others. (Chan Decl. at ¶¶ 25, 37, 38, 42.) Even if patients do not disenroll, they are likely to forgo routine preventive care, resulting in a significant increase in high-severity inpatient services. (*Id.* at ¶¶ 21, 32, 49; Peller Decl. at ¶¶ 29, 31-32.) Finally, patients may seek to avoid providing identifying information to health service providers, making it more difficult to collect payment for services rendered. (*See* Chan Decl. at ¶ 52; Peller Decl. at ¶¶ 27-29, 32.) These several consequences will each create a sicker and less productive population by reducing access to preventive care and causing delays in treatment, and will simultaneously increase the overall costs to the County's healthcare system by requiring the provision of additional emergency services. (Chan Decl. at ¶¶ 21, 32, 49.) These impacts will reduce the County's ability to provide healthcare services to all of its residents by increasing the strain on the local healthcare system. (*Id.* at ¶¶ 32, 41, 46.) Moreover, because uninsured non-citizens affected by the Final Rule are likely to forgo immunizations and health screenings, the entire community is placed at increased risk for disease transmission and for the spread of vaccine-preventable diseases. (*Id.* at ¶¶ 21, 33; Hou Decl. at ¶ 18.)

      **2.      The Final Rule Will Generate Food Insecurity Resulting In Irreparable Harm.**

Just as the Final Rule will greatly impact enrollment in public medical services, the Final Rule directly penalizes immigrant participation in SNAP, undermining Plaintiffs' interests in preventing food insecurity. (Chan Decl. at ¶¶ 36-39.)  Cook County will be responsible for the substantial financial burden of increased health care costs associated with the decline in SNAP and WIC usage.  (*See id*. at ¶¶ 30, 41.)  Commensurate with the 15-35% disenrollment rate of such individuals in 1996 when the Welfare Reform Act was enacted, Cook County could see 39,000 to 92,000 of these otherwise eligible people disenrolling from benefits.  (*See id*. at ¶ 27; Morrison Decl., Ex. K.)

Programs such as SNAP are essential to ensuring the health of Cook County residents, which translates to a reduced burden on CCH in terms of providing care.  The link between access to adequate nutrition and health is intuitive.  Reductions in SNAP enrollment as a result of the Final Rule will decrease the health of those already experiencing food insecurity and may increase the number of CCH patients experiencing food insecurity.  (Chan Decl. at ¶¶ 36-39.)  Forgoing SNAP benefits results in significant harms to public health because food-insecure individuals are disproportionately likely to experience poor physical health, further exacerbating the health effects of the Final Rule described above and directly affecting the financial ability of the County to provide medical care. (*Id.* at ¶¶ 35-37, 41.)  Currently, nearly 14% of CCH's adult primary care patients report food insecurity. (*Id.* at ¶ 39.)  With the implementation of the Final Rule, this percentage will likely grow, worsening the health outcomes for many CCH patients, and forcing CCH to spend more resources on each patient. (*Id*. at ¶¶ 36-39, 49.)

Moreover, because of the significant role nutrition plays in child health and development, the lack of needed food assistance could impact reading and math skills and even the likelihood

of high school graduation. (Morrison Decl., Exs. L, M, N.) Children who grow up with resulting higher rates of disease and malnutrition will likely need to rely on health care provided by state governments, and thus care provided by CCH, to treat these long-term issues. (*See* Chan Decl. at ¶¶ 28, 29.)

### 3. The Final Rule And The Disenrollment And Forgone Benefits It Engenders Will Create An Economic Ripple Effect Causing Sweeping Detrimental Impacts To The Local Cook County Economy.

Cook County's economy will suffer a significant detriment as the Final Rule causes non-citizens and their families to forgo and disenroll from food and medical benefits. (*See* Chan Decl. at ¶¶ 48, 50; *see* Hou Decl. at ¶¶ 8, 21, 22, 24.) As far as food benefits, SNAP (formerly known as "food stamps") provides eligible individuals with electronic funds to enable the purchase of food from local retailers. This benefit infuses money into the local economy at the point of sale, but also creates a ripple effect throughout the local economy. (Hou Decl. at ¶ 21.) Indeed, according to a United States Department of Agriculture study, every dollar issued to a SNAP recipient results in $1.80 in local economic activity. (Hou Decl. at ¶ 23.) Losing this potential local investment imposes an detriment to the dynamism of the local economy.

With regard to health benefits, the Final Rule also will reduce the overall economic output of Cook County, as reduced access to healthcare makes the workforce less healthy and productive. Access to affordable health insurance helps workers to enter and remain in the workforce. (Morrison Decl. Ex. O.) Workers with health insurance miss approximately 75% fewer work days and are more productive at work than their uninsured peers. (Morrison Decl., Ex. P.) These harms would not only reduce the Cook County tax base, but would also more broadly affect the ability of Cook County residents to obtain economic self-sufficiency, and the vicious cycle would continue.

**B.**     **The Chilling Effect Created By The Final Rule Inflicts Irreparable Harm To ICIRR And Its Member Organizations.**

The demands of responding to the Final Rule's destructive and discriminatory consequences to the Community served by ICIRR and its member organizations frustrate ICIRR's core missions of providing health and social services to immigrant Illinoisans, both citizens and non-citizens. (Benito Decl. at ¶¶ 3-18, 23, 28, 38-42.) ICIRR's activity in responding to the Final Rule—including its actions to co-found the Protecting Immigrant Families Illinois Coalition—has caused ICIRR to forgo its planned advocacy initiatives and to divert resources from providing services to immigrant Illinoisans to educating them about the Final Rule's effects.

Significantly, ICIRR is funded, in part, based on a reimbursement model. (*Id.* at ¶¶ 29-30). That is, ICIRR receives funding from the state of Illinois in return for successfully enrolling individuals into a variety of public benefits including Temporary Assistance for Needy Families ("TANF" or otherwise known as cash welfare), SNAP, and Medicaid. (*Id.*) Accordingly, the significant chilling effects imposed by the Final Rule serve to reduce the funds available to ICIRR and its member organizations while increasing the demand for their services among immigrant Illinoisans. (*Id* at ¶¶ 30, 32-37.)

Moreover, counseling citizens and non-citizens concerned about the potential immigration-related impacts of the Final Rule have continued to reduce the ability of ICIRR to offer programming and public outreach initiatives targeted at advancing its core agenda of increasing the services provided to immigrant communities in Illinois. (*Id.* at ¶¶ 24-31.) These consequences result in incalculable harm to ICIRR and its members; there is no way to measure the full impact of the programs and activities that have been forgone in response to the Final Rule and the fear and confusion it has already engendered among native Illinoisans.

**III.   The Balance Of Equities Favors The Issuance Of A Stay And/Or Preliminary Injunction, And Issuing An Injunction Would Serve The Public Interest.**

When the government is a party, the final two *Winter* factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the traditional inquiry "calls for assessing the harm to the opposing party and weighing the public interest [but these] factors merge when the Government is the opposing party").  In any event, the balance of equities tip overwhelmingly in Plaintiffs' favor.  As explained above, the Final Rule is already causing serious injury to the public health and economic prosperity of the communities served by Plaintiffs, while at the same time degrading the ability of Plaintiffs to continue offering important services.  On the other hand, the issuance of a preliminary injunction would cause no harm to Defendants, as Plaintiffs merely seek to keep in place a regulatory regime that has governed the definition of public charge for decades.  No action from Defendants is required.

Similarly, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Here, the Final Rule violates the APA and is already causing significant harm to Plaintiffs and the communities they serve.  Under these circumstances, it is difficult to see how impeding non-citizens, lawfully present in the United States, from accessing the critical public benefits to which they are entitled serves the interests of the public.  Instead, the public interest dramatically favors promoting the health, safety, and economic well-being of all U.S. residents and ensuring that "'government agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see also Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest").

Accordingly, whether judged separately or together, the final two *Winter* factors strongly support the issuance of a stay or interim equitable relief as Plaintiffs request.

### CONCLUSION

For the foregoing reasons, the Court should stay or enjoin the Final Rule's implementation in the State of Illinois, without bond.

Dated:  September 25, 2019      Respectfully submitted,

KIMBERLY M. FOXX        COOK COUNTY, ILLINOIS
*Cook County Illinois State's Attorney*

By  */s/ Jessica M. Scheller*
     Jessica M. Scheller, Assistant State's Attorney
     Chief; Advice, Business & Complex Litigation Division
     Lauren Miller, Special Assistant State's Attorney
     Civil Actions Bureau
     500 W. Richard J. Daley Center Place, Suite 500
     Chicago, IL 60602
     Phone: (312) 603-6934
     Phone: (312) 603-4320
     Jessica.Scheller@cookcountyil.gov
     Lauren.Miller@cookcountyil.gov

     */s/ David E. Morrison*
     David E. Morrison
     Steven A. Levy
     A. Colin Wexler
     Takayuki  Ono
     Juan C. Arguello
     Goldberg Kohn Ltd.
     Special Assistant State's Attorneys
     55 E. Monroe St., Suite 3300
     Chicago, IL 60603
     Phone:   (312) 201-4000
     Fax:  (312) 332-2196
     david.morrison@goldbergkohn.com
     steven.levy@goldbergkohn.com
     colin.wexler@goldbergkohn.com
     takayuki.ono@goldbergkohn.com
     juan.arguello@goldbergkohn.com

     *Counsel for Cook County, Illinois*

ILLINOIS COALITION FOR IMMIGRANT AND
REFUGEE RIGHTS, INC.


By   */s/ Tacy F. Flint*
     David A. Gordon
     Tacy F. Flint
     Sidley Austin LLP
     One South Dearborn Street
     Chicago, IL 60603
     (312) 853-7000 (Telephone)
     (312) 853-7036 (Facsimile)
     dgordon@sidley.com
     tflint@sidley.com

     Yvette Ostolaza (*pro hac vice pending*)
     Texas Bar No. 00784703
     Robert S. Velevis (*pro hac vice pending*)
     Texas Bar No. 24047032
     SIDLEY AUSTIN LLP
     2021 McKinney Ave, Suite 2000
     Dallas, Texas 75201
     (214) 981-3300 (Telephone)
     (214) 981-3400 (Facsimile)
     Yvette.ostolaza@sidley.com
     rvelevis@sidley.com


     Caroline Chapman
     Meghan P. Carter
     Shelmun Dashan
     LEGAL COUNCIL FOR HEALTH JUSTICE
     17 N. State, Suite 900
     Chicago, IL 60602
     Phone: (312) 605-1958
     Fax: 312-427-8419
     cchapman@legalcouncil.org
     mcarter@legalcouncil.org
     sdashan@legalcouncil.org

55

Katherine E. Walz
Gavin M. Kearney
Andrea Kovach
Militza M. Pagan (*pro hac vice pending*)
SHRIVER CENTER ON POVERTY LAW
67 E. Madison, Suite 2000
Chicago, IL 60603
Phone:     (312) 368-2679
Fax:          (312) 263-3846
katewalz@povertylaw.org
gavinkearney@povertylaw.org
andreakovach@povertylaw.org
militzapagan@povertylaw.org

*Counsel for Illinois Coalition For Immigrant and Refugee Rights, Inc.*