# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; and **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.**, <br><br> **Plaintiffs,** <br><br> vs. <br><br> **KEVIN K. McALEENAN,** in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; **KENNETH T. CUCCINELLI II,** in his official capacity as Director of U.S. Citizenship and Immigration Services; and **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency, <br><br> **Defendants.** | Case No. 19-cv-06334 |

## DECLARATION OF DAVID E. MORRISON

Pursuant to 28 U.S.C. Section 1746, I, David E. Morrison, declare as follows:

1.      I am over the age of 18, am competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.      I am a principle at Goldberg Kohn and am counsel of record for Plaintiff Cook County, Illinois in this matter.

3.       Attached hereto as Exhibit A is a true and correct copy of Danilo Trisi, *One-Third of U.S.-Born Citizens Would Struggle to Meet Standard of Extreme Trump Rule for Immigrants*, Center on Budget and Policy Priorities (2018), available at   https://www.cbpp.org/blog/one-third-of-us-born-citizens-would-struggle-to-meet-standard-of-extreme-trump-rule-for.

4.      Attached hereto as Exhibit B is a true and correct copy of Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman, *One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018*, Urban Institute (2019), available at, https://www.urban.org/research/publication/one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018.

5.      Attached hereto as Exhibit C is a true and correct copy of Samantha Artiga, Rachel Garfield, and Anthony Damico, *Estimated Impacts of Final Public Charge Inadmissibility Rule on Immigrants and Medicaid Coverage*, Henry J. Kaiser Family Foundation (2019), available at https://www.kff.org/disparities-policy/issue-brief/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and-medicaid/.

6.      Attached hereto as Exhibit D is a true and correct copy of Fiscal Policy Institute, *"Only Wealthy Immigrants Need Apply": How a Trump Rule's Chilling Effect Will Harm the U.S.* (2018), available at http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf.

7.      Attached hereto as Exhibit E is a true and correct copy of United States Census Bureau data for Cook County, Illinois (based off of 2010 Census data), available at https://www.census.gov/quickfacts/fact/table/cookcountyillinois/IPE120218.

8.      Attached hereto as Exhibit F is a true and correct copy of the public comment letter submitted by the American Association of School Administrators, The School Superintendents Association, available at https://www.regulations.gov/document?D=USCIS-2010-0012-29378.

9.      Attached hereto as Exhibit G is a true and correct copy of the public comment letter submitted by Justice in Aging, available at https://www.regulations.gov/document?D=USCIS-2010-0012-50846.

10.     Attached hereto as Exhibit H is a true and correct copy of Peng-jun Lu, Alissa O'Halloran, and Walter W. Williams, *Impact of Health Insurance Status on Vaccination Coverage Among Adult Populations,* American Journal of Preventive Medicine (2015), available at https://www.ajpmonline.org/article/S0749-3797(14)00719-3/pdf.

11.     Attached hereto as Exhibit I is a true and correct copy of the public comment letter submitted by the Consortium for Citizens with Disabilities, available at https://www.regulations.gov/document?D=USCIS-2010-0012-62933.

12.     Attached hereto as Exhibit J is a true and correct copy of Wendy Cervantes, Rebecca Ullrich, and Hannah Matthews, *Our Children's Fear: Immigration Policy's Effects on Young Children*, Center on Law and Social Policy (2018), available at https://www.clasp.org/sites/default/files/publications/2018/03/2018_ourchildrensfears.pdf.

13.     Attached hereto as Exhibit K is a true and correct copy of Samantha Artiga, Anthony Damico and Rachel Garfield, *Potential Effects of Public Charge Changes on Health Coverage for Citizen Children*, Kaiser Family Foundation (2018), available at https://www.kff.org/report-section/potential-effects-of-public-charge-changes-on-health-coverage-for-citizen-children-issue-brief/.

14.     Attached hereto as Exhibit L is a true and correct copy of *The Role of the Supplemental Nutrition Assistance Program in Improving Health and Well-Being*, Food Research & Action Center (2017), available at http://frac.org/wp-content/uploads/hunger-health-role-snap-improving-healthwell-being.pdf.

15.     Attached hereto as Exhibit M is a true and correct copy of Diana F. Jyoti, Edward A. Frongillo, and Sonya J. Jones, *Food Insecurity Affects School Children's Academic Performance, Weight Gain, and Social Skills,* Journal of Nutrition (2005), available at https://academic.oup.com/jn/article/135/12/2831/4669915#targetText=These%20cross%2Dsectional%20studies%20suggest,change%20over%20time%20(20).

16.     Attached hereto as Exhibit N is a true and correct copy of Hilary Hoynes, Diane Whitmore Schanzenbach, and Douglas Almond, *Long-Run Impacts of Childhood Access to the Safety Net*, American Economic Review (2016), available at https://gspp.berkeley.edu/assets/uploads/research/pdf/Hoynes-Schanzenbach-Almond-AER-2016.pdf.

17.     Attached hereto as Exhibit O is a true and correct copy of Larisa Antonisse and Rachel Garfield, *The Relationship Between Work and Health: Findings from a Literature Review*, Kaiser Family Foundation (2018), available at https://tinyurl.com/KKFRelationship-work-health.

18.     Attached hereto as Exhibit P is a true and correct copy of Allan Gloe Dizioli and Roberto B. Pinheiro, *Health Insurance as a Productive Factor*, Labour Economics (2016), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2096415.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on September 24, 2019.


_/s/ David E. Morrison_

# EXHIBIT A



# One-Third of U.S.-Born Citizens Would Struggle to Meet Standard of Extreme Trump Rule for Immigrants

BLOG POST | SEPTEMBER 27, 2018 AT 3:30 PM   | BY DANILO TRISI

A new draft proposed rule from President Trump's Department of Homeland Security would create a harsh new standard for immigration officials to decide whether to let immigrants lawfully in the United States stay here and let those seeking legal entry come and rejoin family. Under the proposed rule, immigration officials could turn away lawfully residing immigrants seeking to remain here or others seeking to come in the first place if they have received, or are judged *likely to receive* in the future, any of an array of public benefits tied to need. If the new standard regarding benefit receipt were applied to U.S.-born citizens, nearly one-third would have trouble meeting it, based on conservative assumptions.

Under federal law back to the late 1800s, immigration officials can turn down people seeking to enter the United States or become lawful permanent residents (a.k.a. green card holders) if officials determine that they are, or will likely become, a "public charge." Longstanding federal policy considers someone a "public charge" if they receive (or are deemed likely to receive) more than half of their income from cash assistance programs, such as Temporary Assistance for Needy Families (TANF) and Supplemental Security Income (SSI), or receive long-term care through Medicaid.

The new Trump Administration proposal, by contrast, significantly broadens the public benefit programs considered in a public charge determination. It would consider whether the individual received, or would likely receive, assistance that includes health coverage through Medicaid; food assistance through SNAP (food stamps); housing assistance; subsidies to help Medicare recipients afford prescription drugs; and cash assistance through programs like TANF and SSI. And, instead of looking at whether more than half of an immigrant's income comes (or would likely come in the future) from cash assistance tied to need, as they do now, immigration authorities would consider whether the individual received, or is likely to receive, modest amounts of any of these benefits — even if the benefits reflect only a small share of an immigrant's total income.

If, as noted, this new standard were applied to U.S.-born citizens, a significant share likely would be considered a public charge. Looking at just one year of program participation shows that nearly one-third of U.S.-born citizens receive one of the main benefits that the rule targets. (As the note below explains, we could not examine all benefits included in the proposed rule; doing so would increase this estimate.) By contrast, about 5 percent of U.S.-born citizens meet the current benefit-related criteria in the public charge determination. The benefits included in the new proposal serve a far broader group of low- and moderate-income families, including many that include working adults but need help to make ends meet.

Moreover, because it reflects benefits received only during a *single* year, the one-third figure *understates* the share of U.S.-born citizens who could be determined a public charge. The rule itself would consider both immigrants' (or would-be immigrants') current receipt of assistance *and* if they'll likely receive assistance from these programs in the future or received any in the past.

Under the proposal, immigration officials also would consider whether an individual's current household income (excluding means-tested benefits) is below 125 percent of the poverty line, or about $31,375 for a household of four; immigrants who don't receive benefits but have incomes below this threshold also could be denied entry. About 16

Case 1:19-cv-06334 Document 27-1 Filed 09/26/19 Page 8 of 373 PageID #: 629

percent of U.S.-born citizens have cash income (excluding means-tested benefits) below this threshold, including many low-wage workers.

While U.S. citizens with such incomes often receive some assistance (such as SNAP or Medicaid), many immigrants with incomes this low do not. The household income-based factor in the proposed rule could mean that immigration officials could deny individuals who work in important but low-paid jobs — such as home health workers and custodians — the ability to remain in the United States or rejoin families here.

The rule is not only harsh but short-sighted. It will sow fear in immigrant communities and likely lead many immigrants who are here legally to forgo health coverage, nutrition, and housing assistance for which their families are eligible and which they need. Because immigration rules are complicated and sometimes opaque, many families that wouldn't be subject to a public charge determination may nevertheless choose to forgo benefits for which they qualify, out of fear that their status could otherwise be in jeopardy. The affected children are important to our nation's future. Many studies show that the kinds of assistance that the rule covers have positive effects on children, improving their health and helping them do better (and go farther) in school, thereby boosting their expected earnings as adults.

Moreover, the rule would essentially put a price tag on legal U.S. residency, turning our immigration system into one that heavily favors prospective immigrants with wealth over those who seek to follow the path of upward mobility that for centuries has brought millions of immigrants to our shores and enriched our country and economy in the process.

(Note: For the calculations above, we used the Current Population Survey, and we corrected for underreporting of SNAP, TANF, and SSI receipt in the Census survey using the Department of Health and Human Services/Urban Institute Transfer Income Model. The figures are for 2015, the latest year for which these corrections are available. Our program participation calculations include SNAP, TANF, SSI, Medicaid, housing assistance, and state General Assistance programs. If we could correct for the underreporting of Medicaid and count Medicare Part D low-income subsidies that are included in the Administration's proposal, our estimates of program participation would increase. On the other hand, the rule disregards program participation in certain cases when the benefit amount is low, and modeling those provisions would decrease our estimates somewhat.)

TOPICS: Poverty and Inequality, Immigration

# EXHIBIT B

FROM SAFETY NET TO SOLID GROUND



# One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018

*Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman*
*May 2019*

**Immigration policy has been at the center of public debate for many years, but the debate has intensified since the 2016 presidential election. In October 2018, after months of anticipation, the administration published a proposed rule altering "public charge" determinations that would make it harder for immigrants to get a green card (i.e., establish permanent residency). After a public comment period that closed in December, the rule is being finalized. If implemented, the rule would make it more difficult for immigrants to get green cards if they have received certain noncash public benefits or have low incomes or other characteristics considered to increase their likelihood of using benefits in the future. Beyond reducing future immigration numbers, there is widespread concern this revised public charge rule would have "chilling effects" on low-income immigrant families by discouraging them from applying for and receiving public benefits for which they are eligible, for fear of risking future green card status.[1] This chilling effect could spill over to many people, including US citizen children.**

So far, evidence on this chilling effect has largely been based on anecdotal reports from service providers.[2] In this brief, we use unique data from a nationally representative, internet-based survey conducted in December 2018 to provide the first systematic evidence on the extent of chilling effects among immigrant families before release of a final public charge rule. [3] The survey included nearly 2,000 nonelderly adults who are foreign born or live with one or more foreign-born family members (hereafter called "adults in immigrant families"), who make up about one-quarter of all nonelderly adults in the US, according to the 2017 American Community Survey. We provide here the first estimates of self-

reported chilling effects on participation in public benefit programs associated with the proposed public charge rule. These findings complement projections that other researchers have developed to model expected chilling that will follow a final rule (Artiga, Damico, and Garfield et al. 2018; Artiga, Garfield, and Damico 2018; Batalova, Fix, and Greenberg 2018; Fiscal Policy Institute 2018; Kenney, Haley, and Wang 2018; Laird et al. 2019; Zallman and Finnegan 2018).[4]

We find the following:

- About one in seven adults in immigrant families (13.7 percent) reported "chilling effects," in which the respondent or a family member did not participate in a noncash government benefit program in 2018 for fear of risking future green card status. This figure was even higher, 20.7 percent, among adults in low-income immigrant families.

- Though the proposed rule would only directly affect adults who do not yet have a green card (i.e., lawful permanent residence), we observed chilling effects in families with various mixes of immigration and citizenship statuses, including 14.7 percent of adults in families where all noncitizen members had green cards and 9.3 percent of those in families where all foreign-born members were naturalized citizens.

- Hispanic adults in immigrant families were more than twice as likely (20.6 percent) as non-Hispanic white and non-Hispanic nonwhite adults in immigrant families (8.5 percent and 6.0 percent, respectively) to report chilling effects in their families.

- Though the proposed rule would only directly apply to adults, many households with children experienced chilling effects. Adults in immigrant families living with children under age 19 were more likely to report chilling effects (17.4 percent) than adults without children in the household (8.9 percent).

- Most adults in immigrant families reported awareness of the public charge rule (62.9 percent). Adults who had heard "a lot" about the proposed rule were the most likely to report chilling effects in their families (31.1 percent).

# Background on Public Charge

The administration has advanced sweeping changes to federal immigration policy, including heightened immigration enforcement, termination of temporary protections against deportation, and cuts to refugee and asylee admissions. In 2018, the administration also proposed expanding the criteria used in "public charge" determinations, in which immigration officials may deny applications for permanent residency (green cards) or temporary visas to immigrants who are deemed "likely to become a public charge."[5]

The new approach would make it more difficult for immigrants to get green cards or temporary visas if they received or are deemed likely to receive cash and noncash public benefits. Departing from past practice where only primary reliance on cash benefits or long-term medical institutionalization were considered in public charge determinations, under the proposed rule, officials would consider an

applicant's use of either cash or noncash benefits as "negative factors," as well as several personal characteristics, including income level, age, English proficiency, educational attainment, employment status, family size, health status, credit score, and other financial resources. The proposed rule, posted for public comment in October 2018, expanded the list of benefits to be considered in future public charge determinations to include the Supplementary Nutrition Assistance Program (SNAP, formerly known as food stamps), Medicaid, Section 8 housing assistance, public housing, and subsidies for drug benefits under Medicare Part D.

The proposed rule would affect applicants adjusting from another immigration status who already live in the US and people applying from abroad through family sponsorship or other pathways (Capps et al. 2018). The rule specifically excludes certain groups, such as refugees and other humanitarian entrants, and clarifies that benefits received by eligible children will not be considered in adults' future immigration applications. However, there remains confusion about when and how the final rule will be implemented and what aspects of the proposed rule will carry over to the final version. In the meantime, a parallel change to the public charge test in the Foreign Affairs Manual, used by consular officials considering visa applications filed abroad, was implemented in January 2018, and recent data show that admissions decisions have already been affected; refusals of applications on public charge grounds quadrupled to 13,500 during the 2018 fiscal year.[6] News outlets have also recently reported that the Department of Justice is preparing to publish a rule on deporting green card holders on public charge grounds.[7]

The proposed rule could have pervasive effects for immigrant families, given the complicated nature of the regulation and widespread uncertainty about how or when it will go into effect. Already many immigrant families are reportedly avoiding interaction with public authorities and dropping out of or being reluctant to enroll themselves or their children in critical safety net programs like Medicaid and the Children's Health Insurance Program (CHIP), SNAP, or the Special Supplemental Nutrition Program for Women, Infants, and Children, even though the latter is not on the list of benefits in the proposed rule.[8] Immigrant-serving organizations are reporting heightened reluctance and fear in immigrant communities to receive public benefits for which adults and children are eligible, including programs that would not be considered in public charge determinations (Greenberg, Feierstine, and Voltolini 2019). There is also evidence of far-reaching fear and insecurity among immigrant families in the context of the administration's immigration policy changes and rhetoric; for example, psychological effects are widespread not only for undocumented people or temporary visa holders but among naturalized US citizens (Cervantes, Ullrich, and Matthews 2018; Roche et al. 2018).

Though these reports help clarify the impact of the broader immigration climate, there is no information yet on systematic changes to participation in safety net programs among immigrant families in the context of the debate around the proposed public charge rule. This brief provides new insight into the extent to which immigrant families avoided participating in these programs because of concerns about future green card status in 2018, as this proposed rule was debated. This includes both people who would be directly affected by the rule and have not yet applied for a green card and would receive

the revised public charge test in the future, as well as others who perceive potential risk despite the rule not directly applying to them.

# Data and Methods

## Data and Sample

We draw on data from the December 2018 round of the Well-Being and Basic Needs Survey (WBNS), a nationally representative survey of adults ages 18 to 64 launched in December 2017. This analysis is based on the WBNS core sample and an oversample of noncitizens. For each round of the WBNS, the core sample is a stratified random sample drawn from Ipsos' KnowledgePanel, a probability-based online panel recruited primarily from an address-based sampling frame, and includes a large oversample of adults in low-income households.[9] In December 2018, the survey also included an oversample of noncitizens to support analyses of current policy issues affecting immigrant families. The panel includes only respondents who can complete surveys that are administered in English or Spanish, and adults without internet access are provided laptops and free internet access to facilitate participation.

To assess chilling effects and other immigration policy issues, we constructed a set of weights for analysis of the population of nonelderly adults who are foreign born or living with a foreign-born relative in their household. The weights are based on the probability of selection from the KnowledgePanel and benchmarks from the American Community Survey for nonelderly adults in immigrant families who are English proficient or primarily speak Spanish.[10] The language criterion is used in the weighting to reflect the nature of the survey sample, because the survey is only administered in English or Spanish.

Our final analytic sample consists of 1,950 adults in immigrant families. When assessing the types of programs for which respondents reported chilling, we limit the sample to the 314 adults in immigrant families who reported any chilling effect on participation in public programs.

## Measures

### SELF-REPORTED CHILLING EFFECTS WITHIN A FAMILY

Our main outcome is self-reported chilling effects on participation in public programs *within a family*. We define these chilling effects as either not applying for or stopping participation in a noncash government benefit program, such as Medicaid/CHIP, SNAP, or housing subsidies, within the previous 12 months because of concerns that the respondent or a family member could be disqualified from obtaining a green card.[11] For this measure, a respondent could have defined family as both their immediate family and other relatives who may be living with them or in another household; we have learned from some initial qualitative follow-up work that some respondents took into account family members living in other households when they reported chilling effects. Respondents may also have reported chilling for a program for which they themselves may not have been eligible. For instance,

some parents may have reported chilling effects on the program participation of a citizen child, or a higher-income respondent may have reported chilling affecting a relative with lower income.

AWARENESS OF PROPOSED PUBLIC CHARGE RULE

To assess awareness of the proposed public charge rule published in October 2018, we asked respondents to report how familiar they were with a proposed rule that would make it harder for immigrants to enter the United States or become permanent residents of the US if they have low incomes or use public benefits such as Medicaid, SNAP, or housing subsidies. Respondents could make one selection from the options "a lot," "some," "only a little," or "nothing at all."[12]

## Limitations

One limitation of the WBNS is its low response rate, which is comparable to other panel surveys that account for nonresponse at each stage of recruitment. However, studies assessing recruitment for the KnowledgePanel have found little evidence of nonresponse bias for core demographic and socioeconomic measures (Garrett, Dennis, and DiSogra 2010; Heeren et al. 2008), and WBNS estimates are generally consistent with benchmarks from federal surveys (Karpman, Zuckerman, and Gonzalez 2018). WBNS survey weights reduce, but do not eliminate, the potential error associated with sample coverage and nonresponse, and this is likely to be larger for the subgroup of adults in immigrant families. Though the weights are designed to produce nationally representative estimates for adults in immigrant families, the survey's design implies that our analytic sample of 1,950 adults in immigrant families has precision comparable to a simple random sample of approximately 800 adults, increasing the sampling error around our estimates. We only report differences across subgroups of adults in immigrant families that are statistically significant at the 0.05 level or lower.

In addition, because the WBNS is only administered in English and Spanish, our analytic sample does not describe the experiences of the full spectrum of adults in immigrant families. Our study excludes adults with limited English proficiency whose primary language is not Spanish. We estimate that the excluded adults who do not speak English or Spanish represent between 5 and 15 percent of all nonelderly adults in immigrant households as defined for this brief; according to the 2017 American Community Survey, 5 percent of this group speaks English less than "well"[13] and speaks a primary language other than Spanish.

Some measurement error is likely for questions related to citizenship statuses of respondents and relatives in the household, particularly among adults who are undocumented or have been in the US for a short time (Van Hook and Bachmeier 2012). It is also possible that respondents conflated awareness of the public charge rule with overall awareness of an increasingly hostile political climate toward immigrants, which may have resulted in overreported awareness of the proposed public charge rule. Moreover, follow-up qualitative interviews with respondents for a related project suggested that some respondents did not understand the distinction between two separate survey items: "not applying for a program" versus "stopping participating in a program." Consequently, we have opted to combine

responses to report on the questions in combination: either not applying for or dropping out of a noncash assistance program.

## Analysis

We assess chilling effects within a family, overall and by the following characteristics: annual family income as a percentage of the 2018 federal poverty level, citizenship and immigration status of family members living in the household, race and ethnicity of the respondent, presence of children under age 19 in the household, and respondents' awareness of the proposed public charge rule. We impute missing responses for family income, marital status, and number of children in the household using a multiple-imputation regression approach. We allocate missing citizenship status data for respondents using their responses to the Ipsos panel profile question on citizenship; absent that information, we impute respondent citizenship status. All estimates are weighted to be representative of the national population of nonelderly adults in immigrant families (as described above) and account for the complex survey design.

# Findings

*About one in seven adults in immigrant families (13.7 percent) reported "chilling effects," in which the respondent or a family member did not participate in a noncash government benefit program in 2018 for fear of risking future green card status. This figure was even higher, 20.7 percent, among adults in low-income immigrant families.*

Adults in immigrant families across the income distribution reported chilling effects on their participation in noncash public benefit programs for fear of disqualification from obtaining a green card. Overall, one in seven (13.7 percent) reported chilling effects in his or her family (figure 1). Among adults in low-income immigrant families (i.e., those with family incomes below 200 percent of the federal poverty level), over one in five (20.7 percent) reported chilling, compared with 8.6 percent of adults in immigrant families with higher incomes.

FIGURE 1

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, Overall and by Family Income, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: FPL = federal poverty level. Adults are ages 18 to 64. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.
*** Estimate differs significantly from adults in immigrant families with family incomes below 200 percent of FPL at the 0.01 level, using two-tailed tests.

Among adults in immigrant families reporting any chilling effects, nearly half (46.0 percent) reported that someone in their family did not apply for or stopped participating in SNAP, making it the most common program for which chilling was reported among the programs assessed in this survey (figure 2). Medicaid or CHIP was second, with a share of 42.0 percent among adults in immigrant families who reported chilling. One in three (33.4 percent) adults reporting chilling within his or her family reported not applying for or stopping participation in housing subsidies. A smaller share of adults in immigrant families (8.6 percent) experiencing chilling reported stopping participation or not applying for other programs, offering responses such as federal Marketplace subsidies for health insurance and energy bill assistance programs (data not shown).

One in six (16.7 percent) adults who reported chilling effects indicated that the implicated program was specifically Medicaid or CHIP benefits for a child in their family (data not shown). Though this detail is not available for the other noncash programs, we know that SNAP and housing subsidies affect the entire household, and we found chilling effects disproportionately among households with children.

FIGURE 2

**Share of Adults in Immigrant Families in Which Someone Did Not Participate in SNAP, Medicaid/CHIP, or Housing Subsidies, among Those That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, December 2018**



**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: SNAP = Supplemental Nutrition Assistance Program. CHIP = Children's Health Insurance Program. Adults are ages 18 to 64. Because respondents could report multiple programs, the program categories displayed are not mutually exclusive. Respondents reported that either they or someone in their family did not apply for or stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.

*Though the proposed rule would only directly affect adults who do not yet have a green card (i.e., lawful permanent residence), we observed chilling effects in families with various mixes of immigration and citizenship statuses, including 14.7 percent of adults in families where all noncitizen members had green cards and 9.3 percent of those in families where all foreign-born members were naturalized citizens.*

Immigrant families often include a wide range of citizenship and immigration statuses, including US-born citizens, naturalized US citizens, green card holders, and foreign-born people without permanent residence. Among households where one or more noncitizen family members was not a permanent resident, 20.4 percent of adults reported chilling effects (figure 3). The share was slightly lower but still substantial (14.7 percent) for respondents in households where all noncitizen relatives were permanent residents.

Some respondents living in what should be the least vulnerable households, in which all foreign-born family members are naturalized US citizens, also seem to be affected, with 9.3 percent of these adults reporting chilling effects within their family in the previous year. This suggests spillover effects

on people who will not be subject to future public charge determinations but may be confused about the rule and who it applies to, or fear it could impair their ability to sponsor other family members for green cards.

FIGURE 3

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, by Household Citizenship and Immigration Status, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: Adults are ages 18 to 64. Categories are constructed around the citizenship and immigration status of the foreign-born family members in the household, but each group may contain US-born family members (including the respondent). Respondents reported that either they or someone in their family did not apply for or stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.
\*\* Estimate differs significantly from adults in households where all foreign-born family members are naturalized citizens at the 0.05 level, using two-tailed tests.

*Hispanic adults in immigrant families were more than twice as likely (20.6 percent) as non-Hispanic white and non-Hispanic nonwhite adults in immigrant families (8.5 percent and 6.0 percent, respectively) to report chilling effects in their families.*

About 1 in 5 Hispanic adults in immigrant families (20.6 percent) reported chilling effects within his or her family, compared with fewer than 1 in 10 non-Hispanic white adults in immigrant families (8.5 percent; figure 4). Hispanic adults also reported chilling effects at a higher rate than non-Hispanic nonwhite respondents, of whom only 6.0 percent reported that they or a family member experienced chilling effects on their use of noncash public benefits because of concern over future green card status.

However, we may underestimate reported chilling effects among non-Hispanic nonwhite adults because WBNS respondents do not include adults who do not speak Spanish or English well enough to

complete the survey. This means we cannot observe chilling effects that may have occurred within this group.

FIGURE 4

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of to Green Card Concerns, by Race and Ethnicity, December 2018**



URBAN INSTITUTE

**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: Adults are ages 18 to 64. The non-Hispanic nonwhite category includes non-Hispanic respondents who either do not identify as white or identify as more than one race. Respondents reported that either they or someone in their family did not apply for or stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.
*** Estimate differs significantly from Hispanic adults at the 0.01 level, using two-tailed tests.

*Though the proposed rule would only directly apply to adults, many households with children experienced chilling effects. Adults in immigrant families living with children under age 19 were more likely to report chilling effects than adults without children in the household.*

As shown in figure 5, about one in six (17.4 percent) adults in immigrant families living with children under age 19 reported chilling effects within his or her family, a share about twice as high as that of adults without children in the household (8.9 percent).[14]

FIGURE 5

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, by Presence of Children in the Household, December 2018**



**URBAN** INSTITUTE

**Source**: Well-Being and Basic Needs Survey, December 2018.

**Notes**: Adults are ages 18 to 64. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.

*** Estimate differs significantly from adults with any children under age 19 in the household at the 0.01 level, using two-tailed tests.

*Most adults in immigrant families reported awareness of the public charge rule (62.9 percent). Adults who had heard "a lot" about the proposed rule were the most likely to report chilling effects in their families (31.1 percent).*

Most adults in immigrant families reported awareness of the public charge rule, with 62.9 percent having heard at least "a little" about the rule (data not shown). Adults reporting greater awareness of the proposed rule were about five times more likely to report chilling effects on family members' use of public benefits than adults reporting no awareness. Among the adults in immigrant families who had heard a lot about the proposed rule, nearly one-third (31.1 percent) reported chilling, compared with only 6.2 percent among those who had heard nothing at all about the proposed policy. This suggests that more publicity about the rule when it becomes final could further increase chilling effects and avoidance of public benefits by immigrant families, including those not directly affected by the rule.

FIGURE 6

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, by Awareness of the 2018 Proposed Public Charge Rule, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.

**Notes**: Adults are ages 18 to 64. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.

*** Estimate differs significantly from adults who heard "a lot" about the proposed rule at the 0.01 level, using two-tailed tests.

# Discussion

This report provides the first national data on the scope of chilling effects related to the public charge policy debate in 2018, as the proposed rule was being developed, published, and commented on. The data were collected before the rule was finalized, and it is reasonable to expect that chilling effects will likely expand further if the rule is implemented. It is notable that even these early results show strong evidence of chilling effects, aligning with the on-the-ground perspectives reported by organizations working with immigrant families across the country (Greenberg, Feierstine, and Voltolini 2019) and new state-level data documenting increased reluctance to engage safety net resources (O'Rourke 2019). We find that one in seven nonelderly adults in immigrant families reported "chilling effects," in which the respondent or a family member did not participate in one or more noncash government benefit programs in 2018 for fear of risking future green card status. These decisions were more common among families most in need of safety net support, with one in five adults with family incomes below 200 percent of the federal poverty level reporting chilling effects. Though most research projections of potential chilling have assumed several scenarios, with drops in program participation of 15, 25, or 35 percent, those estimates project chilling rates after implementation of a final rule (Artiga, Damico, and

Garfield 2018; Artiga, Garfield, and Damico 2018; Batalova, Fix, and Greenberg 2018; Fiscal Policy Institute 2018; Kenney, Haley, and Wang 2018; Laird et al. 2019; Zallman and Finnegan 2018).[15] The evidence we collected showing high chilling rates even before release of the final rule suggests that rates could be even larger following implementation.[16]

The confusion and fear around when and how the proposed public charge rule could be finalized and who it would affect appear to be leading to spillover, extending beyond people directly affected by the rule, who have not yet applied for green cards and will receive the revised public charge test when they do. Immigrant households often include people with a variety of immigration, residency, and citizenship statuses, and the survey results show chilling effects in families including US-born citizens, naturalized US citizens, green card holders, and people who lack permanent residence.[17] Though chilling effects were highest in families where one or more noncitizen family members were not permanent residents (20.4 percent), rates were also high in less vulnerable families: 14.7 percent in families where all noncitizen members had green cards and 9.3 percent where all foreign-born members were naturalized citizens. Many people live in households with complex combinations of status and belong to family networks extending across households. These family interconnections are critical for understanding the impacts of the revised public charge rule and other restrictive immigration policy measures on the well-being of families across the US.

In December 2018, most adults in immigrant families reported awareness of the public charge rule (62.9 percent). And the survey results show that people with greater awareness were more likely to report chilling effects, reflecting the fear and confusion around the rule that advocates and service providers have observed. Reports from the field suggest widespread confusion about actual details of the rule (Greenberg, Feierstine, and Voltolini 2019). Under the previous public charge regulations, service providers could convey a clear message, because all noncash benefits were excluded from consideration in public charge determinations. The proposed regulation poses new challenges of understanding and communication, both for the public and legal and other service providers.

Providing families accurate information and guidance as the debate on the proposed public charge rule continues could help mitigate further chilling effects. Investing in educating service providers who may interact with immigrant families could also combat misconceptions and ensure families receive the information they need to make informed choices on their and their children's behalves. This applies to government social services staff and practitioners in community-based organizations, as well as to staff at schools and early childhood education providers, faith leaders, employers, and other sites where families who are afraid of interacting with government authorities may be reached. Initiatives to support advocacy efforts and educate providers face the challenge of accessing vulnerable and hard-to-reach families on a national scale. Education through innovative channels, such as social media, faith-based institutions, and schools, may help reach scale.

Though these survey results provide new insight into the potential scope of chilling effects under the proposed public charge rule, a forthcoming brief drawing on interviews with adults in families that experienced chilling will provide additional qualitative information on the mechanisms and context in which these decisions were made. In addition, such self-reported evidence of chilling should be verified

in administrative data sources, if possible. Local and state government agencies could shed light on changing program participation numbers by examining their own data. Community-based organizations encountering immigrant families could also monitor family experiences. This real-time evidence on the impacts of anticipated and implemented policy changes on the ground is critical to inform policymakers and practitioners developing effective strategies to reduce harm.

Losing access to programs can affect not only adults but children in the household, many of whom are US citizens. Discouraging families from using benefits for which they are eligible will likely increase the risk of material hardship, which can have negative long-term effects on health and well-being, particularly among children.

Our evidence suggests that even without a final rule, chilling effects have already occurred, both in families who would be directly affected by the revised rule and in spillover to immigrant families more broadly. Potential consequences for health and well-being will be important to monitor. Educating service providers and immigrant families is one key strategy to combat misinformation and mitigate harm.

# Notes

[1] Hamutal Bernstein and Archana Pyati, "Expanding the 'Public Charge' Rule Jeopardizes the Well-Being of Immigrants and Citizens," *Urban Wire* (blog), Urban Institute, October 3, 2018, https://www.urban.org/urban-wire/expanding-public-charge-rule-jeopardizes-well-being-immigrants-and-citizens.

[2] Emily Baumgaertner, "Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services," *New York Times*, March 6, 2018, https://www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html; Caitlin Dewey, "Immigrants Are Going Hungry So Trump Won't Deport Them," *Washington Post*, March 16, 2017, https://www.washingtonpost.com/news/wonk/wp/2017/03/16/immigrants-are-now-canceling-their-food-stamps-for-fear-that-trump-will-deport-them/?utm_term=.6cc2529d5e00; Helena Bottemiller Evich, "Immigrants, Fearing Trump Crackdown, Drop out of Nutrition Programs," *Politico*, September 3, 2018, https://www.politico.com/story/2018/09/03/immigrants-nutrition-food-trump-crackdown-806292. One exception is recent research by Children's Health Watch (Bovell-Ammon et al. 2018), which collects data in emergency rooms and primary care clinics in Baltimore, Boston, Little Rock, Minneapolis, and Philadelphia. Their data collection showed reported SNAP receipt declined in the first half of 2018 for immigrant families, especially among recent arrivals. They note limitations in sample size, however, and given the time frame of the drop, from 2017 to the first half of 2018, the connection to the public charge debate is unclear. Some state-level data have also suggested drops in participation or increased reluctance to engage in safety net resources (O'Rourke 2019).

[3] In forthcoming work, we will analyze results from complementary qualitative data collection through semistructured interviews with a portion of survey respondents who reported chilling effects.

[4] "Potential Effects of Public Charge Changes on California Children," The Children's Partnership and KidsData.org, accessed May 15, 2019, https://www.childrenspartnership.org/wp-content/uploads/2018/11/Potential-Effects-of-Public-Charge-Changes-on-California-Children-Brief.pdf; "Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard," Manatt, October 11, 2018, https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population.

[5] Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51114 (Oct. 10, 2018).

[6] Yeganeh Torbati and Kristina Cooke, "Denials of US Immigrant Visas Skyrocket after Little-Heralded Rule Change," *Reuters*, April 15, 2019, https://www.reuters.com/article/us-usa-immigration-visas-insight-idUSKCN1RR0UX.

[7] Yeganeh Torbati, "Exclusive: Trump Administration Proposal Would Make It Easier to Deport Immigrants Who Use Public Benefits," *Reuters*, May 3, 2019, https://www.reuters.com/article/us-usa-immigration-benefits-exclusive/exclusive-trump-administration-proposal-would-make-it-easier-to-deport-immigrants-who-use-public-benefits-idUSKCN1S91UR.

[8] Emily Baumgaertner, "Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services," *New York Times*; Caitlin Dewey, "Immigrants Are Going Hungry So Trump Won't Deport Them," *Washington Post*; Helena Bottemiller Evich, "Immigrants, Fearing Trump Crackdown, Drop out of Nutrition Programs," *Politico*; Emily Moon, "Why Is Participation in Food Assistance Programs like WIC Declining?" *Pacific Standard*, May 8, 2019, https://psmag.com/news/why-is-participation-in-food-assistance-programs-like-wic-declining.

[9] For additional information on the survey design and weighting in the WBNS, see Karpman, Zuckerman, and Gonzalez (2018).

[10] We define adults with English proficiency as those who speak English at least "well," as classified in the American Community Survey. Adults with limited English proficiency are those who speak English less than "well." This is a broader measure than is commonly used to define English proficiency; in most analyses, a person must speak English "very well" to be classified as having English proficiency (Wilson 2014). We use the following measures for weighting: gender, age, race and ethnicity, educational attainment, presence of children under age 18 in the household, census region, homeownership status, family income as a percentage of the federal poverty level, access to the internet, and family composition. We benchmark non-Hispanic "other race" respondents by two categories: (1) other race born in Asia and (2) multiple races or other race not born in Asia.

[11] We draw on measures developed by researchers at the University of California, Los Angeles, for an immigrant follow-up survey to the California Health Interview Survey.

The exact wording of the two questions on chilling effects in the WBNS were as follows:

Question A: *Was there a time in the past 12 months when you or someone in your family **decided not to apply** for one or more non-cash government benefits, such as Medicaid or CHIP, SNAP (formerly known as food stamps), or housing subsidies, because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

Question A1: *Which benefits did you or someone in your family decide not to apply for because you were worried it would disqualify you or a family member or relative from obtaining a green card? Check all that apply.* [Response options: *Medicaid or CHIP; SNAP (formerly known as food stamps); Housing subsidies; Other (please specify)*]

Question A2: *Did you decide not to apply for Medicaid or CHIP for **your children** because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

Question B: *Was there a time in the past 12 months when you or someone in your family **stopped participating** in any non-cash government benefits, such as Medicaid or CHIP, SNAP (formerly known as food stamps), or housing subsidies, because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

Question B1: *Which benefits did you or someone in your family stop participating in because you were worried it would disqualify you or a family member or relative from obtaining a green card? Check all that apply.* [Response options: *Medicaid or CHIP; SNAP (formerly known as food stamps); Housing subsidies; Other (please specify)*]

Question B2: *Did **your children** stop participating in Medicaid or CHIP because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

[12] The exact wording for the question on awareness of the proposed public charge rule in the WBNS was as follows:

*A proposed rule would make it harder for immigrants to enter the United States or become permanent residents of the United States if they have low income or use public benefits such as Medicaid, the Supplemental Nutrition Assistance Program (SNAP, formerly known as food stamps), or housing subsidies. How much have you heard about this proposed rule?* [Response options: *a lot, some, only a little, nothing at all*]

This question was asked later in the survey than the questions on chilling effects.

[13] See endnote 10 for a definition of English proficiency.

[14] Though our analysis did not consider the eligibility of individuals or family members for different public programs, we know that in general, adults living in families with children are more likely to have a family member who is eligible for a public program, which increases their exposure to potential chilling effects relative to adults who do not live with children.

[15] "Potential Effects of Public Charge Changes on California Children," The Children's Partnership and KidsData.org; "Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard," Manatt.

[16] Those estimates drew on lessons from the 1996 Personal Responsibility and Work Authorization Act, which eliminated access to federal assistance for most immigrants during their first five years of residence (Fix and Passel 2002).

[17] In fact, amongst survey respondents, one in five respondents lived in a household where one or more noncitizen family members were not permanent residents (22.9 percent), one in three (33.8 percent) lived in households where all noncitizen family members were permanent residents, and around 43 percent lived with all naturalized US citizen, foreign-born relatives.

# References

Artiga, Samantha, Anthony Damico, and Rachel Garfield. 2018. "Potential Effects of Public Charge Changes on Health Coverage for Citizen Children." San Francisco: Henry J. Kaiser Family Foundation.

Artiga, Samantha, Rachel Garfield, and Anthony Damico. 2018. "Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid." San Francisco: Henry J. Kaiser Family Foundation.

Batalova, Jeanne, Michael Fix, and Mark Greenberg. 2018. *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*. Washington, DC: Migration Policy Institute.

Bovell-Ammon, Allison, Stephanie Ettinger de Cuba, Diana Cutts, and Sharon Coleman. 2018. "Trends in Food Insecurity and SNAP Participation among Immigrant Families of US-Born Young Children." Presentation given at American Public Health Association Annual Meeting and Expo, San Diego, November 10–14.

Capps, Randy, Mark Greenberg, Michael Fix, and Jie Zong. 2018. "Gauging the Impact of DHS' Proposed Public-Charge Rule on US Immigration." Washington, DC: Migration Policy Institute.

Cervantes, Wendy, Rebecca Ullrich, and Hannah Matthews. 2018. *Our Children's Fear: Immigration Policy's Effects on Young Children*. Washington, DC: Center on Law and Social Policy.

Fiscal Policy Institute. 2018. "'Only Wealthy Immigrants Need Apply': How a Trump Rule's Chilling Effect Will Harm the US." Latham, NY: Fiscal Policy Institute.

Fix, Michael, and Jeffrey Passel. 2002. "The Scope and Impact of Welfare Reform's Immigrant Provisions." Washington, DC: Urban Institute.

Garrett, J. Joe, Michael Dennis, and Charles A. DiSogra. 2010. "Non-Response Bias: Recent Findings from Address-Based Panel Recruitment." Presented at the Annual Conference of the American Association for Public Opinion Research, Chicago, May 13–16.

Greenberg, David M., Sara Feierstein, and Patricia Voltolini. 2019. "Supporting the Resilience of America's Immigrant Communities: How Community Organizations Are Responding to Federal Policy Changes." Washington, DC: Local Initiatives Support Corporation.

Heeren, Timothy, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom. 2008. "A Comparison of Results from an Alcohol Survey of a Prerecruited Internet Panel and the National Epidemiologic Survey on Alcohol and Related Conditions." *Alcoholism: Clinical and Experimental Research* 32 (2): 222–9.

Kenney, Genevieve M., Jennifer M. Haley, and Robin Wang. 2018. "Proposed Public Charge Rule Could Jeopardize Recent Coverage Gains among Citizen Children." Washington, DC: Urban Institute.

Karpman, Michael, Stephen Zuckerman, and Dulce Gonzalez. 2018. "The Well-Being and Basic Needs Survey: A New Data Source for Monitoring the Health and Well-Being of Individuals and Families." Washington, DC: Urban Institute.

Laird, Jennifer, Isaac Santelli, Jane Waldfogel, and Christopher Wimer. 2019. "Forgoing Food Assistance out of Fear: Simulating the Child Poverty Impact of Making SNAP a Legal Liability for Immigrants." *Socius: Sociological Research for a Dynamic World* 5: 1–8.

O'Rourke, Lena. 2019. "Trump's Public Charge Proposal Is Hurting Immigrant Families Now, Even Though DHS' Proposed Regulation Is Not Final." Washington, DC: Protecting Immigrant Families Campaign.

Roche, Kathleen M., Elizabeth Vaquera, Rebecca M. B. White, and Maria Ivonne Rivera. 2018. "Impacts of Immigration Actions and News and the Psychological Distress of US Latino Parents Raising Adolescents." *Journal of Adolescent Health* 62 (5): 525–31.

Van Hook, Jennifer, and James D. Bachmeier. 2013. "How Well Does the American Community Survey Count Naturalized Citizens?" *Demographic Research* 29 (1): 1–32.

Wilson, Jill H. 2014. *Investing in English Skills: The Limited-English Proficient Workforce in US Metropolitan Areas.* Washington, DC: Brookings Institution.

Zallman, Leah, and Karen Finnegan. 2018. "Changing Public Charge Immigration Rules: The Potential Impact on Children Who Need Care." Oakland, CA: California Health Care Foundation.

## About the Authors

**Hamutal Bernstein** is a senior research associate in the Income and Benefits Policy Center at the Urban Institute, where her research focuses on immigration and integration, workforce development and education, and program evaluation. She has wide expertise in mixed-methods research, including original survey development, secondary data analysis, and qualitative data collection and analysis. She is a principal investigator on the Annual Survey of Refugees and Survey Redesign for the US Department of Health and Human Services. Her other areas of research focus on immigrant upskilling, immigrant inclusion at the local level, and other human services topics. Before joining Urban, Bernstein was a program officer at the German Marshall Fund of the United States and a research associate at the Institute for the Study of International Migration at Georgetown University. Bernstein received her BA in international relations from Brown University and her PhD in government from Georgetown University

**Dulce Gonzalez** is a research analyst in the Health Policy Center at the Urban Institute. Gonzalez has worked at Los Angeles-based organization Maternal and Child Health Access, where she evaluated health and well-being outcomes for its perinatal home visiting program. She currently supports quantitative analyses of the Urban Institute's Well-Being and Basic Needs Survey. Before joining Urban, she was a graduate intern at the Georgetown University Center for Children and Families. Gonzalez received her MPP from Georgetown University.

**Michael Karpman** is a senior research associate in the Health Policy Center. His work focuses primarily on the implications of the Affordable Care Act, including quantitative analysis related to health insurance coverage, access to and affordability of health care, use of health care services, and health status. His work includes efforts to help coordinate and analyze data from the Urban Institute's Health Reform Monitoring Survey and Well-Being and Basic Needs Survey. Before joining Urban in 2013, Karpman was a senior associate at the National League of Cities Institute for Youth, Education, and Families. He received his MPP from Georgetown University.

**Stephen Zuckerman** is a senior fellow and vice president of the Health Policy Center. He has studied health economics and health policy for 30 years and is a national expert on Medicare and Medicaid physician payment, including how payments affect enrollee access to care and the volume of services they receive. He is currently examining how payment and delivery system reforms can affect the availability of primary care services and studying the implementation and impact of the Affordable Care Act. Before joining Urban, Zuckerman worked at the American Medical Association's Center for Health Policy Research. He received his PhD in economics from Columbia University.

# Acknowledgments

This brief was funded by the Robert Wood Johnson Foundation and Heising-Simons Foundation through their support for Urban's From Safety Net to Solid Ground initiative. We are grateful to them and to all our funders, who make it possible for Urban to advance its mission.

The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Funders do not determine research findings or the insights and recommendations of Urban experts. Further information on the Urban Institute's funding principles is available at urban.org/fundingprinciples.

We are grateful for advice from Ignatius Bau, Julia Gelatt, Katrina Goering, David Kallick, Francisco Pedraza, Katherine Roche, and Holly Straut-Eppsteiner. We also thank Ninez Ponce and Steven P. Wallace from the California Health Interview Survey. It has been immensely valuable to be included in conversations to convene researchers organized by Renato Rocha and David Kallick, through the Protecting Immigrant Families campaign cochaired by the National Immigration Law Center and the Center for Law and Social Policy. We also wish to thank our colleagues Genevieve M. Kenney, Rob Santos, Timothy Triplett, Elaine Waxman, and Doug Wissoker, as well as Randy Capps, Katherine Hempstead, Giridhar Mallya, and Jackie Vimo for their review of an earlier draft. We thank Rachel Kenney for editing.



500 L'Enfant Plaza SW
Washington, DC 20024

www.urban.org

## ABOUT THE URBAN INSTITUTE

The nonprofit Urban Institute is a leading research organization dedicated to developing evidence-based insights that improve people's lives and strengthen communities. For 50 years, Urban has been the trusted source for rigorous analysis of complex social and economic issues; strategic advice to policymakers, philanthropists, and practitioners; and new, promising ideas that expand opportunities for all. Our work inspires effective decisions that advance fairness and enhance the well-being of people and places.

Copyright © May 2019. Urban Institute. Permission is granted for reproduction of this file, with attribution to the Urban Institute.

# EXHIBIT C

September 2019 Update | Issue Brief

# Estimated Impacts of Final Public Charge Inadmissibility Rule on Immigrants and Medicaid Coverage

Samantha Artiga, Rachel Garfield, and Anthony Damico

## Executive Summary

In August 2019, the Trump Administration published a Department of Homeland Security (DHS) final rule to change "public charge" inadmissibility policies. Under longstanding immigration policy, federal officials can deny entry to the U.S. or adjustment to legal permanent resident (LPR) status (i.e., a "green card") to someone they determine to be a public charge. The new rule redefines public charge and expands the programs that the federal government considers in public charge determinations to include previously excluded health, nutrition, and housing programs, such as Medicaid for non-pregnant adults. It also identifies characteristics DHS will consider as negative factors that increase the likelihood of someone becoming a public charge, including having income below 125% of the federal poverty level (FPL) ($26,663 for a family of three as of 2019). The rule is scheduled to go into effect as of October 15, 2019. Using the Survey of Income and Program Participation (SIPP) 2014 Panel and 2017 American Community Survey (ACS) data, this analysis provides estimates of the rule's potential impacts:

**Nearly eight in ten (79%) noncitizens who originally entered the U.S. without LPR status have at least one characteristic that DHS could weigh negatively in a public charge determination.** Over one in four (27%) have a characteristic that DHS could consider a heavily weighted negative factor. The most common negative factors among the population are lacking private health insurance (56%), not having a high school diploma (39%), and having family income below the new 125% FPL threshold (32%).

**If the rule leads to disenrollment rates ranging from 15% to 35% among Medicaid and CHIP enrollees who are noncitizens or live in a household with a noncitizen, between 2.0 to 4.7 million individuals could disenroll.** Previous research and recent experience suggest that the rule will likely lead to decreased enrollment in public programs among immigrant families beyond those directly affected by the rule due to fear and confusion about the changes. Even before the rule was finalized, there were reports of parents disenrolling themselves and their children from Medicaid and CHIP coverage, choosing not to renew coverage, or choosing not to enroll despite being eligible. Beyond potential disenrollment, the rule may also deter new enrollment among some of the nearly 1.8 million uninsured individuals who are eligible for Medicaid and CHIP but not enrolled and are noncitizens themselves or live in a household with a noncitizen. Decreased participation in Medicaid would increase the uninsured rate among immigrant families, reducing access to care and contributing to worse health outcomes. Coverage losses

Headquarters / 185 Berry Street Suite 2000 San Francisco CA 94107 / 650 854 9400
Washington Offices and Conference Center / 1330 G Street NW Washington DC 20005 / 202 347 5270

kff.org / Email Alerts: kff.org/email / facebook.com/KaiserFamilyFoundation / twitter.com/KaiserFamFound

Filling the need for trusted information on national health issues, the Kaiser Family Foundation is a nonprofit organization based in San Francisco, California.



also will likely decrease revenues and increase uncompensated care for providers and have spillover effects within communities.

# Introduction

In August 2019, the Trump Administration published a DHS final rule to change "public charge" inadmissibility policies. Under longstanding immigration policy, federal officials can deny entry to the U.S. or adjustment to LPR status (i.e., a "green card") to someone they determine to be a public charge. Based on Kaiser Family Foundation analysis of the SIPP 2014 Panel and 2017 ACS data, this analysis provides updated estimates of the:

- Share of noncitizens who originally entered the U.S. without LPR status who have characteristics that DHS could potentially weigh negatively in a public charge determination; and

- Number of individuals who might disenroll from Medicaid under different scenarios in response to the rule.

# Background

**Under longstanding policy, if authorities determine that an individual is likely to become a public charge, they may deny that person's application for LPR status or entry into the U.S.[1]** Public charge determinations are a forward-looking test in which officials will assess the likelihood of someone becoming a public charge in the future. Specifically, DHS finds an individual "inadmissible" if officials determine that he or she is more likely than not at any time in the future to become a public charge.

**The rule redefines public charge and broadens the programs that the federal government will consider in public charge determinations to include previously excluded health, nutrition, and housing programs (Table 1).** Under previous policy, a person was considered a public charge if officials determined he or she was likely to become primarily dependent on the federal government as demonstrated by use of cash assistance programs or government-funded institutionalized long-term care. Guidance specifically clarified the exclusion of Medicaid and other non-cash programs from these decisions because of concerns that fears were limiting enrollment of families. Under the new rule, officials will determine someone to be a public charge if they determine an individual is more likely than not at any time in the future to receive one or more public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). Further, the rule defines public benefits to include federal, state, or local cash benefit programs for income maintenance and certain health, nutrition, and housing programs that were previously excluded from public charge determinations, such as non-emergency Medicaid for non-pregnant adults, the Supplemental Nutrition Assistance Program (SNAP), and several housing programs.

| Table 1: Change in Public Charge Definition and Programs Considered | | |
|---|---|---|
| | **Previous Policy** | **Policy Under New Rule** |
| Public Charge Definition | Likely to become primarily dependent on the federal government as demonstrated by use of cash assistance programs or government-funded institutionalized long-term care. | More likely than not at any time in the future to receive one or more public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). |
| Programs Considered in Public Charge Determinations | • SSI<br>• TANF<br>• State/local cash assistance programs<br>• Public assistance for long-term care in an institution (including Medicaid) | • SSI<br>• TANF<br>• Federal, state, or local cash benefit programs for income maintenance<br>• Non-emergency Medicaid for non-pregnant adults over age 21[2]<br>• SNAP food assistance<br>• Housing assistance |

**Officials make public charge determinations based on the totality of the person's circumstances.** At a minimum, officials must take into account an individual's age; health; family status; assets, resources, and financial status; and education and skills. The rule describes how DHS will consider each factor and identifies characteristics it will deem as positive factors that reduce the likelihood of an individual becoming a public charge and negative factors that increase the likelihood of becoming a public charge. DHS indicates that no single factor would govern a determination, and it appears officials would retain significant discretion in assessing factors and making determinations. The rule establishes a new income standard of 125% of the federal poverty level (FPL) ($26,663 for a family of three as of 2019) and specifies that family income below that standard is a negative factor. Some other negative factors include having a lower education level, a health condition, lacking private health insurance, not being employed or a primary caregiver, and having limited English proficiency. Examples of positive factors include being of working age, being in good health, having private health coverage, and having income at or above 125% FPL. The rule also specifies certain heavily weighted negative and positive factors.

**The rule identifies previous or current use of public benefits as a negative factor, but most immigrants who would be seeking admission or adjustment to LPR status are already ineligible for these programs or are exempt from a public charge determination.** For example, eligibility for the programs included in the rule for immigrants without LPR status is now largely limited to humanitarian immigrants such as refugees and asylees, who are exempt from the public charge test. However, since the public charge determination is a forward-looking test, even if an individual is not currently or has not previously used a public benefit, officials will assess the likelihood of an individual using those benefits in the future.

**The new rule will likely lead to decreased enrollment in Medicaid and other programs among individuals in immigrant families beyond those directly affected by the rule, including their primarily U.S.-born children.** Although few people directly affected by the rule are enrolled in Medicaid

and the other public benefit programs, previous experience and recent research suggest that the rule will have chilling effects that would lead individuals to forgo enrollment in or disenroll themselves and their children from programs due to confusion and fear that their or their children's enrollment could negatively affect their or another family member's immigration status.[3] For example, prior to the final rule, there were anecdotal reports of individuals disenrolling or choosing not to enroll themselves or their children in Medicaid and CHIP due to fears and uncertainty.[4] Providers also reported increasing concerns among parents about enrolling their children in Medicaid and food assistance programs,[5] and WIC agencies across a number of states have seen enrollment drops that they attribute largely to fears about public charge.[6] A survey conducted prior to the final rule found that one in seven adults in immigrant families reported avoiding public benefit programs for fear of risking future green card status, and more than one in five adults in low-income immigrant families reported this fear.[7]

# Key Findings

## Characteristics of Noncitizens without LPR status

Using SIPP 2014 Panel data, we show characteristics that DHS could consider in a public charge determination under the rule among noncitizens who originally entered the U.S. without LPR status. Specifically, the analysis examines age, self-reported health status, family income, health insurance type, employment, education, and English proficiency (Appendix B). As noted, officials also will consider previous or current use of public benefits. However, because very few people without a green card are eligible for these programs who would be subject to a public charge test, this analysis does not include estimates of use of public programs.

These estimates illustrate the share of noncitizens living in the U.S. who might face barriers to adjusting to LPR status under the rule based on certain characteristics. Due to data limitations, they do not provide a precise count of the number of people within the U.S. who would be subject to public charge determinations. The estimates do not account for people who DHS could deny entry into the U.S. due to a public charge determination and do not account for all factors that DHS could consider in a public charge determination. As noted, officials would take into account the totality of an individual's circumstances, and no single factor would govern a determination. How DHS would operationalize its assessment of factors may differ from SIPP's measurement of characteristics. (See Appendix A: Methods for more detail.)

**Noncitizens who entered the U.S. without LPR status include individuals across different ages, races/ethnicities, and family statuses.** Although many were nonelderly Hispanic adults without a dependent child**,** 7% are a child, more than one in four is a parent (28%), and one-third (33%) is another race or ethnicity, including nearly one in five (18%) who is Asian (Figure 1).



**Nearly eight in ten (79%) noncitizens who entered the U.S. without LPR status have at least one characteristic that DHS could weigh negatively in a public charge determination under the rule.** The most common characteristics examined that DHS could consider as negative factors include no private health coverage (56%), no high school diploma (39%), and having income below the new 125% FPL[8] standard established by the rule (32%). (Figure 2 and Appendix B).



**More than one in four (27%) noncitizens who originally entered the U.S. without LPR status have a characteristic that DHS could consider a heavily weighted negative factor examined in this analysis.** Potential heavily weighted negative factors examined in this analysis include not being employed and not a full-time student or primary caregiver (29%), and having a disability that limits the ability to work and lacking private health coverage (3%). The rule identifies other heavily weighted negative factors that were not included in this analysis, including receipt of a public benefit for more than 12 of the previous 36 months and being found previously inadmissible or deportable on public charge

grounds. As noted, very few people without a green card are eligible for these programs who would be subject to a public charge test. SIPP data do not provide information on previous determinations of inadmissibility or deportability based on public charge grounds.

**Nearly all of noncitizens who originally entered without LPR status have at least one characteristic that DHS could consider as a positive factor.** The most common positive factors are no physical or mental health disability (95%), excellent, very good, or good health (90%), and being of working age (between age 18 and 61) (88%). Over half (55%) have a heavily weighted positive factor, which includes having private health insurance (44%) or having family income at or above 250% FPL (36%). Given the high prevalence of at least one positive factor among the population, it's unclear how officials would weigh the presence of a positive factor in a public charge test. As noted, officials will make public charge determinations based on a totality of an individual's circumstances. However, the rule does not specify how officials will weigh different factors against each other, leaving officials significant discretion in making determinations on a case-by-case basis.

**Nearly seven in ten (68%) of U.S. citizens (U.S. born and naturalized) also had one or more characteristics that DHS could potentially weigh negatively if they were subject to a public charge determination.** Citizens were more likely than noncitizens who entered the U.S. without LPR status to have certain characteristics that DHS could consider negative, including being a child or older than age 61 and reporting fair or poor health and having a physical or mental disability that limits their ability to work (Appendix B).

## Impact on Medicaid Enrollment

We also illustrate the number of Medicaid and CHIP enrollees who are noncitizens or citizens living in a household with at least one noncitizen who could disenroll under different potential disenrollment scenarios. We use 2017 American Community Survey (ACS) data for this analysis as ACS provides more recent estimates of health coverage than available through SIPP. Although CHIP was not included as a public benefit in the rule, many individuals are not able to distinguish between their enrollment in Medicaid versus CHIP, and ACS data do not provide separate Medicaid and CHIP coverage measures. As noted, previous experience and recent research suggests that the proposed rule may lead to broader disenrollment among individuals in families with immigrants beyond those the rule directly affects.

We applied disenrollment rates of 15%, 25%, and 35% to the total number of Medicaid and CHIP enrollees who are noncitizens or citizens living in a household with at least one noncitizen. It is difficult to predict what actual disenrollment rates may be in response to the rule. These disenrollment rates illustrate a range of potential impacts and draw on previous research on the chilling effect welfare reform had on enrollment in health coverage among immigrant families.[9] As noted, a 2019 survey fielded prior to finalization of the rule found that one in seven (13.7%) of adults in immigrant families reported avoiding public benefit programs for fear of risking future green card status, and more than one in five (20.7%) adults in low-income immigrant families reported this fear.[10]

**According to the ACS data, there were over 13.5 million Medicaid/CHIP enrollees who were noncitizens or citizens living in a household with at least one noncitizen, including 7.6 million children, who may be at risk for decreased enrollment as a result of the rule.** If the proposed rule leads to disenrollment rates ranging from 15% to 35%, between 2.0 million and 4.7 million Medicaid and CHIP enrollees who are noncitizens or citizens living in a family with at least one noncitizen would disenroll (Figure 3). Because very few noncitizens are eligible for Medicaid would be subject to public charge, this disenrollment would primarily be due to chilling effects of fear and confusion. The estimates provide illustrative examples and, due to data limitations, may reflect both an undercount of noncitizens and an overestimate of noncitizens receiving Medicaid. (See Appendix A: Methods for more detail.)



Figure 3

Declines in Medicaid/CHIP Enrollment among Individuals who are Noncitizens or in a Household with a Noncitizen Under Different Scenarios

In Millions:

If 15% Disenroll: -2.0
If 25% Disenroll: -3.4
If 35% Disenroll: -4.7

Medicaid/CHIP Enrollees Who Are Noncitizens or in Households with a Noncitizen: 13.5 million

Source: Kaiser Family Foundation analysis of 2017 American Community Survey Data.

KFF

**Beyond potential disenrollment, the proposed rule may also deter new enrollment among the nearly 1.8 million uninsured individuals who are eligible for Medicaid and CHIP but not enrolled and are noncitizens or live in a household with a noncitizen.** Specifically, there are 652,200 noncitizen adults and 219,100 noncitizen children who are uninsured but eligible for Medicaid or CHIP. In addition, there are 366,800 uninsured citizen adults and 602,400 uninsured citizen children who are eligible for one of the programs and live in a household with a noncitizen.[11] Given continually evolving immigration trends, potential effects of the new rule on lawful immigration in the future, and families' increased fears of accessing programs, the number of people living in a household with a noncitizen who enroll in Medicaid and CHIP may continually decline over time.

## Implications

**The rule will make it more difficult for some individuals, particularly those with low incomes and health needs, to obtain LPR status or immigrate to the U.S.** For example, a full-time worker in a family of three earning the federal minimum wage would not have sufficient annual income ($15,080) to meet the new income standard established in the rule, which would be $26,663 for a family of three. As such, the rule will affect future immigration opportunities for individuals and families. The rule may also increase

barriers to family reunification and potentially lead to family separation, particularly among families with mixed immigration statuses. For example, if DHS denies an individual a green card and that individual loses permission to remain in the U.S due to a public charge determination, he or she may have to leave other family members, such as a spouse or child who is a citizen or who has LPR status, in the U.S.

**Reduced participation in Medicaid and other programs would negatively affect the health and financial stability of immigrant families and the growth and healthy development of their children, who are predominantly U.S.-born**. Coverage losses would reduce access to care for families, contributing to worse health outcomes. Reduced participation in nutrition and other programs would likely compound these effects. In addition, the losses in coverage would lead to lost revenues and increased uncompensated care for providers and have broader spillover effects within communities.

This brief was prepared by Samantha Artiga and Rachel Garfield, with the Kaiser Family Foundation, and Anthony Damico, an independent consultant to the Kaiser Family Foundation.

# Appendix A: Methods

The findings presented in this brief are based on Kaiser Family Foundation analysis of Wave 3 of the Survey of Income and Program Participation (SIPP) 2014 Panel and 2017 American Community Survey (ACS) data. SIPP enables us to directly measure individuals' immigration status at the time they entered the U.S. and health status. SIPP also provides measures of health coverage, but 2015 is the most recent year of data available. Because 2015 was a year of substantial transition for Medicaid due to the implementation of the Affordable Care Act, we base our Medicaid and CHIP disenrollment analysis on 2017 ACS data.

We classified people as not having LPR status when originally entering the U.S. based on a SIPP question that asks, "What was [respondent's] immigration status when he/she first moved to the United States?" In addition to measuring people who might adjust to LPR status in the future, who would be subject to a public charge determination (unless they fall into an exempt category), this measure includes noncitizens who have adjusted to LPR status since arriving into the U.S. It also includes nonimmigrants and undocumented immigrants who do not have a current pathway to adjust to LPR status. Our testing of different citizenship measures led to overall similar patterns. The 2014 SIPP shows 17.8 million noncitizens, including 7.4 million of whom originally entered the country without LPR status. Due to underreporting of noncitizens and legal immigration status in the SIPP, these estimates may reflect an undercount of the total noncitizen population and especially the undocumented population. Given this potential undercount—and that the group of noncitizens without LPR status includes some individuals who have since adjusted to LPR status as well as nonimmigrants and undocumented immigrants who do not have a pathway to adjust to LPR status— our analysis of characteristics that DHS could consider negative in public charge determinations focuses on shares rather than absolute numbers of affected individuals.

For the estimates of the share of noncitizens without LPR status living within the U.S. who have characteristics that DHS could weigh negatively in a public charge determination under the proposed rule, we used SIPP to measure age, poverty and work status, insurance status, education, English proficiency, and health status and classified each factor as positive or negative based on the rule's description of how DHS would consider the characteristic. DHS' implementation and operationalization of its assessment of factors may differ from SIPP's measurement of characteristics.

In our analysis of household income, we use 125% of the Census poverty threshold, or $23,848 for a family of three in 2015. Census poverty thresholds are measured slightly differently than HHS poverty guidelines but lead to similar poverty levels for incomes of similar household size. In the rule, DHS provides a specific definition of a household to be used in the calculation of household income. Thus, the final income cutoff for a particular family to meet the 125% of poverty rule as implemented may differ from our measurement or that used by other programs.

We base the Medicaid and CHIP potential disenrollment analysis on 2017 ACS data. These data show that over 13.5 million Medicaid/CHIP enrollees were noncitizens or living in a household with at least one

noncitizen. These data on Medicaid enrollees reflect both an undercount of noncitizens in the survey data (as noted above) as well as an overestimate of the share of noncitizens participating in Medicaid as it includes some who may be reporting emergency Medicaid or other state or local health assistance programs as Medicaid coverage.

For estimates of potential changes in coverage due to public charge policies, we present several scenarios using different disenrollment rates for Medicaid and CHIP. These disenrollment rates drew on previous research that showed decreased enrollment in Medicaid and CHIP among immigrant families after welfare reform.[12] For example, Kaushal and Kaestner found that after new eligibility restrictions were implemented for recent immigrants as part of welfare reform, there was 25% disenrollment among children of foreign-born parents from Medicaid even though the majority of these children were not affected by the eligibility changes and remained eligible.[13] Using this 25% disenrollment rate as a mid-range target, we assume a range of disenrollment rates from a low of 15% to a high of 35%. However, it remains uncertain what share of individuals may disenroll from Medicaid and CHIP in response to the proposed rule. Although the welfare reform experience is instructive of chilling effects among immigrant families broadly, it was associated with changes to program eligibility for immigrants. In contrast, this rule would change the potential consequences of participating in programs on an individual's immigration status.

## Appendix B

| Characteristics that DHS Could Consider in Public Charge Determinations by Citizenship Status, 2015 | | | | | |
|---|---|---|---|---|---|
| | Potential Positive or Negative Factor? | Heavily Weighted? | Non-LPR Noncitizen | Total Noncitizens | Citizens |
| **Age** | | | | | |
| 17 or younger | Negative | | 7% | 8% | 22% |
| 18 to 61 | Positive | | 88% | 84% | 58% |
| 62 or older | Negative | | 6% | 8% | 21% |
| **Health Status** | | | | | |
| No Physical or Mental Health Disability | Positive | | 95% | 94% | 86% |
| Physical or Mental Health Disability | Negative | | 5% | 6% | 14% |
| Excellent, Very Good, or Good Health | Positive | | 90% | 90% | 86% |
| Fair or Poor health | Negative | | 10% | 10% | 14% |
| Physical or Mental Health Disability and No Private Coverage | Negative | Y | 3% | 4% | 7% |
| **Family Income** | | | | | |
| Less than 125% Federal Poverty Level (FPL) | Negative | | 32% | 28% | 16% |
| 125% to less than 250% FPL | Positive | | 32% | 29% | 22% |
| 250% FPL or more | Positive | Y | 36% | 43% | 62% |
| **Health Coverage** | | | | | |
| Private Coverage | Positive | Y | 44% | 48% | 71% |
| No Private Coverage | Negative | | 56% | 52% | 29% |
| **Employment** | | | | | |
| Employed (and age 18+) | Positive | | 64% | 62% | 48% |
| Not employed and not a caregiver  (and age 18+) | Negative | | 29% | 30% | 30% |
| Not employed and not a student (and age 18+) | Negative | Y | 27% | 28% | 28% |
| **Education** | | | | | |
| Has high school diploma or higher (and age 18+) | Positive | | 54% | 56% | 71% |
| No high school diploma (and age 18+) | Negative | | 39% | 36% | 8% |
| **English Proficiency** | | | | | |
| Does Not Have Limited English Proficiency | Positive | | 77% | 77% | 99% |
| Limited English Proficiency | Negative | | 23% | 23% | 1% |
| **Any Positive Factor** | | | **100%** | **100%** | **100%** |
| **Any Heavily Weighted Positive Factor** | | | **55%** | **60%** | **79%** |
| **Any Negative Factor** | | | **79%** | **78%** | **68%** |
| **Any Heavily Weighted Negative Factor** | | | **27%** | **29%** | **29%** |

Notes: For each individual subject to a determination, DHS would take into account the totality of his or her circumstances and would retain discretion on how to weigh specific circumstances and factors; no single factor would govern a determination. How DHS would implement and operationalize its assessment of factors under the rule may differ from how SIPP measures characteristics.
Source: Kaiser Family Foundation Analysis of Survey of Income and Program Participation 2014 Panel data.

# Endnotes

[1] Becoming a public charge may also be a basis for deportation in extremely limited circumstances. "Public Charge Fact Sheet," U.S. Citizenship and Immigration Services, https://www.uscis.gov/news/fact-sheets/public-charge-fact-sheet, accessed February 12, 2018.

[2] Services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act and school-based services or benefits provided to individuals who are at or below the oldest age eligible for secondary education as determined under state or local law are not included as a public benefit.

[3] Findings show that recent immigration policy changes have increased fears and confusion among broad groups of immigrants beyond those directly affected by the changes. See Samantha Artiga and Petry Ubri, *Living in an Immigrant Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health*, (Washington, DC: Kaiser Family Foundation, December 2017), https://www.kff.org/disparities-policy/issue-brief/living-in-an-immigrant-family-in-america-how-fear-and-toxic-stress-are-affecting-daily-life-well-being-health/ and Samantha Artiga and Barbara Lyons, *Family Consequences of Detention/Deportation: Effects on Finances, Health, and Well-Being,* (Washington, DC: Kaiser Family Foundation, September 2018), https://www.kff.org/disparities-policy/issue-brief/family-consequences-of-detention-deportation-effects-on-finances-health-and-well-being/. Similarly, earlier experiences show that welfare reform changes increased confusion and fear about enrolling in public benefits among immigrant families beyond those directly affected by the changes. See. Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research*,40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/; Michael Fix and Jeffrey Passel, *Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform 1994-97* (Washington, DC: The Urban Institute, March 1, 1999) https://www.urban.org/sites/default/files/publication/69781/408086-Trends-in-Noncitizens-and-Citizens-Use-of-Public-Benefits-Following-Welfare-Reform.pdf; Namratha R. Kandula, et. al, "The Unintended Impact of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants, *Health Services Research,* 39(5), (October 2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361081/; Rachel Benson Gold, *Immigrants and Medicaid After Welfare Reform*, (Washington, DC: The Guttmacher Institute, May 1, 2003), https://www.guttmacher.org/gpr/2003/05/immigrants-and-medicaid-after-welfare-reform.

[4] Samantha Artiga and Petry Ubri, *Living in an Immigrant Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health*, (Washington, DC: Kaiser Family Foundation, December 2017), https://www.kff.org/disparities-policy/issue-brief/living-in-an-immigrant-family-in-america-how-fear-and-toxic-stress-are-affecting-daily-life-well-being-health/; Samantha Artiga and Barbara Lyons, *Family Consequences of Detention/Deportation: Effects on Finances, Health, and Well-Being* (Washington, DC: Kaiser Family Foundation, September 2018),https://www.kff.org/disparities-policy/issue-brief/family-consequences-of-detention-deportation-effects-on-finances-health-and-well-being/; and Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman, *With Public Charge Rule Looming, One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018,* (Washington, DC: Urban Institute, May 2019), https://www.urban.org/urban-wire/public-charge-rule-looming-one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018

[5] The Children's Partnership, "California Children in Immigrant Families: The Health Provider Perspective," 2018, https://www.childrenspartnership.org/wp-content/uploads/2018/03/Provider-Survey-Inforgraphic-.pdf.

[6] Bottemiller Evich, H., "Immigrants, fearing Trump crackdown, drop out of nutrition programs," Politico (Washington, DC, September 4, 2018). Accessed July 18, 2019, https://www.politico.com/story/2018/09/03/immigrants-nutrition-food-trump-crackdown-806292

[7] Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman, *With Public Charge Rule Looming, One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018,* (Washington, DC: Urban Institute, May 2019), https://www.urban.org/urban-wire/public-charge-rule-looming-one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018

[8] In our data analysis, we use the Census poverty threshold, which was $23,848 for a family of three in 2015. Census poverty thresholds are measured slightly differently than HHS poverty guidelines but lead to similar poverty levels for incomes of similar household size. See Methods for more detail.

[9] Earlier experiences show that welfare reform changes increased confusion and fear about enrolling in public benefits among immigrant families beyond those directly affected by the changes. See. Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research*,40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/; Michael Fix and Jeffrey Passel, *Trends in Noncitizens' and*

*Citizens' Use of Public Benefits Following Welfare Reform 1994-97* (Washington, DC: The Urban Institute, March 1, 1999) https://www.urban.org/sites/default/files/publication/69781/408086-Trends-in-Noncitizens-and-Citizens-Use-of-Public-Benefits-Following-Welfare-Reform.pdf; Namratha R. Kandula, et. al, "The Unintended Impact of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants, *Health Services Research,* 39(5), (October 2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361081/; Rachel Benson Gold, *Immigrants and Medicaid After Welfare Reform*, (Washington, DC: The Guttmacher Institute, May 1, 2003), https://www.guttmacher.org/gpr/2003/05/immigrants-and-medicaid-after-welfare-reform.

[10] Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman, *With Public Charge Rule Looming, One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018,* (Washington, DC: Urban Institute, May 2019), https://www.urban.org/urban-wire/public-charge-rule-looming-one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018

[11] Kaiser Family Foundation analysis of 2017 American Community Survey data.

[12] Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research,*40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/; Michael Fix and Jeffrey Passel, *Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform 1994-97* (Washington, DC: The Urban Institute, March 1, 1999) https://www.urban.org/sites/default/files/publication/69781/408086-Trends-in-Noncitizens-and-Citizens-Use-of-Public-Benefits-Following-Welfare-Reform.pdf; Namratha R. Kandula, et. al, "The Unintended Impact of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants, *Health Services Research,* 39(5), (October 2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361081/; Rachel Benson Gold, *Immigrants and Medicaid After Welfare Reform*, (Washington, DC: The Guttmacher Institute, May 1, 2003), https://www.guttmacher.org/gpr/2003/05/immigrants-and-medicaid-after-welfare-reform.

[13] Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research,*40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/

# EXHIBIT D



**FPI**
FISCAL POLICY
Institute

BRIEF LOOK

# "Only Wealthy Immigrants Need Apply"
## How a Trump Rule's Chilling Effect Will Harm the U.S.

October 10, 2018

**A DRASTIC CHANGE IN THE "PUBLIC CHARGE" RULE** proposed by the Trump administration would restrict access to green cards and various types of visas for immigrants who are not already comparatively well off. This "Trump Rule" fundamentally changes our approach to immigration, making family income and potential use of health care, nutrition or housing programs central considerations in whether or not to offer people an opportunity to make their lives in this country. The Trump Rule takes an existing standard and proposes to make it vastly more restrictive.

## The Chilling Effect

The direct effect of the Trump Rule would fall primarily on people applying for a green card through a family based petition, where public charge is relevant. Similar standards would also apply to people seeking to extend or change their temporary non-immigrant status in the United States. The rule change would likely lead to the denial of green cards to hundreds of thousands of otherwise eligible applicants for family-based and employment visas.

Beyond that, if implemented the Trump Rule is also expected—and perhaps intended—to have a widespread chilling effect. Even people who already have a green card, or who are exempt from the rule, such as refugees or asylees, are expected to be frightened and

## Who could feel a chilling effect?

➢ **24 million** people
➢ **Including 9 million** children under 18

---

**Definition of Terms**

**Directly affected population:** People applying for a green card through a pathway where public charge is relevant, such as petition for a family-based visa or a range of other visas.

**People who may experience a chilling effect:** The number of people who are likely to be nervous or confused about whether they should apply for benefits if they qualify is a much larger group than the directly affected population. For this paper, we estimate it to be everyone who lives in a family with at least one non-citizen immigrant, and where someone in that family has received one of the public benefits named in the public charge rule.

**Disenrollment from programs:** Among the people who experience a chilling effect, the portion that would go so far as to disenroll from programs for which they are eligible. When calculating the economic impacts, we start with the portion of those experiencing the chilling effects who currently receive any benefits, and simulate the impact of disenrollment rates of 15, 25, and 35 percent.

confused about the potential consequences of applying for food, health, and housing supports they are eligible to receive. The chilling effect is the focus of this brief.

We estimate that 24 million people in the United States would be affected by the chilling effect of the Trump Rule. Not all will face a public charge determination, but all are likely to be nervous about applying for benefits, and some portion will in fact disenroll from benefit programs.

Our estimate of the population who may experience a chilling effect includes anyone in a family that has received any food, health, or housing supports, and where at least one member of the family is a non-citizen. Based on past experience, there is good reason to believe that when there are changes around immigration and public benefits even people who are not directly targeted by this rule will be affected. Indeed, there is already evidence that significant numbers of immigrants are withdrawing from Women, Infants, Children, known as WIC, despite the fact that the program is not included in the Trump Rule and the rule has not yet been implemented.[1]

## The Trump Rule Goes Much Too Far

The Trump Rule uses the public charge designation as a way to unilaterally change immigration policy, without input from Congress, fundamentally redefining how we think about who is an "acceptable" immigrant and undercutting the very idea of the American Dream.

The pre-existing public charge rule has required immigration officers to evaluate the overall circumstances of immigrants to determine whether they can support themselves in the United States or whether they are likely to rely primarily on the government for support. Under longstanding policy, this has meant showing an applicant will not become primarily dependent on the government—relying, for example, on cash aid from Temporary Assistance for Needy Families, Supplemental Security Income, or General Assistance for their monthly income, or on long-term institutional care.

The Trump Rule aggressively reinterprets this longstanding policy. While continuing to look at the overall circumstances of a family, the Trump Rule would deem immigrants potentially unacceptable if they have received, or are considered likely to receive, even a modest amount of support from any one of a number of *non-cash* supports: Medicaid, food stamps (SNAP), housing supports, and subsidies for Medicare Part D to reduce the cost of prescription drugs. It would also for the first time make a specific income threshold a central issue in immigration decisions. Having an income of under $15,000 for a single person or $31,000 for a family of four would be weighed negatively, and could lead to a denial. Indeed, the rule proposes to weigh a range of factors negatively. The only factor weighed as "heavily positive" is if an applicant has an income or resources of over $30,000 for a single person or

**BRIEF LOOK**                           "Only Wealthy Immigrants Need Apply"

### What if the Trump Rule Were Applied to You?



28 percent of non-citizens might be deemed unacceptable if they were subjected to the Trump Rule. So might 29 percent of people born in the United States, if they were subjected to the same test.

**FIG. 1** Center on Budget and Policy Priorities analysis.

$63,000 for a family of four. By way of comparison, the median household income in the United States is $60,000.[2]

As noted, only some non-citizens currently in the United States will face this Trump Rule; many will not. But what would it look like if we applied the Trump Rule to all non-citizens? The effect is extreme: in United States, 28 percent of non-citizens have benefited from health care, food, housing, or cash supports. That should come as no surprise: so have basically the same share of people born in the United States, 29 percent. The fact is, a large number of Americans—whether or not they are immigrants—make use of federal food, health, and housing programs in any given year to get through hard times and to advance to a better life.

Most of these programs are structured in significant measure as work supports, helping people with relatively low-wage jobs keep healthy, stay in their homes, and put food on the table. Discouraging families from making use of these programs when they need them only makes it harder for them to move up the economic ladder and contribute to their fullest capacity to the American economy.

## Further Inhumane Treatment of Kids to Pressure Families

The nation was outraged to find out that the Trump Administration has been using the forced separation of children from their parents as an inhumane tactic of immigration enforcement.[3] The redefinition of public charge doubles down on this strategy

### 9 Million Kids
### in Families Experiencing the Chilling Effect

|  | Citizens | Non-Citizens | All |
|---|---|---|---|
| Children under 18 years old | 7.8 million | 1.2 million | 9.0 million |
| Adults | 4.6 million | 10.2 million | 14.8 million |
| Total | 12.4 million | 11.4 million | 23.8 million |

**FIG. 2** Center on Budget and Policy Priorities analysis.

by inflicting harm on children, whether intentionally or as a side effect of the Trump Rule.

Some children will themselves be subject to the Trump Rule.[4] A far greater number live in families that will likely experience a chilling effect. In the United States, 9 million children under 18 years old live in families with at least one non-citizen family member and that have received one of the benefits specified by the Trump Rule. The large majority, 7.8 million of the 9 million, are United States citizens.

It also pushes parents to make heart-wrenching decisions for their families. The stakes are unbearably high. As a parent, if you apply for SNAP or Medicaid, you may fear losing the chance to stay in this country with your kids. Yet, not applying may mean seeing your family go hungry or not being able to see a doctor when you are sick.

If the Trump Rule is put into effect, advocates and service providers will need to work strenuously to clarify which individuals may be directly impacted and which may be relatively safe. But confusion and fear will undoubtedly spread well beyond the directly targeted population.

> The stakes are unbearably high. As a parent, if you apply for SNAP or Medicaid, you may fear losing the chance to stay in this country with your kids. Yet, not applying may mean seeing your family go hungry or not being able to see a doctor when you are sick.

Helping kids in immigrant families do well is not only the right thing to do, it's also a sound investment in our state and the country's future. One of the clearest and most striking findings in a major study of the National Academy of Sciences is that the children of immigrants, once grown, become among the strongest contributors to the country's economy.[5]

## An Economic Loss for the United States

To look at the economic impact, we modeled the impact of two of the biggest supports the Trump Rule would affect: SNAP and Medicaid. We provide estimates of the impacts if 15, 25, and 35 percent of people currently receiving benefits who experience the chilling effect feel compelled to disenroll from programs for which they qualify. This range of disenrollment is derived from studies of prior experiences of big policy changes creating a chilling effect for immigrants, such as the welfare reform bill of the 1990s.[6]

## Economic Loss to the United States

| Simulated Impact of Trump Rule | Lower Estimate 15% disenrollment | Middle Estimate 25% disenrollment | Higher Estimate 35% disenrollment |
|---|---|---|---|
| Reduction in Benefits | $7.5 billion | $12.5 billion | $17.5 billion |
| Potential Economic Ripple Effects | $14.5 billion | $24.1 billion | $33.8 billion |
| Potential Jobs Lost | 99,000 | 164,000 | 230,000 |

**FIG. 3** Estimate of direct loss was calculated by the Center on Budget and Policy Priorities; economic ripple effects and jobs lost was estimated by the Economic Policy Institute. See Methodology for details. Totals may not sum due to independent rounding. See "Methodology" for details.

The middle-level estimate shows a loss of $12.5 billion in health care and food supports.

If money on this scale is withdrawn from the economy, there would be predictable ripple effects to businesses and workers. Withdrawal of SNAP funding means a reduction in spending in grocery stores and supermarkets. When families lose health insurance, hospitals and doctors lose income.[7] And some spending would be reduced in other areas as families struggle to pay food and health costs. Our mid-level estimate shows a potential loss of $24.1 billion due to the ripple effects of this lost spending.[8] Further, when businesses have less revenue, they lay off workers. Translating the job loss implied by an economic loss of this magnitude, based on the number of jobs implied per dollar of gross domestic product, the country stands potentially to lose up to 164,000 jobs under our middle estimate as a result of this reduction in federal benefits.[9] The economic impact would vary depending on where the country is in the business cycle. Because these programs serve as an important economic stabilizer, they create a bigger stimulus during an economic downturn and less in a period of high growth.

In addition to this mid-level estimate, we run a simulation for lower and higher levels of disenrollment. At the lower level, with just 15 percent of people receiving benefits disenrolling, the modeled loss of spending on these programs is $7.5 billion, the potential economic ripple effects are $14.5 billion, and the potential job loss is 99,000. At the higher estimate, with 35 percent disenrollment, the reduction in health and food supports amounts to $17.5 billion, the potential ripple effects are $33.8 billion, and there could be up to 230,000 jobs lost.

## Conclusion

From the beginning, the United States has been a place where immigrants have come to make a new life. In this country, many immigrants and U.S.-born workers alike have climbed from the lowest rungs of the economic ladder into the middle class and beyond. It was the opportunities America provided—and often enough the supports they needed to get started or make it through hard times—that allowed them to succeed. This is the story of the American Dream. And it is the story engraved in poetry on the Statue of Liberty.

The Trump Rule sees America's story differently, as one governed by barriers and fear of newcomers. By suggesting that only immigrants who are already above a certain income threshold are welcome, the Trump Rule shows a disturbing lack of faith in our country and the opportunities it provides.

## METHODOLOGY

### 1. ESTIMATING THE POPULATION THAT WOULD EXPERIENCE A CHILLING EFFECT

We define the population that would experience a chilling effect as those who might be nervous and confused by the new rule, and might feel like they need to make a choice between applying for needed benefits and avoiding putting their family at risk. As noted in the body of this paper most of the people experiencing a chilling effect are people who will not have to go through a public charge determination.

In order to estimate the size of the population experiencing a chilling effect, the Fiscal Policy Institute uses estimates provided by the Center on Budget and Policy Priorities (CBPP) of the number of people living in families where at least one person is a non-citizen, and where someone in that family has received one of the public benefits named in the proposed public charge rule. The analysis uses the Current Population Survey and corrects for underreporting of SNAP, TANF and SSI receipt in the Census survey using data from the Department of Health and Human Services/Urban Institute Transfer Income Model (TRIM). These TRIM corrections take into account program eligibility rules by immigration status. Three years of data are combined in order to increase sample size and improve the reliability of the state-level estimates: 2013 to 2015, the most recent for which the TRIM-adjusted data are available. National level estimates are based on data just from 2015.

CBPP's calculations of program participation include the newly considered programs — Medicaid, SNAP, and housing benefits—as well as those already considered—TANF, SSI, and General Assistance. The Census data for Medicaid used by CBPP also include the closely intertwined Children's Health Insurance Program (CHIP). Most participants can be expected to have a very hard time distinguishing between a program funded by Medicaid and one funded by CHIP. The proposed rule does not presently include CHIP, but the notice announcing the proposal explains that the administration is considering including it. Medicare Part D low-income subsidies are included in the proposed rule but were not included in CBPP's estimates due to a lack of a Census variable that identifies those participants. To model the current public charge benefit related test, CBPP looked at those people who get more than half of their income from TANF, SSI, and General Assistance.

### 2. ESTIMATING THE ECONOMIC LOSS

Among the people who experience a chilling effect, some portion would go so far as to disenroll from programs for which they are eligible.

The estimate of the direct loss of family economic supports due to disenrollment from these programs begins with SNAP, Medicaid and CHIP federal funding data. The estimates use administrative and survey data to approximate the amount of benefits received by families that include a non-citizen. This is the population that due to fear or confusion could forgo

benefits even though most of them are themselves not likely to be subject to a public-charge determination. In estimating the economic consequences of the Trump Rule, we assume that only a portion of this group will actually disenroll from these food, health, housing, or cash supports. While a lot is at stake for people in families with a non-citizen immigrant if they fear running afoul of the public charge rule, there is also a lot at stake in not applying and having your family go hungry or lack health insurance. Again, we include CHIP in our estimates.

In our estimates, we assume a range of 15 to 35 percent of the people experiencing a chilling effect will disenroll from SNAP and Medicaid. We provide estimates of the economic effects of the higher and lower disenrollment rates as well as the midpoint of 25 percent. In doing this, we follow the Kaiser Family Fund's paper of February, 2018, "Proposed Changes to 'Public Charge' Policies for Immigrants: Implications for Health Coverage," which provides a review of the literature leading to this estimate range.[10] We do not attempt to simulate the consequences of adverse selection—for instance, that healthier people may be more likely to withdraw from health care coverage than less healthy people. The 15, 25, and 35 percent disenrollment rates are already a broad range and not a precise prediction.

To estimate the economic ripple effects, the Fiscal Policy Institute uses an analysis provided to us by Josh Biven of the Economic Policy Institute. The analysis takes the direct benefit loss as calculated above, and applies to it an output multiplier for SNAP of 1.6, in line with estimates Bivens summarizes in a 2011 paper.[11] The Medicaid multiplier is 2.0, and is drawn from an analysis of the effects of the American Recovery and Reinvestment Act.[12]

After calculating the effect of benefit reductions on output, the output was divided by $146,880 to obtain an estimate of the effect on employment, on a full-time equivalent (FTE) basis. This employment multiplier was obtained by dividing U.S. gross domestic product in 2017 by the number of FTEs in that year.[13]

The economic impact can be expected to vary with the state of the economy. The economic and job loss of the Trump Rule will be greater in times of high unemployment, and lower in times of full employment. Since the Trump Rule is proposed to be permanent, the effect could be expected to vary.

[1] See Helena Bottemiller Evich, "Immigrants, Fearing Trump Crackdown, Drop Out of Nutrition Programs," Politico, September 3, 2018.

[2] The rule gives a family income of below 125 percent of the federal poverty level as a negatively weighing factor, and above 250 percent of the poverty level as a positively weighing factor. We translate those into dollar figures for different family sizes using the 2018 poverty line. Household income is a Fiscal Policy Institute analysis of the 2017 American Community Survey 1-year data. Household income includes individuals of varying size including households of just one person.

[3] As Attorney General Jeff Sessions put it: "we will prosecute you, and that child will be separated from you as required by law. If you don't like that, then don't smuggle children over our border."[3] See Rafael Carranza and Daniel González, "AG Sessions Vows to Separate Kids from Parents, Prosecute All Illegal Border-Crossers," The Republic, May 8, 2018.

[4] Disturbingly, for those children who do apply for status that requires a public charge designation, the Trump Rule penalizes children by weighing their age negatively. The theory, presumably, is that children do not adequately contribute to the economy.

[5] National Academies of Sciences, Engineering, and Medicine, The Economic and Fiscal Consequences of Immigration. Washington, DC: The National Academies Press, 2017. For a brief synopsis of major findings, see the press release at http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=23550.

[6] Our estimate of disenrollment follows the analysis of "Proposed Changes to 'Public Charge' Policies for Immigrants: Implications for Health Coverage," Kaiser Family Foundation, September 24, 2018. That report cites: Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," Health Services Research,40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/; Michael Fix and Jeffrey Passel, Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform 1994-97 (Washington, DC: The Urban Institute, March 1, 1999) https://www.urban.org/sites/default/files/publication/69781/408086-Trends-in-Noncitizens-and-Citizens-Use-of-Public-Benefits-Following-Welfare-Reform.pdf; Namratha R. Kandula, et. al, "The Unintended Impact of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants, Health Services Research, 39(5), (October 2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361081/; and Rachel Benson Gold, Immigrants and Medicaid After Welfare Reform, (Washington, DC: The Guttmacher Institute, May 1, 2003), https://www.guttmacher.org/gpr/2003/05/immigrants-and-medicaid-after-welfare-reform.

[7] Uncompensated care funds must also be replenished to make up for losses in emergency care of people without health insurance, but this cost is not included in our analysis of the economic impacts.

[8] The extent of employment impact depends on the state of the overall economy, with a higher impact during times of high overall unemployment, when these programs serve as both a safety net and an automatic economic stabilizer. Since the Trump Rule would be a permanent measure, there would be periods in the economic cycle the predicted economic impact would be higher and when it would be lower.

[9] The analysis of direct loss to in supports was performed by Danilo Trisi of the Center on Budget and Policy Priorities, and the analysis of economic ripple effects was performed by Josh Bivens of the Economic Policy Institute. See Methology section for more details.

[10] That report cites as the underpinning for this range of estimates: Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," Health Services Research,40(3), June, 2005; Michael Fix and Jeffrey Passel, Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform 1994-97 (Washington, DC: The Urban Institute, March 1, 1999); Namratha R. Kandula, et. al, "The Unintended Impact of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants, Health Services Research, 39(5), October 2004; and Rachel Benson Gold, Immigrants and Medicaid After Welfare Reform, (Washington, DC: The Guttmacher Institute, May 1, 2003).

[11] Josh Bivens, "Method Memo on Estimating the Jobs Impact of Various Policy Changes," Economic Policy Institute, November 8, 2011.

[12] Any slowdown in the growth of aggregate demand caused by reductions in spending on these programs could in theory be neutralized by the Federal Reserve Bank lowering rates to spur growth. However, this does not change the size of the fiscal drag that benefit cuts would impose on the economy. These estimates are implicitly a measure of how much harder other macroeconomic policy tools would have to work to neutralize the demand drag stemming these cuts. Further, it is deeply uncertain whether other tools of macroeconomic policy have the ability to neutralize negative fiscal shocks. See Gabriel Chodorow-Reich, Laura Feiveson, Zachary Liscow, and William Gui Woolston, "Does State Fiscal Relief During Recessions Increase Employment?," American Economic Journal: Economic Policy, August 2012, pp. 118-145.

[13] Data for the analysis come from tables 1.1.5 and 6.5 from the National Income and Product Accounts of the Bureau of Economic Analysis. The quotient was increased by the growth in its nominal value in 2017 to forecast what it would be in 2018.

# EXHIBIT E

| | Search |

**QuickFacts**

**Cook County, Illinois**

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more*.

## Table

| All Topics ▼ | Cook County, Illinois |
|---|---|
| **Persons in poverty, percent** | ▲ 14.6% |

### 👤 PEOPLE

| | |
|---|---|
| **Population** | |
| Population estimates, July 1, 2018, (V2018) | 5,180,493 |
| Population estimates base, April 1, 2010, (V2018) | 5,195,026 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2018, (V2018) | -0.3% |
| Population, Census, April 1, 2010 | 5,194,675 |
| **Age and Sex** | |
| Persons under 5 years, percent | ▲ 6.1% |
| Persons under 18 years, percent | ▲ 21.8% |
| Persons 65 years and over, percent | ▲ 14.6% |
| Female persons, percent | ▲ 51.4% |
| **Race and Hispanic Origin** | |
| White alone, percent | ▲ 65.5% |
| Black or African American alone, percent   (a) | ▲ 23.9% |
| American Indian and Alaska Native alone, percent   (a) | ▲ 0.7% |
| Asian alone, percent   (a) | ▲ 7.9% |
| Native Hawaiian and Other Pacific Islander alone, percent   (a) | ▲ 0.1% |
| Two or More Races, percent | ▲ 2.0% |
| Hispanic or Latino, percent   (b) | ▲ 25.5% |
| White alone, not Hispanic or Latino, percent | ▲ 42.1% |
| **Population Characteristics** | |
| Veterans, 2013-2017 | 172,838 |
| Foreign born persons, percent, 2013-2017 | 21.1% |
| **Housing** | |
| Housing units, July 1, 2018, (V2018) | 2,200,221 |
| Owner-occupied housing unit rate, 2013-2017 | 56.9% |
| Median value of owner-occupied housing units, 2013-2017 | $227,400 |
| Median selected monthly owner costs -with a mortgage, 2013-2017 | $1,847 |
| Median selected monthly owner costs -without a mortgage, 2013-2017 | $713 |
| Median gross rent, 2013-2017 | $1,044 |
| Building permits, 2018 | 8,199 |
| **Families & Living Arrangements** | |
| Households, 2013-2017 | 1,956,561 |
| Persons per household, 2013-2017 | 2.63 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2013-2017 | 86.8% |
| Language other than English spoken at home, percent of persons age 5 years+, 2013-2017 | 35.1% |
| **Computer and Internet Use** | |
| Households with a computer, percent, 2013-2017 | 85.9% |
| Households with a broadband Internet subscription, percent, 2013-2017 | 76.7% |
| **Education** | |
| High school graduate or higher, percent of persons age 25 years+, 2013-2017 | 86.2% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2013-2017 | 37.2% |
| **Health** | |
| With a disability, under age 65 years, percent, 2013-2017 | 6.6% |
| Persons without health insurance, under age 65 years, percent | ▲ 10.0% |
| **Economy** | |
| In civilian labor force, total, percent of population age 16 years+, 2013-2017 | 65.8% |
| In civilian labor force, female, percent of population age 16 years+, 2013-2017 | 60.6% |
| Total accommodation and food services sales, 2012 ($1,000)   (c) | 14,553,105 |
| Total health care and social assistance receipts/revenue, 2012 ($1,000)   (c) | 39,639,868 |

| | |
|---|---|
| Total manufacturers shipments, 2012 ($1,000) (c) | 330,380 |
| Total merchant wholesaler sales, 2012 ($1,000) (c) | 100,829,550 |
| Total retail sales, 2012 ($1,000) (c) | 62,767,358 |
| Total retail sales per capita, 2012 (c) | $11,998 |

**Transportation**

| | |
|---|---|
| Mean travel time to work (minutes), workers age 16 years+, 2013-2017 | 32.9 |

**Income & Poverty**

| | |
|---|---|
| Median household income (in 2017 dollars), 2013-2017 | $59,426 |
| Per capita income in past 12 months (in 2017 dollars), 2013-2017 | $33,722 |
| Persons in poverty, percent | ▲ 14.6% |

## 📊 BUSINESSES

**Businesses**

| | |
|---|---|
| Total employer establishments, 2016 | 133,150 |
| Total employment, 2016 | 2,401,662 |
| Total annual payroll, 2016 ($1,000) | 145,680,137 |
| Total employment, percent change, 2015-2016 | 1.7% |
| Total nonemployer establishments, 2017 | 485,902 |
| All firms, 2012 | 549,686 |
| Men-owned firms, 2012 | 291,278 |
| Women-owned firms, 2012 | 216,929 |
| Minority-owned firms, 2012 | 216,374 |
| Nonminority-owned firms, 2012 | 319,115 |
| Veteran-owned firms, 2012 | 38,665 |
| Nonveteran-owned firms, 2012 | 495,450 |

## 🌐 GEOGRAPHY

**Geography**

| | |
|---|---|
| Population per square mile, 2010 | 5,495.1 |
| Land area in square miles, 2010 | 945.33 |
| FIPS Code | 17031 |

About datasets used in this table

**Value Notes**

 Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ⓘ icon to the row in TABLE view to learn about sampling error.

The vintage year (e.g., V2018) refers to the final year of the series (2010 thru 2018). *Different vintage years of estimates are not comparable.*

**Fact Notes**
- **(a)** Includes persons reporting only one race
- **(b)** Hispanics may be of any race, so also are included in applicable race categories
- **(c)** Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**
- **-** Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper in open ended distribution.
- **D** Suppressed to avoid disclosure of confidential information
- **F** Fewer than 25 firms
- **FN** Footnote on this item in place of data
- **NA** Not available
- **S** Suppressed; does not meet publication standards
- **X** Not applicable
- **Z** Value greater than zero but less than half unit of measure shown

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and P Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**ABOUT US**
Are You in a Survey?
FAQs
Director's Corner
Regional Offices
History
Research
Scientific Integrity
Census Careers
Diversity @ Census
Business Opportunities
Congressional and Intergovernmental
Contact Us

**FIND DATA**
QuickFacts
American FactFinder
2010 Census
Economic Census
Interactive Maps
Training & Workshops
Data Tools
Developers
Catalogs
Publications

**BUSINESS & INDUSTRY**
Help With Your Forms
Economic Indicators
Economic Census
E-Stats
International Trade
Export Codes
NAICS
Governments
Longitudinal Employer-Household Dynamics (LEHD)
Survey of Business Owners

**PEOPLE & HOUSEHOLDS**
2020 Census
2010 Census
American Community Survey
Income
Poverty
Population Estimates
Population Projections
Health Insurance
Housing
International
Genealogy

**SPECIAL TOPICS**
Advisors, Centers and Research Programs
Statistics in Schools
Tribal Resources (AIAN)
Emergency Preparedness
Statistical Abstract
Special Census Program
Data Linkage Infrastructure
Fraudulent Activity & Scams
USA.gov

**NEWSROOM**
News Releases
Release Schedule
Facts for Features
Stats for Stories
Blogs

**CONNECT WITH US**

Accessibility | Information Quality | FOIA | Data Protection and Privacy Policy | U.S. Department of Commerce

# EXHIBIT F



1615 Duke Street | Alexandria, VA 22314
Phone: 703.528.0700 | Fax: 703.841.1543
www.aasa.org

December 1, 2018

Samantha Deshommes, Chief
Regulatory Coordination Division, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue N.W.
Washington, DC 20529-2140

**RE      DHS Docket No. USCIS-2010-0012, RIN 1615-AA22, Comments in Response to Proposed Rulemaking: Inadmissibility on Public Charge Grounds**

Dear Ms. Deshommes:

AASA, The School Superintendents Association submits the following comments in response to the October 10, 2018 notice by the Department of Homeland Security of its proposed rule setting forth new "public charge" grounds for inadmissibility. AASA is the professional organization for more than 13,000 educational leaders in the United States and we write to share the views of our members. AASA strongly opposes the proposed rule and the impact it will have on children and families in the communities we lead. Specifically, we fear it will lead to a reduction in access to healthcare, food and housing for the children we are charged with educating, which will impede school districts' efforts to ensure every child is a productive, successful member of American society.

First, we believe the proposed regulation will negatively impact K-12 students' access to healthcare despite a carveout in the regulation for accessing school-based Medicaid programs. Recent research[1] has shown that the proposed rule would have "a chilling effect" that could lead to disenrollment from public programs for a larger group of immigrant families because they do not understand the rule's details and would fear their or their children's enrollment could negatively affect their or their family members' immigration status. An analysis conducted by Kaiser Family Foundation found that if the proposed rule leads to Medicaid disenrollment rates ranging from 15% to 35% among Medicaid and CHIP enrollees living in a household with a noncitizen, between 2.1 to 4.9 million Medicaid/CHIP enrollees would disenroll. These estimates reflect disenrollment among immigrants who lack legal permanent resident status and fear participation could affect their changes of receiving legal permanent resident status as well as disenrollment among a broader group of enrollees in immigrant families, which could encompass their primarily U.S. born children.

Schools deliver health services effectively and efficiently to children—immigrant and native-born—since school is where these children spend most of their days. Increasing access to health care services through Medicaid improves health care and educational outcomes for all students including immigrant children. Providing health and wellness services for immigrant children through school-based Medicaid programs helps enable these children to become employable, attend higher-education and be productive contributors to American society.

Districts are already strained in ensuring qualified children from immigrant families access school-based Medicaid programs. AASA has spoken to school leaders across the U.S. who have received proactive requests from families over the past year asking that their children be dis-enrolled from the school-based

---

[1] Kaiser Family Foundation, Proposed Changes to "Public Charge" Policies for Immigrants: Implications for Health Coverage (September 2018), available at https://www.kff.org/disparities-policy/fact-sheet/ proposed-changes-to-public-charge-policies-for-immigrants-implications-for-health-coverage/

Medicaid program. Other district leaders report a significant decline in participation in these programs since the announcement of the regulation in Spring 2018 and even declines in school attendance for children who are still living within the district.

While school administrators try to explain to parents that their children are entitled to Medicaid or CHIP and that they will not be sharing this information with immigration enforcement agencies, school administrators have not been successful in convincing families to continue allowing them to provide Medicaid-reimbursable services to their children. While some obligations for serving students with disabilities fall to the district regardless of whether the parent consents to billing Medicaid, many districts can bill Medicaid for services for children that are considered under Early and Periodic Screening, Diagnostic and Treatment (EPSDT) benefits. However, the district is not obligated to meet these additional healthcare needs of children without an IEP and without Medicaid reimbursement it is often difficult to continue to do so. Thus, children could lose valuable access to healthcare services in schools or schools will be forced to use local dollars, if available, to continue to meet the healthcare needs of these children. Ultimately, this could lead to less successful educational outcomes for children if schools or Medicaid cannot address the healthcare impediments to learning.

As to the question of whether the Children's Health Insurance Program (CHIP) should be included in a public charge determination, AASA opposes its inclusion for many of the same reasons that we oppose the inclusion of Medicaid. In addition to the great harm that would be caused by the inclusion of CHIP, this would be counter to Congress' explicit intent in expanding coverage to lawfully present children and pregnant women. Section 214 of the 2009 Children's Health Insurance Program Reauthorization Act (CHIPRA) gave states a new option to cover, with regular federal matching dollars, lawfully residing children under Medicaid and CHIP during their first five years in the U.S. This was enacted because Congress recognized the public health, economic, and social benefits of ensuring that these populations have access to care.

Second, we oppose the regulation because of how it will exacerbate food insecurity of children. The consequences of food insecurity are especially detrimental to the health, development, and well-being of children.[2] Children are more likely to become sick without access to proper nutrition and could experience developmental delays as well. Any delays that impact learning will have to be addressed by schools, thus putting the burden on meeting the nutritional needs of children who are too hungry or malnourished to learn back on districts. Further, research shows a link between food insecurity and poor educational performance and academic outcomes for children[3] — all of which have developmental, health, and economic consequences in both the short and long terms. Hungry children are less able to learn and are more likely to miss school due to illness, repeat a grade, receive special education services, and/or receive mental health services.[4] Moreover, districts that already work with emergency food providers to ensure that children are receiving food on weekends and holidays are going to be stretched to maintain this work given the increased need of families who are no longer receiving SNAP. Consequently, this will place an incredible burden on districts to ensure children are accessing the food they need to be able to learn.

Third, we oppose this regulation as it will lead to increased numbers of children in unstable housing situations as it will deter eligible immigrant families from seeking much-needed housing and homelessness benefits. If families opt out of housing opportunities in our community and become homeless, families will experience increased housing instability, likely driving up homeless rates, increasing housing mobility, or both. Having safe and stable housing is crucial to a person's good health, sustaining employment, and overall

---

[2] Food Research & Action Center. (2017). Hunger and Health: The Role of the Supplemental Nutrition Assistance Program in Improving Health and Well-Being. Available at: http://frac.org/wp-content/uploads/hunger-health-role-snap-improving-healthwell-being.pdf. Accessed on October 5, 2018.

[3] Jyoti, D. F., Frongillo, E. A., & Jones, S. J. (2005). Food insecurity affects school children's academic performance, weight gain, and social skills. Journal of Nutrition, 135, 2831-2839

[4] Howard, L. L. (2011). Does food insecurity at home affect non-cognitive performance at school? A longitudinal analysis of elementary student classroom behavior. Economics of Education Review, 30, 157-176.

self-sufficiency. These effects will be particularly prominent in children, many of whom are U.S. citizens, who are part of immigrant families. Research has shown that economic and housing instability negatively impacts children's cognitive development, leading to poorer life outcomes as adults.[5] Housing instability is directly correlated to decreases in student retention rates and contributes to homeless students' high suspension rates, school turnover, truancy, and expulsions, limiting students' opportunity to obtain the education they need to succeed later in life.[6] The loss of federal housing assistance will increase the risk of students living in unsafe, overcrowded, and unstable housing. Housing instability, coupled with other stressors, results in high levels of parental stress that can harm children's cognitive development and lower educational attainment.[7]

When families opt out of public housing assistance and become homeless districts will have to do more to serve children who are now displaced from their homes. Specifically, districts will be required to provide specific educational services for immigrant children under the McKinney-Vento Act to ensure that homeless children are able to continue to attend school. It is considerably expensive to meet the requirements under the McKinney-Vento Act to serve homeless children. The lack of federal funding associated with the program's mandates means that school districts rely on local funding to meet the needs of homeless students they currently serve. If this number increases, then districts will struggle greatly to ensure they maintain compliance with McKinney-Vento and that all homeless children in the district receive the services and educational stability they are entitled to by law.

In conclusion, AASA asks that you do not move forward with this regulation as it will have a devastating impact on the children that we educate and the school district budgets we manage. Schools have a legal requirement to accept and educate all students that come through their door, regardless of their or their family's immigration status, and we expect federal laws and policies to support school districts in our efforts to educate students, not undermine those efforts. We strive to serve all students in our districts and believe this regulation would imperil the educational benefits of all students.

For these reasons, we urge you to withdraw this harmful proposed rule in its entirety. If you have any additional questions, please reach out to AASA's Advocacy Director, Sasha Pudelski, at spudelski@aasa.org.

Sincerely,

Daniel G. Domenech

Daniel Domenech
Executive Director

---

[5] 21 HEATHER SANDSTROM & SANDRA HUERTA, THE NEGATIVE EFFECTS OF INSTABILITY ON CHILD DEVELOPMENT: A RESEARCH SYNTHESIS (2013), https://www.urban.org/sites/default/files/publication/32706/412899-The-Negative-Effects-of-Instability-on-Child-Development-A-Research-Synthesis.PDF.

[6] See Mai Abdul Rahman, The Demographic Profile of Black Homeless High School Students Residing in the District of Columbia Shelters and the Factors that Influence their Education 55 (Mar. 2014) (Ph.D. dissertation, Howard University), available at http://gradworks.umi.com/3639463.pdf (citations omitted).

[7] HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN 23-24 (2011); Heather Sandstrom & Sandra Huerta, The Negative Effects of Instability on Child Development: A Research Synthesis 28-32 (Urban Inst., Low-Income Working Families, Discussion Paper No. 3, 2013), available at https://www.urban.org/sites/default/files/publication/32706/412899-The-Negative-Effects-of-Instability-on-Child-Development-A-Research-Synthesis.PDF.

# EXHIBIT G



December 10, 2018

*Submitted via www.regulations.gov*

Samantha Deshommes, Chief
Regulatory Coordination Division, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Avenue NW
Washington, DC 20529-2140

**Re: DHS Docket No. USCIS-2010-0012, RIN 1615-AA22, Comments in Response to Proposed Rulemaking: Inadmissibility on Public Charge Grounds**

Justice in Aging is strongly opposed to the Department of Homeland Security's (DHS) proposed changes to "public charge" in the above referenced Notice of Proposed Rulemaking (NPRM or proposed rule). The proposed rule targets older immigrants and their families, causing them as well as their communities, states, and health care systems serious harm. Furthermore, DHS has failed to provide any adequate justification for why these changes are needed. Therefore, we urge DHS to withdraw the proposed rule, and to ensure that long-standing principles clarified in the 1999 Field Guidance remain in effect.

Justice in Aging is a non-profit organization with the mission of improving the lives of low-income older adults living in the United States. For 46 years, we have used the power of law to fight senior poverty by securing access to affordable health care, economic security, and the courts for older adults with limited resources. Our mission is to secure the opportunity for older adults to live with dignity, regardless of financial circumstances—free from the worry, harm, and injustice caused by lack of health care, food, or a safe place to sleep.

Using our deep expertise in Social Security, Supplemental Security Income, Medicare and Medicaid, we work to strengthen the social safety net and remove the barriers low-income seniors face in trying to access the services they need. We also provide technical expertise to thousands of advocates across the country on how to help low-income older adults access the programs and services they need to meet their basic needs. Our advocacy centers on populations that have traditionally lacked legal protection, including people of color, people with limited English proficiency (LEP), women, and LGBTQ individuals.

Our comments focus primarily on the harms the proposed changes will have by specifically targeting older adults and their families. Our comments also discuss the negative impact the proposed rule will have on people with disabilities, and on communities, states, and health care systems. We have cited research demonstrating the harms of the proposed rule changes and we respectfully request that DHS review each of the sources cited and made available to the

**WASHINGTON**
1444 Eye Street, NW, Suite 1100
Washington, DC 20005
202-289-6976

**LOS ANGELES**
3660 Wilshire Boulevard, Suite 718
Los Angeles, CA 90010
213-639-0930

**OAKLAND**
1330 Broadway, Suite 525
Oakland, CA 94612
510-663-1055

agency through active hyperlinks. We further request that the full text of each of the sources cited, along with the full text of our comments, be considered part of the administrative record in this matter for purposes of the Administrative Procedure Act.

The proposed changes to the definition of public charge and the weighing of the factors in the totality of the circumstances test will make it nearly impossible for an older adult to pass the public charge test. Because these changes would fundamentally and radically shift American immigration policy to count wealth and income as the primary indicators of a person's contribution and discount the value of intergenerational families and DHS has failed to adequately justify them, the NPRM must not be adopted.

## I. The Proposed Rule Would Radically Change Current Public Charge Policy and Specifically Target Older Immigrants and People with Disabilities

We strongly oppose the proposal to change the definition of "public charge" from a person who is "likely to become primarily dependent on the government for subsistence" to a person who "receives one or more public benefits" as well as the proposed expansion of the definition of "public benefit" for purposes of public charge determination. First, these changes would abandon longstanding guidance that only cash "welfare" assistance for income maintenance and government funded long-term institutional care can be taken into consideration in the "public charge" test – and only when it represents the majority of a person's support. Second, this change would radically expand the scope of public charge to include older adults who use basic needs programs to supplement their savings or fixed incomes during retirement, as well as others with earnings from low-wage work. If the NPRM is finalized, immigration officials could consider a much wider range of government programs in the "public charge" determination: most Medicaid programs, including Medicare Savings Programs; the Medicare Part D low-income subsidy for seniors, including those who have accumulated the necessary work history themselves or through a spouse to qualify for Social Security; housing assistance such as Section 8 housing vouchers, Project-based Section 8, or Public Housing; and SNAP (Supplemental Nutrition Assistance Program, formerly Food Stamps). DHS asks whether additional programs should be considered in the public charge determination. We strongly oppose adding any programs and believe the inclusion of programs proposed in the NPRM already mark a dramatic and dangerous departure from well-established guidance and congressional intent.

The proposed rule would also assign negative weight to numerous factors that disproportionately apply to older adults, some of which have never been relevant to the public charge determination. In particular, the proposed rule details how being over age 62, having a large family, or having a treatable medical condition could be held against immigrants seeking a permanent legal status. In addition to the clear bias against older adults based on age, these named factors disproportionately target seniors because they often live in intergenerational

households with several family members,[1] and the vast majority of adults over age 50 have at least one chronic health condition.[2]

The NPRM contains new language describing how an individual's health is to be considered in making public charge determinations. The new language would specify that, when considering an individual's health, DHS will consider "whether the alien has any physical or mental condition that . . . is significant enough to interfere with the person's ability to care for him- or herself or to attend school or work, or that is likely to require extensive medical treatment or institutionalization in the future."[3] This standard is so broad that virtually every person with any type of significant disability, as well as many individuals with less significant disabilities, would have their disability or other chronic health conditions count against them in the public charge test. This standard would also unfairly tip the balance of factors against most older adults dually eligible for Medicare and Medicaid, nearly 70% of whom have at least three chronic conditions and half of whom use long-term services and supports.[4]

The rule also indicates a preference for immigrants who speak English. This preference is particularly problematic because a majority of older immigrants are LEP.[5] The public charge test applies to people when they first enter the U.S. or apply for lawful permanent residence. Parents of U.S. citizens and other older adults from non-English speaking countries who are newly entering the U.S. or applying to adjust status are less likely to have gained proficiency in English. Moreover, the public charge statute does not include English proficiency as a factor to be considered in an individual's assessment and instead refers only to "education and skills," among other factors. Congress did not impose an English language test on applicants for lawful permanent residence, but instead enacted laws that explicitly require an English test for lawful permanent residents who have lived in the U.S. for a number of years and are applying to become a U.S. Citizen, and even then the English test is subject to exemptions for older adults in particular circumstances.

The U.S. does not have a national language, and no law allows the government to give preference to those who speak English over those who are limited English proficient (LEP). In contrast to this proposal, federal civil rights laws protect LEP persons from discrimination on the basis of English proficiency. Title VI, 42 U.S.C. § 2000d of the Civil Rights Act prohibits

---

[1] Foreign-born U.S. residents are more likely than U.S. born to live in multi-generational households. (*See* www.pewsocialtrends.org/2014/07/17/the-growth-in-multi-generational-family-households/); and household size for foreign-born U.S. residents are on average larger than for U.S. born residents (*see* www.migrationpolicy.org/data/state-profiles/state/demographics/US.)

[2] AARP Public Policy Institute, Chronic Care: A Call to Action for Health Reform 11–12, 16 (March 2009), *available at* www.aarp.org/health/medicare-insurance/info-03-2009/beyond_50_hcr.html.

[3] 83 Fed. Reg. 51182.

[4] Centers for Medicare & Medicaid Services, PEOPLE ENROLLED IN MEDICARE AND MEDICAID (Feb. 2018), *available at* www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/Downloads/MMCO_Factsheet.pdf.

[5] Jeanne Batalova, Senior Immigrants in the United States (May 30, 2012), *available at* www.migrationpolicy.org/article/senior-immigrants-united-states#5.



discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. Title VII, 42 U.S.C. § 2000e of the Civil Rights Act prohibits discrimination in employment on the basis of race, color, national origin, sex, or religion. And, as the Supreme Court held in *Lau v. Nichols,* 414 U.S. 563 (1974), discrimination on the basis of language or English proficiency is a form of national origin discrimination in violation of Title VI.

By giving de-facto preference to individuals from English speaking nations, DHS is undermining the careful balancing that Congress created to move the country away from the racist quota system. In particular, this standard disproportionately impacts older Asian immigrants. Asian people in the U.S. have the highest rates of limited English proficiency. Eighty percent of Asian American and Pacific Islander older adults are immigrants, and almost 60% have limited English proficiency.[6]

Finally, the proposed rule introduces an arbitrary and unprecedented income test. Over 1.1 million noncitizens age 62 and older live in low- or moderate income households,[7] meaning that under this test they would have no "heavily weighed" positive factors to offset the fact that their age is considered a negative factor. The income test also discredits even full-time work at low wages as failing to contribute to society. Immigrant older adults are more likely to have been in the country for many decades[8] and over that substantial amount of time, contributed to our nation's economy and been integrated into the fabric of our country. In addition, the proposed test pretends scientific objectivity but actually puts a thumb on the scale to give further negative weight to having limited income by naming experiences correlated with it, such as lack of employment, lack of private health insurance, and poor credit scores.

## II.   The Proposed Changes Are Not Justified by Any Rationale

DHS has failed to justify the need for the massive changes it is proposing and account for or fully consider the harms it will cause. As detailed below, the proposed changes will greatly harm older immigrants and their families living in the U.S. In fact, DHS acknowledges in the NPRM that the changes would harm individuals, families, and communities. However, it fails to quantify the harm and therefore largely ignores it.

In the NPRM, DHS states that it "seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.,* do not depend on

---

[6] National Asian Pacific Center on Aging, The Emerging Needs of Asian American and Pacific Islander Older Adults (Feb. 2017), *available at* napca.org/wp-content/uploads/2017/10/NAPCA-The-Emerging-Needs-of-AAPI-Older-Adults_Final-Report_Feb2017.pdf. See also data showing that 75% of the "Asian alone" population speaks a language other than English at home and 35% are LEP. Karthick Ramakrishnan et al, Language Diversity and English Proficiency, Center for American Progress (May 27, 2014) https://cdn.americanprogress.org/wp-content/uploads/2014/04/AAPI-LanguageAccess1.pdf.

[7] Manatt, Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard (Oct. 11, 2018), https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population#DataDashboard

[8] 75% of older immigrants came to the United States in the 1980s or earlier.

4


JUSTICE IN AGING

public resources to meet their needs, but rather rely on their own capabilities, as well as the resources of family members, sponsors, and private organizations."[9] However, by creating an arbitrary income test that most low-wage workers cannot meet, assigning negative weight to other factors that are associated with having low-income, and penalizing individuals who utilize even modest amounts of public benefits to supplement their incomes, the proposed rule would actually inhibit individuals who are not wealthy from being self-sufficient. Additionally, in direct contrast to DHS's stated intent, the proposed changes explicitly diminish the importance of sponsor affidavits and support of family members by negatively weighing having a larger family. In particular, the proposed rule's bias against older adults will make it impossible for younger adults, immigrants and citizens alike, to rely on family to meet their needs. This is because, as explained below, the proposed changes will prevent many intergenerational families from living together, to care for one another and support each other.

Moreover, both research and Congressional actions over the nearly 20 years that the 1999 Field Guidance has been in effect provide ample evidence that there is no problem with implementation of the public charge rule now and no persuasive rationale for changing it, especially in such a radical and fundamental way. In fact, this history supports the importance of the very benefits DHS is proposing to consider as supporting individuals and families in becoming self-sufficient. Contrary to DHS's stated rationale in the NPRM, the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) limited immigrant eligibility for federal means-tested public benefits, but Congress did not amend the public charge law to change what types of programs should be considered. That same year, in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress codified the case law interpretation of public charge. After 1996, there was a lot of confusion about how the public charge test might be used against immigrants who were eligible for and receiving certain non-cash benefits and legal immigrants' use of public assistance programs declined significantly. In response to concerns that some consular officials and employees of the then-Immigration and Naturalization Service (INS) were inappropriately scrutinizing the use of health care and nutrition programs, and the strong evidence of chilling effects from the 1996 law, INS issued an administrative guidance in 1999. The Field Guidance, which remains in effect today, clarifies that the public charge test applies only to those "primarily dependent on the government for subsistence", demonstrated by receipt of public cash assistance for "income maintenance", or institutionalization for long-term care at government expense. INS provided several reasons for deciding to adopt this definition of public charge, including the observation that non-cash benefits "serve important public interests," "are by their nature supplemental" and participation in such non-cash programs is "not evidence of poverty or dependence."[10] INS also recognized that benefits are "increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general health

---

[9] 83 Fed. Reg. 51122.

[10] 64 Fed. Reg. at 28,692, U.S. Government Publishing Office, May 26, 1999, https://www.gpo.gov/fdsys/pkg/FR-1999-05-26/html/99-13202.htm.

and nutrition, promoting education, and assisting working poor families in the process of becoming self-sufficient."[11] The Field Guidance also specifically lists non-cash programs NOT to be considered for purposes of public charge, including Medicare, Medicaid, food stamps, WIC, Head Start, child care, school nutrition, housing, energy assistance, emergency/disaster relief as programs. Since that time, Congress has made explicit choices to expand eligibility (or permit states to do so) under these programs, including the 2002 and 2008 Farm Bills, which made it easier for low-income working families to receive SNAP benefits and the 2010 Patient Protection and Affordable Care Act, which expanded Medicaid access for millions of low-income working families.

Finally, in the NPRM, DHS states that the 1999 Guidance did not "sufficiently" describe the mandatory factors in the public charge totality of the circumstances test, but provides no evidence of any resulting problems. Rather, DHS's assertion that the Field Guidance is insufficient is undermined by the fact that the Guidance has remained in effect through both Democratic and Republican administrations with no indication that INS or DHS have had any difficulties in implementing it.

### III. The Proposed Rule Would Disproportionately Harm Older Adults of Color

Because this rule targets family-based immigration as well as low and moderate wage workers, it will also have a disproportionate impact on seniors of color. While people of color account for approximately 36% of the total U.S. population, of the 25.9 million people potentially discouraged from seeking services by the proposed rule, approximately 90% are people from communities of color (23.2 million). An estimated 70% are Latino (18.3 million), 12% are Asian American and Pacific Islander (3.2 million), and 7% are Black (1.8 million).[12] By another estimate, over 55% of noncitizen Hispanic and over 45% of Asian American and Pacific Islander adults age 55 and older live in families receiving Medicaid/CHIP, SSI, TANF or general assistance, and/or SNAP and thus could be discouraged from seeking these benefits.[13]

The disproportionate impact on communities of color provides additional evidence of the radical effect this rule would have in reshaping the country's population. Not only would it cause disproportionate harm among people of color with unmet health and nutrition needs, it would dramatically reduce the diversity of immigrants entering the US and obtaining green

---

[11] Inadmissibility and Deportability on Public Charge Grounds, A Proposed Rule by the Immigration and Naturalization Service on 05/26/1999; 64 Federal Register 28678, U.S. Government Publishing Office, May 26, 1999, https://www.gpo.gov/fdsys/pkg/FR-1999-05-26/html/99-13188.htm.

[12] 2012-2016 5-Year American Community Survey Public Use Microdata Sample (ACS/PUMS); 20122016 5-Year American Community Survey (ACS) estimates accessed via American FactFinder; Missouri Census Data Center (MCDC) MABLE PUMA-County Crosswalk. Custom Tabulation by Manatt health, 9/30/2018. Found online at https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population.

[13] Migration Policy Institute, Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use (June 2018), *available at* www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families.

6



cards, reshaping the demographics of this country for decades to come. According to recent analysis by the Migration Policy Institute, the proposed rule would likely cause a significant shift in the origins of immigrants seeking visas and green cards, away from Mexico and Central America and towards Europe.[14] Thus, this proposal should be rejected because it would reduce the diversity of immigration to the United States and cause further harm by disproportionately increasing family separation among immigrants of color – and US citizens – already residing in the US.

### IV. The Proposed Rule Would Make It Nearly Impossible for an Older Adult to Pass the Public Charge Test and Thereby Prevent U.S. Citizens from Welcoming Their Parents to Join Them in the U.S.

The number of seniors in the United States who are immigrants is growing. Between 1990 and 2010, the number of immigrants age 65 and older grew from 2.7 million to nearly 5 million. This is due to aging of the immigrant population who arrived during the 1970s, 80s and 90s, as well as the rise in naturalized citizens who sponsor their parents to immigrate to the U.S. Additionally, the number of parents of U.S. citizens who have been admitted as legal permanent residents nearly tripled between 1994 and 2017 and now account for almost 15% of all admissions and almost 30% of family-based admissions.[15]

The proposed changes would prevent many U.S. citizens from being able to welcome their own parents into the country, even after they signed a commitment to support them. This is because the factors outlined above will make it nearly impossible for an older adult to pass the public charge test. More than 1.1 million noncitizens age 62 and older would have no "heavily weighed" positive factors to offset the fact that their age is considered a negative factor because they live in low- or moderate income households.[16] Families could even be penalized for sharing housing or providing significant support to a parent or grandparent or other family member, as this would increase their household size and force them to demonstrate higher levels of income to avoid being considered a public charge. In the NPRM, DHS neither recognizes the value of intergenerational families who support each other, nor accounts for the costs of separating these families. Instead, the proposed rule specifically targets and callously labels older adults who are parents and grandparents as a burden because of their age, health needs, and LEP status, ignoring the critical roles many grandparents play in caring for their grandchildren and other family members, often enabling others to work.

---

[14] Migration Policy Institute,   Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration (Nov. 2018),
 *available at* www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration.
[15] Dept. of Homeland Security, Office of Immigration Statistics, *2017 Yearbook of Immigration Statistics*, Table 7, *available at*
www.dhs.gov/sites/default/files/publications/2016%20Yearbook%20of%20Immigration%20Statistics.pdf.
[16] Manatt, Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard (Oct. 11, 2018),
https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population#DataDashboard



### V.     The Proposed Rule Would Harm Older Adults Living in Immigrant Families & Their Communities

This proposed rule would impact seniors living in immigrant families in the U.S. who may stop accessing services they need and that their own tax dollars support out of fear of being penalized. The rule would increase poverty, hunger, ill health, and housing insecurity by discouraging enrollment in programs that improve health, food security, nutrition, and economic security, with profound consequences for seniors and their families' well-being and long-term success.

The widespread "chilling effect" that causes families to withdraw from benefits due to fear is already evident as a result of publicity around the proposed rule. In fact, we have heard from advocates and providers across the country that older immigrants and their families are already dis-enrolling from benefits that they are eligible for and have stopped accessing services because they fear accessing these benefits will negatively impact their immigration status. Historical evidence from the 1996 PRWORA policy changes, which DHS cites in the NPRM, demonstrates that providing information to the public cannot prevent these damaging consequences because of the complexity of immigration policies (greatly increased by this proposed rule), among other reasons. Even among groups of immigrants who were explicitly excluded from the 1996 eligibility changes, and U.S citizen children in mixed status families, participation dropped dramatically.[17]

#### A.   Access to Health Care

Having health insurance is especially important for older adults because they have greater health care needs. Without ongoing coverage and the assistance they need to afford their prescription drugs and other care and services, seniors are likely to develop more serious health care conditions, driving up the cost of care and creating a new uncompensated care burden on health care providers.

Medicare is a lifeline for most seniors, including immigrant seniors who have worked for many years in the U.S. and earned this benefit. Medicare provides coverage for hospital stays, doctors' visits, and prescription drugs. However, many Medicare beneficiaries rely on other programs to help them afford out-of-pocket costs. Almost 1 in 3 Medicare beneficiaries enrolled in Part D prescription drug coverage get "Extra Help" with their premiums and copays through the low-income subsidy.[18] And nearly 7 million seniors 65 and older are enrolled in

---

[17] Neeraj Kaushal and Robert Kaestner, "Welfare Reform and health insurance of Immigrants," Health Services Research, 40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/pdf/hesr_00381.pdf.

[18] Kaiser Family Foundation, Medicare Part D in 2018: The Latest on Enrollment, Premiums, and Cost Sharing (May 17, 2018), *available at* www.kff.org/medicare/issue-brief/medicare-part-d-in-2018-the-latest-on-enrollment-premiums-and-cost-sharing/.



both Medicare and Medicaid, and 1 in 5 Medicare beneficiaries relies on Medicaid to help them pay for Medicare premiums and cost-sharing.[19]

Medicaid is critical for long-term services and supports. Because they could be penalized for or fear being penalized for accessing Medicaid home and community-based services, fewer older adults will be able to age with dignity, at home with their families and in their communities. Medicaid is also the key to access to oral health care, transportation, and other services Medicare does not cover and older adults could otherwise not afford.

### B. Access to Nutrition & Housing Support

Low-income seniors also greatly benefit from programs such as Section 8 rental assistance and SNAP to meet their basic needs.[20] If immigrant families are afraid of being penalized for accessing nutrition assistance programs, more older adults will be food insecure and at risk of unhealthy eating, which can cause or exacerbate other health conditions and unnecessarily burden the healthcare system. If immigrant families are afraid of being penalized for seeking housing assistance, seniors with limited, fixed incomes and their families will have fewer resources to spend on other basic needs, including food, medicine, transportation, and clothing.

### C. Harms to Communities

The fear created by these rules would extend far beyond any individual who may be subject to the "public charge" test, harming entire communities as well as the infrastructure that serves all of us, such as hospitals, health clinics, and schools. All of these consequences are identified in the NPRM under costs, and a substantial body of evidence demonstrates that they are highly significant and damaging.

When older adults and others are afraid they will be penalized for accessing these services, not only does their own health and well-being suffer, but the effects ripple through the community. For example, if an individual who is eligible for Medicaid is discouraged from enrolling in coverage, they are less likely to get primary care they need and more likely to end up in the emergency room, driving up the hospital's uncompensated care costs. An individual may even refuse to get Emergency Medicaid coverage because they fear that any use of Medicaid could have negative consequences on their immigration status.

---

[19] Kaiser Family Foundation, Medicaid Enrollment by Age, www.kff.org/medicaid/state-indicator/medicaid-enrollment-by-age/?dataView=1&currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

[20] *See* Justice in Aging, Supporting Older Americans' Basic Needs: Health Care, Income, Housing and Food (Apr. 2018), *available at* www.justiceinaging.org/wp-content/uploads/2018/04/Supporting-Older-Americans%E2%80%99-Basic-Needs_Health-Care-Income-Housing-and-Food.pdf.

9



### VI. The proposed rule threatens the well-being of caregivers, many of whom are immigrants.

Direct care workers provide critical assistance to millions of older adults and people with disabilities who need help with dressing, bathing, eating, and other daily tasks. An estimated one million immigrants work in direct care, making up a quarter of the direct care workforce.[21] More than four in five are women, and nearly a third are over age 55. Because caregiving jobs tend to be part time and low-wage, many direct care workers utilize public benefits programs to support themselves and their families. Nearly half of immigrant direct care workers live at or below 200% of the federal poverty level, and more than 40% rely on programs such as SNAP and Medicaid.[22]

If direct care workers are afraid they will be penalized for accessing these programs, their own health and well-being will be compromised. Moreover, care workers who would need to use these programs to supplement their low-wage work may be prevented from coming to the U.S. in the first place. Many others may be unable to afford to remain the U.S. without this support. The ripple effect would be a shortage in direct care workers, leaving many older Americans and people with disabilities without access to the caregiving they need and furthering the negative impact on healthcare systems in local communities.

### VII. The Proposed Rule Would Increase State, Local, and Federal Agency Costs and Negatively Affect Program Administration

As previously discussed, the proposed rule would pressure large numbers of immigrants and their families to forgo enrolling in vital programs such as Medicaid and the Medicare Part D LIS, nutrition assistance, and housing that their families are eligible for and need. The rule will also create new challenges for federal, state and local agencies administering these programs, not only increasing the agencies' workload, but also creating administrative burdens that can have negative effects throughout the programs and on all the beneficiaries they are charged with serving.

For example, agencies will need to provide immigrants with documentation regarding their history of benefit receipt, respond to consumer inquiries related to a complicated new policy, and change existing communications and forms related to public charge. Each of these tasks will generate a huge workload for agencies. Moreover, as beneficiaries learn about the new rule, some will terminate their participation in programs, which has already happened in response to draft public charge-related proposed rule changes being leaked to the media.[23] But, because these programs support vital needs, some of these families would likely re-enroll. This

---

[21] Robert Espinoza, PHI, Immigrants and the Direct Care Workforce (June 20, 2017), *available at* https://phinational.org/resource/immigrants-and-the-direct-care-workforce/.
[22] *Id.*
[23] Emily Baumgaertner, *Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services*, New York Times, 2018, www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html.



off and on approach to benefit enrollment not only yields negative results for families, it also results in duplicative work for agencies. Churn is expensive for states; in one study of SNAP-related churn, the costs averaged $80 for each instance of churn that requires a new application.[24]

When states and agencies have to put more money and resources towards dealing with new issues such as those created by this proposed rule, they have less money and resources to maintain or enhance these programs and services. DHS fails to adequately account for these additional costs and challenges, and the consequential harm to everyone who needs these vital programs and supports.

**Conclusion**

The changes to the public charge test that DHS has proposed are massive and not justified by any adequate rationale. The proposed rule would create a multitude of ways for individuals, and particularly low-income older adults, to fail the public charge test, and very few ways to overcome it. If this rule were implemented it would change America's system of family-based immigration to grant preference to immigrants who are young and wealthy in ways that the Administration has proposed through legislation but that Congress has rejected. Therefore, we strongly oppose the NPRM and urge DHS to withdraw it in its entirety.

Thank you for considering our comments. If any questions arise concerning this submission, please contact Natalie Kean, Staff Attorney at Justice in Aging, at nkean@justiceinaging.org.

Sincerely,

Kevin Prindiville

Executive Director

---

[24] Gregory Mills et al., ,"Understanding the Rates, Causes, and Costs of Churning in the Supplemental Nutrition Assistance Program (SNAP) - Final Report," Prepared by Urban Institute for the US Department of Agriculture, Food and Nutrition Service, 2014, https://fns-prod.azureedge.net/sites/default/files/ops/SNAPChurning.pdf.

# EXHIBIT H

# Impact of Health Insurance Status on Vaccination Coverage Among Adult Populations



Peng-jun Lu, MD, PhD, Alissa O'Halloran, MSPH, Walter W. Williams, MD, MPH

**This activity is available for CME credit. See page A3 for information.**

**Introduction:** Underinsurance is a barrier to vaccination among children. Information on vaccination among adults aged ≥18 years by insurance status is limited. This study assesses vaccination coverage among adults aged ≥18 years in the U.S. in 2012 by health insurance status and access to care characteristics.

**Methods:** The 2012 National Health Interview Survey data were analyzed in 2014 to estimate vaccination coverage among adults aged ≥18 years by health insurance status for seven routinely recommended vaccines.

**Results:** Influenza vaccination coverage among adults aged ≥18 years without or with health insurance was 14.4% versus 44.3%, respectively; pneumococcal vaccination coverage among adults aged 18–64 years with high-risk conditions was 9.8% versus 23.0%; tetanus and diphtheria toxoid (Td) coverage (age ≥18 years) was 53.2% versus 64.5%; tetanus, diphtheria, and acellular pertussis (Tdap) coverage (age ≥18 years) was 8.4% versus 15.7%; hepatitis A (HepA) coverage (age 18–49 years) was 16.6% versus 19.8%; hepatitis B (HepB) coverage (age 18–49 years) was 27.5% versus 38.0%; shingles coverage (age ≥60 years) was 6.1% versus 20.8%; and human papillomavirus (HPV) coverage (women aged 18–26 years) was 20.9% versus 39.8%. In addition, vaccination coverage differed by insurance type, whether respondents had a regular physician, and number of physician contacts.

**Conclusions:** Overall, vaccination coverage among adults aged ≥18 years is lower among uninsured populations. Implementation of effective strategies is needed to help improve vaccination coverage among adults aged ≥18 years, especially those without health insurance.
(Am J Prev Med 2015;48(6):647–661) Published by Elsevier Inc. on behalf of American Journal of Preventive Medicine

## Introduction

In 2011, the overall percentage of people without health insurance in the U.S. was 15.7% (48.6 million) and that among adult populations was 17.8% (41.0 million).[1] Among non-Hispanic whites, 11.1% (21.7 million) were uninsured in 2011, whereas 19.5% (7.7 million) of non-Hispanic blacks and 30.1% (5.8 million) of Hispanics were uninsured.[1] The relationship between health insurance and vaccination coverage among child and adolescent populations has been well studied,[2–5] and

cost is a recognized barrier to receiving timely preventive medical care. Information regarding some adult vaccinations by health insurance status is documented.[6–11]

Vaccination is the most effective strategy for preventing vaccine-preventable diseases and their complications. Adult vaccination coverage, however, remains low for most routinely recommended vaccines and well below Healthy People 2020 targets.[12–15] The adult immunization schedule,[16] updated annually by the Advisory Committee on Immunization Practices (ACIP), provides current recommendations for vaccinating adults. Influenza vaccination is recommended for all adults each year; other vaccinations recommended for adults target different populations based on age, health conditions, behavioral risk factors, occupation, travel, and other indications.[16,17]

This study uses data from the 2012 National Health Interview Survey (NHIS) to examine associations of

From the Immunization Services Division, National Center for Immunization and Respiratory Diseases, CDC, Atlanta, Georgia
Address correspondence to: Peng-jun Lu, National Center for Immunization and Respiratory Diseases, CDC, 1600 Clifton Road, NE, Mail Stop A-19, Atlanta GA 30333. E-mail: lhp8@cdc.gov.
0749-3797/$36.00
http://dx.doi.org/10.1016/j.amepre.2014.12.008

routinely recommended adult vaccinations (influenza; pneumococcal [PPSV]; tetanus toxoid–containing vaccines, including tetanus and diphtheria toxoid [Td] and tetanus, diphtheria, and acellular pertussis [Tdap]; hepatitis A [HepA]; hepatitis B [HepB]; herpes zoster [shingles]; and human papillomavirus [HPV]) with insurance status, having a primary physician, seeing a provider during the previous year, and select demographic characteristics.

## Methods

### Study Sample

The 2012 NHIS data were analyzed in 2014 (2013 data became available after the manuscript was submitted). The NHIS is a multistage sampling survey, which collects health information on the U.S. civilian, non-institutionalized population.[18] In the sample adult core, questions about receipt of recommended vaccinations for adults were asked of one randomly selected adult within each family in the household. In 2012, the final response rate for the sample adult core was 61.2%.[18]

### Measures

Vaccination coverage for influenza, PPSV, Td, HepA, HepB, shingles, and HPV vaccines were assessed from coded survey questions on receipt of these vaccines (respondents were asked whether they have ever received specific vaccinations or not except for influenza vaccination, for which seasonal vaccination were asked and assessed).[18] To determine Tdap vaccination status, respondents were asked, *Have you received a tetanus shot in the past 10 years?* Respondents who answered *yes* were asked, *Was your most recent tetanus shot given in 2005 or later?* An affirmative answer to this question prompted another question: *Did the doctor tell you the vaccine included the pertussis or whooping cough vaccine?* Respondents without *yes* or *no* responses for these three questions were excluded from the assessment of Tdap vaccination.

Covariates from coded survey questions were selected to measure associations between vaccination coverage and health insurance status (yes, no); health insurance type (public only, private [including some people with both private and public insurances], none); regular physician status (yes, no); number of provider visits during the prior year (zero, one to three, four to nine, ten or more); and race/ethnicity (non-Hispanic white, non-Hispanic black, non-Hispanic Asian, other races including American Indian/Alaska Native and people reporting multiple races). Demographic (e.g., marital status) and access to care variables (e.g., health insurance) reflect the status as of the time of survey. HepA vaccination was assessed among those traveling to countries of high or intermediate endemicity. PPSV vaccination was assessed among all respondents aged ≥65 years and adults aged 18–64 years with high-risk conditions. Respondents were considered at high risk for PPSV disease if they had ever been told by a doctor or other health professional that they had diabetes, emphysema, chronic obstructive pulmonary disease, coronary heart disease, angina, heart attack, or another heart condition; had a diagnosis of cancer during the previous 12 months (excluding non-melanoma skin cancer); had ever been told by a doctor or other health professional that they had lymphoma, leukemia, or blood cancer; had been told by a doctor or other health professional that they had chronic bronchitis or weak or failing kidneys during the preceding 12 months; had an asthma episode or attack during the preceding 12 months; or were current smokers. Poverty status was defined using 2012 poverty thresholds published by the U.S. Census Bureau, with below poverty defined as a total family income of <$23,492 for a family of four.[19]

### Statistical Analysis

SUDAAN, version 11.0.1, was used to calculate point estimates and 95% CIs of vaccination coverage.[20] For the non-influenza adult vaccination coverage estimates, regular descriptive analysis was used. To better assess influenza vaccination coverage for the 2011–2012 influenza season, coverage was reported by restricting to individuals interviewed September 2011 through June 2012 and vaccinated August 2011 through May 2012 using Kaplan–Meier survival analysis. Vaccination month was used to define the "event" variable and interview date to define the "censoring" variable of the Kaplan–Meier procedure. This analysis has advantages for season-specific influenza estimates over other approaches, such as using a full calendar year of data, which provides annual estimates representing incomplete estimates for up to three influenza seasons, or restricting estimates based on interviews conducted in the post-vaccination period (e.g., March–June), which does not use all relevant data.[21] The Kaplan–Meier approach allows us to use all relevant data to maximize precision and to use data collected during the vaccination period that likely have more accurate recall of vaccinations.[21] Estimates were weighted to the adult civilian population of the U.S. Chi-square tests were used to test coverage differences within or between assessed variables. Statistical significance was defined as $p < 0.05$. Influenza, PPSV, and HepB coverage differences by health insurance status between 2001 and 2012 were assessed (information regarding other vaccines were not collected in the 2001 NHIS). Wide differences by insurance status (with versus without insurance) may indicate more strength of association between insurance status. To assess adjusted vaccination coverage and adjusted prevalence ratios for each selected vaccination, we used logistic regression and predicted marginal modeling comparing respondents with health insurance and those without health insurance, controlling for age, gender, race/ethnicity, marital status, education, employment status, poverty level, health insurance, number of doctor visits in the past year, whether the respondent had a usual place of health care, self-reported health status, and region of residence. The NHIS was approved by the Research Ethics Review Board (ERB number, 2009-16) of the National Center for Health Statistics, CDC.

## Results

Characteristics of the study population are shown in Table 1. Overall, vaccination coverage was significantly lower ($p < 0.05$) among adults without health insurance compared with those with health insurance, except for overall HepA vaccination and HepB vaccination of people aged ≥18 years with diabetes (Table 2): influenza coverage, adults aged ≥18 years (14.4% vs 44.3%); PPSV,

Lu et al / Am J Prev Med 2015;48(6):647–661 **649**

**Table 1.** Characteristics of the Study Population by Access to Care Factors, National Health Interview Survey, 2012

| Characteristics | All adults | With health insurance | | | Without health insurance | Regular physician | | Physician contacts in the past 12 months | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | n | Overall % | Public % | Private % | % | Yes % | No % | None % | 1–3 % | 4–9 % | ≥10 % |
| Total | 34,525 | 83.0 | 24.5 | 75.5 | 17.0 | 83.9 | 16.1 | 19.7 | 43.8 | 23.1 | 13.4 |
| **Age (years)** | | | | | | | | | | | |
| ≥18 | 34,525 | 83.0 | 24.5 | 75.5 | 17.0 | 83.9 | 16.1 | 19.7 | 43.8 | 23.1 | 13.4 |
| 18–26 | 4,558 | 74.0 | 23.5 | 76.5 | 26.0 | 72.1 | 27.9 | 29.6 | 45.5 | 15.5 | 9.4 |
| 18–49 | 18,165 | 76.4 | 18.4 | 81.6 | 23.6 | 77.3 | 22.7 | 26.2 | 45.3 | 17.6 | 10.9 |
| 18–64 HR | 9,799 | 76.6 | 28.2 | 71.8 | 23.4 | 81.2 | 18.8 | 19.5 | 37.8 | 24.9 | 17.8 |
| ≥60 | 10,269 | 95.7 | 40.2 | 59.8 | 4.3 | 95.0 | 5.0 | 8.0 | 39.2 | 34.1 | 18.7 |
| ≥65 | 7,382 | 99.3 | 48.0 | 52.0 | 0.7 | 96.7 | 3.3 | 6.8 | 37.0 | 36.0 | 20.1 |
| **Gender** | | | | | | | | | | | |
| Male[a] | 15,273 | 80.7 | 22.3 | 77.7* | 19.3* | 79.3 | 20.7* | 26.7 | 44.4 | 18.7 | 10.3* |
| Female | 19,252 | 85.1** | 26.5** | 73.5** | 14.9** | 88.1** | 11.9** | 13.2** | 43.2 | 27.3** | 16.3** |
| **Race/ethnicity** | | | | | | | | | | | |
| Non-Hispanic white[a] | 20,619 | 88.4 | 20.7 | 79.3* | 11.6* | 87.3 | 12.7* | 16.0 | 44.0 | 25.0 | 14.9* |
| Non-Hispanic black | 5,119 | 79.4** | 36.8** | 63.2** | 20.6** | 84.0** | 16.0** | 20.4** | 45.4 | 22.6** | 11.6** |
| Hispanic | 5,859 | 61.6** | 37.2** | 62.8** | 38.4** | 69.6** | 30.4** | 33.4** | 40.3** | 16.9** | 9.4** |
| Non-Hispanic Asian | 2,108 | 83.3** | 19.8 | 80.2 | 16.7** | 81.8** | 18.2** | 25.6** | 47.7** | 18.2** | 8.4** |
| Other | 820 | 83.6** | 33.4** | 66.6** | 16.4** | 81.8** | 18.2** | 19.2 | 41.3 | 21.9 | 17.6 |
| **Marital status** | | | | | | | | | | | |
| Married[a] | 14,930 | 87.7 | 18.5 | 81.5* | 12.3* | 87.8 | 12.2* | 16.5 | 45.8 | 24.7 | 13.1* |
| Widowed/divorced/separated | 9,124 | 85.1** | 41.4** | 58.6** | 14.9** | 87.8 | 12.2 | 14.8** | 38.3** | 28.4** | 18.5** |
| Never married | 10,393 | 73.3** | 26.0** | 74.0** | 26.7** | 74.6** | 25.4** | 28.3** | 43.3** | 17.3** | 11.1** |
| **Education** | | | | | | | | | | | |
| Less than high school[b] | 5,487 | 68.8 | 55.3 | 44.7* | 31.2* | 76.5 | 23.5* | 28.3 | 35.9 | 22.1 | 13.8* |
| High school graduate | 8,938 | 78.4** | 29.8** | 70.2** | 21.6** | 82.0** | 18.0** | 22.5** | 41.5** | 22.4 | 13.6 |

(continued on next page)

650     Lu et al / Am J Prev Med 2015;48(6):647–661

Table 1. Characteristics of the Study Population by Access to Care Factors, National Health Interview Survey, 2012 (continued)

| Characteristics | All adults n | With health insurance Overall % | Public % | Private % | Without health insurance % | Regular physician Yes % | No % | Physician contacts in the past 12 months None % | 1–3 % | 4–9 % | ≥10 % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Some college/college graduate | 16,577 | 86.9*** | 17.9*** | 82.1*** | 13.1*** | 85.6*** | 14.4*** | 17.4*** | 46.5*** | 23.0 | 13.1 |
| Higher than college graduate | 3,370 | 96.3*** | 11.6*** | 88.4*** | 3.7*** | 90.9*** | 9.1*** | 11.3*** | 47.1*** | 27.4*** | 14.2 |
| Employment status | | | | | | | | | | | |
| Employed | 20,038 | 82.7*** | 10.5*** | 89.5*** | 17.3*** | 81.7*** | 18.3*** | 22.5*** | 48.4*** | 19.9*** | 9.2* |
| Unemployed[a] | 2,077 | 53.6 | 45.0 | 55.0 | 46.4 | 66.6 | 33.4 | 34.6 | 39.2 | 16.8 | 9.4 |
| Not in work force | 12,385 | 89.1*** | 11.6*** | 53.7 | 10.9*** | 91.3*** | 8.7*** | 11.6*** | 36.1*** | 30.4*** | 22.0*** |
| Poverty level | | | | | | | | | | | |
| At or above poverty[a] | 24,725 | 85.9*** | 18.1*** | 81.9*** | 14.1*** | 85.4*** | 14.6*** | 18.1*** | 45.6*** | 23.4*** | 12.9*** |
| Below poverty[b] | 6,008 | 64.9 | 67.6 | 32.4 | 35.1 | 73.5 | 26.5 | 29.1 | 33.5 | 20.5 | 16.9 |
| Self-reported health status | | | | | | | | | | | |
| Excellent/very good[a] | 19,602 | 84.1 | 16.3 | 83.7* | 15.9* | 82.6 | 17.4* | 21.9 | 49.5 | 19.8 | 8.8* |
| Good | 9,636 | 81.2*** | 28.4*** | 71.6*** | 18.8*** | 84.6*** | 15.4*** | 18.2*** | 40.3*** | 26.8*** | 14.7*** |
| Fair | 3,999 | 80.8*** | 52.1*** | 47.9*** | 19.2*** | 87.3*** | 12.7*** | 14.1*** | 26.0*** | 31.9*** | 27.9*** |
| Poor | 1,270 | 84.6 | 67.0*** | 33.0*** | 15.4 | 92.6*** | 7.4*** | 6.6*** | 16.7*** | 29.3*** | 47.4*** |
| U.S.-born status | | | | | | | | | | | |
| U.S.-born[a] | 27,956 | 86.2 | 23.6 | 76.6* | 13.8* | 86.1 | 13.9* | 17.3 | 44.1 | 24.1 | 14.4* |
| Born outside U.S.—in U.S. ≤10 years | 1,339 | 52.1*** | 25.5 | 74.5 | 47.9*** | 55.7*** | 44.3*** | 42.1*** | 39.4*** | 12.9*** | 5.6*** |
| Born outside U.S.—in U.S. >10 years | 5,167 | 72.1*** | 32.5*** | 67.5*** | 27.9*** | 77.9*** | 22.1*** | 27.6*** | 42.7 | 19.9*** | 9.8*** |
| Region of residence | | | | | | | | | | | |
| Northeast[a] | 5,774 | 88.3 | 23.6 | 76.4* | 11.7* | 89.7 | 10.3* | 16.3 | 44.9 | 24.9 | 13.9* |
| Midwest | 7,193 | 86.2*** | 19.2*** | 80.8*** | 13.8*** | 85.8*** | 14.2*** | 17.8 | 45.3 | 22.9*** | 14.0 |
| South | 12,536 | 79.8*** | 26.8*** | 73.2*** | 20.2*** | 81.8*** | 18.2*** | 20.5*** | 42.8*** | 23.7 | 13.0 |
| West | 9,022 | 80.7*** | 27.4*** | 72.6*** | 19.3*** | 80.6*** | 19.4*** | 23.0*** | 42.8 | 21.0*** | 13.1 |

Note: Boldface indicates statistical significance.

[a] Reference level.

*$p < 0.05$ by $\chi^2$ test (comparing health insurance [yes/no], private versus public insurance, regular physician [yes/no], and physician contacts in the past 12 months by each demographic variable).

**$p < 0.05$ by $\chi^2$ test (comparing within each demographic variable with the indicated reference level).

HR, high risk.

Lu et al / Am J Prev Med 2015;48(6):647–661

**651**

**Table 2.** Adult Vaccination Coverage by Health Insurance Status in the U.S., National Health Interview Survey, 2012

| Vaccination | All adults % (95% CI) | With health insurance | | | Without health insurance % (95% CI) |
|---|---|---|---|---|---|
| | | Overall % (95% CI) | Public % (95% CI) | Private % (95% CI) | |
| **Influenza vaccination (2011–2012 season)[a]** | | | | | |
| ≥18 | 39.2 (38.3, 40.2) | 44.3 (43.3, 45.4)* | 50.8 (48.8, 52.8)*,** | 42.3 (41.1, 43.5)* | 14.4 (12.8, 16.1) |
| 18–64 | 32.6 (31.6, 33.6) | 37.3 (36.2, 38.5)* | 39.4 (36.7, 42.2)* | 36.9 (35.6, 38.1)* | 14.3 (12.8, 16.0) |
| ≥65 | 70.1 (68.2, 72.0)*** | 70.5 (68.6, 72.4)*,*** | 66.6 (63.9, 69.3)*,**,*** | 74.0 (71.5, 76.5)*,*** | 23.4 (12.9, 40.1) |
| **Pneumococcal vaccination (ever received)** | | | | | |
| 18–64 HR | 19.9 (18.8, 21.0) | 23.0 (21.7, 24.4)* | 29.8 (27.1, 32.8)*,** | 20.4 (18.9, 21.9)* | 9.8 (8.4, 11.4) |
| ≥65 | 59.9 (58.4, 61.4)*** | 60.2 (58.7, 61.7)*** | 56.4 (53.9, 58.7)***,*** | 63.7 (61.8, 65.5)*** | —[b] |
| **Tetanus vaccination (past 10 years)** | | | | | |
| ≥18 | 62.5 (61.8, 63.3) | 64.5 (63.6, 65.3)* | 59.2 (57.6, 60.8)*,** | 66.2 (65.2, 67.1)* | 53.2 (51.5, 54.9) |
| 18–64 | 64.1 (63.3, 64.9) | 66.9 (66.0, 67.8)* | 63.8 (61.8, 65.8)*,** | 67.6 (66.6, 68.5)* | 53.4 (51.7, 55.1) |
| ≥65 | 55.1 (53.6, 56.7)*** | 55.4 (53.8, 56.9)*,*** | 52.6 (50.4, 54.8)*,*** | 57.9 (55.8, 60.0)*,*** | 26.2 (14.1, 43.4)*** |
| **Tetanus vaccination including pertussis vaccine (past 7 years)** | | | | | |
| ≥18 | 14.3 (13.7, 15.0) | 15.7 (15.0, 16.4)* | 10.7 (9.5, 12.0)*,** | 17.3 (16.5, 18.1)* | 8.4 (7.2, 9.6) |
| 18–64 | 15.7 (15.0, 16.5) | 17.8 (17.0, 18.7)* | 13.4 (11.7, 15.3)*,** | 18.8 (17.9, 19.7)* | 8.4 (7.3, 9.7) |
| ≥65 | 8.0 (7.0, 9.1)*** | 8.1 (7.1, 9.2)*,*** | 7.2 (5.9, 8.8)*,*** | 8.9 (7.5, 10.5)*,*** | 0.0 (—)*** |
| **Hepatitis A vaccination (≥2 doses)** | | | | | |
| 18–49 among travelers | 19.1 (17.7, 20.6) | 19.8 (18.2, 21.4) | 24.6 (20.0, 29.9)*,** | 19.2 (17.5, 21.0) | 16.6 (13.8, 19.9) |
| **Hepatitis B vaccination (≥3 doses)** | | | | | |
| 18–49 | 35.5 (34.5, 36.5) | 38.0 (36.9, 39.2)* | 34.4 (31.9, 37.0)*,** | 38.8 (37.5, 40.1)* | 27.5 (25.7, 29.3) |
| ≥18 with diabetes | 21.2 (19.3, 23.1) | 21.3 (19.4, 23.3) | 16.9 (14.4, 19.8)** | 24.3 (21.6, 27.3) | 20.2 (15.0, 26.5) |
| 18–64 with diabetes | 27.1 (24.4, 30.1) | 28.5 (25.5, 31.6)* | 25.5 (20.3, 31.4) | 30.0 (26.3, 34.0)* | 20.2 (15.0, 26.7) |
| ≥65 with diabetes | 12.0 (9.9, 14.5)*** | 12.0 (9.9, 14.5)*** | 9.7 (7.3, 12.7)*,*** | 14.4 (11.1, 18.4)*,*** | —[b] |
| **Shingles vaccination (ever received)** | | | | | |
| ≥60 | 20.1 (19.1, 21.2) | 20.8 (19.8, 21.9)* | 17.7 (16.3, 19.2)*,** | 22.9 (21.4, 24.5)* | 6.1 (3.9, 9.5) |

(continued on next page)

652     *Lu et al / Am J Prev Med 2015;48(6):647–661*

**Table 2.** Adult Vaccination Coverage by Health Insurance Status in the U.S., National Health Interview Survey, 2012 (continued)

| Vaccination | All adults % (95% CI) | With health insurance | | | Without health insurance % (95% CI) |
|---|---|---|---|---|---|
| | | Overall % (95% CI) | Public % (95% CI) | Private % (95% CI) | |
| 60–64 | 14.0 (12.4, 15.7) | **15.1 (13.4, 17.1)**\* | 8.4 (6.1, 11.4)\*\* | 16.8 (14.7, 19.1)\* | 6.5 (4.0, 10.2) |
| ≥65 | **22.9 (21.6, 24.2)**\*\*\* | **23.0 (21.8, 24.4)**\*\*\* | 19.2 (17.6, 20.9)\*\*,\*\*\* | 26.6 (24.6, 28.6)\*\*\* | —[b] |
| Human papillomavirus vaccination (≥1 dose) | | | | | |
| 18–26 male | 3.7 (2.7, 5.1) | 4.2 (2.9, 6.0) | —[b] | 3.5 (2.3, 5.3) | —[b] |
| 18–26 female | 35.6 (33.0, 38.3) | **39.8 (36.7, 42.9)**\* | 30.4 (25.2, 36.2)\*,\*\*\* | 43.4 (39.7, 47.2)\* | 20.9 (16.8, 25.7) |

Note: Boldface indicates statistical significance.

[a] Influenza vaccination coverage estimates are based on interviews conducted during September 2011 through June 2012, and vaccination received during August 2011 through May 2012.

[b] Estimates may not be reliable because of sample size <30 or relative standard error >30%.

\* $p < 0.05$ by $\chi^2$ test (comparing health insurance types with "without health insurance" as the reference group).

\*\* $p < 0.05$ by $\chi^2$ test (private health insurance versus public health insurance).

\*\*\* $p < 0.05$ by $\chi^2$ test (comparing adults 18–64 years with ≥65 years for influenza, tetanus, and Tdap; persons 18–64 years with high-risk conditions to persons ≥65 years for pneumococcal; persons 18–64 years with diabetes with ≥65 years with diabetes for hepatitis B; persons 60–64 years with ≥65 years for shingles).

HR, high risk.

adults aged 18–64 years with high-risk conditions (9.8% vs 23.0%); Td, adults aged ≥18 years (53.2% vs 64.5%); Tdap, adults aged ≥18 years (8.4% vs 15.7%); HepA (two or more doses), adults aged 18–49 years traveling to countries of high or intermediate endemicity (16.6% vs 19.8%); HepB (three or more doses), adults aged 18–49 years (27.5% vs 38.0%); shingles, adults aged ≥60 years (6.1% vs 20.8%); and HPV, women aged 18–26 years (20.9% vs 39.8%). Coverage was lower for these vaccinations among those with no insurance compared with those who reported either public or private health insurance. For influenza, PPSV, shingles, and HPV vaccination, coverage was two to three times higher among those with health insurance versus those without insurance (Table 2).

Adult vaccination coverage differed by type of health insurance. Vaccination coverage was significantly higher among adults with private health insurance compared with those reporting public health insurance for PPSV vaccination among adults aged ≥65 years, tetanus vaccination among adults aged ≥18 years, Tdap vaccination among adults aged ≥18 years, HepB vaccination among adults aged 18–49 years and adults ≥18 years with diabetes, shingles vaccination among adults aged ≥60 years, and HPV vaccination among women aged 18–26 years ($p < 0.05$), but lower for influenza vaccination among adults aged ≥18 years, PPSV vaccination among adults aged 18–64 years with high-risk conditions, and HepA vaccination among adults aged 18–49 years ($p < 0.05$) (Table 2).

Generally, those with a regular physician were more likely to report having received recommended vaccinations than those who did not have a regular physician, regardless of whether they had health insurance. Among adults with health insurance, coverage was significantly higher among those who reported having a regular physician compared with those who did not have a regular physician, except for HepA vaccination among travelers. Among adults without health insurance, except for HepA vaccination among travelers and HPV vaccination among women aged 18–26 years, coverage was significantly higher among adults who had a regular physician compared with those who did not (Table 3).

With a few exceptions (HepA vaccination among travelers, HepB vaccination among adults with diabetes, and HPV vaccination among women aged 18–26 years), vaccination coverage was significantly higher among those reporting one or more physician contacts in the past year compared with those who had not visited a physician in the past year, regardless of whether they had health insurance (Table 4). Additionally, vaccination coverage increased as the number of physician contacts increased (Table 4). Among adults who had health insurance and ten or more physician contacts within

*Lu et al / Am J Prev Med 2015;48(6):647–661*

653

**Table 3.** Adult Vaccination Coverage by Health Insurance and Regular Physician Status, National Health Interview Survey, 2012

| | With health insurance | | | | Without health insurance | | | |
| | With a regular physician | | Without a regular physician | | With a regular physician | | Without a regular physician | |
| Vaccination | n[a] | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) |
|---|---|---|---|---|---|---|---|---|
| **Influenza vaccination (2011–2012 season)[b]** | | | | | | | | |
| ≥18 | 145.0 | 47.0 (45.9, 48.1) | 14.0 | 18.0 (15.5, 20.9)* | 16.1 | 21.7 (19.1, 24.7) | 17.1 | 7.6 (6.2, 9.2)* |
| 18–64 | 112.6 | 39.7 (38.5, 41.0) | 13.0 | 17.4 (14.8, 20.4)* | 16.0 | 21.6 (18.9, 24.5) | 17.0 | 7.6 (6.2, 9.2)* |
| ≥65 | 32.4 | 71.8 (69.9, 73.7)** | 0.9 | 26.9 (19.8, 35.9)*** | 0.1 | —c | 0.1 | —c |
| **Pneumococcal vaccination (ever received)** | | | | | | | | |
| 18–64 HR | 45.4 | 24.5 (23.1, 26.0) | 4.8 | 8.5 (6.3, 11.4)* | 7.8 | 12.8 (10.7, 15.2) | 7.5 | 6.8 (5.0, 9.0)* |
| ≥65 | 39.7 | 61.4 (59.8, 62.9)** | 1.2 | 20.7 (15.1, 27.7)*** | 0.1 | —c | 0.1 | —c |
| **Tetanus vaccination (past 10 years)** | | | | | | | | |
| ≥18 | 175.3 | 65.2 (64.4, 66.0) | 17.0 | 57.0 (54.3, 59.7)* | 19.0 | 58.8 (56.3, 60.9) | 20.3 | 48.1 (45.7, 50.5)* |
| 18–64 | 135.6 | 67.9 (67.0, 68.8) | 15.8 | 58.3 (55.5, 61.1)* | 18.9 | 58.8 (56.5, 61.1) | 20.1 | 48.3 (45.9, 50.7)* |
| ≥65 | 39.7 | 55.8 (54.3, 57.4)** | 1.2 | 40.1 (31.4, 49.6)*** | 0.1 | —c | 0.1 | —c |
| **Tetanus vaccination including pertussis vaccine (past 7 years)** | | | | | | | | |
| ≥18 | 175.3 | 16.2 (15.4, 17.0) | 17.0 | 11.0 (9.1, 13.3)* | 19.0 | 11.0 (9.2, 13.2) | 20.3 | 6.0 (4.8, 7.6)* |
| 18–64 | 135.6 | 18.6 (17.7, 19.5) | 15.8 | 11.8 (9.7, 14.2)* | 18.9 | 11.1 (9.2, 13.3) | 20.1 | 6.1 (4.8, 7.6)* |
| ≥65 | 39.7 | 8.3 (7.3, 9.5)** | 1.2 | —c | 0.1 | —c | 0.1 | —c |
| **Hepatitis A vaccination (≥2 doses)** | | | | | | | | |
| 18–49 among travelers | 32.6 | 19.9 (18.2, 21.7) | 5.1 | 18.9 (15.4, 23.0) | 3.9 | 17.7 (13.5, 22.8) | 5.1 | 15.8 (12.4, 20.0) |
| **Hepatitis B vaccination (≥3 doses)** | | | | | | | | |
| 18–49 | 87.0 | 38.6 (37.3, 39.8) | 12.8 | 34.3 (31.4, 37.3)* | 13.9 | 29.5 (26.9, 32.3) | 16.8 | 25.8 (23.4, 28.3)* |
| ≥18 with diabetes | 18.8 | 21.3 (19.4, 23.4) | 0.3 | —c | 1.5 | 21.8 (15.8, 29.2) | 0.5 | —c |
| 18–64 with diabetes | 10.6 | 28.6 (25.6, 31.8) | 0.2 | —c | 1.5 | 21.9 (15.9, 29.3) | 0.5 | —c |
| ≥65 with diabetes | 8.2 | 12.1 (9.9, 14.6)** | 0.1 | —c | 0.0 | —c | 0.0 | —c |
| **Shingles vaccination (ever received)** | | | | | | | | |
| ≥60 | 55.0 | 21.2 (20.1, 22.4) | 2.0 | 8.9 (5.8, 13.5)* | 1.6 | 7.6 (4.6, 12.5) | 1.0 | —c |

(continued on next page)

**Table 3.** Adult Vaccination Coverage by Health Insurance and Regular Physician Status, National Health Interview Survey, 2012 *(continued)*

| | With health insurance | | | | Without health insurance | | | |
| | With a regular physician | | Without a regular physician | | With a regular physician | | Without a regular physician | |
| Vaccination | n[a] | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) |
|---|---|---|---|---|---|---|---|---|
| 60–64 | 15.2 | 15.6 (13.8, 17.6) | 0.7 | —[c] | 1.4 | 7.8 (4.6, 13.1) | 0.9 | —[c] |
| ≥65 | 39.7 | **23.4 (22.0, 24.8)**\*\* | 1.2 | **11.6 (7.4, 17.7)**\* | 0.1 | —[c] | 0.1 | —[c] |
| Human papillomavirus vaccination (≥1 dose) | | | | | | | | |
| 18–26 male | 10.4 | 5.1 (3.5, 7.4) | 2.8 | —[c] | 2.0 | —[c] | 3.6 | —[c] |
| 18–26 female | 12.6 | 42.0 (38.7, 45.4) | 2.1 | **24.6 (17.7, 33.2)**\* | 2.2 | 22.7 (17.0, 29.5) | 2.0 | 19.0 (13.7, 25.8) |

*Note:* Boldface indicates significance.

[a]Weighted sample size in millions.

[b]Influenza vaccination coverage estimates are based on interviews conducted during September 2011 through June 2012, and vaccination received during August 2011 through May 2012.

[c]Estimates may not be reliable because of sample size <30 or relative standard error >30%.

\**p*<0.05 by $\chi^2$ test (with regular physician versus without regular physician).

\*\**p*<0.05 by $\chi^2$ test (comparing persons 18–64 years with ≥65 years for influenza, tetanus, and Tdap; persons 18–64 years with high-risk conditions to persons ≥65 years for pneumococcal; persons 18–64 years with diabetes with ≥65 years with diabetes for Hepatitis B; persons 60–64 years with ≥65 years for shingles).

HR, high risk.

---

the past year, 28.4%–80.4% reported not receiving recommended vaccinations (not receiving Td vaccination, 28.4%; PPSV [age ≥65 years], 30.2%; influenza, 41.1%; PPSV [high-risk, age 18–64 years], 61.0%; HPV [women aged 18–26 years], 61.4%; HepA [travelers aged 18–49 years], 72%; HepB [diabetics aged ≥18 years], 76.5%; shingles, 76.9%; and Tdap, 80.4% (Table 4).

Influenza and PPSV vaccination coverage among adults aged ≥65 years was usually higher compared with coverage among adults aged 18–64 years; however, Td, Tdap, and HepB coverage among adults aged ≥65 years was usually lower compared with coverage among adults aged 18–64 years (Tables 2–4). Shingles vaccination coverage among adults aged ≥65 years was usually higher compared with coverage among adults aged 60–64 years (Tables 2–4). Additionally, for influenza, PPSV, and HepB vaccinations, the majority of coverage differences by health insurance status (with versus without insurance) were smaller in 2001 compared with those in 2012 (Table 5).

Adults without health insurance were significantly less likely than those with health insurance to be vaccinated for influenza (age ≥18 years); pneumococcal (aged 18–64 years with high-risk conditions); tetanus (age ≥18 years); and Tdap (age ≥18 years) after adjusting for confounders (Table 6). The difference in adjusted vaccination coverage between respondents with and without health insurance ranged from –0.2% (HepA vaccination among travelers aged 18–49 years) to 10.9% (influenza vaccination among adults aged ≥18 years) (Table 6).

## Discussion

This is the first comprehensive assessment of vaccination coverage by health insurance status among U.S. adult populations. Such information is important for understanding factors that contribute to disparities in vaccination coverage and implementing strategies to improve vaccination coverage.[2–5,22–28] Most respondents (83%) in this study indicated having some type of health insurance. Having health insurance was associated with a greater likelihood of having received recommended vaccinations, even after adjusting for confounders for influenza, PPSV, Td, and Tdap. For influenza, PPSV, shingles, and HPV vaccination, coverage was two to three times higher among those with health insurance versus those without. Wider coverage differences by insurance status (with versus without insurance) in 2012 compared with 2001 may indicate a greater strength of association between health insurance and vaccination in 2012 compared with 2001. Additionally, after controlling demographic and access to care variables based on our

*Lu et al / Am J Prev Med 2015;48(6):647–661*     **655**

**Table 4.** Adult Vaccination Coverage by Health Insurance and Physician Contacts, National Health Interview Survey, 2012

| Vaccination | n[a] | With health insurance — Physician contacts in the past 12 months | | | | | | | Without health insurance — Physician contacts in the past 12 months | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | None % (95% CI)[b] | 1-3 n | 1-3 % (95% CI) | 4-9 n | 4-9 % (95% CI) | ≥10 n | ≥10 % (95% CI) | None n | None % (95% CI) | 1-3 n | 1-3 % (95% CI) | 4-9 n | 4-9 % (95% CI) | ≥10 n | ≥10 % (95% CI) |
| **Influenza vaccination (2011–2012 season)[b]** | | | | | | | | | | | | | | | | |
| ≥18 | 20.5 | 20.7 (18.6, 23.1) | 71.7 | 39.9 (38.4, 41.5)* | 42.2 | 55.8 (53.7, 57.9)* | 23.1 | 58.1 (55.3, 60.9)* | 15.8 | 8.0 (6.4, 9.9) | 11.6 | 14.8 (12.5, 17.6)* | 3.5 | 28.7 (22.2, 36.7)* | 2.0 | 39.3 (29.8, 50.5)* |
| 18–64 | 18.5 | 19.1 (16.8, 21.6) | 59.8 | 34.7 (33.0, 36.4)* | 29.7 | 47.0 (44.6, 49.4)* | 16.7 | 50.3 (46.9, 53.7)* | 15.7 | 7.9 (6.3, 9.8) | 11.5 | 14.8 (12.4, 17.6)* | 3.5 | 28.7 (22.2, 36.7)* | 1.9 | 39.1 (29.6, 50.3)* |
| ≥65 | 2.0 | 35.7 (29.3, 43.0)** | 12.0 | 66.1 (63.0, 69.2)*** | 12.5 | 76.0 (72.9, 78.9)*** | 6.5 | 78.3 (74.3, 82.0)*** | 0.1 | —[c] | 0.1 | —[c] | 0.0 | —[c] | 0.0 | —[c] |
| **Pneumococcal vaccination (ever received)** | | | | | | | | | | | | | | | | |
| 18–64 HR | 6.0 | 8.9 (6.7, 11.8) | 19.2 | 17.8 (15.9, 19.9)* | 14.1 | 24.3 (22.0, 26.8)* | 10.3 | 39.0 (35.6, 42.5)* | 5.3 | 6.1 (4.4, 8.3) | 2.1 | 10.4 (8.2, 13.1)* | | 17.8 (13.1, 23.8)* | 1.2 | 14.8 (10.1, 21.2)* |
| ≥65 | 2.6 | 31.3 (26.2, 36.9)** | 15.0 | 55.7 (53.2, 58.1)*** | 14.7 | 64.8 (62.3, 67.2)*** | 8.2 | 69.8 (66.5, 72.9)*** | 0.1 | —[c] | 0.0 | —[c] | 0.0 | —[c] | 0.0 | —[c] |
| **Tetanus vaccination (past 10 years)** | | | | | | | | | | | | | | | | |
| ≥18 | 26.0 | 55.4 (53.4, 57.5) | 86.9 | 64.3 (63.1, 65.5)* | 49.2 | 65.5 (64.0, 67.0)* | 28.5 | 71.6 (69.9, 73.4)* | 13.5 | 46.7 (44.2, 49.2) | 13.5 | 56.9 (54.1, 59.7)* | 4.0 | 61.2 (55.8, 66.2)* | 2.3 | 71.5 (65.0, 77.3)* |
| 18–64 | 23.4 | 57.4 (55.2, 59.6) | 71.9 | 66.3 (65.0, 67.6)* | 34.5 | 69.7 (68.0, 71.4)* | 20.3 | 75.0 (73.0, 77.0)* | 13.4 | 46.9 (44.4, 49.4) | 13.4 | 57.0 (54.2, 59.8)* | 3.9 | 61.5 (56.2, 66.6)* | 2.3 | 71.5 (64.9, 77.2)* |
| ≥65 | 2.6 | 37.6 (32.6, 42.9)** | 15.0 | 54.3 (51.7, 56.9)*** | 14.7 | 55.4 (52.9, 57.9)*** | 8.2 | 63.1 (59.9, 66.3)*** | 0.1 | —[c] | 0.1 | —[c] | 0.0 | —[c] | 0.0 | —[c] |
| **Tetanus vaccination including pertussis vaccine (past 7 years)** | | | | | | | | | | | | | | | | |
| ≥18 | 26.0 | 9.5 (8.1, 11.2) | 86.9 | 16.2 (15.2, 17.3)* | 49.2 | 16.3 (14.9, 17.7)* | 28.5 | 19.6 (17.6, 21.8)* | 13.5 | 5.4 (4.3, 6.7) | 13.5 | 9.5 (7.6, 11.9)* | 4.0 | 13.5 (9.8, 18.2)* | 2.3 | 19.8 (12.6, 29.7)* |
| 18–64 | 23.4 | 10.0 (8.5, 11.8) | 71.9 | 18.1 (16.9, 19.3)* | 34.5 | 19.6 (17.9, 21.5)* | 20.3 | 24.0 (21.4, 26.8)* | 13.4 | 5.4 (4.4, 6.7) | 13.4 | 9.6 (7.7, 12.0)* | 3.9 | 13.6 (9.9, 18.4)* | 2.3 | 19.8 (12.6, 29.7)* |
| ≥65 | 2.6 | —[c] | 15.0 | 7.6 (6.1, 9.3)** | 14.7 | 8.6 (7.0, 10.5)** | 8.2 | 9.4 (7.2, 12.2)** | 0.2 | 0.0 (—)** | 0.1 | —[c] | 0.0 | —[c] | 0.0 | —[c] |
| **Hepatitis A vaccination (≥2 doses)** | | | | | | | | | | | | | | | | |

(continued on next page)

656    *Lu et al / Am J Prev Med 2015;48(6):647–661*

**Table 4.** Adult Vaccination Coverage by Health Insurance and Physician Contacts, National Health Interview Survey, 2012 *(continued)*

| Vaccination | n[a] | With health insurance — Physician contacts in the past 12 months | | | | | | | | Without health insurance — Physician contacts in the past 12 months | | | | | | | |
| | | None | | 1–3 | | 4–9 | | ≥10 | | None | | 1–3 | | 4–9 | | ≥10 | |
| | | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) | n | % (95% CI) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18–49 among travelers | 6.2 | 18.8 | 17.3 (14.2, 21.0) | 8.1 | 18.2 (16.2, 20.4) | 4.6 | 20.7 (17.5, 24.4) | 4.4 | **28.0 (23.3, 33.3)\*** | 3.3 | 15.2 (11.4, 19.8) | 0.8 | 17.7 (13.2, 23.4) | 0.5 | 17.9 (11.2, 27.6) | 0.5 | 21.2 (12.0, 34.6) |
| **Hepatitis B vaccination (≥ 3doses)** | | | | | | | | | | | | | | | | | |
| 18–49 | 18.1 | 48.2 | 32.4 (30.0, 35.0) | 20.4 | **36.3 (34.6, 38.0)\*** | 12.4 | **41.8 (39.4, 44.4)\*** | 15.8 | **47.5 (44.0, 51.0)\*** | 10.3 | 22.4 (20.1, 24.9) | 2.5 | **32.1 (29.1, 35.2)\*** | 1.8 | **36.6 (30.2, 43.5)\*** | 1.8 | **31.2 (23.9, 39.7)\*** |
| ≥18 with diabetes | 0.6 | 5.2 | 22.1 (12.6, 35.8) | 7.6 | 21.2 (17.7, 25.1) | 5.3 | 19.8 (17.1, 22.9) | 5.3 | 23.5 (19.9, 27.5) | 0.7 | —[c] | 0.7 | 21.5 (12.8, 33.9) | 0.3 | 20.9 (12.0, 33.8) | 0.3 | 27.3 (14.4, 45.7) |
| 18–64 with diabetes | 0.4 | 3.3 | 29.2 (15.8, 47.4) | 4.1 | 26.8 (21.9, 32.3) | 2.9 | 28.5 (24.0, 33.4) | 3.0 | 30.9 (25.2, 37.2) | 0.7 | —[c] | 0.7 | 21.7 (12.9, 34.2) | 0.3 | 20.5 (11.6, 33.6) | 0.3 | 28.0 (14.7, 46.7) |
| ≥65 with diabetes | 0.2 | 1.9 | —[c] | 3.5 | **11.7 (8.0, 16.8)\*\*** | 2.4 | **9.7 (7.2, 13.0)\*\*** | 2.9 | **15.1 (10.8, 20.9)\*\*** | 0.0 | —[c] | 0.0 | —[c] | 0.0 | —[c] | 0.0 | —[c] |
| **Shingles vaccination (ever received)** | | | | | | | | | | | | | | | | | |
| ≥60 | 3.8 | 22.0 | 7.9 (5.7, 10.7) | 19.5 | **21.3 (19.7, 23.0)\*** | 10.8 | **21.6 (19.7, 23.5)\*** | 10.3 | **23.1 (20.6, 25.9)\*** | 1.0 | —[c] | 0.5 | —[c] | 0.5 | —[c] | 0.1 | —[c] |
| 60–64 | 1.2 | 7.0 | —[c] | 4.9 | 16.8 (14.1, 19.8) | 2.6 | 14.8 (11.5, 18.9) | 2.5 | 15.8 (11.9, 20.7) | 0.9 | —[c] | 0.5 | —[c] | 0.5 | —[c] | 0.1 | —[c] |
| ≥65 | 2.6 | 15.0 | 8.9 (6.5, 12.1) | 14.7 | **23.4 (21.5, 25.4)\*\*\*** | 8.2 | **23.8 (21.7, 26.1)\*\*\*** | 8.2 | **25.5 (22.6, 28.7)\*\*\*** | 0.1 | —[c] | 0.0 | —[c] | 0.0 | —[c] | 0.0 | —[c] |
| **Human papillomavirus vaccination (≥1 dose)** | | | | | | | | | | | | | | | | | |
| 18–26 male | 4.1 | 6.8 | —[c] | 1.4 | 5.1 (3.2, 7.9) | 0.7 | —[c] | 3.6 | —[c] | 1.6 | —[c] | 0.2 | —[c] | 0.2 | —[c] | 0.2 | —[c] |
| 18–26 female | 1.7 | 6.9 | 28.6 (19.7, 39.5) | 3.7 | **41.2 (36.5, 46.1)\*** | 2.3 | **43.0 (37.5, 48.7)\*** | 1.6 | 38.6 (31.3, 46.5) | 1.6 | 17.3 (11.6, 24.9) | 0.5 | 21.0 (14.7, 29.2) | 0.5 | 30.3 (17.5, 47.2) | 0.4 | 26.2 (15.2, 41.2) |

*Note: Boldface indicates statistical significance.*

[a] Weighted sample size in millions.

[b] Influenza vaccination coverage estimates are based on interviews conducted during September 2011 through June 2012, and vaccination received during August 2011 through May 2012.

[c] Estimates may not be reliable because of sample size <30 or relative standard error >30%.

\* $p < 0.05$ by t test (comparing physician contacts where "none" is the reference group).

\*\* $p < 0.05$ by t test (comparing persons 18–64 years for influenza, tetanus, and Tdap; persons 18–64 years with high-risk conditions to persons ≥65 years for pneumococcal; persons 18–64 years with diabetes with ≥65 years with diabetes for Hepatitis B; persons 60–64 years with ≥65 years for shingles).

HR, high risk.

*Lu et al / Am J Prev Med 2015;48(6):647–661*

657

**Table 5.** Adult Vaccination Coverage by Health Insurance Status in the U.S., National Health Interview Survey, 2001 and 2012

| | 2012 | | | 2001 | | |
|---|---|---|---|---|---|---|
| Vaccination | With health insurance % (95% CI) | Without health insurance % (95% CI) | Difference[a] | With health insurance % (95% CI) | Without health insurance % (95% CI) | Difference |
| Influenza vaccination (past 12 months)[b] | | | | | | |
| ≥18 | 44.3 (43.3, 45.4) | 14.4 (12.8, 16.1) | **29.9***  | 29.1 (28.5, 29.8) | 9.9 (9.1, 10.9) | **19.2*** |
| 18–64 | 37.3 (36.2, 38.5) | 14.3 (12.8, 16.0) | **23.0***  | 21.3 (20.7, 22.0) | 9.6 (8.8, 10.5) | **11.7*** |
| ≥65 | 70.5 (68.6, 72.4) | 23.4 (12.9, 40.1) | **47.1***  | 63.3 (61.9, 64.7) | 38.1 (24.3, 54.1) | **25.1*** |
| Pneumococcal vaccination (ever received) | | | | | | |
| 18–64 HR | 23.0 (21.7, 24.4) | 9.8 (8.4, 11.4) | **13.2***  | 18.3 (16.9, 19.7) | 11.3 (8.7, 14.4) | **7.0*** |
| ≥65 | 60.2 (58.7, 61.7) | —[c] | —[c] | 54.2 (52.6, 55.7) | 23.5 (12.9, 38.9) | **30.6*** |
| Hepatitis B vaccination (≥3 doses) | | | | | | |
| 18–49 | 38.0 (36.9, 39.2) | 27.5 (25.7, 29.3) | **10.6***  | 26.1 (25.2, 27.1) | 19.3 (17.8, 20.8) | **6.8*** |
| ≥18 with diabetes | 21.3 (19.4, 23.3) | 20.2 (15.0, 26.5) | 1.1 | 12.7 (11.1, 14.5) | 17.6 (12.3, 24.4) | −4.9 |
| 18–64 with diabetes | 28.5 (25.5, 31.6) | 20.2 (15.0, 26.7) | **8.2***  | 18.7 (16.2, 21.6) | 16.6 (11.5, 23.3) | 2.1 |
| ≥65 with diabetes | 12.0 (9.9, 14.5) | —[c] | —[c] | 4.2 (2.9, 6.1) | —[c] | —[c] |

*Note:* Boldface indicates statistical significance.
[a]Vaccination coverage estimate among those with health insurance minus vaccination coverage estimate among those without health insurance.
[b]Influenza vaccination coverage estimates are based on proportion of respondents who answered that they had received a flu shot in the past 12 months.
[c]Estimates may not be reliable because of sample size <30 or relative standard error >30%.
*$p < 0.05$ by $\chi^2$ test (comparing with health insurance to without health insurance).
HR, high risk.

multivariable analysis, coverage might increase up to 11 percentage points if uninsured respondents had health insurance.

The type of health insurance indicated by respondents had a significant association with vaccination coverage. In this study, vaccination coverage was generally higher among adults with private health insurance compared with those reporting public health insurance. Studies[23,29,30] on insurance status and vaccination in children have reported similar findings. The factors contributing to vaccination levels by type of health insurance are not well understood. In one study,[1] the percentage of people with private health insurance declined from 1999 through 2011, ranging from 67% to 74% in 1999–2008 and 64% in 2009–2011. This downward shift in private insurance coverage might have a negative impact on most adult vaccination coverage. A better understanding of factors influencing vaccination by type of health insurance is needed.

For those aged ≥65 years, Medicare covers some vaccinations. Medicare Part B covers influenza, PPSV, and HepB (if people are at high risk). Part B also covers other vaccinations only if people have been exposed to a dangerous virus or disease (e.g., if people step on a rusty nail [acute wound], Medicare will cover a Td vaccine). All vaccines other than influenza, PPSV, and HepB are covered under Medicare Part D, including shingles. Medicare Part D pays for the vaccination itself and for doctor or other healthcare providers who administer the vaccine. These Medicare benefits may remove financial barriers to some vaccinations for those aged ≥65 years and help improve vaccination coverage among seniors.[31]

*Lu et al / Am J Prev Med 2015;48(6):647–661*

**Table 6.** Adjusted Adult Vaccination Coverage by Health Insurance Status, United States, National Health Interview Survey, 2012

| Vaccination | With health insurance | | Without health insurance | | Difference[b] |
|---|---|---|---|---|---|
| | Adjusted[a] vaccination coverage (95% CI) | Adjusted prevalence ratio (95 % CI) | Adjusted vaccination coverage(95% CI) | Adjusted prevalence ratio (95 % CI) | |
| Influenza vaccination (2011–2012 season)[c] | | | | | |
| ≥18 | 30.9 (29.8, 32.0) | ref | 20.0 (17.8, 22.4) | **0.6 (0.6, 0.7)**[*] | 10.9 |
| Pneumococcal vaccination (ever received) | | | | | |
| 18–64 HR | 14.6 (13.0, 16.4) | ref | 10.1 (8.3, 12.2) | **0.7 (0.5, 0.9)**[*] | 4.5 |
| ≥65 | 51.9 (49.4, 54.3) | ref | 41.6 (21.5, 65.0) | 0.8 (0.5, 1.4) | 10.3 |
| Tetanus vaccination (past 10 years) | | | | | |
| ≥18 | 61.3 (60.1, 62.4) | ref | 57.5 (55.3, 59.7) | **0.9 (0.9, 1.0)**[*] | 3.8 |
| Tetanus vaccination including pertussis vaccine (past 7 years) | | | | | |
| ≥18 | 13.9 (13.1, 14.8) | ref | 10.6 (8.9, 12.5) | **0.8 (0.6, 0.9)**[*] | 3.4 |
| Hepatitis A vaccination (≥2 doses) | | | | | |
| 18–49 among travelers | 17.7 (15.9, 19.6) | ref | 17.9 (14.1, 22.4) | 1.0 (0.8, 1.3) | −0.2 |
| Hepatitis B vaccination (≥3 doses) | | | | | |
| 18–49 | 33.6 (32.1, 35.1) | ref | 32.1 (29.6, 34.7) | 1.0 (0.9, 1.0) | 1.5 |
| ≥18 with diabetes | 22.3 (18.6, 26.6) | ref | 19.4 (12.1, 29.6) | 0.9 (0.5, 1.4) | 2.9 |
| Shingles vaccination (ever received) | | | | | |
| ≥60 | 18.7 (17.1, 20.4) | ref | 15.5 (9.2, 25.1) | 0.8 (0.5, 1.4) | 3.1 |
| Human papillomavirus vaccination (≥1 dose) | | | | | |
| 18–26 male | —[d] | ref | —[d] | —[d] | —[d] |
| 18–26 female | 34.9 (30.9, 39.2) | ref | 29.5 (22.6, 37.5) | 0.8 (0.6, 1.1) | 5.4 |

*Note:* Boldface indicates statistical significance.
[a]Multivariable logistic model was conducted to get adjusted vaccination coverage (adjusted for age, gender, race/ethnicity, marital status, education, employment status, poverty level, number of physician contacts in the past year, usual source of care, self-reported health status, U.S.-born status, region of residence).
[b]Adjusted vaccination coverage among those with health insurance minus adjusted vaccination coverage among those without health insurance.
[c]Influenza vaccination coverage estimates are based on interviews conducted during September 2011 through June 2012, and vaccination received during the past 12 months.
[d]Not enough sample size to run adjusted models.
[*]$p < 0.05$.
HR, high risk.

Vaccination coverage for three vaccines in this report that are included in *Healthy People 2020* (influenza, PPSV, and shingles) were well below the respective target levels of 70% for influenza vaccination among adults aged ≥18 years, 60% for PPSV vaccination among adults aged 18–64 years with high-risk conditions, 90% for PPSV vaccination among adults aged ≥65 years, and 30% for shingles vaccination among adults aged ≥60

years, even among those with health insurance.[14,15] Substantial improvement in vaccination coverage among adult populations, especially among those without health insurance, will be needed to achieve *Healthy People 2020* targets.

Removing cost barriers to adult vaccination might improve coverage.[23–25] The federal Immunization Grant Program supports the immunization infrastructure to

*Lu et al / Am J Prev Med 2015;48(6):647–661*

**659**

deliver vaccines to underinsured children and, as funding permits, to uninsured and underinsured adults.[32] The vaccine manufacturer of HepA, HepB, shingles, and HPV vaccines has implemented the Merck Vaccine Patient Assistance Program, which provides free vaccines to all adults who are uninsured and poor (household income <$44,680 for individuals, $60,520 for couples, or $92,200 for a family of four).[33] Additionally, this manufacturer sometimes makes exceptions based on special circumstances of financial or medical hardship.[33] Programs like this might help improve vaccination coverage among uninsured and poor adult populations. Federal, state, and local partners should continue to build support for adult vaccination and identify other strategies to remove cost barriers for uninsured populations.

Generally, those with a regular physician were more likely to report having received recommended vaccinations than those who did not have a regular physician, regardless of whether they had health insurance, and vaccination coverage generally increased as the number of physician contacts increased. This observation suggests that an increased number of physician contacts might have facilitated opportunities to be reminded of the need for vaccinations, discussions about indicated vaccinations, and a recommendation and decision to vaccinate. These findings are also consistent with previous reports indicating that people who have a usual place for health care or medical home and who seek medical care one or more times during the year are more likely to be vaccinated and receive other preventive services than those without a usual place for health care.[30,34] Studies[35–38] have shown that healthcare provider recommendations for vaccination are strongly associated with adult vaccination coverage. Having a regular physician and routine physician contact can provide important opportunities for providers to educate their patients about vaccine-preventable diseases, as well as recommend and offer vaccination.[23,35–37] Routine patient reminder and recall, expanded access in healthcare settings, reduced patient out-of-pocket costs, provider reminder, standing orders, and provider assessment and feedback should be incorporated into routine adult clinical care.[39–41]

## Limitations

The findings in this report are subject to limitations. First, adult vaccination coverage was self-reported and therefore might be subject to recall bias. Self-reported influenza and PPSV vaccination status among adults, however, has been shown to be fairly sensitive and specific.[42–46] Adult self-reported vaccination status also has been shown to be sensitive for tetanus, HepA, HepB,

HPV, and shingles vaccination and specific for vaccination with all these vaccines, except for tetanus vaccination.[46] Second, NHIS response rates were 60%–70%, and it is possible that nonresponse bias may have remained after weighting adjustments. Third, self-reported vaccination might be subject to social desirability bias. Fourth, statistical tests for estimates were conducted with one ref group and we did not perform multiple comparisons. Finally, other factors like cultural, religious, vaccine safety concerns, state immunization intervention programs, and numerous other factors also may affect vaccination coverage; however, the NHIS did not collect this information.

## Conclusions

Adult vaccination coverage is low overall and especially low for those without health insurance. Any comprehensive strategy needs to be tailored to the needs of the healthcare institution to improve coverage among adults overall and those without health insurance.[39,40] The Patient Protection and Affordable Care Act (ACA) requires that certain clinical preventive services, including all ACIP-recommended vaccines, be provided without cost sharing in Medicare Part B benefits and by newly qualified private and public health plans. The ACA also encourages state Medicaid programs to provide selected clinical preventive services with no cost sharing.[47] Beginning in 2013, state Medicaid programs that eliminate cost sharing for these preventive services may receive enhanced federal matching funds for them.[47,48] The expanded enrollment in public and private insurance programs expected from provisions of the ACA might improve access to healthcare services (including vaccination) for previously uninsured individuals. Other provisions of the ACA that create incentives for primary care, including increased payments for primary care services provided by primary care doctors, and coverage without cost sharing[49] for vaccines recommended by the ACIP, also should help to improve adult vaccination coverage. Additionally, to improve vaccination coverage, routine patient reminder and recall, expanded access in healthcare settings, reduced patient out-of-pocket costs, provider reminder, standing orders, and provider assessment and feedback should be incorporated into routine adult clinical care.[39–41]

---

We thank James A. Singleton and Stacie M. Greby for their thoughtful review of the manuscript. The findings and conclusions in this paper are those of the authors and do not necessarily represent the views of CDC.

No financial disclosures were reported by the authors of this paper.

**660** *Lu et al / Am J Prev Med 2015;48(6):647–661*

# References

1. U.S. Census Bureau. Income, poverty, and health insurance coverage in the United States: 2011. www.census.gov/prod/2012pubs/p60-243.pdf.
2. Zhao Z, Mokdad AH, Barker L. Impact of health insurance status on vaccination coverage in children 19-35 months old, United States, 1993-1996. *Public Health Rep.* 2004;119(2):156–162.
3. Smith PJ, Stevenson J, Chu SY. Associations between childhood vaccination coverage, insurance type, and breaks in health insurance coverage. *Pediatrics.* 2006;117(6):1972–1978. http://dx.doi.org/10.1542/peds.2005-2414.
4. Hunsaker J, Veselovskiy G, Gazmararian JA. Health insurance plans and immunization: assessment of practices and policies, 2005-2008. *Pediatrics.* 2009;124(suppl 1):S532–S539. http://dx.doi.org/10.1542/peds.2009-1542M.
5. Smith PJ, Lindley MC, Shefer A, Rodewald LE. Underinsurance and adolescent immunization delivery in the United States. *Pediatrics.* 2009;124(suppl 5):S515–S521. http://dx.doi.org/10.1542/peds.2009-1542K.
6. Kharbanda EO, Parker E, Nordin JD, Hedblom B, Rolnick SJ. Receipt of human papillomavirus vaccine among privately insured adult women in a U.S. Midwestern Health Maintenance Organization. *Prev Med.* 2013;57(5):712–714. http://dx.doi.org/10.1016/j.ypmed.2013.07.011.
7. Hurley LP, Bridges CB, Harpaz R, et al. U.S. physicians' perspective of adult vaccine delivery. *Ann Intern Med.* 2014;160(3):161. http://dx.doi.org/10.7326/M13-2332.
8. Ayanian JZ, Weissman JS, Schneider EC, Ginsburg JA, Zaslavsky AM. Unmet health needs of uninsured adults in the United States. *JAMA.* 2000;284(16):2061–2069. http://dx.doi.org/10.1001/jama.284.16.2061.
9. Jain N, Yusuf H, Wortley PM, Euler GL, Walton S, Stokley S. Factors associated with receiving hepatitis B vaccination among high-risk adults in the United States: an analysis of the National Health Interview Survey, 2000. *Fam Med.* 2004;36:480–486.
10. Ross JS, Bradley EH, Busch SH. Use of health care services by lower-income and higher-income uninsured adults. *JAMA.* 2006;295:2027–2036. http://dx.doi.org/10.1001/jama.295.17.2027.
11. Hinman AR, Orenstein WA. Adult immunization: what can we learn from the childhood immunization program? *Clin Infect Dis.* 2007;44(12):1532–1535. http://dx.doi.org/10.1086/519453.
12. CDC. Non-influenza vaccination coverage among adults. MMWR. 2013;62(4):66-72.
13. CDC. Non-influenza vaccination coverage among adults. MMWR. 2014;63(5):95-102.
14. Healthy People 2020. Topics & objectives—immunization and infectious diseases. www.healthypeople.gov/2020/topics-objectives/topic/immunization-and-infectious-diseases/objectives.
15. Healthy People 2020. Explore the latest data from the immunization and infectious diseases and global health progress review. www.healthypeople.gov/2020/topics-objectives/topic/immunization-and-infectious-diseases/objectives.
16. CDC. Advisory Committee on Immunization Practices Recommended Immunization Schedule for Adults Aged 19 Years or Older—United States, 2014. *MMWR.* 2014;63(5):110–112.
17. CDC. Prevention and control of seasonal influenza with vaccines: recommendations of the Advisory Committee on Immunization Practices—United States, 2013–2014. *MMWR.* 2013;66(RR07):1–43.
18. CDC. National Health Interview Survey. ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2012/srvydesc.pdf.
19. U.S. Census Bureau. Poverty thresholds. www.census.gov/hhes/www/poverty/data/threshld/.
20. Shah B, Barnwell B, Bieier G. *SUDAAN User's Manual, Release 10.1.* Research Triangle Park, NC: Research Triangle Institute; 2010.
21. Lu PJ, Santibanez TA, Williams WW, et al. Surveillance of influenza vaccination coverage—United States, 2007-08 through 2011-12 influenza seasons. *MMWR Surveill Summ.* 2013;62(suppl 4):1–29.
22. Lu PJ, Jain N, Cohn AC. Meningococcal conjugate vaccination among adolescents aged 13-17 years, United States, 2007. *Vaccine.* 2010;28: 2350–2355. http://dx.doi.org/10.1016/j.vaccine.2009.12.032.
23. Lu PJ, Euler GL, Harpaz R. Herpes zoster vaccination among adults aged 60 years and over in the United States, 2008. Am J Prev Med. 2011;40(2):e1-e6. 10.1016/j.amepre.2010.10.012.
24. Lu PJ, Byrd KK, Murphy TV, Weinbaum CM. Hepatitis B vaccination coverage among high-risk adults 18-49 years, U.S., 2009. *Vaccine.* 2011;29(40):7049–7057. http://dx.doi.org/10.1016/j.vaccine.2011.07.030.
25. Williams WW, Lu PJ, Saraiya M, et al. Factors associated with human papillomavirus vaccination among young adult women in the United States. *Vaccine.* 2013;31(28):2937–2946. http://dx.doi.org/10.1016/j.vaccine.2013.04.041.
26. CDC. Influenza vaccination coverage among adults—National Health Interview Survey, United States, 2008–09 Influenza Season. *MMWR.* 2012;61(suppl):65–72.
27. CDC. Vaccination coverage by race/ethnicity and poverty level among children aged 19–35 months—United States, 1997. *MMWR.* 1998;47: 956–959.
28. Egede LE, Zheng D. Racial/ethnic differences in adult vaccination among individuals with diabetes. *Am J Public Health.* 2003;93(2):324–329. http://dx.doi.org/10.2105/AJPH.93.2.324.
29. Santoli JM, Huet NJ, Smith PJ, et al. Insurance status and vaccination coverage among U.S. preschool children. *Pediatrics.* 2004;113(suppl 6): 1959–1964.
30. Sudano JJ, Baker DW. Intermittent lack of health insurance coverage and use of preventive services. *Am J Public Health.* 2003;93:130–137. http://dx.doi.org/10.2105/AJPH.93.1.130.
31. Medicare coverage of vaccines and immunizations. www.medicareinteractive.org/page2.php?topic=counselor&page=script&script_id=1519.
32. CDC. Immunization Grant Program (Section 317). www.cdc.gov/vaccines/imz-managers/guides-pubs/index.html.
33. Merck Vaccine Patient Assistance Program. www.merckhelps.com/VPAP/.
34. Beal AC, Doty MM, Hernandez SE, Shea KK, Davis K. *Closing the divide: how medical homes promote equity in health care—Results from the Commonwealth Fund 2006 Health Care Quality Survey.* New York, NY. The Commonwealth Fund; 2007.
35. Lu PJ, Euler GL, Jumaan AO, Harpaz R. Herpes zoster vaccination among adults aged 60 years or older in United States, 2007: uptake of the first new vaccine to target seniors. *Vaccine.* 2009;27:882–887. http://dx.doi.org/10.1016/j.vaccine.2008.11.077.
36. CDC. Influenza vaccination among pregnant women, the 2011-12 season. *MMWR.* 2012;61(38):758–763.
37. CDC. Influenza vaccination coverage among health-care personnel—the 2011-12 season. *MMWR.* 2012;61(38):753–757.
38. Winston CA, Wortley PM, Lees KA. Factors associated with vaccination of Medicare beneficiaries in five U.S. communities: results from the Racial and Ethnic Adult Disparities Immunization Initiative survey, 2003. *J Am Geriatr Soc.* 2006;54:303–310. http://dx.doi.org/10.1111/j.1532-5415.2005.00585.x.
39. Poland GA, Shefer AM, McCauley M, et al. Standards for adult immunization practice. *Am J Prev Med.* 2003;25(2):144–150. http://dx.doi.org/10.1016/S0749-3797(03)00120-X.
40. Guide to Community Preventive Services. www.thecommunityguide.org/vaccines/healthsysteminterventions.html.
41. Recommendations from the National Vaccine Advisory Committee: standards for adult immunization practice. Public Health Rep. 2014;129:115-123.
42. Donald RM, Baken L, Nelson A, Nichol KL. Validation of self-report of influenza and pneumococcal vaccination status in elderly outpatients. *Am J Prev Med.* 1999;16(3):173–177. http://dx.doi.org/10.1016/S0749-3797(98)00159-7.
43. Zimmerman RK, Raymund M, Janosky JE, Nowalk MP, Fine MJ. Sensitivity and specificity of patient self-report of influenza and pneumococcal polysaccharide vaccinations among elderly out-

*Lu et al / Am J Prev Med 2015;48(6):647–661*                    **661**

patients in diverse patient care strata. *Vaccine*. 2003;21:1486–1491.

44. Mangtani P, Shah A, Roberts JA. Validation of influenza and pneumococcal vaccine status in adults based on self-report. *Epidemiol Infect*. 2007;135(1):139–143. http://dx.doi.org/10.1017/S095026880600649.

45. Shenson D, DiMartino D, Bolen J, Campbell M, Lu PJ, Singleton JA. Validation of self-reported pneumococcal vaccination in behavioral risk factor surveillance surveys: experience from the sickness prevention achieved through regional collaboration (SPARC) program. *Vaccine*. 2005;23:1015–1020. http://dx.doi.org/10.1016/j.vaccine.2004.07.039.

46. Rolnick SJ, Parker ED, Nordin JD, et al. Self-report compared to electronic medical record across eight adult vaccines: do results

vary by demographic factors? *Vaccine*. 2013;31(37):3928–3935.

47. Dorrell CG, Jain N, Yankey D. Validity of parent-reported vaccination status for adolescents aged 13-17 years: National Immunization Survey—Teen, 2008. *Public Health Rep*. 2011;126(S2):60–69. http://dx.doi.org/10.1016/j.vaccine.2013.06.041.

48. 111th Congress. Public Law 111-148 - March. 23, 2010. 124 STAT. 119 (H.R. 3590). An act entitled: the Patient Protection and Affordable Care Act. www.gpo.gov/fdsys/pkg/PLAW-111publ148/pdf/PLAW-111publ148.pdf.

49. Koh HK, Sebelius KG. Promoting prevention through the Affordable Care Act. *N Engl J Med*. 2010;363:1296–1299. http://dx.doi.org/10.1056/NEJMp1008560.

# EXHIBIT I



Dec. 10, 2018

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave, NW
Washington DC 20529-2140

       Re: <u>Notice of Proposed Rulemaking:  Inadmissibility on Public Charge Grounds,</u>
          <u>DHS Docket No. USCIS-2010-0012, RIN 1615-AA22</u>

Dear Ms. Deshommes:

The undersigned members of the Consortium for Citizens with Disabilities (CCD) write to express our strong opposition to the above-captioned proposed rule.  CCD is the largest coalition of national organizations working together to advocate for federal public policy that ensures the self-determination, independence, empowerment, integration and inclusion of children and adults with disabilities in all aspects of society.

We believe that the proposed rule would greatly harm immigrant families with an adult or child who has a disability by discouraging enrollment in needed services; would undermine the purpose of the public charge rule by increasing reliance on costly late-stage and emergency care; contradicts the reasoned analysis of multiple federal agencies with relevant expertise supporting the rules laid out in the Immigration and Naturalization Service's (INS's) 1999 interim guidance concerning public charge determinations;[1] is inconsistent with Congressional intent and with federal anti-discrimination law; and fails to meet Administrative Procedures Act requirements.

---

[1] U.S. Dep't of Justice, Immigration and Naturalization Service, *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* (May 26, 1999), and U.S. Dep't of Justice, Immigration and Naturalization Service, *Memorandum of Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, for All Regional Directors* (May 20, 1999), https://www.uscis.gov/ilink/docView/FR/HTML/FR/0-0-0-1/0-0-0-54070/0-0-0-54088/0-0-0-55744.html.

1. **The Proposed Rule Would Harm People with Disabilities and Lead Many to Avoid Using Needed Services**

The proposed rule, if adopted, would cause great harm to people with disabilities. In contrast to the current rule and Department of Homeland Security (DHS) guidance, which reflect a careful balance designed to ensure that people do not avoid or disenroll from critically needed medical services and housing assistance out of fear that these services might result in a public charge determination, the proposed rule would greatly increase the risks of such disenrollment or avoidance by dramatically expanding the types of assistance that would count against individuals in public charge determinations, significantly lowering the threshold for counting benefits against individuals, and heavily weighting the negative impact of such benefit receipt.

### Abandoning the "Primarily Dependent" Standard

First, rather than focusing on whether a person is likely to become "primarily dependent on the government for subsistence," as the government currently does (meaning that public benefits represent more than half of the person's income and support)[2] the proposed rule would adopt a staggeringly low threshold of counting all monetizable benefits with a combined value that exceeds 15% of the Federal Poverty Guidelines for a household of one within 12 months (just over $1800), or for non-monetizable benefits, receipt of such benefits for at least 12 months within a 3-year period.[3] Despite acknowledging that the current approach is straightforward and easy to administer,[4] DHS proposes a dramatic change to count anything above a "nominal"[5] level of benefits without any specific evidence demonstrating why this change is necessary or justifying the particular threshold of 15% of the Federal Poverty Guidelines.

### Expanding the Types of Benefits Considered

Second, the proposed rule would vastly expand the types of benefits that count toward this 'anything above nominal' threshold. The current rule applied by the government, set forth by the INS (now the U.S. Citizenship and Immigration Services within the Department of Homeland Security) after extensive consultation with other federal agencies with relevant expertise (including the Department of Health and Human Services, the Social Security Administration, and the U.S. Department of Agriculture), counts only cash benefits for income maintenance (such as Temporary Aid to Needy Families and Supplemental Security Income) and long-term institutionalization at government expense in considering the "resources" factor in public charge determinations.[6] These agencies agreed that receipt of cash benefits and long-term

---

[2] Dep't of Homeland Security Notice of Proposed Rulemaking, 83 Fed. Reg. 51114, 51163 (Oct. 10, 2018), https://www.gpo.gov/fdsys/pkg/FR-2018-10-10/pdf/2018-21106.pdf.

[3] *Id.* at 51158, 51164.

[4] *Id.* at 51164.

[5] *Id.* at 51165.

[6] *Id.* at 51133.

2

institutionalization were the "best evidence" of whether a person is primarily dependent on the government for subsistence, and that other benefits should be excluded.[7]

In particular, the INS "sought to reduce negative public health and nutrition consequences generated by the confusion [about public charge determinations]" and

> aimed to stem the fears that were causing noncitizens to refuse limited public benefits, such as transportation vouchers and child care assistance, so that they would be better able to obtain and retain employment and establish self-sufficiency.[8]

Without specific evidence justifying its massive proposed change, DHS proposes to expand the consideration of benefits to include a slew of benefits and services commonly used by people with disabilities, including Medicaid, Supplemental Nutrition Assistance Program benefits (SNAP or Food Stamps), Section 8 housing vouchers and project-based rental assistance, Medicare Part D benefits, and possibly Children's Health Insurance Program (CHIP) benefits.

The proposed rule correctly notes that the "wide array of limited-purpose public benefits now available did not yet exist" at the time that the public charge rule was developed in the 19th century,[9] but ignores the fact that these benefits were well-established and considered when the INS and other agencies determined that most of them should be excluded in public charge determinations.

### Heavily Weighting Receipt of Benefits as a Negative Factor

The proposed rule also specifies that receipt of or approval for benefits would now be considered a "heavily weighted negative factor" in determining whether a person is likely to become a public charge.[10]

### Modifying the "Health" Factor

The proposed rule would also add new language to the current regulation describing how an individual's health is to be considered in making public charge determinations. The new language would specify that, when considering an individual's health, DHS will consider "whether the alien has any physical or mental condition that . . . is significant enough to interfere with the person's ability to care for him- or herself or to attend school or work, or that is likely to require extensive medical treatment or institutionalization in the future."[11] This standard is broad

---

[7] *Id.* at 51133, 51163-64.

[8] *Id.* at 51133.

[9] *Id.* at 51164.

[10] *Id.* at 51292.

[11] *Id.* at 51182.

enough to sweep in virtually every person with any type of significant disability and, depending on how it is construed, many individuals with disabilities that are less significant. Some might even read it to apply to any child with an Individualized Education Plan (IEP), or any person who needs reasonable accommodations to work.

The proposed rule would also heavily weight against a person the presence of a health condition likely to require extensive medical treatment or interfere with the ability to provide for oneself, work, or attend school if the person has no prospect of securing private insurance and no means to pay for reasonably foreseeable medical costs.

### *These Changes Would Cause Great Harm to People with Disabilities*

The combination of dramatically expanding the benefits that count against a person in a public charge determination, lowering the threshold to consider all benefits above a "nominal" amount, and heavily weighting receipt of these benefits against a person, along with heavily weighting of health impairments, would effectively place virtually anyone with a significant disability in serious jeopardy of being deemed likely to become a public charge.

In addition to the harms that may be caused by actually finding an adult or child likely to become a public charge and preventing them from obtaining lawful permanent resident status, the proposed rule would cause precisely the type of damage that led the INS to exclude consideration of most of these benefits previously: it would lead many people to decline needed health and other services, creating "negative public health and nutrition consequences" and making it more difficult for people to secure employment. Indeed, there is evidence that even before reports of the contents of the proposed rule surfaced, "families were already experiencing growing fears of participation in health, nutrition, and other programs that led them to disenroll or avoid enrolling themselves and their children."[12]

### 2. The Proposed Rule Would Undermine the Purpose of the Public Charge Rule by Driving Up Public Costs

Rather than limiting government spending on individuals who have immigrated to the U.S., the proposed changes to the rule are likely to have the opposite effect. The disenrollment of large numbers of individuals from needed health, housing, nutrition and other benefits (or their non-enrollment in such benefits) is likely to drive *up* health care costs. Removing access to medical care, housing, or food assistance can be expected to lead to increased use of costly emergency department services, temporary hospitalizations, and complex late-stage treatment that could have been avoided if individuals received far less costly preventive care and housing assistance. The costs of such emergency services and late-stage care would typically be borne by local, state and/or federal government assistance.

---

[12] Henry J. Kaiser Family Foundation, Proposed Changes to "Public Charge" Policies for Immigrants: Implications for Health Coverage, **https://www.kff.org/disparities-policy/fact-sheet/proposed-changes-to-public-charge-policies-for-immigrants-implications-for-health-coverage**.

### 3. The Proposed Rule is Inconsistent with Congressional Intent

As DHS observes in the preamble to the proposed rule, Congress provided in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) that all "aliens," including nonimmigrants and undocumented immigrants, would be eligible for certain public benefits due to the importance of those benefits—for example, emergency Medicaid, crisis counseling, certain types of housing assistance, mental health and substance use disorder treatment, and other services.[13] Certain immigrants would also be eligible for additional important benefits, such as SNAP, Head Start, and school lunch. When Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) shortly after PRWORA, adding the five public charge determination factors that DHS is now interpreting, it made no change to the PRWORA provisions affording certain public benefits to immigrants.

DHS acknowledges that there is overlap between benefits that Congress required to be provided to all aliens and the benefits it now proposes to weight heavily against individuals in public charge determinations. It contends, however, that "[t]here is no tension between the availability of public benefits to some aliens as set forth in PRWORA and Congress's intent to deny visa issuance, admission, and adjustment of status to aliens who are likely to become a public charge."[14] According to DHS, Congress "must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge grounds of inadmissibility, even though receipt of such benefits could render the alien inadmissible as likely to become a public charge."

This interpretation strains credulity and is simply not a reasonable interpretation of the statutes, as required by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Congress afforded certain public benefits to immigrants because of its concern about their importance and the impact of individuals not receiving those services when needed. That concern is wholly inconsistent with DHS's proposal to afford those services to certain immigrants only on pain of jeopardizing the ability to secure permanent resident status. Contrary to DHS's interpretation, the enactment of the two statutes close in time suggests that Congress assumed that receipt of these benefits would *not* be counted against a person in determining whether the individual is likely to become a public charge.

### 4. The Proposed Rule Improperly Construes the Statute in a Manner Inconsistent with Federal Anti-Discrimination Law

Section 504 of the Rehabilitation Act prohibits disability-based discrimination in any program or activity of a federal executive branch agency, including DHS.[15] To the extent that the

---

[13] 83 Fed. Reg. 51131-32.

[14] *Id.* at 51132.

[15] 29 U.S.C. § 794(a).

Immigration and Nationality Act (INA) applies to federal agency programs and activities regulated by Section 504, it must be read *in pari materia* with Section 504. Accordingly, the INA's provisions concerning public charge determinations must be read in a manner that aligns with Section 504's prohibition on disability-based discrimination.

The proposed rule's breathtakingly broad reading of the statutory "health" and "resources" factors for public charge determinations are inconsistent with Section 504's prohibition on disability-based discrimination. As noted above, together these modifications would likely result in virtually all people with any type of significant disability being considered a public charge. These determinations would be made based on heavily weighting benefits such as Medicaid that are essential for large numbers of people with disabilities[16] as well as directly considering individuals' disabilities and adversely treating any significant disability. Contrary to DHS's argument that these determinations are individualized and would merely consider disability as part of the "totality of circumstances,"[17] the proposed formula effectively authorizes blanket determinations that anyone with a significant disability is likely to become a public charge.

This reading of the public charge statute is not only inconsistent with the intent of the Immigration and Nationality Act, which was previously amended to ensure that individuals were not determined inadmissible based simply on their disability status,[18] but is also inconsistent with Section 504's bar on disability-based discrimination in DHS's programs and activities. DHS states that it is not singling out people with disabilities because other factors must be considered as well, but between the proposal to adversely consider any significant disability under the health factor, the proposal to give heavy negative weight to receipt of benefits used by large numbers of people with significant disabilities, and the proposal to give heavy negative weight to having such a disability without private insurance coverage or the means to pay independently for medical costs, these provisions undoubtedly single out people with disabilities. It is immaterial that other factors besides disability are considered if the consideration of these factors all but predetermines a negative outcome for anyone with a significant disability.

---

[16] For many individuals with disabilities, Medicaid is the only possible source of coverage for the home and community-based services that they need to live and work in their communities. Commercial insurance generally does not cover services such as attendant care, skill-building services, peer support, crisis services, respite care, and employment services.

[17] 83 Fed. Reg. 51184.

[18] Shortly after passage of the Americans with Disabilities Act, the Immigration and Nationality Act was amended to eliminate provisions that made individuals inadmissible on the basis of having certain disabilities. Immigration Act of 1990, PL 101-649, 104 Stat 4978, sections 601-603 (Nov. 29, 1990) (deleting and replacing language excluding "[a]liens who are mentally retarded," "[a]liens who are insane," "[a]liens who have had one or more attacks of insanity," "[a]liens afflicted with psychopathic personality, or sexual deviation, or a mental defect," and "[a]liens who are … chronic alcoholics").

### 5. The Proposed Rule Does Not Meet Administrative Procedures Act Requirements

The Administrative Procedures Act (APA) requires a federal agency conducting a notice and-comment rulemaking to "examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."[19] Moreover, there is a presumption "against changes in current policy that are not justified by the rulemaking record."[20] DHS offers no relevant data or other evidence to explain why the interpretation used by the federal government for the last twenty years is inappropriate or to justify why the particular articulation of the resources and health factors that it proposes is necessary. Much more is required in order to justify this massive change in the agency's interpretation of federal law.

### Conclusion

We strongly oppose the proposed rule for the reasons identified above, and we urge DHS not to adopt the proposed modifications to the rule.


Sincerely,

ACCSES

Advocacy Institute

American Association of People with Disabilities

American Dance Therapy Association

American Music Therapy Association

American Network of Community Options and Resources

American Psychological Association

American Speech-Language-Hearing Association

The Arc of the United States

Association of University Centers on Disabilities

---

[19] *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). *See also* Jeffrey S. Lubbers, A GUIDE TO FEDERAL AGENCY RULEMAKING 477-489 (4th ed. 2006).

[20] *Motor Veh. Mfgs. Ass'n* at 42.

Autism Society of America

Autistic Self Advocacy Network

Bazelon Center for Mental Health Law

Brain Injury Association of America

Center for Public Representation

Children and Adults with Attention-Deficit Hyperactivity Disorder

Council of Administrators of Special Education

Council of State Administrators of Vocational Rehabilitation

Council for Exceptional Children

Council for Learning Disabilities

Disability Rights Education and Defense Fund

Division for Early Childhood of the Council for Exceptional Children

Family Voices

Goodwill Industries International

Learning Disabilities Association of America

Lutheran Services in America-Disability Network

National Academy of Elder Law Attorneys

National Alliance on Mental Illness

National Association of Councils on Developmental Disabilities

National Association of State Head Injury Administrators

National Center for Learning Disabilities

National Council on Independent Living

National Disability Rights Network

National Down Syndrome Congress

National Multiple Sclerosis Society

National Respite Coalition

RespectAbility

School Social Work Association of America

TASH

United Spinal Association

# EXHIBIT J



# Our Children's Fear

Immigration Policy's Effects
on Young Children



**Wendy Cervantes**
**Rebecca Ullrich**
**Hannah Matthews**
March 2018

**Compromising Our Nation's Future**

# Executive summary



**In 17 years, I've never seen this before. The stress is so high, they're biting their fingers.**

– Georgia preschool director

This report documents how the current immigration context is affecting our nation's youngest children, under age eight, based on interviews and focus groups in 2017 with more than 150 early childhood educators and parents in six states—California, Georgia, Illinois, New Mexico, North Carolina, and Pennsylvania. We conducted this first multi-state study of its kind to focus on young children for two reasons.

First, the early years lay the foundation for children's long-term health and wellbeing. For children to learn and grow and ultimately succeed in school and in life, they need good nutrition, regular health care, a stable and healthy living environment, and nurturing and loving care. When their basic needs are not met—or when hardship and distress occur in children's environments—their growth and development is undercut and can have enduring, even life-long consequences.[1]

Second, immigrants are central to our nation's past and future. Children of immigrants—those with at least one foreign-born parent—comprise a quarter of all young children, and the overwhelming majority of them are U.S. citizens. Our collective future is tied to their health and wellbeing, as well as their success in school and later careers.

Our study was motivated by widespread reports that children and families are being harmed by the Trump Administration's immigration policy priorities. This report documents impacts on young children of immigrants, whether their parents have some form of lawful immigration status or are undocumented.

## Documenting the impact: key findings

**Young children fear their parents will be taken away**. Parent and provider reports of child behaviors and actions suggest that children as young as three are deeply aware of the Trump Administration's anti-immigrant sentiment and the possibility of losing a parent. As a result, they are fearful for their parents' and their own safety. An early childhood educator in New Mexico described children making comments such as, **"He cannot take my family"** and **"Can you imagine if they take my friend's family away from them? What will they do?"**

Children also showed disturbing new behaviors—such as increased aggression, separation anxiety, and withdrawal from their environments. Educators with many years of experience described behavior they observed as distinct from children's behaviors in past years.

A preschool director in Georgia described a five-year-old child whose anxiety was so severe that he was biting his fingertips to the point that they were bleeding.

Expressions of fear were not limited to children in mixed-status families (those with an undocumented parent) but extended to children whose parents have lawful immigration status—some even children of U.S. citizens. Because young children can't understand the details of immigration policy—and may not even know their parent's immigration status—providers reported that children feared the worst based on what they hear around them. A Head Start teacher in Pennsylvania told us that a four-year-old girl in her class said that President Trump wanted to send her mom back to Mexico. **"Her mother is not even from Mexico,"** the teacher told us.

Children who had been separated from a parent or who had come into contact with immigration agents seemed to exhibit the greatest fear and evidence of behavioral changes. Providers and parents in nearly all of our interview sites described disturbing accounts of immigration enforcement activities that undermine the best interest of children, such as parents being arrested in their children's view or children and parents being separated during interrogation.

**Young children's daily routines are interrupted because fear is keeping families isolated in their homes—resulting in reduced access to early care and education programs.** Families are afraid to leave their homes and encounter immigration enforcement agents, leading them to make dramatic changes to their daily routines. They leave their homes for necessary activities—like going to work or buying groceries—yet have stopped frequenting parks, libraries, and retail stores.

**"We don't feel safe even taking the kids to child care,"** a parent in California told us. Early education programs reported drops in attendance, fewer applicants, trouble filling available spaces, and decreased parent participation in classrooms and at events.[2] As a result of this withdrawal from ordinary life and decreased participation in early care and education programs, children are losing out on enriching early childhood experiences that are important to prepare them for success in school and in life.[3]

**Parent and provider accounts suggest that young children are getting less access to nutrition and health care services because of families' fears.** In all six states, providers and parents report elevated concerns about enrolling in or maintaining enrollment in publicly funded programs that support basic needs, including for their citizen children. Parents reported being worried about their information being shared with immigration officials and about how participation in programs would affect their ability to obtain lawful permanent residence. Some providers also described instances of blatant discrimination against immigrant parents when attempting to enroll in public programs and parents avoiding services because they are afraid they might encounter immigration enforcement agents when they drive. For example, in Pennsylvania, parents questioned whether it was safe to take their children to the hospital for emergency care because it required taking a route where immigration agents often patrolled. Research shows that access to medical care and nutritious foods are critical to promote good health, particularly in early childhood. Delaying doctors' visits or not getting enough healthy food may lead to greater health and developmental problems later.[4]

**Young children's housing and economic stability are in turmoil, with likely significant consequences for their wellbeing.** Providers and parents reported increased job loss and more difficulty finding work; overcrowded housing and frequent moving; and more exploitation by employers and landlords. A preschool director in California described receiving frequent notifications of changes in employment and addresses in recent months. She speculated that parents were making these changes to avoid immigration enforcement actions. This increased instability—on top of increased fear and anxiety—can impose incredible harm on children's developing minds and bodies.[5]

**Parents and caregivers—the most important source of support for young children—are themselves under severe stress and lack resources to meet their needs.** Providers in all six states talked about parents coming to them with increased worries and new questions. Parents are struggling with difficult decisions, such as what to do if they or their spouses are deported, and how to talk to their children about deportation. Many parents are asking for resources, such as legal assistance and mental health services, but there is not enough to meet the need. Providers are also under increased stress as they attempt to support families in new ways.

**"You feel like you don't know what's going to happen,"** an early childhood educator in Illinois said. **"That feeling of stability—emotional stability and security—is what most of our families have lost."** When the support systems that children rely on—their parents and teachers—are frayed due to their own stress and fear, children feel the effect as the adults they rely on may be preoccupied with anxiety to fully meet children's caregiving needs.[6]

# The cumulative effect of these threats is likely harming millions of young children.

Our interviews and focus groups revealed a distressing picture of the day-to-day experiences for young children around the country, characterized by fear, stress, and disruptions to their normal routines. Prolonged exposure to such anxiety and uncertainty undermines children's brain development and can have lasting effects on their capacity to learn and manage their emotions.[7] This elevated fear comes at the same time that children are losing access to health care, nutrition services, and early care and education—supports that are necessary to set them on a path to success.[8]

Each of these risk factors by themselves have well-documented and powerful negative effects on children's health and wellbeing. But developmental research is clear that the harm children face is cumulative. Experiencing multiple types of hardships (for example, lower household income, housing instability, and not having enough to eat) does far greater damage to young children's long-term development than simply adding up the effects of each individual risk factor.[9] Without changing course, we as a nation will also pay a heavy price as our future prosperity will be largely determined by the extent to which our increasingly diverse U.S. child population is able to succeed.

# A better path forward: recommendations

To change course and safeguard the healthy development of young children in immigrant families, CLASP recommends the following:

## *Congress and the Trump Administration should ensure that the best interests of children, including U.S. citizen children living in mixed-status families, are held paramount in immigration policy decisions.*

- Congress should pass legislation that provides a pathway to citizenship to undocumented immigrants, including parents and Dreamers.
- Congress should ensure immigration judges are able to weigh the hardship to children in decisions regarding a parent's ability to enter or remain in the country.
- The U.S. Department of Homeland Security (DHS) should use discretion when making decisions to arrest, detain, and deport parents of minor children in the United States.
- Congress and DHS should expand and consistently enforce the sensitive locations policy to restrict enforcement actions at or near places that are critical to children's health and wellbeing.
- DHS should strengthen protocols to minimize potential harm to children when they are present during immigration enforcement actions and train all staff on these protocols.
- DHS should ensure that detained and deported parents are able to make decisions about their children's care.

## *Federal, state, and local policymakers should ensure that immigrant families have access to the programs and services they need to promote their children's healthy development.*

- Congress and federal agencies should reverse course on the Trump Administration's efforts to discourage immigrant families and their children from accessing health, nutrition, and early childhood education services.
- State and local policymakers should safeguard the wellbeing of young children in immigrant families in state and local legislation, laws, and policies.
- State and local policymakers should increase funding for legal services in communities and build links to pro bono services.
- State agencies administering public benefits should ensure immigrant families and their children are not deterred from enrolling in critical programs.
- State agencies administering public benefits should issue guidance to programs on protecting data and personal confidentiality.

## *State policymakers should ensure early childhood programs have the resources they need to better serve children in immigrant families.*

- State policymakers should promote and fund coordination and collaboration between child care and early education and immigrant-serving organizations, so families and providers have better access to key immigration information.
- State policymakers should provide resources to meet the unprecedented needs of the early childhood workforce for training, education, and support.
- State policymakers should ensure that programs have access to best practices and training on trauma-informed care, as well as the funding to implement those practices.

## *The philanthropic community should protect, defend, and elevate the wellbeing of children in immigrant families.*

- Funders should invest in immediate and urgent support to children in immigrant families and the programs that serve them through a comprehensive agenda that includes policy advocacy; strong collaborations across the immigrant and early childhood sectors; creation and dissemination of training and resources for early care and education and other program staff; and a research agenda that includes documentation of the impacts of immigration policies on young children.
- Funders should speak out about the wellbeing of young children of immigrants, their needs and the developmental consequences of the current crisis.



# A national concern

Roughly 9 million young children under age 8 in the United States live in an immigrant family with one or more member who is foreign-born.[10] Young children in immigrant families are a significant and growing segment of the young child population, comprising 26 percent of all children under 8. The vast majority of these children—94 percent—are U.S. citizens, entitling them to all the legal rights and privileges that citizenship guarantees.[11]

Most young children in immigrant families live with parents who have some form of legal U.S. immigration status. Many others are members of "mixed-status families," meaning that they are living with at least one undocumented family member. An estimated 5.1 million children under the age of 18 in the United States live with at least one undocumented parent; nearly 2 million of these children are under age 5.[12]



This first-ever multi-state study documents effects of the current immigration climate on young children under age eight, including those living in families where every member has lawful immigration status as well as those in mixed-status families.

We focus on young children for two reasons. First, the early years lay the foundation to children's lifelong health and wellbeing. Experiences early in life affect children's physical, social, and emotional development. Good nutrition, regular health care, a stable and healthy living environment, and nurturing and loving care are necessities for children to grow and learn and ultimately do well in school and in life. When basic needs are not met—or hardship and distress occur in children's environments—it undercuts their growth and development and can have enduring, even life-long, effects.[13]

Second, immigrants are central to our nation's past and their experiences matter for America's future. Since our nation's founding, immigrants have moved to this country seeking a better life for themselves and their families. Children of immigrants represent a large and growing share of young children, and the overwhelming majority of them are U.S. citizens. Their experiences, development, and education are essential to all of us. Our future is tied to their health and wellbeing, as well as their success in school and later careers.

Our study was motivated by widespread reports that children and families are being harmed by the Trump Administration's immigration policy priorities, such as efforts to ramp up immigration enforcement and the removal of protections for groups that had previously been granted discretion, including parents of citizen-children and young immigrants who came to the United States as children. The administration has also threatened to restrict immigrant families' access to public assistance programs, including for their citizen-children. Our goal was to understand how our youngest children are experiencing—and are affected by—this changing environment.

# Study overview

Between May and November 2017, CLASP conducted semi-structured interviews with child care and early education teachers, home visitors, and staff and community-based social service providers in six states around the country—California, Georgia, Illinois, New Mexico, North Carolina, and Pennsylvania. (We have withheld the names of specific locations to protect participants' privacy.) Participants included more than 100 staff across 33 organizations, including private child care centers, Head Start programs, preschools, public schools, and home visiting programs. We also convened four focus groups in California, New Mexico, and Pennsylvania with a total of 45 immigrant parents of young children.

# Documenting the impact: key findings

## "Who will take care of me?"

### *Young children fear their parents will be taken away*

In an elementary school in North Carolina, a school counselor reported overhearing children planning for "when their parents go back to Mexico—not if, but when." **One little boy was writing down what he knew how to cook—peanut butter sandwiches and cheese sandwiches—in order to reassure his frightened five-year-old sister that they would be okay if their parents were deported.**

Young children's day-to-day lives were described as clouded by persistent fear of being separated from their parents or other loved ones. Children—as young as three years old—are articulating fears that their mothers won't be home when they return from preschool.

"[Children] hear and they understand," a teacher in Georgia told us. "They got so anxious. They were very concerned, very sad… What happens if they deport my mom? Who will take care of me?"

A Head Start teacher in Pennsylvania told us that a four-year-old girl in her class said that President Trump wanted to send her mom back to Mexico. **"Her mother is not even from Mexico,"** the teacher told us.

Young children can't understand the details of immigration policy and may not even know their parents' immigration status. Yet the behaviors, actions, and statements relayed to us suggest children are deeply aware of the administration's anti-immigrant sentiment and the possibility of losing a parent, and they fear for their parents' and their own safety. This pervasive fear is not limited to children in mixed-status families but extends to children whose parents have lawful immigration status—some even children of U.S. citizens.



> **How do you know they're afraid? By the way they express themselves: "He cannot take my family. Can you imagine if they take my friend's family away from them? What will they do?" They're not just angry; they're concerned. They're worried about other members of their class.**
>
> – Early childhood educator in New Mexico

Very young children typically lack the vocabulary or emotional maturity to articulate their feelings and often express their emotions through behavior. Early childhood educators described disturbing behavioral changes among young children—including increased aggression, hyperactivity, and separation anxiety; decreased engagement; and withdrawal from their environments. They could not always attribute a direct cause of the behaviors, but we noted consistent observations across early care and education programs and not limited to children with an undocumented parent. Educators with many years of experience described behavior they observed as distinct from children's behaviors in past years, suggesting the behaviors were related to the current environment.

An early childhood educator in California said that following the 2016 election, "The kids were crying. It was tough for the kids to say good-bye to the parents when they came to school [for the morning drop off]. It was awful." A teacher in North Carolina told of reading a story about houses to her pre-kindergarten class. When she got to a page with a picture of the White House, children burst into tears.

"It could be this year's class is just different…" a pre-kindergarten teacher in Georgia told us, "**but this year they [the children] are less lively and verbal as throughout the years I've been here. I don't know if it's because they are experiencing the stress of it. They are reluctant to talk.**"

Some providers recounted especially alarming behaviors, such as a five-year-old child whose anxiety was so severe that he was biting his fingertips to the point that they were bleeding. **"In 17 years I've never seen this before,"** his preschool director said. **"The stress is so high they're biting their fingers."**



"We've seen [behavior changes] first-hand," a home visiting director in New Mexico told us. "Kids who were toilet trained are all of a sudden having more accidents at night, having accidents at their preschool or day care when they weren't previously."



The director went on to describe several children who were backsliding on certain age-appropriate skills. **"They were engaged before, would sit down for a period of time, write or color with us, and we've now seen a regression where they're just kind of sad, anxious, not wanting to participate as much as they used to."**

A social worker in California described signs in clients' homes, saying: *No abra la puerta*—Do not open the door—hung at children's eye level. "They see that everyday going in and out [of their homes]," she told us. **"They know that if you open the door for someone, they can come in and take you or your parent."**

Early care and education providers generally described more pronounced behavioral changes among children who had been directly affected by immigration enforcement. A preschooler in Georgia refused to talk and ate quickly during meal times. Educators at his child care center told us, "We kind of figured something was going on." As it turned out, ICE agents had been to the child's home. "It turned out they [the family] were afraid someone was going to come back to the home, so they had to eat quickly."

A preschool director in California described a three-year-old child who became aggressive and began fighting with his classmates after his father was deported. She noticed he particularly targeted three children whose fathers drop them off and pick them up from school. "The ones whose moms pick them up, he's fine," she said. "But to the others he's like, 'oh you can't be my friend because you have a daddy.'"

**"Last [school] year we had an incident where a child drew a picture of a cop, his dad, and himself.** He gave it to the teacher and the teacher asked what it was. **And he was like, 'That's ICE who came and picked up my dad.'** He was having a hard time… He'd wake up in the middle of the night, and he would cry," recalled a child care provider in Georgia.

Children have reportedly developed new fears of police and law enforcement officers, which providers attributed to an inability to distinguish between immigration officers and local law enforcement.[14] A parent in Georgia told her child's preschool director that her four- and six-year-old children are now afraid of seeing police officers in the community. When they see a policeman, they tell their mother to hide so the officer won't take her. "The kids have taken a role of protecting the parents," the preschool director said. "…they don't completely understand why. The only thing that they know is that a policeman is a figure they can't trust."

The Trump Administration's immigration actions, unpredictability, and racist and xenophobic comments about immigrants have all contributed to heightened tension in immigrant communities, which is clearly absorbed by children.[15] Providers and parents also described increased racism in their communities, and some providers noted that very young children have even repeated racist comments to their peers. A few parents talked about their children suddenly not wanting to speak Spanish anymore because it meant "you were from another country."

The levels of anxiety and stress experienced by young children during these formative years can have serious and lasting effects on their physical and emotional development.[16] Persistent and substantial exposure to fear and anxiety—sometimes called "toxic stress"—can do immense damage to children's health. This level of stress can interfere with young children's physical brain development, altering how they learn and their ability to manage their emotions. It can also lead to physical and mental health problems that last into adulthood.[17]

Family separation represents one of the greatest risks to the health and wellbeing of children, especially in early childhood when children are physically, emotionally, and economically dependent on their parents. There may be no greater threat to children's emotional security than the fear of being separated from a parent. One study found that nearly 30 percent of children with one or more undocumented parent reported being afraid nearly all or most of the time.[18] Three-quarters of undocumented parents in the same study reported their children were experiencing symptoms of post-traumatic stress disorder, such as frequent crying, trouble sleeping, and increased anxiety.[19] Children whose parents have actually been deported and children who witness a parent's arrest may suffer even further from significant' anxiety and health problems.[20] The very real threat of family separation places children with undocumented parents at greater risk of developing mental and behavioral health problems compared to children whose parents have legal status.[21]

This anti-immigrant context also affects children's developing social identities. Children's earliest experiences shape their identities, which form the basis of their personalities and sense of self as they grow older. When children experience their identity group being denigrated, it can disparage their own self-worth and reduce their self-esteem. These early experiences matter for their emotional development, capacity to learn, and ultimately their academic and economic success.[22]

## "They didn't allow for him to say goodbye."
### *Witnessing a parent's arrest is traumatizing for young children.*

Immigration and Customs Enforcement (ICE) agents apprehended a father in New Mexico as he and his wife were walking their four-year-old daughter into child care one morning. "ICE came and served him papers, and in front of his children, put him in the vehicle," the family's home visitor told us. **"They didn't allow for him to say goodbye or to even give any attention to the child to let her know he would be okay."** The preschooler's seven-year-old brother witnessed the incident from the car. After the arrest, the four-year-old girl became unusually clingy with her mother while her older brother began have toileting accidents at school.

"[The mother's] big thing was why did they do that in front of [the children]? Why couldn't they… there were so many opportunities, at work for example. [ICE] had all his information," the home visitor said. **"It was just the lack of the humanity around this person, this father, being taken away in front of his children and his wife."**

Staff in a California early childhood program expressed concern for a four-year-old girl at the center whose father had been deported a few weeks before the school year started. "It really affected the child. She's four... She has older siblings: one in elementary school and one in junior high. They were all home when ICE busted in and took the dad. **She's been upset and really withdrawn… nervous, didn't want to talk."** Her teacher noted it was a dramatic change in behavior from the year before.

Given our relatively small sample, we were particularly concerned about the large number of providers and parents who shared stories of children witnessing first-hand their parent being apprehended by ICE agents—an experience that could be particularly traumatizing for young children.[23]



# "For a week, I didn't send my kids to school."

## *Young children's daily routines are interrupted*

"I asked one of my clients how she was doing," a social worker in California shared, "and she said, **'Oh, ICE was in the neighborhood, so I had to go the long way to school** through all these back alleys, and we were late. **And my kids were wondering why we had to hurry and I won't let them play outside.'"**



Young children's everyday lives have been dramatically altered, according to providers and parents we interviewed. Families are fearful of leaving their homes and coming into contact with immigration agents.[24] Some families go out only when necessary—to buy groceries or go to work. As a result, children are not attending early childhood programs and may be secluded in homes for days or weeks at a time. Early education programs reported drops in attendance, fewer applications, trouble filling available spaces, and lower parent participation in the classroom and events.[25]

"We had a decrease in enrollment when it first started," a preschool director in California said. "Some brought their kids back but some didn't." More recently, she had roughly 30 children who simply stopped attending. **"I can't get in touch with the moms, I call the job and they say she doesn't work there anymore… we hope they'll call back but none of them have,"** she said. **"I just lost them."**

"For a week I didn't send my kids to school because I couldn't drop them off," one parent in California told us. "I heard ICE was there." Another parent said, "**We don't feel safe even taking the kids to child care**. You are worried you will run into them [immigration] and they will take you. It's very stressful." In some cases, providers had specific examples of families in which a parent was deported, and the child stopped coming to the program. They often did not know where the child was.

Providers and parents both described families avoiding other places in the community as well. In California, a Head Start director told us that families stopped using the library. "**They pick up the kids and they go straight home,**" she said. A Head Start teacher in Pennsylvania said a child in her class complains that his parents don't take him to the park anymore because they are afraid of running into immigration agents.



> **Even going to places like the library or to buy groceries, one no longer feels safe just walking like before. You don't know when you're going to run into ICE. You don't even know who is who anymore because ICE no longer wears uniforms; they dress like everyone else.**
>
> – Mother in California

"It became really unsafe right around February or March [2017]. Families stopped going places….**It had a very bad impact on our single moms who are already isolated, already have a lot of little ones and need to be out in the community.** All of a sudden, they only wanted to go to the places they had to go to—the supermarket. Some were skipping doctor's appointments and well visits," a home visitor in New Mexico told us.

Providers described changes in how families navigated leaving their homes. For instance, they no longer go places together as a group, especially not with both parents. A home visitor in North Carolina noticed that when her program hosted outings in the community, whole families no longer attended. In North Carolina, a kindergarten teacher said she knows families who take turns going to the grocery store: one mom goes shopping while the other stays home with all the kids.

Young children grow and learn in the context of their environments. Participating in regular routines—going grocery shopping, taking walks, and riding bikes—are opportunities for children to practice emerging skills, such as following directions and managing their emotions and behaviors.[26] Use of community resources such as libraries, parks, and museums provide additional opportunities for play and enrichment that support children's healthy development.[27] Disrupting routines with trusted caregivers and reducing access to critical community resources— particularly during a time of heightened stress and uncertainty—may make children more vulnerable to the most harmful effects of anxiety.

For many children, attending an early education program is an important component of their daily routine. When children lose access to early education programs, they lose out on the educational opportunities that come from high-quality child care and early education—experiences that can be particularly important in bolstering the development of children facing hardship and adversity.[28] Children also lose nurturing, supportive relationships with caregivers who are fundamental to children's development.[29]

## "…they didn't apply for WIC because they heard that immigration would come to their door."

### Children are not getting nutrition assistance or medical care

**"We've seen a major reluctance to enroll or re-enroll in public benefits. Moms are afraid to sign back up for Medicaid, food stamps, and other services,"** a home visitor in North Carolina said.

"It's also because of the news they hear," said a provider in California. "One family disclosed that they didn't apply for WIC because they heard that immigration would come to their door."

In every site visited, providers and parents described families' reluctance to enroll in or maintain enrollment in the publicly funded health and nutrition services for which they are eligible. Providers most commonly mentioned parents refusing nutrition assistance, such as the Special Supplemental Food Program for Women, Infants, and Children (WIC) program and Supplemental Nutrition Assistance Program (SNAP). A home visiting director in New Mexico said families were afraid to visit social service agencies to sign up for these benefits, even when accompanied by a home visitor.



Parents' concerns about public programs were reportedly elevated immediately after the 2016 election and following a leaked policy memo in January 2017 that outlined the Trump Administration's plans to restrict immigrant families' access to health, nutrition, and educational services.[30] Parents' concerns were primarily related to how participation in health and nutrition programs could potentially have immigration-related consequences. Specifically, parents are worried that using these programs will affect their ability to obtain legal permanent residence or make them identifiable to immigration enforcement agents. Families also expressed fear that immigration agents would be able to locate them by obtaining their information through these programs.

"Right now we're the guardians of our grandsons, and one never knows how that might affect things," a parent in California shared. **"What if I apply for that benefit and they say I'm living off of that? Or maybe even they come looking for me? Or maybe they will say that's why they don't want us living here? Really that's why I haven't applied for anything."**

Most providers noted that immigrant families, including those who are lawfully present, have always been apprehensive about enrolling in public benefits, but they have noticed more acute

fears recently. In some cases, providers said they were able to calm families' fears and maintain their participation in these critical programs. However, some parents were declining to enroll, withdrawing their enrollment, or choosing not to reapply.



We also learned that families are delaying or forgoing medical care. Both parents and providers reported increased no-shows at health clinics and missed appointments. A provider in Georgia said that pregnant immigrant women are increasingly delaying prenatal care until late in their pregnancies or going without it altogether. Home visitors reported that families were refusing connections to other services, such as therapists and other medical professionals.

One reason families gave for forgoing services is fear of driving and encountering immigrant agents. A provider in Georgia told us about a child with autism who is no longer receiving therapeutic services because his father is too afraid to drive to the clinic. In Pennsylvania, parents talked about hesitating to take their children to the hospital for emergency care as it required a route where immigration agents often patrolled.

Families are also experiencing increased hostility and discrimination from staff in government offices. Parents in New Mexico and providers in California told of staff making discriminatory comments to families enrolling in nutrition assistance programs for their citizen-children. A social worker in California said that some of the parents she works with, all of whom have a young child with a disability, had experienced discrimination at the Supplemental Security Income (SSI) office. "One woman was told when she could speak English she could come back to apply for SSI," she said. "We've never had that happen before." SSI—like all federally funded programs—does not require applicants to speak English and, in fact, federal law requires that individuals with limited English proficiency have meaningful access to such programs.

Our interview findings are consistent with media reports that immigrant families are declining to obtain SNAP and WIC—even for their citizen children—and staying away from community hospitals and health centers.[31] In a 2017 survey of 90 local agencies that manage WIC, one-quarter reported to the National WIC Association that undocumented parents are refusing services.[32]

Not getting enough healthy food or forgoing doctors' visits can make children sick and lead to chronic health problems. Moreover, decades of research show the positive impact of public benefits—such as Medicaid, SNAP, and WIC—on children's long-term health and their economic security.[33] That is, when children get access to these programs, they are both healthier and their families have more money in their budgets to spend on other basic needs. For example, millions of children in households receiving SNAP would be living in poverty if weren't for the economic boost of SNAP assistance.[34]

# "People say it's better not to take the kids to school…"
### *Egregious ICE practices are harmful to children.*

A father in California who regularly walks his nine-year-old daughter to school was arrested minutes after dropping her off. The ICE agents waited for him to leave the school and apprehended him in front of several other children when he was a block away. His daughter's classmates immediately informed her of the arrest. Once she heard what happened, **"She got really bad in the school, she went crazy, wailing, holding her head,"** his wife told us. **"I had to talk to the director to help calm her down."**

In nearly all our interview sites, we heard disturbing accounts of ICE practices that undermine the best interest of children. In several sites, ICE reportedly parked outside schools and child care centers at drop-off or pick-up times and arrested parents on the way to drop children off or take them home.



**"ICE can't go *inside* the schools, but they can be outside,"** a parent in California said, demonstrating the confusion regarding the Department of Homeland Security's sensitive locations policy that restricts ICE and Customs and Border Patrol (CBP) from carrying out enforcement actions at certain locations—including schools and child care centers.[35] **"And if they are outside, it's the same thing as being inside, so people say it's better not to take the kids to school or not go there."**

We also heard of aggressive actions taken by ICE during home raids, which often happen very early in the morning when children are in the home and sleeping. In a California incident, seven **children—ranging from an infant to a high schooler—were woken up, taken outside, and interrogated without their parents present** by ICE regarding the whereabouts of their older brother, who had taken a U-turn out of a traffic stop the previous day. The parents were sent to the backyard while the children remained in the front yard. ICE agents threatened to investigate the entire family if they didn't give information about the brother's location, and so both the mother and one of the teenage boys provided the information. While they were outside, one of the children—a middle-school-aged boy with autism—reached into his pocket for his phone, and an agent drew a gun on him.

ICE then went to the restaurant where the brother worked and detained him. Despite the family's assumption that, by cooperating, no further action would be taken against them, ICE arrived at the father's work a few weeks later and detained and deported him, as well. The teenager who shared the information with ICE now feels responsible for losing both his brother and father.

It is common for immigration enforcement agents to encounter children during enforcement actions in or near homes or during traffic stops, all of which can be traumatic experiences for children. To minimize the harm to children, the U.S. Department of Homeland Security (DHS) has developed protocols, such as what to do if minors are present during certain enforcement actions and how to protect the parental rights of detained parents, among others. While many of these policies currently remain in place, our interviews suggest some of these protocols may not be followed consistently.

# "You know I have 11 people living in my house."
## *Young children's housing and economic stability are in turmoil*



"One of the smallest kids in the class told me, 'you know I have 11 people living in my house,'" a kindergarten teacher in North Carolina told us. **"They're congregating, saving as much as they can so that if something happens they can get out of here."**

A child care provider in California said she noticed families changing addresses every three months. "One parent said it's because rent is expensive, but I think it's just fear," she said. "I think it's a way for her to feel secure." She was receiving notifications of changes in employment, as parents moved to less formal and often lower-paying jobs to avoid the risk of a worksite raid or other enforcement actions.

We also heard about increased job loss among immigrant parents and more difficulty finding work. Parents in California reported that more employers were letting undocumented employees go "because they [did]n't want to have problems." In some cases, ICE presence prevented people from getting to work, resulting in unapproved absences that led to employees being fired.

Undocumented immigrants are particularly vulnerable to exploitation by employers and landlords. A social service provider in Georgia described clients experiencing wage theft and refusing to take sick days for fear of being fired. A mother in Pennsylvania said, **"They know we can't find other work, so there is nothing we can do."**

Similarly, a home visitor in California described how landlords were charging families higher rent and taking longer to respond to maintenance requests. One child's asthma was worsening because of black mold in the home, but the family's landlord wouldn't respond to the family's requests to address it. "[The mom] was sort of stuck because she didn't think she could find housing anywhere and she thinks that if she raises any concerns or asserts her rights as a tenant there will be [immigration] consequences," the home visitor said.

These unstable and exploitative conditions undermine families' economic security and negatively affect their living conditions.[36] Job and housing instability coupled with other worries described by parents results in high levels of parental stress that can harm children's cognitive development—and children with undocumented parents are more likely to face stressors such as moving frequently, living in overcrowded or inadequate housing, and struggling to pay utility bills.[37] Unsafe or unstable housing represents one of the greatest threats to children's health and development. Children who move frequently or live in crowded conditions are more likely to have poor health outcomes, including developmental delays or behavior problems, and worse academic and social outcomes—all of which contribute to lower adult educational attainment.[38]

Providers and parents reported particularly high levels of instability in families where a parent had been deported. For instance, a home visitor in Illinois told the story of her client whose husband was detained outside his home as he was leaving for work one morning. Terrified, the mother fled their home, taking only her children—an 18-year-old, 12-year-old, 5-year-old, and 1-month-old— and leaving behind baby supplies, medical cards, birth certificates, and clothing.



**We can see how it's affecting the mom. She's undocumented. The language barrier… she's been here for a couple years and she never worked because he was the only one working and providing for the family. She doesn't know how to look for a job, where she can leave her children…**

– Home visitor in Illinois

A parent's deportation can drastically undercut the economic security of families who are already struggling to make ends meet. Notably, men are far more likely to be deported—one analysis estimates that approximately 85 to 90 percent of deportees are men—and many are also the sole or primary breadwinner in their homes.[39] Deported fathers leave behind wives and children who often fall into poverty in their absence. Studies have found the sudden loss of income resulting from a parent's detention or deportation can reduce a family's income by half or more.[40] This leads families to not have enough food to eat, move abruptly and frequently, or live in crowded housing with family or friends.

# "I don't feel comfortable saying it's going to be okay."
## *Children's parents and caregivers are stressed and lack resources*

**"My young daughter tells me, why are those people coming for us? And she asks questions I don't know how to answer,"** a parent in New Mexico told us. "I'm not going to tell [my children] that we can be deported at any moment. They are from here. They don't know what that even means…They don't know what Mexico is. They are so little. How are we going to explain if her father goes to Mexico, we can't go there because [she] will suffer there?"

These are the tough questions that parents are grappling with. In all six states, we heard about the immense stress and uncertainty that parents of young children are experiencing. For example, an early education provider in Georgia said that for the first time, parents were requesting help with stress management and emotional support. A home visitor in California described increases in anxiety, depression, and concerns about intimate partner violence among the mothers in her program.

**"You feel like you don't know what's going to happen. I think that's the fear some of our families are feeling right now, not knowing what is coming.** That feeling of stability—emotional stability and security—is what most of our families have lost," said an early childhood educator in Illinois.

Consequently, providers—many of whom are immigrants themselves—are under increased pressure to support families in new ways. The providers we spoke with expressed great emotion at how challenging their already-demanding jobs had become. Some are experiencing the effects of the current environment personally due to their own immigrant or cultural backgrounds. But the incredible emotional stress of the work was prevalent across providers of every racial, ethnic, and immigrant background. Many were doing their best to connect parents to resources but felt ill-equipped to meet families' needs or even offer them emotional support.[41]

"I don't feel comfortable saying it's going to be okay because we don't know," one service provider said.

**"You can't help but think about the families you serve and have a great relationship with. It gives me stress to think about what would happen if something happened to them. What would happen to their children?"** said an early education provider in Illinois.

While being an undocumented immigrant in the United States has always been precarious, parents and providers indicated that the climate feels different. A family services coordinator in Illinois shared that his program has always served families with immigration cases. "What's changed now is that we never know if they're coming back after the check-in," he said, referring to the periodic check-ins with ICE required of those with pending immigration cases, including parents who have previously been granted permission to remain in this country. "The stress is different."



A woman in New Mexico broke down in tears while she described how hard her brother's detention was on their entire family. She took in her five nieces and nephews after he was detained by immigration authorities two months ago. **"They keep asking when he will come back, if they will get to see him again,"** she said. "The youngest one has panic attacks in school, so we have to go pick her up all the time." On top of trying to support her nieces and nephews, she is struggling to reassure her own children of their safety, manage her own mental health, and keep up with the mounting costs associated with immigration hearings.

Providers and parents noted that the president's decision in September 2017 to terminate the Deferred Action for Childhood Arrivals (DACA) program triggered a spike in fear and anxiety (see accompanying text box on DACA). "We got a spike in calls right after DACA was eliminated," the director of a home visiting program in New Mexico shared, noting that DACA recipients, who had felt safe, were suddenly experiencing very acute anxiety.

Parents and providers highlighted the lack of resources available in the community, most notably around legal assistance and help with legal fees, as well as more broadly accurate information about how immigration policies impact their families. Similarly, providers noted the dearth of mental health services for parents. Children who have health coverage can at least get some support, but there are few if any bilingual, culturally competent providers that will take clients without insurance. The shortage of legal and mental health resources was a problem echoed by providers in every state.

Young children depend on adults for their basic needs and emotional support. The adults that young children rely on the most—their parents and other caregivers—are experiencing significant stress themselves. While parents are doing their best to manage in unmanageable situations, for many the stress is overwhelming, especially as they are often unable to get the information and resources they need. Similarly, early care and education providers—already under-resourced and stretched thin—are left feeling helpless by their inability to fully meet families' rapidly changing needs.

The heightened fear that parents are experiencing is undoubtedly passed down to children, despite their best efforts to shield their children from concerns and worry.[42] Just as children's own stress can be physically damaging, experiencing parental stress can directly hamper children's cognitive, emotional, and physical development.[43] Children feel sad, anxious, or scared when they

sense those emotions in their parents and caregivers. High levels of stress when parents are preoccupied by concerns can also get in the way of effective parenting and leave parents unable to fully meet their children's needs. The impacts of parental stress on children's development extend to other caregivers as well. When early care and education providers are experiencing significant stressors, all the children in their care may lack for support and be at risk for unhealthy development.[44]



## " I don't know what my kids are going to do if they take me when my DACA expires."

### *Fates of children and their DACA parents are inextricably linked.*

**"When they gave us DACA, everything was going really well. Better than before,"** said a parent in New Mexico, who obtained DACA status three years ago and has two citizen children. "Better work—we bought a house, a truck. The American Dream."

On September 5, 2017, the Trump Administration announced the termination of the Deferred Action for Childhood Arrivals (DACA) program, a program introduced by the Obama Administration in 2012 that removed the possibility of deportation and made work authorization available to approximately 800,000 immigrant youth and young adults who came to the U.S. as children—many when they were younger than six years old. DACA is widely regarded as a successful program, providing pathways to higher education, better jobs, and higher income.[45] Now teens and young adults, DACA recipients are integral members of their schools, workplaces, and communities. Some have started families themselves: in one survey of DACA recipients, 25 percent were parents of U.S. citizen-children.[46]

Notably, DACA's benefits likely extend far beyond the recipients themselves. The doors opened for millions of immigrant youth and young adults may also improve opportunities for their young children. Children markedly benefit from having parents with higher levels of education and better-quality jobs.[47] Better-educated parents have more resources to support their children's development, which benefits children's health, academic achievement, educational attainment, and employment in the long run. When parents are facing less stress and are better able to make ends meet, they have more time and energy to devote to their children. One study found that mothers' eligibility for DACA was linked to better mental health outcomes for their children.[48]

The harm of rescinding the program will be expansive as well. As a result of the administration's action, DACA recipients will eventually lose their protected status, work permits, and other critical supports.[49] The majority of our interviews and two out of the four focus groups took place after the program was terminated. Parents we spoke with were frustrated, angered, and scared by this decision. Parents in New Mexico with DACA voiced concerns about how they would continue to make end meets and support their families once their work permits expire. They described trying to save as much as possible and planning for what may happen should they eventually be deported.

Parents with DACA status also expressed concern about what will happen to their children when their status expires. A mother in New Mexico told us, **"My husband doesn't have papers, he lost DACA. So every time I hear immigration is near here, I get scared.** He's been here since he was two years old. And I always tell him, what are we going to do if you get deported? He has family in Mexico but nothing there. **He says if he gets deported we need to go with him. And it's scary because all my life we have been here. So we don't know what to do."**

Some teachers and staff we interviewed were DACA recipients.[50] An assistant teacher in New Mexico, whose DACA status allowed her to work in a child care center and study early childhood education at a local college, was facing the expiration of her status in 2019. **"If there's no work, I can't go to school because I'm paying for it,"** she said. **"It would affect me in every area."**

# Consequences of fear, anxiety, and hardship on children

Young children in immigrant families have had their worlds turned upside down. Now, opening the front door could take a parent away forever, police officers are seen as threats rather than protectors, and school is no longer a guaranteed safe place. Increased immigration enforcement and anti-immigrant rhetoric, racism, discrimination, and xenophobia are all negatively influencing an entire generation of children.

Our interviews and focus groups revealed a distressing picture of young children's day-to-day experiences around the country. Young children in immigrant families—including children whose parents have lawful immigration status—are expressing their fearfulness in words and troubling behaviors. They are increasingly isolated from their communities. Some are missing out on child care and early education programs. Some are forgoing medical care and are not getting health and nutrition assistance they are legally entitled to as citizens. Their home lives are increasingly unstable due to overcrowded housing, frequent moving, or decreased economic security. Their parents and caregivers—their primary support system—are experiencing high levels of anxiety. And they are internalizing harmful ideas about their own self-worth.



Importantly, children do not experience these events—or their consequences—in isolation. Rather, child development research is clear that the harm children face is cumulative. Experiencing multiple types of hardships (for example, lower household income, housing instability, and not having enough to eat) does far greater damage to young children's long-term development than simply adding up the effects of each individual risk factor.[51] The result: the development of millions of young children is likely being harmed—with many denied their rights as citizens of the United States simply because their parents are not.

Children of immigrants matters to America's future. Our nation's collective economic success is tied to the individual success of all our children. Therefore, our immigration policies must put the needs of children front and center. Our public policies must be designed to ensure that all children are able to achieve their full potential—through access to high-quality early educational experiences, health care and nutrition assistance, and other supports that promote healthy development from birth through adulthood. Without changing course, we as a nation will also pay a heavy price, as our future prosperity will be largely determined by the extent to which our increasingly diverse U.S. child population is able to succeed.

# A better path forward: recommendations



**We need laws to help people—not break people.**

– Father in New Mexico

**Congress and the Administration should ensure that the best interest of children, including U.S. citizen children living in mixed-status families, are held paramount in immigration policy decisions.**

**Congress should pass legislation that provides a pathway to citizenship for undocumented immigrants, including parents and Dreamers.** The majority of the 11 million undocumented immigrants living in the United States are connected to families and communities who rely on them, and for Dreamers—undocumented youth who came to this country as children—the United States is often the only home they have ever known. Legislation with a path to citizenship will remove the instability caused by lack of status and fear of deportation and enable parents to better provide for their children's basic needs. For recipients of the DACA program and other young Dreamers, passage of narrow legislation like the Dream Act of 2017 will provide a permanent solution and allow them to better pursue their educational and career goals, which is critical for their own wellbeing and that of their families.[52]

**Congress should ensure immigration judges are able to weigh the hardship to children in decisions regarding a parent's ability to enter or remain in the United States.** Current immigration law explicitly overlooks hardship to children in critical immigration decisions regarding their parents. Congress should correct this flawed principle and reinstate judicial discretion that enables immigration judges to consider the potential hardship of a parent's deportation or ability to enter the country on U.S. citizen children, such as the risk of developmental harm and economic hardship on children left behind.

**The U.S. Department of Homeland Security (DHS) should use discretion when making decisions to arrest, detain, and deport parents of minor children in the United States.** Parents of minor children in the United States should not be priorities for enforcement. Parents who have been placed into deportation proceedings should generally be able to await deportation at home with their children as they to continue to care and provide for them and make arrangements for the future. Parents who must be detained should be placed into one of the agency's alternative-to-detention programs.

**Congress and DHS should expand and consistently enforce the sensitive locations policy to restrict enforcement actions from occurring at or near places that are critical to children's health and wellbeing.** The current sensitive locations policy is vague and may be inconsistently followed. For it to be effective in making parents feel safe taking their children to child care, school, hospitals, and other critical places, it must be uniformly enforced across the country and violations must be investigated and addressed. The policy should also be expanded to restrict immigration agents from carrying out enforcement actions *near* sensitive locations and be extended to other locations, such as home-based child care programs. Congress should pass the Protecting Sensitive Locations Act, which would strengthen and codify the current policy.[53]

**DHS should strengthen protocols to minimize potential harm to children when they are present during immigration enforcement actions and train all staff on these protocols.** To mitigate trauma for children and prevent them from being separated from family members or becoming unnecessarily involved in the child welfare system, it is important to establish protocols about the time of apprehension or enforcement action. While some protocols have been developed in recent years, they should be strengthened and consistently enforced. Immigration enforcement actions should generally be avoided when children are present. In cases where children are present, parents should be given the opportunity to designate a caregiver and to make phone calls or otherwise reach a designated caregiver. Children should neither be interrogated without the presence or consent of a parent nor be asked to translate for others, and parents or other family members should not be interrogated in the presence of children. All agents who may come into contact with a child should receive training in how to appropriately handle such situations to minimize trauma to children, and DHS should investigate and address reported violations.

**DHS should ensure that detained and deported parents are able to make decisions about their children's care.** In 2013, ICE implemented a policy known as the "parental interest directive" aimed at upholding the rights of detained parents with minor children, including those involved in the child welfare system.[54] ICE should preserve and implement this policy in its entirety, including the use of discretion in certain cases involving parents, legal guardians, and primary caregivers and the facilitation of a parents' ability to make long-term decisions regarding their children's care, regardless of whether they wish to leave their children with a designated caregiver or take their children with them. Parents whose children are involved in the child welfare system should continue to be able to interact with caseworkers and participate in case plans and family court proceedings necessary to reunify with their children.

# Federal, state, and local policymakers should ensure that immigrant families have access to the programs and services they need to promote their children's healthy development.

**Congress and federal agencies should reverse course on the Trump Administration's efforts to discourage immigrant families and their citizen children from accessing the health, nutrition, and early childhood education services.** The Trump Administration is currently developing regulations to rewrite the current definition of what is known as a "public charge" to significantly broaden the range of programs that government officials can consider in the public charge determination, possibly to include programs such as WIC, SNAP, Medicaid, the Children's Health Insurance Program (CHIP) and Head Start (See Appendix for a description of "public charge.") The proposed rule also may expand scrutiny to include use of public benefits by the applicant's family, including U.S. citizen children. If finalized, this proposal could force immigrant families to forgo needed health care, nutrition, and early education services to obtain secure immigration status for themselves or their families. The administration should reverse course on this harmful proposal that threatens the long-term health and wellbeing of millions of children, including citizen children. If federal agencies move forward, Congress should use its authority to undo this regulatory change through legislation.

**State and local policymakers should safeguard the wellbeing of young children in immigrant families through state and local legislation, laws, and policies.** Policymakers should oppose laws that promote more immigration enforcement—such as collaborative agreements between immigration enforcement agencies and local polices—that limit immigrant families' mobility and ability to seek out essential services on behalf of their children. Likewise, policymakers should oppose laws that create barriers to health, nutrition, or educational services for children in immigrant families. Conversely, policymakers should support policies that encourage the health, safety and wellbeing of immigrant families and protect children's interests, such as expanded access to health care coverage for immigrant children.

**State and local policymakers should increase funding for legal services in communities and build links to pro bono services.** Resources are needed in communities to provide free legal advice and representation to families on immigration, child custody, and family law to help families navigate the legal system.

**State agencies administering public benefits should ensure immigrant families and their children are not deterred from enrolling in critical programs.** Agencies should issue guidance on immigrant eligibility rules, including recommendations for ensuring that enrollment practices do not deter immigrants from accessing benefits on behalf of themselves or their children.[55] Agencies should analyze their data to identify any declines in public benefit use and conduct targeted outreach to reach underserved communities and limited-English proficient communities. By partnering with trusted organizations such as early childhood programs and immigrant-serving organizations and paying attention to language access, agencies can improve their outreach to immigrant families.

**State agencies administering public benefits should issue guidance to programs on protecting data and personal confidentiality.** Agencies can work with local agencies and social service providers to ensure compliance with privacy rules and to provide guidance on interactions or requests from immigration enforcement officials.[56] Agencies can also issue public messages explaining individuals' privacy protections as they relate to immigration concerns.

## State policymakers should ensure that early childhood programs have the resources they need to better serve children in immigrant families.

**State policymakers should promote and fund coordination and collaboration between child care and early education and immigrant-serving organizations.** This will improve access by families and the workforce to key information that affects immigrant families. Collaborations can ensure that early education programs have experts who can provide credible information on immigration policy, immigrant rights, and immigrant eligibility for public benefits. Added financial resources can increase the capacity of immigrant-serving organizations to partner with early education programs. This support could be in the form of grants to community-based organizations to increase capacity, funded partnerships between immigrant-serving and early childhood organizations, or resources for creating joint immigrant and early childhood coalitions. States and localities with immigrant and refugee offices, or other coordinating bodies, should both include early care and education organizations in community planning and inform early care and education organizations about state and local efforts related to immigrant families.

**Provide resources to meet the unprecedented needs of the early childhood workforce for training, education, and support.** State agencies should fund the development and implementation of trainings and supports, as well as increased staff compensation and benefits to ensure that early childhood providers can get the supports they need to do their job. States can fund entities such as universities and community-based organizations to develop resources and materials to give the early childhood workforce the tools they need to help children cope with fear, to support parents in discussing deportation and other issues with children, and to work with families in crisis due to immigration actions.

**Ensure that programs have access to best practices and training on trauma-informed care and funding to implement those practices.** According to the National Child Traumatic Stress Network, key components of a trauma-informed program include routinely screening for trauma exposure and symptoms; use of evidence-based, culturally responsive assessment and treatment; and a focus on continuity of care and collaboration across systems. Trauma-informed programs also intentionally address parent trauma, emphasize staff wellness, and make resources available to children, families and providers.[57]

# The philanthropic community should protect, defend, and elevate the well-being of children in immigrant families.

**Philanthropies should make investments in immediate and urgent support to children in immigrant families and the programs that serve them.** A comprehensive philanthropic agenda would include:

- Policy advocacy at all levels of government to protect and defend the wellbeing of young children;
- Affordable legal services and representation for immigrant families;
- Strong collaborations across the immigrant and early childhood sectors as well as other sectors serving children such as child welfare, education, etc.;
- Creation and dissemination of training and resources for early care and education and other program staff;
- Outreach and information dissemination to inform immigrant families about policies that affect them;
- A comprehensive research agenda that includes documentation of the impacts of immigration policies on young children and their caregivers, as well as the developmental consequences of those impacts; and
- Raising awareness among the public and policymakers about the importance of young children of immigrants to our country's future.

Funders should speak out about the wellbeing of young children of immigrants, their needs and the developmental consequences of the current crisis. National, state, and local foundations should use their own credibility and prominence to elevate the importance of the wellbeing of young children and the urgency of a supportive policy, research, and advocacy agenda. Funders can issue broad statements aimed at influencing key constituencies or speak out on specific policy issues.



# Acknowledgments

This paper was made possible by the generous support of the Alliance for Early Success, Annie E. Casey Foundation, Ford Foundation, George Gund Foundation, Heising-Simons Foundation, Irving Harris Foundation, David and Lucile Packard Foundation, and Charles and Lynn Schusterman Family Foundation.

Many individuals contributed to this study. Foremost, the authors are indebted to the parents, teachers, home visitors, social workers, directors, family support workers and social service providers who so willingly gave of their time to talk with us and trusted us to share their stories. We are honored and grateful. We also thank the individuals in our site visit states and communities who assisted us in arranging visits. Without their assistance, this study would not have been possible.

The authors are grateful to CLASP colleagues—Olivia Golden, Madison Hardee, and Tom Salyers—for their insights and editorial review. We also appreciate the thoughtful input of our reviewers: Emily Butera, Women's Refugee Commission; Ajay Chaudry, New York University; and Patrick O'Shea, National Immigration Law Center. Thank you to Randy Capps and Jie Zong of Migration Policy Institute for data analysis related to young children of immigrants. Thank you also to CLASP colleagues Andy Beres and Sivan Sherriffe for their graphic and design support and Shiva Sethi for research assistance.

While the authors are grateful for all assistance and funding related to this report, the authors alone are responsible for its content.

# Appendix: Overview of major immigration policy changes affecting young children under the Trump Administration

## Increased immigration enforcement

Separation from a parent due to immigration enforcement is not a new consequence for children in mixed-status families. Over the past decade, DHS reported high rates of deportations involving parents of U.S. citizen children, which gradually decreased over time, from as high as 72,410 in 2013 to 28,860 in 2016.[58] However, between 2007 and 2013, ICE put a series of policies in place that were intended to mitigate the collateral effects of enforcement on children.[59] Central to these policies was an emphasis on the use of discretion when making decisions about the arrest and detention of parents, legal guardians, and primary caregivers. For example, immigration enforcement agents were instructed to consider factors such as family ties—including whether individuals are parents or guardians of U.S. citizen or lawful permanent resident (LPR) children—when determining whether they were an enforcement priority and whether to place them in deportation proceedings as well as whether and where to detain them.[60] In 2013, ICE issued a directive known as the "parental interest directive" that specifically addressed the need of parents facing removal to make arrangements for their children and to allow detained parents to participate in child welfare proceedings.[61] Protective policies such as these helped reduce the likelihood that parents and guardians of citizen and LPR children would be arrested, detained, and removed, which helped reduce long-term harmful effects of enforcement on children.

The inception of the Trump Administration in 2017 was immediately marked by a drastic new focus on heightened immigration enforcement and decreased protections for vulnerable populations. Shortly after entering office, President Trump introduced two executive orders that significantly increased the intensity and scope of immigration enforcement in the United States. For example, the executive order entitled "Enhancing Public Safety in the Interior of the United States" calls for triple the number of enforcement agents, encourages increased collaboration between ICE and local police, and rescinds the enforcement priorities established under the Obama Administration—making every undocumented immigrant a priority for deportation, including parents of U.S. citizen children. The orders also limit the use of prosecutorial discretion and roll back protective policies, including key aspects of the parental interest directive. Recent reports from DHS for fiscal year (FY) 2017 reveal that ICE agents arrested 25 percent more people in the interior of the country who were suspected of being in violation of immigration laws than in FY 2016 and removed 30 percent more in FY 2017 compared to FY 2016. Arrests in the community—notably among immigrants without criminal violations—were particularly heightened, with the number of arrested immigrants without a criminal record increasing 146 percent between FY 2016 and FY 2017.[62]

While protective policies such as the sensitive locations memo—which restricts ICE and CBP from carrying out enforcement actions in certain locations—and certain aspects of the parental interest directive remain in place as of the date of publication, our findings raise questions about oversight and accountability. It is unclear whether the Trump Administration will continue to

uphold and consistently implement its own policies designed to mitigate the effects of enforcement on child wellbeing and family unity. In addition, the speed with which many deportations are being carried out and the focus on removing individuals who have previously been permitted to remain in the United States contingent on regular check-in with ICE has put children in mixed-status families at increased risk of separation from a parent.

## Undercutting access to vital programs

Through several public statements, proposed immigration principles, ramped up enforcement actions, and leaked policy proposals, the Trump Administration has made clear its intent to further restrict access to basic health and nutrition supports for low-income immigrant families and their citizen children. It is important to note that undocumented immigrants are already barred from most federal public benefits, and lawfully present immigrants already are subject to a five-year waiting period for federal programs like SNAP, TANF, CHIP, Medicaid, and SSI. Furthermore, low-income children with foreign-born parents are already less likely to receive SNAP or Medicaid than children with U.S.-born parents.[63] In fact, children in immigrant families are less likely to have health insurance at all—8.7 percent of children with foreign-born parents are uninsured, compared to 4.4 percent of children with native-born parents.[64]

One of the most urgent threats is the Trump Administration's intent to redefine what is known as the "public charge" statute. "Public Charge" is a term used by U.S. immigration officials to refer to a person who is considered primarily dependent on the government for subsistence. Certain immigrants can be denied entry to the United States or a "green card" (lawful permanent residence) if, based on all their circumstances, they are deemed likely to become a "public charge" in the future. In very limited circumstances, the law also makes individuals deportable for becoming a public charge. Under longstanding practice, only the use of cash assistance for income maintenance (such as TANF and SSI) or government-funded long-term care have been considered in the public charge determination. Immigrants not subject to the public charge rules include refugees, asylees, victims of domestic violence and other crimes, as well as green card holders applying for citizenship.

Under a draft executive order leaked in January 2017, the Trump Administration threatened to rewrite the rules regarding the "public charge" statute to drastically broaden the scope of programs considered in the public charge determination as well as several other provisions that would restrict immigrants from accessing critical benefits and income supports. While the draft executive order was never released, even the rumor of it created a chilling effect by leading some immigrants to choose not to enroll themselves or their citizen children in critical programs, despite being eligible.

On February 8, 2018, media outlets published a leaked draft public charge "notice of proposed rulemaking" indicating the Trump Administration's intent to change the regulations used to implement the public charge provision of federal immigration law.[65] The leaked draft proposal would broadly expand the types of benefits to be considered under the public charge determination, explicitly including Medicaid, CHIP, SNAP, WIC, Head Start, and many other human services programs. The proposed rule also indicates the administration's intent to expand scrutiny to include use of public benefits by the applicant's family, including U.S. citizen children. If finalized, this proposal could force immigrant families to forgo needed health

care or go hungry in order to obtain secure immigration status for themselves or their families.

As of publication of this paper, this proposal is still in development and has not been published. CLASP and the National Immigration Law Center (NILC) lead the "Protecting Immigrant Families, Advancing Our Future" campaign, a broad coalition of advocates for immigrants, children, education, health, anti-hunger and anti-poverty groups and faith leaders. The Protecting Immigrant Families campaign is developing resources and will coordinate efforts to fight back against this dangerous proposal. For more information on the campaign, please contact Madison Hardee (**mhardee@clasp.org**).

# Removing protections for certain populations

Another aspect of the Trump Administration's immigration policy has been to expel immigrants with long, established roots in the United States through the termination or cancellation of protective status for immigrants granted relief through the Deferred Action for Childhood Arrivals (DACA) program and through Temporary Protective Status (TPS).

In 2012, the Obama Administration introduced the DACA program, which provided an administrative solution to many of the barriers facing undocumented youth. DACA provided temporary work authorization and relief from deportation to nearly 800,000 qualifying Dreamers, allowing many to pursue postsecondary education and work legally.[66] Despite DACA's success, the Trump Administration announced its termination on September 5, 2017. The decision, which came after months of uncertainty, has put the lives of millions of immigrant youth and young adults and their families in jeopardy. In one survey, more than 25 percent of DACA respondents were parents of U.S. citizen children.[67] The program officially expires on March 5, 2018, and thousands of DACA recipients have already lost their protections and with it their jobs and ability to provide for their families.[68] At the time of writing, Congress had still failed to reach agreement on a legislative fix for DACA beneficiaries and other Dreamers as a result of the Trump Administration's refusal to accept multiple bipartisan proposals, including several that included the robust border enforcement measures requested by President Trump. As a result, DACA beneficiaries and their families remain in a state of limbo.

TPS is a temporary, renewable immigration status authorized through the Immigration Act of 1990. It provides work authorization and protection from deportation for individuals whose countries have experienced environmental disasters or epidemics, persistent armed conflicts, or other extraordinary conditions that prevent them from safely returning to their country of origin.[69] Decisions to extend TPS for immigrants from affected countries must be made periodically based on a review of existing circumstances in the designated country. Over the past year, the Trump Administration has announced the cancellation of the TPS designation for approximately 195,000 Salvadorans, 46,000 Haitians, 2,550 Nicaraguans, and over 1,000 Sudanese. These TPS holders have been given a deadline for when they must uproot themselves from the families and communities where they have resided for decades and potentially return to countries where conditions remain tenuous and they may have little ties. TPS holders are parents or guardians of U.S. citizen children, such as Salvadoran TPS holders who are estimated to have 192,000 U.S. citizen children.[70] A decision regarding the designation of TPS for approximately 57,000 Hondurans is expected this July.

# Endnotes

[1] National Scientific Council on the Developing Child, *The Science of Early Childhood Development: Closing the Gap Between What We Know and What We Do,* 2007, **http://developingchild.harvard.edu/wp-content/uploads/2015/05/Science_Early_Childhood_Development.pdf**; Committee on Integrating the Science of Early Childhood Development, From Neurons to Neighborhoods: The Science of Early Childhood Development, Jack P. Shonkoff and Deborah A. Phillips, eds., National Research Council and Institute of Medicine, 2000.

[2] Hannah Matthews, Rebecca Ullrich, and Wendy Cervantes, *Immigration Policy's Harmful Impacts on Early Care and Education*, CLASP, 2018, **https://www.clasp.org/eceimmigration**.

[3] Jorge Luis Garcia, James J. Heckman, Duncan Ermini Leaf et al, *The Life-Cycle Benefits of an Influential Early Childhood Program*, NBER Working Paper Series, 2016, **http://www.nber.org/papers/w22993.pdf**.

[4] American Academy of Pediatrics, Council on Community Pediatrics, Committee on Nutrition, "Promoting Food Security for All Children," *Pediatrics* 136 (2015); Michel H. Boudreaux, Ezra Golberstein, and Donna D. McAlpine, "The Long-Term Impacts of Medicaid Exposure in Early Childhood: Evidence from the Program's Origin," *Journal of Health Economics* 45 (2016); Dolores de la Mata, *The Effect of Medicaid on Children's Health: A Regression Discontinuity Approach,* 2011, **https://www.york.ac.uk/media/economics/documents/herc/wp/11_16.pdf**.

[5] Sharon H. Bzostek and Audry N. Beck, "Familial Instability and Young Children's Physical Health," *Social Science and Medicine* 73 (2011); Heather Sandstrom and Sandra Huerta, *The Negative Effects of Instability on Child Development: A Research Synthesis,* Urban Institute, 2013, **https://www.urban.org/sites/default/files/publication/32706/412899-The-Negative-Effects-of-Instability-on-Child-Development-A-Research-Synthesis.PDF**.

[6] Lorraine M. McKelvey, Hiram E. Fitzgerald, Rachel F. Schiffman et al, "Family Stress and Parent-Infant Interaction: The Mediating Role of Coping," *Infant Mental Health Journal* 23 (2002); Antoinette Y. Rodgers, "Multiple Sources of Stress and Parenting Behavior," *Children and Youth Services Review* 20 (1998); Monica Faulkner, Paula Gerstenblatt, Ahyoung Lee et al., "Childcare Providers: Work Stress and Personal Well-being," *Journal of Early Childhood Research* (2014).

[7] National Scientific Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Development: Working Paper No. 9*, 2010, **http://www.developingchild.net/**.

[8] Maya Rossin-Slater, "Promoting Health in Early Childhood," *The Future of Children* 25 (2015).

[9] Karen Hughes, Mark A. Bellis, Katherine A. Hardcastle, et al., "The Effect of Multiple Adverse Childhood Experiences on Health: A Systematic Review and Meta-Analysis," *The Lancet Public Health* 2 (2017); Elizabeth A. Schilling, Robert H. Aseltine, and Susan Gore, "The Impact of Cumulative Childhood Adversity on Young Adult Mental Health: Measures, Models, and Interpretations," *Social Science & Medicine* 66 (2008); Natalie Slopen, Karestan C. Koenen, Laura D. Kubzansky, "Cumulative Adversity in Childhood and Emergent Risk Factors for Long-Term Health," *The Journal of Pediatrics* 164 (2014).

[10] Migration Policy Institute tabulation of 2014 American Community Survey (ACS) and 2008 Survey of Income and Program Participation (SIPP) by Bachmeier and Van Hook.

[11] Ibid.

[12] Randy Capps, Michael Fix, Jie Zong, *A Profile of U.S. Children with Unauthorized Immigrant Parents,* Migration Policy Institute, 2016, **https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents.**

[13] National Scientific Council on the Developing Child, *Closing the Gap*; Committee on Integrating the Science of Early Childhood Development, From Neurons to Neighborhoods.

[14] These patterns of behavior are consistent with prior research showing that children with undocumented parents tend to conflate police officers with immigration officials. Joanna Dreby, *How Today's Immigration Enforcement Policies Impact Children, Families, and Communities,* Center for American Progress, 2012, **https://www.americanprogress.org/wp-content/uploads/2012/08/DrebyImmigrationFamiliesFINAL.pdf.**

[15] For details on the Trump Administration's immigration policies, see Appendix.

[16] Committee on Integrating the Science of Early Childhood Development, From Neurons to Neighborhoods.

[17] National Scientific Council on the Developing Child, *Persistent Fear and Anxiety;* Jack P. Shonkoff, Andrew S. Garner, et al. "The Lifelong Effects of Early Childhood Adversity and Toxic Stress," Pediatrics *129* (2012).

[18] Sara Satinsky, Alice Hu, et al. *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families,* Human Impact Partners, 2013, **https://www.familyunityfamilyhealth.org/uploads/images/FamilyUnityFamilyHealth.pdf**.

[19] Satinsky et al., *Family Unity, Family Health.*

[20] Ajay Chaudry, Randy Capps, et al., *Facing Our Future: Children in the Aftermath of Immigration Enforcement,* Urban Institute, 2010, **https://www.urban.org/sites/default/files/publication/28331/412020-Facing-Our-Future.PDF**.

[21] Randy Capps, Rosa Maria Castaneda, Ajay Chaudry, et al., *Paying the Price: The Impact of Immigration Raids on America's Children,* Urban Institute, 2007, **https://www.urban.org/sites/default/files/publication/46811/411566-Paying-the-Price-The-Impact-of-Immigration-Raids-on-America-s-Children.PDF**; Randy Capps, Heather Koball, Andrea Campetella, et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature,* Migration Policy Institute, 2015, **https://www.migrationpolicy.org/research/implications-immigration-enforcement-activities-well-being-children-immigrant-families**.

[22] Jennifer Keys Adair, *The Impact of Discrimination on the Early Schooling Experiences of Children From Immigrant Families,* Migration Policy Institute, 2015, **https://www.migrationpolicy.org/research/impact-discrimination-early-schooling-experiences-children-immigrant-families.**

[23] Capps et al., *Paying the Price*; Capps et al., *Implications of Immigration Enforcement Activities.*

[24] Enforcement activity appeared to more frequent in areas where local police cooperated with federal immigration agents as well as in areas close to the U.S. southern border. In several states, providers and parents noted that families have limited how often or how far they drive for fear of being stopped by police or immigration enforcement agents. Many of the communities we visited had limited public transportation options, making it especially difficult to get around.

[25] Matthews et. al, *Immigration Policy's Harmful Impacts on Early Care and Education*.

26 Carl J. Dunst, Deborah Hamby, Carol M. Trivette, et al., "Everyday Family and Community Life and Children's Naturally Occurring Learning Opportunities," *Journal of Early Intervention* 23 (2000); Larissa K. Ferretti and Kristen L. Bub, "The Influence of Family Routines on the Resilience of Low-Income Preschoolers," *Journal of Applied Developmental Psychology* 35 (2014).

27 See for example, Institute of Museum and Library Services, *Growing Young Minds: How Museums and Libraries Create Lifelong Learners,* 2013, **https://www.imls.gov/assets/1/AssetManager/GrowingYoungMinds.pdf**; M. Elena Lopez, Margaret Caspe, and Lorette McWilliams, *Public Libraries: A Vital Space for Family Engagement,* Harvard Family Research Project, 2016, **http://www.ala.org/pla/sites/ala.org.pla/files/content/initiatives/familyengagement/Public-Libraries-A-Vital-Space-for-Family-Engagement_HFRP-PLA_August-2-2016.pdf**; Hayley Christian, Stephen R. Zubrick, Sarah Foster, et al., "The Influence of the Neighborhood Physical Environment on Early Child Health and Development: A Review and Call for Research," *Health & Place* 33 (2015).

28 Garcia et al, *Benefits of an Influential Early Childhood Program;* Hirokazu Yoshikawa, Christina Weiland, Jeanne Brooks-Gunn, et al., *Investing in Our Future: The Evidence Base on Preschool Education,* Society for Research in Child Development and Foundation for Child Development, 2013, **http://www.srcd.org/sites/default/files/documents/washington/mb_2013_10_16_investing_in_children.pdf**.

29 Committee on Integrating the Science of Early Childhood Development, From Neurons to Neighborhoods.

30 In January 2017, a draft executive order from the Trump Administration was leaked, revealing the administration's intent to rewrite longstanding rules regarding immigrants' ability to access a green card, enter the country, or even be deportable based on their use of certain public benefits, including nutrition assistance and health care. In February 2018, after the conclusion of our site visits, a leaked draft notice of proposed rulemaking was published indicting the administration's intent to pursue this policy change through a rulemaking process. As of publication of this paper, notice of this regulatory change is yet to be released or promulgated.

31 See for example Caitlin Dewey, "Immigrants Are Going Hungry So Trump Won't Deport Them," *The Washington Post,* March 16, 2017, **https://www.washingtonpost.com/news/wonk/wp/2017/03/16/immigrants-are-now-canceling-their-food-stamps-for-fear-that-trump-will-deport-them/**; Greg Kaufman, "Why Immigrants in California are Canceling Their Food Stamps," *The Nation,* March 17, 2017, **https://www.thenation.com/article/why-immigrants-in-california-are-canceling-their-food-stamps/**; Annie Lowrey, "Trump's Anti-Immigrant Policies are Scaring Eligible Families Away from the Safety Net," *The Atlantic*, March 24, 2017, **https://www.theatlantic.com/business/archive/2017/03/trump-safety-net-latino-families/520779/**; Ileana Najarro, Jenny Deam, "Fearing Deportation, Undocumented Immigrants in Houston Are Avoiding Hospitals and Clinics," *The Houston Chronicle,* December 27, 2017, **http://www.houstonchronicle.com/news/houston-texas/houston/article/Fearing-deportation-undocumented-immigrants-are-12450772.php**.

32 Molly Redden, "Undocumented Immigrants Avoid Vital Nutrition Services for Fear of Deportation," *The Guardian,* May 9, 2017, **https://www.theguardian.com/us-news/2017/may/09/undocumented-immigrants-wic-nutrition-services-deportation**.

[33] Rossin-Slater, "Promoting Health in Early Childhood;" Hilary Hoynes, Diane Whitemore Schazenbach, and Douglas Almond, "Long-Run Impacts of Childhood Access to the Safety Net," *American Economic Review* 106 (2016); David Murphey, *Health Insurance Coverage Improves Child Well-Being,* Urban Institute, 2017, **https://www.childtrends.org/publications/health-insurance-coverage-improves-child-well**.

[34] Laura Wheaton and Victoria Tran, *The Anti-Poverty Effects of SNAP,* Urban Institute, 2018, **https://www.urban.org/research/publication/antipoverty-effects-supplemental-nutrition-assistance-program**.

[35] Currently, both ICE and Customs and Border Patrol (CBP) have policies restricting enforcement actions at or focused on places deemed sensitive locations, including education settings, hospitals, and places of worship. In 2016, DHS issued additional clarification on these policies to specify that places like early education and child care centers, bus stops, health clinics and other health care settings, and public demonstrations also fall under the definition of a sensitive location. While DHS has claimed that the policy still stands and issued new guidelines in 2017 to clarify the policy related to courthouses, our study and other documented incidents suggest that the policy may not be enforced consistently around the country. It is also unclear whether reported violations are being investigated.

[36] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children,* 2011.

[37] Yoshikawa, *Immigrants Raising Citizens*.

[38] Sandstrom and Huerta, *Negative Effects of Instability;* Diana Becker Cutts, Alan F. Meyers, Maureen M. Black, et al., "US Housing Insecurity and the Health of Very Young Children," *American Journal of Public Health* (2011); Kathleen M. Ziol-Guest, Claire C. McKenna, "Early Childhood Housing Instability and School Readiness," *Child Development* 85 (2014); Nabihah Maqbool, Janet Viverios, Minday Ault, *The Impacts of Affordable Housing on Health*, Center for Housing Policy, 2015, **https://www.rupco.org/wp-content/uploads/pdfs/The-Impacts-of-Affordable-Housing-on-Health-CenterforHousingPolicy-Maqbool.etal.pdf**.

[39] Tanya Goloash-Boza, Pierrette Hondagneu-Sotelo, "Latino Immigrant Men and the Deportation Crisis: A Gendered Racial Removal Program," *Latino Studies* 11 (2013); Satinsky et al., *Family Unity, Family Health*.

[40] Randy Capps et al., *Deferred Action for Unauthorized Immigrant Parents: Analysis of DAPA's Potential Effects on Families and Children*, Migration Policy Institute, 2016; Chaudry, et al., *Facing our Future*; Joanna Dreby, *How Today's Immigration Enforcement Policies Impact Children, Families, and Communities*, Center for American Progress, 2012.

[41] Matthews et. al, *Immigration Policy's Harmful Impacts on Early Care and Education*.

[42] Luis Zayas, *Forgotten Citizens: Deportation, Children, and the Making of America's Exiles and Orphans,* 2015.

[43] Committee on Integrating the Science of Early Childhood Development, From Neurons to Neighborhoods; Tess Lefmann and Terri Combs-Orme, "Prenatal Stress, Poverty, and Child Outcomes," *Child and Adolescent Social Work Journal* 31 (2014).

[44] Robert C. Whitaker, Tracy Dearth-Wesley, and Rachel A. Gooze, "Workplace Stress and the Quality of Teacher-Children Relationships in Head Start," *Early Childhood Research Quarterly* 30 (2015); Amy Roberts, Jennifer LoCasale-Crouch, Bridget Hamre et al., "Exploring Teachers' Depressive Symptoms, Interaction Quality, and Children's Social-Emotional Development in Head Start," *Early Education and Development* 27 (2016); Aletha C. Huston, Kaeley C. Bobbit, and Alison Bentley, "Time Spent in Child Care: How and Why Does it Affect Social Development?" *Developmental Psychology* 51 (2015).

[45] Tom K. Wong, Greisa Martinez-Rosas, Adrian Reyna, et al., *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes,* Center for American Progress, 2016, **https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/**.

[46] Zenen Jaimes Perez, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later,* United We Dream, 2015, **https://unitedwedream.org/wp-content/uploads/2015/10/DACA-report-final-1.pdf**.

[47] Neeraj Kaushal, "Intergenerational Payoffs for Education," *The Future of Children* 24 (2014); Alexandra Mitukiewicz and Heather Boushey, *Job Quality Matters: How Our Future Economic Competitiveness Hinges on the Quality of Parents' Jobs,* Washington Center for Equitable Growth, 2014, **http://equitablegrowth.org/human-capital/job-quality-matters-future-economic-competitiveness-hinges-quality-parents-jobs/**.

[48] Jens Hainmueller, Duncan Lawrence, Linna Marten, et al., "Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health," *Science* 31 (2017).

[49] Duy Pham, Wendy Cervantes, *DACA Has Been Rescinded. What Now?* CLASP, 2017, **https://www.clasp.org/publications/report/brief/daca-has-been-rescinded-what-now.**

[50] The Migration Policy Institute estimates that more than 40,000 DACA recipients are employed in the education, health, and social services industries—many of them are likely nurses, K-12 teachers, and early childhood educators. Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation,* Migration Policy Institute, 2017, **https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.**

[51] Hughes, et al., "The Effect of Multiple Adverse Childhood Experiences on Health;" Schilling et al., "The Impact of Cumulative Childhood Adversity;" Slopen, et al., "Cumulative Adversity in Childhood."

[52] The Dream Act of 2017 (S.1615/H.R.3440) is bipartisan legislation that would provide a path to citizenship—by completing postsecondary education, military or employment requirements— to  certain immigrants who entered the U.S. as children, including beneficiaries of the DACA program. The bill was introduced by Senators Lindsey Graham (R-SC) and Dick Durbin (D-IL) and Representatives Ileana Ros-Lehtinen (R-FL) and Lucille Roybal-Allard (D-CA). **https://www.congress.gov/bill/115th-congress/senate-bill/1615**, **https://www.congress.gov/bill/115th-congress/house-bill/3440/related-bills**.

[53] The Protecting Sensitive Locations Act (S.845/H.R.1815) would clarify and expand the types of "sensitive locations" where immigration enforcement agents are restricted from carrying out enforcement actions.  The legislation was introduced in 2017 by Senator Richard Blumenthal (D-CT) and Representative Adriano Espaillat (D-NY). **https://www.congress.gov/bill/115th-congress/senate-bill/845/related-bills,  https://www.congress.gov/bill/115th-congress/house-bill/1815**.

[54] U.S. Immigration and Customs Enforcement, *ICE Parental Interests Directive*, U.S. Department of Homeland Security, 2013, **https://www.ice.gov/parental-interest.**

[55] Cities across the country including San Francisco, New York, and Los Angeles have developed and distributed public-facing flyers, presentations and other resources reassuring families that the election has not changed the local government's commitment to provide quality services for all, regardless of immigration status.

[56] See for example, San Francisco Department of Health policy memorandum on how to interact with ICE officials and respond to judicial warrants, administrative warrants and subpoenas, **https://www.sfdph.org/dph/files/PoliciesProcedures/COM10-ImmigrationStatus-and-Interactions-with-ICEAgentsPolicy-2018-01-19.pdf**.

[57] National Child Traumatic Stress Network, **https://www.nctsn.org**.

[58] U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS), *Deportation of Aliens Claiming U.S.-Born Children: First Semi-Annual, Calendar Year 2013,* 2014, **http://big.assets.huffingtonpost.com/2013report1.pdf**; ICE, DHS, *Deportation of Aliens Claiming U.S.-Born Children: Second Half, Calendar Year 2013,* 2014, **http://big.assets.huffingtonpost.com/2013report2.pdf**; ICE, DHS, *Deportation of Aliens Claiming U.S.-Born Children: First Half, Calendar Year 2016,* 2016, **https://www.dhs.gov/sites/default/files/publications/Immigration%20and%20Customs%20Enforcement%20-%20Deportation%20of%20Aliens%20Claiming%20U.S.%20-Born%20Children%20-%20First%20Semiannual%2C%20CY%202016.pdf**; ICE, DHS, *Deportation of Aliens Claiming U.S.-Born Children: Second Half, Calendar Year 2016,* 2017, **https://www.dhs.gov/sites/default/files/publications/ICE%20-%20Deportation%20of%20Aliens%20Claiming%20U.S.%20-Born%20Children%20-%20Second%20Semiannual%2C%20CY%202016_0.pdf**

[59] Emily Butera, Wendy Cervantes, *Family Unity in the Face of Immigration Enforcement: Past, Present, and Future,* The Sentencing Project, First Focus, 2013, **http://cimmcw.org/wp-content/uploads/2013/03/cc_Children-in-Harms-Way-final.pdf**.

[60] John Morton, "Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens", March 2, 2011, U.S. Immigration and Customs Enforcement, **https://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf.**

[61] U.S. Immigration and Customs Enforcement, "ICE Parental Interests Directive," **https://www.ice.gov/parental-interest**.

[62] Joshua Breisblatt, "DHS: Immigration Arrests Inside the U.S. Spiked While Border Crossings Dropped to Record Lows", American Immigration Council, **http://immigrationimpact.com/2017/12/06/immigration-enforcement-border-crossing-low/.**

[63] Krista M. Perreira, Robert Crosnoe, et al., *Barriers to Immigrants' Access to Health and Human Services Programs*, Office of the Assistant Secretary for Planning and Evaluation U.S. Department of Health and Human Services, 2012, **https://aspe.hhs.gov/basic-report/barriers-immigrants-access-health-and-human-services-programs**.; Julia Gelatt, Heather Joball, et al., *State Immigration Enforcement Policies: How They Impact Low-Income Households,* The Urban Institute, National Center for Children in Poverty, 2017, **https://www.urban.org/research/publication/state-immigration-enforcement-policies**.

[64] Child and Adolescent Health Measurement Initiative, Data Resource Center for Child and Adolescent Health. 2016 National Survey of Children's Health (NSCH) data query. Retrieved 2/25/2018 from **www.childhealthdata.org**.

[65] National Immigration Law Center, *The Trump Administration's "Public Charge" Attack on Immigrant Families Information About an Upcoming Proposed Rule*, 2018, **https://www.nilc.org/wp-content/uploads/2018/01/Public-Charge-Fact-Sheet-2018.pdf**.

[66] For more information on DACA, see the U.S. Citizenship and Immigration Services archived page, "Consideration of Deferred Action for Childhood Arrivals (DACA)," **https://www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca**.

[67] Perez, *A Portrait of Deferred Action for Childhood Arrivals Recipients*.

[68] Tom Jawetz and Nicole Prchal Svajlenka, "Thousands of DACA Recipients Are Already Losing Their Protection from Deportation," Center for American Progress, November 9, 2017, **https://www.americanprogress.org/issues/immigration/news/2017/11/09/442502/thousands-daca-recipients-already-losing-protection-deportation/**.

[69] Jill H. Wilson, *Temporary Protected Status: Overview and Current Issues,* Congressional Research Service, 2018, **https://fas.org/sgp/crs/homesec/RS20844.pdf**.

[70] Robert Warren and Donald Kerwin, "A Statistical and Demographic Profile of the U.S. Temporary Protected Status Populations from El Salvador, Honduras, and Haiti," *Journal on Migration and Human Security* 5 (2017).

# Photo credits

The report includes a banner from freepik.com. It also includes work from the Shutterstock artists below.

Page 6: pimchawee; Page 7: Nowik Sylwia; Page 9: Panic Attack; Page 10: Brovko Serhii, Kindlena; Page 11: pimchawee; Page 12: pimchawee; Page 13: Nowik Sylwia, aarows; Page 15: Nowik Sylwia; Page 16: Pavel L Photo and Video; Page 17: Nowik Sylwia; Page 18: daraanja, Eladora, majivecka; Page 21: majivecka, keko-ka; Page 22: majivecka, Eladora; and Page 29: NiklsN.

The cover photo is a modified version of a photo by Michael Fleshman. The original is available at **https://www.flickr.com/photos/fleshmanpix**.

# EXHIBIT K

May 2018 | Issue Brief

# Potential Effects of Public Charge Changes on Health Coverage for Citizen Children

Samantha Artiga, Anthony Damico, and Rachel Garfield

## Key Findings

The Trump Administration is pursuing changes that, for the first time, would allow the federal government to take into account use of Medicaid, CHIP, subsidies for Marketplace coverage and other health, nutrition, and non-cash programs when making public charge determinations. These changes would likely lead to decreased participation in Medicaid, CHIP, Marketplace coverage, and other programs among legal immigrants and their citizen children, even though they would remain eligible. This brief provides an overview of citizen children with a noncitizen parent potentially affected by the changes and analyzes three Medicaid/CHIP disenrollment scenarios to illustrate how the changes could potentially affect their health coverage and uninsured rate.

**In 2016, there were 10.4 million citizen children with at least one noncitizen parent.** Nearly nine in ten of these children live in a family with a full-time worker, but these workers often are in low-wage jobs, leading to lower family incomes and more limited access to health coverage. As such, over half (56%), or 5.8 million, citizen children with a noncitizen parent had Medicaid or CHIP coverage in 2016. (See Appendix tables for state data.)

**We illustrate the potential impact of different Medicaid/CHIP disenrollment rates and show that, if the policy leads to disenrollment rates from 15% to 35%, an estimated 875,000 to 2 million citizen children with a noncitizen parent could drop Medicaid/CHIP coverage despite remaining eligible.** The majority disenrolling would become uninsured, increasing their uninsured rate from 8% to between 14% and 22% and the uninsured rate for all children from 5% to between 6% and 7%. Although it is difficult to predict the effect of the policy change, these disenrollment rates illustrate the potential impact and draw on previous research on the chilling effect welfare reform had on enrollment of immigrant families. However, unlike the current draft policy, welfare reform did not affect immigration status. Thus, this illustrative analysis may underestimate the policy's impact on Medicaid/CHIP participation. In addition, this analysis does not account for coverage losses that would result from decreased participation in Marketplace coverage.

**Coverage losses would negatively affect the health of children and their families' financial stability.** Coverage losses would reduce access to care, contributing to worse health outcomes. Moreover, reduced participation in nutrition and other support programs that are also proposed to be considered as part of public charge determinations would likely compound these effects.

Headquarters / 185 Berry Street Suite 2000 San Francisco CA 94107 / 650 854 9400
Washington Offices and Conference Center / 1330 G Street NW Washington DC 20005 / 202 347 5270

kff.org / Email Alerts: kff.org/email / facebook.com/KaiserFamilyFoundation / twitter.com/KaiserFamFound

Filling the need for trusted information on national health issues, the Kaiser Family Foundation is a nonprofit organization based in San Francisco, California.



# Introduction

The Trump Administration is pursuing changes that, for the first time, would allow the federal government to take into account use of health, nutrition, and other non-cash programs when making public charge determinations. Under these changes, use of these programs, including Medicaid, CHIP, and subsidies for Marketplace coverage, by an individual or family member, including a citizen child, could result in the federal government denying an individual a "green card" or adjustment to lawful permanent status or entry into the U.S. These changes would likely result in reduced participation in Medicaid, CHIP, Marketplace coverage, and other programs by immigrant families, including citizen children, even though they would remain eligible. Decreases in Medicaid and CHIP enrollment would increase the number of uninsured and reduce access to care, increase financial strains on families, and widen disparities in coverage. This brief provides an overview of citizen children with a noncitizen parent who could potentially be affected by the proposed changes and presents three Medicaid/CHIP disenrollment scenarios to illustrate how the changes could potentially affect their health coverage and uninsured rate. It is based on Kaiser Family Foundation analysis of Current Population Survey Data. (See Methods for more details.) Appendix Tables 2 and 3 provide state-specific data.

# Overview of Citizen Children with a Noncitizen Parent

**In 2016, nearly 20 million, or one in four, children had at least one immigrant parent, and nearly nine in ten (88%) of these children were citizens (Figure 1).** Over half, or 10.4 million, of these children lived in mixed status families, where the child is a citizen and at least one parent is a noncitizen. Citizen children with a noncitizen parent are heavily concentrated in a few states. Over half of children with a noncitizen parent live in California (25%), Texas (16%), New York (7%), and Florida (6%) (Appendix Table 2).



Figure 1

Children by Parental Immigration Status, 2016

Children with U.S.-Born Parents 75%

Citizen Children with Naturalized Citizen Parent 9%

Citizen Children with Noncitizen Parent 13%

Noncitizen Children 3%

19.8 million children with an immigrant parent

Total Children (Ages 0-18): 78.2 million

Note: Percentages do not sum to 100% due to rounding.
Source: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement.

KFF

**Citizen children with a noncitizen parent range in age and race/ethnicity, although the majority are between ages 6-18 and Hispanic (Figure 2).** About one in three (36%) citizen children with a noncitizen parent are below age six; the remaining 64% are between ages 6-18. Over two-thirds (69%) of citizen children with a noncitizen parent are Hispanic and 11% are Asian. The remaining 19% includes 11% who are White non-Hispanic, 6% who are Black non-Hispanic, and 2% who are another or mixed race.



Figure 2

**Age and Race/Ethnicity of Citizen Children with A Noncitizen Parent, 2016**

**Total = 10.4 Million Citizen Children with a Noncitizen Parent**

NOTES: Children ages 0-18. Data may not total 100% due to rounding. Persons of Hispanic origin may be of any race; all other race/ethnicity groups are non-Hispanic.
SOURCE: Kaiser Family Foundation analysis of the March 2017 Current Population Survey, Annual Social and Economic Supplement.

**Although citizen children with a noncitizen parent are more likely to live in a family with a full-time worker compared to those with U.S. born parents, they have lower family incomes.** Nearly nine in ten (86%) citizen children with a noncitizen parent live in a family with at least one full-time worker (Figure 3). However, over two-thirds (67%) of citizen children with a noncitizen parent have family incomes below 250% of the federal poverty level (FPL), compared to 45% of children with U.S. born parents. This finding reflects that noncitizens are often employed in low-wage jobs and industries.



Figure 3

**Employment and Income among Children by Parental Citizenship Status, 2016**

NOTES: *Indicates statistically significant difference from citizens at p<0.05 level. Income based on 2016 Census Bureau federal poverty level for a family of three (with one child).
SOURCE: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement

**Reflecting their lower family incomes, Medicaid and CHIP play a key role in covering citizen children with a noncitizen parent, but they remain more likely than those with U.S. born parents to be uninsured.** Given that over two-thirds of citizen children with a noncitizen parent have family incomes below 250% FPL, many are within the income eligibility limits for Medicaid or CHIP.[1] As such, Medicaid and CHIP cover over half (56%), or 5.8 million, citizen children with a noncitizen parent. This coverage helps to fill gaps in private coverage since many noncitizen parents work in low-wage jobs that often do not offer health coverage. However, citizen children with a noncitizen parent remain more likely than children with U.S. born parents to be uninsured (8% vs. 5%). Moreover, their parents are more than three times as likely to be uninsured themselves compared to U.S. born parents (24% vs. 7%).



Figure 4
### Health Coverage of Citizen Children with a Noncitizen Parent, 2016

Uninsured 8%

Medicaid/CHIP 56%

Private/Other 36%

**Total = 10.4 Million Citizen Children with a Noncitizen Parent**

NOTES: Children ages 0-18. Data may not total 100% due to rounding.
SOURCE: Kaiser Family Foundation analysis of the March 2017 Current Population Survey, Annual Social and Economic Supplement.

# Potential Coverage Losses Due to Public Charge Policies

**Under draft changes proposed by the Trump Administration, use of health, nutrition, and other non-cash programs by an individual or a family member, including a citizen child, could result in the federal government denying an individual adjustment to lawful permanent resident status (i.e., a "green card") or entry into the United States.[2]** Under longstanding policy, individuals who are determined to be a "public charge" can be denied lawful permanent residence or entry into the U.S. Today, individuals may be determined a public charge if they rely on or are likely to rely on public cash assistance or government funded long-term institutional care. Current policy does not allow the federal government to consider the use of non-cash benefits, such as health and nutrition programs, in public charge determinations. Under the draft proposed changes, the federal government could consider previously excluded health, nutrition, and other non-cash programs in public charge determinations. These programs would include Medicaid, CHIP, and subsidies for Marketplace coverage. In addition, the changes would newly allow the federal government to take into account use of programs by citizen children and other family members in making a public charge determination.

**The changes in public charge policy would likely lead to decreased participation in Medicaid, CHIP, Marketplace coverage, and other programs among legal immigrant families, including their citizen children, even though they would remain eligible.** Fears of negative consequences on immigration status are a barrier to Medicaid and CHIP enrollment for eligible immigrant families today even though the federal government cannot consider use of Medicaid and CHIP in public charge determinations under current policy.[3] The proposed changes would amplify these fears because use of Medicaid, CHIP, as well as subsidies for Marketplace coverage and other programs could negatively affect immigration status. The preamble to the draft proposed rule notes, "the action provides a strong disincentive for the receipt or use of public benefits by aliens, as well as their household members, including U.S. children." It is expected that the public charge policy change would primarily affect individuals seeking a green card through a family-based petition. However, increased fears would likely extend beyond individuals directly affected by the policy to the broader immigrant community.[4] Due to increased fears, it is likely that fewer eligible individuals would enroll themselves and their children in health coverage and individuals currently enrolled in programs would disenroll themselves and their children despite remaining eligible for coverage.

**To illustrate potential effects of these changes on health coverage of children, we present three scenarios of disenrollment from Medicaid and CHIP among citizen children with a noncitizen parent.** As of 2016, 5.8 million citizen children with a noncitizen parent were enrolled in Medicaid or CHIP (see Appendix 2 for state data), and 790,000 or 8% were uninsured. We applied disenrollment rates from Medicaid and CHIP of 15%, 25%, and 35%. Although it is difficult to predict the effect of the policy change, these disenrollment rates illustrate the potential impact and draw on previous research on the chilling effect welfare reform had on enrollment of immigrant families.[5] However, unlike the current draft policy, welfare reform did not affect immigration status. Thus, this illustrative analysis may underestimate the impact that the policy may have on participation in Medicaid/CHIP. We assume that 75% of children disenrolling from Medicaid and CHIP would become uninsured based on data showing some access to private coverage among this population.[6] However, some families may not be able to afford private coverage even if it is available. As such, this analysis may underestimate the share of children disenrolling from Medicaid/CHIP who would become uninsured. In addition, this analysis does not account for decreased coverage due to fewer individuals enrolling their eligible children in Medicaid or CHIP or coverage losses that would result from decreased participation in Marketplace coverage.

**If the public charge policy change leads to Medicaid/CHIP disenrollment rates ranging from 15% to 35%, an estimated 875,000 to 2 million citizen children with a noncitizen parent could drop Medicaid/CHIP coverage despite remaining eligible, and their uninsured rate would rise from 8% to between 14% and 22%.** Specifically, as shown in Figures 5 and 6 and Appendix Table 1:

- **A 15% decline in Medicaid/CHIP enrollment among citizen children with a noncitizen parent would result in 875,000 children losing Medicaid/CHIP coverage and 657,000 becoming uninsured.** These losses would increase the uninsured rate for citizen children with a noncitizen parent from 8% to 14%, and the uninsured rate for all children would increase from 5% to 6%.

- **A 25% decline in Medicaid/CHIP enrollment among citizen children with a noncitizen parent would result in 1.5 million children losing Medicaid/CHIP coverage and 1.1 million becoming uninsured.** These losses would increase the uninsured rate for citizen children with a noncitizen parent from 8% to 18%, and the uninsured rate for all children would increase from 5% to 7%.

- **A 35% decline in Medicaid/CHIP enrollment among citizen children with a noncitizen parent would result in 2.0 million children losing Medicaid/CHIP coverage and 1.5 million becoming uninsured.** These losses would increase the uninsured rate for citizen children with a noncitizen parent from 8% to 22%, and the uninsured rate for all children would increase from 5% to 7%.



Figure 5

Changes in Coverage for Citizen Children with a Noncitizen Parent Under Different Scenarios of Disenrollment from Medicaid/CHIP

In millions:

■ Decrease in Number of Medicaid/CHIP Enrollees   ■ Increase in Number of Uninsured

- If 15% Disenroll: -0.9, 0.7
- If 25% Disenroll: -1.5, 1.1
- If 35% Disenroll: -2.0, 1.5

Assuming 75% of Disenrollees Become Uninsured

Source: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement.

KFF



Figure 6

Uninsured Rate for Citizen Children with a Noncitizen Parent Under Different Scenarios of Disenrollment from Medicaid/CHIP

■ Citizen Children with a Noncitizen Parent   ■ All Children

- Current Uninsured Rate (2016): 8%, 5%
- If 15% Disenroll: 14%, 6%
- If 25% Disenroll: 18%, 7%
- If 35% Disenroll: 22%, 7%

Assuming 75% of Disenrollees Become Uninsured

Source: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement.

KFF

**Coverage losses would negatively affect the health of children and their families' financial stability.** Coverage losses would reduce access to care, contributing to worse health outcomes.[7] Reduced participation in nutrition and other programs that are also proposed to be considered in public charge determinations would likely compound these effects. In particular, the Earned Income Tax Credit, free or reduced price lunch program, Supplemental Nutrition Assistance Program, and Women Infant and Children's Program (WIC) provide important sources of support for these households (Appendix 3). Decreased participation in these programs would negatively affect the financial stability of families and the growth and healthy development of their children.[8]

## Methods

Findings in this brief are based on Kaiser Family Foundation analysis of the March 2017 Current Population Survey, Annual Social and Economic Supplement. Children include individuals ages 0-18. For the analysis, children are grouped into mutually exclusive categories, including: children with U.S. born parents, citizen children in a household where at least one parent is a naturalized citizen, citizen children in a household where at least one parent is a noncitizen, and noncitizen children.

For estimates of potential changes in coverage due to public charge policies, we present several scenarios using different disenrollment rates for Medicaid and CHIP. These disenrollment scenarios are illustrative of the potential impact of the public charge policy change and draw on previous research on the chilling effect welfare reform had on enrollment of immigrant families. Specifically, Kaushal and Kaestner found 25% disenrollment among children of foreign-born parents.[1] This study was most relevant to our analysis given its focus on children and its inclusion of children who remained eligible after the welfare reform changes. Using this 25% disenrollment rate as a midpoint, we also examined the impact if the disenrollment rate was lower at 15% or higher at 35% to illustrate the impact of alternate disenrollment rates given uncertainty about the actual impact if the policy is implemented. Because, unlike the current draft proposed policy, welfare reform did not affect immigration status, this illustrative analysis may underestimate the impact the policy may have on participation in Medicaid/CHIP.

The estimates also assume that 75% of those disenrolling from Medicaid and CHIP would become uninsured. This assumption is based on Kaiser Family Foundation analysis of Current Population Survey data showing some access to private coverage among this population. However, this analysis may underestimate the share of children disenrolling from Medicaid/CHIP who would become uninsured since some families may not be able to afford private coverage even if it is available. Further, this analysis does not account for decreased coverage due to fewer individuals enrolling their eligible children in Medicaid or CHIP or coverage losses that would result from decreased participation in Marketplace coverage.

[1] Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research*,40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/

This brief was prepared by Samantha Artiga and Rachel Garfield, with the Kaiser Family Foundation, and Anthony Damico, an independent consultant to the Kaiser Family Foundation.

| Appendix Table 1: Projected Changes in Children's Coverage Based Assumed Disenrollment of Citizen Children with a Noncitizen Parent from Medicaid/CHIP (in Millions) | | | | |
|---|---|---|---|---|
| | **Current Coverage (as of 2016)** | **15% Disenrollment Rate** | **25% Disenrollment Rate** | **35% Disenrollment Rate** |
| **Number Disenrolled from Medicaid/CHIP** | | 0.9 | 1.5 | 2.0 |
| **Increase in Uninsured (if 75% of disenrollees become uninsured)** | | 0.7 | 1.1 | 1.5 |
| **Citizen Children with a Noncitizen Parent** | | | | |
| Medicaid/CHIP | 5.8 | 5.0 | 4.4 | 3.8 |
| Uninsured | 0.8 | 1.4 | 1.9 | 2.3 |
| Uninsured Rate | 8% | 14% | 18% | 22% |
| **Total Children** | | | | |
| Medicaid/CHIP | 29.8 | 28.9 | 28.4 | 27.8 |
| Uninsured | 4.2 | 4.9 | 5.3 | 5.7 |
| Uninsured Rate | 5% | 6% | 7% | 7% |
| Source: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement. | | | | |

| Appendix Table 2: Medicaid/CHIP Coverage for Citizen Children With a Noncitizen Parent, 2016 | | | | |
|---|---|---|---|---|
| | **All Children** | **Citizen Children with a Noncitizen Parent** | | |
| | | **Total** | **Income <250% FPL** | **Medicaid/CHIP Coverage** |
| **United States** | 78,150,000 | 10,398,000 | 6,985,000 | 5,836,000 |
| **Alabama** | 1,155,000 | 59,000 | 44,000 | 34,000 |
| **Alaska** | 202,000 | 11,000 | NA | NA |
| **Arizona** | 1,715,000 | 312,000 | 264,000 | 168,000 |
| **Arkansas** | 742,000 | 38,000 | 26,000 | 20,000 |
| **California** | 9,678,000 | 2,559,000 | 1,815,000 | 1,567,000 |
| **Colorado** | 1,318,000 | 136,000 | NA | 84,000 |
| **Connecticut** | 804,000 | 83,000 | 42,000 | 45,000 |
| **Delaware** | 215,000 | 25,000 | 15,000 | 12,000 |
| **DC** | 128,000 | 12,000 | 6,000 | 5,000 |
| **Florida** | 4,450,000 | 638,000 | 416,000 | 308,000 |
| **Georgia** | 2,666,000 | 315,000 | 238,000 | 204,000 |
| **Hawaii** | 319,000 | 37,000 | 23,000 | 17,000 |
| **Idaho** | 473,000 | 49,000 | 42,000 | NA |
| **Illinois** | 3,048,000 | 442,000 | 251,000 | 224,000 |
| **Indiana** | 1,694,000 | NA | NA | NA |
| **Iowa** | 756,000 | 46,000 | 39,000 | 29,000 |
| **Kansas** | 763,000 | 65,000 | 50,000 | NA |
| **Kentucky** | 1,104,000 | NA | NA | NA |
| **Louisiana** | 1,176,000 | 36,000 | NA | NA |
| **Maine** | 272,000 | NA | NA | NA |
| **Maryland** | 1,428,000 | 190,000 | 113,000 | 91,000 |
| **Massachusetts** | 1,480,000 | 208,000 | 105,000 | 102,000 |
| **Michigan** | 2,280,000 | 118,000 | 46,000 | 55,000 |
| **Minnesota** | 1,383,000 | 131,000 | NA | NA |
| **Mississippi** | 768,000 | 19,000 | NA | NA |
| **Missouri** | 1,479,000 | 63,000 | NA | NA |
| **Montana** | 241,000 | 6,000 | NA | NA |
| **Nebraska** | 500,000 | 56,000 | 39,000 | 26,000 |
| **Nevada** | 729,000 | 140,000 | 94,000 | 61,000 |
| **New Hampshire** | 283,000 | NA | NA | NA |
| **New Jersey** | 2,077,000 | 362,000 | 194,000 | 150,000 |
| **New Mexico** | 522,000 | 65,000 | 53,000 | 46,000 |
| **New York** | 4,397,000 | 678,000 | 406,000 | 392,000 |
| **North Carolina** | 2,450,000 | 300,000 | 221,000 | 197,000 |
| **North Dakota** | 188,000 | NA | NA | NA |
| **Ohio** | 2,792,000 | 126,000 | 81,000 | 70,000 |
| **Oklahoma** | 1,023,000 | 121,000 | 97,000 | 90,000 |
| **Oregon** | 933,000 | 162,000 | 127,000 | 110,000 |
| **Pennsylvania** | 2,836,000 | 165,000 | 86,000 | 97,000 |
| **Rhode Island** | 217,000 | 25,000 | NA | NA |
| **South Carolina** | 1,183,000 | 76,000 | 44,000 | NA |
| **South Dakota** | 229,000 | NA | NA | NA |
| **Tennessee** | 1,550,000 | 104,000 | 82,000 | 58,000 |
| **Texas** | 7,731,000 | 1,644,000 | 1,170,000 | 966,000 |
| **Utah** | 963,000 | 76,000 | 56,000 | NA |
| **Vermont** | 131,000 | NA | NA | NA |
| **Virginia** | 2,013,000 | 243,000 | 151,000 | 93,000 |
| **Washington** | 1,721,000 | 262,000 | 164,000 | 157,000 |
| **West Virginia** | 398,000 | NA | NA | NA |
| **Wisconsin** | 1,396,000 | NA | NA | NA |
| **Wyoming** | 153,000 | 6,000 | 4,000 | NA |

NA: Estimate not reported; Relative Standard Error is greater than 30%. FPL is Federal Poverty Level.
Source: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement.

| Appendix Table 3: Household Use of Selected Programs for Citizen Children with a Non-Citizen Parent, 2016 | | | | |
|---|---|---|---|---|
| | Earned Income Tax Credit | Free or Reduced Price Lunch | Supplemental Nutrition Assistance Program | Women, Infant, and Children's Service |
| United States | 5,849,000 | 5,267,000 | 2,644,000 | 1,932,000 |
| Alabama | 38,000 | 29,000 | NA | NA |
| Alaska | NA | NA | NA | NA |
| Arizona | 241,000 | 195,000 | 123,000 | 88,000 |
| Arkansas | 20,000 | 22,000 | NA | NA |
| California | 1,554,000 | 1,507,000 | 715,000 | 573,000 |
| Colorado | 64,000 | 47,000 | NA | NA |
| Connecticut | 33,000 | 39,000 | NA | NA |
| Delaware | 13,000 | 11,000 | NA | NA |
| DC | 6,000 | 4,000 | NA | NA |
| Florida | 321,000 | 279,000 | 159,000 | 102,000 |
| Georgia | 201,000 | 162,000 | NA | NA |
| Hawaii | 18,000 | 16,000 | NA | NA |
| Idaho | 38,000 | 28,000 | 20,000 | NA |
| Illinois | 194,000 | 181,000 | 94,000 | NA |
| Indiana | 46,000 | NA | NA | NA |
| Iowa | 25,000 | 24,000 | NA | NA |
| Kansas | 50,000 | 47,000 | NA | 21,000 |
| Kentucky | 20,000 | 23,000 | NA | NA |
| Louisiana | 19,000 | 18,000 | NA | NA |
| Maine | NA | NA | NA | NA |
| Maryland | 103,000 | 89,000 | NA | NA |
| Massachusetts | 82,000 | 71,000 | NA | 41,000 |
| Michigan | 44,000 | NA | NA | NA |
| Minnesota | 76,000 | 76,000 | NA | NA |
| Mississippi | 10,000 | NA | NA | NA |
| Missouri | 33,000 | 36,000 | NA | NA |
| Montana | NA | NA | NA | NA |
| Nebraska | 36,000 | 32,000 | NA | NA |
| Nevada | 87,000 | 77,000 | NA | NA |
| New Hampshire | NA | NA | NA | NA |
| New Jersey | 171,000 | 127,000 | NA | NA |
| New Mexico | 42,000 | 32,000 | 31,000 | 13,000 |
| New York | 352,000 | 296,000 | 194,000 | 73,000 |
| North Carolina | 171,000 | 200,000 | 88,000 | 103,000 |
| North Dakota | 5,000 | NA | NA | 5,000 |
| Ohio | 61,000 | 62,000 | 60,000 | NA |
| Oklahoma | 78,000 | 55,000 | 45,000 | 54,000 |
| Oregon | 102,000 | 107,000 | 61,000 | NA |
| Pennsylvania | 63,000 | 63,000 | 54,000 | NA |
| Rhode Island | 14,000 | 15,000 | 12,000 | NA |
| South Carolina | 37,000 | 37,000 | NA | NA |
| South Dakota | 6,000 | 5,000 | NA | NA |
| Tennessee | 62,000 | 59,000 | 36,000 | NA |
| Texas | 987,000 | 856,000 | 395,000 | 289,000 |
| Utah | 42,000 | 26,000 | NA | NA |
| Vermont | NA | NA | NA | NA |
| Virginia | 119,000 | 79,000 | NA | 38,000 |
| Washington | 117,000 | 145,000 | 91,000 | 78,000 |
| West Virginia | NA | NA | NA | NA |
| Wisconsin | 33,000 | 27,000 | NA | NA |
| Wyoming | NA | NA | NA | NA |

NA: Estimate not reported; Relative Standard Error is greater than 30%.
Source: Kaiser Family Foundation analysis of March 2017 Current Population Survey, Annual Social and Economic Supplement.

# ENDNOTES

[1] The median Medicaid/CHIP eligibility level for children across states is 255% FPL as of January 2018. Tricia Brooks, Karina Wagnerman, Samantha Artiga and Elizabeth Cornachione, Medicaid and CHIP Eligibility, Enrollment, Renewal, and Cost Sharing Policies as of January 2018: Findings from a 50-State Survey, (Washington, DC: Kaiser Family Foundation, March 2018), https://www.kff.org/medicaid/report/medicaid-and-chip-eligibility-enrollment-renewal-and-cost-sharing-policies-as-of-january-2018-findings-from-a-50-state-survey/.

[2] Similar criteria would also be applied to people seeking to extend or change their temporary nonimmigrant status in the U.S.

[3] Oscar C. Gomez, Liberty Day, and Samantha Artiga, Connecting Eligible Immigrant Families to Health Coverage and Care: Key Lessons from Outreach and Enrollment Workers, (Washington, DC: Kaiser Family Foundation, October 2011), https://www.kff.org/disparities-policy/issue-brief/connecting-eligible-immigrant-families-to-health-coverage/ and Samantha Artiga and Petry Ubri, Living in an Immigrant Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health, (Washington, DC: Kaiser Family Foundation, December 2017), https://www.kff.org/disparities-policy/issue-brief/living-in-an-immigrant-family-in-america-how-fear-and-toxic-stress-are-affecting-daily-life-well-being-health/.

[4] Findings show that recent immigration policy changes have increased fears and confusion among broad groups of immigrants beyond those directly affected by the changes. See Samantha Artiga and Petry Ubri, Living in an Immigrant Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health, (Washington, DC: Kaiser Family Foundation, December 2017), https://www.kff.org/disparities-policy/issue-brief/living-in-an-immigrant-family-in-america-how-fear-and-toxic-stress-are-affecting-daily-life-well-being-health/. Similarly, earlier experiences show that welfare reform changes increased confusion and fear about enrolling in public benefits among immigrant families beyond those directly affected by the changes. See. Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research*,40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/;

[5] Neeraj Kaushal and Robert Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research*,40(3), (June 2005), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/; Michael Fix and Jeffrey Passel, *Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform 1994-97* (Washington, DC: The Urban Institute, March 1, 1999) https://www.urban.org/sites/default/files/publication/69781/408086-Trends-in-Noncitizens-and-Citizens-Use-of-Public-Benefits-Following-Welfare-Reform.pdf; Namratha R. Kandula, et. al, "The Unintended Impact of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants, *Health Services Research,* 39(5), (October 2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361081/; Rachel Benson Gold, *Immigrants and Medicaid After Welfare Reform*, (Washington, DC: The Guttmacher Institute, May 1, 2003), https://www.guttmacher.org/gpr/2003/05/immigrants-and-medicaid-after-welfare-reform.

[6] Kaiser Family Foundation analysis of March 2017 Current Population Survey data.

[7] Julia Paradise, Data Note: Three Findings about Access to Care and Health Outcomes in Medicaid, (Washington, DC: Kaiser Family Foundation, March 23, 2017), https://www.kff.org/medicaid/issue-brief/data-note-three-findings-about-access-to-care-and-health-outcomes-in-medicaid/

[8] SNAP Helps Millions of Children, (Washington, DC: Center on Budget and Policy Priorities, April 2017), https://www.cbpp.org/research/food-assistance/snap-helps-millions-of-children, "About WIC-How WIC Helps," United States Department of Agriculture, Women, Infants and Children (WIC), https://www.fns.usda.gov/wic/about-wic-how-wic-helps, accessed May 10, 2018; and Chuck Marr, et al, EITC and Child Tax Credit Promote Work, Reduce Poverty, and Support Children's Development Research Finds, (Washington, DC: Center on Budget and Policy Priorities, October 2015), https://www.cbpp.org/research/federal-tax/eitc-and-child-tax-credit-promote-work-reduce-poverty-and-support-childrens.

# EXHIBIT L



## Hunger & Health

## The Role of the Supplemental Nutrition Assistance Program in Improving Health and Well-Being

**T**he Supplemental Nutrition Assistance Program (SNAP, formerly "food stamps") is the largest nutrition assistance program administered by the U.S. Department of Agriculture (USDA). SNAP serves as the first line of the nation's public policy defense against hunger and undernutrition as well as an effective anti-poverty initiative. This invaluable program has a critical role, not just in reducing food insecurity, but in improving the health of the nation, especially among the most vulnerable Americans.

SNAP's role in improving health is crucially important, given the high rates of food insecurity,[1] obesity,[2,3] and diet-related chronic disease in the nation.[4] Furthermore, leading scholars, economists, and health professionals recognize SNAP's impacts on health and well-being, for example:

- According to the White House Council of Economic Advisors for the Obama Administration, "a growing body of high-quality research shows that SNAP is highly effective at reducing food insecurity, and in turn has important short-run and long-run benefits for low-income families. SNAP's benefits are especially evident and wide-ranging for those who receive food assistance as children; they extend beyond the immediate goal of alleviating hunger and include improvements in short-run health and academic performance as well as in long-run health, educational attainment, and economic self-sufficiency."[5]

- In 2015, two prominent food insecurity and poverty scholars wrote: "simply put, SNAP should be viewed as an important health care intervention for low-income Americans."[6]

- James Marks, MD, MPH, of the Robert Wood Johnson Foundation, wrote in 2012: "SNAP helps families stretch their food dollars to alleviate hunger and buy healthier foods ... As we strive for a full economic recovery and a healthier nation, supporting SNAP is both the right thing to do and the smart thing to do."[7]

Overall, this white paper demonstrates that poverty and food insecurity have serious consequences for health and well-being in the short and long terms. Research shows that SNAP plays a critical role, not just in alleviating poverty and food insecurity, but also in improving dietary intake and health, especially among children. Increasing access to SNAP and improving SNAP benefit levels would further improve the nation's health.

This paper will provide background information on SNAP; briefly summarize the harmful impacts of poverty, food insecurity, and poor nutrition on health and well-being; summarize research on SNAP's role in addressing these issues among low-income Americans;* and describe how this role of furthering the public's health would be enhanced if SNAP benefits were more adequate.

> *"Simply put, SNAP should be viewed as an important health care intervention for low-income Americans."*
>
> — Gundersen & Ziliak, 2015[8]

---

\* For research on the federal Child Nutrition Programs, see FRAC's *The Role of the Federal Child Nutrition Programs in Improving Health and Well-Being* at www.frac.org. [The federal Child Nutrition Programs include the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC); National School Lunch Program (NSLP); School Breakfast Program (SBP); Child and Adult Care Food Program (CACFP); Summer Food Service Program (SFSP), and Afterschool Nutrition Programs.]



**Hunger & Health:** Supplemental Nutrition Assistance Program



# Background of SNAP

In July 2017, more than 41.2 million Americans participated in SNAP.[9] This is a monthly number, and USDA estimates that 1.3 to 1.4 times as many people receive SNAP at some point during the year as do during an average month. This suggests that in fiscal year 2017, at least 54 million Americans will have received SNAP benefits for at least one month.[10,11] (Many stays on SNAP are of short duration — half of SNAP participants entering the program are enrolled 12 months or less.[12]) Over longer periods of time, even higher proportions of Americans participate: researchers estimate that half of all American children will receive SNAP at some point during childhood,[13] and half of all adults will do so at some point between the ages of 20 and 65.[14]

Thus, the program has a very broad reach. On the other hand, **at any given time, approximately 1 in 6 people**

eligible for SNAP does not participate in the program.[15] This problem is even more pronounced among eligible older Americans,[16] who are far less likely to participate in the program than most other demographic groups for a variety of reasons, including barriers related to mobility, technology, and stigma, and to widespread mistaken beliefs about how the program works, who can qualify, and benefit levels.[17]

**Among those participating in the program, nearly two-thirds are children, elderly persons, or individuals with disabilities.**[18] In fact, 84 percent of all SNAP benefits go to households with children, elderly persons, or nonelderly persons with disabilities.[19] SNAP recipients are diverse with regards to race-ethnicity, many have earned income, and the vast majority of SNAP households do not receive cash welfare benefits.[20]

**The monthly benefits provided by SNAP enhance the food purchasing power of eligible low-income families.** The benefits can be used only for food and are delivered through Electronic Benefit Transfer (EBT) cards, which are used like debit cards at authorized food retailers. USDA reports that more than 87 percent of SNAP benefits are redeemed at super stores, supermarkets, and small, medium, and large grocery stores.[21]

**SNAP benefit allotments are calculated based on household income and size.**[22] The maximum allotment in fiscal year 2018 is $192 a month for a single person, and $640 a month for a family of four.[23] Families with countable income from earnings, Social Security, or other sources receive less than the maximum. About 39 percent of SNAP households receive the maximum allotment.[24] The other nearly 3 out of 5 participating households receive less than the maximum, and are expected to spend some of their other income on food to make up the difference. In fiscal year 2016, the average monthly benefit per household was $254.[25]

*SNAP serves as the first line of the nation's public policy defense against hunger and undernutrition as well as an effective anti-poverty initiative. This invaluable program has a critical role, not just in reducing food insecurity, but in improving the health of the nation, especially among the most vulnerable Americans.*

**Hunger & Health:** Supplemental Nutrition Assistance Program

# How Poverty, Food Insecurity, and Poor Nutrition Impact Health and Well-Being

Poverty, food insecurity, and poor nutrition have serious consequences for the health and well-being of children and adults, as summarized in this section.[†]

## Health Consequences of Poverty

In 2016, about 40.6 million Americans (12.7 percent of the population) lived in poverty.[26] This included nearly 13.2 million children, or 18 percent of all children.[27] **A considerable amount of research demonstrates that people living in or near poverty have disproportionately worse health outcomes and less access to health care than those who do not.**[28,29,30,31]

During childhood, low-income children are more likely to experience food insecurity,[32,33] obesity,[34,35] tobacco exposure,[36,37] lead exposure,[38] poor growth (e.g., low birth weight, short stature),[39] asthma,[40] developmental risk,[41] poor academic outcomes,[42,43] behavioral and emotional problems,[44] and unintentional injury.[45] **Childhood poverty and socioeconomic inequalities have health implications that carry through into adulthood as well.**[46,47,48] Furthermore, adults living in poverty are at greater risk for a number of health issues, such as diabetes,[49] heart disease and stroke,[50,51] obesity (primarily among women),[52] depression,[53] disability,[54] poor oral health,[55] and premature mortality.[56] The high levels of stress facing low-income families, including children, also can contribute to, or worsen, existing health problems.[57,58]

## Health Consequences of Food Insecurity

In 2016, approximately 28.3 million adults (11.5 percent of all adults) and 12.9 million children (17.5 percent of all children) lived in food-insecure households.[59] **Food insecurity — even marginal food security (a less severe level of food insecurity) — is associated with some of the most common and costly health problems and**

behaviors among adults, including fair or poor self-rated health status,[60] diabetes,[61,62] obesity (primarily among women),[63,64,65] hypertension,[66] pregnancy complications (e.g., gestational diabetes, iron deficiency),[67,68] and depression (including maternal depression).[69,70] Among older adults, food insecurity has been linked with poor or fair health status,[71] diabetes,[72] depression,[73] congestive heart failure,[74] hypertension,[75] obesity (primarily among women),[76] lower cognitive function,[77] and lower intakes of calories and key nutrients (e.g., protein, iron, calcium, vitamins A and C).[78]



**The consequences of food insecurity — and, again, even marginal food security**[79,80] **— are especially detrimental to the health, development, and well-being of children.**[81,82,83,84] Research shows a link for children between food insecurity and lower health status,[85,86] low birth weight,[87,88] birth defects,[89] iron deficiency anemia,[90,91] more frequent colds and stomachaches,[92] asthma,[93] developmental risk,[94] mental health problems (e.g., depression, anxiety, suicidal ideation),[95,96,97] and poor educational performance and academic outcomes[98,99,100,101] — all of which have health and economic consequences in the short and long terms.

**Because of limited financial resources, households that are food insecure also may use coping strategies to stretch budgets that are harmful for health,** such as engaging in cost-related medication underuse or non-adherence,[102,103,104] postponing or forgoing preventive or needed medical care,[105,106] forgoing the foods needed for special medical diets (e.g., diabetic diets),[107] or diluting or rationing infant formula.[108] Food insecurity and coping strategies such as these can exacerbate existing disease and compromise health.

> *Food insecurity — even marginal food security (a less severe level of food insecurity) — is associated with some of the most common and costly health problems and behaviors among adults.*

---

[†] For a comprehensive review of this topic, see FRAC's *The Impact of Poverty, Food Insecurity, and Poor Nutrition on Health and Well-Being* at www.frac.org. A companion paper, *The Role of the Federal Child Nutrition Programs in Improving Health and Well-Being,* has a comparable section on consequences, but with a focus on children.



**Hunger & Health:** Supplemental Nutrition Assistance Program

**Not surprisingly, research shows that household food insecurity is a strong predictor of higher health care utilization and increased health care costs.**[109,110] The direct and indirect health-related costs of hunger and food insecurity in the U.S. have been estimated to be $160 billion for 2014 alone.[111]

> *The direct and indirect health-related costs of hunger and food insecurity in the U.S. have been estimated to be $160 billion for 2014 alone.*

### Health Consequences of Poor Nutrition

**Americans from all income groups fall short of meeting federal dietary guidance — consuming diets too low in fruits, vegetables, whole grains, and low-fat dairy, and consuming diets too high in added sugars, sodium, and solid fats.**[112,113,114] In general, poor dietary intake (e.g., excess saturated or *trans* fat intake, a diet low in fruits and vegetables) has been linked to a number of diseases and chronic conditions, including obesity, cardiovascular disease, Type 2 diabetes, some types of cancer, and osteoporosis.[115,116] In addition, inadequate dietary intake during pregnancy and early childhood — which may be a consequence of food insecurity — can increase the risk for birth defects, anemia, low birth weight, preterm birth, and developmental risk.[117,118,119,120]

**Food-insecure and low-income people can be especially vulnerable to poor nutrition and obesity, due to additional risk factors associated with inadequate household resources as well as under-resourced communities.** This might include lack of access to healthy and affordable foods; cycles of food deprivation and overeating; high levels of stress, anxiety, and depression; fewer opportunities for physical activity; greater exposure to marketing of obesity-promoting products; and limited access to health care.[121] In addition to these unique challenges, those who are food insecure or low income are subject to the same and often challenging cultural changes (e.g., more sedentary lifestyles, increased portion sizes) as other Americans in trying to adopt and maintain healthful behaviors.[122]

## SNAP Improves the Health and Well-Being of Low-Income Americans

Research shows that SNAP plays a critical role in alleviating poverty and food insecurity and in improving dietary intake, weight outcomes, and health, especially among the nation's most vulnerable children. The following selection of studies demonstrates these points.

### SNAP Reduces Poverty and Deep Poverty

- Nationally, 3.6 million people — including 1.5 million children — were lifted above the poverty line in 2016 under the alternative poverty computation that counts SNAP benefits as income, based on Census Bureau data on poverty and income in the U.S.[123] However, these estimates understate SNAP's anti-poverty effects due to the underreporting of program participation in Census surveys.

- Making this adjustment for underreporting, SNAP lowers the poverty rate by 14 to 16 percent, according to analyses using national data in *SNAP Matters: How Food Stamps Affect Health and Well-Being.*[124] In addition, the anti-poverty effects are particularly strong when poverty rates rise during recessionary periods. Based on these and other findings contained in the book, the authors "conclude that SNAP is our nation's most effective anti-poverty program for the nonelderly when adjusted for underreporting, one that is especially good at reducing extreme poverty — by over 50 percent — and also especially effective for poor families with children." (Households are defined as living in extreme poverty when their cash income does not exceed $2 per person per day.)

- The average annual decline in the depth of child poverty when adding SNAP benefits to income was 15.5 percent, according to Current Population Survey data from 2000 to 2009.[125] The effect was strongest in 2009, when the temporary increase in SNAP benefit levels from the American Recovery and Reinvestment Act (ARRA) began. In that year, SNAP benefits reduced the depth of child poverty by 20.9 percent.



**Hunger & Health:** Supplemental Nutrition Assistance Program

## SNAP Supports Economic Stability and Academic Outcomes



■ Access to SNAP *in utero* and in early childhood increased women's economic self-sufficiency in terms of increased educational attainment, earnings, and income, and reduced poverty and public assistance program participation in adulthood, according to a study of people who grew up in disadvantaged families and were born between 1956 and 1981.[126]

■ Families receiving housing subsidies, SNAP, and WIC (Special Supplemental Nutrition Program for Women, Infants, and Children) benefits were 72 percent more likely to be housing secure (i.e., defined as living without overcrowding or frequent moves within the last year), compared to those families receiving housing subsidies alone, based on a study of low-income caregivers of children younger than 3 years old.[127]

■ Based on a national sample of low-income children, SNAP significantly moderated the association between difficulty affording basic needs and repeating a grade, indicating that "SNAP may contribute to the educational advancement of children living in poverty, which could have lifelong positive effects for them, their families, and society as a whole."[128]

■ Starting (versus stopping) Food Stamp Program participation at some point during the kindergarten through third grade years was associated with significant improvements in math and reading scores, particularly for female students, based on national survey data.[129] (At the time of data collection, SNAP was known as the Food Stamp Program.)

■ Other research has shown SNAP's value by exploring the effects of its absence: the end-of-the-month effects, i.e., the adverse impact on student performance and behavior when SNAP benefits, inadequate to last the whole month, are running low or depleted for households. Based on preliminary studies set in North Carolina and South Carolina, the exhaustion of SNAP benefits at the end of the month or benefit cycle may contribute to lower math and reading achievement test scores among third to eighth grade students.[130,131] Similarly, in a study of Chicago Public Schools' fifth to eighth graders, disciplinary infractions increased at the end of the SNAP benefit cycle for students in SNAP and non-SNAP households. However, the increase was larger for students from SNAP households.[132]

## SNAP Reduces Food Insecurity

### Households

■ The significant, temporary increase in monthly SNAP benefits from ARRA helped reduce food insecurity by 2.2 percentage points and reduce very low food security by 2.0 percentage points among low-income households between December 2008 (pre-ARRA) and December 2009 (about eight months post-ARRA).[133]

■ Participation in SNAP for six months reduced the percentage of SNAP households that were food insecure by 6–17 percent, and reduced the percentage that were very low food secure by 12–19 percent, based on various estimates using a national sample of SNAP households.[134]

■ In another study, SNAP participation reduced the likelihood of being food insecure and very low food secure by 31 and 20 percent, respectively, based on a national sample of low-income households.[135]

### Children

■ Children in households that had participated in SNAP for six months were approximately one-third less likely to be food insecure than children in households recently approved for SNAP but not yet receiving it, based on a national sample of SNAP households with children.[136]

■ Among low-income households experiencing food insecurity among children, the odds of being food secure



**Hunger & Health:** Supplemental Nutrition Assistance Program

two years later were almost four times higher for SNAP participants compared to non-participants, according to a study that used national, longitudinal data.[137]

■ While food insecurity is dynamic and changes as families with children enter, participate in, and leave SNAP, a national study of more than 10,000 families found that participation in SNAP reduced the probability of child food insecurity.[138]

■ Among low-income families with children in the Three Cities Study (Boston, Chicago, and San Antonio), SNAP receipt reduced the probability of very low food security for households and for children.[139]

■ According to one estimate using national data, SNAP reduces childhood food insecurity by at least 8.1 percentage points "and perhaps much more."[140]

## SNAP Protects Against Obesity

### Adults

■ In a national study of low-income adults, SNAP participants with marginal, low, or very low food security had lower Body Mass Index (BMI).[141] In addition, the probability of obesity was lower among SNAP participants experiencing marginal food security. The authors concluded that SNAP participation appears to buffer against obesity among those who are food insecure.

■ In a study controlling for food security status, adult SNAP participants in Massachusetts, who live in households



participating in the program for at least six months, had a lower BMI compared to those participating less than six months, suggesting that long-term participation is associated with lower BMI.[142]

■ A study set in eight New York City-area primary care practices found that food insecurity was significantly associated with increased BMI only among those women who were *not* receiving food assistance (SNAP or WIC), suggesting that food assistance program participation plays a protective role against obesity among food-insecure women.[143]

### Children

■ Based on a study of low-income families from a national sample, food-insecure girls participating in SNAP, school lunch, or school breakfast (or all three programs combined) had a lower risk of overweight compared to food-insecure girls from non-participating households.[144]

■ According to Children's HealthWatch data on more than 5,000 families in Minneapolis, young children in food-insecure households that received SNAP benefits were less likely to be overweight, compared to children in food-insecure households that were not receiving SNAP benefits.[145]

■ SNAP participation reduced the probability of being overweight or obese for boys and young girls in a national sample of children and adolescents.[146]

■ SNAP reduces the rate of childhood obesity by 5.3 percentage points, according to an estimate using national data.[147]

■ Increasing participation in the federal nutrition programs — including SNAP — was recommended in two Institute of Medicine (IOM) reports that focused on child obesity prevention.[148,149]

## SNAP Improves Dietary Intake

■ In a national sample of low-income adults, SNAP participation was associated with better dietary quality among those who were food insecure.[150] More specifically, SNAP participants with marginal, low, and very low food security had better overall dietary quality, compared to similar low-income non-participants.



**Hunger & Health:** Supplemental Nutrition Assistance Program

- Based on national food consumption data, each additional SNAP dollar increased a household's score for overall dietary quality (as measured by USDA's Healthy Eating Index).[151]

- Household participation in SNAP increased preschool children's intake of iron, zinc, niacin, thiamin, and vitamin A, according to a national sample of children.[152]

- Young children enrolled in SNAP, WIC, or both had lower rates of anemia and nutritional deficiency than low-income non-participants, based on a study of more than 350,000 children in Illinois.[153]

- SNAP-Education (SNAP-Ed) has positive impacts on the dietary intake of low-income households as well. For example, in a study of mothers in SNAP households, mothers living in census tracts with high SNAP-Ed reach ate more cups of fruits and vegetables, consumed fewer calories from high-fat foods, and drank fewer cups of sugar-sweetened beverages, when compared to mothers living in census tracts with no or low SNAP-Ed reach.[154] (SNAP-Ed, a partnership between USDA and states, promotes healthy food and lifestyle choices among SNAP participants and eligible non-participants, using evidence-based strategies.)

## SNAP Improves Health Outcomes

### Adults

- SNAP participation was associated with lower health care spending among low-income adults in a national survey.[155] According to one estimate, annual healthcare expenditures averaged $1,409 lower in the case of SNAP participants versus non-participants, and even larger differences occurred among SNAP participants with hypertension or coronary heart disease.[156,157]

- Hospital admissions for hypoglycemia (i.e., low blood sugar) are higher at the end of the month for low-income individuals with diabetes than high-income individuals with diabetes.[158] This suggests that low-income patients are more likely to have hypoglycemia when food and other benefits (e.g., SNAP) are most likely to be depleted, typically at the end of the month.

- SNAP participation was associated with reduced hospitalization and, among those who were hospitalized,



less costly hospital stays, in a study of Maryland older adults dually enrolled in Medicare and Medicaid. According to the study team's estimates, "expanding SNAP access to nonparticipating dual eligible older adults in Maryland could have resulted in inpatient hospital cost savings of $19 million in 2012."[159] In addition, a companion study found an association between SNAP participation and reduced nursing home admissions and admission costs, with estimated cost savings of $34 million in 2012 if SNAP had been provided to eligible nonparticipants.[160]

- National data found that SNAP improves adult health in terms of increasing the probability of reporting excellent or good health as well as having fewer sick days, office-based doctor's visits, and outpatient visits.[161]

- Access to SNAP *in utero* and in early childhood reduced the incidence of metabolic syndrome (obesity, hypertension, diabetes, heart disease, heart attack), reduced the risk of stunting, and, for women, increased reports of being in good health in adulthood, based on a study of people who grew up in disadvantaged families and were born between 1956 and 1981.[162]

- A study of SNAP-eligible households examined the impact of program participation on adult health and



**Hunger & Health:** Supplemental Nutrition Assistance Program

health care utilization when accounting for state policy variation.[163] SNAP participation was associated with an increased probability of being in excellent or very good health. In addition, participation was associated with a decreased probability of reporting a stomach problem in the past two weeks, and needing, but not being able to afford, dental care and eyeglasses.

- Among a sample of low-income, urban medical center patients with Type 2 diabetes, SNAP receipt was associated with a lower risk of poor glucose control among those who were food insecure. According to the authors of this study, "recent cuts to SNAP benefits may have unintended consequences, such as worse chronic disease control among low-income patients with diabetes."[164]

- A 2016 study found that states with higher ratios of social spending-to-health spending had significantly better state-level health outcomes (e.g., adult obesity, asthma, mentally unhealthy days, lung cancer mortality) compared to states with lower ratios.[165] Social spending included spending for SNAP and WIC. The authors concluded that, "our study suggests that broadening the debate beyond what should be spent on health care to include what should be invested in health — not only in health care but also in social services and public health — is warranted."

## Children

- Maternal access to SNAP in pregnancy improves birth outcomes, including increasing birth weight, based on a study that examined the rollout of the program (then known as Food Stamps) in the 1960s and 1970s.[166]



- According to Children's HealthWatch, SNAP-recipient children of immigrant mothers were more likely to be in good or excellent health and live in a food-secure household, and their families were less likely to need

to make health care trade-offs (e.g., paying for health care costs instead of paying for food or housing), when compared to income-eligible non-participants.[167]

- SNAP reduces the rate of poor general health by at least 3.1 percentage points, and anemia by at least 1.6 percentage points, among children, based on estimates using national data.[168]

- Compared to low-income non-participants, young children participating in SNAP, WIC, or both programs had lower rates of failure to thrive and lower risk of abuse and neglect, based on administrative data from more than 350,000 children in Illinois.[169]

- Young children in food-insecure households in Boston who received SNAP benefits were less likely to be at developmental risk and in fair or poor health, compared to children in food-insecure households who were not receiving SNAP benefits.[170]

- Young, food-insecure children who participated in SNAP had fewer hospitalizations than comparable non-participants and were less likely to be in poor or fair health, based on responses from more than 17,000 caregivers in six urban centers.[171]

- A recent study of SNAP-eligible households examined the impact of program participation on child health and health care utilization when accounting for state policy variation.[172] SNAP participation was associated with an increased probability of being in excellent or very good health. In addition, participation was associated with a decreased probability of needing, but not being able to afford, dental care and eyeglasses.

- A loss or reduction in SNAP benefits has detrimental health impacts on children and families. According to Children's HealthWatch research, young children in families whose SNAP benefits were recently lost or reduced due to an increase in income were more likely to be in fair or poor health and at risk for developmental delays, compared to young children in families who consistently received SNAP benefits.[173] Families with SNAP benefit loss or reductions were more likely to forgo medical care for the child or other family members due to cost, or to make health care trade-offs.[174,175]



**Hunger & Health:** Supplemental Nutrition Assistance Program

## SNAP Improves Mental Health Outcomes

■ Children's HealthWatch data from Minneapolis and Boston found that mothers of young children in food-insecure households receiving SNAP benefits were less likely to experience maternal depressive symptoms and less likely to be in fair or poor health, compared to mothers in food-insecure households that were not receiving SNAP benefits.[176,177]

■ Among mothers who became food insecure, losing SNAP benefits was associated with an increased probability of depression and gaining SNAP benefits was associated with a reduced probability of depression.[178] These findings are based on data from urban, unmarried mothers who participated in the Fragile Families and Child Wellbeing Study.

■ Participation in SNAP for six months was associated with a 38 percent reduction in psychological distress, according to a national study of SNAP households.[179]

■ In a national sample of low-income adults, low food security and very low food security were both associated with higher odds of depression among SNAP participants, but the odds were not as great as those for similarly situated non-participants. These findings suggest that SNAP may have a protective effect on mental health.[180]

■ Food-insecure seniors participating in SNAP were less likely to be depressed than non-participants, according to analyses from a large, nationally representative sample of adults over age 54.[181]

### The Supplemental Nutrition Assistance Program (SNAP):

■ reduces poverty and deep poverty;
■ supports economic stability and academic outcomes;
■ reduces food insecurity;
■ protects against obesity;
■ improves dietary intake;
■ improves health outcomes; and
■ improves mental health outcomes.

### SNAP Benefit Loss or Reduction is Harmful to Health and Well-Being

■ Young children in families whose SNAP benefits were recently lost or reduced due to an increase in income were more likely to be in fair or poor health and at risk for developmental delays.[182]

■ Families with SNAP benefit loss or reductions were more likely to forgo medical care for a child or other family members due to cost, or to make health care trade-offs.[183,184]

■ Among mothers who became food insecure, losing SNAP benefits was associated with an increased probability of depression.[185]

## SNAP Improves Health; More Adequate SNAP Benefit Levels Will Further Improve Health and Well-Being

The evidence shows that SNAP reduces poverty and food insecurity, improves dietary quality, protects against obesity, and improves health, especially among children. However, inadequate benefits — the most important weakness of SNAP — severely limit the program's ability to do even more to improve the health of low-income Americans. Regular monthly benefits are just too low to purchase an adequate, healthy diet on a consistent basis. Benefits are inadequate, even though SNAP recipients use a variety of savvy shopping practices to stretch their limited food dollars, such as clipping coupons, using shopping lists, looking for deals by comparing store circulars, purchasing generic brands, buying in bulk quantities, and shopping at multiple stores.[186,187,188]

Researchers, advocates, food pantries, and SNAP participants have been saying for years that SNAP benefits are inadequate, and in 2013, after a thorough study, the prestigious Institute of Medicine (IOM) outlined the factors



that explain why the SNAP allotment is not enough to get most families through the month with a minimally adequate diet (e.g., the lag in SNAP benefits keeping up with inflation, the failure to fully account for shelter costs).[189] An analysis by FRAC one year earlier found that SNAP benefits are inadequate, in part, because they are based on USDA's impractical Thrifty Food Plan. The plan assumes impractical lists of foods; lacks the variety called for in the Dietary Guidelines for Americans; unrealistically assumes adequate facilities and time for food preparation; unrealistically assumes food availability, affordability, and adequate transportation; even accounting for these shortcomings, the Thrifty Food Plan costs more than the SNAP allotment in many parts of the country; and ignores special dietary needs.[190]

The nation ran a large natural experiment involving more adequate benefits several years ago, and it worked. Average benefits starting in April 2009 reflected a temporary boost in allotments pursuant to the American Recovery and Reinvestment Act (ARRA) of 2009 — initially by 13.6 percent for those receiving the maximum allotment. This increase was in recognition of the effective and quick stimulative effect of SNAP benefits on the economy as well as the recognition that hard-hit families needed additional assistance. Unfortunately, the temporary ARRA boost ended on November 1, 2013, and benefits were reduced for all SNAP participants. Research on the ARRA boost and benefit adequacy suggest that SNAP's favorable impacts on health *are even greater* the higher the level of SNAP benefits, as highlighted in the following selection of studies.

## More Adequate Benefits Improve Food and Economic Security

- The temporary ARRA increase in SNAP benefit levels helped reduce food insecurity, and helped increase food expenditures by 5.4 percent among low-income households between December 2008 (pre-ARRA) and December 2009 (about eight months post-ARRA).[191]

- After the ARRA boost took effect, SNAP households also exhausted benefits later in the month — meaning, they were able to save slightly more benefits for use at the end of the month.[192]

- A USDA report examining the impact on food spending behavior as a result of the ARRA increase found that "SNAP benefits provided a larger boost to food-expenditure share than an equal amount of cash ... Lowest income households (here, those with incomes under $15,000 per year), single-parent households, and households with an unemployed member increased the food share of total expenditures the most in response to increased benefit levels ... [H]igher SNAP benefits can redirect households' spending behavior toward food at home."[193]

- The temporary ARRA boost had positive spillover effects on non-food household needs, according to a study using a national sample of low-income households. More specifically, the increase in benefits had positive effects, not only on food expenditures, but also on housing, entertainment, and education expenditures.[194] The study "provides compelling evidence that during the economic crisis, the SNAP benefit boost not only shifted up food spending but also improved expenditures in other essential spending categories of low-income households."

- One USDA researcher estimated that increasing the maximum SNAP benefit by 10 percent would reduce the number of SNAP households with very low food security by about 22 percent.[195]

- According to Children's HealthWatch, SNAP households with children would have an 8 percent increase in food purchasing power if SNAP benefits were based on the more-adequate Low Cost Food Plan (rather than the Thrifty Food Plan), resulting in 5.3 percent of food-insecure families with children becoming food secure.[196]

- Children's HealthWatch examined the impact on food insecurity of the post-ARRA reduction by analyzing data from 12,335 households with young children that were participating in SNAP. Compared to SNAP households with young children during the SNAP benefit boost period, SNAP households with young children after the SNAP rollback were 23 percent more likely to be household food insecure and 17 percent more likely to be child food insecure.[197] This is consistent with other Children's HealthWatch research demonstrating that young children and their families were more likely to experience food insecurity when SNAP benefits were reduced or lost due to an increase in income.[198,199]



**Hunger & Health:** Supplemental Nutrition Assistance Program

■ A 2011 demonstration project providing $60 per month in EBT-delivered benefits to purchase food for low-income children in summer months (not limited to SNAP-recipient children) found a 19 percent reduction in food insecurity and a 20 percent reduction in very low food security.[200]

## More Adequate Benefits Protect Against Obesity

■ Using national data, researchers examined the impact of increased SNAP benefits on obesity among adults living in SNAP households with at least one school-age child and at least one child under 5 years old.[201] The additional SNAP benefits available per adult from a child entering school were associated with reductions in BMI and the probability of being obese for SNAP adults. (In this study, a larger share of school-age children who were eligible for free school meals served as a proxy for increased SNAP benefits available per adult.)

■ A larger amount of SNAP dollars received in the previous month was associated with significantly lower BMI and waist circumference among those women who reported their SNAP benefit levels in a national study.[202]

■ Food insecurity was significantly related to increased BMI among North Carolina women receiving less than $150 in SNAP benefits per household member, but not related among those women receiving $150 or more in benefits.[203] In addition, the mean BMI of women receiving at least $150 in benefits per household member was significantly lower than the mean BMI of women receiving less than $150 in benefits. These findings "suggest that the provision of adequate SNAP benefits per household member might partially ameliorate the negative effects of food insecurity on BMI."

## More Adequate Benefits Improve Dietary Quality

■ Prior to the temporary ARRA boost in SNAP benefits, caloric intake declined by as much as 25 percent at the end of the month among SNAP participants, based on national survey data; however, the temporary boost in benefits eliminated this decline. This study's author concluded: "now that the ARRA-induced benefit boost has been eliminated, it is likely that SNAP recipients are again experiencing a monthly cycle in caloric intake."[204]

■ A $30-per-person increase in monthly SNAP benefits was estimated to reduce food insecurity as well as increase grocery spending, improve the consumption of many nutritious foods (including vegetables and lean sources of protein), and reduce fast food consumption.[205]

■ In communities across the country, financial incentives are being offered to SNAP participants to promote the purchase and consumption of fruits, vegetables, and other nutritious foods at SNAP-authorized farmers' markets and food retailers. These incentives increase the purchasing power of SNAP benefits, thereby improving their adequacy. Research and local success stories demonstrate that these positive economic incentives improve dietary outcomes among SNAP participants. Most notably, the USDA-funded evaluation of the Healthy Incentives Pilot in Massachusetts found that pilot participants on SNAP who received a financial incentive for targeted fruits and vegetables consumed about one-quarter cup (26 percent) more fruits and vegetables than non-participants on SNAP, which was a statistically significant and nutritionally relevant difference.[206]

■ Each additional SNAP dollar increases a household's score for overall dietary quality.[207] The higher the level of SNAP benefits, the larger the positive nutritional effect of program participation. Positive effects were most evident





**Hunger & Health:** Supplemental Nutrition Assistance Program

for the vegetable, dairy, meat, and sodium components of USDA's Healthy Eating Index.

- In a 2010 report from USDA examining the potential impact of an increase in SNAP benefits on a number of measures of dietary quality, spending more money on food was associated with positive improvements in dietary quality, energy density, nutrient density, and fruit and vegetable consumption.[208]

## More Adequate Benefits Improve Health Outcomes

- In Massachusetts, inpatient Medicaid cost growth significantly declined after the ARRA increase, especially among people with chronic illnesses.[209] The cost declines were driven by reduced hospital admissions and, to a lesser extent, reduced length of stay per admission. The author concluded: "because of the link between additional SNAP benefits and reduced hospital admissions, it appears that the allotment amounts before the SNAP increase may not have been sufficient to fully alleviate food insecurity and its associated health effects."

- Based on claims data for more than 560,000 commercially insured nonelderly adults, those of lower income had an increased risk of emergency room visits or inpatient hospitalizations for hypoglycemia at the end of the month.[210] However, this risk was reduced to non-significance during the temporary ARRA boost in SNAP benefits. In other words, the ARRA boost was associated with less risk of end-of-the-month hypoglycemia among low-income Americans.

- Two years after the beginning of the temporary ARRA boost, young children in households receiving SNAP benefits were significantly more likely to be "well" than children from non-participating low-income households, according to a study of young children in emergency rooms and primary care clinics.[211] Such a difference was not observed prior to the benefit boost — that is, improved SNAP benefit levels positively impacted child health. (Children were classified as "well" if they were in good health per parent report, were developing normally, were not overweight or underweight, and had never been hospitalized.)

- A $10 increase in monthly SNAP benefits was associated with reduced hospitalization and, among those who were hospitalized, less costly hospital stays, according to a study of Maryland older adults dually enrolled in Medicare and Medicaid.[212] A companion study had similar findings on nursing home admissions: a $10 increase in benefits was associated with reduced nursing home admissions and, among those who were admitted, shorter and less costly stays.[213]

- Emergency room claims for hypoglycemia were significantly and inversely related to the size of SNAP benefits in a study linking Missouri SNAP and Medicaid claims data on 362,101 SNAP participants.[214] The findings suggest that as monthly SNAP benefits increase, there is a reduction in the likelihood of being treated for hypoglycemia in the emergency room, with the effect being larger for SNAP participants receiving smaller (i.e., less generous) allotments.

- According to a recent cost-effectiveness analysis, a nationwide expansion of the Healthy Incentives Pilot would reduce the incidence of Type 2 diabetes by 10.3 percent, myocardial infarction (heart attack) by 8.5 percent, stroke by 7.4 percent, and obesity by 1.3 percent among SNAP participants.[215] This translates into a reduction in incidence by 1.7 percent, 1.4 percent, 1.2 percent, and 0.2 percent, respectively, for the overall U.S. population. Such an expansion also would be cost-saving, largely because of costs averted for diabetes and cardiovascular disease.

- In a study exploring the impacts of four nutrition policy scenarios, researchers conclude that a fruit and vegetable subsidy for SNAP participants that reduces prices by 30 percent would be the most effective in reducing socioeconomic disparities in cardiovascular disease mortality.[216] The three other scenarios were a national mass media campaign to increase fruit and vegetable consumption and reduce sugar-sweetened beverage consumption; a national policy to tax sugar-sweetened beverages to increase prices by 10 percent; and, a national fruit and vegetable subsidy that reduces prices by 10 percent.



**Hunger & Health:** Supplemental Nutrition Assistance Program

■ Based on preliminary research using national survey data and regional food prices, increased SNAP purchasing power raises the likelihood that a child had a checkup in the past 12 months.[217] Increased SNAP purchasing power also decreases the likelihood that a child had to delay or forgo medical care in the past year due to cost, visit the emergency room in the past year, and miss school due to illness.

*The evidence shows that SNAP reduces poverty and food insecurity, improves dietary quality, protects against obesity, and improves health, especially among children. However, inadequate benefits — the most important weakness of SNAP — severely limit the program's ability to do even more to improve the health of low-income Americans. Research on the ARRA boost and benefit adequacy suggest that SNAP's favorable impacts on health are even greater the higher the level of SNAP benefits.*

## Conclusion

Protecting and improving the public's health is critically important for the nation. Far too many Americans struggle with poverty, food insecurity, inadequate dietary intake, and obesity. Research shows that SNAP alleviates these problems and improves health and well-being. Increasing access to SNAP and improving SNAP benefit levels would further SNAP's role in improving the public's health.

*This paper was prepared by FRAC's Heather Hartline-Grafton, DrPH, RD, Senior Nutrition Policy and Research Analyst, with research assistance provided by Olivia Dean during a spring 2017 internship.*



**Hunger & Health:** Supplemental Nutrition Assistance Program

# Endnotes

1 Coleman-Jensen, A., Rabbitt, M. P., Gregory, C. A., & Singh, A. (2017). Household food security in the United States in 2016. *Economic Research Report*, 237. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

2 Flegal, K. M., Kruszon-Moran, D., Carroll, M. D., Fryar, C. D., & Ogden, C. L. (2016). Trends in obesity among adults in the United States, 2005 to 2014. *JAMA*, 315(21), 2284–2291.

3 Ogden C. L., Carroll, M. D., Lawman, H. G., Fryar, C. D., Kruszon-Moran, D., Kit, B. K., & Flegal K. M. (2016). Trends in obesity prevalence among children and adolescents in the United States, 1988–1994 through 2013–2014. *JAMA*, 315(21), 2292–2299.

4 American Heart Association Statistics Committee and Stroke Statistics Subcommittee. (2017). Heart disease and stroke statistics — 2017 update: a report from the American Heart Association. *Circulation*, 135(10), e146–e603.

5 White House Council of Economic Advisers. (2015). *Long-Term Benefits of the Supplemental Nutrition Assistance Program.* Washington, DC: Executive Office of the President of the United States.

6 Gundersen, C., & Ziliak, J. P. (2015). Food insecurity and health outcomes. *Health Affairs*, 34(11), 1830–1839.

7 Marks, J. S. (2012). *Congress: Do No Harm to SNAP.* Available at: http://www.huffingtonpost.com/james-s-marks/congress-do-no-harm-to-sn_b_2270786.html. Accessed on September 20, 2017.

8 Gundersen, C., & Ziliak, J. P. (2015). Food insecurity and health outcomes. *Health Affairs*, 34(11), 1830–1839.

9 U.S. Department of Agriculture, Food and Nutrition Service. (2017). *Supplemental Nutrition Assistance Program.* Available at: https://www.fns.usda.gov/sites/default/files/pd/34SNAPmonthly.pdf. Accessed on October 31, 2017.

10 Leftin, J., Wemmerus, N., Mabli, J., Godfrey, T., & Tordella, S. (2014). *Dynamics of Supplemental Nutrition Assistance Program Participation from 2008 to 2012.* Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Research and Analysis.

11 U.S. Department of Agriculture, Food and Nutrition Service. (2017). *Supplemental Nutrition Assistance Program.* Available at: https://www.fns.usda.gov/sites/default/files/pd/34SNAPmonthly.pdf. Accessed on October 31, 2017.

12 Leftin, J., Wemmerus, N., Mabli, J., Godfrey, T., & Tordella, S. (2014). *Dynamics of Supplemental Nutrition Assistance Program Participation from 2008 to 2012.* Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Research and Analysis.

13 Rank, M. R., & Hirschl, T. A. (2009). Estimating the risk of food stamp use and impoverishment during childhood. *Archives of Pediatrics and Adolescent Medicine*, 163(11), 994–999.

14 Rank, M. R., & Hirschl, T. A. (2005). Likelihood of using food stamps during the adulthood years. *Journal of Nutrition Education and Behavior*, 37(3), 137–146.

15 Farson Gray, K., & Cunnyngham, K. (2017). *Trends in Supplemental Nutrition Assistance Program Participation Rates: Fiscal Year 2010 to Fiscal Year 2015.* Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

16 Farson Gray, K., & Cunnyngham, K. (2017). *Trends in Supplemental Nutrition Assistance Program Participation Rates: Fiscal Year 2010 to Fiscal Year 2015.* Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

17 AARP Foundation and the Food Research and Action Center. (2015). *Combating Food Insecurity: Tools for Helping Older Adults Access SNAP.* Available at: http://www.frac.org/research/resource-library/combating-food-insecurity-tools-helping-older-adults-access-snap-2. Accessed on September 20, 2017.

18 Lauffer, S. (2017). *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2016.* Report No. SNAP-17-CHAR. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

19 Lauffer, S. (2017). *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2015.* Report No. SNAP-17-CHAR. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

20 Lauffer, S. (2017). *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2015.* Report No. SNAP-17-CHAR. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

21 U.S. Department of Agriculture, Food and Nutrition Service. (2016). *2016 SNAP Retailer Management Year End Summary.* Available at: https://www.fns.usda.gov/sites/default/files/snap/2016-SNAP-Retailer-Management-Year-End-Summary.pdf. Accessed on September 21, 2017.

22 U.S. Department of Agriculture, Food and Nutrition Service. (2017). *Supplemental Nutrition Assistance Program — Eligibility.* Available at: http://www.fns.usda.gov/snap/eligibility. Accessed on September 21, 2017.

23 Silbermann, L. (2017). *Memo to Regional Supplemental Nutrition Assistance Program Directors: SNAP — Fiscal Year 2018 Cost-of-Living Adjustments.* Available at: https://fns-prod.azureedge.net/sites/default/files/snap/SNAP_Fiscal_Year_2018_Cost_of_Living_Adjustments.pdf. Accessed on September 21, 2017.

24 Lauffer, S. (2017). *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2015.* Report No. SNAP-17-CHAR. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

25 U.S. Department of Agriculture, Food and Nutrition Service. (2017). *Supplemental Nutrition Assistance Program.* Available at: https://www.fns.usda.gov/sites/default/files/pd/34SNAPmonthly.pdf. Accessed on September 21, 2017.

26 Semega, J. L., Fontenot, K. R., & Kollar, M. A. (2017). *Income and Poverty in the United States: 2016.* U.S. Census Bureau, Current Population Reports, P60–259. Washington, DC: U.S. Government Printing Office.

27 Semega, J. L., Fontenot, K. R., & Kollar, M. A. (2017). *Income and Poverty in the United States: 2016.* U.S. Census Bureau, Current Population Reports, P60–259. Washington, DC: U.S. Government Printing Office.



**Hunger & Health:** Supplemental Nutrition Assistance Program

28 Woolf, S. H., Aron, L., Dubay, L., Simon, S. M., Zimmerman, E., & Luk, K. X. (2015). *How are Income and Wealth Linked to Health and Longevity?* Washington, DC: The Urban Institute; Richmond, VA: Virginia Commonwealth University, Center on Society and Health.

29 Barnett, J. C., & Berchick, E. R. (2017). *Health Insurance Coverage in the United States: 2016.* U.S. Census Bureau, Current Population Reports, P60–260. Washington, DC: U.S. Government Printing Office.

30 National Center for Health Statistics. (2017). *Health, United States, 2016: With Chartbook on Long-term Trends in Health.* Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics.

31 Martinez, M. E., & Ward, B. W. (2016). Health care access and utilization among adults aged 18–64, by poverty level: United States, 2013–2015. *NCHS Data Brief,* 262, 1–8.

32 Morrissey, T. W., Oellerich, D., Meade, E., Simms, J., & Stock, A. (2016). Neighborhood poverty and children's food insecurity. *Child and Youth Services Review,* 66, 85–93.

33 Coleman-Jensen, A., Rabbitt, M. P., Gregory, C. A., & Singh, A. (2017). Household food security in the United States in 2016. *Economic Research Report,* 237. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

34 Lee, H., Andrew, M., Gebremariam, A., Lumeng, J. C., & Lee, J. M. (2014). Longitudinal associations between poverty and obesity from birth through adolescence. *American Journal of Public Health,* 104(5), e70–e76

35 Datar, A., & Chung, P. J. (2015). Changes in socioeconomic, racial/ethnic, and sex disparities in childhood obesity at school entry in the United States. *JAMA Pediatrics,* 169(7), 696–697.

36 Singh, G. K., Siahpush, M., & Kogan, M. D. (2010). Disparities in children's exposure to environmental tobacco smoke in the United States, 2007. *Pediatrics,* 126(1), 4–13.

37 Ali, M. K., Bullard, K. M., Beckles, G. L., Stevens, M. R., Barker, L., Narayan, K. M., & Imperatore, G. (2011). Household income and cardiovascular disease risks in U.S. children and young adults: analyses from NHANES 1999–2008. *Diabetes Care,* 34(9), 1998–2004.

38 Ekono, M., Jiang, Y., & Smith, S. (2016). *Young Children in Deep Poverty.* New York, NY: National Center for Children in Poverty, Mailman School of Public Health, Columbia University.

39 Pascoe, J. M., Wood, D. L., Duffee, J. H., & Kuo, A. (2016). Mediators and adverse effects of child poverty in the United States. *Pediatrics,* 137(4), 20160340.

40 National Center for Health Statistics. (2017). *Health, United States, 2016: With Chartbook on Long-term Trends in Health.* Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics.

41 Ekono, M., Jiang, Y., & Smith, S. (2016). *Young Children in Deep Poverty.* New York, NY: National Center for Children in Poverty, Mailman School of Public Health, Columbia University.

42 Hair, N. L., Hanson, J. L., Wolfe, B. L., & Pollak, S. D. (2015). Association of child poverty, brain development, and academic achievement. *JAMA Pediatrics,* 169(9), 822–829.

43 Reardon, S. F. (2011). The widening academic achievement gap between the rich and the poor: New evidence and possible explanations. In R. Murnane & G. Duncan (Eds.), *Whither Opportunity? Rising Inequality and the Uncertain Life Chances of Low-Income Children.* New York, NY: Russell Sage Foundation Press.

44 Perou, R., Bitsko, R. H., Blumberg, S. J., Pastor, P., Ghandour, R. M., Gfroerer, J. C., Hedden, S. L., Crosby, A. E., Visser, S. N., Schieve, L. A., Parks, S. E., Hall, J. E., Brody, D., Simile, C. M., Thompson, W. W., Baio, J., Avenevoli, S., Kogan, M. D., & Huang, L. N. (2013). Mental health surveillance among children – United States, 2005–2011. *Morbidity and Mortality Weekly Report,* 62(Supplement 2), 1–35.

45 Consumer Federation of America. (2013). *Child Poverty, Unintentional Injuries and Foodborne Illness: Are Low-Income Children at Greater Risk?* Washington, DC: Consumer Federation of America.

46 Non, A. L., Roman, J. C., Gross, C. L., Gilman, S. E., Loucks, E. B., Buka, S. L., & Kubzansky, L. D. (2016). Early childhood social disadvantage is associated with poor health behaviours in adulthood. *Annals of Human Biology,* 43(2), 144–53.

47 Braveman, P., & Barclay, C. (2009). Health disparities beginning in childhood: a life-course perspective. *Pediatrics,* 125, S163–S175.

48 Cohen, S., Janicki-Deverts, D., Chen, E., & Matthews, K. A. (2010). Childhood socioeconomic status and adult health. *Annals of the New York Academy of Sciences,* 1186, 37–55.

49 Beckles, G. L., & Chou, C. (2016). Disparities in the prevalence of diagnosed diabetes — United States, 1999–2002 and 2011–2014. *Morbidity and Mortality Weekly Report,* 65, 1265–1269.

50 Franks, P., Winters, P. C., Tancredi, D. J., & Fiscella, K. A. (2011). Do changes in traditional coronary heart disease risk factors over time explain the association between socio-economic status and coronary heart disease? *BMC Cardiovascular Disorders,* 11, 28.

51 National Center for Health Statistics. (2017). *Health, United States, 2016: With Chartbook on Long-term Trends in Health.* Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics.

52 Ogden, C. L., Lamb, M. M., Carroll, M. D., & Flegal, K. M. (2010). Obesity and socioeconomic status in adults: United States, 2005–2008. *NCHS Data Brief,* 50, 1–8.

53 Pratt, L. A., & Brody, D. J. (2014). Depression in the U.S. household population, 2009–2012. *NCHS Data Brief,* 172, 1–8.

54 Courtney-Long, E. A., Carroll, D. D., Zhang, Q. C., Stevens, A. C., Griffin-Blake, S., Armour, B. S., & Campbell, V. A. (2015). Prevalence of disability and disability type among adults — United States, 2013. *Morbidity and Mortality Weekly Report,* 64(29), 777–783.

55 Centers for Disease Control and Prevention. (2013). CDC health disparities and inequalities report — United States, 2013. *Morbidity and Mortality Weekly Report,* 62(Supplement 3), 1–187.

56 Signorello, L. B., Cohen, S. S., Williams, D. R., Munro, H. M., Hargreaves, M. K., & Blot, W. J. (2014). Socioeconomic status, race, and mortality: a prospective cohort study. *American Journal of Public Health,* 104(12), e98–e107.



[57] Black, M. M., Quigg, A. M., Cook, J., Casey, P. H., Cutts, D. B., Chilton, M., Meyers, A., Ettinger de Cuba, S., Heeren, T., Coleman, S., Rose-Jacobs, R., & Frank, D. A. (2012). WIC participation and attenuation of stress-related child health risks of household food insecurity and caregiver depressive symptoms. *Archives of Pediatrics and Adolescent Medicine*, 166(5), 444–451.

[58] Moore, C. J., & Cunningham, S. A. (2012). Social position, psychological stress, and obesity: a systematic review. *Journal of the Academy of Nutrition and Dietetics*, 112(4), 518–526.

[59] Coleman-Jensen, A., Rabbitt, M. P., Gregory, C. A., & Singh, A. (2017). Household food security in the United States in 2016. *Economic Research Report*, 237. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

[60] Pruitt, S. L., Leonard, T., Xuan, L., Amory, R., Higashi, R. T., Nguyen, O. K., Pezzia, C., & Swales, S. (2016). Who is food insecure? Implications for targeted recruitment and outreach, National Health and Nutrition Examination Survey, 2005–2010. *Preventing Chronic Disease*, 13, e143.

[61] Seligman, H. K., Bindman, A. B., Vittinghoff, E., Kanaya, A. M., & Kushel, M. B. (2007). Food insecurity is associated with diabetes mellitus: Results from the National Health Examination and Nutrition Examination Survey (NHANES) 1999–2002. *Journal of General Internal Medicine*, 22(7), 1018–1023.

[62] Fitzgerald, N., Hromi-Fiedler, A., Segura-Pérez, S., & Pérez-Escamilla, R. (2011). Food insecurity is related to increased risk of type 2 diabetes among Latinas. *Ethnicity and Disease*, 21(3), 328–334.

[63] Martin, M. A., & Lippert A. M. (2012). Feeding her children, but risking her health: the intersection of gender, household food insecurity, and obesity. *Social Science Medicine*, 74(11), 1754–1764.

[64] Pruitt, S. L., Leonard, T., Xuan, L., Amory, R., Higashi, R. T., Nguyen, O. K., Pezzia, C., & Swales, S. (2016). Who is food insecure? Implications for targeted recruitment and outreach, National Health and Nutrition Examination Survey, 2005–2010. *Preventing Chronic Disease*, 13, e143.

[65] Pan, L., Sherry, B., Njai, R., & Blanck, H. M. (2012). Food insecurity is associated with obesity among US adults in 12 states. *Journal of the Academy of Nutrition and Dietetics*, 112(9), 1403–1409.

[66] Irving, S. M., Njai, R. S., & Siegel, P. Z. (2014). Food insecurity and self-reported hypertension among Hispanic, Black, and White adults in 12 states, Behavioral Risk Factor Surveillance System, 2009. *Preventing Chronic Disease*, 11(E161), 1–6.

[67] Laraia, B. A., Siega-Riz, A. M., & Gundersen, C. (2010). Household food insecurity is associated with self-reported pregravid weight status, gestational weight gain, and pregnancy complications. *Journal of the American Dietetic Association*, 110(5), 692–701.

[68] Park, C. Y., & Eicher-Miller, H. A. (2014). Iron deficiency is associated with food insecurity in pregnant females in the United States: National Health and Nutrition Examination Survey 1999–2010. *Journal of the Academy of Nutrition and Dietetics*, 114(12), 1967–1973.

[69] Leung, C. W., Epel, E. S., Willett, W. C., Rimm, E. B., & Laraia, B. A. (2015). Household food insecurity is positively associated with depression among low-income Supplemental Nutrition Assistance Program participants and income-eligible nonparticipants. *Journal of Nutrition*, 145(3), 622–627.

[70] Munger, A. L., Hofferth, S. L., & Grutzmacher, S. K. (2016). The role of the Supplemental Nutrition Assistance Program in the relationship between food insecurity and probability of maternal depression. *Journal of Hunger and Environmental Nutrition*, 11(2), 147–161.

[71] Ziliak, J. P., & Gundersen, C. (2014). *The Health Consequences of Senior Hunger in the United States: Evidence from the 1999–2010 NHANES*. Prepared for the National Foundation to End Senior Hunger.

[72] Ziliak, J. P., & Gundersen, C. (2014). *The Health Consequences of Senior Hunger in the United States: Evidence from the 1999–2010 NHANES*. Prepared for the National Foundation to End Senior Hunger.

[73] Ziliak, J. P., & Gundersen, C. (2014). *The Health Consequences of Senior Hunger in the United States: Evidence from the 1999–2010 NHANES*. Prepared for the National Foundation to End Senior Hunger.

[74] Ziliak, J. P., & Gundersen, C. (2014). *The Health Consequences of Senior Hunger in the United States: Evidence from the 1999–2010 NHANES*. Prepared for the National Foundation to End Senior Hunger.

[75] Ziliak, J. P., & Gundersen, C. (2014). *The Health Consequences of Senior Hunger in the United States: Evidence from the 1999–2010 NHANES*. Prepared for the National Foundation to End Senior Hunger.

[76] Ahn, S., Smith, M. L., Hendricks, M., & Ory, M. G. (2014). Associations of food insecurity with body mass index among baby boomers and older adults. Food Security, 6(3), 423–433.

[77] Frith, E., & Loprinzi, P. D. (2017). Food insecurity and cognitive function in older adults: brief report. *Clinical Nutrition*, published online ahead of print.

[78] Ziliak, J. P., & Gundersen, C. (2014). *The Health Consequences of Senior Hunger in the United States: Evidence from the 1999–2010 NHANES*. Prepared for the National Foundation to End Senior Hunger.

[79] Cook, J. T., Black, M., Chilton, M., Cutts, D., Ettinger de Cuba, S., Heeren, T. C., Rose-Jacobs, R., Sandel, M., Casey, P. H., Coleman, S., Weiss, I., & Frank, D. A. (2013). Are food insecurity's health impacts underestimated in the U.S. population? Marginal food security also predicts adverse health outcomes in young U.S. children and mothers. *Advances in Nutrition*, 4(1), 51–61.

[80] Lee, J. S., Gundersen, C., Cook, J., Laraia, B., & Johnson, M. A. (2012). Food insecurity and health across the lifespan. *Advances in Nutrition*, 3(5), 744–745.

[81] Nord, M., & Parker, L. (2010). How adequately are food needs of children in low-income households being met? *Children and Youth Services Review*, 32(9), 1175–1185.

[82] Gundersen, C., & Ziliak, J. P. (2015). Food insecurity and health outcomes. *Health Affairs*, 34(11), 1830–1839.

[83] American Academy of Pediatrics. (2015). Promoting food security for all children. *Pediatrics*, 136(5), e1431–e1438.

[84] Shankar, P., Chung, R., & Frank, D. A. (2017). Association of food insecurity with children's behavioral, emotional, and academic outcomes: a systematic review. *Journal of Developmental and Behavioral Pediatrics*, 38(2), 135–150.



**Hunger & Health:** Supplemental Nutrition Assistance Program

85 Ryu, J. H., & Bartfeld, J. S. (2012). Household food insecurity during childhood and subsequent health status: the early childhood longitudinal study - kindergarten cohort. *American Journal of Public Health*, 102(11), e50-e55.

86 Kimbro, R. T., & Denney, J. T. (2015). Transitions into food insecurity associated with behavioral problems and worse overall health among children. *Health Affairs*, 34(11), 1949–1955.

87 Borders, A. E., Grobman, W. A., Amsden, L. B., & Holl, J. L. (2007). Chronic stress and low birth weight neonates in a low-income population of women. *Obstetrics and Gynecology*, 109(2 Part 1), 331–338.

88 Hromi-Fiedler, A., Bermúdez-Millán, A., Chapman, D., Segura-Pérez, S., Damio, G., Melgar-Quiñonez, H., & Pérez-Escamilla, R. (2008). Household food security status before pregnancy as a risk factor for delivering a low birthweight infant [abstract]. *The FASEB Journal*, 22, 36.1.

89 Carmichael, S. L., Yang, W., Herring, A., Abrams, B., & Shaw, G. M. (2007). Maternal food insecurity is associated with increased risk of certain birth defects. *Journal of Nutrition*, 137(9), 2087–2092.

90 Metallinos-Katsaras, E., Colchamiro, R., Edelstein, S., & Siu, E. (2016). Household food security status is associated with anemia risk at age 18 months among low-income infants in Massachusetts. *Journal of the Academy of Nutrition and Dietetics*, 116(11), 1760–1766.

91 Eicher-Miller, H. A., Mason, A. C., Weaver, C. M., McCabe, G. P., & Boushey, C. J. (2009). Food insecurity is associated with iron deficiency anemia in US adolescents. *American Journal of Clinical Nutrition*, 90(5), 1358–1371.

92 Alaimo, K., Olson, C. M., Frongillo, E. A. Jr., & Briefel, R. R. (2001). Food insufficiency, family income, and health in U.S. preschool and school-aged children. *American Journal of Public Health*, 91(5), 781–786.

93 Mangini, L. D., Hayward, M. D., Dong, Y. Q., & Forman, M. R. (2015). Household food insecurity is associated with childhood asthma. *Journal of Nutrition*, 145(12), 2756–2764.

94 Rose-Jacobs, R., Black, M. M., Casey, P. H., Cook, J. T., Cutts, D. B., Chilton, M., Heeren, T., Levenson, S. M., Meyers, A. F., & Frank, D. A. (2008). Household food insecurity: associations with at-risk infant and toddler development. *Pediatrics*, 121(1), 65–72.

95 Poole-Di Salvo, E., Silver, E. J., & Stein, R. E. (2016). Household food insecurity and mental health problems among adolescents: what do parents report? *Academic Pediatrics*, 16(1), 90–96.

96 McLaughlin, K. A., Green, J. G., Alegría, M., Jane Costello, E., Gruber, M. J., Sampson, N. A., & Kessler, R. C. (2012). Food insecurity and mental disorders in a national sample of U.S. adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry*, 51(12), 1293–1303.

97 McIntyre, L., Williams, J. V., Lavorato, D. H., & Patten, S. (2013). Depression and suicide ideation in late adolescence and early adulthood are an outcome of child hunger. *Journal of Affective Disorders*, 150(1), 123–129.

98 Jyoti, D. F., Frongillo, E. A., & Jones, S. J. (2005). Food insecurity affects school children's academic performance, weight gain, and social skills. *Journal of Nutrition*, 135, 2831–2839.

99 Shanafelt, A., Hearst, M. O., Wang, Q., & Nanney, M. S. (2016). Food insecurity and rural adolescent personal health, home, and academic environments. *Journal of School Health*, 86(6), 472–480.

100 Nelson, B. B., Dudovitz, R. N., Coker, T. R., Barnert, E. S., Biely, C., Li, N., Szilagyi, P. G., Larson, K., Halfon, N., Zimmerman, F. J., & Chung, P. J. (2016). Predictors of poor school readiness in children without developmental delay at age 2. *Pediatrics*, 138(2), e20154477.

101 Howard, L. L. (2011). Does food insecurity at home affect non-cognitive performance at school? A longitudinal analysis of elementary student classroom behavior. *Economics of Education Review*, 30, 157–176.

102 Herman, D., Afulani, P., Coleman-Jensen, A., & Harrison, G. G. (2015). Food insecurity and cost-related medication underuse among nonelderly adults in a nationally representative sample. *American Journal of Public Health*, 105(10), 48–59.

103 Afulani, P., Herman, D., Coleman-Jensen, A., & Harrison, G. G. (2015). Food insecurity and health outcomes among older adults: The role of cost-related medication underuse. *Journal of Nutrition in Gerontology and Geriatrics*, 34(3), 319–342.

104 Knight, C. K., Probst, J. C., Liese, A. D., Sercy, E., & Jones, S. J. (2016). Household food insecurity and medication "scrimping" among US adults with diabetes. *Preventive Medicine*, 83, 41–45.

105 Mayer, V. L., McDonough, K., Seligman, H., Mitra, N., & Long, J. A. (2016). Food insecurity, coping strategies and glucose control in low-income patients with diabetes. *Public Health Nutrition*, 19(6), 1103–1111.

106 Kushel, M. B., Gupta, R., Gee, L., & Haas, J. S. (2006). Housing instability and food insecurity as barriers to health care among low-income Americans. *Journal of General Internal Medicine*, 21, 71–77.

107 Seligman, H. K., Jacobs, E. A., López, A., Tschann, J., & Fernandez, A. (2012). Food insecurity and glycemic control among low-income patients with type 2 diabetes. *Diabetes Care*, 35(2), 233–238.

108 Burkhardt, M. C., Beck, A. F., Kahn, R. S., & Klein, M. D. (2012). Are our babies hungry? Food insecurity among infants in urban clinics. *Clinical Pediatrics*, 51(3), 238–243.

109 Tarasuk, V., Cheng, J., de Oliveira, C., Dachner, N., Gundersen, C., & Kurdyak, P. (2015). Association between household food insecurity and annual health care costs. *Canadian Medical Association Journal*, 187(14), E429–436.

110 Berkowitz, S. A., Basu, S., Meigs, J. B., & Seligman, H. (2017). Food insecurity and health care expenditures in the United States, 2011–2013. *Health Services Research*, published online ahead of print.

111 Cook, J. T., & Poblacion, A. P. (2016). *Estimating the Health-Related Costs of Food Insecurity and Hunger*. In *The Nourishing Effect: Ending Hunger, Improving Health, Reducing Inequality (2016 Hunger Report)*. Washington, DC: Bread for the World Institute.

112 Dietary Guidelines Advisory Committee. (2015). *Scientific Report of the 2015 Dietary Guidelines Advisory Committee*. Washington, DC: U.S. Department of Agriculture & U.S. Department of Health and Human Services.

113 Hiza, H. A., Casavale, K. O., Guenther, P. M., & Davis, C. A. (2013). Diet quality of Americans differs by age, sex, race/ethnicity, income, and education level. *Journal of the Academy of Nutrition and Dietetics*, 113(2), 297–306.

114 Rehm, C. D., Peñalvo, J. L., Afshin, A., & Mozaffarian, D. (2016). Dietary intake among U.S. adults, 1999–2012. *JAMA*, 315(23), 2542–2553.



# Hunger & Health: Supplemental Nutrition Assistance Program

[115] Dietary Guidelines Advisory Committee. (2010). *Report of the Dietary Guidelines Advisory Committee on the Dietary Guidelines for Americans, 2010, to the Secretary of Agriculture and the Secretary of Health and Human Services.* Washington, DC: U.S. Department of Agriculture, Agricultural Research Service.

[116] Dietary Guidelines Advisory Committee. (2015). *Scientific Report of the 2015 Dietary Guidelines Advisory Committee.* Washington, DC: U.S. Department of Agriculture & U.S. Department of Health and Human Services.

[117] Black, M. M., Quigg, A. M., Hurley, K. M., & Pepper, M. R. (2011). Iron deficiency and iron-deficiency anemia in the first two years of life: strategies to prevent loss of developmental potential. *Nutrition Reviews*, 69 (Supplement 1), S64–S70.

[118] Dietary Guidelines Advisory Committee. (2010). *Report of the Dietary Guidelines Advisory Committee on the Dietary Guidelines for Americans, 2010, to the Secretary of Agriculture and the Secretary of Health and Human Services.* Washington, DC: U.S. Department of Agriculture, Agricultural Research Service.

[119] Dietary Guidelines Advisory Committee. (2015). *Scientific Report of the 2015 Dietary Guidelines Advisory Committee.* Washington, DC: U.S. Department of Agriculture & U.S. Department of Health and Human Services.

[120] Haider, B. A., Olofin, I., Wang, M., Spiegelman, D., Ezzati, M., & Fawzi, W. W.; Nutrition Impact Model Study Group (anaemia). (2013). Anaemia, prenatal iron use, and risk of adverse pregnancy outcomes: systematic review and meta-analysis. *BMJ*, 346, f3443.

[121] Hartline-Grafton, H. (2015). *Understanding the Connections: Food Insecurity and Obesity.* Washington, DC: Food Research & Action Center.

[122] Hartline-Grafton, H. (2015). *Understanding the Connections: Food Insecurity and Obesity.* Washington, DC: Food Research & Action Center.

[123] Fox, L. (2017). *The Supplemental Poverty Measure: 2016.* Current Population Reports, P60–261(RV). U.S. Census Bureau.

[124] Tiehen, L., Jolliffe, D., & Smeeding, T. M. (2015). The Effect of SNAP on Poverty. In J. Bartfeld, C. Gundersen, T. M. Smeeding, & J. P. Ziliak (Eds.), *SNAP Matters: How Food Stamps Affect Health and Well-Being* (pp. 49–73). Stanford, CA: Stanford University Press.

[125] Tiehen, L., Jolliffe, D., & Gundersen, C. (2012). Alleviating poverty in the United States: The critical role of SNAP benefits. *Economic Research Report*, 132. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

[126] Hoynes, H., Schanzenbach, D. W., & Almond, D. (2016). Long-run impacts of childhood access to the safety net. *American Economic Review*, 106(4), 903–934.

[127] Sandel, M., Cutts, D., Meyers, A., Ettinger de Cuba, S., Coleman, S., Black, M. M., Casey, P. H., Chilton, M., Cook, J. T., Shortell, A., Heeren, T., & Frank, D. (2014). Co-enrollment for child health: how receipt and loss of food and housing subsidies relate to housing security and statutes for streamlined, multi-subsidy application. *Journal of Applied Research on Children: Informing Policy for Children at Risk*, 5(2), Article 2.

[128] Beharie, N., Mercado, M., & McKay, M. (2017). A protective association between SNAP participation and educational outcomes among children of economically strained households. *Journal of Hunger & Environmental Nutrition*, 12(2), 181–192.

[129] Frongillo, E. A., Jyoti, D. F., & Jones, S. J. (2006). Food Stamp Program participation is associated with better academic learning among school children. *Journal of Nutrition*, 136(4), 1077–1080.

[130] Gassman-Pines, A., & Bellows, L. E. (2015). *The Timing of SNAP Benefit Receipt and Children's Academic Achievement.* Presentation at the Association of Public Policy Analysis and Management Fall Conference on November 13, 2015, Miami, FL.

[131] Cotti, C., Gordanier, J., & Ozturk, O. (2017). *When Does It Count? The Timing of Food Stamp Receipt and Educational Performance.* Available at: https://ssrn.com/abstract=2992390. Accessed on October 31, 2017.

[132] Gennetian, L. A., Seshadri, R., Hess, N. D., Winn, A. N., & Goerge, R. M. (2016). Supplemental Nutrition Assistance Program (SNAP) benefit cycles and student disciplinary infractions. *Social Service Review*, 90(3), 403–433.

[133] Nord, M., & Prell, M. (2011). Food security improved following the 2009 ARRA increase in SNAP benefits. *Economic Research Report*, 116. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

[134] Mabli, J., & Ohls, J. (2015). Supplemental Nutrition Assistance Program participation is associated with an increase in household food security in a national evaluation. *Journal of Nutrition*, 145(2), 344–351.

[135] Ratcliffe, C., McKernan, S. M., & Zhang, S. (2011). How much does the Supplemental Nutrition Assistance Program reduce food insecurity? *American Journal of Agricultural Economics*, 93(4), 1082–1098.

[136] Mabli, J., & Worthington, J. (2014). Supplemental Nutrition Assistance Program participation and child food security. *Pediatrics*, 133(4), 1–10.

[137] Vericker, T., & Mills, G. (2012). *Childhood Food Insecurity: The Mitigating Role of SNAP.* Washington, DC: Urban Institute.

[138] Li, Y., Mills, B., Davis, G. C., & Mykerezi, E. (2014). Child food insecurity and the Food Stamp Program: what a difference monthly data make. *Social Service Review*, 88(2), 322–348.

[139] Moffitt, R. A., & Ribar, D. C. (2016). Rasch analyses of very low food security among households and children in the Three City Study. *Southern Economic Journal*, 82(4), 1123–1146.

[140] Kreider, B., Pepper, J. V., Gundersen, C., & Jolliffe, D. (2012). Identifying the effects of SNAP (Food Stamps) on child health outcomes when participation is endogenous and misreported. *Journal of the American Statistical Association*, 107(499), 958–975.

[141] Nguyen, B. T., Shuval, K., Bertmann, F., & Yaroch, A. L. (2015). The Supplemental Nutrition Assistance Program, food insecurity, dietary quality, and obesity among US adults. *American Journal of Public Health*, 105(7), 1453–1459.

[142] Webb, A. L., Schiff, A., Currivan, D., & Villamor, E. (2008). Food Stamp Program participation but not food insecurity is associated with higher adult BMI in Massachusetts residents living in low income neighbourhoods. *Public Health Nutrition*, 11(12), 1248–1255.

[143] Karnik, A., Foster, B. A., Mayer, V., Pratomo, V., McKee, D., Maher, S., Campos, G., & Anderson, M. (2011). Food insecurity and obesity in New York City primary care clinics. *Medical Care*, 49(7), 658–661.



**Hunger & Health:** Supplemental Nutrition Assistance Program

144  Jones, S. J., Jahns, L., Laraia, B. A., & Haughton, B. (2003). Lower risk of overweight in school-aged food insecure girls who participate in food assistance: results from the Panel Study of Income Dynamics Child Development Supplement. *Archives of Pediatric and Adolescent Medicine*, 157(8), 780–784.

145  Goldman, N., Ettinger de Cuba, S., Sheward, R., Cutts, D., & Coleman, S. (2014). *Food Security Protects Minnesota Children's Health*. Series — Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.

146  Schmeiser, M. D. (2012). The impact of long-term participation in the Supplemental Nutrition Assistance Program on child obesity. *Health Economics*, 21(4), 386–404

147  Kreider, B., Pepper, J. V., Gundersen, C., & Jolliffe, D. (2012). Identifying the effects of SNAP (Food Stamps) on child health outcomes when participation is endogenous and misreported. *Journal of the American Statistical Association*, 107(499), 958–975.

148  Institute of Medicine. (2009). *Local Government Actions to Prevent Childhood Obesity*. Washington, DC: The National Academies Press.

149  Institute of Medicine. (2011). *Early Childhood Obesity Prevention Policies*. Washington, DC: The National Academies Press.

150  Nguyen, B. T., Shuval, K., Bertmann, F., & Yaroch, A. L. (2015). The Supplemental Nutrition Assistance Program, food insecurity, dietary quality, and obesity among US adults. *American Journal of Public Health*, 105(7), 1453–1459.

151  Basiotis, P. P., Kramer-LeBlanc, C. S., & Kennedy, E. T. (1998). Maintaining nutrition security and diet quality: the role of the Food Stamp Program and WIC. *Family Economics and Nutrition Review*, 11(1 & 2), 4–16.

152  Rose, D., Habicht, J. P., & Devaney, B. (1998). Household participation in the Food Stamp and WIC programs increases the nutrient intakes of preschool children. *Journal of Nutrition*, 128(3), 548–555.

153  Lee, B. J., Mackery-Bilaver, L., & Chin, M. (2006). Effects of WIC and Food Stamp Program participation on child outcomes. *Contractor and Cooperator Report*, 27. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

154  Molitor, F., Sugerman, S. B., & Sciortino, S. (2016). Fruit and vegetable, fat, and sugar-sweetened beverage intake among low-income mothers living in neighborhoods with Supplemental Nutrition Assistance Program-Education. *Journal of Nutrition Education and Behavior*, 48(10), 683–690.

155  Berkowitz, S. A., Seligman, H. K., Rigdon, J., Meigs, J. B., & Basu, S. (2017). Supplemental Nutrition Assistance Program (SNAP) participation and health care expenditures among low-income adults. *JAMA Internal Medicine*, published online ahead of print.

156  Berkowitz, S. A., Seligman, H. K., & Basu, S. (2017). *Impact of Food Insecurity and SNAP Participation on Healthcare Utilization and Expenditures*. University of Kentucky Center for Poverty Research Discussion Paper Series. Lexington, KY: University of Kentucky Center for Poverty Research.

157  Berkowitz, S. A., Seligman, H. K., Rigdon, J., Meigs, J. B., & Basu, S. (2017). Supplemental Nutrition Assistance Program (SNAP) participation and health care expenditures among low-income adults. *JAMA Internal Medicine*, published online ahead of print.

158  Seligman, H. K., Bolger, A. F., Guzman, D., López, A., & Bibbins-Domingo, K. (2014). Exhaustion of food budgets at month's end and hospital admissions for hypoglycemia. *Health Affairs*, 33(1), 116–123.

159  Samuel, L. J., Szanton, S. L., Cahill, R., Wolff, J. L., Ong, P., Zielinskie, G., & Betley, C. (2017). Does the Supplemental Nutrition Assistance Program affect hospital utilization among older adults? The case of Maryland. *Population Health Management*, published online ahead of print.

160  Szanton, S. L., Samuel, L. J., Cahill, R., Zielinskie, G., Wolff, J. L., Thorpe, R. J. Jr., & Betley, C. (2017). Food assistance is associated with decreased nursing home admissions for Maryland's dually eligible older adults. *BMC Geriatrics*, 17(1), 162.

161  Gregory, C. A., & Deb, P. (2015). Does SNAP improve your health? *Food Policy*, 50, 11–19.

162  Hoynes, H., Schanzenbach, D. W., & Almond, D. (2016). Long-run impacts of childhood access to the safety net. *American Economic Review*, 106(4), 903–934.

163  Miller, D. P., & Morrissey, T. (2017). *Using Natural Experiments to Identify the Effects of SNAP on Child and Adult Health*. University of Kentucky Center for Poverty Research Discussion Paper Series. Lexington, KY: University of Kentucky Center for Poverty Research.

164  Mayer, V. L., McDonough, K., Seligman, H., Mitra, N., & Long, J. A. (2016). Food insecurity, coping strategies and glucose control in low-income patients with diabetes. *Public Health Nutrition*, 19(6), 1103-1111.

165  Bradley, E. H., Canavan, M., Rogan, E., Talbert-Slagle, K., Ndumele, C., Taylor, L., & Curry, L. A. (2016). Variation in health outcomes: the role of spending on social services, public health, and health care, 2000–2009. *Health Affairs*, 35(5), 760–768.

166  Almond, D., Hoynes, H. W., & Schanzenbach, D. W. (2011). Inside the War on Poverty: the impact of food stamps on birth outcomes. *Review of Economics and Statistics*, 93(2), 387–403.

167  Ettinger de Cuba, S., Weiss, I., Pasquariello, J., Schiffmiller, A., Frank, D. A., Coleman, S., Breen, A., & Cook, J. (2012). *The SNAP Vaccine: Boosting Children's Health*. Boston, MA: Children's HealthWatch.

168  Kreider, B., Pepper, J. V., Gundersen, C., & Jolliffe, D. (2012). Identifying the effects of SNAP (Food Stamps) on child health outcomes when participation is endogenous and misreported. *Journal of the American Statistical Association*, 107(499), 958–975.

169  Lee, B. J., Mackery-Bilaver, L., & Chin, M. (2006). Effects of WIC and Food Stamp Program participation on child outcomes. *Contractor and Cooperator Report*, 27. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

170  Sheward, R., Ettinger de Cuba, S., Cook, J., Pasquariello, J., & Coleman, S. (2014). *RX for Healthy Child Development: Nutritious, Affordable Food Promotes Health and Economic Stability for Boston Families*. Series – Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.

171  Cook, J. T., Frank, D. A., Levenson, S. M., Neault, N. B., Heeren, T. C., Black, M. M., Berkowitz, C., Casey, P. H., Meyers, A. F., Cutts, D. B., & Chilton, M. (2006). Child food insecurity increases risks posed by household food insecurity to young children's health. *Journal of Nutrition*, 136(4), 1073–1076.



**Hunger & Health:** Supplemental Nutrition Assistance Program

172  Miller, D. P., & Morrissey, T. (2017). *Using Natural Experiments to Identify the Effects of SNAP on Child and Adult Health*. University of Kentucky Center for Poverty Research Discussion Paper Series. Lexington, KY: University of Kentucky Center for Poverty Research.

173  Ettinger de Cuba, S., Harker, L., Weiss, I., Scully, K., Chilton, M., & Coleman, S. (2013). *Punishing Hard Work: The Unintended Consequences of Cutting SNAP Benefits*. Boston, MA: Children's HealthWatch.

174  Ettinger de Cuba, S., Harker, L., Weiss, I., Scully, K., Chilton, M., & Coleman, S. (2013). *Punishing Hard Work: The Unintended Consequences of Cutting SNAP Benefits*. Boston, MA: Children's HealthWatch.

175  Bovell, A., Ettinger de Cuba, S., Scully, K., Chilton, M., & Coleman, S. (2014). *Making SNAP Work for Families Leaving Poverty*. Series – Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.

176  Goldman, N., Ettinger de Cuba, S., Sheward, R., Cutts, D., & Coleman, S. (2014). *Food Security Protects Minnesota Children's Health*. Series – Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.

177  Sheward, R., Ettinger de Cuba, S., Cook, J., Pasquariello, J., & Coleman, S. (2014). *RX for Healthy Child Development: Nutritious, Affordable Food Promotes Health and Economic Stability for Boston Families*. Series — Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.

178  Munger, A. L., Hofferth, S. L., & Grutzmacher, S. K. (2016). The role of the Supplemental Nutrition Assistance Program in the relationship between food insecurity and probability of maternal depression. *Journal of Hunger and Environmental Nutrition*, 11(2), 147–161.

179  Oddo, V. M., & Mabli, J. (2015). Association of participation in the Supplemental Nutrition Assistance Program and psychological distress. *American Journal of Public Health*, 105(6), e30–e35.

180  Leung, C. W., Epel, E. S., Willett, W. C., Rimm, E. B., & Laraia, B. A. (2015). Household food insecurity is positively associated with depression among low-income Supplemental Nutrition Assistance Program participants and income-eligible nonparticipants. *Journal of Nutrition*, 145(3), 622–627.

181  Kim, K., & Frongillo, E. A. (2007). Participation in food assistance programs modifies the relation of food insecurity with weight and depression in elders. *Journal of Nutrition*, 137, 1005–1010.

182  Ettinger de Cuba, S., Harker, L., Weiss, I., Scully, K., Chilton, M., & Coleman, S. (2013). *Punishing Hard Work: The Unintended Consequences of Cutting SNAP Benefits*. Boston, MA: Children's HealthWatch.

183  Ettinger de Cuba, S., Harker, L., Weiss, I., Scully, K., Chilton, M., & Coleman, S. (2013). *Punishing Hard Work: The Unintended Consequences of Cutting SNAP Benefits*. Boston, MA: Children's HealthWatch.

184  Bovell, A., Ettinger de Cuba, S., Scully, K., Chilton, M., & Coleman, S. (2014). *Making SNAP Work for Families Leaving Poverty*. Series – Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.

185  Munger, A. L., Hofferth, S. L., & Grutzmacher, S. K. (2016). The role of the Supplemental Nutrition Assistance Program in the relationship between food insecurity and probability of maternal depression. *Journal of Hunger and Environmental Nutrition*, 11(2), 147–161.

186  Edin, K., Boyd, M., Mabli, J., Ohls, J., Worthington, J., Greene, S., Redel, N., & Sridharan, S. (2013). *SNAP Food Security In-Depth Interview Study*. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Research and Analysis.

187  Seefeldt, K. S., & Castelli, T. (2009). Low-income women's experiences with food programs, food spending, and food-related hardships: evidence from qualitative data. *Contractor and Cooperator Report*, 57. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

188  Wiig, K., & Smith, C. (2009). The art of grocery shopping on a food stamp budget: factors influencing the food choices of low-income women as they try to make ends meet. *Public Health Nutrition*, 12(10), 1726–1734.

189  Institute of Medicine and National Research Council Committee on Examination of the Adequacy of Food Resources and SNAP Allotments. (2013). *Supplemental Nutrition Assistance Program: Examining the Evidence to Define Benefit Adequacy*. Washington, DC: National Academies Press.

190  Hartline-Grafton, H., & Weill, J. (2012). *Replacing the Thrifty Food Plan in Order to Provide Adequate Allotments for SNAP Beneficiaries*. Washington, DC: Food Research & Action Center.

191  Nord, M., & Prell, M. (2011). Food security improved following the 2009 ARRA increase in SNAP benefits. *Economic Research Report*, 116. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

192  Castner, L., & Henke, J. (2011). *Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program*. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Research and Analysis.

193  Tuttle, C. (2016). The Stimulus Act of 2009 and its effect on food-at-home spending by SNAP participants. *Economic Research Report*, 213. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

194  Kim, J. (2016). Do SNAP participants expand non-food spending when they receive more SNAP Benefits?—Evidence from the 2009 SNAP benefits increase. *Food Policy*, 65, 9–20.

195  Nord, M. (2013). Effects of the decline in the real value of SNAP benefits from 2009 to 2011. *Economic Research Report*, 151. Washington, DC: U.S. Department of Agriculture, Economic Research Service.

196  Cook, J. T., Poblacion, A., Bovell, A., Sheward, R., Ettinger de Cuba, S., Pasquariello, J., & Cutts, D. (2016). *Treatment Plan for Hunger: SNAP, WIC, and the Community Eligibility Provision*. Boston, MA: Children's HealthWatch.

197  Ettinger de Cuba, S., Bovell, A., Coleman, S., & Frank, D. A. (2015). *Diluting the Dose: Cuts to SNAP Benefits Increased Food Insecurity Following the Great Recession*. Boston, MA: Children's HealthWatch.

198  Ettinger de Cuba, S., Harker, L., Weiss, I., Scully, K., Chilton, M., & Coleman, S. (2013). *Punishing Hard Work: The Unintended Consequences of Cutting SNAP Benefits*. Boston, MA: Children's HealthWatch.

199  Bovell, A., Ettinger de Cuba, S., Scully, K., Chilton, M., & Coleman, S. (2014). *Making SNAP Work for Families Leaving Poverty*. Series – Hunger: A New Vital Sign. Boston, MA: Children's HealthWatch.



**Hunger & Health:** Supplemental Nutrition Assistance Program

200 Collins, A., Briefel, R., Klerman, J. A., Bell, S., Bellotti, J., Logan, C. W., Gordon, A., Wolf, A., Rowe, G., McLaughlin, S. M., Enver, A., Fernandes, M., Wolfson, C., Komarovksy, M., Cabili, C., & Owens, C. (2012). *Summer Electronic Benefits Transfer for Children: Evaluation Findings for the Proof-of-Concept Year.* Prepared by Abt Associates, Mathematica Policy Research, and Maximus under Contract No. AG-3198-C-11—002. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service.

201 Almada, L. N., & Tchernis, R. (2016). *Measuring Effects of SNAP on Obesity at the Intensive Margin.* NBER Working Paper No. 22681.

202 Jilcott, S. B., Liu, H., Dubose, K. D., Chen, S., & Kranz, S. (2011). Food Stamp participation is associated with fewer meals away from home, yet higher body mass index and waist circumference in a nationally representative sample. *Journal of Nutrition Education and Behavior*, 43(2), 110—115.

203 Jilcott, S. B., Wall-Bassett, E. D., Burke, S. C., & Moore, J. B. (2011). Associations between food insecurity, Supplemental Nutrition Assistance Program (SNAP) benefits, and body mass index among adult females. *Journal of the American Dietetic Association*, 111(11), 1741—1745.

204 Todd, J. E. (2015). Revisiting the Supplemental Nutrition Assistance Program cycle of food intake: investigating heterogeneity, diet quality, and a large boost in benefit amounts. *Applied Economic Perspectives and Policy*, 37(3), 437—458.

205 Anderson, P. M., & Butcher, K. F. (2016). *The Relationships Among SNAP Benefits, Grocery Spending, Diet Quality, and the Adequacy of Low-Income Families' Resources.* Washington, DC: Center on Budget and Policy Priorities.

206 Bartlett, S., Klerman, J., Olsho, L., Logan, C., Clocklin, M., Beauregard, M., Enver, A., Wilde, P., Owens, C., & Melhem, M. (2014). *Evaluation of the Healthy Incentives Pilot (HIP): Final Report.* Prepared by Abt Associates under Contract No. AG-3198-D-10—0044. Alexandria, VA: U.S. Department of Agriculture, Food and Nutrition Service, Office of Policy Support.

207 Basiotis, P. P., Kramer-LeBlanc, C. S., & Kennedy, E. T. (1998). Maintaining nutrition security and diet quality: the role of the Food Stamp Program and WIC. *Family Economics and Nutrition Review*, 11(1 & 2), 4—16.

208 Mabli, J., Castner, L., Ohls, J., Fox, M. K., Crepinsek, M. K., & Condon, E. (2010). *Food Expenditures and Diet Quality Among Low-Income Households and Individuals.* Report to the U.S. Department of Agriculture, Food and Nutrition Service. Washington, DC: Mathematica Policy Research, Inc.

209 Sonik, R. A. (2016). Massachusetts inpatient Medicaid cost response to increased Supplemental Nutrition Assistance Program benefits. *American Journal of Public Health*, 106(3), 443—448.

210 Basu, S., Berkowitz, S. A., & Seligman, H. (2017). The monthly cycle of hypoglycemia: an observational claims-based study of emergency room visits, hospital admissions, and costs in a commercially insured population. *Medical Care*, 55(7), 639—645.

211 March, E. L., Ettinger de Cuba, S., Bailey, K., Cook, J., Coleman, S., Schiffmiller, A., & Frank, D. A. (2011). *Boost to SNAP Benefits Protected Young Children's Health.* Boston, MA: Children's HealthWatch.

212 Samuel, L. J., Szanton, S. L., Cahill, R., Wolff, J. L., Ong, P., Zielinskie, G., & Betley, C. (2017). Does the Supplemental Nutrition Assistance Program affect hospital utilization among older adults? The case of Maryland. *Population Health Management*, published online ahead of print.

213 Szanton, S. L., Samuel, L. J., Cahill, R., Zielinskie, G., Wolff, J. L., Thorpe, R. J. Jr., & Betley, C. (2017). Food assistance is associated with decreased nursing home admissions for Maryland's dually eligible older adults. *BMC Geriatrics*, 17(1), 162.

214 Heflin, C., Hodges, L., & Mueser, P. (2017). Supplemental Nutrition Assistance Program benefits and emergency room visits for hypoglycaemia. *Public Health Nutrition*, 20(7), 1314—1321.

215 Choi, S. E., Seligman, H., & Basu, S. (2017). Cost effectiveness of subsidizing fruit and vegetable purchases through the Supplemental Nutrition Assistance Program. *American Journal of Preventive Medicine*, 52(5), e147—e155.

216 Pearson-Stuttard, J., Bandosz, P., Rehm, C. D., Penalvo, J., Whitsel, L., Gaziano, T., Conrad, Z., Wilde, P., Micha, R., Lloyd-Williams, F., Capewell, S., Mozaffarian, D., & O'Flaherty, M. (2017). Reducing US cardiovascular disease burden and disparities through national and targeted dietary policies: a modelling study. *PLoS One*, 14(6), e1002311.

217 Hoynes, H., Bronchetti, E., & Christensen, G. (2017). *The Real Value of SNAP Benefits and Health Outcomes.* University of Kentucky Center for Poverty Research Discussion Paper Series. Lexington, KY: University of Kentucky Center for Poverty Research.









# EXHIBIT M

# Community and International Nutrition

# Food Insecurity Affects School Children's Academic Performance, Weight Gain, and Social Skills[1–3]

Diana F. Jyoti, Edward A. Frongillo,[4] and Sonya J. Jones*

*Division of Nutritional Sciences, Savage Hall, Cornell University, Ithaca, NY 14853-6301 and *Center for Research in Nutrition and Health Disparities, University of South Carolina, Arnold School of Public Health, Columbia, SC 29204*

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

ABSTRACT Food insecurity has been associated with diverse developmental consequences for U.S. children primarily from cross-sectional studies. We used longitudinal data to investigate how food insecurity over time related to changes in reading and mathematics test performance, weight and BMI, and social skills in children. Data were from the Early Childhood Longitudinal Study-Kindergarten Cohort, a prospective sample of ~21,000 nationally representative children entering kindergarten in 1998 and followed through 3rd grade. Food insecurity was measured by parent interview using a modification of the USDA module in which households were classified as food insecure if they reported ≥1 affirmative response in the past year. Households were grouped into 4 categories based on the temporal occurrence of food insecurity in kindergarten and 3rd grade. Children's academic performance, height, and weight were assessed directly. Children's social skills were reported by teachers. Analyses examined the effects of modified food insecurity on changes in child outcomes using lagged, dynamic, and difference (i.e., fixed-effects) models and controlling for child and household contextual variables. In lagged models, food insecurity was predictive of poor developmental trajectories in children before controlling for other variables. Food insecurity thus serves as an important marker for identifying children who fare worse in terms of subsequent development. In all models with controls, food insecurity was associated with outcomes, and associations differed by gender. This study provides the strongest empirical evidence to date that food insecurity is linked to specific developmental consequences for children, and that these consequences may be both nutritional and nonnutritional. J. Nutr. 135: 2831–2839, 2005.

KEY WORDS: • food insecurity • child development • overweight • academic • longitudinal

Despite federal food assistance and private charitable programs, food insecurity is a persistent national problem (1), affecting 11% of all households (2) and 16% of households with children (3). Food insecurity refers to limited or uncertain availability of or inability to acquire nutritionally adequate, safe, and acceptable foods due to financial resource constraint (1). More specifically, food insufficiency refers to an inadequate amount of food intake due to resource constraint (4).

Food insecurity and insufficiency are associated with adverse health and developmental outcomes in U.S. children (5–12). Among 6- to 12-y-old children, food insufficiency was associated with poorer mathematics scores, grade repetition, absenteeism, tardiness, visits to a psychologist, anxiety, aggression, psychosocial dysfunction, and difficulty getting along with other children (13–15). Among 15- to 16-y-old adolescents, food insufficiency was associated with depressive disorders and suicide symptoms after controlling for income and other factors (16). Recently, food insecurity was associated with poor social functioning, but not academic performance or attained BMI, in kindergarten children (17).

Cross-sectional studies also suggest possible associations between food insecurity and overweight in children. White girls 8–16 y old from food-insufficient households were 3.5 times more likely to be overweight than food-sufficient girls after controlling for potential confounding factors (18). Casey and colleagues (19) reported a significantly higher prevalence of overweight among children from low-income, food-insufficient households in contrast to high-income, food-sufficient households, but no differences between food-insufficient and food-sufficient low-income households.

These cross-sectional studies suggest that food insecurity has consequences for academic performance, social skills, and weight in children. Longitudinal data, however, have clear analytical advantages over cross-sectional data. First, the temporal nature allows for measurement of change over time (20). For example, how does the transition from food security to food insecurity relate to weight gain? Second, temporality helps ensure that observed outcomes are associated with initial

[1] Presented in part at Experimental Biology 05, April 1–6, 2005, San Diego, CA [Jyoti, D. F., Frongillo, E. A. & Jones, S. J. (2005) Consequences of food insecurity for child social and academic learning and weight gain. FASEB J. 19: 449.6 (abs.)].

[2] Supported by cooperative agreement 43–3AEM-3-80104 with the U.S. Department of Agriculture Economic Research Service.

[3] Supplemental Tables 1–3 are available as Online Supporting Material with the online posting of this paper at www.nutrition.org.

[4] To whom correspondence should be addressed. E-mail: eaf1@cornell.edu.

0022-3166/05 $8.00 © 2005 American Society for Nutrition.
Manuscript received 10 May 2005. Initial review completed 29 May 2005. Revision accepted 9 September 2005.

JYOTI ET AL.

exposure status and not due to reverse causality. Third, investigation of intraindividual changes reduces the effects of unmeasured confounders (20). Absent a randomized design, longitudinal data provide the best means to establish that observed effects are causal and not due to confounding, selection bias, or reverse causality (21).

Only one earlier study examined the effects of food insecurity on aspects of child development using longitudinal methods (22). Data from the Early Child Longitudinal Study-Kindergarten Cohort (ECLS-K)[5] showed that reporting ≥3 indicators of food insecurity in the spring of kindergarten was not associated with physical growth across the kindergarten year, but that reporting at least 1 indicator of food insecurity was significantly associated with impaired learning in mathematics from fall to spring of the kindergarten year. This study was limited by the short duration of time between assessments, lack of data on changes in food insecurity, and inability to establish whether exposure to food insecurity preceded the learning effect.

This study aimed to determine relations between household food insecurity and selected dimensions of children's academic, social, and physical development over several years using a prospective longitudinal study design and modeling techniques that attempt to account for bias. The selected developmental outcomes were mathematics performance, reading performance, weight, BMI, and composite social skills. First, we examined whether household food insecurity at kindergarten resulted in poorer subsequent development. Second, we examined how changes in food insecurity were associated with concurrent development.

## SUBJECTS AND METHODS

Nonrestricted, public-use data were obtained from the ECLS-K (23), which utilized a multistage probability, cluster sample design to select a nationally representative sample of 21,260 kindergarten children attending 1592 elementary schools in 1998–1999. Data were collected nonexperimentally by means of survey and direct assessment over 4 consecutive years. We utilized parent, teacher, and child data from spring of kindergarten (1999) and spring of 3rd grade (2002). Data from children with full response, i.e., eligible children who completed some assessment data *or* had a parent who completed the family section of the parent interview, were available for 20,578 children in the spring of 1999 and for 15,305 children in the spring of 2002. Attrition was due mainly to children moving outside of the primary sampling units or moving to areas in which they could not be located. Locatable movers from a random 50% of schools were followed. A small number of children became ineligible because they moved outside of the United States or died. Our 2 analytic samples consisted of the following: *1)* ~13,500 children for whom full data, i.e., a scored reading or mathematics assessment *and* parent completion of the USDA food security module, were available at kindergarten; and *2)* ~11,400 children for whom these full data were available at both kindergarten *and* 3rd grade.

The ECLS-K longitudinal design offered 4 advantages. First, it gave an opportunity to analyze the effects of changes in food security status over time. Second, the large sample size allowed for substantial statistical power. Third, national representation of the sample allowed for generalizations to the entire population. Fourth, ample supplementary information regarding characteristics of the children, parents, and home environments was collected as part of the ECLS-K.

*Food insecurity.* Household food insecurity was measured using the USDA's Household Food Security Survey Module, an 18-item scale designed to capture experiences associated with inadequate quality and quantity of the household food supply within the past 12 mo (1,24). The USDA module was administered to parents by means of telephone interviews in the spring of 1999 and the spring of 2002. Parents responded in the affirmative or negative to each of the experiences itemized in the scale. In standard guidelines for use (1), households that affirm ≤2 responses are classified as food secure, and households that affirm ≥3 responses are classified as food insecure.

A previous study using ECLS-K data suggested that experiencing food insecurity at even marginal levels is associated with child development (22). Using the standard threshold of ≥3 affirmative responses to the USDA food security module had less value in predicting mathematical test performance than a threshold of ≥1 affirmative responses on the module. Also, households affirming 1 or 2 responses (labeled marginally food secure) were more similar in mean baseline characteristics to households affirming >2 responses than households affirming no responses. The authors concluded that reporting *any* affirmative response on the module signifies increased food insecurity.

We created 2 separate binary variables to represent the experience of food insecurity in both 1999 and 2002. For the first variable, only households reporting ≥2 affirmative responses on the USDA module were coded as food insecure; all other households were coded as food secure. For the second variable, households reporting *any* (≥1) affirmative response on the USDA module were coded as food insecure; households reporting 0 affirmative responses were coded as food secure. Of the households having valid responses, 8.7% reported ≥3 affirmative responses and 17.1% reported at least 1 affirmative response. Our preliminary results confirmed that the second measure better predicted differences in development, and this variable was used for all successive analysis.

To capture changes in food insecurity over time, a categorical variable was created to represent transitions into and out of food insecurity. Respondents were categorized into 4 groups: remained food secure at both times (persistent food secure), remained food insecure at both times (persistent food insecure), transitioned from food security to food insecurity (became food insecure), and transitioned from food insecurity to food security (became food secure).

*Academic performance.* Direct assessments of mathematics and reading ability were administered individually in kindergarten and 3rd grade. The mathematical proficiency test measured understanding of the properties of numbers, mathematical operations, problem solving, understanding of patterns and relations among numbers, formulating conjectures, and identifying solutions. The reading proficiency test measured basic literacy, vocabulary, and reading comprehension (24).

Scaled scores for the mathematics and reading performances were calculated using item response theory (IRT). Although assessments are grade-appropriate and nonidentical over time, IRT places each score on a continuous ability scale, making possible longitudinal measurements of gain in achievement. The scores represent estimates of the number of items students would have answered correctly had they completed all of the questions in all of the first- and second-stage forms. Values for IRT mathematics and reading scores ranged from 0 to 123 and from 0 to 154, respectively. Reliability of the test scores was high, between 0.92 and 0.95 (24).

*Weight, height, and BMI.* Children's heights and weights were assessed directly in both kindergarten and 3rd grade. A Shorr Board was used to obtain height measurements. A digital bathroom scale was used to obtain weight measurements. Heights and weights were each measured twice to minimize measurement error and the mean of each set of values was used. If 2 height values were ≥5 cm apart, the composite height was set as the value closest to 109.2 cm (the mean height for a 5-y-old child) at kindergarten. If the 2 weight values were ≥2.3 kg apart, the composite weight was set as the value closest to 18.2 kg (the mean weight for a 5-y-old child) at kindergarten. BMIs (kg/m$^2$) were calculated from heights and weights (24). Weights and BMIs were within normal ranges for appropriate ages (25).

*Social skills.* Children's social skills were assessed by teacher questionnaires. Teachers rated how often their students exhibited certain social skills and behaviors on a scale of 1 (never) to 4 (very often), for a variety of behaviors within each of 5 overall scales. Of the 5 scales, 3 captured positive aspects of children's development:

---

[5] Abbreviations used: ECLS-K, Early Child Longitudinal Study-Kindergarten Cohort; FIS, food insecurity; IRT, Item Response Theory.

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

approaches to learning (behaviors that affect ease of benefiting from the learning environment); self control (ability to control behavior); and interpersonal skills (forming and maintaining friendships, getting along despite differences, comforting or helping others, and showing sensitivity). The other 2 scales captured externalizing (acting-out) and internalizing (anxiety, loneliness, low self-esteem, sadness) problem behaviors. Scores were computed only if the student was rated on at least two-thirds of the 5 items within each of the 5 scales. All of these measures were adapted from Gresham and Elliott's (26) Social Skills Rating System. The reliability for the teacher social rating scales was high (24).

After preliminary analysis with individual scales, we averaged the individual scales to create a composite social skills behavior score, in which a higher score indicated better social skills. The scale for internalizing problem behaviors was not averaged into the score for 2 reasons: first, its low correlation with the other scale measures, and second, previous literature questioning the validity of teacher-ratings of internalized behaviors (27–29). Change in social skills score was calculated by subtracting the kindergarten composite score from the 3rd grade composite score. Separate analysis was done using a composite average of all 5 scales (including internalizing behaviors) and yielded similar results.

**Control measures.** Controlling for many individual, parent, and household variables in the analysis reduced the possibility of spurious associations between the variables of interest. The following child-specific data were collected using direct assessment and parent report at both times: gender, age, birth weight, home language, race-ethnicity, disability (diagnosed activity, mobility, speech, hearing or vision problem), health insurance coverage, and frequency of exercise per week. Children were classified into 4 race-ethnicity categories: non-Hispanic white, non-Hispanic black or African-American, Hispanic of any race, and other (which includes children of Native American and Asian descent). Children were categorized as normal birth weight, low birth weight ($\geq$1500 and $<$2500 g), or very low birth weight ($<$1500 g). We created dichotomous variables for the following: non-English as the home language, the presence of a child disability, and child health insurance coverage. Child psychomotor skills were assessed at kindergarten only and rated on a composite scale of 0 (poor) to 17 (excellent).

Parents reported the following information about home environments at both times: family income (multiples of $5000 up to $40,000; $40,001–50,000; $50,001–75,000; $75,001–100,000; $100,001–200,000; >$200,001), number of parents in household (1; 2; no biological/step parents), household size (total number people), mother's age, father's age, parent marital status (married; divorced; widowed; separated; never married; no biological/adoptive parent in home), mother's age at 1st birth, parent employment ($\geq$35 h/w; <35 h/w; looking for work; not in labor force; no mother/father in household), highest education level attained by either parent (<8th grade; 9th-12th; high school diploma; vocational/technical program; some college; bachelor's degree; some graduate/professional school; master's degree; doctorate/professional degree), child care arrangements (no nonparental care; relative care; nonrelative care; center-based program; other/variation), number of siblings, parent ratings of his or her own depression and ability to "get going" (never; sometimes/moderate amount; most of time;), region of residence (Northeast; Midwest; South; West), area of residence (large/mid-size city; suburb/large town; small town/rural), and neighborhood safety rating (not at all safe; somewhat safe; very safe). Data regarding the death of a close relative in the past 2 y and the number of places the child had lived in the past 3 y were collected in the spring of 2002 only.

Composite variables were created to capture transitions between kindergarten and 3rd grade for relevant background variables. Categorical variables were as follows: child disability (no change; became disabled, became nondisabled), child health insurance (no change; became covered, became uninsured), parent marital status (no change; became married, became divorced, became separated, became widowed), parent employment (no change; became part time; became full time; change to looking; change to not in labor force); child care arrangements (no change; change to no nonparental care; started center-based care; started relative care; started nonrelative care), region of residence (no change; moved to Northeast; moved to

South; moved to Midwest; moved to Pacific), and area of residence (no change: moved to large city; moved to large town/suburb; moved to rural/small town). Differences between kindergarten and 3rd grade values were computed for the following: child's frequency of exercise, household income, number of parents, household size, highest education level attained by either parent, number of siblings, parent ratings of his or her own depression and ability to "get going," and neighborhood safety rating.

**Statistical methods.** Preliminary analyses showed nonnormal distributions for change in BMI, change in weight, initial mathematics score, and initial reading score. Logarithmic transformations of these variables were used to create measures with normal distributions. Results for means are reported after back transformations. Results for differences, i.e., $\beta$-coefficients, are reported after back transformations using the sample means and differences from the regression coefficients obtained on the logarithmic scale.

Initial analysis determined whether children with missing data due to loss to follow-up differed in any way from those with complete data. A binary variable distinguished children with missing data from those with complete data across both time points, which was then regressed (logistic) upon all available background variables. Any variable identified as predicting the probability of missing data was included in the analysis as a covariate.

Multiple linear regression methods were used to test the differential effects of food insecurity transitions on the 5 child developmental outcomes of interest: change in mathematics score, change in reading score, change in weight and BMI (controlling for height), and change in social skills score. The SAS *surveyreg* (version 9.1, SAS Institute) procedure accounted for effects of survey clustering, primary sampling units, and sample weights. ECLS-K sampling weights adjusted for an oversampling of Asian and Pacific Islanders and nonresponse. Analyses were run using the full sample and gender-stratified samples. Differences were considered significant at the 5% level.

**Models.** Each of the 5 developmental outcomes was analyzed using 4 models: *1)* lagged model without controls, *2)* lagged model with controls, *3)* dynamic model, and *4)* difference model. The lagged model assessed the effects of initial food insecurity on subsequent development. This model makes use of the temporal sequence to establish that food insecurity precedes its effect and that the association is not likely due to reverse causality. For the first analysis, change in development score was modeled as a function of initial development score and initial food insecurity (food insecure vs. food secure):

$$\Delta \text{ score}_{3-k} = \beta_0 + \beta_1 \text{ score}_k + \beta_2 \text{ FIS}_k + E$$

where the subscripts 3 and k refer to the time of assessment (3rd grade or kindergarten) and FIS refers to food insecurity status.

The previous model estimated effects of kindergarten food insecurity on subsequent developmental trajectories without regard to background characteristics. A second lagged model was conducted in which time-invariant variables were controlled:

$$\Delta \text{ score}_{3-k} = \beta_0 + \beta_1 \text{ score}_k + \beta_2 \text{ FIS}_k + \beta_3 \text{ covariates}_k + E$$

To reduce bias further, a third lagged model was conducted in which both time-invariant and time-varying variables were controlled:

$$\Delta \text{ score}_{3-k} = \beta_0 + \beta_1 \text{ score}_k + \beta_2 \text{ FIS}_k$$
$$+ \beta_3 \text{ covariates}_k + \beta_4 \Delta \text{ covariates}_{3-k} + E$$

Although the lagged model is useful in establishing direction, it does not take into account food insecurity at 3rd grade. A dynamic model has the advantage of capturing the differential effects of food insecurity between kindergarten and 3rd grade. For the dynamic model analysis, change in the development score was modeled as a function of the initial development score, time-invariant covariates, time-varying covariates, and food insecurity modeled as a 4-category variable to capture both persistent and transitional effects:

$$\Delta \text{ score}_{3-k} = \beta_0 + \beta_1 \text{ score}_k + \beta_2 \Delta \text{FIS}_{3-k}$$
$$+ \beta_3 \text{ time-invariant covariates}_k + \beta_4 \text{ time-varying covariates}_k$$
$$+ \beta_4 \Delta \text{ time-varying covariates}_{3-k} + E$$

The difference model is a reduced version of the dynamic model concerned only with transitions. Change in the development score was modeled as a function of time-varying covariates and change in household food insecurity:

$$\Delta \text{ score}_{3-k} = \beta_0 + \beta_1 \Delta FIS_{3-k} + \beta_2 \Delta \text{ covariates}_{3-k} + E$$

Continuous variables, including food insecurity, were entered into the model as differences. Categorical variables were entered into the class statement, with 0 representing no change from kindergarten to 3rd grade and each level other than 0 representing a change in status (e.g., 1 = became divorced, 2 = became married, 3 = became widowed).

The difference model removes individual fixed effects and eliminates the influence of time-invariant unobserved (and observed) heterogeneity by differencing out effects of factors that remain unchanged over time and focusing entirely on transitions. Theoretically, this model gives the least biased estimates of association (30), assuming that there is a short lag between the experience of becoming food insecure and its effect on child development relative to the duration of time between measurements. We controlled for as many relevant child- and household-level time-varying covariates as available.

## RESULTS

Background characteristics for the subset of children with full data are summarized in Supplemental Tables 1 and 2. Included are the characteristics for the 15.6% of kindergarteners from households affirming ≥1 response on the USDA food security module. Supplemental Table 3 summarizes background characteristics over time. Characteristics of the entire sample at kindergarten were reported elsewhere (17). Between kindergarten and 3rd grade, 77.9% of children's households remained food secure, 6.0% remained food insecure, 9.7% became food secure and 6.5% became food insecure (n = 11,460); 22.2% experienced food insecurity at one *or* both times.

Observed changes in outcomes were in the expected ranges for child age and developmental stage (**Table 1**). Reading IRT score increased by 70.43 points, mathematics IRT score by 53.37 points, weight by 10.96 kg, and BMI by 1.99 kg/m². The teacher-rated social skills score changed little (−0.06 points). Weights at kindergarten and 3rd grade were slightly above the expected norm for the U.S. population. The observed mean weight of 22.5 kg and mean age of 6.23 y at kindergarten corresponded roughly to the 65th percentile weight-for-age for the U.S. population. Three years later, the observed mean weight of 34.26 kg corresponded roughly to the 75th percentile weight-for-age for the U.S. population (25).

Without controlling for background variables, the lagged model showed that children from households experiencing food insecurity at kindergarten demonstrated a 2.34-point smaller increase in mathematics score, a 4.39-point smaller increase in reading score, a 0.27-U greater gain in BMI, a 0.44-kg greater gain in weight, and a 0.08-point greater decline in social skills score than children from food-secure households at kindergarten (**Table 2**). Stratification by gender showed that the associations between academic outcomes and kindergarten food insecurity were significant for both boys and girls. Associations between kindergarten food insecurity and changes in BMI and weight were significant for girls only ($\beta$ = 0.503 kg/m² and $\beta$ = 0.827 kg). The association between kindergarten food insecurity and change in social skills was significant for boys only ($\beta$ = −0.135).

After controlling for both time-varying and time-invariant covariates in the lagged model, the association between kindergarten food insecurity and change in mathematics score remained negative, although this was significant only for girls ($\beta$ = −1.766, $P < 0.017$). Kindergarten food insecurity also had significant effects on BMI, weight, and social skill outcomes among girls only ($\beta$ = 0.428 kg/m², $\beta$ = 0.764 kg, and $\beta$ = 0.09 points). Sign changes were observed for reading performance, BMI, and weight outcomes among boys, but these associations were not significant.

Over time, persistent food insecurity as well as transitions into and out of food insecurity were related to several outcomes (**Table 3**). Children from persistently food *insecure* households had a 0.35 kg/m² greater gain in BMI ($P < 0.028$) and a 0.65 kg greater gain in weight ($P < 0.026$) compared with children from persistently *food secure* households after controlling for all time-invariant and time-varying covariates, including initial height and change in height. These associations were significant among girls ($\beta$ = 0.55 kg/m² and $\beta$ = 1.041 kg, respectively) but not among boys in the stratified analysis.

Persistent food insecurity was not associated with differential changes in mathematics score, reading score, or social skills score when contrasted with persistent food security in the full sample. Among girls only, however, persistent food insecurity was associated with a smaller increase in reading score ($\beta$ = −2.91; $P < 0.078$)) than persistent food security. Children from households transitioning from food *security* to food *insecurity* exhibited a 3.21 point smaller increase in reading score ($P < 0.0007$) in contrast to children from households remaining food secure. This contrast was significant regardless of gender. Children from households transitioning from food *insecurity* to food *security* exhibited a 1.50 point smaller increase in mathematics score ($P < 0.005$) in contrast to children from households remaining food secure. Transitioning

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

## TABLE 1

Selected developmental outcomes at kindergarten (K) and 3rd grade, and changes in outcomes[1,2]

| Outcome | Spring, 1999 K | | Spring, 2002 3rd Grade | | Difference, K to 3rd Grade | |
|---|---|---|---|---|---|---|
| | n | | n | | n | |
| Mathematics score | 13,556 | 32.17 ± 11.57 | 12,362 | 85.49 ± 17.75 | 11,460 | 53.37 ± 12.35 |
| Reading score | 13,055 | 39.35 ± 13.55 | 12,287 | 108.70 ± 20.03 | 10,990 | 70.43 ± 16.12 |
| BMI, kg/m² | 13,504 | 16.42 ± 2.32 | 11,936 | 18.63 ± 3.86 | 11,011 | 1.99 ± 2.12 |
| Weight, kg | 13,511 | 22.58 ± 4.45 | 11,972 | 34.26 ± 9.19 | 11,056 | 10.98 ± 5.08 |
| Social skills score | 13,119 | 3.22 ± 0.55 | 10,169 | 3.18 ± 0.56 | 9261 | −0.06 ± 0.54 |

[1] Values are means ± SD.
[2] Includes children with complete data: scored academic assessment and food security portion of parent interview completed.

**TABLE 2**

*Lagged model effects of kindergarten (K) food insecurity on outcomes[1]*

| Outcome, K–3rd grade | Controlling only for K outcome | | Effect of K food insecurity additionally controlling for K background covariates[2] | | Additionally controlling for changes (K–3rd grade) in background covariates[3] | |
|---|---|---|---|---|---|---|
| | n | β-Coefficient (P-value) | n | β-Coefficient (P-value) | n | β-Coefficient (P-value) |
| Δ Mathematics scaled score | | | | | | |
| All | 11,180 | −2.335 (<0.0001) | 9090 | −1.303 (0.0116) | 8191 | −1.474 (0.0051) |
| Boys | 5682 | −2.099 (0.0009) | 4497 | −1.038 (0.1695) | 4157 | −1.091 (0.1652) |
| Girls | 5498 | −2.578 (<0.0001) | 4365 | −1.589 (0.0176) | 4034 | −1.766 (0.0165) |
| Δ Reading scaled score | | | | | | |
| All | 10,758 | −4.387 (<0.0001) | 8545 | −0.631 (0.3249) | 7907 | −0.242 (0.7222) |
| Boys | 5452 | −3.878 (<0.0001) | 4332 | −0.545 (0.5120) | 4010 | 0.097 (0.9114) |
| Girls | 5306 | −5.116 (<0.0001) | 4213 | −1.025 (0.2358) | 3897 | −0.738 (0.4220) |
| Δ BMI[4] (kg/m²) | | | | | | |
| All | 10,869 | 0.274 (0.0003) | 8571 | 0.088 (0.4184) | 7898 | 0.162 (0.1151) |
| Boys | 5534 | 0.082 (0.4156) | 4360 | −0.181 (0.1285) | 4013 | −0.098 (0.3922) |
| Girls | 5335 | 0.503 (<0.0001) | 4211 | 0.384 (0.0137) | 3885 | 0.428 (0.0022) |
| Δ Weight[4] (kg) | | | | | | |
| All | 10,869 | 0.440 (0.0036) | 8571 | 0.260 (0.2365) | 7898 | 0.276 (0.1341) |
| Boys | 5534 | 0.128 (0.4934) | 4360 | −0.205 (0.3817) | 4013 | −0.210 (0.3127) |
| Girls | 5335 | 0.825 (0.0002) | 4211 | 0.740 (0.0155) | 3885 | 0.761 (0.0024) |
| Δ Social skills scaled score | | | | | | |
| All | 9160 | −0.083 (<0.0001) | 7295 | 0.007 (0.7858) | 6812 | 0.013 (0.5919) |
| Boys | 4595 | −0.135 (<0.0001) | 3648 | −0.052 (0.1464) | 3411 | −0.048 (0.1743) |
| Girls | 4566 | −0.037 (0.1538) | 3648 | 0.083 (0.0054) | 3401 | 0.091 (0.0016) |

[1] Food insecurity is defined as ≥1 affirmative response on the USDA Module.
[2] Controlling for kindergarten outcome score, child's age, child's gender, child's race-ethnicity, whether child was low birth weight, initial child disability status, initial child health insurance status, whether first language spoken at home not English, initial household income, initial household size, initial frequency of child's exercise, parents' age, mother's age at first birth, initial parent marital status, initial parent highest education, initial parent depression rating, initial parent rating of ability to get going, initial child care status, initial parent employment status, initial number of parents, initial number of siblings, initial neighborhood safety rating, initial area of residence, and initial region of residence.
[3] Additionally controlling for *changes* in: disability status, child health insurance status, household income, household size, frequency of exercise, parent marital status, parent highest education, parent depression rating, parent rating of ability to get going, child care status, parent employment status, number of parents, number of siblings, region of residence, area of residence, neighborhood safety rating; number of close relatives died in past 2 y, number of residences for >4 mo in past 2 y.
[4] Additionally controlling for child's initial height and change in height.

from food *insecurity* to food *security* was also associated with a greater increase in social skills score for girls ($P < 0.0001$) but with a smaller increase in social skills for boys ($P < 0.038$).

Significant effects of food insecurity were found using the difference model as well **(Table 4)**. When children from households that became food *insecure* were contrasted with children from households that became food *secure*, food insecurity was associated with a smaller increase in reading score ($\beta = -3.41$; $P < 0.005$). Although the observed associations were negative for both boys and girls, the association for boys was somewhat weaker and not significant.

Gender-stratified analysis using the difference model showed differential effects of food insecurity on BMI, weight, and social skills. Becoming food insecure was associated significantly with *greater* weight and BMI gains among boys ($\beta = 1.165$ kg and $\beta = 0.430$ kg/m², respectively) but nonsignificantly with *smaller* weight and BMI gains among girls ($\beta = -0.809$ kg and $\beta = -0.446$ kg/m², respectively). Becoming food insecure was associated with a greater *decline* in social skills score among girls ($\beta = -0.135$; $P < 0.005$) but with greater *improvement* in social skills score among boys ($\beta = 0.124$; $P < 0.050$).

## DISCUSSION

The first aim of the study was to examine the effects of household food insecurity at kindergarten on subsequent se-

lected dimensions of child development. Food insecurity at kindergarten predicted impaired academic performance in reading and mathematics for girls and boys, a greater decline in social skills for boys, and greater weight and BMI gains for girls. Food insecurity thus serves as an important marker for identifying children with delayed trajectories of development.

After controlling for known confounders in the lagged model, food insecurity at kindergarten predicted poorer mathematics performance for girls, greater BMI and weight gains for girls, and greater improvement in social skills for girls. The relation between social skills and food insecurity in girls was unexpected. A limitation of using the lagged model, however, is that it does not control for changes in food insecurity between kindergarten and 3rd grade, that is, we do not know whether the improvement in social skills observed among girls was due to initial food insecurity or simultaneous improvements in food security. In fact, the dynamic model showed the greatest improvement in social skills was among girls from households becoming food insecure between kindergarten and 3rd grade.

For the second aim, we examined the relation of changes in food insecurity over time and concurrent development using dynamic and difference models, each having its own advantages. Whether contrasted with children from persistently food-secure households (in the dynamic model) or households that became food secure (in either the dynamic or difference

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

JYOTI ET AL.

**TABLE 3**

*Dynamic model effects of food insecurity over time[1,2]*

| | | Effect over time in comparison to persistently food secure | | | | In comparison to Became food secure |
|---|---|---|---|---|---|---|
| Outcome, K–3rd grade | n | Persistently food insecure | Became food secure | Became food insecure | Food insecure at any time | Became food insecure |
| | | *β-Coefficient (P-value)* | | | | |
| Δ Mathematics scaled score | | | | | | |
| All | 8189 | −0.615 (0.462) | −1.503 (0.005) | −0.957 (0.220) | −1.025 (0.032) | 0.546 (0.541) |
| Boys | 4155 | −0.085 (0.942) | −1.156 (0.147) | 0.008 (0.942) | −0.411 (0.543) | 1.164 (0.406) |
| Girls | 4034 | −1.098 (0.326) | −1.680 (0.045) | −1.451 (0.156) | −1.41 (0.039) | 0.114 (0.853) |
| Δ Reading scaled score | | | | | | |
| All | 7906 | −0.902 (0.421) | 0.081 (0.908) | −3.209 (0.0007) | −1.343 (0.039) | −3.290 (0.003) |
| Boys | 4009 | 1.219 (0.330) | −0.419 (0.688) | −2.834 (0.069) | −0.820 (0.414) | −2.415 (0.168) |
| Girls | 3897 | −2.911 (0.078) | 0.739 (0.465) | −3.568 (0.0035) | −1.913 (0.030) | −4.307 (0.003) |
| Δ BMI[3] (kg/m$^2$) | | | | | | |
| All | 7896 | 0.354 (0.028) | 0.027 (0.809) | 0.018 (0.889) | 0.133 (0.151) | −0.009 (0.956) |
| Boys | 4011 | 0.196 (0.300) | −0.232 (0.076) | 0.107 (0.584) | 0.024 (0.848) | 0.339 (0.119) |
| Girls | 3885 | 0.552 (0.021) | 0.313 (0.060) | −0.075 (0.704) | 0.263 (0.052) | −0.388 (0.119) |
| Δ Weight[3] (kg) | | | | | | |
| All | 7896 | 0.649 (0.026) | 0.034 (0.869) | 0.092 (0.701) | 0.258 (0.122) | 0.059 (0.840) |
| Boys | 4011 | 0.319 (0.353) | −0.438 (0.068) | 0.243 (0.496) | 0.124 (0.854) | 0.680 (0.092) |
| Girls | 3885 | 1.040 (0.016) | 0.535 (0.068) | −0.069 (0.841) | 0.502 (0.038) | −0.605 (0.165) |
| Δ Social skills scaled score | | | | | | |
| All | 6812 | 0.020 (0.625) | 0.008 (0.739) | −0.030 (0.287) | −0.001 (0.982) | −0.039 (0.255) |
| Boys | 3411 | 0.021 (0.711) | −0.080 (0.038) | −0.009 (0.826) | −0.023 (0.467) | 0.071 (0.169) |
| Girls | 3401 | 0.033 (0.542) | 0.123 (<0.0001) | −0.060 (0.101) | 0.032 (0.269) | −0.182 (<0.0001) |

[1] Food insecurity is defined as ≥1 affirmative response on the USDA Module.
[2] See Table 2, footnotes 2 and 3.
[3] Additionally controlling for child's initial height and change in height.

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

model), children from households that became food insecure exhibited poorer reading performance, and this was especially significant among girls. The magnitude of the difference was about one-fourth of the SD of the change from K to 3rd grade. For girls, there is evidence for a relatively short lag between food insecurity and its effects on reading from comparing results in Tables 2 and 3. Persistent food insecurity through 3rd grade increased the delay in reading ($β = −2.911$) relative to the effect of food insecurity at kindergarten alone ($β = −0.738$). The association of kindergarten food insecurity with reading performance was reversed if the household was no longer food insecure by 3rd grade ($β = 0.739$). Given evidence of a short lag, and that the difference model theoretically provides the least biased estimates of association under this assumption, we conclude that the difference model represents a true association between food insecurity and delayed reading performance among girls. Although the direction of the association was the same for boys, the association was not significant, and there was no evidence for a relatively short lag.

For predicting mathematics performance, the effect of food insecurity at kindergarten, rather than the change in status over time, mattered most for boys and girls. Coefficients for remaining food insecure or becoming food secure (dynamic model) were similar to the effects of kindergarten food insecurity (lagged model) on mathematics performance, suggesting no effect of 3rd grade status. This may be due in part to the possibility of a long lag between food insecurity and its effect on mathematics performance.

Although the links between malnutrition and cognition (31) and between fasting and cognition in children (32) are well established, the literature reporting on the effects of less severe forms of food insecurity on academic performance is less consistent. Two studies reported significant associations be-

tween food insecurity and lower test scores for arithmetic, letter-word, and passage comprehension (7,15), although associations with reading performance and 2 other measures of cognitive functioning were not found to be significant in one of the studies (15). Alternatively, 3 studies reported no significant cross-sectional associations between food insecurity and cognitive or academic performance (8,11,17). No studies to date have attempted longitudinal, gender-stratified analyses; therefore, this study advances the field by providing the strongest longitudinal evidence that food insecurity is associated with impaired reading performance for girls. Our study is also consistent with previous findings using ECLS-K of a negative association between kindergarten food insecurity and mathematics learning (22).

This is the first study to investigate the longitudinal relation between household food insecurity and social skills in children. Comparisons between Tables 2 and 3 suggest a short lag between food insecurity and socials skills for girls: food security status at 3rd grade changes the observed effect on social skills relative to kindergarten food insecurity. Under the assumption of short lag, we find an association between food insecurity and impaired social skills among girls. Girls from households becoming food insecure exhibited smaller gains in social skills whether compared with girls from households becoming food secure ($β = −0.135$ in difference model, $P < 0.005$) or persistently food secure households ($β = −0.06$ in dynamic model; $P < 0.101$). For boys, unexpectedly, it appears that the transition from food *insecurity* to food *security* is associated with modest deficits in social skills over time ($β = −0.124$ in difference model; $P < 0.050$). Evidence for a short lag is less clear for boys, however, making this association questionable.

This study used teacher reports of social skill competence

**TABLE 4**

*Difference model effects of transitions in food insecurity status[1]*

| Outcome, K–3rd grade | n | Became food insecure vs. became food secure[2] |
|---|---|---|
| | | β-Coefficient (P-value) |
| Δ Mathematics scaled score | | |
| All | 8775 | −0.012 (0.991) |
| Boys | 4450 | 0.168 (0.911) |
| Girls | 4325 | −0.047 (0.974) |
| Δ Reading scaled score | | |
| All | 8471 | −3.413 (0.005) |
| Boys | 4292 | −3.182 (0.102) |
| Girls | 4179 | −3.833 (0.014) |
| Δ BMI[3] (kg/m²) | | |
| All | 8471 | −0.005 (0.978) |
| Boys | 4305 | 0.430 (0.059) |
| Girls | 4167 | −0.446 (0.091) |
| Δ Weight[3] (kg) | | |
| All | 8472 | 0.135 (0.681) |
| Boys | 4305 | 1.165 (0.019) |
| Girls | 4167 | −0.809 (0.105) |
| Δ Social skills scaled score | | |
| All | 7275 | −0.001 (0.986) |
| Boys | 3644 | 0.124 (0.050) |
| Girls | 3631 | −0.135 (0.005) |

[1] Food insecurity is defined as ≥1 affirmative response on the USDA Module.

[2] Controlling for change in household income, change in child disability status, change in number of parents in household, change in parental marital status, change in mother's employment status, change in father's employment, change in child insurance status, change in parent depression rating, change in parent rating of ability to get going, difference in household size, change in frequency of child's exercise, whether close relative died in past 2 y, change in parent education status, total number places child lived in past 3 y for more than 4 mo, change in child care status, change in area of residence, change in region of residence, change in number of siblings in household, change in neighborhood safety rating.

[3] Additionally controlling for child's change in height.

rather than parent or child report, direct observation, or a combination of methods. Studies suggest that both teacher and parent reports are important for assessing overall social competence of children [33]. These teacher reports did not account for factors such as teacher distress or cultural background [27]. Nonetheless, reliabilities for the rating scales were found to be high and teacher-reported social skills provide the best means of measuring social competence in the absence of additional data.

The association between household food insecurity and impaired social skills development among girls is consistent with cross-sectional studies reporting significantly greater risks of psychosocial dysfunction and behavioral and attention problems among hungry and at-risk-for-hunger children compared with not-hungry children [13,14], although neither study reported gender-stratified results and both were restricted to analysis of low-income children. The finding among girls is also consistent with cross-sectional studies linking food insecurity with decreased levels of positive behavior [8], decreased levels of teacher-rated "social ability" [17], difficulty getting along with other children [15], and greater levels of social behavior problems [7,10] in children. No previous study exists, however, to corroborate the potential association between food insecurity and *better* social skills among boys, perhaps due to the lack of gender-stratified, longitudinal analyses.

Less clear are the conclusions that can be drawn from an analysis of the effect of food insecurity on weight or BMI. Although results from the difference model support an association between food insecurity and reduced gain in weight among girls, caution is warranted in interpreting the results due to the possibility of a long lag between cause and effect. Rather, the strong association between kindergarten food insecurity and subsequent greater weight gain among girls remained significant regardless of food insecurity at 3rd grade, suggesting that the change in food security status has little effect. The difference model also suggests an association between food insecurity and *greater* weight gain among boys. From the dynamic model, boys in households that transitioned from food *insecurity* to *security* gained less weight than boys remaining food insecure, boys remaining food secure, or boys becoming food insecure. Therefore, the association in boys seems to be with change in food security status, giving evidence for a relatively short lag between cause and effect. Unless we are sure about this assumption, however, we do not know whether the difference model provides the least biased estimates of association. This study was not able to control for parental height and weight in assessing effects on child weight and BMI.

Overweight and obesity have emerged in recent years as major public health problems. To date, only one study has looked at the effects of household food insufficiency on child weight status by gender [15]. Food insufficiency was associated with a reduced risk of overweight among 2- to 7-y-old girls but with increased risk of overweight among 8- to 16-y-old non-Hispanic white girls. The strong association between kindergarten food insecurity and greater subsequent weight gain among girls in this study could explain the greater risk of overweight among older girls if the effect is cumulative. Two previous cross-sectional studies using ECLS-K to examine effects of food insecurity found no associations with BMI or weight status [17,22].

Several mechanisms may explain the associations between food insecurity and developmental outcomes. One possible mechanism is that food insecurity results in compromised dietary quality or quantity [34]. Studies have shown that adults in food-insecure households had lower consumption of fruits and vegetables [35], had less food on hand [35], obtained a higher percentage of energy from carbohydrate [36], and had lower intakes of dietary fiber and other vital nutrients [36] compared with food-secure households. Alternatively, economic deprivation may be associated with consumption of cheap, energy-dense foods that contribute to weight gain [37,38]. Either decreases in diet quality or increases in energy density could lead to accelerated weight gain and may relate to academic and social development in children.

Another possible mechanism is that food insecurity acts as a psychological or emotional stressor, affecting parent and child behavior. Lupien and colleagues [39] found that children of low socioeconomic status have significantly higher cortisol levels than children of high socioeconomic status, and that this effect emerges as early as age 6 y. Cumulative exposure to high levels of cortisol in humans has been related to depression, cognitive deficits, and atrophy of brain structures involved in learning and memory [40,41]. Several studies showed that economic hardship is linked to increases in children's social behavior problems, and that this association can be mediated by parent-child interactions [40–44] as well as children's feeling of control or mastery over time in relation to perceived financial difficulties [45,46]. One study in Canada linked food insecurity directly with stress, anxiety, sociofamilial perturbations, and disrupted household dynamics [47].

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

The latter mechanism, in which food insecurity acts as a stressor, would better support observed gender differences in the effects of food insecurity. That is, it better explains how food insecurity at the household level could affect girls and boys differentially at the individual level. Previous studies reported gender differences in children's and adolescents' reactions to life stress and acute stress (16,45,47–53). A recent study suggests that higher levels of anxiety may protect preadolescent boys from engaging in antisocial behaviors, which might partially explain the increase in social skills score observed among boys transitioning into food insecurity in this study (53).

Overall, this study provides the strongest empirical evidence to date that food insecurity is linked to developmental consequences for girls and boys, particularly impaired social skills development and reading performance for girls. There are 3 possible explanations for the associations between food insecurity and development outcomes: first, child development problems result in concurrent household food insecurity; second, food insecurity results in concurrent developmental consequences; and third, other variables confound the relation. Because there is no theoretical reason to assume that impaired child development causes household food insecurity and we controlled for confounders at the individual and household levels, the most plausible interpretation of the results is that food insecurity in the early elementary years has developmental consequences. Furthermore, these consequences may be both nutritional and nonnutritional.

## ACKNOWLEDGMENT

We acknowledge the assistance of Patricia Kariger with the interpretation of the academic performance and social skill data.

## LITERATURE CITED

1. Bickel, G. W., Nord, M., Price, C., Hamilton, W. & Cook, J. (2000) Guide to Measuring Household Food Security in the United States: Revised 2000. No. 6. March 2000. USDA, Food and Nutrition Services, Alexandria, VA.

2. Nord, M., Andrews, M. & Carlson, S. (2004) Household Food Security in the United States, 2003. Food Assistance and Nutrition Research Report no. (FANRR) 42. October 2004. U.S. Department of Agriculture, Economic Research Service, Washington, DC.

3. Nord, M. (2003) Food Insecurity in Households with Children. (2003) Food Assistance and Nutrition Research Report no. (FANRR) 34–13. July 2003. USDA, Economic Research Service, Washington, DC.

4. Sahyoun, N. & Basiotis, P. P. (2000) Food Insufficiency and the Nutritional Status of the Elderly Population [Online]. USDA Center for Nutrition Policy and Promotion. Nutrition Insights no. 18. Http://www.usda.gov/cnpp/Insights/Insight18.pdf. [Accessed June 4, 2005].

5. Rose, D., Habicht, J. P. & Devaney, B. (1998) Household participation in the Food Stamp and WIC programs increases the nutrient intakes of preschool children. J. Nutr. 128: 548–555.

6. Alaimo, K., Olson, C., Frongillo, E. & Briefel, R. (2001a) Food insufficiency, poverty, and health in U.S. pre-school and school-age children. Am. J. Public Health 91: 781–86.

7. Reid, L. (2001) The Consequences of Food Insecurity for Child Well-Being: An Analysis of Children's School Achievement, Psychological Well-Being, and Health. Joint Center for Poverty Research, Working Paper 137. January 2001. Chicago, IL.

8. Dunifon, R. & Kowaleski-Jones, L. (2003) The influences of participation in the National School Lunch Program and food insecurity on child well-being. Soc. Soc. Rev. 77: 72–92.

9. Cook, J. T., Frank, D. A., Berkowitz, C., Black, M. M., Casey, P. H., Cutts, D. B., Meyers, A. F., Zaldivar, N., Skalicky, A., Levenson, S., et al. (2004) Food insecurity is associated with adverse health outcomes among human infants and toddlers. J. Nutr. 134: 1432–1438.

10. Shook Slack, K. & Yoo, J. (2004) Food hardships and child behavior problems among low-income children. Institute for Research on Poverty Discussion Paper no. 1290–04. Madison, WI.

11. Weinreb, L., Wehler, C., Perloff, J., Scott, R., Hosmer, D., Sagor, L. & Gunderson, C. (2005) Hunger: its impact on children's health and mental health. Pediatrics 110: 41–50.

12. Ashiabi, G. (2005) Household food insecurity and children's school engagement. J. Child. Poverty 11: 3–17.

13. Kleinman, R. E., Murphy, J. M., Little, M., Pagano, M., Wehler, C. A.,

Regal, K. & Jellinek, M. S. (1998) Hunger in children in the United States: potential behavioral and emotional correlates. Pediatrics 101: 3.

14. Murphy, J. M., Wehler, C. A., Pagano, M. E., Little, M., Kleinman, R. E. & Jellinek, M. S. (1998) Relationships between hunger and psychosocial functioning in low-income American children. J. Am. Acad. Child Adolesc. Psychiatry 37: 163–171.

15. Alaimo, K., Olson, C. M. & Frongillo, E. A. (2001c) Food insufficiency and American school-aged children's cognitive, academic and psychosocial development. Pediatrics 108: 44–53.

16. Alaimo, K., Olson, C. M. & Frongillo, E. A. (2002) Family food insufficiency, but not low family income, is positively associated with dysthymia and suicide symptoms in adolescents. J. Nutr. 132: 719–725.

17. Stormer, A. & Harrison, G. G. (2003) Does Household Food Security Affect Cognitive and Social Development of Kindergarteners? Institute for Research on Poverty: Discussion Paper no. 1276-03. Madison, WI.

18. Alaimo, K., Olson, C. M. & Frongillo, E. A. (2001b) Low family income and food insufficiency in relation to overweight in U.S. children—is there a paradox? Arch. Pediatr. Adolesc. Med. 155: 1161–1167.

19. Casey, P. H., Szeto, K., Lensing, S., Bogle, M. & Weber, J. (2001) Children in food-insufficient, low-income families—prevalence, health, and nutritional status. Arch. Pediatr. Adolesc. Med. 155: 508–514.

20. Frongillo, E. A. & Rowe, E. M. (1999) Challenges and solutions using and analyzing longitudinal growth data. In: Human Growth in Context (Johnstone, F. E., Eveleth, P. & Zemel, B., eds.), pp. 51–64. Smith-Gordon, London, UK.

21. Lee, J. S. & Frongillo, E. A. (2001) Understanding needs is important for assessing the impact of food assistance program participation on nutritional and health status of U.S. elderly persons. J. Nutr. 131: 765–773.

22. Winicki, J. & Jemison, K. (2003) Food insecurity and hunger in the kindergarten classroom: its effect on learning and growth. Contemp. Econ. Policy 21: 145–157.

23. National Center for Education Statistics (2004) ECLS-K Longitudinal Kindergarten-Third Grade Public-Use Data File [CD-ROM]. U.S Department of Education, Institute of Education Sciences, Washington, DC.

24. Bose, J., West, J., Tourangeau, K., Nord, C. & Le T. & Wan, S. (2002) User's Guide to the Longitudinal Kindergarten-First Grade Public-Use Data File. U.S. Department of Education, Office of Educational Research and Improvement. National Center for Education Statistics 2002–149, Washington, DC.

25. Clinical Growth Charts [Online]. National Center for Health Statistics, CDC. http://www.cdc.gov/nchs/about/major/nhanes/growthcharts/clinical_charts.htm [Accessed June 4, 2005].

26. Gresham, F. M. & Elliott, S. N. (1990) Social Skills Rating System. American Guidance Service, Circle Pines, MN.

27. Fagan, J. & Fantuzzo, J. W. (1999) Multirater congruence on the Social Skills Rating System: mother, father, and teacher assessments of urban head start children's social competencies. Early Childhood Res. Q. 14: 229–242.

28. Glaser, B. A., Kronsnoble, K. M. & Forkner, C.B.W. (1997) Parents and teachers as raters of children's problem behaviors. Child Fam. Behav. Ther. 19: 1–13.

29. Winsler, A. & Wallace, G. L. (2002) Behavior problems and social skills in preschool children: parent-teacher agreement and relations with classroom observations. Early Educ. Dev. 13: 41–58.

30. Cawley, J. (2003) The impact of obesity on wages. J. Hum. Resour. 39: 451–475.

31. Bryan, J., Osendarp, S., Hughes, D., Calvaresi, E., Baghurst, K. & van Klinken, J. W. (2004) Nutrients for cognitive development in school-aged children. Nutr. Rev. 62: 295–306.

32. Pollitt, E., Cueto, S. & Jacoby, E. R. (1998) Fasting and cognition in well- and undernourished schoolchildren: a review of three experimental studies. Am. J. Clin. Nutr. 67: 779S–784S.

33. Elliott, S. N., Barnard, J. & Gresham, F. M. (1989) Preschoolers' social behavior: teachers' and parents' assessments. J. Psychoeduc. Assess. 7: 223–234.

34. Bhattacharya, J., Currie, J. & Haider, S. (2004) Poverty, food insecurity, and nutritional outcomes in children and adults. J. Health Econ. 23: 839–862.

35. Kendall, A., Olson, C. & Frongillo, E. A. (1996) Relationship of hunger and food insecurity to food availability and consumption. J. Am. Diet. Assoc. 96: 1019–24.

36. Connell, C. L., Yadrick, K., Hinton, A. W. & Su, L. J. (2000) Nutrient intakes of food insufficient and food sufficient adults in the southern region of the United States and the impact of federal food assistance programs. Final report to the Southern Rural Development Center. December 2000. Mississippi State, MS.

37. Drewnowski, A. & Spector, S. E. (2004) Poverty and obesity: the role of energy density and energy costs. Am. J. Clin. Nutr. 79: 6–16.

38. Darmon, N., Ferguson, E. & Briend, A. (2003) Do economic constraints encourage the selection of energy dense diets? Appetite 41: 315–322.

39. Lupien, S. J., King, S., Meaney, M. J. & McEwan, B. S. (2000) Child's stress hormone levels correlate with mother's socioeconomic status and depressive state. Biol. Psychiatry 48: 976–980.

40. Lupien, S. J. & McEwan, B. S. (1997) The acute effects of corticosteroids on cognition: integration of animal and human model studies. Brain Res. Rev. 24: 1–27.

41. Lupien, S. J., DeLeon, M., DeSanti, S., Convit, A., Tarshish, C., Nair, N.P.V., et al. (1998) Longitudinal increase in cortisol during human aging predicts hippocampal atrophy and memory deficits. Nat. Neurosci. 1: 69–73.

42. McLoyd, V. (1990) The impact of economic hardship on black families

and children: psychological distress, parenting, and socioemotional development. Child Dev. 61: 311–346.

43. Conger, R. D., Conger, K. J., Elder, G. H., Lorenz, F. O., Simons, R. L. & Whitbeck, L. B. (1992) A family process model of economic hardship and adjustment of early adolescent boys. Child Dev. 63: 526–541.

44. Conger, R. D., Conger, K. J., Elder, G. H., Lorenz, F. O., Simons, R. L. & Whitbeck, L. B. (1993) Family economic stress and adjustment of early adolescent girls. Dev. Psychol. 29: 206–219.

45. Conger, R. D., Conger, K. J., Matthews, L. S. & Elder, G. H. (1999) Pathways of economic influence on adolescent adjustment. Am. J. Community Psychol. 27: 519–541.

46. Lehman, S. J. & Koerner, S. S. (2002) Family financial hardship and adolescent girls' adjustment: the role of maternal disclosure of financial concerns. Merrill-Palmer Q. 48: 1–24.

47. Hamelin, A., Habicht, J. P. & Beaudry, M. (1999) Food insecurity: consequences for the household and broader social implications. J. Nutr. 129: 525S–528S.

48. Goodman, S. H., Brumley, H. E., Schwartz, K. R. & Purcell, D. W. (1993)

Gender and age in the relation between stress and children's school adjustment. J. Early Adolesc. 13: 329–345.

49. Cassady, M. (2003) Situational, gender, and age-related differences in adolescents' responses to stress. Diss. Abstr. Int. B Sci. Eng. 63: 5548.

50. Jose, P. E & Ratcliffe, V. (2004) Stressor frequency and perceived intensity as predictors of internalizing symptoms: gender and age differences in adolescence. N.Z. J. Psychol. 33: 145–154.

51. Kudielka, B. M., Buske-Kirschbaum, A., Hellhammer, D. H. & Kirschbaum, C. (2004) Differential heart rate reactivity and recovery after psychosocial stress (TSST) in healthy children, younger adults, and elderly adults: the impact of age and gender. Int. J. Behav. Med. 11: 116–121.

52. Rosmalen, J.G.M., Oldehinkel, A. J., Ormel, J., de Winter, A. F., Buitelaar, J. K. & Verhulst, F. C. (2005) Determinants of salivary cortisol levels in 10–12 year old children; a population-based study of individual differences. Psychoneuroendocrinology 30: 483–495.

53. Rudolph, K. D. & Hammon C. (2005) Age and gender as determinants of stress exposure, generation, and reactions in youngsters: a transactional perspective. Child Dev. 70: 660–677.

Downloaded from https://academic.oup.com/jn/article-abstract/135/12/2831/4669915 by guest on 24 September 2019

# EXHIBIT N

*American Economic Review 2016, 106(4): 903–934*
*http://dx.doi.org/10.1257/aer.20130375*

# Long-Run Impacts of Childhood Access to the Safety Net[†]

*By* Hilary Hoynes, Diane Whitmore Schanzenbach, and Douglas Almond*

*We examine the impact of a positive and policy-driven change in economic resources available in utero and during childhood. We focus on the introduction of the Food Stamp Program, which was rolled out across counties between 1961 and 1975. We use the Panel Study of Income Dynamics to assemble unique data linking family background and county of residence in early childhood to adult health and economic outcomes. Our findings indicate access to food stamps in childhood leads to a significant reduction in the incidence of metabolic syndrome and, for women, an increase in economic self-sufficiency.* (JEL I12, I38, J24)

There is substantial evidence on the strong intergenerational correlations in health and income. As documented by Case, Lubotsky, and Paxson (2002), health and economic disparities unfold early in life. There is less evidence, however, on causal mechanisms behind this gap. The "early origins" literature offers some guidance toward the causal relationships underlying intergenerational correlations. The extent to which policies aimed at improving early life conditions can improve long-term health and economic outcomes is of great interest, and a growing literature in this area seeks to better understand these linkages.

In this paper, we evaluate whether increasing the family's economic resources when a child is in utero and during childhood improves later life health and economic outcomes. In particular, we focus on the introduction of a key element of

*Hoynes: University of California, Berkeley, 2607 Hearst Ave., #7320, Berkeley, CA 94720, and NBER (e-mail: hoynes@berkeley.edu); Schanzenbach: Northwestern University, 2120 Campus Drive, Evanston, IL 60208, and NBER (e-mail: dws@northwestern.edu); Almond: Columbia University, 420 West 118th Street, New York, NY 10027 (e-mail: da2152@columbia.edu). We thank Rucker Johnson, Bhash Mazumder, Doug Miller, Jesse Rothstein, Caroline Hoxby, and seminar participants at Northwestern University, Princeton University, UC Davis Center for Poverty Research, UCSB, UC Berkeley, Stanford, University of Stavanger, the Goldman School, University College London, and the University of Michigan for helpful comments. We are grateful to Bob Schoeni and Donna Nordquist for help with the PSID, Karen Norberg for help identifying deaths due to nutritional deficiencies, Martha Bailey and Andrew Goodman-Bacon for sharing data on rollout of Community Health Centers, and Amy Finkelstein and Jean Roth for sharing American Hospital Association Annual Survey data. This work was supported by NSF Career Award SES-0847320 (Almond), USDA FANRP Project 235, "Impact of Food Stamps and WIC on Health and Long Run Economic Outcomes," the University of Michigan PSID Small Grant Program, the UC Davis Center for Poverty Research, and UC Davis Committee on Research New Research Initiative. We appreciate the excellent research assistance of Charles Stoecker, Ankur Patel, Danielle Sandler, and Andrew Foote. This paper was previously circulated under the title of "Long Run Economic and Health Impacts of Participation in the Food Stamp Program." The authors declare that they have no relevant or material financial interests that relate to the research described in this paper. This study is covered by UC Berkeley IRB approval 2013-09-5644. Confidential data from the Panel Study of Income Dynamics was received under contract N017046-07.*

*[†] Go to http://dx.doi.org/10.1257/aer.20130375 to visit the article page for additional materials and author disclosure statement(s).*

the US safety net, the Food Stamp Program (FSP). The FSP was rolled out in a county-by-county basis between 1962 and 1975, providing low-income families with vouchers that could be used at grocery stores to purchase food. Both economic theory and prior empirical evidence (using the same FSP rollout identification strategy adopted in this paper) suggest that these vouchers increase the total resources available to a household, and are treated the same as an equivalent cash income transfer would be (Hoynes and Schanzenbach 2009). Thus, we can utilize the FSP rollout as an identification strategy for increases in economic resource availability early in life. Our analysis builds on previous research finding a positive "first-stage" effect of FSP rollout on contemporaneous health, as measured in natality data by birth weight (Almond, Hoynes, and Schanzenbach 2011; Currie and Moretti 2008), though outcomes in adulthood need not operate solely though that channel (Almond, Chay, and Lee 2005; Almond and Currie 2011b). The program rollout design links the paper to a growing literature evaluating the introduction of other Great Society programs.[1]

Our analysis also makes three important contributions to the literature that relates resources in utero and during childhood to economic and health outcomes in adulthood. First, much of the early design-based observational studies looked at *extreme*, *negative* events including famines, natural disaster, or disease outbreaks (see Currie 2009 and Almond and Currie 2011a,b for recent reviews). More recently, studies have examined the long-term effects of positive, policy-driven treatments such as early childhood education (Ludwig and Miller 2007; Campbell et al. 2014); Medicaid (Brown, Kowalski, and Lurie 2015; Meyer and Wherry 2012); early twentieth century welfare benefits (Aizer et al. 2016); environmental policies (Isen, Rossin-Slater, and Walker forthcoming); alcohol availability (Nilsson forthcoming); and reduced infectious disease burden (Almond, Currie, and Hermann 2012).[2] We extend the literature by examining the impact of a central element of the US safety net, and currently our only universal welfare program (Hoynes and Schanzenbach forthcoming). We know little about the Food Stamp Program yet, after Social Security, it touches more families than about any other element of the social safety net. Second, because our policy experiment is essentially a disposable income transfer to low-income households containing young children, the results shed light on the causal impact of increased income during childhood on long-term outcomes. Third, our treatment extends beyond in utero exposure; we can test whether the impacts of exposure to food stamps vary throughout childhood examining *when* treatment matters.[3]

The Food Stamp Program, recently renamed Supplemental Nutrition Assistance Program (SNAP), is the fundamental safety net in the United States. Importantly,

[1] Other rollout studies examine Head Start (Ludwig and Miller 2007); Medicare (Almond, Chay, and Greenstone 2007; Finkelstein and McKnight 2008); Women, Infants, and Children (WIC) (Hoynes, Page, and Stevens 2011); family planning programs (Bailey 2012); Title I (Cascio et al. 2010); and community health centers (Bailey and Goodman-Bacon 2015).

[2] Other studies analyzing the longer-run impacts of positive policy treatments examine compulsory schooling laws (Lleras-Muney 2005; Clark and Royer 2013); introduction of unleaded gasoline (Reyes 2007; Nilsson 2009); and Medicare-induced hospital desegregation (Chay, Guryan, and Mazumder 2009).

[3] There is also an important literature on height and stunting, and the potential for "catch-up growth" (see, e.g., Case and Paxson 2008 and Tanner 1981). Our ability to speak to this literature is limited, however, by the low incidence of stunting, the birth cohorts in our sample, and the fact that, in our analysis, once treatment turns on it does not turn off.

it is the only public assistance program that is available to all income-eligible families (other programs limit eligibility to particular groups such as female-headed households, children, the disabled, or the elderly). It is currently the largest US cash or near cash means-tested transfer program with spending in 2012 of $74 billion compared to $29 billion for Temporary Assistance for Needy Families (TANF) and $64 billion for the federal Earned Income Tax Credit (EITC).[4] In 2013, food stamps lifted five million people out of poverty, behind only Social Security and the EITC in its antipoverty effects (Short 2014). Additionally, food stamps played an important role in protecting families in the Great Recession (Bitler and Hoynes 2015). Interestingly, in contrast to the rest of the US safety net, the FSP is a federal program and exhibits little variation across states (Currie 2003). It also has remained largely intact in the presence of dramatic reforms to other parts of the safety net (Bitler and Hoynes 2010). This lack of variation across states and over time presents significant challenges for evaluating the impacts of the FSP (Currie 2003), and as a result the program is tremendously understudied in the economics literature.

Our main results are for a sample of adults born between 1956 and 1981 who grew up in disadvantaged families (their parent had less than a high school education). We refer to this as the "high-participation sample." We employ a difference-in-differences model where the treatment varies by county of birth and birth cohort, and we include controls for county and year of birth and interview fixed effects, state-linear time trends, and county-year of birth controls. We also stratify on other measures of disadvantage at the individual and county level in a difference-in-differences framework. In addition, we estimate a triple-difference model that extends beyond the low education sample and uses variation across subgroups with varying propensities of being affected by food stamps (Hoynes and Schanzenbach 2009). Our main treatment variable is the share of time between conception and age five that a Food Stamp Program was available in the individual's county of birth. We estimate impacts on weight, height, stunting, general health status, disability, the incidence of many conditions and diseases (e.g., high blood pressure, diabetes, heart disease, etc.), health behaviors (smoking, drinking), as well as education, earnings, income, and program participation. Because of the many outcome variables, we follow Kling, Liebman, and Katz (2007) and Anderson (2008) and estimate summary standardized indices that aggregate information over multiple treatments.

We find that access to the FSP in utero and in early childhood leads to a large and statistically significant reduction in the incidence of "metabolic syndrome" (a cluster of conditions including obesity, high blood pressure, heart disease, and diabetes) as well as an increase in reporting to be in good health. The United States is facing high levels of obesity, described by many as a "public health crisis," and our results show that addressing nutrition in early life through a policy program can have a positive effect on the problem. We also find for women that access to food stamps in early childhood leads to an increase in economic self-sufficiency.

---

[4]Food stamp participation has increased to historic highs during the Great Recession: in 2007, expenditures on food stamps, at $31 billion, compared to $48 billion for the EITC and $27 billion for TANF. Program costs are found in US Department of Health and Human Services (2012), Internal Revenue Service (2012), and US Department of Agriculture (2012).

Our results are robust to adding a rich set of county controls (possible confounders), and event-study models further support the validity of the research design. Further, we find important results concerning the timing of exposure—the beneficial impacts of food stamps are concentrated in exposure during the period ranging from in utero through early childhood, with limited additional impacts after that time frame.

Our results not only make a contribution by establishing a link between increased economic resources in childhood and long-run health and economic outcomes, but we also can speak to the "program evaluation" of the FSP by quantifying aspects of long-term internal and external benefits of the safety net that have not previously been measured. Our work shows that the FSP generates larger private and social benefits when taking into account the "multiplier effect" on later life outcomes.

The remainder of our paper is as follows. In Section I we summarize the economic literature on long-term effects of early life interventions. In Section II we summarize the biological science literature in order to provide guidance for which health outcomes are expected to be impacted by the FSP treatment. In Section III we provide the background on the FSP and in Section IV we describe our data. In Section V we present our empirical model and Section VI our results. We conclude in Section VII.

## I. Background and Prior Research

That in utero and early childhood events can have important vestigial effects has been documented for a wide range of later life outcomes, including health status, test scores, education attainment, wages, and mortality. Most of the early studies leveraged short, extreme events experienced in utero as identification strategies (see reviews by Currie 2009 and Almond and Currie 2011a,b). Examples include famine (Stein et al. 1975; Susser and Lin 1992; Painter, Roseboom, and Bleker 2005; Chen and Zhou 2007); disease (Almond 2006; Barreca 2010); and radiation (Almond, Edlund, and Palme 2009). A natural question is how generalizable such linkages are, and in particular whether more routine childhood experiences may also shape health and economic outcomes during adulthood. Evidence from famines may be especially difficult to interpret because they typically are less "clean" natural experiments, with diffuse start and end points, endogenous migration, and high levels of sample attrition.

There is less work that combines the strength of design-based identification strategies for causal inference with more commonplace treatments/exposures, particularly those that are driven by policy. The shortage of previous work stems from the challenge of marrying identification strategies for program evaluation to (i) policies that affect children at a young age, and (ii) policies that can be mapped to data on later life outcomes in adulthood. Thus, we are still at the beginning stages of learning what type of shocks, in what setting, and during what point in early life matter for long-term health and economic outcomes.

The understanding of the long-term effects of positive, policy-based treatments is quickly changing in this active literature. In particular, there are a handful of studies that are closest to our own. Ludwig and Miller (2007), using the introduction of Head Start in the poorest US counties, find the program reduced childhood

mortality rates and increased educational attainment.[5] Campbell et al. (2014) follow a cohort experimentally assigned to attend the Abecedarian Project, a high-quality preschool program in North Carolina, and find strong improvements in adult health. Meyer and Wherry (2012) find that Medicaid expansions reduce mortality rates among black teens and Brown, Kowalski, and Lurie (2015) find that the Medicaid and State Children's Health Insurance Program expansions in the 1980s and early 1990s increased economic and educational outcomes by age 28. Isen, Rossin-Slater, and Walker (forthcoming) find that reductions in early life exposure to air pollution, identified by the 1970 Clean Air Act, led to improvements in employment and earnings for workers by age 30. Nilsson (forthcoming) finds that a policy-driven increase in alcohol availability during pregnancy leads to reductions in employment, earnings, and education in adulthood. Chetty et al. (2011) and Dynarski, Hyman, and Schanzenbach (2013) find persistent effects of class-size reductions at 5–8 years old on educational attainment and initial labor market outcomes.

Additionally, Reyes (2007) and Nilsson (2009) consider the effect of early childhood lead exposure on later life outcomes, and Glied and Neidell (2010) evaluate the long-term impacts of water fluoridation. Chay, Guryan, and Mazumder (2009) find that improved health for young black children during the late 1960s and early 1970s yielded substantially increased National Assessment of Educational Progress (NAEP) and Armed Forces Qualification Test (AFQT) test scores during the 1980s. Building on Almond, Chay, and Greenstone (2007), they argue that improved access to hospitals following the Civil Rights Act and Medicare-induced desegregation of hospitals drove the reduction in post-neonatal mortality rates for blacks that subsequently yielded higher test scores. Likewise, more specific medical interventions in the early postnatal period have been found to exert long-term effects, including surfactant and related treatments for very low birth weight infants (Bharadwaj, Løken, and Nielson 2013) and breastfeeding-encouragement by hospital nurses following delivery (Fitzsimons and Vera-Hernández 2014). Additionally, Almond, Currie, and Herman (2012) consider improvements in post-neonatal mortality in the 1960s and 1970s United States, which were driven by various factors including access to medical care. Focusing on how these improvements differed by race, they found that improvements in early life disease environment decreased the incidence of diabetes during pregnancy (i.e., when the exposed cohort reached adulthood) for blacks.

A second strand of research, relevant for our study, considers the effect of income on health. Much of this literature is concerned with the short-term effects of income changes experienced in adulthood, and there are few studies that consider the long-term effect of *early life* income changes. Van den Berg, Lindeboom, and Portrait (2006) compare Dutch mortality rates among those born during economic downturns to those born during expansions. Those born during expansions lived substantially longer, which they argue is not due to changes in cohort composition or other potential confounders. Banerjee et al. (2010) consider the nineteenth century blight of French vineyards that created a region by birth cohort varying shock to production and hence income. They find this led to shorter heights in adulthood but no impact on mortality.

---

[5] Carneiro and Ginja (2014) find that Head Start exposure reduces subsequent obesity among males measured at ages 12 to 13.

## II. Impacts of Early Nutrition and Expected Effects of the FSP

Causal mechanisms by which early childhood events affect later life are best understood for nutrition. This section reviews specific mechanisms by which early malnutrition can impair development with long-term consequences. Although the FSP was clearly a program designed to improve nutritional intake among recipients, economic theory suggests that in-kind transfers are treated as cash for recipients who are inframarginal. As a result, the long-term impacts of the FSP may also be mediated through other pathways such as family stress reduction (Evans and Garthwaite 2014) or reduced maternal employment (Hoynes and Schanzenbach 2012) in addition to through nutrition pathways.

Using the same program introduction design adopted in this paper (described below), Hoynes and Schanzenbach (2009) find that the introduction of the FSP increased households' spending on food. But, because most recipients received a food stamp benefit below their normal food expenditures, they also find that the increase in food spending is in line with what one would expect from a cash income transfer. We argue, then, that the program is better understood as an income transfer program than a more narrow nutrition program, and its introduction can be thought of as an increase in economic resources. However, keep in mind that because recipients were by definition poor, a large portion of their FSP benefit was spent on food and thus many of the mechanisms at work can be expected to run through nutrition pathways.

At the time the FSP was introduced, hunger and nutritional deficiencies were not uncommon among Americans. For example, a survey of low-income families in Texas, Louisiana, Kentucky, and West Virginia during the period 1968–1970 found that 15 percent of whites and 37 percent of blacks had low hemoglobin levels as well as relatively high rates of deficiencies in vitamin C, riboflavin, and protein (Eisinger 1998). The 1968 CBS documentary *Hunger in America* raised national awareness of the problem and possibly influenced the policy debate on the FSP (Berry 1984). Here, by briefly summarizing the linkages between early life nutrition and later life outcomes, we provide predictions about outcomes that may be altered by our FSP treatment.

Some linkages between early life nutrition and later life outcomes are fairly intuitive. For example, severely undernourished children may suffer from anemia and listlessness. This may reduce their ability to invest in learning during childhood and may harm their long-run earnings and other outcomes. Another long understood mechanism is rickets, caused by prolonged vitamin D deficiency, which causes weakening of bones in children and leads to stunting of growth, skeletal deformities, and other long-term poor health outcomes. To be sure, the longer-run health impacts of poor nutrition during early life were in part understood prior to the introduction of the Food Stamp Program. During World War II, for example, high numbers of young men were excluded from active military service because of health conditions thought caused by the poor nutrition they experienced during the Great Depression, and as a result the issue of adequate nutrition became a national security concern. Shortly thereafter, Congress passed the National School Lunch Act citing as its purpose "to protect the health and welfare of the children of the United States" (Galer-Unti 1995).

Poor early life nutrition may also directly harm long-run outcomes through altering the body's developmental trajectory. There is an emerging scientific consensus that describes critical periods of development during early life that "program" the body's long-term survival outcomes (Barker 1992; Gluckman and Hanson 2004). During development, the fetus (and postnatally the child) may take cues from the current environment to predict the type of environment it is expected to face in the long run and in some cases adapts its formation to better thrive in the expected environment (Gluckman and Hanson 2004). A problem arises, however, when the predicted later environment and the actual later environment are substantially different. For example, if nutrients are scarce during the prenatal (or early postnatal) period, the developing body predicts that the future will also be nutritionally deprived. The body may then invoke (difficult-to-reverse) biological mechanisms to adapt to the predicted future environment. For example, the metabolic system may adapt in a manner that will allow the individual to survive in an environment with chronic food shortages. This pattern is termed the "thrifty phenotype" and is sometimes referred to as the Barker hypothesis. The "problem" arises if in fact there is not a long-run food shortage, and nutrition is plentiful. In that case, the early life metabolic adaptations are a bad match to the actual environment and will increase the likelihood that the individual develops a metabolic disorder, which can include high blood pressure (hypertension), type II diabetes, obesity, and cardiovascular disease. The negative consequences do not usually appear until after reproductive age, which is preferable to the species from an evolutionary perspective (Barker 1992). Note that both pre- and postnatal nutrition can drive this programming.[6]

Observational studies of the Dutch Hunger Winter yielded influential and supportive findings. At the end of World War II, the Nazis sharply restricted food shipments in the Netherlands over the seven-month period between November 1944 and April 1945. As a result, the previously well-nourished society experienced a severe decline in caloric availability from 1,800 calories per day to between 400 and 800. Upon liberation, the food supply returned to normal levels quickly. Painter, Roseboom, and Bleker (2005) find that children exposed to famine in the third trimester had birth weight and birth lengths about one-half of a standard deviation lower than a control group.[7] Further, when the cohort that was exposed to malnutrition in utero reached middle age, they were more likely to be obese, and had higher incidence of heart disease, lower self-reported health status, and worse mental health (Painter, Roseboom, and Bleker 2005; Susser and Lin 1992). Although the period of malnutrition was short and abrupt relative to other famines, nonetheless the interpretation of these findings is subject to caveats due to the high rate of mortality during

---

[6]Much of the experimental work on nutritional programming has been conducted on rats. A canonical study, McCance (1962) experimentally reduced the amount of breast milk available to baby rats during their normal 21-day suckling period. At the end of the experiment, the treatment group was smaller than the control group, but quickly caught up to normal size when fed normal rations. In the longer run, however, the treatment group became more obese despite being fed the same amount as the control group. In a follow-up study, researchers found that if they manipulated the food intake for a different (later) 21-day period, there were no long-run effects suggesting a "critical period" for the effects.

[7]In a parallel manner, our earlier work (Almond, Hoynes, and Schanzenbach 2011) finds that infants have higher birth weight if exposed to food stamps in the third trimester.

the famine (leading to selection in survival) and pretrends in famine measures such as death rates.[8]

To summarize, the literature has found that lack of nutrition in early life leads to higher incidence of metabolic syndrome. These impacts have occurred both when the nutritional shock occurred in utero and when it occurred in the period shortly after birth. Importantly, the long-run health outcomes have been found even in cases in which birth weight itself was not affected. Thus, the impacts of in utero shocks do not necessarily directly map into birth weight and evaluating the long-term impacts requires the analysis of a many-decade-past change, such as we do in this paper.

In our setting, we examine a policy-driven increase in economic resources to a population that had previously experienced chronic low levels of nutrition. Therefore, we expect that individuals who were exposed to the FSP program in early life will be less likely to have misadapted to the future environment and are predicted to have lower incidence of metabolic syndrome—as measured by high blood pressure, obesity, and diabetes—in adult life. We also expect to find better human capital outcomes, as measured by education, earnings, income, and the like. Because the literature is unclear about the exact timing of postnatal damage, we will explore alternative specifications for the timing of FSP exposure.

### III. Introduction of the Food Stamp Program

Today, food stamp benefits are the fundamental safety net in the US, being the only public assistance program that is available to all family types (most programs are targeted on female-headed households, children, or the elderly). Eligibility requires satisfying income and asset tests, and benefits can be used to purchase most grocery store food goods. A family's benefit is equal to the difference between the federally defined maximum benefit level for a given family size and the amount that the family is deemed to be able to afford to pay for food on its own according to the benefits formula (essentially 30 percent of cash income, less some deductions).[9]

The roots of today's Food Stamp Program began with President Kennedy's 1961 announcement of a pilot food stamp program that was to be established in eight impoverished counties. The pilot programs were later expanded to 43 counties in 1962 and 1963. The success of these pilot programs led to the Food Stamp Act of 1964, which gave local areas the authority to start up the FSP in their county. As with the current FSP, the program was federally funded and benefits were redeemable at approved retail food stores. In the period following the passage of the Food Stamp Act, there was a steady stream of counties initiating Food Stamp Programs and Federal spending on the FSP more than doubled between 1967 and 1969 (from $115 million to $250 million). Support for a national FSP grew due to a public spotlight on hunger (Berry 1984). This interest culminated in passage of 1973

---

[8] Almond and Mazumder (2011) consider the effect of nutrition timing during pregnancy on later life outcomes, focusing on the Ramadan fast as an identification strategy and finding that children born with in utero exposure to the Ramadan fast experienced large increases in disability in adulthood. Because fasting during Ramadan is confined to daylight hours, the nutritional treatment is relatively mild compared to famine episodes. We discuss early life interventions below in Section IVC

[9] A recent restriction limits nonworking, nondisabled childless adults aged 18 to 49 (referred to as able bodied adults without dependents (ABAWD)) to three months of benefits within a three-year period (Hoynes and Schanzenbach forthcoming).



FIGURE 1. WEIGHTED PERCENT OF COUNTIES WITH FOOD STAMP PROGRAM, 1960–1975

*Source:* Authors' tabulations of food stamp administrative data (US Department of Agriculture, various years). Counties are weighted by their 1960 population.

Amendments to the Food Stamp Act, which mandated that all counties offer FSP by 1975.

Figure 1 plots the percent of counties with a FSP from 1960 to 1975.[10] During the pilot phase (1961–1964), FSP coverage increased slowly. Beginning in 1964, program growth accelerated; coverage expanded at a steady pace until all counties were covered in 1974. Furthermore, there was substantial heterogeneity in timing of adoption of the FSP, both within and across states. The map in Figure 2 shades counties according to date of FSP adoption (darker shading denotes a later start-up date). Our basic identification strategy considers the month of FSP adoption for each county to trigger the beginning of the FSP "treatment."

For our identification strategy to yield causal estimates of the program, it is important to establish that the timing of FSP adoption appears to be exogenous and here we summarize what we have examined in our earlier work (Hoynes and Schanzenbach 2009). Prior to the FSP, some counties provided food aid through the commodity distribution program (CDP) which took surplus food purchased by the Federal government as part of an agricultural price support policy and distributed those goods to the poor. The 1964 Food Stamp Act allowed for counties to voluntarily set up a FSP,

---

[10]Counties are weighted by their 1970 population. Note this is not the food stamp caseload, but represents the percent of the US population that lived in a county with a FSP. Online Appendix Figure 1 reproduces this figure and adds the county-level coverage rate using the PSID data. The data available in the PSID line up well with the national rollout trends.



FIGURE 2. FOOD STAMP PROGRAM START DATE, BY COUNTY, 1961–1974

*Notes:* Authors' tabulations of food stamp administrative data (US Department of Agriculture, various years). The shading corresponds to the county FSP start date, where darker shading indicates later county implementation.

but the Act also stated that no county could run both the FSP and the CDP. Thus, for counties which previously ran a CDP, adoption of the FSP implies termination of the CDP.[11] The political accounts of the time suggest that debates about adopting the FSP pitted powerful agricultural interests (who favored the CDP) against advocates for the poor (who favored the FSP: see MacDonald 1977; Berry 1984). In particular, counties with strong support for farming interests (e.g., Southern or rural counties) may be late adopters of the FSP. On the other hand, counties with strong support for the low-income population (e.g., Northern, urban counties with large poor populations) may adopt FSP earlier in the period. This systematic variation in food stamp adoption could lead to spurious estimates of the program impact if those same county characteristics are associated with differential trends in the outcome variables.

In earlier work (Hoynes and Schanzenbach 2009), we documented that larger counties with a greater fraction of the population that was urban, black, or low income indeed implemented the FSP earlier (i.e., consistent with the historical accounts).[12] Nevertheless, we found that the county characteristics explain very little of the variation in adoption dates. This is consistent with the characterization of funding limits controlling the movement of counties off the waiting list to start up

---

[11] This transition in nutritional assistance would tend to bias downward FSP impact estimates, but we do not think this bias is substantial because of the limited scope of the CDP. The CDP was not available in all counties and recipients often had to travel long distances to pick up the items. Further, the commodities were distributed infrequently and inconsistently, and provided a very narrow set of commodities—the most frequently available were flour, cornmeal, rice, dried milk, peanut butter, and rolled wheat (Citizens' Board of Inquiry 1968). In contrast, food stamp benefits can be used to purchase a wide range of grocery food items.

[12] For more detail, see Table 1 in Hoynes and Schanzenbach (2009).

their FSP (Berry 1984). We view the weakness of this model fit as a strength when it comes to our identification approach in that much of the variation in the implementation of FSP appears to be idiosyncratic. Nonetheless, in order to control for possible differences in trends across counties that are spuriously correlated with the county treatment effect, all of our regressions include interactions of these 1960 pretreatment county characteristics with time trends as in Acemoglu, Autor, and Lyle (2004) and Hoynes and Schanzenbach (2009).

## IV. Data

Given the county rollout of the FSP, our analysis requires data with information on adult health and economic outcomes as well as county of birth for cohorts that were impacted by the FSP introduction (1963–1975) at birth or during early childhood. We use the Panel Study of Income Dynamics (PSID), which began in 1968 with a sample of approximately 5,000 households, and subsequently followed and interviewed all members and descendants. The original sample comprises two subsamples: a nationally representative sample of 3,000 households and the Survey of Economic Opportunity subsample including 1,900 low-income and minority households selected from an existing sample. To adjust for this nonrandom composition, we conduct all analysis using the PSID weights.

Since the beginning of the survey, the PSID has collected detailed information on economic and demographic outcomes. We use those data to generate adult economic outcomes such as educational attainment, employment, earnings, family income, and poverty. Starting in the 1980s and 1990s, the PSID also began regularly collecting information on health outcomes. We use self-reported general health status (reported on a 5-point scale: excellent, very good, etc.) and disability (physical or nervous condition that limits the type or amount of work), both of which have been asked of heads and wives each year beginning in 1984. In addition, the PSID respondents report height and weight (hence we can construct obesity[13] and height stunting[14]), and information on whether a doctor has diagnosed the respondent with specific health conditions such as diabetes, high blood pressure, heart attack, and heart disease.[15] These health data are collected for all heads and wives and have been available since 1999, when the survey became biennial. These data allow us to test for the prediction that the introduction of food stamps in early life leads to a reduction in the incidence of obesity, heart disease, and other components of metabolic syndrome. In addition, we use information on health behaviors including smoking, drinking, and exercise.

We use a restricted version of the PSID allowing for identification of county of residence for each year of the survey (the public-use version of the data only identifies state). Because of the longitudinal and dynastic nature of the data, for each individual, we can assign their county of residence at birth or, for those born prior to the

---

[13]Obesity is defined as having a body mass index (BMI, one's weight in kilograms divided by height in meters squared) of 30 and above.

[14]Height stunting is measured as being below the fifth percentile in the nationally normed height distribution (Lewit and Kerrebrock 1997). We use a gender-specific height distribution for 30–50-year olds in 2003–2006 reported in McDowell et al. (2008).

[15]Other health conditions measured in the PSID include stroke, arthritis, asthma, cancer, psychiatric problems, lung disease, and mental ability.

beginning of PSID data collection, their county of residence in 1968 when their family is first observed in the data. We merge the PSID data to FSP program information based on this county of birth. The key variable for our analysis is constructed from the month and year that each county introduced the FSP, which we collected from USDA annual reports on county FSP caseloads (USDA, various years). With this, and using the month and year of birth (measured for each person in the survey), we construct measures of childhood exposure to the FSP.[16] In our main specification, we use the share of time between conception and age five that FSP is available in county of birth.[17]

Our sample includes individuals born between the years 1956 and 1981. Importantly, this yields cohorts that span the entire food stamp rollout period (as well as several cohorts both pre- and post-rollout) to identify the impact on adult outcomes. In addition, we only include individuals whose family is observed at the individual's birth or in early life.[18] This is necessary to identify the individual's county of birth.[19] We also use information on the family background of the individual in early life (whether the child was born into a family headed by a single woman, education of head, and family income) as control variables and to identify groups more and less likely to participate in the FSP. We limit the sample to persons age 18 and older for the health outcomes and age 25 and older for the economic outcomes (to facilitate completed education). The sample includes one observation for each interview year that the individual satisfies these age restrictions, and is a head or spouse (recall that the health measures are only asked if a head or spouse). We use the PSID data through interview year 2009.[20] Thus, given our birth cohorts (1956–1981) the oldest individuals in our sample are 53 years old at the end of the period. We focus on a "high participation" sample, the sample of adults who grew up in disadvantaged families (their parent had less than a high school education).

We augment the PSID data with additional county variables to control for possible county confounders. First, we use county-level variables from the 1960 census of population and census of agriculture, including: the percent of the 1960 county population that lives in an urban area, is black, is younger than five, is older than 65, has income less than $3,000 (in 1959 US$), the percent of land in the county used for farming, and log county population. Second, we measure for each county and year the number of hospital beds and hospitals per capita (from the American Hospital Association[21]), real (non-FSP) government transfers per capita (from the

---

[16] The geographic coverage of the PSID is quite good (especially given the modest sample size in the longitudinal survey). We find that about 60 percent of the population-weighted counties are captured by the sample. Online Appendix Figure 1 shows that the county rollout in the PSID matches well the pattern of the rollout based on all counties.

[17] We assume a nine-month gestation, so month of conception is nine months prior to birth month.

[18] In effect, this limits the sample to persons born into original 1968 PSID families.

[19] Because of the possibility of nonrandom migration, we calculate childhood exposure to the FSP using county of birth, rather than the time-varying county of residence.

[20] While sample attrition prior to 2009 is not insignificant (35 percent), we find that it is unrelated to the treatment variable. Summary statistics of the PSID sample look similar to nationally representative data from the Current Population Survey and National Health and Nutrition Examination Survey (with similar sample selection criteria).

[21] The American Hospital Association (AHA) data provide annual data that allows for us to measure county variables for the first five years of life for all birth cohorts (the *Hospitals: Guide Issue* publication goes back to 1948). We collapse the hospital-level data to county-year and then convert to per capita measures using historical

Bureau of Economic Analysis Regional Economic Information System (REIS)[22]), and whether the county has a community health center.[23] We use the AHA and REIS data and construct averages for the first five years of life (using county and year of birth). We use the community health center data to measure the share of months between conception and age five that there was a community health center present.

Table 1 presents descriptive statistics on our estimation sample. About 68 percent of the full sample and 58 percent of the high participation (parent low education) sample report to be in excellent or very good health. About 10 percent report a work disability and less than 5 percent are diabetic. Thirteen (19) percent of the full sample (low education subsample) has high blood pressure and 24 percent (32 percent) are obese.

## V. Empirical Model

Our basic specification is a difference-in-differences model, where we compare adult outcomes for those with early childhood exposure to FSP in their county of birth to those born earlier (and therefore without childhood FSP exposure). We estimate

$$(1) \quad y_{icb} = \alpha + \delta FSP_{cb} + X_{icb}\beta + \eta_c + \lambda_b + \gamma_t + \theta_s \times b + \varphi CB60_c \times b + \varepsilon_{icb},$$

where $i$ indexes the individual, $c$ the county of birth, $b$ the birth year, $s$ the state of birth, and $t$ the survey year. $FSP$ is a measure of food stamp availability in early life. In our base case models we measure the share of months between conception and age 5 that food stamps is available in the adult's birth county.

Because counties adopted FSP at different times, we compare those with or without FSP access in early childhood by virtue of their county and date of birth. Thus, we can allow for unrestricted cohort effects at the national level $\lambda_b$, unrestricted county effects $\eta_c$, unrestricted interview year effects $\gamma_t$, and state-specific linear year of birth trends $\theta_s \times b$. The parameter of interest is $\delta$, the effect of exposure to FSP, which is identified from variation within counties across birth cohorts. We also control for individual-level covariates $X_{icb}$ (including gender, marital status, race, and a quadratic in age) and family background (whether you were born into a female-headed household, the education attainment of the head of household, and

county population data. We then prepare a simple average over the first five years of life. We thank Amy Finkelstein and Martin Gaynor for the pre-1976 data, Jean Roth of the NBER for the 1976 and on data, and Martha Bailey and Andrew Goodman-Bacon for providing code to clean the data.

[22]The REIS data are available for 1959 and 1962 and then annually beginning in 1965. We construct three measures for real per capita transfers that can be consistently measured throughout this period: cash public assistance benefits (Aid to Families with Dependent Children, Supplemental Security Income, and General Assistance), medical spending (Medicare and military health care), and cash retirement and disability payments (Social Security, Disability Insurance, other). We interpolate to fill in the gaps (1960, 1961, 1963, 1964). Analyses with these controls must drop birth cohorts before 1960 due to missing data.

[23]The information on community health centers provide the year that the first center established in a county, which occurred between 1965 and 1974 (Bailey and Goodman-Bacon 2015). We thank Martha Bailey and Andrew Goodman-Bacon for sharing this data.

TABLE 1—DESCRIPTIVE STATISTICS

| | Full sample | | High impact sample | |
| --- | --- | --- | --- | --- |
| | Observations | Mean | Observations | Mean |
| FS share age IU–5 | 60,782 | 0.370 | 28,808 | 0.338 |
| *Health outcomes* | | | | |
| Metabolic health index | 22,070 | −0.079 | 9,097 | 0.010 |
| In good health = 1 | 60,757 | 0.679 | 28,833 | 0.581 |
| Disabled = 1 | 60,753 | 0.096 | 28,827 | 0.118 |
| Diabetes = 1 | 22,546 | 0.041 | 9,321 | 0.054 |
| High blood pressure = 1 | 22,544 | 0.133 | 9,319 | 0.187 |
| Obesity = 1 | 24,127 | 0.240 | 10,209 | 0.322 |
| Heart disease = 1 | 22,543 | 0.019 | 9,320 | 0.028 |
| Heart attack = 1 | 22,548 | 0.006 | 9,323 | 0.008 |
| Healthy weight = 1 | 24,127 | 0.408 | 10,209 | 0.322 |
| BMI | 24,127 | 26.862 | 10,209 | 28.255 |
| Body weight (pounds) | 24,645 | 193.148 | 10,461 | 202.688 |
| Height (inches) | 24,589 | 67.760 | 10,428 | 67.427 |
| Height below 5th percentile | 24,589 | 0.011 | 10,428 | 0.016 |
| *Economic outcomes* | | | | |
| Economic outcome index | 57,585 | −0.051 | 27,303 | −0.304 |
| Education high school plus | 60,106 | 0.903 | 28,663 | 0.786 |
| log(total fam. income) | 60,599 | 10.847 | 28,706 | 10.435 |
| Earnings (including 0s) | 59,136 | 35,047 | 27,862 | 23,473 |
| Employed = 1 | 60,843 | 0.864 | 28,881 | 0.739 |
| Poverty = 1 | 60,599 | 0.184 | 28,706 | 0.339 |
| Food stamp receipt | 60,665 | 0.085 | 28,759 | 0.157 |
| TANF receipt | 60,839 | 0.033 | 28,873 | 0.061 |
| *Health behaviors* | | | | |
| Ever smoked | 22,548 | 0.447 | 9,318 | 0.522 |
| Drink 3+ per day, now | 22,493 | 0.152 | 9,300 | 0.153 |
| *Demographics* | | | | |
| Male | 60,898 | 0.462 | 28,905 | 0.442 |
| Nonwhite | 60,777 | 0.171 | 28,823 | 0.317 |
| High school grad. | 60,106 | 0.390 | 28,663 | 0.500 |
| Greater than high school | 60,106 | 0.502 | 28,663 | 0.286 |
| Age | 60,898 | 32.135 | 28,905 | 32.126 |
| Married | 60,897 | 0.585 | 28,904 | 0.542 |
| *Family background* | | | | |
| Female-headed household | 60,898 | 0.094 | 28,905 | 0.161 |
| Income to needs ratio (5-year average) | 60,898 | 2.365 | 28,905 | 1.512 |
| Head less than high school education | 60,496 | 0.345 | 28,905 | 1.000 |
| *1960 county characteristics* | | | | |
| Population | 60,882 | 593,051 | 28,905 | 514,635 |
| Fraction of land, farmland | 60,882 | 48.4 | 28,905 | 49.4 |
| Fraction of population, urban | 60,882 | 67.0 | 28,905 | 61.4 |
| Fraction of population, black | 60,882 | 9.6 | 28,905 | 13.8 |
| Retirement transfers per capita, 0–5 average | 48,009 | 928.29 | 21,984 | 876.26 |
| Medical transfers per capita, 0–5 average | 47,568 | 149.71 | 21,661 | 125.15 |
| Other public assistance per capita, 0–5 average | 47,568 | 195.03 | 21,661 | 194.66 |
| Number of hospital beds, 0–5 average | 58,098 | 4.608 | 27,274 | 4.494 |
| Number of hospitals, 0–5 average | 58,098 | 0.036 | 27,274 | 0.040 |
| Presence of Community Health Center, age 0–5 average | 60,898 | 0.100 | 28,905 | 0.073 |

*Notes:* Author's tabulations of 1968–2009 PSID. Sample consists of heads and wives born between 1956 and 1981. Observations from Alaska are dropped because of missing data on Food Stamp Program start date. See text for details on sample selection.

Case: 1:19-cv-06334 Document #: 27-1 Filed: 09/26/19 Page 202 of 373 PageID #:823

the family's income to needs ratio).[24] All models are estimated using the PSID sample weights and we cluster standard errors by county of birth.[25]

Because of the many outcome variables, we follow Kling, Liebman, and Katz (2007) and Anderson (2008) and estimate summary standardized indices that aggregate information over multiple treatments. In particular, we form two indices: metabolic syndrome and economic self-sufficiency. As discussed by Kling, Liebman, and Katz (2007), aggregating multiple measures in a given area (e.g., metabolic syndrome) improves statistical power. The summary index is the simple average across standardized $z$-score measures of each component. The $z$-score is calculated by subtracting the mean and dividing by the standard deviation.[26] In the case of metabolic syndrome, all components are "bads" (obesity, high blood pressure, diabetes, heart disease, heart attack) and an increase in metabolic syndrome index indicates a worse outcome. For economic self-sufficiency, we convert each component of the index so that a higher score is a better outcome (e.g., convert "poor" to "not poor"). Economic self-sufficiency includes seven measures: high school graduate, employed, not poor, not on TANF, not on food stamps, earnings, and family income.[27]

The validity of our design depends on the exogeneity of the introduction of the FSP across counties. We address this in two ways. First, following Hoynes and Schanzenbach (2009), we control for trends in the observable determinants of FSP adoption by including interactions between characteristics of the county of birth and linear trends in year of birth ($CB60_c \times b$). Further, this period of FSP introduction took place during a period of tremendous expansion in cash and noncash transfer programs as part of the War on Poverty and Great Society. To explore these possible confounders, we directly control for several characteristics of county of birth (community health centers, hospitals and hospital beds per capita, and non-FSP government transfers per capita), measured as averages over the first five years of life.

The basic identification strategy underpinning equation (1) is different from many previous design-based studies in the fetal origins literature. Typically, natural experiments induced by famines, disease outbreaks, etc., are episodic: they turn on and then turn off. In contrast, once the FSP starts operating in a given county, it keeps operating and does not "turn off." An analysis of short-term impacts of the policy, such as maternal exposure and impacts on birth weight (as in Almond, Hoynes, and Schanzenbach 2011), leads to a 0/1 treatment variable for "FSP introduction." However, in the current setting, we have a much longer period of potential exposure (through childhood). This restricts the set of cohort comparisons that can be made. For example, we will never observe a birth cohort exposed in early childhood (e.g., up to age five), but without exposure in later childhood (after age five). Instead, comparisons are "from above": we observe cohorts with the addition of exposure prior to age five, but this comes on top of exposure at older ages. So, comparisons are inherently about additional FSP

---

[24] These family background measures are averages over the first five years of life, or in the case of the cohorts born prior to the beginning of the PSID, the first five years of sample.

[25] The significance of results are robust to including dynastic family fixed effects and clustering instead by dynastic family.

[26] Kling, Liebman, and Katz (2007) analyze a randomized experiment and use the control group mean and standard deviation in calculating the $z$-score. In our quasi-experimental design, we mimic this approach by using the mean and standard deviation of the cohorts born before food stamp rollout began (cohorts born before 1961).

[27] The top-coding of earnings and income changes over the course of the survey. We trim the sample and drop those (relative few observations) with earnings or income in excess of $300,000.

exposure earlier in childhood, conditional on having it later in childhood. To illustrate the variation we have, online Appendix Figure 2 shows average FSP exposure by birth cohort for three measures of food stamp availability: in utero, share of months between birth and age five, and share of months between 6 and age 18.

## VI. Results

### A. *High Participation Sample*

We begin with our "high participation" sample, adults born between 1956 and 1981 who grew up in disadvantaged families (i.e., their parent had less than a high school education). Table 2 presents estimates for metabolic syndrome for the high participation sample. We define FSP exposure as the share of months between conception and age five that the FSP was available in the individual's county of birth (*FS share IU–5* in the table). The "metabolic syndrome index" is the equal weighted average of the *z*-score of five dichotomous variables: obese, diabetic, high blood pressure, heart disease, and heart attack. This, and all subsequent specifications, includes individual demographics, family background controls, and fixed effects for year of birth, year of interview, county, state linear trends (in cohort), and 1960 county characteristics linear cohort trends. The effect of access to food stamps in childhood on metabolic syndrome, as shown in column 1, is $-0.294$ and is statistically significant at the 1 percent level. The magnitude of the coefficient implies that increasing the share from zero to 1 (from no exposure to full exposure in utero to age five) reduces metabolic syndrome by 0.3 standard deviations.

The remaining columns of Table 2 show the regressions for the individual components of metabolic syndrome index. While individually only obesity reaches statistical significance, each of the point estimates indicate an improvement in adult health with the food stamp treatment in childhood. To test whether the improvements on the other components of metabolic syndrome are mediated through the reduction in obesity, we reestimated the metabolic syndrome index excluding obesity, including and excluding direct controls for obesity. Doing so changed the estimated impact of FSP on the adjusted index very little, suggesting the other health improvements are not merely resulting from a decline in obesity. To further understand mechanisms, we also explored how the impacts of the FSP on metabolic syndrome (or obesity) change if we control for adult health behaviors such as smoking, alcohol consumption, and exercise. The estimated impacts of FSP exposure were little changed when these additional (potentially endogenous) variables were controlled, providing support for the Barker hypothesis and not pointing to behavioral changes as the mechanism.[28] Results are available in online Appendix Tables 1–3.

The estimates in Table 2 are intent-to-treat estimates, averaging across persons with higher and lower likelihoods of being affected by food stamps.[29] Of course,

---

[28] We also explored including direct controls for birth weight, and the results are also little changed. Birth weight measures are very incomplete for these cohorts of the PSID, though, with one-half of the sample having missing data or only a binary indicator for whether birth weight was above 5.5 pounds.

[29] This is a reduced-form model, rather than an instrumental variables (IV) approach with the FSP rollout instrumenting for the household's FSP participation. We do not estimate the IV because participation is measured only beginning in 1968, the first year of the PSID survey.

TABLE 2—METABOLIC SYNDROME INDEX FOR HIGH PARTICIPATION SAMPLE

| | Metabolic syndrome (index) | Components of metabolic syndrome index | | | | |
|---|---|---|---|---|---|---|
| | | Diabetes | High blood pressure | Obesity | Heart disease | Heart attack |
| FS share IU–5 | −0.294*** | −0.032 | −0.13 | −0.159* | −0.053 | −0.031 |
| | (0.107) | (0.048) | (0.086) | (0.086) | (0.027) | (0.019) |
| Mean of dependent variable | 0.01 | 0.05 | 0.19 | 0.33 | 0.03 | 0.01 |
| Observations | 8,246 | 8,431 | 8,430 | 9,217 | 8,430 | 8,432 |
| $R^2$ | 0.26 | 0.19 | 0.22 | 0.26 | 0.13 | 0.08 |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between 18 and 53 (or 24–53 for economic outcomes). The high participation sample includes those born into families where the head had less than a high school education. Estimates are weighted using the PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors are in parentheses.

***Significant at the 1 percent level.
**Significant at the 5 percent level.
*Significant at the 10 percent level.

the food stamp participation rate is not 100 percent, even in this high participation sample. We estimate that for families where heads have less than a high school degree, 43 percent participate in food stamps at some point in their child's life. Thus, to convert these estimates to the treatment on the treated, one should divide the treatment effects by 0.43.[30]

Table 3 presents estimates for other health outcomes for the high participation sample. Column 1 presents results for being in "good health" defined as one if the individual reports being in excellent or very good health (as opposed to good, fair, or poor health). The coefficient equals 0.11, which implies that going to full exposure between conception and age five leads to an 11-percentage-point increase compared to a mean of 59 percent, though this is not statistically significant. Column 2 presents estimates for a work-limiting disability and while the coefficient is negative (i.e., an improvement as expected) it is very small and statistically insignificant.[31] The third column indicates that access to the FSP leads to a reduction in the risk of stunting (height below the fifth percentile of the nationally normed distribution).[32] The final two columns of the table present results for health behaviors: dichotomous variables for whether the person ever smoked and whether they drink 3 or more drinks per day (now). Both suggest an improvement but neither is statistically significant.

---

[30]It is the participation rate of the sample individuals *at birth* and *in early life* that is relevant, rather than their contemporaneous (adult) participation rate. To calculate the 0.43 FSP participation rate, we calculate the share of families with children who ever report receiving food stamps (in the period when they have children in the household). We limit the sample to 1978 and later, after the FSP has been rolled out in all counties.

[31]Note that the sample size for health status and disability are substantially larger than those in Table 2 because these questions have been included in the survey since 1984.

[32]Table 3 shows that the mean of the stunting measure is below 0.05 which is consistent with the results in Andreski, McGonagle, and Schoeni (2009) finding that the height measures in the PSID are somewhat higher than in other health surveys. The qualitative results are the same if we define stunting as below the tenth percentile. In results not reported here, we also investigated whether availability of food stamps during more refined age categories reduced stunting, consistent with Case and Paxson's (2008) finding of some "catch-up" growth during puberty. The results in the PSID were inconsistent and imprecise.

TABLE 3—ADDITIONAL HEALTH OUTCOMES FOR THE HIGH PARTICIPATION SAMPLE

| | Other health outcomes | | | Health behaviors | |
|---|---|---|---|---|---|
| | In good health | Disabled | Height below 5th percentile | Ever smoked | Drink 3+ day now |
| FS share IU–5 | 0.110 (0.074) | −0.004 (0.039) | −0.060** (0.026) | −0.078 (0.131) | −0.002 (0.052) |
| Y-mean | 0.59 | 0.12 | 0.02 | 0.52 | 0.15 |
| Observations | 25,738 | 25,731 | 9,398 | 8,430 | 8,413 |
| R² | 0.16 | 0.13 | 0.22 | 0.32 | 0.25 |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between 18 and 53 years old (or 24–53 for economic outcomes). The high participation sample includes those born into families where the head had less than a high school education. Estimates are weighted using the PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors are in parentheses.

   ***Significant at the 1 percent level.
   **Significant at the 5 percent level.
   *Significant at the 10 percent level.

TABLE 4—ECONOMIC SELF-SUFFICIENCY IN THE HIGH PARTICIPATION SAMPLE

| | | Components of economic self-sufficiency index | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Economic self sufficiency (index) | High school plus | Not poor | Not on food stamps | Not on TANF | Employed | Earnings | log(family income) |
| FS share IU–5 | 0.182 (0.124) | 0.184* (0.108) | 0.052 (0.067) | 0.032 (0.052) | 0.023 (0.026) | −0.007 (0.056) | 3,610 (5,064) | 0.247 (0.165) |
| Y-mean | −0.25 | 0.80 | 0.70 | 0.86 | 0.95 | 0.76 | 24,495 | 10.52 |
| Observations | 20,115 | 21,197 | 21,209 | 20,115 | 21,347 | 21,348 | 20,529 | 21,160 |
| R² | 0.38 | 0.29 | 0.30 | 0.38 | 0.16 | 0.18 | 0.34 | 0.37 |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between ages 18 and 53 (or 24–53 for economic outcomes). The high participation sample includes those born into families where the head had less than a high school education. Estimates are weighted using PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors in parentheses.

   ***Significant at the 1 percent level.
   **Significant at the 5 percent level.
   *Significant at the 10 percent level.

We go on to analyze the economic outcomes for the high participation sample in Table 4. The first column presents estimates for the "economic self-sufficiency index." This is an equal weighted average of seven items where, for each, the variables are converted (if needed) such that an increase in the outcome represents a better outcome. The components are: educational attainment is high school or higher, not poor, not on food stamps, not on TANF, employed, earnings, and the log

of family income.[33] The coefficient on the food stamp treatment is 0.182, implying that full FSP access to age five leads to a 0.2 standard deviation improvement in economic self-sufficiency ($p$-value is 0.14). The remainder of the columns provide the estimates for the individual components of the economic self-sufficiency index. All coefficients with the exception of employment status suggest that exposure to food stamps leads to an improvement in later life economic well-being: increases in education, earnings, and income and a reduction in poverty and participation in public assistance programs. However, only the coefficient on educational attainment reaches statistical significance.

Interestingly, the interpretation of the coefficient on adult food stamp receipt (column 4 of Table 4) is potentially more complicated than the biological theories discussed above. Observational data show a relatively strong degree of intergenerational transmission of "welfare use" (Bane and Ellwood 1994). Obtaining causal estimates for intergeneration transmission is difficult, however, given the strong persistence in other factors associated with economic success.[34] In any case, the intergeneration transmission story would imply a positive effect of exposure to food stamps in early life on adult participation in the program. While the results here are not conclusive given the lack of precision in the estimate, the point estimate (positive on *not* participating in food stamps) suggests that on net the improvement in skills dominates any intergenerational transmission of welfare use.

In Table 5 we present the main results in the high participation sample by gender of the adult.[35] We find quite striking evidence that the effects for economic self-sufficiency vary by gender, with large and statistically significant impacts for women, but very small and insignificant results for men. This is consistent with the several studies that find larger economic impacts of postnatal, early life interventions among girls (Anderson 2008; Bleakley 2007; Dahl and Lochner 2012; Field, Robles, and Torero 2009; Kling, Liebman, and Katz 2007; Maccini and Yang 2009; Milligan and Stabile 2011). The estimates for the effect of food stamps on metabolic syndrome are significant for both groups, but larger for men than for women. The larger effects for men are consistent with the long-term health impacts of randomized trials on high-quality early childcare (Campbell et al. 2014) and of nutritional supplementation in Guatemala (Stein et al. 2006), and also with the biological evidence that males are more subject to harm in utero than females (Almond and Currie 2011a).[36] Interestingly, the gender differences in self-reported health status show a different pattern, with significant positive effects concentrated among women. In interpreting these gender differences, it is important to point out that there is no evidence that prenatal exposure to food stamps affects number of live births or infant mortality, overall or by gender (Almond,

---

[33] Note that in Table 4, the mean of the self-sufficiency index is not zero. As described above, we use the full sample of individuals born before 1962 to create the $z$-scores of each component. The mean here is lower due to our "high participation" subsample (which is lower socioeconomic status) and due to our sample being younger (and thus lower earnings etc.) than the pre-1962 sample.

[34] Dahl, Kostøl, and Mogstad (2014) find causal evidence from Norway that the adult children of parents who receive disability insurance are also more likely to participate in the program.

[35] Table 5 shows that we have more women in our sample than men which is a result of the fact that our sample includes individuals in survey years when they are a head or spouse. This gender imbalance is known and has been documented by Andreski, McGonagle, and Schoeni (2009).

[36] Males tend to suffer higher mortality rates in response to adverse events than females. In addition to higher mortality, males could also exhibit larger long-term effects if males suffer a more pronounced (unobserved) health shock than females in response to the same event (e.g., food stamps).

THE AMERICAN ECONOMIC REVIEW

TABLE 5—METABOLIC SYNDROME AND ECONOMIC SELF-SUFFICIENCY IN THE HIGH PARTICIPATION SAMPLE, BY GENDER

| | Women | | | Men | | |
|---|---|---|---|---|---|---|
| | Metabolic syndrome (index) | Good health | Economic self-sufficiency (index) | Metabolic syndrome (index) | Good health | Economic self-sufficiency (index) |
| FS share IU–5 | −0.312** | 0.336*** | 0.306* | −0.526** | −0.077 | 0.005 |
| | (0.130) | (0.100) | (0.164) | (0.251) | (0.112) | (0.168) |
| Mean of dependent variable | 0.03 | 0.53 | −0.37 | −0.01 | 0.66 | −0.11 |
| Observations | 5,062 | 15,702 | 12,208 | 3,184 | 10,036 | 7,907 |
| $R^2$ | 0.37 | 0.22 | 0.43 | 0.32 | 0.18 | 0.46 |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between ages 18 and 53 (or 24–53 for economic outcomes). The high participation sample includes those born into families where the head had less than a high school education. Estimates are weighted using PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors in parentheses.

*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

Hoynes, and Schanzenbach 2011); such an effect, if present, would suggest selective mortality and cloud the interpretation of these results.[37]

Identification in the model comes from variation in food stamp rollout across counties and birth cohorts. Importantly, the Food Stamp Program was expanded in the midst of the Great Society, a time when many health and human capital programs were expanding across the United States. Much of that policy variation resulted from state rather than county implementation. However, in Table 6, we examine the sensitivity of our core health and economics outcomes to adding controls for county programs and resources available between ages zero and five. The first three columns examine metabolic syndrome, where the first column repeats the main estimates from column 1 of Table 2. In the second column we add controls for access to health care resources (hospitals per capita, hospital beds per capita, presence of community health centers). In the third column we add controls for real per capita government transfers.[38] We then repeat the three specifications for the economic self-sufficiency index in columns 4 to 6. The table shows that our results are highly robust to adding these controls.[39]

An additional test for the validity of the design is to estimate the model by limiting the sample to those who are unlikely to have been impacted by the program. In Table 7, we employ this placebo test and limit to only those individuals from families with

[37] Aside from biological factors, it is possible that postnatal treatment differs between girls and boys, and that this might change with food stamp treatment. Interestingly, Lhila and Simon (2008) find that families with girls are more likely to take up the WIC nutrition program postnatally.

[38] The number of observations declines when we add the county controls for government per capita transfers. This is because the REIS data begin in 1959 and we therefore have to drop all observations with a year of birth 1958 or earlier.

[39] We also control for county-level birth year infant mortality rates in supplemental specifications (see online Appendix Table 4). Including this variable makes only a small difference in the coefficient size, but we do not include it in our main specification because of endogeneity concerns.

TABLE 6—METABOLIC SYNDROME AND ECONOMIC SELF-SUFFICIENCY IN THE HIGH PARTICIPATION SAMPLE, ADDING COUNTY CONTROLS

|  | Metabolic syndrome (index) | | | Economic self-sufficiency (index) | | |
|---|---|---|---|---|---|---|
| FS share IU–5 | −0.294*** | −0.200** | −0.209** | 0.182 | 0.171 | 0.210 |
|  | (0.107) | (0.079) | (0.081) | (0.124) | (0.125) | (0.150) |
| $Y$-mean | 0.01 | 0.01 | −0.02 | −0.25 | −0.27 | −0.26 |
| Observations | 8,246 | 7,737 | 6,561 | 20,115 | 18,992 | 13,268 |
| $R^2$ | 0.26 | 0.27 | 0.26 | 0.38 | 0.38 | 0.37 |
| Hospitals, beds per capita |  | X | X |  | X | X |
| Community health center |  | X | X |  | X | X |
| REIS real per capita transfers |  |  | X |  |  | X |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between 18 and 53 years old (or 24–53 for economic outcomes). The high participation sample includes those born into families where the head had less than a high school education. Estimates are weighted using the PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. The additional county controls are annual averages from birth to age five. Standard errors are in parentheses.

*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

high levels of head's education (more than a high school education). These results show small, imprecise, and generally wrong-signed impacts for both health and economic outcomes. In online Appendix Table 5 we extend this analysis and estimate the metabolic syndrome model for more subgroups, finding larger effects of food stamps on more disadvantaged groups including nonwhites and children growing up with single parents. Overall, these results add support to our approach.

Another concern may be that our high participation sample is too broad, and may include substantial shares of individuals who do not participate in the program or are not malnourished. A different approach, which we take in Table 8, is to limit the analysis to individuals living in counties with high levels of deprivation. The first column provides our base results for metabolic syndrome. Columns 2 and 3 use information on county-level "hunger deaths" (ICD code "malnutrition unqualified") measured in 1962 and 1963, stratifying based on hunger deaths as a fraction of the total population (column 2) and hunger deaths as a fraction of all deaths (column 3). In column 4 we stratify on infant mortality rates for deaths that could be related to nutritional deficiencies.[40] In column 5, we stratify by the 1960 county-level poverty rate. Panel A limits the analysis to the most disadvantaged quartile of counties (population weighted) as measured by each of these characteristics and panel B limits to counties in the lowest quartile of each measure: i.e., the least disadvantaged counties. The point estimates show that our main finding is concentrated in the most disadvantaged counties with consistently smaller impacts in the more advantaged

[40] "Hunger deaths" are rare (about 1,400 per year in this period) and are identified by the one ICD code. Nutrition-related deaths capture a much broader set of cause of death conditions. See Almond, Hoynes, and Schanzenbach (2011) for a discussion of these variables and their definitions.

TABLE 7—METABOLIC SYNDROME AND ECONOMIC SELF-SUFFICIENCY FOR HIGH EDUCATION GROUP (*Placebo Test*)

|  | Metabolic syndrome (index) | Economic self-sufficiency (index) |
|---|---|---|
| FS share IU–5 | −0.013 | 0.073 |
|  | (0.060) | (0.087) |
| *Y*-mean |  |  |
|  | −0.17 | 0.22 |
| Observations | 5,398 | 10,180 |
| $R^2$ | 0.24 | 0.33 |
| "Right" signed components | obesity, high blood pressure | employed, earnings, TANF |
| "Wrong" signed components | good health, disability, diabetes, heart disease | education, family income, food stamps |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between 18 and 53 years old (or 24–53 for economic outcomes). The sample includes those born into families where the head had a high school education or more. Estimates are weighted using the PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors are in parentheses.
  ***Significant at the 1 percent level.
   **Significant at the 5 percent level.
    *Significant at the 10 percent level.

counties. While imprecisely estimated, we take these results as further support for our findings.

### B. *Full Sample Triple Difference*

In choosing our preferred sample for this analysis, we face a trade-off between sample size (using the full sample of adults) and targeting (using the smaller, more targeted samples). Building on the findings for the high participation sample, here we use the full sample of adults in our PSID sample, but use a triple-difference specification that accounts for different probabilities of being affected by food stamps. In particular, we augment model (1) above and estimate

$$(2) \qquad y_{icb} = \alpha + \varphi FSP_{cb} + \delta FSP_{cb} P_g + X_{icb}\beta + \eta_c$$

$$+ \lambda_b + \gamma_t + \mu_g + \theta_s \times b + \varphi CB60_c \times b + \varepsilon_{icb}.$$

To capture the varying risks of being treated we multiply the FSP treatment by a group-level food stamp participation rate (Bleakley 2007; Hoynes and Schanzenbach 2009). The group food stamp participation rate $P_g$ is defined for 12 groups using education (<12, 12, >12), race (white, nonwhite), and marital status (married, not married) based on the family background of the adult (e.g., their parents' characteristics). We calculate the participation rate in the same fashion as discussed above (to convert intent-to-treat to treatment-on-treated). In addition to the variables in the model (1), we add a main effect for food stamp treatment, fixed effects for

TABLE 8—METABOLIC SYNDROME INDEX FOR HIGH PARTICIPATION SAMPLE, STRATIFY ON PRETREATMENT COUNTY CHARACTERISTICS

| | Base | Hunger deaths/population | Hunger deaths/all deaths | IMR for nutrition-related deaths | Share with low income |
|---|---|---|---|---|---|
| | | Top quartile counties (most disadvantaged) | | | |
| FS share IU–5 | −0.294*** | −0.367 | −0.424 | −0.243* | −0.426 |
| | (0.107) | (0.300) | (0.277) | (0.144) | (0.226) |
| Observations | 8,246 | 2,217 | 2,428 | 3,685 | 4,180 |
| $R^2$ | 0.26 | 0.32 | 0.31 | 0.28 | 0.24 |
| | | Bottom quartile counties (least disadvantaged) | | | |
| FS share IU–5 | | −0.123 | −0.123 | 0.202 | −0.351 |
| | | (0.175) | (0.175) | (0.215) | (0.181) |
| Observations | | 2,312 | 2,312 | 1,174 | 1,135 |
| $R^2$ | | 0.29 | 0.25 | 0.38 | 0.29 |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county). The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between 18 and 53 years old (or 24–53 for economic outcomes). Quartiles are assigned using 1962 and 1963 counts of county deaths (columns 2–4) and share county population with income less than $3,000 (in 1960 US$). Estimates are weighted using the PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors are in parentheses.

***Significant at the 1 percent level.
**Significant at the 5 percent level.
*Significant at the 10 percent level.

TABLE 9—TRIPLE-DIFFERENCE ESTIMATES FOR METABOLIC SYNDROME AND ECONOMIC SELF-SUFFICIENCY, FULL SAMPLE

| | Metabolic syndrome (index) | Good health | Economic self-sufficiency (index) |
|---|---|---|---|
| FS share IU–5 × $p_g$ | −0.438** | 0.292** | 0.400 |
| | (0.204) | (0.133) | (0.323) |
| FS share IU–5 | −0.032 | −0.021 | −0.045 |
| | (0.073) | (0.051) | (0.083) |
| Mean of dependent variable | −0.08 | 0.68 | 0.69 |
| Observations | 19,948 | 54,787 | 43,117 |
| $R^2$ | 0.20 | 0.13 | 0.35 |

*Notes:* Each parameter is from a separate regression of the outcome variable on FSP exposure (share of months between conception and age five that FSP is in the county) interacted with a group-specific FSP participation rate. The sample comes from the 1968–2009 PSID and includes heads and wives born between 1956 and 1981 who are between 18 and 53 years old (or 24–53 for economic outcomes). Estimates are weighted using the PSID weights and clustered on county of birth. The models control for individual demographics, family background, and fixed effects for year of birth, year of interview, county, state-specific linear cohort, and 1960 county characteristics interacted with linear cohort. Standard errors are in parentheses.

***Significant at the 1 percent level.
**Significant at the 5 percent level.
*Significant at the 10 percent level.

each group $\mu_g$, and (although not shown in (2)), interactions of $P_g$ with demographics, year of birth and interview fixed effects, and 1960 county characteristic trends. The coefficient on the main effect for food stamp treatment $\varphi$ represents the impact for a participation rate of zero; therefore we expect this coefficient to be zero. In this

triple-difference model, the maintained assumption is that there are no differential trends for high participation versus low participation groups within early versus late implementing counties.

Results for this specification are presented in Table 9. Note that the main treatment variable, *FS Share IU–5*, is interacted with the participation rate and therefore the coefficient represents the impact of FSP exposure on health and economic outcome for someone who takes up the program. Thus, these are treatment-on-the-treated estimates and should be compared to the inflated estimates in the high participation sample.

The results in Table 9 show that full exposure to food stamps through age five leads to a 0.4 standard deviation reduction in metabolic syndrome and an about 30-percentage-point increase in reporting good health. Economic self-sufficiency is improved, but not significantly. The magnitudes are similar but somewhat smaller than the comparable (treatment on the treated) results for the high participation sample. Further, as expected the main effect on food stamp exposure (effect implied for a group with a participation rate of zero) is very small and insignificant.

## C. *Putting the Effect Size into Context*

Animal lab experiments can provide "proof of concept" of biological plausibility. Presenting effect magnitudes has not typically been a focus in these studies, e.g., standard deviations or other information required to calculate effect sizes are often omitted. Nonetheless, when they can be assessed, effect sizes are quite large. For example, in a laboratory study of 30 pregnant rats, Vickers et al. (2000) reduced the nutritional intake of the treatment group by 30 percent. The offspring's adult weight increased 80 percent of the control group's standard deviation, while impacts on length, fat measures, and kidney and liver sizes were over one standard deviation.

What we view as the closest evidence, both in the quality of the design and broad similarity to our food stamps treatment, comes from the handful of high-quality evaluations of early life policy interventions. In the Carolina Abecedarian (ABC) Project, children were randomly assigned to a cognitively and socially stimulating environment for eight hours per day during their first five years of life. Children were also given two meals and a snack at the childcare center, along with primary medical care. In their mid-30s, no males in the treatment group had metabolic syndrome, compared with 25 percent of the control group (Campbell et al. 2014). There were also significant and large (over 40 percentage points) declines in hypertension, and improvements in high-density lipoprotein (HDL) cholesterol and vitamin D deficiency. Fewer results were statistically significant among women, though the point estimates also suggest very large effects on outcomes such as abdominal obesity and the Framingham cardiovascular risk score.[41]

Another influential strand of evidence considers an experimental nutrition supplementation in Guatemala in the 1970s. Children up to age seven were given access to a protein drink that increased average caloric intake by 10 percent and protein

---

[41] Aizer et al. (2016) examine the Mothers Pension program, a cash welfare program that preceded the AFDC program. Boys exposed to the additional income as children (on average 12–25 percent of family income and for a three-year period) experienced a 50 percent reduction in underweight as well as a large reduction in mortality.

intake by almost 30 percent. In adulthood, women had increased educational attainment of more than one grade (more than 50 percent of a standard deviation), and males who were exposed to the treatment between birth and age three saw their wages increase by 46 percent (Maluccio et al. 2009; Hoddinott et al. 2008). Men showed a significant, approximately 30 percent of a standard deviation decline in metabolic syndrome and body mass index, and 40 percent of a standard deviation decline in waist circumference (Stein et al. 2006).[42]

In sum, policy interventions that improve early childhood environments can generate large long-term effects, frequently the same magnitude or larger than what we find for food stamps.

### D. *Does the Timing of Treatment Matter?*

The results thus far measure food stamp treatment as the share of time between conception and age five that food stamps is in place in the county of birth. There are two reasons to explore alternative specifications for exposure to the food stamps rollout. First, as discussed above, the nature of our treatment is such that the policy turns on and does not turn off. Therefore, when a child is treated in early life (e.g., zero to five years old) they are also treated in later childhood. Our estimates, therefore, also reflect exposure beyond age five; exploring the timing of impacts may help in interpreting the magnitudes of the effects. Second, the biological and economic literature is not clear on when exposure to the safety net matters. Thus, exploring alternative specifications for food stamp exposure can provide new evidence on this important issue.

We explore this using an event study model, and for this we return to the high-participation sample. The event study model allows us to explore the timing of food stamp exposure more systematically and to evaluate the validity of the research design. In particular, these estimates allow us to explore nonparametrically the relationship between age at initial rollout and adult outcomes. In addition, we can use these results to rule out the presence of pre- (or post-) trends that could lead to spurious findings. Specifically, we allow for the impact of FSP program to vary with the *age at FSP introduction* in their county of birth. For example, individuals born in 1970 in a county that implemented food stamps in 1975 would have an event time of 5. They would have event time of $-5$ if FSP was implemented in their birth county in 1965 (and thus they were exposed during their entire childhood).

We estimate a version of model (1) where the main FSP effect ($FSP_{cb}$) is replaced with a series of dummies for based on two-year intervals of age at FSP introduction (e.g., age 0–1, 2–3, 4–5, and so on) with age 10–11 as the omitted year. The end points are open brackets (5 or more years prior to birth on the left, age 12 or later on the right) which helps reduce the collinearity between event time and birth year. Because the sample is unbalanced in event time we focus on the event study coefficients inside these unbalanced endpoints (Kline 2012). We present results for metabolic syndrome index in Figure 3 and for the economic self-sufficiency index in Figure 4. For economic self-sufficiency, we estimate the event study for women

---

[42] Stein et al. (2006) report intention-to-treat impacts, and to make these comparable to our estimates we inflate by their 0.65 estimate of the share of children who ever participated in the program.



FIGURE 3. EVENT STUDY ESTIMATES OF THE IMPACT OF FSP EXPOSURE ON METABOLIC SYNDROME INDEX
(*High Participation Sample*)

*Notes:* The figure plots coefficients from an event-study analysis. Event time is defined as age when FSP is implemented in the birth county. The models are estimated for the sample of individuals born into families where the head has less than a high school education. Age 10–11 is the omitted year so estimates are relative to that point. See the text for a description of the model.

given that we find zero impact on economic self-sufficiency for men (Table 6). Note that these are the reverse of a typical event study graph, in that negative "event time" is the case where a person was fully treated (food stamps was in place in their county prior to birth). Further, treatment (exposure to the program) increases as we move from the right (treated in later life) to the left (treated in early life). Finally, as we have said before, once the treatment turns on it does not turn off.

While we do not have a strong prediction about the precise shape of the treatment effects, our hypothesis is that the impact of the FSP treatment should decline as age at initial exposure increases. Or to state the reverse, the younger the initial age of exposure the larger the (cumulative) effect of the FSP. If exposure in later childhood does not matter, then the event study coefficients should be flat on the right end of the graph (suggesting no "pretrend"). Eventually, once we hit the point in early childhood when exposure matters, a movement left (toward earlier initial exposure) should reduce the metabolic syndrome index (or increase economic self-sufficiency). Eventually, the event study should be flat once exposure is "complete" (exposure is prior to conception or an event time of −1 or before).

The results in Figure 3 are highly consistent with these predictions and quite encouraging for our research design. They show that the largest effects of the food stamp treatment (in this case a reduction in metabolic syndrome is good and so a



FIGURE 4. EVENT STUDY ESTIMATES OF THE IMPACT OF FSP EXPOSURE ON ECONOMIC SELF-SUFFICIENCY
(*High Participation Sample*)

*Notes:* The figure plots coefficients from an event-study analysis. Event time is defined as age when FSP is implemented in the birth county. The models are estimated for the sample of individuals born into families where the head has less than a high school education. Age 10–11 is the omitted year so estimates are relative to that point. See the text for a description of the model.

beneficial effect is represented by a negative impact) are to those who are treated in utero and early childhood. The improvement in health is steepest with additional exposure between conception and age four or five. The results suggest that the adult health impacts of the FSP are minimal if the child is exposed after age five. It is notable that for negative event time (fully exposed) the line is flat (and similarly that it is flat across older ages): this is an important result that can rule out that our estimates are identified by cohort trends within counties.

The event study figure for economic outcomes for women is provided in Figure 4. The event study shows results consistent with a positive effect of the FSP on economic outcomes again with the most beneficial effects in early life (in utero to age two to three). There is also some evidence that increasing exposure between ages eight to nine and four to five. We note that the theory linking FSP to economic self-sufficiency is less well developed in the literature and we do not have strong priors on what the graph should look like. On one hand, increased resources during the in utero period or early life may improve brain development and yield a larger gain to long-term economic outcomes. On the other hand, to the extent that improved nutrition during schooling years increases a child's ability to pay attention in school (or even to attend school), we would expect to see positive impacts even if the program was introduced at a later age. It is important to interpret the coefficients by age

Case: 1:19-cv-06334 Document #: 27-1 Filed: 09/26/19 Page 215 of 373 PageID #:836

with some caution because we do not have an experiment where the older children receive treatment but the younger ones do not. The event study results are consistent with the positive estimated impact in Table 5, and the results suggest that positive effects are not concentrated only in utero.

## VII. Conclusion

In this paper, we present new evidence that expanding economic resources in utero and in early childhood can lead to significant improvement in adult health and, for women, economic outcomes. In particular, we use the rollout of the most important cash or near cash safety net program in the US, the Food Stamp Program. We find that access to food stamps in utero and in early childhood leads to significant reductions in metabolic syndrome conditions (obesity, high blood pressure, heart disease, diabetes) in adulthood and, for women, increases in economic self-sufficiency (increases in educational attainment, earnings, income, and decreases in welfare participation). Further, we provide new evidence on when exposure to additional resources matters: the gains are large and increasing with exposure to age five. Beyond that point the additional resources do not translate into improved adult health outcomes. These results pass several robustness tests including controlling for other county-year of birth controls for the Great Society period, alternate ways of targeting the population that is highly impacted by the program, various placebo tests, and event study models.

Given the near-cash nature of food stamp vouchers (Hoynes and Schanzenbach 2009), the exact biological mechanisms that lead to the long-run improvement in health and human capital is not clear. The availability of food stamps leads to more food consumption (Hoynes and Schanzenbach 2009; Currie 2003) and thus one clear channel is through an increase in nutrition in the critical in utero and early life period. Additionally, recent work suggests that additional income can lead to reductions in cortisol in mothers, reducing biological harm due to persistent stress (Aizer, Stroud, and Buka forthcoming; Evans and Garthwaite 2014).

Our analysis finds strong, long-term improvements in health, and, for women, economic outcomes, from increasing the economic resources in low-income households with young children through transfers via the Food Stamp Program. The results suggest that a robust safety net insuring young children against low levels of income is an investment in their long-run human capital, with internal and external benefits that to date not been quantified. The past four decades have provided strong productivity growth in the US yet earnings and family incomes have fallen in real terms for the bottom third or quarter of the distribution. More families will be relying on food stamps, the Earned Income Tax Credit, and Medicaid to counter these trends. Advancing our knowledge about the short- and long-run effects of these programs is critical in light of their growing importance.

# REFERENCES

**Acemoglu, Daron, David H. Autor, and David Lyle.** 2004. "Women, War, and Wages: The Effect of Female Labor Supply on the Wage Structure at Midcentury." *Journal of Political Economy* 112 (3): 497–551.

**Aizer, Anna, Shari Eli, Joseph Ferrie, and Adriana Lleras-Muney.** 2016. "The Long Run Impact of Cash Transfers to Poor Families." *American Economic Review* 106 (4): 935–71.

**Aizer, Anna, Laura Stroud, and Stephen Buka.** Forthcoming. "Maternal Stress and Child Outcomes: Evidence From Siblings." *Journal of Human Resources.*

**Almond, Douglas.** 2006. "Is the 1918 Influenza Pandemic Over? Long-Term Effects of In Utero Influenza Exposure in the Post-1940 U.S. Population." *Journal of Political Economy* 114 (4): 672–712.

**Almond, Douglas, Kenneth Chay, and Michael Greenstone.** 2007. "Civil Rights, the War on Poverty, and Black-White Convergence in Infant Mortality in the Rural South and Mississippi." MIT Working Paper 07-04.

**Almond, Douglas, Kenneth Chay, and David S. Lee.** 2005. "The Costs of Low Birth Weight." *Quarterly Journal of Economics* 120 (3): 1031–83.

**Almond, Douglas, and Janet Currie.** 2011a. "Human Capital Development Before Age Five." In *Handbook of Labor Economics,* Vol. 4B, edited by Orley Ashenfelter and David Card, 1315–1486. New York: Elsevier.

**Almond, Douglas, and Janet Currie.** 2011b. "Killing Me Softly: The Fetal Origins Hypothesis." *Journal of Economic Perspectives* 25 (3): 153–72.

**Almond, Douglas, Janet Currie, and Mariesa Hermann.** 2012. "From Infant to Mother: Early Disease Environment and Future Maternal Health." *Labour Economics* 19 (4): 475–83.

**Almond, Douglas, Lena Edlund, and Mårten Palme.** 2009. "Chernobyl's Subclinical Legacy: Prenatal Exposure to Radioactive Fallout and School Outcomes in Sweden." *Quarterly Journal of Economics* 124 (4): 1729–72.

**Almond, Douglas, Hilary W. Hoynes, and Diane Whitmore Schanzenbach.** 2011. "Inside the War on Poverty: The Impact of Food Stamps on Birth Outcomes." *Review of Economics and Statistics* 93 (2): 387–403.

**Almond, Douglas, and Bhashkar Mazumder.** 2011. "Health Capital and the Prenatal Environment: The Effect of Ramadan Observance during Pregnancy." *American Economic Journal: Applied Economics* 3 (4): 56–85.

**Anderson, Michael L.** 2008. "Multiple Inference and Gender Differences in the Effects of Early Intervention: A Reevaluation of the Abecedarian, Perry Preschool, and Early Training Projects." *Journal of the American Statistical Association* 103 (484): 1481–95.

**Andreski, Patricia, Katherine McGonagle, and Robert Schoeni.** 2009. "An Analysis of the Quality of the Health Data in the Panel Study of Income Dynamics." PSID Technical Series Paper 09–02.

**Bailey, Martha J.** 2012. "Reexamining the Impact of Family Planning Programs on US Fertility: Evidence from the War on Poverty and the Early Years of Title X." *American Economic Journal: Applied Economics* 4 (2): 62–97.

**Bailey, Martha J., and Andrew Goodman-Bacon.** 2015. "The War on Poverty's Experiment in Public Medicine: Community Health Centers and the Mortality of Older Americans." *American Economic Review* 105 (3): 1067–1104.

**Bane, Mary Jo, and David T. Ellwood.** 1994. *Welfare Realities: From Rhetoric to Reform.* Cambridge, MA: Harvard University Press.

**Banerjee, Abhijit, Esther Duflo, Gilles Postel-Vinay, and Tim Watts.** 2010. "Long-Run Health Impacts of Income Shocks: Wine and Phylloxera in Nineteenth-Century France." *Review of Economics and Statistics* 92 (4): 714–28.

**Barker, D. J. P.** 1992. "Fetal and Infant Origins of Adult Disease." *British Medical Journal* 301 (6761): 1111.

**Barreca, Alan I.** 2010. "The Long-Term Economic Impact of In Utero and Postnatal Exposure to Malaria." *Journal of Human Resources* 45 (4): 865–92.

**Berry, Jeffrey M.** 1984. *Feeding Hungry People: Rulemaking in the Food Stamp Program.* New Brunswick, NJ: Rutgers University Press.

**Bharadwaj, Prashant, Katrine Vellesen Løken, and Christopher Neilson.** 2013. "Early-Life Health Interventions and Academic Achievement." *American Economic Review* 103 (5): 1862–91.

**Bitler, Marianne, and Hilary Hoynes.** 2010. "The State of the Safety Net in the Post-Welfare Reform Era." *Brookings Papers on Economic Activity* (Fall): 71–127.

**Bitler, Marianne, and Hilary Hoynes.** 2015. "Heterogeneity in the Impact of Economic Cycles and the Great Recession: Effects within and across the Income Distribution." *American Economic Review* 105 (5): 154–60.

**Bleakley, Hoyt.** 2007. "Disease and Development: Evidence from Hookworm Eradication in the American South." *Quarterly Journal of Economics* 122 (1): 73–117.

**Bozzoli, Carlos, Angus Deaton, and Climent Quintana-Domeque.** 2009. "Adult Height and Childhood Disease." *Demography* 46 (4): 647–69.

**Brown, David W., Amanda E. Kowalski, and Ithai Z. Lurie.** 2015. "Medicaid as an Investment in Children: What is the Long-Term Impact on Tax Receipts?" National Bureau of Economic Research Working Paper 20835.

**Campbell, Frances, Gabriella Conti, James J. Heckman, Seong Hyeok Moon, Rodrigo Pinto, Elizabeth Pungello, and Yi Pan.** 2014. "Early Childhood Investments Substantially Boost Adult Health." *Science* 343 (6178): 1478–85.

**Carneiro, Pedro, and Rita Ginja.** 2014. "Long-Term Impacts of Compensatory Preschool on Health and Behavior: Evidence from Head Start." *American Economic Journal: Economic Policy* 6 (4): 135–73.

**Cascio, Elizabeth, Nora Gordon, Ethan Lewis, and Sarah Reber.** 2010. "Paying for Progress: Conditional Grants and the Desegregation of Southern Schools." *Quarterly Journal of Economics* 125 (1): 445–82.

**Case, Anne, Darren Lubotsky, and Christina Paxson.** 2002. "Economic Status and Health in Childhood: The Origins of the Gradient." *American Economic Review* 92 (5): 1308–34.

**Case, Anne, and Christina Paxson.** 2008. "Stature and Status: Height, Ability, and Labor Market Outcomes." *Journal of Political Economy* 116 (3): 499–532.

**Chay, Kenneth, Jonathan Guryan, and Bhashkar Mazumder.** 2009. "Birth Cohort and the Black-White Achievement Gap: The Roles of Access and Health Soon after Birth." National Bureau of Economic Research Working Paper 15078.

**Chen, Yuyu and Li-An Zhou.** 2007. "The Long Term Health and Economic Consequences of the 1959–1961 Famine in China." *Journal of Health Economics* 26 (4): 659–81.

**Chetty, Raj, John N. Friedman, Nathaniel Hilger, Emmanuel Saez, Diane Whitmore Schanzenbach, and Danny Yagan.** 2011. "How Does Your Kindergarten Classroom Affect Your Earnings? Evidence from Project STAR." *Quarterly Journal of Economics* 126 (4): 1593–1660.

**Citizens' Board of Inquiry.** 1968. *Hunger, USA: A Report By the Citizens' Board of Inquiry into Hunger and Malnutrition in the United States.* Boston: Beacon Press.

**Clark, Damon, and Heather Royer.** 2013. "The Effect of Education on Adult Mortality and Health: Evidence from Britain." *American Economic Review* 103 (6): 2087–2120.

**Currie, Janet.** 2003. "U.S. Food and Nutrition." In *Means-Tested Transfer Programs in the United States*, edited by Robert A. Moffitt, 199–290. Chicago: University of Chicago Press.

**Currie, Janet.** 2009. "Healthy, Wealthy, and Wise: Socioeconomic Status, Poor Health in Childhood, and Human Capital Development." *Journal of Economic Literature* 47 (1): 87–122.

**Currie, Janet, and Enrico Moretti.** 2008. "Did the Introduction of Food Stamps Affect Birth Outcomes in California?" In *Making Americans Healthier: Social and Economic Policy as Health Policy*, edited by Robert F. Schoeni et al., 122–42. New York: Russell Sage Foundation.

**Dahl, Gordon B., Andreas Ravndal Kostøl, and Magne Mogstad.** 2014. "Family Welfare Cultures." *Quarterly Journal of Economics* 129 (4): 1711–52.

**Dahl, Gordon B., and Lance Lochner.** 2012. "The Impact of Family Income on Child Achievement: Evidence from the Earned Income Tax Credit." *American Economic Review* 102 (5): 1927–56.

**Dynarski, Susan, Joshua Hyman, and Diane Whitmore Schanzenbach.** 2013. "Experimental Evidence on the Effect of Childhood Investments on Postsecondary Attainment and Degree Completion." *Journal of Policy Analysis and Management* 32 (4): 692–717.

**Eisinger, Peter K.** 1998. *Toward an End to Hunger.* Washington, DC: Brookings Institution Press.

**Evans, William N., and Craig L. Garthwaite.** 2014. "Giving Mom a Break: The Effect of Higher EITC Payments on Maternal Health." *American Economic Journal: Economic Policy* 6 (2): 258–90.

**Field, Erica, Omar Robles, and Maximo Torero.** 2009. "Iodine Deficiency and Schooling Attainment in Tanzania." *American Economic Journal: Applied Economics* 1 (4): 140–69.

**Finkelstein, Amy, and Robin McKnight.** 2008. "What Did Medicare Do? The Initial Impact of Medicare on Mortality and Out of Pocket Medical Spending." *Journal of Public Economics* 92 (7): 1644–68.

**Fitzsimons, Emla, and Marcos Vera-Hernández.** 2014. "Food for Thought? Breastfeeding and Child Development." Institute of Education, University College London Working Paper 14-04.

**Galer-Unti, Regina.** 1995. *Hunger and Food Assistance Policy in the United States.* New York: Garland Publishing Inc.

**Glied, Sherry, and Matthew Neidell.** 2010. "The Economic Value of Teeth." *Journal of Human Resources* 45 (2): 468–96.

**Gluckman, Peter, and Mark Hanson.** 2004. *The Fetal Matrix: Evolution, Development, and Disease.* Cambridge: Cambridge University Press.

**Hoddinott, John, John A. Maluccio, Jere R. Behrman, Rafael Flores, and Reynaldo Martorell.** 2008. "Effect of a Nutrition Intervention During Early Childhood on Economic Productivity in Guatemalan Adults." *Lancet* 371 (9610): 411–16.

**Hoynes, Hilary, Marianne Page, and Ann Huff Stevens.** 2011. "Can Targeted Transfers Improve Birth Outcomes? Evidence from the Introduction of the WIC Program." *Journal of Public Economics* 95 (7–8): 813–27.

**Hoynes, Hilary, and Diane Whitmore Schanzenbach.** 2009. "Consumption Reponses to In-Kind Transfers: Evidence from the Introduction of the Food Stamp Program." *American Economic Journal: Applied Economics* 1 (4): 109–39.

**Hoynes, Hilary, and Diane Whitmore Schanzenbach.** 2012. "Work Incentives and the Food Stamp Program." *Journal of Public Economics* 96 (1–2): 151–62.

**Hoynes, Hilary, and Diane Whitmore Schanzenbach.** Forthcoming. "US Food and Nutrition Programs." In *Means-Tested Transfer Programs*, Vol. II, edited by Robert Moffitt. Chicago: University of Chicago Press.

**Hoynes, Hilary, Diane Whitmore Schanzenbach, and Douglas Almond.** 2016. "Long-Run Impacts of Childhood Access to the Safety Net: Dataset." *American Economic Review.* http://dx.doi.org/10.1257/aer.20130375.

**Internal Revenue Service.** 2012. Earned Income Tax Credit Statistics. http://www.eitc.irs.gov/central/eitcstats/ (accessed September 1, 2012.)

**Isen, Adam, Maya Rossin-Slater, and W. Reed Walker.** Forthcoming. "Every Breath You Take—Every Dollar You'll Make: The Long-Term Consequences of the Clean Air Act of 1970." *Journal of Political Economy*.

**Kline, Patrick.** 2012. "The Impact of Juvenile Curfew Laws on Arrests of Youth and Adults." *American Law and Economics Review* 14 (1): 44–67.

**Kling, R. Jeffrey, Jeffrey B. Liebman, and Lawrence F. Katz.** 2007. "Experimental Analysis of Neighborhood Effects." *Econometrica* 75 (1): 83–119.

**Lewit, Eugene M., and Nancy Kerrebrock.** 1997. "Population-Based Growth Stunting." *Future of Children* 7 (2): 149–56.

**Lhila, Aparna, and Kosali I. Simon.** 2008. "Prenatal Health Investment Decisions: Does the Child's Sex Matter?" *Demography* 45 (4): 885–905.

**Lleras-Muney, Adriana.** 2005. "The Relationship between Education and Adult Mortality in the United States." *Review of Economic Studies* 72 (1): 189–221.

**Ludwig, Jens, and Douglas L. Miller.** 2007. "Does Head Start Improve Children's Life Chances? Evidence from a Regression Discontinuity Design." *Quarterly Journal of Economics* 122 (1): 159–208.

**Maccini, Sharon, and Dean Yang.** 2009. "Under the Weather: Health, Schooling, and Economic Consequences of Early-Life Rainfall." *American Economic Review* 99 (3): 1006–26.

**MacDonald, Maurice.** 1977. *Food, Stamps, and Income Maintenance.* Madison, WI: Institute for Poverty Research.

**Maluccio John A., John Hoddinott, Jere R. Behrman, Reynaldo Martorell, Agnes R. Quisumbing, and Aryeh D. Stein.** 2009. "The Impact of Improving Nutrition during Early Childhood on Education among Guatemalan Adults." *Economic Journal* 119 (537): 734–63.

**McCance, R. A.** 1962. "Food, Growth, and Time." *Lancet* 280 (7258): 671–76.

**McDowell, Margaret A., Cheryl D. Fryar, Cynthia L. Ogden, and Katherine M. Flegal.** 2008. "Anthropometric Reference Data for Children and Adults: United States, 2003–2006." National Health Statistics Reports 10. http://ghk.h-cdn.co/assets/cm/15/11/550017f045e74_-_nhsr010.pdf (accessed October 26, 2015).

**Meyer, Bruce D., and Laura R. Wherry.** 2012. "Saving Teens: Using a Policy Discontinuity to Estimate the Effects of Medicaid Eligibility." National Bureau of Economic Research Working Paper 18309.

**Milligan, Kevin, and Mark Stabile.** 2011. "Do Child Tax Benefits Affect the Well-Being of Children? Evidence from Canadian Child Benefit Expansions." *American Economic Journal: Economic Policy* 3 (3): 175–205.

**Nilsson, J. Peter.** 2009. "The Long-Term Effects of Early Childhood Lead Exposure: Evidence from the Phase-Out of Leaded Gasoline." Unpublished.

**Nilsson, J. Peter.** Forthcoming. "Alcohol Availability, Prenatal Conditions, and Long-Term Economic Outcomes." *Journal of Political Economy*.

**Painter, Rebecca C., Tessa J. Roseboom, and Otto P. Bleker.** 2005. "Prenatal Exposure to the Dutch Famine and Disease in Later Life: An Overview." *Reproductive Toxicology* 20 (3): 345–52.

**Reyes, Jessica Wolpaw.** 2007. "Environmental Policy as Social Policy? The Impact of Childhood Lead Exposure on Crime." *BE Journal of Economic Analysis and Policy* 7 (1).

*THE AMERICAN ECONOMIC REVIEW*

**Short, Kathleen.** 2014. *The Research Supplemental Poverty Measure: 2013.* Current Population Reports P60-251. US Census Bureau.

**Stein, Aryeh D., Meng Wang, Manuel Ramirez-Zea, Rafael Flores, Ruben Grajeda, Paul Melgar, Usha Ramakrishnan, and Reynaldo Martorell.** 2006. "Exposure to a Nutrition Supplementation Intervention in Early Childhood and Risk Factors for Cardiovascular Disease in Adulthood: Evidence from Guatemala." *American Journal of Epidemiology* 164 (12): 1160–70.

**Stein, Zena, Mervyn Susser, Gerhart Saenger, and Francis Marolla.** 1975. *Famine and Human Development: The Dutch Hunger Winter of 1944–1945.* New York: Oxford University Press.

**Susser, Ezra S., and Shang P. Lin.** 1992. "Schizophrenia after Prenatal Exposure to the Dutch Hunger Winter of 1944–1945." *Archives of General Psychiatry* 49 (12): 983–88.

**Tanner, James M.** 1981. "Catch-up Growth in Man." *British Medical Bulletin* 37 (3): 233–38.

**US Department of Agriculture (USDA).** Various years. "Food Stamp Program, Year-End Participation and Bonus Coupons Issues." Food and Nutrition Service Technical Report.

**US Department of Agriculture (USDA).** 2012. "Supplemental Nutrition Assistance Program (SNAP)." Food and Nutrition Service. http://www.fns.usda.gov/pd/SNAPsummary.htm (accessed September 1, 2012).

**US Department of Health and Human Services.** 2012. "TANF Financial Data FY 1997–2008." Assistant Secretary for Planning and Evaluation. http://www.acf.hhs.gov/programs/ofs/data/index.html (accessed September 1, 2012).

**van den Berg, Gerard J., Maarten Lindeboom, and France Portrait.** 2006. "Economic Conditions Early in Life and Individual Mortality." *American Economic Review* 96 (1): 290–302.

**Vickers, Mark H., Bernhard H. Breier, Wayne S. Cutfield, Paul L. Hofman, and Peter D. Gluckman.** 2000. "Fetal Origins of Hyperphagia, Obesity, and Hypertension and Postnatal Amplification by Hypercaloric Nutrition." *American Journal of Physiology, Endocrinology, and Metabolism* 279 (1): E83–E87.

# EXHIBIT O

August 2018 | Issue Brief

# The Relationship Between Work and Health: Findings from a Literature Review

Larisa Antonisse and Rachel Garfield

## Summary

A central question in the current debate over work requirements in Medicaid is whether such policies promote health and are therefore within the goals of the Medicaid program. Work requirements in welfare programs in the past have had different goals of strengthening self-esteem and providing a ladder to economic progress, versus improving health. This brief examines literature on the relationship between work and health and analyzes the implications of this research in the context of Medicaid work requirements. We review literature cited in policy documents, as well as additional studies identified through a search of academic papers and policy evaluation reports, focusing primarily on systematic reviews and meta-analyses. Key findings include the following:

- **Being in poor health is associated with increased risk of job loss, while access to affordable health insurance has a positive effect on people's ability to obtain and maintain employment.**
- **There is limited evidence on the effect of** *employment* **on health, with some studies showing a positive effect of work on health yet others showing no relationship or isolated effects.** There is strong evidence of an association between *unemployment* and poorer health outcomes, but authors caution against using these findings to infer that the opposite relationship (work causing improved health) exists. While unemployment is almost universally a negative experience and thus linked to poor outcomes, especially poor mental health outcomes, employment may be positive or negative, depending on the nature of the job (e.g., stability, stress, hours, pay, etc.). Further, most studies note major limitations in our ability to draw broad conclusions on health and work, including:
  - o Job availability and quality are important modifiers in how work affects health; transition from unemployment to poor quality or unstable employment options can be detrimental to health.
  - o Selection bias in the research (e.g., healthy people being more likely to work) and other methodological limitations restrict the ability to determine a causal work-health relationship.
- **Studies note several caveats to and implications of the research on work and health that are particularly relevant to work requirements in Medicaid.** For example:
  - o The work-health relationship may differ for the Medicaid population compared to the broader populations studied in the literature, as Medicaid enrollees report worse health than the general population and face significant challenges related to social determinants of health.
  - o Limited job availability or poor job quality may moderate or reverse any positive effects of work.
  - o Work or volunteering to fulfill a requirement may produce different health effects than work or volunteer activities studied in existing literature.
  - o Loss of Medicaid coverage under work requirements could negatively impact health care access and outcomes, as well as exacerbate health disparities.

Headquarters / 185 Berry Street Suite 2000 San Francisco CA 94107 / 650 854 9400
Washington Offices and Conference Center / 1330 G Street NW Washington DC 20005 / 202 347 5270

kff.org / Email Alerts: kff.org/email / facebook.com/KaiserFamilyFoundation / twitter.com/KaiserFamFound

Filling the need for trusted information on national health issues, the Kaiser Family Foundation is a nonprofit organization based in San Francisco, California.



# Introduction

On January 11, 2018, CMS issued a State Medicaid Director Letter providing new guidance for Section 1115 waiver proposals that would impose work requirements (referred to as community engagement) in Medicaid as a condition of eligibility. On January 12, 2018, CMS approved the first work requirement waiver in Kentucky, and three additional work requirement waiver approvals followed in Indiana (February 1, 2018), Arkansas (March 5, 2018), and New Hampshire (May 7, 2018). The new guidance and work requirement approvals reverse previous positions of both Democratic and Republican Administrations, which had not approved work requirement waiver requests on the basis that such provisions would not further the Medicaid program's purposes of promoting health coverage and access. However, in both the new guidance and work requirement waiver approvals, CMS explains its policy reversal by maintaining that employment leads to improved health outcomes, and policies that condition Medicaid eligibility on meeting a work requirement will further this objective. Though the structure of work requirements is similar to those used in other programs, the administration's stated goal of improving health through Medicaid work requirements is different from the goals of welfare reform work requirements in the past, which were to strengthen self-esteem and provide a ladder to economic progress.

On June 29, 2018, the DC federal district court vacated HHS's approval of the Kentucky Section 1115 waiver program. The court held that consideration of whether the waiver would promote beneficiary health in general is not a substitute for considering whether the waiver promotes Medicaid's primary purpose of providing affordable health coverage and remanded to HHS to consider how the waiver would help furnish medical assistance consistent with Medicaid program objectives. However, the court also noted that plaintiffs and their *amici* assert that proclaimed health benefits of employment are unsupported by substantial evidence. Thus, there is likely to be ongoing debate and policy discussion over whether work requirements will further the aims of Medicaid.

To address whether work will further the aims of Medicaid, we examine the literature on the relationship between work and health and analyze the implications of this research in the context of Medicaid work requirements. Due to the large number of studies in this field spanning decades, this literature review focuses primarily (although not exclusively) on findings from other literature or systematic reviews rather than individual studies on these topics. We drew on studies cited in policy documents on work requirements in Medicaid, results of keyword searches of PubMed and other academic health/social policy search engines, and snowballing through searches of reference lists in previously pulled papers. In total, we reviewed more than 50 sources, the vast majority of which were published academic studies or program evaluations and most of which are reviews of multiple studies themselves. A more detailed description of the methods underlying this analysis is provided in the Methods box at the end of this brief.

# What effect do health and health coverage have on work?

**Not surprisingly, research has demonstrated that being in poor health is associated with an increased risk of job loss or unemployment.**[1,2,3,4,5] A meta-analysis of longitudinal studies on the relationship between health measures and exit from paid employment found that poor health, particularly

self-perceived health, is associated with increased risk of exit from paid employment.[6] Another study that simultaneously examined and contrasted the relative effects of unemployment on mental health and mental health on employment status in a single general population sample found mental health to be both a consequence of and a risk factor for unemployment. However, the evidence for men in particular suggested that mental health was a stronger predictor of subsequent unemployment than unemployment was a predictor of subsequent mental health.[7] Additional research suggests that, in some cases, individual characteristics such as income, race, sex, or education level may mediate the relationship between poor health and unemployment.[8,9,10] Research also demonstrates that an unmet need for mental health or substance use disorder treatment results in greater difficulty with obtaining and maintaining employment.[11,12,13,14,15]

**Additional research suggests that, in addition, access to affordable health insurance and care, which may help people maintain or manage their health, promotes individuals' ability to obtain and maintain employment.** For example, in an analysis of Medicaid expansion in Ohio, most expansion enrollees who were unemployed but looking for work reported that Medicaid enrollment made it easier to seek employment, and over half of employed expansion enrollees reported that Medicaid enrollment made it easier to continue working.[16] Similarly, a study on Medicaid expansion in Michigan found that 69% of enrollees who were working said they performed better at work once they got coverage, and 55% of enrollees who were out of work said the coverage made them better able to look for a job.[17] A study on Montana's Medicaid expansion found a substantial increase of 6 percentage points in labor force participation among low-income, non-disabled Montanans ages 18-64 following expansion, compared to a decline in labor force participation among higher-income Montanans.[18] National research found increases in the share of individuals with disabilities reporting employment and decreases in the share reporting not working due to a disability in Medicaid expansion states following expansion implementation, with no corresponding trends observed in non-expansion states.[19] Additional literature suggests that access to health insurance and care promotes volunteerism, finding that the expansion of Medicaid under the ACA was significantly associated with increased volunteerism among low-income adults.[20,21]

# What effect does work have on health and health coverage?

**Overall, the body of literature examining whether work affects health shows mixed results, with some studies showing a positive effect of work on health yet others showing no relationship or isolated effects.** A 2006 literature review found that, while "there is limited amount of high quality scientific evidence that directly addresses the question [of whether work is good for your health]… there is a strong body of indirect evidence that work is generally good for health and well-being."[22] That assessment was based on comprehensive review of the literature, including other systematic reviews as well as narrative and opinion pieces. A more focused 2014 systematic review about the health effects of employment, which included 33 longitudinal studies,[23] found strong evidence that employment reduces the risk of depression and improves general mental health, yet it found insufficient evidence for an effect

on other health outcomes due to a lack of studies or inconsistent findings of the studies.[24] A 2015 review of 22 longitudinal studies found an association between employment and re-employment with better physical health.[25]

**In contrast, research shows a strong association between *unemployment* and poor health outcomes, though researchers caution that these findings do not necessarily mean the reverse is true (e.g. employment causes improved health).** The effect of unemployment on health has long been an area of research focus, and a substantial body of research from the U.S. and abroad consistently demonstrates a strong association between unemployment and poorer health outcomes,[26,27,28,29 30,31,32] with some evidence suggesting a causal relationship in which unemployment leads to poor health.[33,34,35] The bulk of the research in the unemployment and health field focuses on mental health outcomes.[36] Examples of negative health outcomes associated with unemployment include increases in depression, anxiety, mixed symptoms of distress, and low self-esteem.[37,38] A more limited body of research suggests an association of unemployment with poorer physical health (including increases in cardiovascular risk factors such as hypertension and serum cholesterol as well as increased susceptibility to respiratory infections), and mortality.[39,40] A 2006 literature review noted that there is continuing debate about the relative importance of possible mechanisms involved in this relationship, and adverse effects of unemployment may vary in nature and degree for different individuals in different social contexts.[41] Some evidence also indicates that cumulative length of unemployment is correlated with deteriorated health and health behavior.[42] However, despite the evidence of a relationship between unemployment and health, researchers caution against using findings to infer that an opposite relationship (employment causing improved health) exists.[43,44] In addition, researchers note that the literature on unemployment tends to study more negative than positive health outcome variables,[45] which may skew our understanding of the health effects of unemployment.[46]

**Another related area of research is studies examining the relationship between re-employment (i.e., returning to work) and health, which find some association between re-employment and mental health**. A 2012 systematic review on this topic found support for a beneficial health effect of returning to work, with most of the 18 studies included in this review focusing on mental health-related outcomes.[47] The review also tried to assess to what extent the relationship was causal (i.e., reemployment caused health improvements) versus due to selection (e.g., people with poor health were more likely to remain unemployed) and concluded that both were at play. The review did not reach a definitive conclusion about mechanisms linking re-employment to improved health (due to lack of evidence), and it noted that it is still unclear whether health effects of reemployment are moderated by factors such as socioeconomic status, reason for unemployment, and the nature of employment.[48] The 2006 literature review described above also analyzed research findings on re-employment and found strong evidence that re-employment leads to improved psychological health and measures of general well-being, with a dearth of information on physical health and some but not all studies showing that re-employment/health relationship is at least partly due to health selection. However, these authors also cite

evidence from numerous studies suggesting that "the beneficial effects of re-employment depend mainly on the security of the new job, and also on the individual's motivation, desires, and satisfaction"[49]

**Studies on work and health have found that the quality and stability of work is a key factor in the work-health relationship: research finds that low-quality, unstable, or poorly-paid jobs lead to or are associated with adverse effects on health.**[50,51,52,53,54,55,56] For example, a 2014 meta-analysis of studies published after 2004 found that job insecurity can pose a comparable (and even modestly increased) risk of subsequent depressive symptoms compared to unemployment.[57] A 2011 longitudinal analysis found that while unemployed respondents had poorer mental health than those who were employed, the mental health of those who were unemployed was comparable or more often superior to those in jobs of poor psychosocial quality (based on measures of job control, perceived job security, and job demands and complexity) and the mental health of those in poor quality jobs declined more over time than the mental health of those who were unemployed. Moreover, while moving from unemployment into a high quality job led to improvement in mental health, the transitioning from unemployment to a poor quality job was more detrimental to mental health than remaining unemployed.[58] Additionally, a 2003 study that examined the association of different employment categories with physical health and depression found a consistent association between less than optimal jobs (based on economic, non-income, and psychological aspects of the jobs) and poorer physical and mental health among adults.[59]

**It is possible that the work-health association reflects people in good health being more likely to work, versus work causing good health.** Some researchers caution against the possibility that selection bias has occurred in many of the studies on work and health. The existence of a "healthy worker effect"—in which relatively healthy individuals are more likely to enter the workforce whereas those with health problems are at increased risk to withdraw from and remain outside of the workforce—has been documented in multiple studies.[60,61,62,63 64 ,65] Authors of both individual studies and literature reviews on this topic explain that the healthy worker effect is difficult to control for even in studies that attempt to do so, and thus this effect may cause an overestimation of the findings in the literature on health effects of work.[66,67] As authors of a 2014 systematic review of studies on health effects of employment point out, there are no randomized controlled trials on this topic available in the literature because performing such trials would be unethical,[68] yet randomized controlled trials are the gold standard for determining a causal relationship.

**Most study authors specifically note additional caveats to drawing broad conclusions about work and health.** The 2006 review concluding a general positive effect of work on health emphasized three major provisos to this conclusion: (1) findings are about average or group affects, and a minority of people may experience contrary health effects from work, (2) the beneficial health effects of work depend on the nature and quality of work (described above), and (3) the social context must be taken into account, particularly social gradients in health (i.e. inequalities in population health status related to inequalities in social status) and regional deprivation.[69] These caveats could explain the seemingly contradictory findings about employment and unemployment: While unemployment is almost universally a negative experience and thus linked to poor outcomes, especially poor mental health outcomes,

employment may be positive or negative, depending on the nature of the job (e.g., stability, stress, hours, pay, etc.). As discussed below, these provisos have implications for the applicability of research to Medicaid work requirements.

**While work can help people access employer-sponsored health coverage, many jobs—especially low-wage jobs—do not come with an affordable offer of employer coverage.** In 2017, just over half (53%) of firms offered health coverage to their employees,[70] and workers in low-wage firms are less likely than those in higher wage firms to be eligible for coverage through their employer.[71] In 2017, less than a third of workers who worked at or below their state's minimum wage had an offer of health coverage through their employer.[72] Though most employees take up employer-sponsored coverage when offered, workers in low-wage firms are less likely to be covered by their employer even if coverage is offered, likely reflecting the fact that workers in such firms pay a larger share of the premium than workers in higher-wage firms.[73] The fact that work does not always lead to health coverage is further demonstrated by the large majority of uninsured people who are in a family with either a full-time (74%) or part-time (11%) worker.[74]

## What is the effect of volunteerism on health?

In the January 2018 guidance, CMS includes volunteering as a "community engagement" activity that may improve health outcomes,[75] and the Medicaid work requirement waivers approved to date all permit volunteer activities to count towards the required weekly/monthly hours of work activity.

**However, there is limited existing evidence that volunteer activities benefit health outcomes.** One literature review on the health effects of volunteering "did not find any consistent, significant health benefits arising through volunteering" based on experimental studies available at the time of the literature review.[76] The authors' analysis of cohort studies revealed limited benefits of volunteering on depression, life satisfaction, and well-being (with no significant benefits on physical health). In addition, the cohort studies focused primarily on volunteers ages 50 and over, with some of the studies suggesting that the association between volunteerism and improved health outcomes may be limited to older volunteers and that that the health benefits of volunteering may diminish as hours of volunteering increase.[77] Another study (published in 2018) examined the health benefits of "other-oriented volunteering" (other-regarding, altruistic, and humanitarian-concerned volunteering) compared to "self-oriented volunteering" (volunteering focused on seeking benefits and enhancing the volunteers themselves in return). While the authors found beneficial effects of both forms of volunteer activity on health and well-being, other-oriented volunteering had significantly stronger effects on the health outcomes of mental and physical health, life satisfaction, and social well-being than did self-oriented volunteering.[78] As discussed below, this finding may indicate that health benefits of volunteering are likely to be weaker when individuals are compelled to engage in volunteering.

# What does this research mean for Medicaid work requirements?

The body of literature summarized above includes several notable caveats and conclusions to consider in applying findings to a work requirement in Medicaid. Limitations and implications that are particularly relevant include:

**Effects found for the general population may not apply to Medicaid, as the link between work and health is not universal across populations or social contexts.** In general, the studies examined above analyze the relationship between work and health among broad populations of all income levels. However, several authors suggest that population differences may modify the relationship between work and health.  A 2003 study found that nationally, older adults, women, blacks, and individuals with low education levels were more likely to be employed in jobs viewed as "barely adequate" or "inadequate" (the types of jobs that the study found to be independently associated with poorer physical health and higher rates of depression) compared to other populations.[79] Authors of a 2006 literature review qualify their broad findings on the work/health relationship with the proviso that the social context must be taken into account (particularly social inequities in health and regional deprivation), and also cite evidence that the strong association between socioeconomic status and physical and mental health and mortality likely outweighs (and is confounded with) all other work characteristics that influence health.[80] Authors of a 2005 review on unemployment and health found a strong association between deprived areas, poor health, poverty and unemployment (although the exact relationship is not clear), and highlight the need for more research on the geographical dimension on unemployment and health.[81] These findings imply that the work/health relationship may differ significantly for the low-income Medicaid population, who report worse health status compared to the total US population and often face more significant challenges related to housing, food security, and other social determinants of health.[82,83,84] In addition, some volunteerism research suggests that the association between volunteerism and improved health outcomes may be limited to older volunteers, yet approved and pending Section 1115 Medicaid work requirement waiver requests all include exemptions for individuals above a certain age (which varies by state but ranges from 50 to 65 years).[85]

**Work or volunteering undertaken to fulfill a requirement may produce different health effects than work and volunteer activities studied in existing literature.** For example, research on health effects of work requirements in Temporary Assistance for Needy Families (TANF) suggests that they did not benefit and sometimes negatively affected health among enrollees and their dependents.[86] Another study found that welfare reform was associated with increases in self-reported poor health and self-reported disability among white single mothers without a high school diploma or GED.[87] These adverse effects could reflect different relationships between work and health for low-income populations, as described above, or different effects of work undertaken voluntarily versus as a requirement. Authors of a 2006 literature review on work and health found that forcing claimants off benefits and into work without adequate supports would more likely harm than improve their health and well-being.[88] Similarly, most studies on volunteerism and health define volunteerism as an act of free-will (essentially, a voluntary act), a

definition that may not be applicable to volunteer activity undertaken for the purpose of meeting work/community engagement requirements in order to maintain eligibility for Medicaid. Volunteer activities undertaken to retain Medicaid appear more closely aligned with the self-oriented form of volunteerism (volunteering focused on seeking benefits and enhancing the volunteers themselves in return), which research shows has weaker health effects than the other-oriented form (other-regarding, altruistic, and humanitarian-concerned volunteering).

**Limited job availability, low demand for labor, or poor job quality may moderate any positive health effects of employment.** Authors of a 2014 systematic review of prospective studies on health effects of employment commented that most studies in this field do not adjust for quality of employment and include all kinds of jobs in their analysis (e.g. part- and full-time employment, self-employment, and both blue- and white-collared jobs) despite the possibility that different forms of employment have different health effects.[89] Under Medicaid work requirement programs, the population subject to Medicaid work requirements may have access to only low-wage, unstable, or low-quality jobs to meet the weekly/monthly hours requirement, as these are the types of positions adults with Medicaid who currently work hold.[90] In discussing the policy implications of their findings, multiple researchers have concluded that such policies could be detrimental to health, with authors of one study asserting that, "Policies that promote job growth without giving attention to the overall adequacy of the jobs may undermine health and well-being."[91]

**Long-term effects of work on health are unclear.** Much of the evidence on the work/health relationship is about short-term effects after about one year, which, as authors of one literature review point out, is a short period when assessing health impacts.[92] There is less evidence on longer-term effects over a lifetime perspective.[93] In addition, research on work requirements in other public programs shows little evidence of long-term impacts on employment or income. Studies on welfare recipients subject to work requirements generally have found that any initial increase in employment after an imposition of a work requirement faded over time.[94,95, 96] After five years, one study showed those who were not required to work were just as likely or more likely to be working compared to those who were subject to a work requirement, suggesting that these work requirements had little impact on increasing employment over the long-term.[97] Other research has found that employment among people who left welfare was unsteady and did not lift them out of poverty.[98] Thus, even short-term effects are likely to disappear as short-term boosts in employment fade over time.

**Loss of health insurance coverage due to not meeting reporting or work requirements under waivers could affect access to health care and health.** Low-wage workers typically work in small firms and industries that often have limited employer-based coverage options, and very few have an offer of coverage through their employer. Work requirements in Medicaid could lead to large Medicaid coverage losses, especially among people who would remain eligible for the program but lose coverage due to new administrative burdens or red tape versus those who would lose eligibility due to not working.[99] Several studies on individuals leaving TANF following welfare reform show reductions in insurance coverage across this "welfare leaver" population, with significant decreases in Medicaid coverage that were not fully

offset by the smaller increases in private coverage.[100,101,102,103,104] A study evaluating welfare-to-work interventions found that some programs led to a reduction in health insurance coverage for both children and parents.[105]  Given the evidence of Medicaid's positive impact on access to care and health outcomes,[106] as well as data demonstrating that uninsured individuals go without needed care due to cost at much higher rates than those with Medicaid coverage,[107] widespread coverage losses as a result of Medicaid work requirements are likely to result in adverse effects on health outcomes. In TANF evaluations, for example, studies found that children of TANF enrollees who lose benefits for failure to comply with a work requirement experience adverse health effects such as behavioral health problems[108] or hospitalization.[109]

**Policies that have disproportionate effects on certain Medicaid enrollees could widen health disparities.** Data demonstrate the persistence of clear disparities in health insurance coverage, access to care, and health outcomes for certain vulnerable populations in the US, including people with disabilities (compared to their non-disabled counterparts)[110] and people of color (compared to whites).[111] Research shows that people with disabilities and people of color are face disproportionate challenges in meeting and are disproportionately sanctioned under existing work requirement programs.[112, 113] If racial minority groups, people with disabilities, or other vulnerable populations face similarly disproportionate challenges in meeting work requirements when they are attached to the Medicaid program, these policies could result in wider disparities in health insurance coverage and health outcomes.

# Looking Ahead

Taken as a whole, the large body of research on the link between work and health indicates that proposed policies requiring work as a condition of Medicaid eligibility may not necessarily benefit health among Medicaid enrollees and their dependents, and some literature also suggests that such policies could negatively affect health. While it is difficult to determine a causal relationship between employment and health status (largely due to challenges controlling for health selection bias and the inability to conduct randomized controlled trials on this topic), there is strong evidence of an association between employment and good health. However, research suggests that factors like job availability and quality, as well as the social context of workers, mediate the effect of work or work requirements on health. Given the characteristics of the Medicaid population, research indicates that policies could lead to emotional strain, loss of health coverage, or widening of health disparities for vulnerable populations. As debate considers the question of whether policies to promote health—versus health coverage—are the aim of the Medicaid program, the question of whether work requirements will promote health also will remain key to the ongoing debate over the legality of work requirements in Medicaid.

**Methods**

This brief is based on a review of existing research on the relationship between work and health. To collect relevant studies, we began by drawing on studies cited in policy documents on work requirements in Medicaid, including the January 2018 guidance from CMS, comments and reactions to the guidance, and documents related to the *Stewart v. Azar* litigation and decision. We then conducted keyword searches of PubMed and other academic health/social policy search engines to compile relevant studies and program evaluations.  Due to the large number of studies in this field spanning decades, we focused primarily (although not exclusively) on findings from other literature or systematic reviews rather than individual studies on these topics. We then used a snowballing technique of pulling additional studies from reference lists in previously pulled papers. In areas with limited evidence or in which reviews indicated conflicting or unclear results, we looked at original source studies to understand findings and assess the strength of the evidence.

In total, we reviewed more than 50 sources, the vast majority of which were published academic studies or program evaluations and most of which are reviews of multiple studies themselves. In weighing evidence, we prioritized recent research and research based in the United States over older research and research based on experiences in other countries, though we did include older and international studies if they were highly cited, directly relevant, or included in systematic reviews that also included US-based studies. We excluded commentaries (as compared to original work or comprehensive literature reviews) and studies that were not directly focused on the link between health and work (e.g., we excluded studies of workplace wellness programs).

# Endnotes

[1] Sarah Olesen, Peter Butterworth, Liana Leach, Margaret Kelaher, and Jane Pirkis, "Mental Health Affects Future Employment as Job Loss Affects Mental Health: Findings from a Longitudinal Population Study," *BMC Psychiatry* 13 (2013), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/1471-244X-13-144

[2] Peter Butterworth, Liana Leach, Jane Pirkis, and Margaret Kelaher, "Poor Mental Health Influences Risk and Duration of Unemployment: A Prospective Study," *Social Psychiatry and Psychiatric Epidemiology* 47 no. 6 (June 2012): 1013-1021, https://link.springer.com/article/10.1007/s00127-011-0409-1

[3] Rogier van Rijn, Suzan Robroek, Sandra Brouwer, and Alex Burdorf, "Influence of Poor Health on Exit from Paid Employment: A Systematic Review," *Occupational & Environmental Medicine* 71 no. 4, (2014): pp. 295-301, https://oem.bmj.com/content/71/4/295

[4] Merel Schuring et al., "The Effect of Ill Health and Socioeconomic Status on Labor Force Exist and Re-Employment: A Prospective Study with Ten Years Follow-Up in the Netherlands," *Scandinavian Journal of Work, Environment, and Health* 39 no. 2 (March 2013): pp. 134.

[5] Merel Schuring et al., "The Effects of Ill Health on Entering and Maintaining Paid Employment: Evidence in European Countries," *Journal of Epidemiology & Community Health* 61 (2007): pp. 597-604, https://jech.bmj.com/content/61/7/597.full

[6] Rogier van Rijn, Suzan Robroek, Sandra Brouwer, and Alex Burdorf, "Influence of Poor Health on Exit from Paid Employment: A Systematic Review," *Occupational & Environmental Medicine* 71 no. 4, (2014): pp. 295-301, https://oem.bmj.com/content/71/4/295

[7] Sarah Olesen, Peter Butterworth, Liana Leach, Margaret Kelaher, and Jane Pirkis, "Mental Health Affects Future Employment as Job Loss Affects Mental Health: Findings from a Longitudinal Population Study," *BMC Psychiatry* 13 (2013), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/1471-244X-13-144

[8] Victoria Blinder et al., "Women with Breast Cancer Who Work For Accommodating Employers More Likely To Retain Jobs After Treatment," *Health Affairs* 36 no. 2 (February 2017), https://www.healthaffairs.org/doi/10.1377/hlthaff.2016.1196

[9] Merel Schuring et al., "The Effects of Ill Health on Entering and Maintaining Paid Employment: Evidence in European Countries," *Journal of Epidemiology & Community Health* 61 (2007): pp. 597-604, https://jech.bmj.com/content/61/7/597.full

[10] Victoria Blinder et al., "Women with Breast Cancer Who Work For Accommodating Employers More Likely To Retain Jobs After Treatment," *Health Affairs* 36 no. 2 (February 2017), https://www.healthaffairs.org/doi/10.1377/hlthaff.2016.1196

[11] National Institute on Drug Abuse, Consequences of Drug Misuse (Bethesda, MD: National Institute on Drug Abuse, March 2017), https://www.drugabuse.gov/related-topics/health-consequences-drug-misuse

[12] Neil Jordan et al., "Economic Benefit of Chemical Dependency Treatment to Employers," Journal of Substance Abuse Treatment 34, 3(2008):311-319

[13] Ronald C. Kessler et al., "Depression in the Workplace: Effects on Short-term Disability," Health Affairs (Millwood) 18, 5(1999):163-71

[14] Cheryl J. Cherpitel and Yu Ye, "Drug Use and Problem Drinking Associated with Primary Care and Emergency Room Utilization in the US General Population: Data from the 2005 National Alcohol Survey," Drug and Alcohol Dependence 97 3(2008):226-30

[15] Doris J. James and Lauren E. Glaze, Mental Health Problems of Prison and Jail Inmates (Washington, DC: US Department of Justice, December 2006), https://www.bjs.gov/content/pub/pdf/mhppji.pdf

[16] The Ohio Department of Medicaid, *Ohio Medicaid Group VIII Assessment: A Report to the Ohio General Assembly* (The Ohio Department of Medicaid, January 2017).

[17] University of Michigan Institute for Healthcare Policy & Innovation, *Medicaid Expansion Helped Enrollees Do Better at Work or in Job Searches* (June 2017), http://ihpi.umich.edu/news/medicaid-expansion-helped-enrollees-do-better-work-or-job-searches

[18] Bureau of Business and Economic Research, *The Economic Impact of Medicaid Expansion in Montana* (University of Montana Bureau of Business and Economic Research, Prepared for the Montana Healthcare Foundation and Headwaters Foundation, April 2018), https://mthcf.org/wp-content/uploads/2018/04/BBER-MT-Medicaid-Expansion-Report_4.11.18.pdf

[19] Jean Hall, Adele Shartzer, Noelle Kurth, and Kathleen Thomas, "Medicaid Expansion as an Employment Incentive Program for People With Disabilities," *American Journal of Public Health* epub ahead of print (July 2018), https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2018.304536

[20] Heeju Sohn and Stefan Timmermans, "Social Effects of Health Care Reform: Medicaid Expansion under the Affordable Care Act and Changes in Volunteering," Socius: Sociological Research for a Dynamic World 3 (March 2017): 1-12, http://journals.sagepub.com/doi/full/10.1177/2378023117700903

[21] Sohn and Timmermans used the volunteering supplement to the Current Population Survey (CPS) to measure volunteerism. Analyzed changes in formal volunteering based on two CPS questions: "Since September 1st of last year, have you done any volunteering activities through or for an organization?" and, "Sometimes people don't think of activities they do infrequently or activities they do for children's schools or youth organizations as volunteer activities. Since September 1st of last year, have you done any of these types of volunteer activities?" Also separately analyzed changes in informal helping based on one CPS question: "Since September 1st of last year, have you worked with people in your neighborhood to fix or improve something?"

[22] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[23] The authors judged 23 of these studies to be "high quality" studied from a methodological perspective, and they classified the remaining 10 as "low quality" studies from a methodological perspective.

[24] Maaike van der Noordt, Helma IJzelenberg, Mariel Droomers, and Karin Proper, "Health Effects of Employment: A systematic Review of Prospective Studies," *Occupational and Environmental Medicine,* 71 (October 2014): 730-736, https://www.ncbi.nlm.nih.gov/pubmed/24556535

[25] K. Hergenrather, et al., Employment as a Social Determinant of Health: A Systematic Review of Longitudinal Studies Exploring the Relationship Between Employment Status and Physical Health, Rehabilitation Research, Policy, and Education (2015), https://www.researchgate.net/publication/273333771_Employment_as_a_Social_Determinant_of_Health_A_Systematic_Review_of_Longitudinal_Studies_Exploring_the_Relationship_Between_Employment_Status_and_Physical_Health

[26] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[27] Robert Jin, Chandrakant Shah, and Tomislav Svoboda, "The Impact of Unemployment on Health: A Review of the Evidence," *Canadian Medical Association Journal* 153, no. 5 (September 1995), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1487417/

[28] K. Hergenrather, et al., Employment as a Social Determinant of Health: A Systematic Review of Longitudinal Studies Exploring the Relationship Between Employment Status and Physical Health, Rehabilitation Research, Policy, and Education (2015), https://www.researchgate.net/publication/273333771_Employment_as_a_Social_Determinant_of_Health_A_Systematic_Review_of_Longitudinal_Studies_Exploring_the_Relationship_Between_Employment_Status_and_Physical_Health

[29] Jennifer Pharr, Sheniz Moonie, and Timothy Bungum, "The Impact of Unemployment on Mental and Physical Health, Access to Health Care and Health Risk Behaviors," *International Scholarly Research Network Public Health* (2012), https://www.hindawi.com/journals/isrn/2012/483432/

[30] Carl McClean et al., *Worklessness and Health—What do we Know about the Causal Relationship?* (London: Health Development Agency, 2005), http://www.employabilityinscotland.com/media/83147/worklessness-and-health-what-do-we-know-about-the-relationship.pdf

[31] Gregory Murphy and James Athanasou, "The Effect of Unemployment on Mental Health," *Journal of Occupational and Organizational Psychology* 72 (March 1999): 83-99, https://onlinelibrary.wiley.com/doi/pdf/10.1348/096317999166518

[32] Sarah Olesen, Peter Butterworth, Liana Leach, Margaret Kelaher, and Jane Pirkis, "Mental Health Affects Future Employment as Job Loss Affects Mental Health: Findings from a Longitudinal Population Study," *BMC Psychiatry* 13 (2013), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/1471-244X-13-144

[33] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[34] Karsten Paul and Klaus Moser, "Unemployment Impairs Mental Health: Meta Analyses," *Journal of Vocational Behavior* 74, no.3 (June 2009): 264-282, https://www.sciencedirect.com/science/article/abs/pii/S0001879109000037

[35] Frances McKee-Ryan, Zhaoli Song, Connie Wanberg, and Angelo Kinicki, "Psychological and Physical Well-Being During Unemployment: A Meta-Analytic Study," *Journal of Applied Psychology* 90 no. 1 (January 2005): 53-76, http://psycnet.apa.org/doiLanding?doi=10.1037%2F0021-9010.90.1.53

[36] Frances McKee-Ryan, Zhaoli Song, Connie Wanberg, and Angelo Kinicki, "Psychological and Physical Well-Being During Unemployment: A Meta-Analytic Study," *Journal of Applied Psychology* 90 no. 1 (January 2005): 53-76, http://psycnet.apa.org/doiLanding?doi=10.1037%2F0021-9010.90.1.53

[37] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[38] Karsten Paul and Klaus Moser, "Unemployment Impairs Mental Health: Meta Analyses," *Journal of Vocational Behavior* 74, no.3 (June 2009): 264-282, https://www.sciencedirect.com/science/article/abs/pii/S0001879109000037

[39] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[40] Karsten Paul and Klaus Moser, "Unemployment Impairs Mental Health: Meta Analyses," *Journal of Vocational Behavior* 74, no.3 (June 2009): 264-282, https://www.sciencedirect.com/science/article/abs/pii/S0001879109000037

[41] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[42] Urban Janlert, Anthony Winefield, and Anne Hammarstrom, "Length of Unemployment and Health-Related Outcomes: A Life-Course Analysis," *European Journal of Public Health* 25 no. 4 (August 2015), https://academic.oup.com/eurpub/article/25/4/662/2398865

[43] Steve Crabtree, "In U.S., Depression Rates Higher for Long-Term Unemployed," *Gallup* (June 2014), http://news.gallup.com/poll/171044/depression-rates-higher-among-long-term-unemployed.aspx

[44] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[45] Frances McKee-Ryan, Zhaoli Song, Connie Wanberg, and Angelo Kinicki, "Psychological and Physical Well-Being During Unemployment: A Meta-Analytic Study," *Journal of Applied Psychology* 90 no. 1 (January 2005): 53-76, http://psycnet.apa.org/doiLanding?doi=10.1037%2F0021-9010.90.1.53

[46] Existing research does suggest that for a minority of people, unemployment can lead to improved health and well-being. See Waddell and Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[47] Sergio Rueda et al., "Association of Returning to Work with Better Health in Working-Aged Adults: A Systematic Review," *American Journal of Public Health* 102 no. 3 (March 2012): 541-556, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3487667/

[48] Sergio Rueda et al., "Association of Returning to Work with Better Health in Working-Aged Adults: A Systematic Review," *American Journal of Public Health* 102 no. 3 (March 2012): 541-556, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3487667/

[49] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?*, (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[50] Peter Butterworth et al., "The Psychosocial Quality of Work Determines Whether Employment Has Benefits for Mental Health: Results From a Longitudinal National Household Panel Survey," *Occupational and Environmental Medicine* 68 no. 11 (2011): pp. 806-812, https://oem.bmj.com/content/68/11/806.long

[51] Marianna Virtanen et al., "Temporary Employment and Health: A Review," *International Journal of Epidemiology* 34 (2005): 610-622, https://www.ncbi.nlm.nih.gov/pubmed/15737968

[52] Pekka Virtanen, Urban Janlert, and Anne Hammarstrom, "Exposure to temporary employment and job insecurity: A Longitudinal Study of the Health Effects," *Occupational and Environmental Medicine,* 68, no. 8 (August 2011): 570-574, https://www.ncbi.nlm.nih.gov/pubmed/21081513

[53] Joseph Grzywacz and David Dooley, "'Good jobs' to 'bad jobs': replicated evidence of an employment continuum from two large surveys," Social Science and Medicine 56 no. 8 (April 2003): 1749-1760, https://www.ncbi.nlm.nih.gov/pubmed/12639591

[54] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?*, (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[55] David Dooley and JoAnn Prause, "Underemployment and Alcohol Misuse in the National Longitudinal Survey of Youth," *Journal of Studies on Alcohol and Drugs,* 50, no. 6 (1998): 669-680, https://www.jsad.com/doi/pdf/10.15288/jsa.1998.59.669

[56] JoAnn Prause and David Dooley, "Effect of Underemployment on School-Leavers' Self-Esteem," *Journal of Adolescence,* 20 no. 3 (1997): 243-260, http://psycnet.apa.org/record/1997-04916-002

[57] Tae Jun Kim and O von dem Knesebeck, "Perceived job insecurity, unemployment and depressive symptoms: a systematic review and meta-analysis of prospective observational studies," *International Archives of Occupational and Environmental Health* 89 no. 4 (May 2016): 561-573, https://www.ncbi.nlm.nih.gov/pubmed/26715495

[58] Peter Butterworth et al., "The Psychosocial Quality of Work Determines Whether Employment Has Benefits for Mental Health: Results From a Longitudinal National Household Panel Survey," *Occupational and Environmental Medicine* 68 no. 11 (2011): pp. 806-812, https://oem.bmj.com/content/68/11/806.long

[59] Joseph Grzywacz and David Dooley, "'Good jobs' to 'bad jobs': replicated evidence of an employment continuum from two large surveys," Social Science and Medicine 56 no. 8 (April 2003): 1749-1760, https://www.ncbi.nlm.nih.gov/pubmed/12639591

[60] Sergio Rueda et al., "Association of Returning to Work with Better Health in Working-Aged Adults: A Systematic Review," *American Journal of Public Health* 102 no. 3 (March 2012): 541-556, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3487667/

[61] Ritam Chowdhury, Divyang Shah, and Abhishek Payal, "Healthy Worker Effect Phenomenon: Revisited with Emphasis on Statistical Methods – A review," *Indian Journal of Occupational and Environmental Medicine* 21, no. 1 (2017): 2-8, http://www.ijoem.com/article.asp?issn=0973-2284;year=2017;volume=21;issue=1;spage=2;epage=8;aulast=Chowdhury

[62] Pekka Virtanen, Urban Janlert, and Anne Hammarstrom, "Health status and health behaviour as predictors of the occurrence of unemployment and prolonged unemployment," *Public Health* 127 no. 1 (January 2013): 46-52, https://www.publichealthjrnl.com/article/S0033-3506(12)00370-8/fulltext

[63] Silje Kaspersen et al., "Health and Unemployment: 14 Years of Follow-Up on Job Loss in the Norwegian HUNT Study," *European Journal of Public Health,* 26 no. 2 (April 2016): 312-317, https://academic.oup.com/eurpub/article/26/2/312/2570411

[64] Catherine Ross and John Mirowsky, "Does Employment Affect Health?," *Journal of Health and Social Behavior,* 36 (September 1995): 230-243, https://www.researchgate.net/publication/15605496_Does_Employment_Affect_Health

[65] Maaike van der Noordt, Helma IJzelenberg, Mariel Droomers, and Karin Proper, "Health Effects of Employment: A systematic Review of Prospective Studies," *Occupational and Environmental Medicine,* 71 (October 2014): 730-736, https://www.ncbi.nlm.nih.gov/pubmed/24556535

[66] Maaike van der Noordt, Helma IJzelenberg, Mariel Droomers, and Karin Proper, "Health Effects of Employment: A systematic Review of Prospective Studies," *Occupational and Environmental Medicine,* 71 (October 2014): 730-736, https://www.ncbi.nlm.nih.gov/pubmed/24556535

[67] Pekka Virtanen, Urban Janlert, and Anne Hammarstrom, "Exposure to temporary employment and job insecurity: A Longitudinal Study of the Health Effects," *Occupational and Environmental Medicine,* 68, no. 8 (August 2011): 570-574, https://www.ncbi.nlm.nih.gov/pubmed/21081513

[68] Maaike van der Noordt, Helma IJzelenberg, Mariel Droomers, and Karin Proper, "Health Effects of Employment: A Systematic Review of Prospective Studies," *Occupational and Environmental Medicine,* 71 (October 2014): 730-736, https://www.ncbi.nlm.nih.gov/pubmed/24556535

[69] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[70] Kaiser Family Foundation, *2017 Employer Health Benefits Survey* (Washington, DC: Kaiser Family Foundation, September 2017), https://www.kff.org/report-section/ehbs-2017-section-2-health-benefits-offer-rates/

[71] Kaiser Family Foundation, *2017 Employer Health Benefits Survey* (Washington, DC: Kaiser Family Foundation, September 2017), https://www.kff.org/report-section/ehbs-2017-section-3-employee-coverage-eligibility-and-participation/

[72] Kaiser Family Foundation analysis of 2017 Current Population Survey.

[73] Kaiser Family Foundation, *2017 Employer Health Benefits Survey* (Washington, DC: Kaiser Family Foundation, September 2017), https://www.kff.org/report-section/ehbs-2017-section-6-worker-and-employer-contributions-for-premiums/

[74] Julia Foutz, Anthony Damico, Ellen Squires, and Rachel Garfield, *The Uninsured: A Primer - Key Facts about Health Insurance and the Uninsured Under the Affordable Care Act* (Washington, DC: Kaiser Family Foundation, December 2017), https://www.kff.org/uninsured/report/the-uninsured-a-primer-key-facts-about-health-insurance-and-the-uninsured-under-the-affordable-care-act/

[75] Centers for Medicare and Medicaid Services, "Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries," (Letter to State Medicaid Directors, CMS, January 2018), https://www.medicaid.gov/federal-policy-guidance/downloads/smd18002.pdf

[76] Caroline Jenkinson et al., "Is Volunteering a Public Health Intervention? A Systematic Review and Meta-Analysis of the Health and Survival of Volunteers," *BMC Public Health* 13 (2013), https://bmcpublichealth.biomedcentral.com/articles/10.1186/1471-2458-13-773

[77] Caroline Jenkinson et al., "Is Volunteering a Public Health Intervention? A Systematic Review and Meta-Analysis of the Health and Survival of Volunteers," *BMC Public Health* 13 (2013), https://bmcpublichealth.biomedcentral.com/articles/10.1186/1471-2458-13-773

[78] Jerf Yeung, Zhuoni Zhang, and Tae Yeun Kim, "Volunteering and Health Benefits in General Adults: Cumulative Effects and Forms," *BMC Public Health* 18 no. 8 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5504679/

[79] Joseph Grzywacz and David Dooley, "'Good jobs' to 'bad jobs': replicated evidence of an employment continuum from two large surveys," Social Science and Medicine 56 no. 8 (April 2003): 1749-1760, https://www.ncbi.nlm.nih.gov/pubmed/12639591

[80] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?,* (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[81] Carl Mclean et al., *Worklessness and Health—What do we Know about the Causal Relationship?* (London: Health Development Agency, 2005), http://www.employabilityinscotland.com/media/83147/worklessness-and-health-what-do-we-know-about-the-relationship.pdf

[82] In 2016, 7% of nonelderly adults in Medicaid reported being in "poor" health compared to 2% of the US total nonelderly adult population, and 17% of nonelderly adults in Medicaid reported being in "fair" health compared to 9%

of the US total nonelderly adult population (both differences between the two populations were statistically significant).

A significantly greater percentage of Medicaid nonelderly adults compared to US total nonelderly adults also reported: that they often or sometimes cannot afford to eat balanced meals (26% vs. 11%), that they often or sometimes worry food will run out before they have money to buy more (34% vs. 15%), and that they are very or moderately worried about rent, mortgage, or other housing costs (42% vs. 24%). (Kaiser Family Foundation analysis of 2016 National Health Interview Survey data).

[83] Julia Paradise and Rachel Garfield, *What is Medicaid's Impact on Access to Care, Health Outcomes, and Quality of Care? Setting the Record Straight on the Evidence* (Washington, DC: Kaiser Family Foundation, https://www.kff.org/medicaid/issue-brief/what-is-medicaids-impact-on-access-to-care-health-outcomes-and-quality-of-care-setting-the-record-straight-on-the-evidence/

[84] Julia Paradise, Barbara Lyons, and Diane Rowland, *Medicaid at 50* (Washington, DC: Kaiser Family Foundation, May 2015), https://www.kff.org/medicaid/report/medicaid-at-50/

[85] For more detailed information on work requirement age exemptions by state, see the detailed work requirement waiver table that is downloadable through the KFF Medicaid Waiver Tracker: https://www.kff.org/medicaid/issue-brief/which-states-have-approved-and-pending-section-1115-medicaid-waivers/

[86] Marcia Gibson et al., "Welfare-To-Work Interventions and their Effects on the Mental and Physical Health of Lone Parents and their Children," *The Cochrane Database of Systematic Reviews* (February 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5846185/

[87] Kimberly Narain et al. "The Impact of Welfare Reform on the Health Insurance Coverage, Utilization, and Health of Low Education Single Mothers," *Social Science and Medicine* 180 (March 2017): pp. 28-35, https://www.ncbi.nlm.nih.gov/pubmed/28319907

[88] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?*, (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[89] Maaike van der Noordt, Helma IJzelenberg, Mariel Droomers, and Karin Proper, "Health Effects of Employment: A systematic Review of Prospective Studies," *Occupational and Environmental Medicine,* 71 (October 2014): 730-736, https://www.ncbi.nlm.nih.gov/pubmed/24556535

[90] Rachel Garfield, Robin Rudowitz, MaryBeth Musumeci, and Anthony Damico, *Implications of Work Requirements in Medicaid: What Does the Data Say?* (Washington, DC: Kaiser Family Foundation, June 2018), https://www.kff.org/medicaid/issue-brief/implications-of-work-requirements-in-medicaid-what-does-the-data-say/

[91] Joseph Grzywacz and David Dooley, "'Good jobs' to 'bad jobs': replicated evidence of an employment continuum from two large surveys," Social Science and Medicine 56 no. 8 (April 2003): 1749-1760, https://www.ncbi.nlm.nih.gov/pubmed/12639591

[92] Gordon Waddell and A. Kim Burton, *Is Work Good for your Health and Well-Being?*, (2006), https://www.gov.uk/government/publications/is-work-good-for-your-health-and-well-being

[93] Ibid.

[94] MaryBeth Musumeci and Julia Zur, *Medicaid Enrollees and Work Requirements: Lessons from the TANF Experience* (Washington, DC: Kaiser Family Foundation, August 2017), https://www.kff.org/report-section/medicaid-enrollees-and-work-requirements-issue-brief/#endnote_link_232243-20

[95] LaDonna Pavetti, *Work Requirements Don't Cut Poverty, Evidence Shows* (Center on Budget and Policy Priorities, June 2016), https://www.cbpp.org/research/poverty-and-inequality/work-requirements-dont-cut-poverty-evidence-shows

[96] Marcia Gibson et al., "Welfare-To-Work Interventions and their Effects on the Mental and Physical Health of Lone Parents and their Children," *The Cochrane Database of Systematic Reviews* (February 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5846185/

[97] Gayle Hamilton et al., National Evaluation of Welfare-to-Work Strategies: How Effective are Difference Welfare-to-Work Approaches? Five-Year Adult and Child Impacts for Eleven Programs, (Washington, DC: Manpower Demonstration Research Corporation, December 2001), http://www.mdrc.org/sites/default/files/full_391.pdf

[98] Tazra Mitchell, LaDonna Pavetti, and Yixuan Huang, *Life After TANF in Kansas: For Most, Unsteady Work and Earnings Below Half the Poverty Line* (Washington, DC: Center on Budget and Policy Priorities, February 2018), https://www.cbpp.org/sites/default/files/atoms/files/1-23-18ksstanf.pdf

[99] Rachel Garfield, Robin Rudowitz, and MaryBeth Musumeci, *Implications of a Medicaid Work Requirement: National Estimates of Potential Coverage Losses* (Washington, DC: Kaiser Family Foundation, June 2018), https://www.kff.org/medicaid/issue-brief/implications-of-a-medicaid-work-requirement-national-estimates-of-potential-coverage-losses/

[100] John Cawley, Mathis Schroeder, and Kosali Simon, "How Did Welfare Reform Affect the Health Insurance Coverage of Women and Children?," *Health Services Research* 41 no. 2 (April 2006), 486-506, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1702522/

[101] Marianne Bitler, Jonah Gelbaxch, and Hilary Hoynes, "Welfare Reform and Health," *The Journal of Human Resources* 40 no. 2 (2005): pp. 309-334, https://www.jstor.org/stable/4129526?seq=1#page_scan_tab_contents

[102] Robert Kaestner and Neeraj Kaushal, "Welfare Reform and Health Insurance Coverage of Low-Income Families," *Journal of Health Economics* 22 (2003): 959-981, https://www.ncbi.nlm.nih.gov/pubmed/14604555

[103] Kaiser Family Foundation, *Participation in Welfare and Medicaid Enrollment* (Washington, DC: Kaiser Family Foundation, August 1998), https://www.kff.org/medicaid/participation-in-welfare-and-medicaid-enrollment/

[104] John Cawley, Mathis Schroeder, and Kosali Simon, "How Did Welfare Reform Affect the Health Insurance Coverage of Women and Children?," *Health Services Research* 41 no. 2 (April 2006), 486-506, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1702522/

[105] Gayle Hamilton, Stephen Freedman, and Sharon McGroder, *National Evaluation of Welfare to Work Strategies,* (US Department of Health and Human Services, June 200), https://www.mdrc.org/sites/default/files/do_mandatory_welfare-to-work_programs_affect_fr.pdf

[106] Robin Rudowitz and Rachel Garfield, *10 Things to Know About Medicaid: Setting the Facts Straight* (Washington, DC: Kaiser Family Foundation, April 2018), https://www.kff.org/medicaid/issue-brief/10-things-to-know-about-medicaid-setting-the-facts-straight/

[107] Kaiser Family Foundation, *Key Facts about the Uninsured Population* (Washington, DC: Kaiser Family Foundation, November 2017), https://www.kff.org/uninsured/fact-sheet/key-facts-about-the-uninsured-population/

[108] Brenda J. Lohman et al., "Welfare Reform: What About the Children," Welfare, Children & Families 02-1(2002): 1-8, https://works.bepress.com/brenda_lohman/3/

[109] John Cook et al., "Welfare Reform and the Health of Young Children: A Sentinel Survey in 6 US Cities," *Archives of Pediatrics and Adolescent Medicine* 156 no. 7, (2002): 678-684, https://jamanetwork.com/journals/jamapediatrics/fullarticle/203607

[110] Gloria Krahn, Deborah Walker, and Rosaly Correa-De-Araujo, "Persons with Disabilities as an Unrecognized Health Disparity Population," *American Journal of Public Health* 105 (April 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4355692/

[111] Samantha Artiga, Julia Foutz, Elizabeth Cornachione, and Rachel Garfield, *Key Facts on Health and Health Care by Race and Ethnicity* (Washington, DC: Kaiser Family Foundation, June 2016), https://www.kff.org/disparities-policy/report/key-facts-on-health-and-health-care-by-race-and-ethnicity/

[112] Mathematica Policy Research, Assisting TANF Recipients Living with Disabilities to Obtain and Maintain Employment: Conducting In-Depth Assessments (Feb. 2008), https://www.acf.hhs.gov/sites/default/files/opre/conducting_in_depth.pdf

[113] Heather Hahn et al., *Work Requirements in Social Safety Net Programs,* (Washington, DC: The Urban Institute, December 2017), https://www.urban.org/sites/default/files/publication/95566/work-requirements-in-social-safety-net-programs.pdf

# EXHIBIT P

# Health Insurance as a Productive Factor[☆]

Allan Dizioli[a], Roberto Pinheiro[b,*]

[a]*International Monetary Fund, 700 19th Street, N.W., Washington, D.C. 20431, USA*
[b]*Federal Reserve Bank of Cleveland, 1455 E 6th St., Cleveland, OH 44114, USA*

---

## Abstract

In this paper, we present a less-explored channel through which health insurance impacts productivity: by offering health insurance, employers reduce the expected time workers spend out of work in sick days. Using data from the Medical Expenditure Panel Survey (MEPS), we show that a worker with health coverage misses on average 76.54% fewer workdays than uninsured workers, after controlling for endogeneity. We develop a model that embodies this impact of health coverage in productivity. In our model, health insurance reduces the probability that a healthy worker gets sick, missing workdays, and it increases the probability that a sick worker recovers and returns to work. In our model, firms that offer health insurance are larger and pay higher wages in equilibrium, a pattern observed in the data. We calibrated the model using US data for 2004 and show the impact of increases in health costs, as well as of changes in tax benefits of health insurance expenses, on labor force health coverage and productivity.

*Keywords:*
Health, Health Insurance, Labor Productivity, Labor Markets

*JEL:* E20, E24, E25, E62, I10, J32, J63, J78.

---

## 1. Introduction

At the core of the US health system is the role of employers as the main source of insurance for the population at work age (18 to 64 years old). This role generates a peculiar interaction between health care and labor markets. Because health insurance costs outside the workplace are prohibitive to most workers, employers can distinguish themselves by offering health coverage to their employees

---

[☆]The views in this article do not necessarily reflect those of the Federal Reserve System or the Board of Governors.
[*]Corresponding author
*Email addresses:* `adizioli@imf.org` (Allan Dizioli), `roberto.pinheiro@clev.frb.org` (Roberto Pinheiro)

and obtain a hiring edge over firms that do not offer insurance. On the other hand, as health costs have increased, the labor force's health coverage has become a primary source of variable costs for employers. The increase in health care costs during the last decade was followed by a reduction in the fraction of workers covered by their employers. Consequently, the number of uninsured rose from 36.5 million in 1994 to 45.7 million in 2008, the latter figure representing 17.4% of the non-elderly population. The interaction between the labor market and health insurance in a scenario of rising health care costs is also harmful to labor productivity, since a number of employers hire workers as part-time or contract employees in order to reduce health insurance expenses. Similarly, many workers decide not to move to a job that seems a better match in terms of total productivity but does not offer health insurance. Therefore, a better understanding of the impact of employer-based health insurance on labor market outcomes seems fundamental to estimating the real cost of the US health insurance system.

In this paper, we present a second channel through which health insurance impacts productivity. By offering health insurance, employers reduce employees' expected time out of work in two ways: by reducing the probability a worker gets sick (preventive medicine) and/or increasing the probability a worker recovers from illness (curative medicine). This productivity cost was estimated to be substantial. In 2003, 69 million workers missed a total of 407 million days of work due to illness. This is equivalent to a loss in output of $48 billion, if we value their missed work time at their actual wages ( Davis et al. [10]).[1] Our empirical results using data from the Medical Expenditure Panel Survey (MEPS) show that an insured worker misses on average 76.54% fewer workdays in a 2-year period than an uninsured worker, resulting in 5.5 more workdays in a year.[2] This reduction in missed workdays implies not only that any given worker becomes a more valuable asset for the firm, but also that fewer sick days reduce the firm's expenses in paid leaves for ill absent workers.

We develop an on-the-job search model that embodies this impact of health coverage in productivity through fewer sick days. In our model, employers decide not only which wages to offer, but also whether to offer a health care option to their employees. Offering health insurance has an impact on the probability that a worker gets sick, misses workdays, recovers, and returns to

---

[1] More medical care consumption was shown to reduce the number of missed workdays due to illness. Stratman [39] shows that the productivity effect of doctor visits is substantial for all conditions analyzed. For example, individuals with influenza can cut work loss by 2.5 days and those with chronic asthma can cut work loss by 7 days by visiting a physician.

[2] As usual, we controlled for observables and endogeneity.

work. Through this framework, we match several features empirically observed in the connection between labor market and health insurance coverage. For example, in our model, companies that offer health insurance will be larger in equilibrium as well as offer a higher wage. The reason for higher wages is derived from the productivity boost of health insurance; once employees are working more in expected terms, losing a worker becomes more costly for a firm. In order to avoid workers accepting outside offers, firms offering health insurance pay higher wages. This positive relation between health coverage and wages is also corroborated by our empirical findings with the MEPS. More specifically, according to our empirical results, increases in firm size and wage earned are positively related to the probability of a worker having health insurance coverage. Surprisingly, these labor-related variables are more important predictors of health coverage than health characteristics, such as health habits or addictions.

Once we calibrate the model using US data for 2004, we evaluate the impact of a series of policy changes in the health insurance sector on labor market outcomes. We find that a reduction in health insurance tax subsidies from 35% - as estimated by Gruber [19] - to 31.5% generates a reduction in the share of firms providing health insurance from 59% to 40%. Once fewer firms offer insurance, the share of covered workers drops by 5.42%, while the fraction of sick workers goes up by 13.96%. We also show that a 10% increase in health insurance premiums reduces the proportion of workers with health coverage by 15.43%, increasing the number of workers sick in steady state by 39.64%. In addition, we consider a scenario in which the government mandates that all firms provide health insurance. We show that a mandate reduces firms' aggregate profit but increases previously uninsured workers' utility, while the total welfare effect is positive. Finally, we consider the difference in impact of improvements on preventive versus curative care. We compare the case of a governmental investment in medical research that makes preventive methods 10% more efficient to the case in which such an investment is made to improve curative methods (which also become 10% more efficient). Our results show that, although both medical advances have positive impact, choosing to invest in preventive instead of curative care generates a slightly higher gain in labor force's health coverage and consequently a reduction in the number of sick workers in steady state. Keep in mind that in this exercise we did not take into account potential differences in costs of implementing such advances, that may be considerable.

The next section discusses the related literature. Section 3 describes the data, while section 4 describes our econometric specifications. Section 5 presents empirical results to motivate the model's

main hypothesis, which is the positive effect of holding health insurance on worker productivity. Section 6 describes the model while section 7 presents comparative statistics and policy experiments. Finally, section 8 concludes the paper.

## 2. Related Literature

Many scholars have attempted to explain the predominance of employer-provided health insurance in the United States. There are two current leading explanations for this phenomenon. The first explanation has to do with the U.S. tax system, in which firms receive a tax benefit when they provide nondiscriminatory health insurance to their employees. Gruber and Poterba [22] estimated that the tax-induced reduction in the "price" of employer-provided health insurance is about 27% on average. Woodbury and Huang [43], Gruber and Poterba [21], and Gentry and Peress [16] concluded that taxes are an important factor in the provision of fringe benefits, although, not surprisingly, there is a wide range in the magnitude of the impact of taxes on fringe benefits. The second explanation is the cost advantage that employers gain by reducing adverse selection and lowering administrative expenses through pooling. Together these two factors reduce the cost of providing insurance in large firms relative to small groups. Brown et al. [3] and Brugemann and Manovskii [4] hypothesized these factors as the reasons why large firms are much more likely to offer health insurance than smaller ones.

Regarding the effect of health insurance provision on wages, the empirical literature is inconclusive. The conflicting evidence highlights the difficulty associated with isolating the impact of health insurance on labor market outcomes. In principle, we should expect that employees pay for the cost of employer-provided health insurance through lower wages. Similar to general human capital, health remains in possession of the worker as he moves from one job to another, so employers are unable to recover an investment in employees' health. Surprisingly, Monheit et al. [28] estimated a positive relationship between the two. However, their result does not seem to be robust since Gruber [18], Gruber and Krueger [20], and Eberts and Stone [13], using different datasets and methods, found that most of the cost of the benefit is reflected in lower wages.[3] A problem with these studies, addressed by subsequent research, is the possible endogenous relationship between

---

[3]Gruber [18] uses statewide variation in mandated maternity benefits, Gruber and Krueger [20] employs industry and state variation in the cost of worker's compensation insurance, and Eberts and Stone [13] relies on school district variation in health insurance costs to estimate the manner in which wages are negatively affected by health insurance provision.

health provision and wages. This endogeneity comes from the fact that workers may choose to invest in health through insurance coverage and health habits, knowing that healthier individuals are more productive and obtain higher wages. Several scholars attempted to handle this problem by looking for instrumental variables to obtain a more accurate measure of the health-wage relationship. Leibowitz [24] used health insurance expenditures as an instrumental variable; she used the RAND Health Insurance Study (RHIS) to estimate the wage/fringe benefit trade-off. The RHIS is considered an "ideal" database to test this trade-off, as it is an individual-level database that includes human capital variables that may be used as controls for ability as well as information about individual health insurance expenses.[4,5] Using this "ideal" dataset, Leibowitz [24] estimated that employer health insurance expenditures had a positive effect on wages.

In relation to our empirical analysis, there is a small literature covering similar questions on the impact of employer-provided health coverage on workers' productivity. This literature's findings have been mixed. Lofland and Frick [25], using the same database examined in our study but with older waves, found that workers who held health insurance were 17% less likely to miss any workdays due illness, and when they did miss such days, they missed a smaller number of workdays. Using the 1987 National Medical Expenditure Survey (NMES), Gilleskie [17] found that, on average, full insurance coverage decreased the probability of missing work due illness by 9% and it reduced the number of illness-related absences by 1.7 days per year. On the other hand, there are a few studies which arrive at different conclusions. A recent paper by Xu and Jensen [44], using a sample of the 2004-2006 Health and Retirement Study (HRS), analyzed the impact of holding health insurance on absenteeism among older workers. They found no significant difference in the probability of missing work due to illness between insured and uninsured workers. Finally, Vistnes [42], using the 1987 NMES, found that insurance actually increased absenteeism slightly. Our econometric specifications use similar explanatory variables to these studies, but our analysis differs from theirs in a significant way. First, we use a newer and a lot larger database. Second, our estimation methods take into account the potential selection bias, in which individuals with unobserved health and/or other characteristics that affect absenteeism may also be more likely to look for jobs with health insurance coverage. We find a negative and considerably larger impact of health insurance

---

[4]This database is also known as the RAND Health Insurance Experiment (RHIE).

[5]RAND contacted employers to obtain information on employer health insurance expenditures before survey respondents were enrolled in the study.

on absenteeism than the observed in the previous literature.

In spite of the vast empirical literature on this subject, few theoretical models explain these empirical findings. In the last few years some papers attempted to address this literature gap. Brugemann and Manovskii [4] developed a quantitative equilibrium model that uses tax-deductibility of employer-provided coverage, non-discriminatory restrictions, and the fixed cost of coverage to understand labor market flows and explain why smaller firms are less likely to provide coverage than large firms. Dey and Flinn [11] presented an equilibrium model of health insurance provision and wage determination by firms. They investigated the effect of employer-provided health insurance on job mobility rates and economic welfare using an on-the-job search model with Nash-bargaining. They found an equilibrium in which not all employment matches are covered by health insurance and wages at jobs providing health insurance are larger (in a stochastic sense) than those at jobs without health insurance. Moreover, for any given wage rate, workers at jobs with health insurance are less likely to leave those jobs. They also found that the employer-provided health insurance system does not lead to any serious inefficiency in mobility decisions. Finally, Fang and Gavazza [14] developed a frictional labor market model in which they show that an employment-based health system fails to internalize the entire surplus generated by health investment, which leads to dynamic inefficiencies.

Our paper is different from the previous papers in several ways. Unlike Brugemann and Manovskii [4], we develop a model of homogeneous firms, generating differences in productivity endogenously through firms' health insurance provision decisions. Therefore, our result remains valid even if firms do not have different costs of providing coverage. Our model also delivers the results without the presence of adverse selection, which is fundamental for Brugemann and Manovskii's model even though they found no empirical evidence to support it. Our model differs from Dey and Flinn's in two ways. First, we do not assume that firms that do not offer health coverage necessarily have a larger exogenous job destruction rate. Therefore, our model takes into account not only the productivity impact of large negative health shocks but also the impact of milder ones, which do not necessarily induce job destruction.[6] This approach not only is more general, but also allows us to evaluate the impact of changes or advances in medical treatment - more specifically, investments

---

[6]In their model, even though diseases imply job destruction, they do not impact workers' future productivity and/or employability. These assumptions seem contradictory, once job destructing diseases or injuries are usually related to chronic or permanent states.

in curative versus preventive medicine on productivity, as well as the impact of the provision of health insurance on absenteeism and firms' costs in paid leaves. Second, unlike Dey and Flinn [11], we take into account the impact of taxes on health insurance provision, so we are able to measure the impact of changes in the tax treatment of health insurance expenses on labor market variables.

### 3. Data and Summary Statistic

The data used for this paper come from the Household Component of the Medical Expenditure Panel Survey (MEPS). The MEPS-HC is a nationally representative survey of the U.S. civilian non-institutionalized population. The MEPS-HC collects data from a sample of households through an overlapping panel design. Every year a new sample of households is selected to compose a new panel. Five rounds of interviews take place over a two-year period to collect the panel data. The purpose of this design is to provide continuous and current estimates of health care expenditures at both the individual and household levels for two panels for each calendar year. Since we are interested in the data's panel structure, we use MEPS-HC's longitudinal files, focusing on the subset of workers that were interviewed throughout the five survey rounds. In this sense, we can take into account potential changes in the health coverage status and their impact on health status and labor productivity, while controlling for workers' unobservable characteristics.

The data used in this paper were collected from 2000 to 2012, i.e., we are using information from Panel 5 to Panel 16. A total of 192,291 individuals were interviewed about demographic characteristics, health conditions, health status, access to care, satisfaction with care, health insurance coverage, income, and employment.[7] Our main focus here is estimating the impact of health insurance on missing workdays for people receiving coverage through employment. Therefore, we only consider employed workers ages 18 to 64 that are part of the labor force and who do not receive health insurance through sources other than their employers. Consequently, we do not consider individuals that are out of the labor force for part or all the period cover by the panel.[8] We also do not consider workers that are unemployed for part or all the period covered by the panel for

---

[7]The MEPS sampling frame reflects an oversample of minority groups such as blacks, asians, and hispanics. MEPS also oversamples additional policy relevant sub-groups such as low income households. Following the approach suggested by Solon et al. [35], we redid our analysis using data adjusted by the sampling weights provided by MEPS. Our results were qualitatively the same, indicating that our analysis does not suffer from econometric mispecification. We present the weighted results in an on line appendix.

[8]Retirees, full-time students, housewives, etc.

most of our analysis. However, we will take into account unemployed workers in order to calibrate our job destruction rates for healthy and sick workers in section 7. We also disregard workers that did not answer questions at one or more of the five interview rounds or to whom there are missing observations in one of the key variables for our analysis, described in Table A.1 in the appendix. Finally, since we use geographical variations as instrumental variables in our analysis, in most of our discussion we disregard individuals that have moved from one census region to another within the 2-year period covered by the panel. After we adjust the sample to fit these requirements, 25,171 workers stay in our benchmark analysis. Due to the fact that job changes may affect a worker's decision of missing a workday, we also consider the subsample of workers that stayed in the same job throughout the period covered by the panel. We highlight whenever this is the case in our discussions of the results.

Our measure of missing work is the number of missing workdays due to illness. According to MEPS, they ask respondents to "include any time when this (missed workdays) occurred because of (PERSON)'s physical illness or injury, or a mental or emotional problem such as stress or depression". Consequently, we are not taking into account missing days due to caring for others (sick children or parents) which may bias the results across gender or income levels. Moreover, we also avoid issues about worker productivity while sick – since we focus on missed workdays, the worker's productivity for a missed workday is certainly zero.[9]

Summary statistics for explanatory variables are presented in Table 1. A detailed description of our variables is in Table A.1 in Appendix A. The calculations in Table 1 and in most of our analysis with instrumental variables are based on a two-year period. In the MEPS, interview rounds 1 and 2 are fully contained in panel's year 1, while interview rounds 4 and 5 are fully contained in panel's year 2. Round 3 usually starts in year 1 and ends in year 2. Although some of the variables that we use are calculated based on annual observations, other key variables – including number of workdays missed and health insurance status – are presented at the round level. In order to avoid approximations, in particular by dividing the number of missed workdays in round 3 across years 1 and 2, and due to the fact that rounds have uneven length both across and within workers'

---

[9]MEPS also includes a variable for workdays missed staying in bed, which imply a more serious condition. Unfortunately, in the longitudinal files this variable is missing for most of our sample. As a consequence, we do not include this variable in the current version. In previous versions using the annual data files we obtained similar results to the ones with number of missing workdays.

observations, we preferred to work with the total number of missed workdays in the 2 years of the panel. As a result, for the calculations in Table 1, as well as for the I.V. exercise, we only consider workers that kept their health insurance status throughout the period. Once we discuss our results that take into account the panel structure of the data, we also take into account workers that changed their health insurance coverage status. In Table 3 we show how often these changes occur.

As you can see in Table 1, our health measures include Physical Component Summary (PCS) scores, as well as some objective measures of health, such as dummies for smoke habits, diabetes, and obesity. The PCS score, a self-reported measure of overall health regularly used in health economics, is formed from the answers to the Short-Form 12 questions. The higher the PCS score, the healthier the individual reports to be. We also include a measure of whether the individual currently holds health insurance. Our health coverage indicator is obtained from MEPS' variable HELD$i$X, where $i$ stands for the interview round. Demographic variables include age, gender, race, ethnicity, marital status, family size, and years of education. Economic variables include whether or not the individual is part of a union, real income at year 2000 dollars, whether paid sick leave is offered to the individual, the employer's industry – which comprises of 14 dummies based on employer's industry group – and firm size. Finally, in order to account for the endogeneity problem of health insurance, we use dummies for census region of residence as instrument variables for the probability of holding health insurance coverage. Details about the instrumental variables will be discussed in the next section.[10]

Notice that workers in our sample are older, more educated, and wealthier than in the average population. However, this is due to the requirements imposed in our sample – staying employed throughout the panel period, staying within the same census region – instead of a sampling bias from MEPS. An easy way to arrive to this conclusion it is to simply compare the values in Table 1 to the ones in Table A.2 that looks at the database adjusted for sampling weights. From the comparison, we can see that MEPS sampling design oversamples hispanic workers and workers in the South, but apart from that mean values are very close to the ones from the unweighted sample.

---

[10]In previous versions we also used instruments variables derived from questions about how the individual values health insurance, if they believed they did not need health insurance (ADINSA), if they thought that health insurance was not worth cost (ADINSB), and if they believed that they could overcome ills without medical help (ADOVER). Since results were qualitatively similar they were ommitted.

Since our analysis uses geographical variation on health insurance coverage, it is interesting to look at the differences in descriptive statistics for the relevant variables across the census regions. Tables 2.1 and 2.2 present the results. Table 2.1 shows how the sample of 25,171 individuals is divided across regions, as well as how the workers within each region are divided between insured and uninsured. Notice that, although the proportion of uninsured seems similar across regions, two-sample proportion tests show that the proportion of insured workers is higher in the Midwest and Northeast, compared to the South and West at the 1% statistical level. In terms of the other explanatory variables, Table 2.2 shows that workers in the South are less likely to be unionized, more likely to come from a minority group, have on average lower income, worse overall health, and are more likely to be employed at a smaller firm with a blue collar occupation. In fact, based on t-tests, we can also show that firms are larger in the northeastern and midwestern areas.

Finally, we must move beyond the analysis with a period length of two years to take advantage of MEPS' panel structure in order to control for fixed unobserved worker characteristics. An important problem in this case is that MEPS' rounds have different lengths – both across workers and across different rounds for a given worker. As presented by Millimet and McDonough [27], estimators based on standard methods for panel data with fixed effects are inconsistent and perform quite poorly in finite samples in the presence of irregularly spaced data.[11] In order to avoid this problem, we need to adjust the variables in order to work with an evenly spaced, annual panel data. We do this by splitting the number of missed workdays in the 3rd. round across years 1 and 2 based on the fraction of round 3 within each of these years. Moreover, we consider that a worker has health insurance coverage if he keeps membership for most of the year.[12] Once we implement these adjustments, we are able to specify variables such as Panel-HI that equals one if the worker had health coverage for most of the months in a given year. Based on this variable, we can see how often a worker gains or loses coverage. In Table 3, we show how health insurance status changes between years 1 and 2 for workers that do not change jobs, i.e., for worker that the change in health status happens due to changes in the firm's compensation policy. In Table A.3 in appendix A we consider the change in health insurance coverage for the overall sample.

As we can see, there is still enough variation in the health coverage status across panel years, even

---

[11]Inconsistency happens due to the fact that typical transformations no longer eliminate the time invariant, observation-specific unobserved effect.

[12]Similar argument is made for union membership and paid sick leave.

when we focus on workers that stay in the same job throughout the 2-year period. Moreover, once we compare the values in Table 3 and Table A.3 in Appendix A, we see that most of the transitions across health insurance coverage status are due to changes in firms' compensation policy instead of workers moving across firms with different coverages.

## 4. Econometric Specification

This section tests the crucial hypothesis implicitly assumed throughout our paper, which is: If a worker holds health coverage, then he on average misses fewer workdays due to illness than an uninsured worker with similar characteristics. The decision to miss a workday can be treated within the random utility framework used in binary choice models.[13] Denote by $U_0$ the utility of not missing a workday while sick and by $U_1$ the utility of missing a workday. Both $U_0$ and $U_1$ are latent variables. Let:

$$U_{1i} = \mathbf{x}_i'\beta_1 + \varepsilon_{1i}, \tag{1}$$

$$U_{0i} = \mathbf{x}_i'\beta_0 + \varepsilon_{0i}, \tag{2}$$

where $\mathbf{x}_i$ is a vector of individual attributes, and $\varepsilon_{1i}$ and $\varepsilon_{0i}$ are random errors. Then, for the individual that misses a workday, we have that:

$$U_{1i} > U_{0i} \Rightarrow \varepsilon_{0i} - \varepsilon_{1i} < \mathbf{x}_i'(\beta_1 - \beta_0) \tag{3}$$

Individual $i$ misses a workday when $U_{1i} > U_{0i}$, and we then observe $y_i = 1$; otherwise, we observe $y_i = 0$. The probability of $y_i = 1$, denoted $\pi_i$, is given by $\Pr\left[\varepsilon_{0i} - \varepsilon_{1i} < \mathbf{x}_i'(\beta_1 - \beta_0)\right]$. Thus, the probability of the decision to miss a workday is characterized by the standard binary outcome model.

Now consider repeated events of the same kind. If the events are independent and there is a fixed number $N$ of repetitions, the event distribution is a binomial $B[N, p]$. Suppose then that $N$ is random and follows the Poisson distribution. By the application of the Poisson-stopped binomial result, the distribution of the number of successes will be Poisson distributed.[14] This argument justifies the framework of count data models for the study of repeated events based on event counts

---

[13]Our discussion here is based on the work by Cameron and Trivedi [8].

[14]Let $n$ be the true count process taking nonnegative integer values with $E[n] = \mu$ and $Var(n) = \sigma^2$. Let $B_1$, $B_2$, ..., $B_n$ be a sequence of $n$ independent and identically distributed Bernoulli trials, in which each $B_j$ takes one of only two values, 1 or 0, with probabilities $\pi$ and $1 - \pi$, respectively. Define the count variable $Y = \sum_{i=1}^{n} B_i$. For

(for more details, please see Cameron and Trivedi [8]).

Notice that the above assertion is an application of a known argument used to justify the framework of count data models for the study of medical care utilization based on event counts. Here a missed workday is treated in the same way as a doctor consultation.

This model can be generalized in a straightforward manner to allow for overdispersion, a common problem in applied work. There are two potential sources for overdispersion – unobserved heterogeneity and correlated events. The idea behind unobserved heterogeneity is that there are unobserved characteristics about patients that make some more prone to need more medical care than others. Similarly, the idea behind correlated events is that going to the doctor once may change the likelihood of follow-up visits. Even though these two sources of overdispersion have different economic reasonings, they can both be addressed by the same econometric model, a negative binomial.[15] In order to explain the negative binomial specification, let's consider the correlated-events source of overdispersion. In this case, we ease the assumption that the events are independent, i.e., we assume that the event distribution is a correlated binomial CB[N,$\pi$,$\alpha$] that assumes that any pair of events $(B_i, B_j)$, $i \neq j$, have covariance $\alpha\pi(1-\pi)$, $0 \leq \alpha < 1$.[16] Assuming a random number of events $N \to \infty$ in a given period and $\pi \to 0$ while $n\pi = \mu$, the CB[N,$\pi$,$\alpha$] model generates the *correlated Poisson* model denoted CP[$\mu(1-\alpha), (1-\alpha)(\mu + \alpha\mu^2)$], where the arguments are, respectively, the mean and the variance of the CP model. However, the mean-variance ratio is the same as the one for the negative binomial model NB2, so we can use the NB2 model to control for this type of overdispersion. We present our results for the Negative Binomial case in section 5.

---

$n$ given, $Y$ follows a binomial distribution with parameters $n$ and $\pi$. Hence:

$$
\begin{aligned}
E[Y] &= \mu\pi \\
Var[Y] &= (\sigma^2 - \mu)\pi^2 + \mu\pi
\end{aligned}
$$

The actual distribution of $Y$ depends on the distribution of $n$. For Poisson-distributed $n$ it can be found using the following result, called the Poisson-stopped binomial:

*If $\pi$ is the probability that $B_i = 1, i = 1, ..., n$, and $1 - \pi$ the probability that $B_i = 0$, and $n \sim Poiss[n]$, then $Y \sim Poiss[\mu\pi]$.*

**Proof:** See Cameron and Trivedi [8], Chapter 1, sec. 1.1.4.

[15]For details, see Cameron and Trivedi [8], chapter 4.

[16]So all pairs have constant correlation $\alpha$

*4.1. Estimation Procedure*

In order to evaluate the impact of health coverage on workdays missed, we must account for the possible endogeneity of health insurance provision. Even though we control for health status, both using self-reported health assessment and dummies for medical problems, it is likely that there are still unobserved variations in health status that may affect both the demand for medical treatment as well as the expected number of missed workdays. As discussed by Sheiner [33], available health measures may not capture the severity of illness or the presence of multiple chronic conditions. Even more, our measures are static, indicating worker's current medical conditions. However, the demand for medical care and the likelihood of missed workdays may depend on a time series of health issues. For example, although sick patients are usually thin, long periods of obesity in the past may contribute for poor health in ways that are hard to capture by objective health status measures. Similarly, the cost and severity of diabetes depend on when a person first acquired the disease (see Sheiner [33]). However, even though this additional information about the worker's overall health condition is unavailable to researchers, it is likely to be known by workers and possibly current and potential employers. This knowledge may affect the likelihood that a worker seeks and is offered health insurance coverage. This potential sorting on health coverage based on unobserved health status may bias our analysis. On one hand, health insurance may be offered only to healthy people, who naturally miss fewer workdays. If this is the case, not taking into account the endogenous nature of health insurance would wrongly lead to the conclusion that health insurance reduces the number of missed workdays even if health insurance has no impact on productivity. On the other hand, people with poor health may prefer jobs that offer health insurance. If health status is only partially observed by employers, we may have a situation in which workers with poor health self select into jobs with health coverage. In this case, even if health insurance improves workers overall health and productivity, as long as these sicker workers are still more prone to miss workdays, we would obtain a wrong negative impact of health insurance.[17]

We offer here two alternative methods to address this potential bias selection. First, we use the two-stage residual inclusion approach (2SRI) suggested by Terza et al. [41], which follows the **control function approach** (see details at Navarro [30]). In order to test the robustness of our

---

[17]A similar result is obtained from a simple regression of health status on doctor visits. Since most people only go to the doctor when they are sick, the coefficient of doctor visits would be negative and we would wrongly conclude that going to the doctor makes you sicker.

results, we also propose a Poisson estimation with fixed effects using the data's panel structure. We describe the two methods in more detail below.[18]

Let $m_i$ denote the number of workdays missed. We are assuming that $m_i$ follows a Poisson distribution. We know that:

$$\mu_i = E(m_i|h_i, x_i, u_i) = exp(\beta_1 h_i + x'_{1i}\beta_2 + u_i) \qquad (4)$$

Assume that the error term $u_i$ is correlated with the dummy variable $h_i$, which is equal to 1 when a worker holds health insurance and 0 otherwise. We also assume that the error term $u_i$ is uncorrelated with $x_i$, which is a vector of exogenous regressors.

In order to solve this endogeneity problem, we need to find instruments for the health insurance variable $h_i$. Hence, we specify an OLS equation with robust standard errors[19] for variable $h_i$ :

$$h_i = x'_{2i}\gamma + \varepsilon_i \qquad (5)$$

where $x_{2i}$ is a vector which may include variables which affect workdays missed, but $x_{2i}$ also contains variables which affect the probability of holding health insurance while only affecting workdays missed through $h_i$. Similarly to the linear case, a condition for a robust identification of (4) is that there is at least one valid excluded variable (instrument).

We also assume that there is a common latent factor $\varepsilon$ which affects both $h_i$ and $m_i$ and is the only source of dependence between them, after controlling for the influence of the observable variables $x_1$ and $x_2$. We can model this assumption as follows:

$$u_i = \rho\varepsilon_i + v_i \qquad (6)$$

where $v_i$ is independent of $\varepsilon_i$, $v_i$ is i.i.d., and $E[e^{v_i}] = $ constant.

Using this additional assumption, it is possible to show that:

$$\mu_i = E(m_i|h_i, x_i, \varepsilon_i) = exp(\beta_1 h_i + x'_{1i}\beta_2 + \rho\varepsilon_i) \times E(e^{v_i}) \qquad (7)$$

---

[18]Our exposition partially follows Cameron and Trivedi [7].

[19]A similar specification with a probit 1st. stage regression is also available. In the case of a probit, the first stage regression is represented by:

$$h_i = \Phi\left(x'_{2i}\gamma\right) + \varepsilon_i$$

If $\varepsilon_i$ were observable, we could just include it as an additional regressor and this would solve the endogeneity problem. Since we cannot observe it, we replace it with a consistent estimate. Therefore, the first step of our estimation is to estimate (5) and obtain the residuals $\hat{e}_i$. Then we estimate the parameters of the Poisson given in (7) by replacing $\varepsilon_i$ by $\hat{e}_i$.

We use regional dummies as instrumental variables for health insurance. As we showed in the previous section, there are statistically significant differences in health insurance coverage across US census regions, even within the group of workers that stayed at the same job throughout the 2-year period. Although most of the literature on geographical variation of health costs has focused on the Medicare patients, there is a small and growing literature that looks at private markets' costs (see Philipson et al. [31], McKellar et al. [26], and Dunn et al. [12], among others). These papers find significant geographical variation in the cost of medical procedures as well as health insurance premium. This variation is mostly related to market forces in the medical and health insurance sectors. In particular, the degree of concentration among health providers (doctors and hospitals) as well as the degree of fragmentation in the insurer's market seem to play an important role explaining this geographical variation, although even medical standard practices for a given disease's treatment seem to have a strong regional component (see Staiger [36]). Considering that the insurance cost is an important variable to determine if a employer offers health insurance, as well as if a worker looks for an insured position, we expect that differences in costs of procedures affect the likelihood that a worker obtain health insurance.[20] However, these differences are less likely to affect directly the number of workdays the employee misses. Once a worker has health insurance, her demand for health treatment becomes quite inelastic to price changes. Similarly, due to the high cost of medical procedures on average across the U.S., uninsured tend to avoid treatment in most cases, no matter which region she lives in. In fact, we tested the joint exogeneity of the instruments by performing a J-test for overidentifying restrictions. Although we understand the weaknesses of the approach – since the J-test depends on the assumption that at least one of the instruments is exogenous – the fact that both the test and our economic intuition point in the same direction gives us more confidence in these instruments.[21] Finally, we performance an

---

[20]In terms of direct measures cost of health insurance, unfortunately MEPS-HC does not include variables on the cost of health insurance for employers and employees. Detailed information on Insurance costs for workers and firms is available only through the Insurance component part of MEPS – MEPS-IC – which is only accessible in one of their data centers.

[21]In previous versions we run a regression using regional variables as explanatory variables in the second step

F-test to evaluate if our instruments are *weak*.[22] The test proposes a joint test of the first-stage regression coefficients for the instruments. If the F statistic is larger than 10, then the instruments are considered valid. Our F-statistic for the instrumental variables in the first stage regression is 31.67, which comfortably surpasses the test threshold.

As an alternative to the 2SRI method, we can use the panel design of the MEPS to deal with the constant unobserved variable problem. There are strong reasons to believe that the major omitted variables that could affect our estimation – unobserved health status affecting insurance coverage decisions as well as risk preferences – are unchanged from one year to the next. This makes the Poisson fixed effects estimation a quite suitable method to estimate the effect of health insurance on absenteeism.

The starting point is the Poisson regression model with exponential conditional mean and multiplicative individual-specific term:

$$y_{it} \sim Poiss\left[\exp\left(\ln \alpha_i + \boldsymbol{x}_{it}'\beta\right)\right] \tag{8}$$

where $Poiss\left[\cdot\right]$ is a Poisson distribution.

We consider a short panel with $T$ small and $n \to \infty$. The fixed effect model allows consistent estimates of betas if the regressors are correlated only with the time-invariant component of the error $\alpha_i$. In our specific case, it allows consistent estimation of the impact of having health insurance on the days lost from work due to illness even when unobservable variables, such as risk preferences or health status, are correlated to the decision of having health insurance.

## 5. Results

In this section we present our empirical results for both our cross-section model with region dummy variables as instruments as well as the results for a Poisson fixed effects panel model that would also take into account the workers' transition around health coverage status across the 2-year period.

Table 4 reports the results for our I.V. approach. We present the results for the 2nd. stage

---

regression, controlling for the individual health status among other variables. We found that the regional dummies are uncorrelated with the number of missed workdays. Due to the potential econometric issues with this approach, we omitted this result in the current version.

[22]For more details on weak instruments' tests, see Stock and Watson [37], chapter 12, and Stock et al. [38].

of Poisson and Negative Binomial approaches – first-stage results are presented in Table A.4 in Appendix A – as well as results for a GMM model, as suggested by Cameron and Trivedi [8]. All standard error estimates are robust.[23] Results also include controls for time and industry – panel and industry dummies – but we omit their coefficients for brevity.

Before we start discussing the empirical results, it is important to notice that the coefficient assigned for residuals is positive and significant, indicating that our data is characterized by endogeneity.[24,25] The positive coefficient for the residuals indicates that latent factors that increase the probability that an individual has health coverage also increase the number of missed workdays – an effect consistent with adverse selection.[26]

We are interested in the *Health Insurance* coefficient, which describes the influence of holding a health insurance plan on the number of workdays an employee misses due to illness. Given our specification, if the *Health Insurance* coefficient is negative, then a worker who holds health insurance misses fewer workdays. The impact of health insurance on workdays missed is quantitatively substantial, representing a reduction of 76.54% in the expected number of workdays missed, measured based on average marginal effects (AME). Thus, our empirical results support our paper's main hypothesis, and workers who hold health insurance are less often absent and, consequently, more productive.

Most of the coefficients of other explanatory variables have the expected sign or are not statistically significant in the 2nd. stage count regression. For brevity's sake, we discuss just a few of them here. The self-reported health status has a negative and significant coefficient in all specifications, indicating that a healthier worker misses fewer workdays. Obese and diabetic workers, as well as smokers, are more likely to miss more workdays. Being a member of a union or working for a large company increase the number of workdays missed, the last result corroborating previous research by Barmby and Stephen [1]. In terms of demographic variables, we observe that younger workers, male worker, and workers with larger families miss fewer workdays.[27] The *Paid Leave* coefficient

---

[23]We use the bootstrap method to control for the first stage estimation of $\hat{e}_i$, as well as overdispersion.

[24]Following a robust Wald test based on its $z$-statistic.

[25]If we do not control for the endogeneity of health insurance, the coefficient for having health insurance in the Poisson regression is wrongly positive and significant as we present in a table in our on line appendix.

[26]The data also show signs of overdispersion, since the parameter alpha at the negative binomial estimation is always positive and statistically different from zero. However, since we are mainly concerned with averages, the presence of overdispersion does not affect our results in any significant way, as we can see once the results for the negative binomial and Poisson models are quite similar.

[27]MEPS also asks if a worker misses a workday because he or she needs to take care of a sick relative. Therefore,

is positive, an expected sign since paid sick leaves reduce the cost of missing a workday, a result also observed in previous research on absenteeism. We also include other controls, such as dummy variables indicating industry and panel, which we are omitting for brevity. Finally, we perform a test of overidentifying restrictions. Our Hansen's J $\chi^2(2) = 2.44$ and the p-value is 0.295. Consequently, we do not reject the null hypothesis and conclude that the overidentifying restrictions are valid.

The results for the 1st. stage are presented in Table A.4 in the appendix. Most of the explanatory variables have coefficients with the expected sign. Workers with higher income, working for larger firms, and union members are more likely to have health insurance coverage. Even more, firms that offer paid sick leave are more likely to offer health insurance coverage. In terms of worker characteristics, older male workers are more likely to have health insurance coverage, while workers with larger families are less likely to have coverage. In terms of the our regional instrument variables, we observe that workers in the Northeastern, Midwestern, and Western regions are less likely to have health insurance compared to workers in the South. Although this seems contradictory to what should be expected, notice that this is conditional on workers holding a job continuously for a 2-year period and we are already taking into account worker and job characteristics. In terms of the strength of the instrumental variables, we jointly test the significance of the regional variables coefficients and obtain a F-statistic of 31.67, which is well above the rule of thumb of 10, indicating that these are not weak instruments.

Finally, in order to further control for unobserved characteristics that may bias our results, we exploit the panel structure of the data and run a Poisson panel with fixed effects. In Table 5, we present our results for workers that did not change jobs within the 2-year period that comprises the panel. We specify the variable Panel-HI that equals one if the worker had health coverage for most of the months in a given year.[28]

Results are qualitatively similar to the ones observed before, although the magnitude of the

---

the results showed here are only related to days missed due to worker's own sickness.

[28] As mentioned before, the variables HELDiX are round variables. Based on the survey design, we have that rounds 1 and 2 are fully contained in panel's year 1, rounds 4 and 5 are fully contained in panel's year 2, while round 3 starts in year 1 and ends in year 2. Since, as presented by Millimet and McDonough [27], estimators based on standard methods for panel data with fixed effects are inconsistent in the presence of irregularly spaced data, since typical transformations no longer eliminate the time invariant, observation-specific unobserved effect. Moreover, this inconsistency matters in practice, given that the finite sample performance of these estimators may be quite poor. In order to avoid this problem, we adjust the variables in order to work with a evenly spaced, annual panel data.

impact of holding health insurance is smaller. This reduction in magnitude is likely attributed to two potential sources. First, there is a significant reduction in sample size for the panel model. Given that we need that an individual has a change in health coverage status without a job change, our sample size drops by 18,556 observations or 9,278 individuals. Second, the two approaches are based on completely distinct samples. As we mentioned in section 3, the sample for I.V. approach considers only workers that kept their health insurance status throughout the period, while the panel exercise focus exactly on the workers that do see a change in status without a job change. In any case, workers that have gained health coverage still see a reduction in 17.87% in sick days in terms of average marginal effects and this change is significant at the 1% level. Therefore, even after controlling for all unobserved fixed effects, we conclude that having health insurance coverage reduces the expected number of missed workdays. Even more, since our panel analysis only takes into account individuals that did not change jobs, we are here capturing the effect of changes in insurance coverage without any "new job" effect that may generate a productivity boost.

## 6. Model

There is a continuum of risk neutral workers (measure $m$).[29] While unemployed, the agent receives a job offer with probability $\lambda_0$. When employed, the worker receives a job offer with probability $\lambda_1$. Once received, the offer can be accepted or rejected. There is no recall. While unemployed, the worker receives $b$ (unemployment insurance or the utility of leisure) each period. All agents discount future income at rate $r$.

We assume risk-neutral firms with measure normalized to 1. Firms offer a contract that is comprised of health insurance coverage and an hourly wage. In order to simplify the notation, we use the subscript $I$ for firms that offer health insurance and the subscript $NI$ for firms that do not offer health insurance. To offer health coverage, the firm has to pay an up-front cost $C$. Since the costs of insurance are shared by firm and worker, we allow an employee to decide if he wants coverage or not once it is offered. If yes, he has to pay a flow cost of $c_e$ per period, while the firm pays a flow cost $c_I$ per employee enrolled in the health insurance. We assume that

$$c_I < \frac{\left\{ 1 - \left[ \frac{1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)}}{1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)}} \right] \right\}}{\left[ 1 + \frac{\pi_I}{(\rho_I + \delta_S)} \right]} p.$$ This restriction guarantees that the cost of providing health insurance

---

[29] Table B.1 summarizing our notation is in Appendix B.

19

is not higher than the potential benefit of having a worker missing fewer workdays. In this sense, we avoid the trivial case in which no firm offers health insurance because it is too expensive. If the worker decides not to enroll in the health plan, nothing is paid. We do not assume that health is part of the worker's utility function, but health insurance affects the probability that a worker gets sick ($\pi$) (preventive medicine) and/or the expected time he stays sick ($\frac{1}{\rho}$). For instance, a worker who has health insurance has a lower probability of getting sick ($\pi_I$) than a worker without coverage ($\pi_{NI}$), that is, $\pi_{NI} \geq \pi_I$, as well as a higher probability of healing ($\rho_I \geq \rho_{NI}$).

The proportion of firms not offering health insurance is $\gamma_{NI}$, while the proportion of firms offering it is $\gamma_I$, these proportions being pinned down in equilibrium. We assume that the (potentially trivial) distribution of wages offered by firms providing health insurance is given by $F_I(z)$, while the distribution of wages offered by firms which do not provide it is $F_{NI}(z)$.

A sick worker receives only a $\alpha \in (0,1)$ fraction of his wage. This assumption follows data from the Bureau of Labor Statistics' National Compensation Survey (NCS) (covering March 2008), which shows that 39% of private-sector workers in the United States have no paid sick days or leave. Whenever paid leaves are available, they cover around 60% of the regular salary a worker receives. Since this value is not taxed, the amount can represent up to 80% of the regular wage. Similarly, a sick employee has a potentially higher job destruction rate ($\delta_S$) than a healthy employee ($\delta$), $\delta_S \geq \delta$. Finally, we assume that sick workers incur additional medical and disutility costs $\chi$. Since health insurance covers most costs to its members, we have $\chi_I \leq \chi_{NI}$. A diagram describing the worker's problem is depicted in Figure 1.

In the next subsection, we look at the workers' optimal decision. Subsequently, we look at the firm's optimization problem, and how firms' choice on health insurance coverage and wages depend on workers' and competitors' behavior. Finally, we discuss the steady state equilibrium. All proofs and further calculations are in the appendix.

### 6.1. Worker's Problem

From the framework outlined above, the expected discounted lifetime income when a worker is unemployed and healthy, $V_0$, can be expressed as the solution of the following equation:

$$rV_0 = b + \lambda_0 \sum_{i=NI,I} \gamma_i \int \max\{V_i(z) - V_0, 0\} \, dF_i(z) + \pi_{NI}(D_0 - V_0) \tag{9}$$

where $b$ can be seen as unemployment insurance as well as utility of leisure. A job offer arrives at a rate $\lambda_0$. A fraction $\gamma_{NI}$ of offers comes from firms that do not offer health insurance while the remainder comes from firms offering health coverage. Wages offered are seen by workers as draws from equilibrium distributions $F_i(z)$, where $i \in \{NI, I\}$.[30] $D_0$ is the value of being an unemployed sick worker. We assume that unemployed workers don't have health insurance and that the only way a worker can obtain health insurance is through his employer. This is a simplifying assumption based on the very low percentage of the working population that has private insurance.[31] It is also without loss of generality in our model, since, as we will see, firms offering wages that would lead workers to buy insurance would optimally offer health insurance. Notice that $D_0$ is given by:

$$rD_0 = b - \chi_{NI} + \rho_{NI}(V_0 - D_0) \tag{10}$$

where $\chi_{NI}$ is an additional cost of being sick without health coverage, while $\rho_{NI}$ is the probability a sick worker without coverage recovers. Rearranging the above expression and substituting it back, we have:

$$rV_0 = b + \lambda_0 \left[ \sum_{i=NI,I} \gamma_i \int_{R_U^i}^{\infty} (V_i(z) - V_0)\, dF_i(z) \right] + \pi_{NI}\left( \frac{b - \chi_{NI} - rV_0}{r + \rho_{NI}} \right) \tag{11}$$

where $R_U^I$ and $R_U^{NI}$ are the unemployed's reservation wage for working in a health-coverage company and no health-coverage company, respectively.[32]

Once a worker is employed at a firm that does not offer health insurance, the value of holding a job with wage $w$ at this company is:

$$rV_{NI}(w) = \left\{ \begin{array}{l} w + \lambda_1 \sum_{i=NI,I} \gamma_i \int_{R_{NI}^i(w)} (V_i(z) - V_{NI}(w))\, dF_i(z) \\ + \delta(V_0 - V_{NI}(w)) + \pi_{NI}(D_{NI}(w) - V_{NI}(w)) \end{array} \right\} \tag{12}$$

where $\lambda_1$ is the job offer arrival rate for employed workers. As before, a fraction $\gamma_{NI}$ of offers comes

---

[30]Using the same approach as Burdett and Mortensen [6], we initially assume that the distributions of wages, $F_i(z)$, $i \in \{NI, I\}$ are given and we focus on the optimal workers' decisions given these distributions. We also assume the distributions are well-behaved: continuous, and differentiable (e.g. no mass points). Later, we will derive these distributions and it will be trivial to show that the assumed properties hold.

[31]Most buyers of private health insurance are entrepreneurs/self-employed, a choice that is not allowed in our model.

[32]The fact that the optimal policy is a reservation policy is straightforward and standard. If one accepts wage $w_1$ as part of an optimal policy, then any wage $w_2 > w_1$ for firms that are otherwise identical, gives more utility and hence should be accepted as well.

from firms that do not offer health insurance while the remainder comes from firms offering health coverage. Offers above the reservation wage $R_{NI}^i(w)$, $i \in \{NI, I\}$ are accepted. As expected, reservation wages can differ depending on the company offering health coverage or not. A job match between a firm and a healthy worker is destroyed with probability $\delta$. Finally, a worker without health insurance gets sick with probability $\pi_{NI}$ and $D_{NI}(w)$ is the value of being sick while holding a job that pays a wage rate of $w$ at a company that does not offer health coverage. Therefore:

$$rD_{NI}(w) = \alpha w - \chi_{NI} + \rho_{NI}(V_{NI}(w) - D_{NI}(w)) + \delta_S(D_0 - D_{NI}(w)) \tag{13}$$

where $\alpha$ is the reduction in wages given by the sick leave. We will assume from here on that $\alpha \leq \frac{r+\delta_S}{r+\delta+\lambda_1}$. This inequality is a sufficient condition for workers to ask for a premium when moving from a job with health coverage to a job without coverage. As mentioned before, a worker without health insurance heals at rate $\rho_{NI}$ and a job match is destroyed with probability $\delta_S \geq \delta$ if the worker is sick.

In the case in which a firm offers health coverage, we need to take into account the worker's decision of accepting the coverage or not. Therefore, the value of holding a job at wage $w$ in a company that offers health coverage is:

$$V_I(w) = \max\{V_I(w, y), V_I(w, n)\} \tag{14}$$

where $y$ and $n$ indicate whether or not the worker accepted the coverage, respectively. But notice that $V_I(w, n) = V_{NI}(w)$. Therefore:

$$rV_I(w) = \max\{V_I(w, y); V_{NI}(w)\} \tag{15}$$

where:

$$rV_I(w, y) = \left\{ \begin{array}{c} w - c_e + \lambda_1 \sum_{i=NI,I} \gamma_i \int_{R_I^i(w)} (V_i(z) - V_I(w, y)) \, dF_i(z) \\ + \delta(V_0 - V_I(w, y)) + \pi_I(D_I(w) - V_I(w, y)) \end{array} \right\} \tag{16}$$

As mentioned before, in this case the worker pays a flow cost of $c_e$. We assume that this cost is paid even when the worker is sick, which implies that the value of being a sick worker at this company is given by:

$$rD_I(w) = \alpha w - c_e - \chi_I + \rho_I(V_I(w, y) - D_I(w)) + \delta_S(D_0 - D_I(w)) \tag{17}$$

22

Notice that a firm would only pay the up-front cost $C$ if the worker opted to buy insurance, while a worker would only buy the offered health coverage if at the offered wage $w^{\triangle}$, $V_I\left(w^{\triangle}, y\right) \geq V_{NI}\left(w^{\triangle}\right)$. In Appendix B we show that a worker buys the coverage offered if the wage received $w^{\triangle}$ is larger than a threshold $\widetilde{w}$, determined implicitly by:

$$\left[1 + \frac{\pi_I}{r + \delta_S + \rho_I}\right] c_e = \left\{ \begin{array}{c} \left(\frac{\pi_I}{r + \delta_S + \rho_I} - \frac{\pi_{NI}}{r + \delta_S + \rho_{NI}}\right)\left[\alpha\widetilde{\omega} - (r + \delta_S)\,V_{NI}\left(\widetilde{\omega}\right) + \delta_S D_0\right] \\ + \frac{\pi_{NI}}{r + \delta_S + \rho_{NI}}\chi_{NI} - \frac{\pi_I}{r + \delta_S + \rho_I}\chi_I \end{array} \right\} \quad (18)$$

We would like to emphasize that the presence of a threshold $\widetilde{w}$ for the decision of workers of buying or not health insurance does not mean that all workers are indifferent between having health coverage or not. As we discuss below, there is a positive complementarity between wages and health coverage. Therefore, any worker that earns more than $\widetilde{\omega}$ strictly prefers to have health coverage.

FINDING RESERVATION WAGES: In principle, we could consider four types of job-to-job transitions (two kinds of transition between companies of different types, two kinds between companies of the same type.). However, it is trivial that the reservation wage for transitions between jobs at firms with the same health coverage is simply the current wage, i.e.

$$R_i^i(w_i) = w_i. \quad (19)$$

When we consider the transition between different types of firms, the following simple result simplifies the problem. Keep in mind that $R_{NI}^I(y)$ is the minimum wage that a health-coverage firm needs to offer to poach a worker employed at a no-health-coverage firm currently earning $y$. Similarly, $R_I^{NI}(x)$ is the minimum wage that a no-health-coverage firm needs to offer to poach an insured worker currently receiving wage $x$.

**Lemma 1.** *Given that $V_i(w)$ is continuous and strictly increasing in $w$ for both $i = NI, I$, for a wage $x$ at a health-coverage firm, and a wage $y$ at a no-health-coverage firm, the following should hold*

$$R_{NI}^I(y) = x \iff R_I^{NI}(x) = y.[33] \quad (20)$$

*Hence, we can find a function $\omega^*\left(\cdot\right)$ that maps wages at health-coverage firms into wages at no-*

---

[33]A particular case of the result above is $R_{NI}^I\left(R_U^I\right) = R_U^{NI}$.

*health-coverage firms, such that for $y = \omega^*(x)$,*

$$R_I^{NI}(x) = \omega^*(x), \ and \ R_{NI}^I(y) = \omega^{*-1}(y) \tag{21}$$

*The function $\omega^*$ is continuous and strictly increasing.*

In Appendix C, we show that $\omega^*(w) > w$, i.e. that the function $\omega^*(\cdot)$ is above the 45 degree line. We also show that $\frac{d\omega^*(w)}{dw} > 1$ for every wage above the threshold $\widetilde{w}$. These properties not only imply that all wages can be rescaled into 'health-coverage firm equivalent' wages without loss of generality, but they also show that workers ask for a wage premium to work in a company that does not offer health coverage ($\omega^*(w) > w$) and that this premium is increasing with the current wage level ($\frac{d\omega^*(w)}{dw} > 1$).[34]

The intuition behind these results can be clearly seen in the comparison of offers that provide the same job value but differ in health coverage. Consider two job offers, $(w_I, I)$ and $(w_{NI}, NI)$, in which $w_I > \widetilde{\omega}$ is the wage offered by a firm offering health insurance, while $w_{NI}$ is the offer from a firm that does not provide health coverage. Since both jobs generate the same value for the worker, we must have that:

$$V_I(w_I, y) = V_{NI}(w_{NI}) \tag{22}$$

Rearranging it, we have:

$$w_{NI} = w_I - c_e + \left\{ \begin{array}{c} \pi_{NI} \left[ V_{NI}(w_{NI}) - D_{NI}(w_{NI}) \right] \\ -\pi_I \left[ V_I(w_I, y) - D_I(w_I) \right] \end{array} \right\} \tag{23}$$

Therefore, the wage posted by a no-health-coverage firm must compensate the worker for the increase in the expected cost of sickness, measured by the likelihood that the worker becomes sick ($\pi_i$) multiplied by the loss incurred due to the transition ($V_i(w_i) - D_i(w_i)$). Since both components are affected by health coverage ($\pi_{NI} > \pi_I$ and $V_{NI}(w_{NI}) - D_{NI}(w_{NI}) \geq V_I(w_I, y) - D_I(w_I)$) we have that, for every wage above $\widetilde{\omega}$, in order to offer the same job value, no-health-coverage firms must pay higher salaries. In other words, workers have a positive willingness to pay for health insurance and accept lower wages from firms offering health coverage.

Notice that, since $\frac{d\omega^*(w)}{dw} > 1$, the higher the job value, the higher the worker's willingness to pay

---

[34] Of course, we alternatively could rescale all health-coverage wages into no-health-coverage firm equivalents.

for health insurance through a reduction in wage, i.e., the higher the wage difference between jobs offering and not offering health coverage but providing the same job value. Therefore, there is a clear complementarity between wages and health insurance; the higher the worker's income, the more costly his sickness spells become, implying that higher-paid workers value insurance more.[35] This positive complementarity is present even though workers do not necessarily value health directly. The fact that a disease limits the agent's ability to work, implying a reduction in pay plus any additional cost during the sickness period, is sufficient to generate the result. Introducing risk aversion or any direct disutility of being unhealthy would only strengthen the result.

Since by definition $w_{NI}$ and $w_I = \omega^{*-1}(w_{NI})$ have the same utility values, we can also replace $V_{NI}(w_{NI})$ with $V_I(\omega^{*-1}(w_{NI}))$ in the integrals of the value functions (12) and (16), and integrate over the cumulative distribution of health-coverage-firm-equivalent wages in the economy, $F(z)$ (notice the absence of the subscript!), which we define as follows:

$$F(z) = \gamma_I F_I(z) + (1 - \gamma_I) F_{NI}(\omega^*(z)) \tag{24}$$

Once we make this adjustment, the only thing that matters for the worker's decision is the wage level in terms of 'health-coverage-firm-equivalent' units.

The intuition behind this result is clear. Since workers ultimately care about job values, we can rewrite the model in terms of job values posted by firms, here represented by the wage level in terms of 'health-coverage-firm-equivalent' units.

### 6.2. Firm's Problem

In this subsection, we take the behavior of workers as given and derive the firms' optimal response. Firms post wages that maximize their profits taking as given the distribution of wages posted by their competitors ($F_i(w)$, $i \in \{NI, I\}$) and the distribution of wages that healthy employed workers are currently earning at other firms, given by $G_i(w)$, $i \in \{NI, I\}$. We assume here that all distributions are stationary and well-behaved. In addition, firms decide about the provision of health insurance. If a firm offers health insurance, then it has to pay an up-front cost of $C$ and a per insured worker flow cost $c_I$. Note that firms have to pay taxes $t$ on wages, but they do not pay

---

[35]This complementarity is similar to the one presented by Pinheiro and Visschers [32] in the case of layoff risk.

taxes on health insurance coverage expenditures $C$ and $c_I$. As mentioned before, we assume that

$$c_I < \frac{\left\{ 1 - \left[ \frac{1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)}}{1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)}} \right] \right\}}{\left[ 1 + \frac{\pi_I}{(\rho_I + \delta_S)} \right]} p.$$

As we saw previously, a worker's decision depends only on whether an offer is higher in health-coverage-firm-equivalent wages. Therefore, we can construct a cumulative distribution of employed workers' equivalent-wages as follows:

$$G(w) = (1 - v_{NI}) G_I(w) + v_{NI} G_{NI}(\omega^*(w)) \tag{25}$$

where $v_{NI}$ is the proportion of healthy employed workers in no health-coverage companies.

When a firm is choosing the optimal wage level, it has to take into consideration the amount of active workers it can attract at any given wage. For this reason, before we analyze the firm's wage decision, let's derive the firm's labor force. Since derivations are the same for firms offering and not offering coverage, consider a firm of type $i \in \{NI, I\}$. Then the net inflow of healthy workers over time, given an equivalent-wage posted $w$ is:

$$\frac{dl_i(w)}{dt} = \lambda_0 u + \lambda_1 G(w)(m - u - s_e - s_u) + \rho_i d_i(w) - [\delta + \pi_i + \lambda_1(1 - F(w))] l_i(w) \tag{26}$$

where $d_i(w)$ is the amount of sick workers the firm keeps in any given period, while $u$, $s_e$, $s_u$ are the measure of healthy unemployed workers, sick employed workers and sick unemployed workers in the economy, respectively. Therefore, every period a firm receives an inflow of unemployed workers at rate $\lambda_0$, an inflow of currently employed workers at rate $\lambda_1 G(w)$, and an inflow coming from previously sick employees at rate $\rho_i$. Similarly, every period it loses workers at rate $\delta$ to unemployment, at rate $\lambda_1(1 - F(w))$ to other firms, and at rate $\pi_i$ to sickness. Since in steady state we have $\frac{dl_i(w)}{dt} = 0$, we have, after substituting $d_i(w)$:

$$l_i(w) = \frac{\lambda_0 u + \lambda_1 G(w)(m - u - s_e - s_u)}{\delta + \lambda_1(1 - F(w)) + \frac{\delta_S}{\rho_i + \delta_S} \pi_i} \tag{27}$$

where, therefore, $l_i(w)$ is the measure of healthy workers a type $i$ firm keeps in steady state.

Note that the steady state amounts of workers are different, even when equivalent wages are offered, because of different outflows into sickness. Since $\pi_{NI} \geq \pi_I$ and $\rho_I \geq \rho_{NI}$, with at least one inequality strict, $l_I > l_{NI}$ at any 'health-coverage-firm-equivalent' wage. In terms of the total amount of sick workers kept, the result is ambiguous, although we know that companies that offer

26

health coverage keep a smaller fraction of their labor force in sick leave at any period in time. As is standard in on-the-job search models, we focus on the maximization of steady state profits.[36]

PROFIT MAXIMIZATION  Every wage in distributions $F_I, F_{NI}$ must be optimal in equilibrium; this necessarily means that all wages offered by firms of the same type must yield the same profit. Thus, for a health-coverage firm's maximization, the following must be true in equilibrium

$$Profit_I = \max_w \left( p - c_I - w(1+t) \right) l_I(w) - \left[ \alpha w(1+t) - c_I \right] d_I(w) - C \tag{28}$$

given $F(w), G(w)$,

$$\text{support of } F_I(w) \subseteq \left\{ w' | w' \in \arg\max \left[ \begin{array}{c} (p - c_I - w(1+t)) \, l_I(w) \\ - \left[ \alpha(1+t)w - c_I \right] d_I(w) - C \end{array} \right] \right\}. \tag{29}$$

And, for a firm that does not offer health coverage:

$$Profit_{NI} = \max_w \left( p - \omega^*(w)(1+t) \right) l_{NI}(w) - \alpha(1+t)\omega^*(w) d_{NI}(w) \tag{30}$$

given $F(w), G(w)$,

$$\text{support of } F_{NI}(\omega^*(w)) \subseteq \left\{ \omega^*(w') | w' = \arg\max \left[ \begin{array}{c} (p - (1+t)\omega^*(w)) \, l_{NI}(w) \\ -\alpha(1+t)\omega^*(w) d_{NI}(w) \end{array} \right] \right\}. \tag{31}$$

However, we do not know yet what the distributions $F(w), F_I(w_I)$, and $F_{NI}(w_{NI})$ look like. All we know at this stage is that in the equilibrium, every equivalent-wage in the support of $F(w)$ must be offered by a firm either offering or not offering health coverage.

To construct the distributions of wages offered in equilibrium, we will need to show some additional properties of wages posted by firms that offer and do not offer health coverage. Theorem 1 will allow us not only to put additional structure on the support of wages offered by each firm type, but also to say that in this environment firms do not pay compensating differentials for higher health risks.

But before that, let us present formally the result previously mentioned that no firm that offer health-coverage will offer a wage below $\widetilde{w}$.

**Lemma 2.** *Any firm that pays the up-front cost $C$ offers a wage that induces workers to join the*

---

[36]See Coles [9] for a discussion of this focus.

27

*health insurance plan.*

Now we are ready to present the result that allows us to pin down the wage distributions.

**Theorem 1.** *Suppose that $w_I$ and $w_{NI}$ are profit-maximizing equivalent-wages offered in equilibrium by a firm providing health insurance and by a firm not providing insurance, respectively. For these wages it holds that*

$$w_I \in \arg\max_w \{(p - c_I - w(1+t))\, l_I(w) - [\alpha w(1+t) - c_I]\, d_I(w) - C\};$$
$$w_{NI} \in \arg\max_w \{(p - \omega^*(w)(1+t))\, l_{NI}(w) \quad - \alpha(1+t)\omega^*(w)\, d_{NI}(w)\}$$

*Then, we must have $w_I \geq w_{NI}$. Moreover, the sets of equivalent-wages offered by health-coverage firms, and likewise by no-health-coverage firms, are connected sets.*

This theorem shows that the compensating wage differentials demanded by the worker for an increase in health risk are not 'supplied' by the other side of the market. In the labor market equilibrium, firms that decide not to provide health insurance cannot profitably compete in wages with firms providing it, especially when the required compensating differential becomes large. The reason for this is that paying a high wage for a worker who will be uninsured is not profit maximizing, since the worker will be less productive due to sick leaves, while still receiving a fraction $\alpha$ of that high wage while sick. As a result, firms that do not offer insurance prefer to make more profit per worker and to keep this worker for a shorter period than to pay higher wage rates and risk keeping an unproductive worker for a long period of time due to sickness. Firms offering health insurance, on the other hand, pay higher wages to attract and keep the workers for a longer period since they have already invested in health insurance to keep them healthy and therefore more productive.[37] The differences in average size among firms offering and not offering health coverage are also an immediate consequence of Theorem 1. As firms with health coverage offer more attractive wages than firms with no coverage, they have a higher expected inflow of workers and a lower expected outflow, leading to a higher steady-state labor force.

---

[37]This result is similar to the one found in Fu [15] in a different context. Fu [15] have proved that in an environment with search friction, firms will pay part of the investment in General Human Capital. In the introduction we argued that we can interpret health as a kind of General Human Capital since it is valued by employers and employees take with them from job to job.

An important last remark is that since all firms are identical at the beginning of each period, they all must have the same profit, otherwise either all firms invest in health insurance or no firm invests in it. Therefore, the fraction of firms not investing in health insurance ($\gamma_{NI}$) is endogenously determined by the following equal-profit condition. For any wages $w_I$ and $w_{NI}$ offered in equilibrium by firms offering and not offering health coverage, respectively, we have:

$$
\begin{aligned}
Profit_I &= \left(p - \left[1 + \frac{\pi_I}{\rho_I + \delta_S}\right]c_I - \left[1 + \frac{\alpha\pi_I}{\rho_I + \delta_S}\right]w_I(1+t)\right)l_I(w_I) - C = \qquad (32) \\
&= \left(p - \left[1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right]w_{NI}(1+t)\right)l_{NI}(w_{NI}) = Profit_{NI}
\end{aligned}
$$

Clearly, depending on the parameters,[38] we may have three possible outcomes:

1. All firms offer health insurance;

2. No firm offers health insurance;

3. A fraction $(1 - \gamma_{NI}) \in (0, 1)$ offers health insurance.

As expected, in the next section, our discussion will focus in the third case. We are now ready to define the steady state equilibrium formally.

**Definition 1.** *A steady state equilibrium in the labor market is a tuple* $\{R_U^{NI}, \omega^*(\cdot), F_I(\cdot), F_{NI}(\cdot), G_I(\cdot), G_{NI}(\cdot), u, s_e, s_u, \gamma_{NI}\}$, *such that*

1. *Given* $\{F_I, F_{NI}\}$, $R_U^{NI}, \omega^*$ *follow from worker's optimization*

2. *Given* $\{F_I, F_{NI}, G_I, G_{NI}, u, s_e, s_u, R_U^{NI}, \omega^*\}$ *firms maximize;*

3. $G_I, G_{NI}$ *are stationary distributions, $u$ is stationary unemployment for healthy workers, $s_e$ is stationary measure of sick employees, $s_u$ is stationary measure of sick unemployed workers, given the optimal decisions of workers in 1., and firms in 2.;*

---

[38]There is no closed form solution for $\gamma_{NI}$ from the profit equalization condition. Moreover, once we substitute the other endogenous variables – $w_{NI}, w_I, l(w_{NI}), l(w_I)$ – in the profit equalization condition, the implicit function expression is too complex to allow us to sign any partial derivative of $\gamma_{NI}$ with respect to any given parameter. However, an overall intuition of the results is relatively simple. If we have $\pi_{NI}$ close to $\pi_I$ and $\rho_{NI}$ close to $\rho_I$, the benefits of holding health insurance are small. If at the same time the costs of implementing and sustaining a health plan – $C$ and $c_I$ – are high, even though offering health insurance may allow firms to poach workers more easily from competitors, we should expect that $Profit_{NI} > Profit_I$, for all $\gamma_{NI} \in [0, 1]$. A similar reasoning can be made when $\pi_{NI} >> \pi_I$ and $\rho_{NI} << \rho_I$ and costs of providing health insurance are low – in this case, we should expect all firms would offer health insurance. Finally, this discussion kept the degree of competition among firms – determined by $\lambda_1$ – constant. As $\lambda_1 \to 1$, it becomes easier and easier to poach workers from other firms. In this case, we would expect that $\gamma_{NI} \to 0$.

29

The first two items have been covered in the last two sections. Using these previously presented results, we can show 3 constructing the stationary distributions $G_I$ and $G_{NI}$ as well as the measures of unemployed and sick workers mentioned.

In Appendix D, we explicitly characterize these equilibrium distributions and outline the existence of a steady state equilibrium by construction. We will now extend the model to address the case in which firms may have heterogeneous levels of productivity.

### 6.3. Extension: Firms with different productivity levels

We now extend the model to consider the case in which there are two types of firms, 0 and 1, with $p_1 > p_0$, where $\sigma_0$ is the fraction of firms with low productivity. If a type 1 firm offers health insurance and a wage rate of $w_I$, its profit is given by:

$$\text{Profit}_{I,1}\left(w_I\right) = \left(p_1 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right]c_I - \left[1 + \frac{\alpha\pi_I}{\rho_I + \delta_S}\right]w_I(1+t)\right)l_I\left(w_I\right) - C \quad (33)$$

while, if a type 1 firm does not offer health coverage at wage $w_{NI}$, its profit is given by:

$$\text{Profit}_{NI,1}\left(w_{NI}\right) = \left(p_1 - \left[1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right]w_{NI}(1+t)\right)l_{NI}\left(w_{NI}\right) \quad (34)$$

Similarly, for a type 0 firm, we have:

$$\text{Profit}_{I,0}\left(w_I\right) = \left(p_0 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right]c_I - \left[1 + \frac{\alpha\pi_I}{\rho_I + \delta_S}\right]w_I(1+t)\right)l_I\left(w_I\right) - C \quad (35)$$

$$\text{Profit}_{NI,0}\left(w_{NI}\right) = \left(p_0 - \left[1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right]w_{NI}(1+t)\right)l_{NI}\left(w_{NI}\right) \quad (36)$$

Based on this structure, in Appendix D we prove the following result:

**Theorem 2.** *In an economy in which firms are heterogeneous, having either high or low productivity, the following is true:*

- *If low productivity firms offer jobs with and without health coverage, high productivity firms will offer only jobs with health coverage.*

- *Similarly, if high productivity firms offer jobs with and without health coverage, low productivity firms will offer only jobs without health coverage.*

In terms of finding the labor market equilibrium, notice that in order to pin down $\gamma_{NI}$, we need to consider two possible cases. If high productivity firms are the ones posting both types of

30

contracts - with and without health coverage, then $\sigma_0$ is already part of $\gamma_{NI}$ and we pin down the actual value for $\gamma_{NI}$ from the high productivity firm profit equalization across health-coverage and no-health-coverage firms. On the other side, if low-productivity firms are the ones offering both contracts with and without health coverage, then $1 - \sigma_0$ is already among the $1 - \gamma_{NI}$ firms offering coverage. In this case, the low-productivity firm profit-equalization across firms offering and not offering health coverage pins down $\gamma_{NI}$.

The intuition behind theorem 2 is straightforward; since high-productivity firms incur a higher cost from a worker missing a workday, they have higher incentives to offer health insurance and consequently reduce the likelihood and the expected time any employee spends sick. As a result, introducing firm heterogeneity into the model just strengthens the previous results that firms offering health insurance pay higher wages and are larger in equilibrium. Moreover, once we introduce different levels of productivity, health-coverage firms are also more profitable.

## 7. Discussion and Policy Analysis

The benefit of an equilibrium analysis is that it allows us to analyze the impact of changes in policy, while taking into account the overall effects and potential externalities of such measures. In this section, we present some policy exercises in order to evaluate the impact of changes in health costs and health treatments (preventive vs. curative) on relevant endogenous variables, such as the measure of firms offering health coverage, the measure of workers with health coverage, the measure of sick workers in steady state, and unemployment.

We calibrate the parameters in our model according to the data for the American economy in 2004. The unit of time considered is 1 month. First, we obtain the labor product $p$ from the output per worker by dividing the GDP produced by private non-agricultural firms in 2004, by the total number of employees hired by these companies in the same year.[39] We then divide the value by 12 to obtain an estimated monthly number and we multiply it by 0.65 to obtain an after-tax estimate. Unemployed benefits $b$ are set to 36% of monthly average wage for workers without health coverage in 2004 in the MEPS database.[40] The measure of workers relative to the number of firms, $m$, is

---

[39]The data was provided by the Bureau of Economic Analysis (BEA).

[40]Our estimate for unemployment benefits follows the national average according to reports from the National Employment Law Center.

obtained by dividing the total number of employees by the total number of firms with one or more employees (data obtained from 2004 Census Statistics of U.S. Businesses).

The disutility of getting sick with and without health insurance - $\chi_I$ and $\chi_{NI}$, respectively - are determined by the total expense to self or family in the MEPS data set. The percentage of the wage received during the sickness period ($\alpha$) is set at 80%, which takes into account that the 60% of the compensation that firms usually pay to workers when in sick leave is not taxed.

The labor-market arrival rate for the unemployed ($\lambda_0$) is obtained from Shimer [34]'s estimate of the average monthly job finding rate from 1951 to 2003 using the unemployment level and the number of workers unemployed for 0 to 4 weeks series, both constructed by the Bureau of Labor Statistics. In order to pin down the job offer arrival rate for employed workers ($\lambda_1$), we follow Hornstein et al. [23] and pin down $\lambda_1$ in order to match the estimated job-to-job flow obtained by the empirical literature. In particular, we pin down $\lambda_1$ such that the job-to-job flow delivered by the model is around 2.9%, which is the estimate obtained by Nagypal [29] through estimates using CPS data.

The probabilities of getting sick ($\pi$) and healing ($\rho$) are derived from our estimates of the number of days missed using the MEPS dataset described in section 5. We acknowledge that there is some leeway in how to pin down these parameters, since our data does not specify clearly how the sickness period happened ( i.e. through one long sick period or several short term sick episodes). Because more than 40% of the sickness spells were one-day spells, we decided to assume the latter. That is, if a worker missed more than one day of work, we assumed that she suffered multiple sickness spells.

Given that the length of a sickness spell is $\frac{1}{21}$ months for workers with and without health insurance, we set $\rho_{NI} = \rho_I = 21$. Then, in order to pin down $\pi_i$, $i \in \{NI, I\}$, we use our estimates from section 5. Based on the average marginal effects of having health insurance, we find that the expected number of missed days for workers without coverage is 7.67 days a year which, based in our assumption that each sickness spell lasts a day, implies 7.67 sickness spells per year. From this figure, we obtain the monthly arrival rate of sickness for uninsured workers $\pi_{NI}$. Similarly, using the estimated annual number of sick days (1.49) for insured workers, we obtain the monthly arrival rate of sickness for insured workers $\pi_I$.

The total flow costs of health insurance is determined according to the 2004 average premium of an individual health insurance plan, as reported by the Kaiser Family Foundation. According

to Buchmueller and Monheit [5], the share of premiums paid directly by employees has remained constant over the past decade at around 15% for single coverage and 25% for family coverage. Therefore, we will assume that the worker pays 20% of the cost while the company pays the rest of it. Therefore, $c_e$ is set to comprise 20% of the monthly flow cost of health insurance, while $c_I$ represents the remaining 80%. While the value for $c_I$ does not satisfy the assumption presented in the model, since the assumption is a sufficient but not necessary condition for our results, we still obtain the same qualitative results. Unfortunately, we have no information about the costs of setting up health insurance plans. Our results assume a low cost, around 1% of the monthly costs of providing health insurance for a given worker.[41]

The exogenous termination rate for healthy workers is computed based on Shimer [34]'s estimate of the job separation rate using data from the BLS with a unemployment rate of 5.5%. Notice that the unemployment rate for 2004 in MEPS is around 5.73%, which is close to Shimer's estimate. The exogenous termination rate for sick workers is the one truly free parameter in our calculation. Although there are data counterparts that seem at first look similar – for example, looking at the unemployment rate for workers that report bad health – they are actually not the same, since $\delta_S$ is the job destruction rate for sick workers while in sick leave. We decide to adjust this parameter in order to match the fraction of firms not offering health insurance in equilibrium ($\gamma_{NI}$).[42]

Finally, following Gruber [19], we consider here a tax price of 0.65, i.e., a dollar of health insurance costs 35 cents less than a dollar of other goods purchased with after-tax wages[43], and as in Shimer [34], we consider that $r = 0.004$, implying a annual interest rate of 5%. A summary of calibrated parameters and their interpretations and targets are presented in the Table 6.

The model performance can be evaluated in Table 7. The model overestimates the percentage of workers with health insurance in equilibrium. This may indicate that the competition across firms

---

[41]Results with different values for $C$ are presented in the on line appendix.

[42]Even though the probability of losing a job while sick is considerably larger than the normal termination rate, since sickness spells tend to be very short, the implied probability of terminating a job in a sick day is only 1.65%. If we used a more restrictive structure to choose this parameter, for example restricting the parameter to be close to the one for the overall population, no firms would offer health insurance in equilibrium at the current out of pocket costs of treatment. In previous versions, we used non-monetary costs to match the proportion of firms offering coverage in the data, but the implied costs were considerably larger than the observed data. In particular, these non-monetary costs could be functioning as a proxy of costs associated with sickness that are not directly considered, such as the health coverage of family members as well as additional costs of sickness that are beyond the direct out of pocket payments - child care expenses, changes in premium, among others. However, because differently from the out of pocket health expenses, we have no empirical counterpart for $\delta_S$ to assess if the chosen value is close or far from reality, we chose this parameter to match the number of firms offering health insurance.

[43]Therefore, we multiply firm's cost of providing health insurance $C$ and worker's flow cost $c_e$ by $(1 - 0.35)$.

may be smaller than what is stated by the job-to-job flow rate. One way to address this problem - as shown by Sullivan and To [40] - is to introduce a probability $\lambda_e$ that a worker's current job exogenously ends and he receives a job offer from a new employer in the same period. In this case, the worker can accept the new offer or become unemployed. Our model could be naturally extended in this direction.[44] Another reason why the performance can be poor is due to the fact that the model has no capital and we attribute all output to labor. Due to the fact that it is unclear how we should separate capital from profits due to imperfect competition in the labor market, we abstain from comparing wage levels and only look at the ratio of wages between insured and uninsured workers.[45]

Let us now consider the impact of rising health insurance costs on the measure of firms that offer coverage in equilibrium. Graph 1 summarizes our results. As we can see in Graph 1.a, an increase in health insurance costs steeply reduces the fraction of firms offering health coverage in equilibrium. Since firms offering health coverage tend to be larger in equilibrium, the reduction in health coverage among workers is not as pronounced, but it is still significant. As expected, the measure of sick workers in steady state goes up. The measure of unemployed workers goes slightly up as well.

In particular, our first policy experiment considers an increase in 10% of the health insurance premium - measured by the H.I. flow cost - while keeping the share paid by employee and firm constant. Our results are presented in Table 8, in which the first column represents the values of the current calibration. As we can see, an increase in 10% in the price of health insurance generates a reduction of 60.42% in the fraction of firms offering coverage and a reduction of 15.43% in the measure of workers covered. This reduction in health insurance coverage generates an increase in the measure of sick workers in steady state by 39.64%.

We also consider the case of a reduction in the tax benefits on health insurance expenses. Following Gruber [19], we consider here a tax price of 0.65, i.e., a dollar of health insurance costs 35 cents less than a dollar of other goods purchased with after-tax wages. We simulate the model assuming a reduction of tax benefits by 10%, with results presented in Table 9. The main result

---

[44]In any case, as shown by Hornstein et al. [23], search models, even after extended to encompass on-the-job search, are unable to capture a big fraction of the wage dispersion in the data. In this sense, it is not surprising that our model has a hard time matching the data on these dimensions.

[45]We thank one of our referees for pointing this out.

is the significant reduction in the fraction of firms providing health insurance, which drops from 59% in the benchmark model to 40% with the reduction in tax benefits. Similarly, the share of workers covered by health insurance is reduced by 5.42%. It is not surprising that the fraction of sick workers in steady state goes up, given the reduction in the fraction of the labor force covered.

Using our calibrated model, we can also analyze the effects of a policy change in which the U.S. government mandates that all firms provide health insurance. The results of this experiment are presented in Table 10. After the mandate takes place, firms are worse off, as aggregate profits are reduced, even though the monthly aggregate product increases as a result of more productive workers - notice the reduction of sick workers in steady state. This outcome is not surprising, since the mandate reduces firms' choices and the decision not to offer health insurance by some firms was a profit-maximizing choice. The results for workers are a bit more ambiguous. Workers that have been previously uninsured are better off, their average wage goes up and their expected time sick goes down. However, workers previously insured are slightly worse off, because their average wage goes down. To pin down the net effect, we calculate the utilitarian social welfare function for this economy and we see that welfare goes up, showing that the extra utility gained by new covered workers more than fully compensated by the reduction in firms' profit or utility losses by previously insured workers.

Notice that the inefficiency in the benchmark comes from firms not fully endogenizing the disutility cost of sickness encompassed by workers, embodied in $\chi_i$, $i \in \{NI, I\}$. Due to labor market imperfections, firms only take into account a fraction of these costs through the threat of workers' job-to-job transitions. As shown by Bonhomme and Jolivet [2], labor markets with search frictions are plagued by the lack of compensating wage differentials, in particular since firms can exploit the fact that it can take a while until a worker obtains an outside job offer. Similarly, the higher productivity obtained by health employees is only partially appropriated by firms, since a fraction of the additional product is paid in wages. These combined factors imply that the provision of health insurance is suboptimal at a market equilibrium.

Finally, we evaluate which would be the better health insurance coverage, one that reduces the probability that a worker gets sick (preventive medicine - reduction in $\pi$) or one that reduces the time that a worker stays sick (curative medicine - increase in $\rho$). In order to further investigate the impact of investments in preventive versus curative medicine, we consider the following exercise. Assume that the government has as its main goals to reduce the number of sick workers and to

35

increase the number of workers with health insurance. In order to achieve such goals the government can invest a given amount in scientific advances for preventive or curative medicine. This investment can reduce the probability a worker gets sick or increase the probability that he or she recovers once sick by 10%. Considering that only workers with health insurance could benefit from the medical advance, which choice would be the best? Table 11 compares the results of both cases to the benchmark calibrated model. Even though both investments have a positive impact, the preventive medicine has a slightly greater impact than the curative one. A possible interpretation of this result is that, since most sickness spells are quite short, there is little room for improvement through curative measures in these cases. Consequently, preventive care may have a slightly more positive effect by avoiding that the workers fall sick and receive the negative shock $\chi$ due to illness in the first place. In any case, we would like to emphasize that this is just a first step in this topic. Natural extensions of this exercise need to consider differences in the cost of investments, as well as differences in the cost of treatments in both cases, as well as a deeper discussion of social welfare.

## 8. Concluding Remarks

In this paper, we show that health coverage has a positive impact on labor productivity by reducing the number of sick days a worker needs to take. Our empirical results using data from the Medical Expenditure Panel Survey (MEPS) show that a worker with health coverage misses on average 76.54% fewer workdays per year than workers without health coverage. We introduce this productivity edge to an on-the-job search model in which employers not only post wages, but also decide whether or not to offer health coverage. In equilibrium, firms offering health coverage are bigger and offer higher wages on average. These results are also corroborated by our empirical findings with the MEPS. According to our empirical results, increases in firm size and wage earned are positively related to the probability of a worker having health insurance coverage. Surprisingly, these labor-related variables are more important predictors of health coverage than health characteristics, such as health habits or addictions.

Once we calibrate the model using US data for 2004, we evaluate the impact of a series of policy changes in the health insurance sector on labor market outcomes. We show that an increase of 10% in health insurance premiums reduces the proportion of workers with health coverage by 15.43%, increasing the number of sick workers in steady state by 39.64%. We also find that a reduction in

36

health insurance tax benefits by 10% generates a reduction in the share of firms providing health insurance from 59% to 40%. Finally, we consider the difference in impact of improvements on preventive versus curative care. We compare the case of a governmental investment in medical research that makes preventive methods 10% more efficient to the case in which such an investment is made to improve curative methods (which also become 10% more efficient). Our results show that, although both medical advances have positive impact, choosing to invest in preventive instead of curative care generates a slightly higher gain in labor force's health coverage and consequently a reduction in the number of sick workers in steady state.

## Acknowledgments

We are deeply in debt to Iourii Manovskii for his helpful comments. We would like to thank Bjorn Brugemann, Colin Cameron, Hanming Fang, Elizabeth Mellon, and Philipp Kircher for their comments, as well as the participants of the Macro Seminar at UC Davis, the West Coast Search and Matching Workshop, EPGE-FGV, and the Cleveland Fed. Any remaining errors are our responsibility. The views in this article do not necessarily reflect those of the Federal Reserve System or the Board of Governors.

## References

[1] Barmby, T., and G. Stephen, (2000). "Worker Absenteeism: Why firm size matter," *The Manchester School*, 68 (5), 568-577.

[2] Bonhomme, S. and G. Jolivet, (2009). "The pervasive absence of compensating differentials," *Journal of Applied Econometrics*, 24 (5), 763-795.

[3] Brown, C., and J. Hamilton and J. Meadoff, (1990). *Employers Large and Small*, Harvard University Press, Cambridge, MA.

[4] Brugemann, B., and I. Manovskii, (2009). "Fragility: A quantitative Analysis of the US Health Insurance System," Working Paper, University Of Pennsylvania, mimeo.

[5] Buchmueller, T., and A. Monheit, (2009). "Employer-Sponsored Health Insurance and the Promise of Health Insurance Reform," Working Paper 14839, National Bureau of Economic Research.

[6] Burdett, K., and D. Mortensen, (1998). "Wage Differentials, Employer Size and Unemployment," *International Economic Review,* 39, 257-273.

[7] Cameron, A. C., and P. Trivedi, (2009). *Microeconometrics Using STATA*, STATA Press.

[8] Cameron, A. C. and P. Trivedi, (2013). Regression Analysis of Count Data, 2nd edition, *Econometric Society Monograph,* No.53, Cambridge University Press.

[9] Coles, M., (2001). "Equilibrium Wage Dispersion, Firm Size, and Growth," *Review of Economic Dynamics* 1, 159-187.

[10] Davis, K., Collins, S. R., Doty, M. M., Ho, A. and Holmgren, Al L., (2005). Health and productivity among US workers. Available at: `http://www.cmwf.org/usr_doc/856_Davis_hlt_productivity_USworkers.pdf`.

[11] Dey, M, and C. Flinn, (2005). "An equilibrium Model of Health Insurance Provision and Wage Determination," *Econometrica,* 73 (2), 571-627.

[12] Dunn, A., A. Shapiro, and E. Liebman, (2013). "Geographic variation in commercial medical-care expenditures: A framework for decomposing price and utilization," *Journal of Health Economics,* 32, 1153-1165.

[13] Eberts, R.W. and J.A. Stone (1985), "Wages, fringe benefits and working conditions: an analysis of compensating differentials," *Southern Economic Journal* 52, 274-280.

[14] Fang, H., and A. Gavazza, (2011). "Dynamic Inefficiencies in an Employment-Based Health-Insurance System: Theory and Evidence," *American Economic Review*, 101 (7), 3047-77.

[15] Fu, C., (2011). "Training, Search and Wage Dynamics," *Review of Economic Dynamics* 14, 650-666.

[16] Gentry, W. and E. Peress, (1994). "Taxes and fringe benefits offered by employers," Working paper 4764, National Bureau of Economic Research.

[17] Gilleskie, D. B., (1998). "A dynamic stochastic model of medical care use and work absence," Econometrica, 66, 1-45.

[18] Gruber, J., (1994). "The incidence of mandated maternity benefits," *American Economic Review*, 84, 622-641.

[19] Gruber, J., (2010). "The tax exclusion for employer-sponsored health insurance," Working paper 15766, National Bureau of Economic Research.

[20] Gruber, J., and A. Krueger, (1990). "The Incidence of Mandated Employer-Provided Insurance: Lessons from Workers' Compensation Insurance," Princeton Industrial Relations Section Working Paper 279.

[21] Gruber, J., and J. Poterba, (1994). "Tax incentives and the decision to purchase health insurance: evidence from the self employed," *Quarterly Journal of Economics*, 109, 701-733.

[22] Gruber, J., and J. Poterba, (1996). "Tax subsidies to employer-provided health insurance," University of Chicago Press, Chicago, IL, 135-164.

[23] Hornstein, A., P. Krusell, and G. Violante, (2011). "Frictional Wage Dispersion in Search Models: A Quantitative Assessment," *American Economic Review*, 101, 2873-2898.

[24] Leibowitz, A., (1983). "Fringe benefits in employee compensation," in: Triplett, J. (ed.): *The measurement of labor cost*, The University of Chicago Press, 371-389.

[25] Lofland, J.H., and K.D. Frick, (2006). "Effect of health insurance on workplace absenteeism in the US workforce," *Journal of occupational and environmental medicine,* 48 (1): 13.

[26] McKellar, M., S. Naimer, M. Landrum, T. Gibson, A. Chandra, and M. Chernew, (2014). "Insurer Market Structure and Variation in Commercial Health Care Spending," *Health Services Research*, 49 (3), 878-892.

[27] Millimet, D., and I. McDonough, (2013). "Dynamic Panel Data Models with Irregular Spacing: With Applications to Early Childhood Development," IZA Discussion Paper No. 7359.

[28] Monheit, A., M. Hagan, M. Berk, and P. Farley, (1985). "The employed uninsured and the role of public policy," *Inquiry*, 22, 348-364.

[29] Nagypal, E. (2008). "Worker Reallocation Over the Business Cycle: The Importance of Job-to-Job Transitions," University of Northwestern, mimeo.

[30] Navarro, S., (2008). "Control Functions," in: Durlauf, S. and L. Blume (eds.), *The New Palgrave Dictionary of Economics*, 2nd. edition, Palgrave Macmillan Press, London.

[31] Philipson, T., S. Seabury, L. Lockwood, D. Goldman, D. Lakdawalla, (2010). "Geographic Variation in Health Care: The Role of Private Markets," *Brookings Papers on Economic Activity*, 325-361.

[32] Pinheiro, R., and L. Visschers, (2015). "Unemployment Risk and Wage Differentials," *Journal of Economic Theory*, 157, 397-424.

[33] Sheiner, L. (2014). "Why the geographic variation in health care spending cannot tell us much about efficiency or quality of our health care system," *Brookings Papers on Economic Activity*, 1-52.

[34] Shimer, R. (2005). "The Cyclical Behavior of Equilibrium Unemployment and Vacancies," *American Economic Review*, 95 (1), 25-49.

[35] Solon, G., S. Haider, and J. Wooldridge, (2013). "What are we Weighting for?" , mimeo.

[36] Staiger, D., (2014). Comment on: Sheiner, L. (2014). "Why the geographic variation in health care spending cannot tell us much about efficiency or quality of our health care system," *Brookings Papers on Economic Activity*, 59-67.

[37] Stock, J. and M. Watson, (2012). *Introduction to Econometrics*, 3rd. edition, Pearson Addison-Wesley.

[38] Stock, J., J. Wright, and M. Yogo, (2002). "A Survey of Weak Instruments and Weak Identification in Generalized Method of Moments," *Journal of Business and Economic Statistics*, 20 (4), 518-529.

[39] Stratman, T. (1999). "What Do Medical Services Buy? Effects of Doctor Visits on Work Days Loss," *Eastern Economic Journal*, 25 (1), 1-16.

[40] Sullivan, P. and T. To (2014): "Search and Non-Wage Job Characteristics," *Journal of Human Resources*, 49 (2), 472-507.

[41] Terza, J., A. Basu, and P. Rathouz, (2008). "Two-stage residual inclusion estimation: Addressing endogeneity in health econometric modeling," *Journal of Health Economics*, 27, 531-543.

[42] Vistnes, J. P., (1997). "Gender differences in days lost from work due to illness," *Industrial and Labor Relations Review*, 50, 304-23.

[43] Woodbury, S. and W. Huang, (1991). "The tax treatment of fringe benefits," Working Paper, W.E. Upjotm Institute for Employment Research, Kalamazoo, MI.

[44] Xu, X., and G.A. Jensen, (2012). "Does health insurance reduce illness-related worker absenteeism?" *Applied Economics,* 44 (35), 4591–4603.

**Appendix A: Additional Tables - Empirical Results**

## Table A.1: Variable Definitions

**Variables in Cross-Section IV Analysis**

| Variable | Description |
|---|---|
| Health Insurance | Dummy variable equals to 1 if worker is covered by private health insurance throughout the 2 year period and 0 if not covered (workers with coverage part of the year excluded from the 2 stage cross-section analysis); |
| Health Status | Average of the scores at the PCS - 12 SF (answers obtained at rounds 2 and 4); |
| log(Income) | natural log of the person's total income in the 2 year period at 2000 dollar values; |
| Firm Size | log of the total number of employees; |
| Paid Leave | Dummy variable equals to 1 if the worker is entitled for paid sick leave for at least more than half of the two-year period; |
| Union Member | Dummy variable equals to 1 if the worker is a union member for at least half of the two-year period; |
| Age | Worker's age at Round 1; |
| Male | Dummy variable that is equal to 1 if worker is male, 0 otherwise; |
| Married | Dummy variable equals to 1 if worker married in the panel's 2nd. Year, 0 otherwise; |
| Family Size | Average family size across the 2 years; |
| Obese | Average Body mass across the 2 year-panel larger or equal 30; |
| Diabetes | Dummy variable equals to 1 if worker diagnosed with diabetes in at least one year out of the 2-year period; |
| Smoker | Dummy variable equals to 1 if worker is regularly smoking in at least one year out of the 2-year period; |
| White Collar | Dummy variable equals to 1 if worker has an occupation in groups 1 to 3 (Management, Professional, and Services) in Round 3, 0 otherwise; |
| Hispanic | Dummy variable equals to 1 if worker has Hispanic ethnicity, 0 otherwise; |
| Black | Dummy variable equals to 1 if worker is black, 0 otherwise; |
| Residuals | Residuals from the first stage regression. |
| Northeast | Dummy variable equals to 1 if worker lives in the Northeastern region according to the census, 0 otherwise; |
| Midwest | Dummy variable equals to 1 if worker lives in the Midwestern region according to the census, 0 otherwise; |
| West | Dummy variable equals to 1 if worker lives in the Western region according to the census, 0 otherwise; |
| Years of Education | Years of education the worker had at the beginning of Round 1; |
| Same Job | A dummy variable equals to 1 if worker stayed in the same job throughout the 2-year period, 0 if there was a job-to-job transition. |

**Table A.2: Descriptives - Sample Weighted Data**

Descriptions of the variables are presented in table A.1. Variables calculated taking into account a two-year period.

| Variables | Mean | Median | St. Dev. | N | Size |
|---|---|---|---|---|---|
| Health Insurance | 0.76 | 1 | 0.425 | 25,171 | 557,876,163 |
| Health Status | 52.59 | 54.60 | 6.648 | 25,171 | 557,876,163 |
| log(Income) | 11.16 | 11.17 | 0.610 | 25,171 | 557,876,163 |
| Firm Size | 4.26 | 4.32 | 1.642 | 25,171 | 557,876,163 |
| Paid Leave | 0.78 | 1 | 0.411 | 25,171 | 557,876,163 |
| Union Member | 0.16 | 0 | 0.369 | 25,171 | 557,876,163 |
| Age | 41.76 | 42 | 10.689 | 25,171 | 557,876,163 |
| Male | 0.52 | 1 | 0.499 | 25,171 | 557,876,163 |
| Married | 0.62 | 1 | 0.485 | 25,171 | 557,876,163 |
| Family Size | 2.85 | 3 | 1.451 | 25,171 | 557,876,163 |
| Obese | 0.30 | 0 | 0.458 | 25,171 | 557,876,163 |
| Diabetes | 0.06 | 0 | 0.231 | 25,171 | 557,876,163 |
| Smoker | 0.21 | 0 | 0.405 | 25,171 | 557,876,163 |
| White Collar | 0.44 | 0 | 0.497 | 25,171 | 557,876,163 |
| Hispanic | 0.11 | 0 | 0.320 | 25,171 | 557,876,163 |
| Black | 0.11 | 0 | 0.308 | 25,171 | 557,876,163 |
| Northeast | 0.19 | 0 | 0.396 | 25,171 | 557,876,163 |
| Midwest | 0.24 | 0 | 0.427 | 25,171 | 557,876,163 |
| West | 0.22 | 0 | 0.412 | 25,171 | 557,876,163 |
| South | 0.35 | 0 | 0.477 | 25,171 | 557,876,163 |
| Same Job | 0.94 | 1 | 0.243 | 25,171 | 557,876,163 |
| Years of Education | 13.84 | 14 | 2.571 | 25,171 | 557,876,163 |

*Source:* MEPS panels 5-16 and authors' calculations

**Table A.3: Evolution of Health coverage – Overall**

The table reports the number of agents in each health insurance coverage status transition between years 1 and 2 of the MEPS' panels. Reported in parentheses is the fraction of agents that had a given coverage status in year 1 that ultimately ended up with a given year 2-coverage status.

| Health Insurance Year 1 | Health Insurance Year 2 | | |
|---|---|---|---|
| | *No* | *Yes* | *Total* |
| *No* | 6,357 (90.32) | 681 (9.68) | **7,038** (100) |
| *Yes* | 516 (2.92) | 17,172 (97.08) | **17,688** (100) |
| *Total* | **6,873** (27.80) | **17,853** (72.20) | **24,726** (100) |

44

**Table A.4: First Stage Regression
for Poisson and Negative Binomial in Table 3**

Descriptions of the variables are presented in Table A.1. Coefficients for Hispanic, Black, Panel and Industry dummies omitted. St. Errors presented in parenthesis.

| | **Health Insurance** |
|---|---|
| Health Status | -0.000 |
| | (0.000) |
| log(Income) | 0.107*** |
| | (0.005) |
| Firm Size | 0.044*** |
| | (0.002) |
| Paid Leave | 0.307*** |
| | (0.006) |
| Union Member | 0.124*** |
| | (0.007) |
| Age | 0.001*** |
| | (0.000) |
| Male | 0.063*** |
| | (0.005) |
| Married | -0.094*** |
| | (0.006) |
| Family Size | -0.020*** |
| | (0.002) |
| Obese | 0.014*** |
| | (0.005) |
| Diabetes | 0.013 |
| | (0.010) |
| Smoker | -0.002 |
| | (0.006) |
| White Collar | 0.001 |
| | (0.006) |
| Northeast | -0.065*** |
| | (0.007) |
| Midwest | -0.024*** |
| | (0.006) |
| West | -0.014** |
| | (0.006) |
| $N$ | 25,171 |

* $p < 0.1$; ** $p < 0.05$; *** $p < 0.01$

**Appendix B: Model's Notation and Worker's Problem**

# Table B.1: Model − Notation

| Parameter | Description |
|-----------|-------------|
| $\lambda_0$ | Job offer arrival rate for unemployed workers; |
| $\lambda_1$ | Job offer arrival rate for employed workers; |
| $\pi_{NI}$ | Arrival rate of sickness shock for uninsured workers; |
| $\pi_I$ | Arrival rate of sickness shock for insured workers; |
| $\rho_{NI}$ | Arrival rate of recovery shock for uninsured workers; |
| $\rho_I$ | Arrival rate of recovery shock for insured workers; |
| $\delta$ | Job destruction arrival rate for healthy employed workers; |
| $\delta_S$ | Job destruction arrival rate for sick employed workers; |
| $\chi_{NI}$ | Disutility cost of being sick while uninsured; |
| $\chi_I$ | Disutility cost of being sick while insured; |
| $c_e$ | Employee's flow cost of health insurance |
| $c_I$ | Firm's flow cost of providing health insurance; |
| $C$ | Fixed cost paid by firms to set up health insurance program; |
| $r$ | Interest rate; |
| $\alpha$ | Fraction of salary earned by worker while sick; |
| $b$ | Unemployed benefit; |
| $\gamma_{NI}$ | Fraction of firms that offer health insurance in equilibrium. |

*Worker's Problem - Pinning down $\widetilde{\omega}$*

In this appendix, we present all the calculations that are necessary to pin down $\widetilde{\omega}$, i.e., the minimum wage that a worker that is offered a job with health coverage must earn in order to decide to join the insurance plan. In particular, we want to show that there is at most one wage level $\widetilde{\omega}$ such that, for any wage $w > \widetilde{\omega}$, $V_I(w,y) \geq V_{NI}(w)$. In order to show this result, we must prove that the value functions satisfy a single-crossing condition. In particular, we must show that $\frac{dV_I(w,y)}{dw} > \frac{dV_{NI}(w)}{dw}$ for all values above the point in which $V_I(w,y) = V_{NI}(w)$ which by definition gives us $w = \widetilde{\omega}$. Towards this result, let's consider the case of employed workers with no health coverage. Manipulating the integrals in (12) and (16) and using the definition for $R_{NI}^I(w)$, we have:

$$\frac{dV_{NI}(w)}{dw} = \frac{\left[1 + \frac{\alpha \pi_{NI}}{r + \rho_{NI} + \delta_S}\right]}{r + \delta + \frac{\pi_{NI}(r + \delta_S)}{r + \rho_{NI} + \delta_S} + \lambda_1 \left[1 - F\left(R_{NI}^I(w)\right)\right]} \tag{B.1}$$

46

where $F(\cdot)$ is defined in (24). Similarly, from (16) and Lemma 1, we have that:

$$\frac{dV_I(w,y)}{dw} = \frac{\left(1 + \frac{\alpha \pi_I}{r + \rho_I + \delta_S}\right)}{r + \delta + \frac{\pi_I(r + \delta_S)}{r + \delta_S + \rho_I} + \lambda_1(1 - F(w))} \tag{B.2}$$

First of all, notice that expressions equations (B.1) and (B.2) show that the value functions are strictly increasing in wages, since both derivatives are strictly positive. Then, from our assumptions about the benefits of health insurance – i.e. $\pi_{NI} \geq \pi_I$ and $\rho_I \geq \rho_{NI}$ – we have that $\frac{\pi_{NI}}{r + \rho_{NI} + \delta_S} > \frac{\pi_I}{r + \rho_I + \delta_S}$. In order to consider the impact of obtaining health coverage on the marginal benefit of an increase in lifetime wages, let's define $x = \frac{\pi}{r + \rho + \delta_S}$. Then, we have that $\frac{d^2 V_I(w,y)}{dx\,dw}$ is given by:

$$\frac{d\left(\frac{1 + \alpha x}{r + \delta + (r + \delta_S)x + \lambda_1(1 - F(w))}\right)}{dx} = \frac{\alpha[r + \delta + \lambda_1(1 - F(w))] - (r + \delta_S)}{(r + \delta + (r + \delta_S)x + \lambda_1(1 - F(w)))^2} \tag{B.3}$$

Notice that the sign of the derivative in (B.3) depend on the expression in the numerator of the right hand side (RHS) expression. In particular, we have that $\frac{d^2 V_I(w,y)}{dx\,dw} < 0$ if and only if:

$$\alpha < \frac{(r + \delta_S)}{(r + \delta + \lambda_1(1 - F(\widetilde{w})))} \tag{B.4}$$

Since one of our assumptions is that $\alpha \leq \frac{r + \delta_S}{r + \delta + \lambda_1}$ this is always satisfied and we have that $\frac{d^2 V_I(w,y)}{dx\,dw} < 0$. An identical argument can be made for $\frac{d^2 V_{NI}(w)}{dx\,dw} < 0$. This result proves that we have single-crossing. Since whenever $V_I(w,y) = V_{NI}(w)$, we must have $\frac{dV_I(w,y)}{dw} > \frac{dV_{NI}(w)}{dw}$, there is no way in which the two curves can cross more than once. Since we define $\widetilde{\omega}$ as the wage at which we have $V_I(w,y) = V_{NI}(w)$, we must have that $\frac{dV_I(w,y)}{dw} > \frac{dV_{NI}(w)}{dw}$, $\forall w \geq \widetilde{\omega}$. Moreover, this result also implies that for $w > \widetilde{\omega}$, $R_I^{NI}(w) > w$, as we show in the Lemma C.1.

Now that we have proven the uniqueness of $\widetilde{\omega}$, let's find an implicit expression for it. From $V_I(\widetilde{w}, y) = V_{NI}(\widetilde{w})$, we obtain:

$$c_e = \pi_I(D_I(\widetilde{w}) - V_I(\widetilde{w}, y)) - \pi_{NI}(D_{NI}(\widetilde{w}) - V_{NI}(\widetilde{w})) \tag{B.5}$$

Substituting the equations (12), (13), (16), and (17) and manipulating, we obtain:

$$\left[1 + \frac{\pi_I}{r + \delta_S + \rho_I}\right] c_e = \left\{ \begin{array}{c} \left(\frac{\pi_I}{r + \delta_S + \rho_I} - \frac{\pi_{NI}}{r + \delta_S + \rho_{NI}}\right)[\alpha\widetilde{\omega} - (r + \delta_S)V_{NI}(\widetilde{\omega}) + \delta_S D_0] \\ + \frac{\pi_{NI}}{r + \delta_S + \rho_{NI}}\chi_{NI} - \frac{\pi_I}{r + \delta_S + \rho_I}\chi_I \end{array} \right\} \tag{B.6}$$

47

Notice that:

$$\frac{d\left\{\left(\frac{\pi_I}{r+\delta_S+\rho_I} - \frac{\pi_{NI}}{r+\delta_S+\rho_{NI}}\right)\left[\alpha w - (r+\delta_S)\,V_{NI}\left(w\right) + \delta_S D_0\right]\right\}}{dw} =$$

$$= \left[ \begin{array}{c} \left(\frac{\pi_{NI}}{r+\delta_S+\rho_{NI}} - \frac{\pi_I}{r+\delta_S+\rho_I}\right) \times \\ \times \left(\frac{(r+\delta_S)-\alpha\left[r+\delta+\lambda_1\left[1-F\left(R_{NI}^I(w)\right)\right]\right]}{r+\delta+\frac{\pi_{NI}(r+\delta_S)}{r+\rho_{NI}+\delta_S} + \lambda_1\left[1-F\left(R_{NI}^I(w)\right)\right]}\right) \end{array} \right]$$

$$\geq \left[ \begin{array}{c} \left(\frac{\pi_{NI}}{r+\delta_S+\rho_{NI}} - \frac{\pi_I}{r+\delta_S+\rho_I}\right) \times \\ \times (r+\delta_S) \left(\frac{1 - \frac{\left[r+\delta+\lambda_1\left[1-F\left(R_{NI}^I(w)\right)\right]\right]}{r+\delta+\lambda_1}}{r+\delta+\frac{\pi_{NI}(r+\delta_S)}{r+\rho_{NI}+\delta_S} + \lambda_1\left[1-F\left(R_{NI}^I(w)\right)\right]}\right) \end{array} \right] > 0$$

Therefore, since the RHS of (B.6) is strictly increasing with wages, for any worker earning more than $\widetilde{\omega}$, the benefit of having health coverage is strictly larger than the cost $c_e$, which is constant across workers.

## Appendix C

**Proof of Lemma 1:**

PROOF. At the reservation wage $y$ of a move from a health-coverage firm with wage $x$ to a no health-coverage firm (i.e. we suppose that $y = R_I^{NI}(x)$), and at the reservation wage $R_{NI}^I(y)$ of the reverse transition, it must be the case that

$$V_I(x) = V_{NI}(R_I^{NI}(x)) = V_{NI}(y) = V_I(R_{NI}^I(y)). \tag{C.1}$$

But then, due to the fact that value functions are strictly increasing in wages, it follows that $R_{NI}^I(y) = x$. Similarly, $R_{NI}^I(y) = x \Rightarrow R_I^{NI}(x) = y$. By the same strict monotonicity of the value functions the mapping $R_i^j(y) = x$ is unique. It is straightforward to see that the resulting function must be continuous and increasing.

**Lemma C.1** $\omega^*(w) > w.$

48

PROOF. From equations (12), (16), and the definition of $R_I^{NI}(w)$, we have that:

$$\omega^*(w) = \frac{1}{\left[1 + \frac{\alpha\pi_{NI}}{r+\delta_S+\rho_{NI}}\right]} \left\{ \begin{array}{c} \left[1 + \frac{\alpha\pi_I}{r+\delta_S+\rho_I}\right]w - c_e\left[1 + \frac{\pi_I}{r+\delta_S+\rho_I}\right] \\ + \left(\frac{\pi_I}{r+\delta_S+\rho_I} - \frac{\pi_{NI}}{r+\delta_S+\rho_{NI}}\right)\left[\begin{array}{c} +\frac{\delta_S b}{r+\rho_{NI}} + \frac{\delta_S\rho_{NI}}{r+\rho_{NI}}V_0 \\ -(r+\delta_S)V_I(w,y) \end{array}\right] \\ + \left[\begin{array}{c} \frac{\pi_{NI}}{r+\rho_{NI}} \\ -\frac{\delta_S}{r+\rho_{NI}}\frac{\pi_I}{r+\delta_S+\rho_I} \end{array}\right]\chi_{NI} - \frac{\pi_I}{r+\delta_S+\rho_I}\chi_I \end{array} \right\} \quad (C.2)$$

Rearranging the expression obtained for $\omega^*(w)$, we have:

$$\omega^*(w) = w + \frac{\left(\frac{\pi_{NI}}{r+\delta_S+\rho_{NI}} - \frac{\pi_I}{r+\delta_S+\rho_I}\right)}{\left[1 + \frac{\alpha\pi_{NI}}{r+\delta_S+\rho_{NI}}\right]} \left[\begin{array}{c} \alpha\widetilde{\omega} - \alpha\omega \\ + (r+\delta_S)\left(V_I(w,y) - V_{NI}(\widetilde{\omega})\right) \end{array}\right] \quad (C.3)$$

From equations (12) and (16), we have:

$$
\begin{aligned}
V_I(w,y) - V_{NI}(\widetilde{w}) &= \left(1 + \frac{\alpha\pi_I}{r+\rho_I+\delta_S}\right)\int_{\widetilde{w}}^{w} \frac{1}{r+\delta+\frac{\pi_I(r+\delta_S)}{r+\delta_S+\rho_I}+\lambda_1(1-F(z))}dz \\
&> \left(1 + \frac{\alpha\pi_I}{r+\rho_I+\delta_S}\right)\int_{\widetilde{w}}^{w} \frac{1}{r+\delta+\frac{\pi_I(r+\delta_S)}{r+\delta_S+\rho_I}+\lambda_1(1-F(\widetilde{w}))}dz \\
&= \frac{\left(1 + \frac{\alpha\pi_I}{r+\rho_I+\delta_S}\right)}{r+\delta+\frac{\pi_I(r+\delta_S)}{r+\delta_S+\rho_I}+\lambda_1(1-F(\widetilde{w}))}(w-\widetilde{w})
\end{aligned}
$$

Therefore, we have:

$$\omega^*(w) > w + \frac{\left(\frac{\pi_{NI}}{r+\rho_{NI}+\delta_S} - \frac{\pi_I}{r+\rho_I+\delta_S}\right)}{\left[1 + \frac{\alpha\pi_{NI}}{r+\rho_{NI}+\delta_S}\right]} \left\{ \left[\frac{(r+\delta_S)\left(1 + \frac{\alpha\pi_I}{r+\rho_I+\delta_S}\right)}{r+\delta+\frac{\pi_I(r+\delta_S)}{r+\delta_S+\rho_I}+\lambda_1(1-F(\widetilde{w}))} - \alpha\right](w-\widetilde{w}) \right\} \quad (C.4)$$

Therefore, the second term in the RHS of (C.4) is positive if:

$$\frac{(r+\delta_S)\left(1 + \frac{\alpha\pi_I}{r+\rho_I+\delta_S}\right)}{r+\delta+\frac{\pi_I(r+\delta_S)}{r+\delta_S+\rho_I}+\lambda_1(1-F(\widetilde{w}))} > \alpha \quad (C.5)$$

Rearranging the above inequality, we have:

$$\alpha < \frac{(r + \delta_S)}{r + \delta + \lambda_1 \left(1 - F\left(\widetilde{w}\right)\right)} \tag{C.6}$$

which is satisfied by $\alpha$, once $\alpha \le \frac{r + \delta_S}{r + \delta + \lambda_1}$.

**Lemma C.2** $\forall w > \widetilde{w}, \ \frac{d\omega^*(w)}{dw} > 1.$

PROOF. From equations (C.3), (B.1), and (B.2), as well as Lemma C.1, we can show that:

$$\frac{d\omega^*(w)}{dw} = 1 + \frac{\left(\frac{\pi_{NI}}{r + \rho_{NI} + \delta_S} - \frac{\pi_I}{r + \rho_I + \delta_S}\right)}{\left[1 + \frac{\alpha \pi_{NI}}{r + \rho_{NI} + \delta_S}\right]} \left\{ \left( \frac{(r + \delta_S)\left(1 + \frac{\alpha \pi_I}{r + \rho_I + \delta_S}\right)}{r + \delta + \frac{\pi_I(r + \delta_S)}{r + \delta_S + \rho_I} + \lambda_1 \left(1 - F(w)\right)} - \alpha \right) \right\} \tag{C.7}$$

Notice that a sufficient condition for the second term in the RHS of equation (C.7) to be positive is:

$$\alpha < \frac{(r + \delta_S)}{r + \delta + \lambda_1 \left(1 - F(w)\right)} \tag{C.8}$$

which is satisfied once $\alpha \le \frac{r + \delta_S}{r + \delta + \lambda_1}$.

**Proof of Lemma 2:**

PROOF. Suppose that a firm pays the up-front $C$ and offers a wage lower than $\widetilde{w}$. As we previously discussed, the worker will not differentiate this firm from a competitor that does not pay the up-front cost, therefore $\omega^*(w) = w$. Consequently, the number of workers this firm keeps in steady state is $l_{NI}(w)$.[46] Therefore:

$$Profit_I(w) = [p - w(1 + t)] \, l_{NI}(w) - \alpha w (1 + t) \, d_{NI}(w) - C = Profit_{NI}(w) - C, \ \forall w < \widetilde{w} \tag{C.9}$$

Consequently, this firm would have a profitable deviation, which would be not pay the up-front cost $C$ and become a $NI$-firm.

**Proof of Theorem 1:**

---

[46]Notice that we do not include $c_I$ since the worker do not to enroll in the health coverage.

PROOF. Suppose there exists $w_B, w_A$, such that $w_B$ is offered by no health-coverage firm while $w_A$ is offered by a health-coverage firm and $w_B > w_A$. Then, from equations (28) and (30), we have:

$$\left( p_I - \left[ 1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)} \right] w_A \left( 1 + t \right) \right) l_I \left( w_A \right)$$
$$\geq \left( p_I - \left[ 1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)} \right] w_B \left( 1 + t \right) \right) l_I \left( w_B \right) \tag{C.10}$$

where $p_I = p - \left[ 1 + \frac{\pi_I}{(\rho_I + \delta_S)} \right] c_I$, and

$$\left( p - \left[ 1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)} \right] \omega^* \left( w_B \right) \left( 1 + t \right) \right) l_{NI} \left( w_B \right)$$
$$\geq \left( p - \left[ 1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)} \right] \omega^* \left( w_A \right) \left( 1 + t \right) \right) l_{NI} \left( w_A \right) \tag{C.11}$$

From equation (27), we have

$$\frac{l_I \left( w \right)}{l_{NI} \left( w \right)} = \frac{\delta + \lambda_1 \left( 1 - F \left( w \right) \right) + \frac{\delta_S \pi_{NI}}{\rho_{NI} + \delta_S}}{\delta + \lambda_1 \left( 1 - F \left( w \right) \right) + \frac{\delta_S \pi_I}{\rho_I + \delta_S}} > 1 \tag{C.12}$$

Since $\pi_{NI} > \pi_I$ and $\rho_I > \rho_{NI}$. Taking the derivative with respect to $w$, we have:

$$\frac{d \left( \frac{l_I(w)}{l_{NI}(w)} \right)}{dw} = \frac{\lambda_1 F' \left( w \right) \delta_S \left[ \frac{\pi_{NI}}{\rho_{NI} + \delta_S} - \frac{\pi_I}{\rho_I + \delta_S} \right]}{\left\{ \delta + \lambda_1 \left( 1 - F \left( w \right) \right) + \frac{\delta_S \pi_I}{\rho_I + \delta_S} \right\}^2} > 0 \tag{C.13}$$

Therefore, this ratio is larger than 1 and increasing. In particular, it follows that:

$$\frac{l_I(w_B)}{l_I(w_A)} > \frac{l_{NI}(w_B)}{l_{NI}(w_A)}. \tag{C.14}$$

To study the instantaneous profit per worker, notice:

$$\frac{d \left\{ \frac{\left( p_I - \left[ 1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)} \right] w(1+t) \right)}{\left( p - \left[ 1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)} \right] \omega^*(w)(1+t) \right)} \right\}}{dw} =$$
$$= \frac{\left\{ \begin{array}{c} - \left[ 1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)} \right] \times \\ \times \left( p - \left[ 1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)} \right] \omega^* \left( w \right) \left( 1 + t \right) \right) \\ + \left[ 1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)} \right] \frac{d\omega^*(w)}{dw} \times \\ \times \left( p_I - \left[ 1 + \frac{\alpha \pi_I}{(\rho_I + \delta_S)} \right] w \left( 1 + t \right) \right) \end{array} \right\} (1+t)}{\left( p - \left[ 1 + \frac{\alpha \pi_{NI}}{(\rho_{NI} + \delta_S)} \right] \omega^*(w)(1+t) \right)^2} \tag{C.15}$$

51

From Lemma C.2, we showed that for any $w > \widetilde{w}$, $\frac{d\omega^*(w)}{dw} > 1$. Consequently:

$$\frac{d\left\{\frac{\left(p_I - \left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]w(1+t)\right)}{\left(p - \left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\omega^*(w)(1+t)\right)}\right\}}{dw_I} > \frac{\left\{\left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]p_I\frac{\omega^*(w)}{w} - \left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]p\right\}(1+t)}{\left(p - \left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\omega^*(w)(1+t)\right)^2} \quad \text{(C.16)}$$

Rearranging it, we have:

$$\frac{d\left\{\frac{\left(p_I - \left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]w(1+t)\right)}{\left(p - \left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\omega^*(w)(1+t)\right)}\right\}}{dw} >$$

$$> \frac{\left\{\begin{array}{c}\left\{\left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\frac{\omega^*(w)}{w} - \left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]\right\}p \\ -\left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right]\frac{\omega^*(w)}{w}c_I\end{array}\right\}(1+t)}{\left(p - \left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\omega^*(w)(1+t)\right)^2} \quad \text{(C.17)}$$

Notice that the term in the RHS of the inequality presented in (C.17) is positive if:

$$\frac{\left\{1 - \frac{\left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]}{\left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]}\frac{w}{\omega^*(w)}\right\}}{\left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right]}p > c_I \quad \text{(C.18)}$$

From Lemma C.1, we have that $\frac{w_I}{\omega^*(w_I)} < 1$. Consequently, a sufficient condition for the RHS of the inequality presented in (C.17) to be positive is:

$$c_I < \frac{\left\{1 - \frac{\left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]}{\left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]}\right\}}{\left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right]}p \quad \text{(C.19)}$$

which is one of our maintained assumption. Since by Lemma 2 no firm that offers health insurance would offer a wages lower than $\widetilde{w}$, there is no loss of generality. Summing up, we were able to show:

$$\frac{d\left\{\frac{\left(p_I - \left[1 + \frac{\alpha\pi_I}{(\rho_I + \delta_S)}\right]w(1+t)\right)}{\left(p - \left[1 + \frac{\alpha\pi_{NI}}{(\rho_{NI} + \delta_S)}\right]\omega^*(w)(1+t)\right)}\right\}}{dw} > 0 \quad \text{(C.20)}$$

But given that $w_B > w_A$, after a few manipulations, the inequality in (C.20) implies that:

$$\frac{p_I - \left(1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right) w_B (1+t)}{p_I - \left(1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right) w_A (1+t)} > \frac{p - \left(1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right) \omega^*(w_B)(1+t)}{p - \left(1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right) \omega^*(w_A)(1+t)}. \tag{C.21}$$

Now, putting (C.14) and (C.21) together, it follows that:

$$\frac{p_I - \left(1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right) w_B (1+t)}{p_I - \left(1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right) w_A (1+t)} \times \frac{l_I(w_B)}{l_I(w_A)} > \frac{p - \left(1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right) \omega^*(w_B)(1+t)}{p - \left(1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right) \omega^*(w_A)(1+t)} \times \frac{l_{NI}(w_B)}{l_{NI}(w_A)} \tag{C.22}$$

From (C.11) we have that the RHS of inequality (C.22) is bigger than one. Consequently, we have:

$$\begin{aligned} &\left(p_I - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_B (1+t)\right) l_I(w_B) - C \\ &\geq \left(p_I - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_A (1+t)\right) l_I(w_A) - C, \end{aligned} \tag{C.23}$$

contradicting inequality (C.10), which was derived based on our initial assumption that $w_A < w_B$ was the profit maximizing choice of the health-coverage firm. The connectedness follows from the fact that any 'holes' will give an opportunity for a profitable deviation by the next (higher) firm, it can increase instantaneous profit per worker, without losing workers faster, or gaining slower. For details in this argument, please see Burdett and Mortensen [6].

Based on Theorem 1, it is straightforward to show the following results.

**Corollary C.1** The minimum wage posted by a firm that do not offer health insurance is $R_U^{NI}$, while the minimum wage posted by a firm that offers health insurance is $\widetilde{w}$.

**Corollary C.2** There is no mass point in the distribution of offered wages.

## Appendix D

In this appendix, we will construct the steady-state equilibrium measures and distributions. In particular, we will construct the equilibrium distributions of earned and posted wages, as well as the measure of workers in each state (sick and employed, sick and unemployed, healthy and employed,

and healthy and unemployed) in the steady state. In this way, we will show the existence of a steady-state equilibrium by construction.

We start pinning down the cumulative distribution of earned wages by healthy workers at firms offering and not offering health coverage – $G_i(\cdot)$, $i \in \{I, NI\}$. In order to show this result, we initially take as given not only the distribution of posted wages – $F_i(\cdot)$, $i \in \{I, NI\}$ – as well as the distribution of earned wages by sick employees – $S_i(\cdot)$, $i \in \{I, NI\}$ and the measures of workers in each possible state. As previously mentioned, all these equilibrium objects will be pinned down later in this appendix.

We pin down these distributions by looking at the inflows and outflows at any given point in time. Starting with the distribution of employed workers with health coverage that earn wage a wage rate less or equal to $w$, we have that the distribution varies over time according to the following expression:

$$\frac{dG_I(w,t)}{dt} = \left\{ \begin{array}{c} (1-\gamma_{NI})\, F_I(w,t)\,[\lambda_0 u(t) + \lambda_1 v_{NI}(m - u - s_e - s_u)] \\ + \rho_I S_I(w,t)\,(1 - \mathfrak{s}_{NI})\, s_e \\ -\lambda_1\,(1-\gamma_{NI})\,(1-F_I(w,t))\, G_I(w,t)\,(1-v_{NI})\,(m - s_e - s_u - u) \\ -(\delta + \pi_I) G_I(w,t)\,(1-v_{NI})\,(m - s_e - s_u - u) \end{array} \right\} \quad \text{(D.1)}$$

where the first two terms in the RHS determine the inflow from unemployment, from jobs without coverage, and sickness, respectively. The last two terms in the RHS present outflows to other firms and to unemployment and sickness, respectively. Since we are focusing on the steady state equilibrium, we have that in steady state $\frac{dG_I(w,t)}{dt} = 0$. Consequently:

$$G_I(w) = \frac{\left\{ \begin{array}{c} [\lambda_0 u + \lambda_1 v_{NI}(m - u - s_e - s_u)]\,(1-\gamma_{NI})\, F_I(w) \\ + \rho_I S_I(w)\,(1 - \mathfrak{s}_{NI})\, s_e \end{array} \right\}}{\left[ \begin{array}{c} \lambda_1\,(1-\gamma_{NI})\,(1 - F_I(w)) \\ +\delta + \pi_I \end{array} \right]\,(1-v_{NI})\,(m - s_e - s_u - u)} \quad \text{(D.2)}$$

Using a similar argument, we can pin down the earned wage distribution for sick employees at firms that offer insurance $(S_I(\cdot))$. Notice that this case in simpler, since sick workers cannot move on-the-job. Consequently, we have:

$$S_I(w) = \frac{\pi_I G_I(w)\,(1-v_{NI})\,(m - s_e - s_u - u)}{(\delta_S + \rho_I)\,(1 - \mathfrak{s}_{NI})\, s_e} \quad \text{(D.3)}$$

54

Finally, we can follow the same process to obtain the distribution of earned wages by healthy and sick workers at no health-coverage firms. Apart from the difference in the flow rates of moving in and out of sickness, we also need to keep in mind that due to Theorem 1, no worker at a firm that offers insurance will move on the job to a no health-coverage firm, while any worker at a firm without coverage will move to a job that offers insurance. Consequently, the steady-state distributions $G_{NI}(\cdot)$ and $S_{NI}(\cdot)$ are given by:

$$G_{NI}(w) = \frac{\lambda_0 \gamma_{NI} F_{NI}(w) u + \rho_{NI} S_{NI}(w) \mathfrak{s}_{NI} s_e}{\left[\begin{array}{c} \lambda_1 \gamma_{NI}(1 - F_{NI}(w)) \\ + \lambda_1(1 - \gamma_{NI}) + \delta + \pi_{NI} \end{array}\right] \upsilon_{NI}(m - s_e - s_u - u)} \tag{D.4}$$

and

$$S_{NI}(w) = \frac{\pi_{NI} G_{NI}(w) \upsilon_{NI}(m - s_e - s_u - u)}{(\delta_S + \rho_{NI}) \mathfrak{s}_{NI} s_e} \tag{D.5}$$

Therefore, equations $(D.1) - (D.5)$ pin down the distributions of earned wages based on the equilibrium measures of workers in each state and the distributions of posted wages $F_i(\cdot)$, $i \in \{I, NI\}$.

We must now pin down the distribution of posted wages. In order to obtain $F_I(\cdot)$, we use the profit equality condition for all wages offered by companies that provide health insurance. Consider that $w_0^I$ is the minimum wage offered by a company with health insurance in equilibrium, while $w_I$ is another profit-maximizing wage offered by a HI-firm in equilibrium. Therefore, it must be true that a HI-firm is indifferent between posting these two wages, i.e.:

$$\begin{pmatrix} p - \left[1 + \frac{\pi_I}{\rho_I + \delta_S}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_0^I (1 + t) \end{pmatrix} \frac{\lambda_0 u + \lambda_1 G(w_0^I)(m - u - s_e - s_u)}{\delta + \lambda_1(1 - F(w_0^I)) + \frac{\delta_S}{\rho_I + \delta_S} \pi_I} - C$$

$$= \begin{pmatrix} p - \left[1 + \frac{\pi_I}{\rho_I + \delta_S}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_I (1 + t) \end{pmatrix} \frac{\lambda_0 u + \lambda_1 G(w_I)(m - u - s_e - s_u)}{\delta + \lambda_1(1 - F(w_I)) + \frac{\delta_S}{\rho_I + \delta_S} \pi_I} - C \tag{D.6}$$

where $F(\cdot)$ and $G(\cdot)$ are described in equations (24) and (25), respectively. Then, based on the results from Theorem 1, we know that $w_0^I$ must be the highest equivalent-wage offered by a company that does not offer health insurance, given that the support of posted equivalent-wages is connected. Consequently, we have that $F\left(w_0^I\right) = \gamma_{NI}$. Similarly, $G\left(w_0^I\right) = \upsilon_{NI}$. Therefore, substituting these values in equation (D.6) and manipulating it, we obtain:

$$F_I\left(w\right) = \frac{\left[\delta + \lambda_1\left(1 - \gamma_{NI}\right) + \frac{\delta_S}{\rho_I + \delta_S}\pi_I\right]}{\lambda_1\left(1 - \gamma_{NI}\right)}\left\{1 - \left(\frac{p - \left[1 + \frac{\pi_I}{\rho_I + \delta_S}\right]c_I - \left(1 + \frac{\alpha\pi_I}{\rho_I + \delta_S}\right)w\left(1 + t\right)}{p - \left[1 + \frac{\pi_I}{\rho_I + \delta_S}\right]c_I - \left(1 + \frac{\alpha\pi_I}{\rho_I + \delta_S}\right)w_0^I\left(1 + t\right)}\right)^{\frac{1}{2}}\right\} \quad \text{(D.7)}$$

A similar argument can be used to pin down $F_{NI}\left(\cdot\right)$. Based on Theorem 1 and a simple argument of optimality, we can easily show that the minimum wage offered by a no health-coverage firm is $R_U^{NI}$. Then, in equilibrium, a no health-coverage firm must be indifferent between posting $R_U^{NI}$ or any other wage $w_{NI}$ in the support of $F_{NI}\left(\cdot\right)$:

$$\begin{aligned}
\left(p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)R_U^I\left(1 + t\right)\right)&\frac{\lambda_0 u}{\delta + \lambda_1 + \frac{\delta_S}{\rho_{NI} + \delta_S}\pi_{NI}} \\
= \left(p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta}\right)\omega^*\left(w_{NI}\right)\left(1 + t\right)\right)&\times \\
\times\frac{\lambda_0 u + \lambda_1 v_{NI} G_{NI}(\omega^*(w_{NI}))(m - u - s_e - s_u)}{\delta + \lambda_1(1 - \gamma_{NI}F_{NI}(\omega^*(w_{NI}))) + \frac{\delta_S}{\rho_{NI} + \delta_S}\pi_{NI}}
\end{aligned} \quad \text{(D.8)}$$

Substituting equations (D.4) and (D.5) and manipulating, we obtain:

$$F_{NI}\left(\omega^*\left(w_{NI}\right)\right) = \frac{\left[\delta + \lambda_1 + \frac{\delta_S}{\rho_{NI} + \delta_S}\pi_{NI}\right]}{\lambda_1\gamma_{NI}}\left\{1 - \left(\frac{p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)\omega^*\left(w_{NI}\right)\left(1 + t\right)}{p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)R_U^I\left(1 + t\right)}\right)^{\frac{1}{2}}\right\} \quad \text{(D.9)}$$

Since $\omega^*\left(\cdot\right)$ is a strictly increasing function, we can make a simple transformation in variables in order to obtain the distribution in levels (see details in Pinheiro and Visschers [32]):

$$F_{NI}\left(w_{NI}\right) = \frac{\left[\delta + \lambda_1 + \frac{\delta_S}{\rho_{NI} + \delta_S}\pi_{NI}\right]}{\lambda_1\gamma_{NI}}\left\{1 - \left(\frac{p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)w_{NI}\left(1 + t\right)}{p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)R_U^{NI}\left(1 + t\right)}\right)^{\frac{1}{2}}\right\} \quad \text{(D.10)}$$

Finally, to fully characterize the wages offered and earned in equilibrium we need to find the reservation wage, $R_U^i$, and the maximum wage posted, $\bar{w}_i$ for both firms that offer and do not offer health insurance. First let's find the highest wage offered by a no health-coverage firm. From $F_{NI}(\bar{w}_{NI}) = 1$, we obtain:

$$\bar{w}_{NI} = \frac{1}{\left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)\left(1 + t\right)}\left\{p - \left[\begin{array}{c}\left(\frac{\delta + \lambda_1(1 - \gamma_{NI}) + \frac{\delta_S}{\rho_{NI} + \delta_S}\pi_{NI}}{\delta + \lambda_1 + \frac{\delta_S}{\rho_{NI} + \delta_S}\pi_{NI}}\right)^2 \times \\ \times\left(p - \left(1 + \frac{\alpha\pi_{NI}}{\rho_{NI} + \delta_S}\right)R_U^{NI}\left(1 + t\right)\right)\end{array}\right]\right\} \quad \text{(D.11)}$$

Note that the value of $\bar{w}_{NI}$ depends crucially on $\gamma_I$. Indeed, as $\gamma_{NI} \to 0$, $\bar{w}_{NI} \to R_U^{NI}$. Since the dispersion of wages offered by no health-coverage companies on the interval $\left[R_U^{NI}, \bar{w}_{NI}\right]$ is generated

by the competition between no health-coverage companies, as the measure of no health-coverage companies goes down, this dispersion shrinks to 0.

Similarly, we can derive the maximum wage paid by firms that offer health insurance by setting $F_I(\bar{w}_I) = 1$:

$$\bar{w}_I = \frac{1}{\left(1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right)(1 + t)} \left\{ \begin{array}{c} p - \left(\frac{\delta + \frac{\delta_S \pi_I}{\rho_I + \delta_S}}{\delta + \lambda_1(1 - \gamma_{NI}) + \frac{\delta_S \pi_I}{\rho_I + \delta_S}}\right)^2 \times \\ \times \left(p - \left(1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right) w_0^I (1 + t)\right) \end{array} \right\} \tag{D.12}$$

Again, since wage dispersion within health-coverage firms depends only on the competition among these firms — as we showed in Theorem 1 — as $\gamma_{NI} \to 1$, we have that $\bar{w}_I \to w_0^I$.

In order to obtain $w_0^I$, we must compare the minimum wage asked by employees to accept health coverage once offered, $\tilde{\omega}$, and the optimal wage $w_0^{L*}$ obtained by equating $\omega^*\left(w_0^{L*}\right)$ to $\bar{w}_{NI}$. In other words, if $\tilde{\omega} < w_0^{L*}$, then the constraint that the minimum wage offered by a HI-firm is above the threshold that induces workers to join the insurance is non-binding and the usual arguments for a connected support in the wage-posting distribution applies. Otherwise, the minimum wage posted by a firm offering coverage must be $\tilde{\omega}$. Consequently, we have that the lower bound in the support of $F_I(\cdot)$ is:

$$w_0^I = \max\left\{w_0^{L*}, \tilde{w}\right\} \tag{D.13}$$

Finally, in order to obtain an expression for $R_U^{NI}$ we start with the expression $V_{NI}(R_U^{NI}) = V_0$ and manipulating while substituting in it all the previously discussed results. Although the algebraic manipulations are straightforward, the final expression is particularly lengthy, so we will omit it here, being available upon request.

We now move towards the steady-state measures of workers in each given state. Similarly to the approach used to pin down cumulative distributions, we will also use the equality of inflows and outflows to a given state in order to pin down the steady-state magnitude. Consequently, the equality of inflow and outflow for the states healthy and unemployed ($u$), sick and unemployed ($s_u$), sick and employed ($s_e$) gives us the following equations:

$$\delta\left(m - u - s_e - s_u\right) + \rho_{NI} s_u = \pi_{NI} u + \lambda_0 u \tag{D.14}$$

$$\delta_S s_e + \pi_{NI} u = \rho_{NI} s_u \tag{D.15}$$

$$\left\{ \begin{array}{c} v_{NI}\left(m - u - s_e - s_u\right) \pi_{NI} \\ + \left(1 - v_{NI}\right)\left(m - s_e - s_u - u\right) \pi_I \end{array} \right\} = \mathfrak{s}_{NI} s_e \rho_{NI} + \left(1 - \mathfrak{s}_{NI}\right) s_e \rho_I + \delta_S s_e \tag{D.16}$$

For employed workers, the we also need to know the proportion of workers without health coverage both among healthy ($v_{NI}$) and sick ($\mathfrak{s}_{NI}$) workers. Again, from equality between inflows and outflows in a steady state, we have:

$$\lambda_0 \gamma_{NI} u + \rho_{NI} \mathfrak{s}_{NI} s_e = \left\{ \begin{array}{c} \delta v_{NI} \left(m - s_e - s_u - u\right) + \pi_{NI} v_{NI} \left(m - s_e - s_u - u\right) \\ + \lambda_1 \left(1 - \gamma_{NI}\right) v_{NI} \left(m - s_e - s_u - u\right) \end{array} \right\} \quad \text{(D.17)}$$

$$\pi_{NI} v_{NI} \left(m - s_e - s_u - u\right) = \delta_S \mathfrak{s}_{NI} s_e + \rho_{NI} \mathfrak{s}_{NI} s_e \quad \text{(D.18)}$$

Equations (D.14) − (D.18) gives us a system of 5 equations and 5 unknowns ($v_{NI}$, $s_e$, $\mathfrak{s}_{NI}$, $u$, $s_u$). Solving this system, we pin down all the steady state measures of workers needed to complete our equilibrium objects.

**Proof of Theorem 2:**

Proof. In order to prove this theorem, we need to show three auxiliary claims:

**Claim 1:** If type 0 and and type 1 firms offer the same health coverage deal and wages $w_0$ and $w_1$, respectively, we must have $w_1 \geq w_0$.

Proof. Suppose that type 1 and type 0 firms offer health insurance and that $w_1$ and $w_0$ are profit-maximizing wages for firms type 1 and 0, respectively. Then, we have that:

$$
\begin{aligned}
\text{Profit}_{I,1}\left(w_1\right) &= \left( \begin{array}{c} p_1 - \left[1 + \frac{\pi_I}{\left(\rho_I + \delta_S\right)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_1 (1+t) \end{array} \right) l_I\left(w_1\right) - C \geq \\
&\geq \left( \begin{array}{c} p_1 - \left[1 + \frac{\pi_I}{\left(\rho_I + \delta_S\right)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_0 (1+t) \end{array} \right) l_I\left(w_0\right) - C > \\
&> \left( \begin{array}{c} p_0 - \left[1 + \frac{\pi_I}{\left(\rho_I + \delta_S\right)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_0 (1+t) \end{array} \right) l_I\left(w_0\right) - C = \\
&= \text{Profit}_{I,0}\left(w_0\right) \geq \\
&\geq \left( \begin{array}{c} p_0 - \left[1 + \frac{\pi_I}{\left(\rho_I + \delta_S\right)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_1 (1+t) \end{array} \right) l_I\left(w_1\right) - C
\end{aligned}
$$

Now, comparing the difference between the first and the last terms of the above expression with

58

the difference between the middle two yields the following inequality:

$$(p_1 - p_0) \, l_I \, (w_1) \geq (p_1 - p_0) \, l_I \, (w_0) \tag{D.19}$$

Since $l_I \, (\cdot)$ is increasing in $w$, we must have $w_1 \geq w_0$. An identical argument shows that the same must be true if both firm types do not offer health coverage. $\square$

**Claim 2:** If type 0 firms offer both contracts with and without health coverage, type 1 firms will offer contracts with health coverage.

PROOF. Towards a contradiction, consider the case in which a type 0 firm offers both deals with health insurance and without while type 1 firms only offer jobs without health insurance. In particular, consider the case in which the wages offered are $w_{0i}$ and $\bar{w}_{0ni}$, where $\bar{w}_{0ni}$ is the highest wage offered by type 0 firms that do not offer health coverage and $w_{0i}$ is any profit-maximizing wage in the case in which a type 0 firm offers health insurance. Due to profit equalization, we have:

$$\left( \begin{array}{c} p_0 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_{0i}(1+t) \end{array} \right) l_I \, (w_{0i}) - C = \left( p_0 - \left[1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right] \bar{w}_{0ni}(1+t) \right) l_{NI} \, (\bar{w}_{0ni}) \tag{D.20}$$

As mentioned before, we assume that type 1 firms only offer jobs without health insurance. Assume that $\underline{w}_{1ni}$ is the lowest wage among the optimal wages offered by a type 1 firm. Therefore, we must have:

$$\left( \begin{array}{c} p_1 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_{0i}(1+t) \end{array} \right) l_I \, (w_{0i}) - C < \left( p_1 - \left[1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right] \underline{w}_{1ni}(1+t) \right) l_{NI} \, (\underline{w}_{1ni}) \tag{D.21}$$

Due to the fact that the distribution of wages within contract type (with and without health insurance) is connected and due to Claim 1, we have that: $\underline{w}_{1ni} = \bar{w}_{0ni}$.[47] Therefore, the above inequality can be rewritten as:

$$\left( \begin{array}{c} p_1 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] w_{0i}(1+t) \end{array} \right) l_I \, (w_{0i}) - C < \left( p_1 - \left[1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right] \bar{w}_{0ni}(1+t) \right) l_{NI} \, (\bar{w}_{0ni}) \tag{D.22}$$

---

[47]Notice that we are discussing wages within a given contract type - with or without health coverage. Therefore, we do not need to be concerned about the potential overlap in actual wages between firms offering and not offering coverage.

Now, from equations (D.20) and (D.22), we have:

$$(p_0 - p_1)\, l_I\,(w_{0i}) > (p_0 - p_1)\, l_{NI}\,(\overline{w}_{0ni}) \tag{D.23}$$

Which is a contradiction, since $p_0 - p_1 < 0$ and $l_I\,(w_{0i}) > l_{NI}\,(\overline{w}_{0ni})$. $\square$

**Claim 3:** If type 0 firms offer both contracts with and without health coverage, type 1 firms will offer only jobs with health coverage.

PROOF. Towards a contradiction, consider the case in which both types offer contracts with and without health coverage. In particular, consider $\bar{w}_{0i}$ and $\bar{w}_{0ni}$ the highest salary offered by a type 0 firm offering health insurance and the highest wage offered by a firm that does not offer health insurance, respectively. Since in equilibrium firms offering these contracts must be indifferent, we have:

$$\begin{pmatrix} p_0 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] \bar{w}_{0i}(1 + t) \end{pmatrix} l_I\,(\bar{w}_{0i}) - C = \\ = \left(p_0 - \left[1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right] \bar{w}_{0ni}(1 + t)\right) l_{NI}\,(\bar{w}_{0ni}) \tag{D.24}$$

Similarly, consider $\underline{w}_{1i}$ and $\underline{w}_{1ni}$ the lowest wages offered by type 1 firms offering and not offering health insurance, respectively. Again, due to profit equalization, we have:

$$\begin{pmatrix} p_1 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] \underline{w}_{1i}(1 + t) \end{pmatrix} l_I\,(\underline{w}_{1i}) - C = \\ = \left(p_1 - \left[1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right] \underline{w}_{1ni}(1 + t)\right) l_{NI}\,(\underline{w}_{1ni}) \tag{D.25}$$

Again, due to the fact that the distribution of wages within contract type (with and without health insurance) is connected and due to Claim 1, we have that: $\underline{w}_{1ni} = \bar{w}_{0ni}$ and $\bar{w}_{0i} = \underline{w}_{1i}$. Therefore, the last equality can be rewritten as:

$$\begin{pmatrix} p_1 - \left[1 + \frac{\pi_I}{(\rho_I + \delta_S)}\right] c_I \\ - \left[1 + \frac{\alpha \pi_I}{\rho_I + \delta_S}\right] \bar{w}_{0i}(1 + t) \end{pmatrix} l_I\,(\bar{w}_{0i}) - C = \\ = \left(p_1 - \left[1 + \frac{\alpha \pi_{NI}}{\rho_{NI} + \delta_S}\right] \bar{w}_{0ni}(1 + t)\right) l_{NI}\,(\bar{w}_{0ni}) \tag{D.26}$$

Now, subtracting the profit equality conditions for type 1 and type 0 firms from each other, we

have:

$$(p_0 - p_1) \, l_I \, (\bar{w}_{0i}) = (p_0 - p_1) \, l_{NI} \, (\bar{w}_{0ni}) \tag{D.27}$$

which is a contradiction, since $l_I \, (\bar{w}_{0i}) > l_{NI} \, (\bar{w}_{0ni})$. $\square$

Based on the three claims above, we obtain the Theorem 2 through the following argument: In order to show the first statement, just combine claims $1, 2$, and $3$. Similar arguments deliver the result when high productivity firms offer both types of jobs.



**Figure 1:** Potential worker states and probabilities of transition



**Graph 1:** Impact of Insurance cost on main labor market variables

**Table 1: Descriptives**

Descriptions of the variables are presented in table A.1. Variables calculated taking into account a two-year period.

| Variable | Mean | Median | St. Dev. | N |
|----------|------|--------|----------|---|
| Health Insurance | 0.72 | 1 | .448 | 25,171 |
| Workdays Missed | 6.68 | 1 | 17.686 | 25,171 |
| Health Status | 52.32 | 54.3 | 6.684 | 25,171 |
| log(Income) | 11.06 | 11 | .634 | 25,171 |
| Firm Size | 4.18 | 4.2 | 1.660 | 25,171 |
| Paid Leave | 0.74 | 1 | .4359 | 25,171 |
| Union Member | 0.16 | 0 | .364 | 25,171 |
| Age | 41.69 | 42 | 10.555 | 25,171 |
| Male | 0 .51 | 1 | .500 | 25,171 |
| Married | 0.63 | 1 | .482 | 25,171 |
| Family Size | 3.10 | 3 | 1.543 | 25,171 |
| Obese | 0.31 | 0 | .464 | 25,171 |
| Diabetes | 0.06 | 0 | .243 | 25,171 |
| Smoker | 0.21 | 0 | .406 | 25,171 |
| White Collar | 0.39 | 0 | .488 | 25,171 |
| Hispanic | 0.21 | 0 | .404 | 25,171 |
| Black | 0.15 | 0 | .358 | 25,171 |
| Northeast | 0.16 | 0 | .366 | 25,171 |
| Midwest | 0.23 | 0 | .418 | 25,171 |
| West | 0.25 | 0 | .432 | 25,171 |
| South | 0.36 | 0 | .482 | 25,171 |
| Same Job | 0.94 | 1 | .296 | 25,171 |
| Years of Education | 13.34 | 13 | 2.919 | 25,171 |

*Source:* MEPS panels 5-16 and authors' calculations

**Table 2.1: Health Insurance Coverage per Region**

Descriptions of the variables are presented in table A.1. Variables calculated taking into account a two-year period.

| Health Insurance | Northeast | Midwest | South | West | Total |
|------------------|-----------|---------|-------|------|-------|
| No | 1,082 | 1,470 | 2,591 | 1,877 | 7,020 |
| Yes | 2,936 | 4,239 | 6,609 | 4,367 | 18,151 |
| **Total** | **4,018** | **5,709** | **9,200** | **6,244** | **25,171** |

*Source:* MEPS panels 5-16 and authors' calculations

**Table 2.2: Descriptives per Region**

Descriptions of the variables are presented in table A.1. Variables calculated taking into account a two-year period.

| Variable | Northeast | Midwest | South | West |
|---|---|---|---|---|
| Health Status | 52.70 | 52.50 | 51.84 | 52.65 |
| log(Income) | 11.17 | 11.10 | 10.97 | 11.07 |
| Firm Size | 4.31 | 4.28 | 4.14 | 4.08 |
| Paid Leave | .81 | .74 | .74 | .72 |
| Union Member | .26 | .19 | .08 | .17 |
| Age | 43.03 | 41.69 | 41.53 | 40.82 |
| Male | .49 | .50 | .49 | .55 |
| Married | .63 | .64 | .62 | .64 |
| Family Size | 3.02 | 3.01 | 3.05 | 3.31 |
| Obese | .27 | .32 | .36 | .27 |
| Diabetes | .057 | .06 | .070 | .058 |
| Smoker | .194 | .236 | .223 | .159 |
| White Collar | .42 | .41 | .37 | .39 |
| Hispanic | .138 | .080 | .200 | .37 |
| Black | .14 | .10 | .25 | .052 |
| Same Job | .94 | .94 | .92 | .94 |
| Years of Education | 13.84 | 13.74 | 13.13 | 12.99 |

*Source:* MEPS panels 5-16 and authors' calculations

**Table 3: Evolution of Health coverage**

The table reports the number of agents in each health insurance coverage status transition between years 1 and 2 of the MEPS' panels. Reported in parentheses is the fraction of agents that had a given coverage status in year 1 that ultimately ended up with a given year 2-coverage status.

| Health Insurance Year 1 | Health Insurance Year 2 | | |
|---|---|---|---|
| | *No* | *Yes* | *Total* |
| *No* | 5,746 (91.60) | 527 (8.40) | **6,273** (100) |
| *Yes* | 280 (1.68) | 16,350 (98.32) | **16,630** (100) |
| *Total* | **6,026** (26.31) | **16,877** (73.69) | **22,903** (100) |

65

**Table 4: Two stage residual inclusion approach**

Poisson and Negative Binomial columns show the results of the 2nd. stage regression, which includes the residuals of a first stage OLS of health insurance on firm and worker characteristics and regional dummies. Descriptions of the variables are presented in table A.1. Coefficients for Panel, Hispanic, Black, and Industry dummies are omitted. St. Errors presented in parenthesis.

|  | **Poisson** | **Neg. Binomial** | **GMM** |
|---|---|---|---|
| Health Insurance | -1.833** | -1.450** | -2.195** |
|  | (0.714) | (0.718) | (1.049) |
| Health Status | -0.069*** | -0.076*** | -0.071*** |
|  | (0.002) | (0.002) | (0.003) |
| log(Income) | 0.125 | 0.076 | 0.183 |
|  | (0.079) | (0.085) | (0.137) |
| Firm Size | 0.163*** | 0.133*** | 0.180*** |
|  | (0.035) | (0.034) | (0.043) |
| Paid Leave | 0.721*** | 0.556** | 0.780*** |
|  | (0.226) | (0.227) | (0.229) |
| Union Member | 0.564*** | 0.541*** | 0.663*** |
|  | (0.089) | (0.089) | (0.177) |
| Age | -0.007*** | -0.005*** | -0.008*** |
|  | (0.002) | (0.002) | (0.002) |
| Male | -0.221*** | -0.352*** | -0.171* |
|  | (0.057) | (0.051) | (0.098) |
| Married | -0.192*** | -0.173** | -0.388 |
|  | (0.074) | (0.080) | (0.247) |
| Family Size | -0.073*** | -0.067*** | -0.085*** |
|  | (0.020) | (0.019) | (0.029) |
| Obese | 0.122*** | 0.156*** | 0.157*** |
|  | (0.036) | (0.033) | (0.051) |
| Diabetes | 0.209*** | 0.310*** | 0.218*** |
|  | (0.068) | (0.070) | (0.071) |
| Smoker | 0.148*** | 0.145*** | 0.120** |
|  | (0.039) | (0.037) | (0.049) |
| White Collar | -0.140*** | -0.125*** | -0.136*** |
|  | (0.034) | (0.037) | (0.044) |
| Residuals | 1.990*** | 1.632** |  |
|  | (0.717) | (0.717) |  |
| $N$ | 25,171 | 25,171 | 25,171 |

* $p < 0.1$; ** $p < 0.05$; *** $p < 0.01$

66

**Table 5: Panel Poisson with Fixed Effects**

Descriptions of the variables are presented in Table A.1. St. Errors presented in parenthesis. 9,278 individuals (18,556 obs.) dropped because of all zero outcomes. Only workers that did not change jobs in the 2-year panel period are included.

|  | **Missed Workdays** |
|---|---|
| Panel-HI | -0.197*** |
|  | (0.030) |
| Health Status | -0.042*** |
|  | (0.001) |
| log(Income) | -0.133*** |
|  | (0.010) |
| Age | 0.005 |
|  | (0.005) |
| Married | -0.116*** |
|  | (0.032) |
| Family Size | 0.093*** |
|  | (0.010) |
| Obese | -0.052*** |
|  | (0.014) |
| Diabetes | -0.176*** |
|  | (0.038) |
| Smoker | -0.189*** |
|  | (0.020) |
| White Collar | 0.009 |
|  | (0.044) |
| No. of Individuals | 13,611 |
| No. of Obs. | 27,222 |

* $p < 0.1$; ** $p < 0.05$; *** $p < 0.01$

**Table 6: Calibration of Parameters**

| Parameter | Value | Interpretation |
|---|---|---|
| $p$ | 4,581.85 | After-tax monthly output per worker (information on total output from civilian non-rural establishments comes from the 2004 census, while the total employment by civilian non-rural establishments comes from the BLS); |
| $b$ | 738 | Unemployed benefit is set to 36% of monthly average wage for workers without health coverage in 2004 in the MEPS database ; |
| $m$ | 22.64 | Ratio of the size of the labor force that is not employed in rural areas or government divided by the number civilian non-rural establishments - values from the 2004 Census Statistics of U.S. Businesses; |
| $\lambda_0$ | 0.45 | Following Shimer [34]'s estimate of the average monthly job finding rate from 1951 to 2003 using the unemployment level and the number of workers unemployed for 0 to 4 weeks series, both constructed by the Bureau of Labor Statistics; |
| $\lambda_1$ | 0.339 | Set such that the job-to-job flow delivered by the model is around 2.9% (Nagypal [29]); |
| $\pi_{NI}$ | 0.64 | Considering the average number of missed workdays due to sickness for uninsured workers - based on our results for the Negative Binomial model in section 5 (marginal effect with all other variables at their mean values - 7.25 days per year). We assume here that each missed day is a different sickness spell due to the fact that 40% of sickness spells are 1 day long; |

| | | |
|---|---|---|
| $\pi_I$ | 0.124 | Considering the average number of missed work-days due to sickness for insured workers - based on our results for the Negative Binomial model in section 5 (marginal effect with all other variables at their mean values - 1.70 days per year). We assumed here that each missed day is a different sickness spell due to the fact that 40% of sickness spells are 1 day long; |
| $\rho_{NI}$ | 21 | From MEPS, length of a sickness spell is $\frac{1}{21}$ months for workers with and without health insurance; |
| $\rho_I$ | 21 | From MEPS, length of a sickness spell is $\frac{1}{21}$ months for workers with and without health insurance; |
| $\delta$ | 0.026 | Following Shimer [34]'s estimate of the job separation rate using data from the BLS with an unemployment rate of 5.5%; |
| $\delta_S$ | 0.3346 | Adjusted in order to obtain a fraction of firms that offer health insurance in equilibrium equal to 59%, the same fraction observed in the data ; |
| $\chi_{NI}$ | 639.78 | From MEPS, average out of pocket expenditure in health care (totslfy1/12) by uninsured per treatment; |
| $\chi_I$ | 391.56 | From MEPS, average out of pocket expenditure in health care (totslfy1/12) by insured per treatment; |
| $c_e$ | 40.03 | Worker's share (20%) of the average monthly cost of health insurance in 2004 ($200.15) ; |

69

| | | |
|---|---|---|
| $c_I$ | 160.12 | Firm's share (80%) of the average monthly cost of health insurance in 2004 ($200.15); |
| $C$ | 2.00 | 1% of the average monthly cost of health insurance in 2004 as set-up cost; |
| $r$ | 0.004 | Implied annual interest rate of 5% (Shimer [34]); |
| $\alpha$ | 0.8 | Based on worker's paid leave representing 60% of regular salary, which once it is non-taxed it represents 80% of regular wage (based on National Compensation Survey); |
| $tax$ | 0.35 | Tax price is 0.65, i.e., a dollar of health insurance costs 35 cents less than a dollar of other goods purchased with after-tax wage (Gruber [19]); |

**Table 7: Model vs. Actual Data**

| Variables | Benchmark | Actual data | % Variation |
|---|---|---|---|
| % of employed workers with HI | 95% | 72.11% | +32% |
| Unemployment | 5.87% | 5.73% | +2.44% |
| Ratio of wages - $I$ vs. $NI$ | 1.62 | 1.57 | +3.185% |

**Table 8: Effect of Higher Health Insurance Premium**

| Variables | Benchmark | Higher Premium | % Variation |
|---|---|---|---|
| % of firms offering insurance | 59% | 23.35% | −60.42% |
| % of workers insured | 95% | 80.34% | 15.43% |
| Fraction of sick workers | 0.845% | 1.18% | +39.64% |
| Unemployment rate | 5.87% | 6.09% | +3.75% |

**Table 9: Model with Lower Tax Benefits vs Benchmark**

| Variables | Benchmark | Lower Tax[1] | % Variation |
|---|---|---|---|
| % of firms offering insurance | 59% | 40% | −32.20% |
| % of workers insured | 95% | 89.85% | −5.42% |
| % of sick workers | 0.845% | 0.963% | +13.96% |
| Unemployment | 5.87% | 5.95% | +1.36% |
| Ratio of wages - $I$ vs. $NI$ | 1.62 | 1.37 | −15.43% |

[1]Tax Benefits reduced from 35 to 31.5%

**Table 10: Effects of Government Mandate**

| Variables | Benchmark | Mandate | % Variation |
|---|---|---|---|
| Firms' Aggregate Profit | 4,818.94 | 4,448.34 | −7.69% |
| Aggregate Product | 96,743.31 | 96,939.03 | +0.20% |
| % of firms offering HI | 59% | 100% | +69.49% |
| % of workers insured | 95% | 100% | +5.26% |
| % of sick workers | 0.845% | 0.729% | −13.73% |
| Unemployment | 5.87% | 5.80% | −1.19% |
| Social Welfare | 22,167,578.87 | 22,230,963.57 | +0.29% |

**Table 11: Preventive vs Curative Methods**

| Variables | Benchmark | Preventive | Curative |
|---|---|---|---|
| % of firms offering HI | 59% | 66.48% | 65.65% |
| % of workers insured | 95% | 96.40% | 96.27% |
| % of sick workers | 0.845% | 0.758% | 0.767% |
| Unemployment rate | 5.87% | 5.82% | 5.83% |

71

# EXHIBIT 2

1   ROBERT W. FERGUSON
    *Attorney General*

2
    RENE D. TOMISSER, WSBA #17509
3   *Senior Counsel*
    JEFFREY T. SPRUNG, WSBA #23607
4   ZACHARY P. JONES, WSBA #44557
    JOSHUA WEISSMAN, WSBA #42648
5   PAUL M. CRISALLI, WSBA #40681
    NATHAN K. BAYS, WSBA #43025
6   BRYAN M.S. OVENS, WSBA #32901
    *Assistant Attorneys General*
7   8127 W. Klamath Court, Suite A
    Kennewick, WA 99336
8   (509) 734-7285

9              **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF WASHINGTON**
10                    **AT RICHLAND**

| | |
|---|---|
| 11  STATE OF WASHINGTON, et al., | NO. 4:19-cv-05210-RMP |
| 12     Plaintiffs, | DECLARATION OF GRACE B. HOU IN SUPPORT OF PLAINTIFF |
| 13   v. | STATES' MOTION FOR § 705 STAY PENDING JUDICIAL |
| 14  UNITED STATES DEPARTMENT OF HOMELAND SECURITY, a | REVIEW OR FOR PRELIMINARY INJUNCTION |
| 15  federal agency, et al. | NOTED FOR: October 3, 2019 |
| 16     Defendants. | With Oral Argument at 10:00 a.m. |

17

18

19

20

21

22

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1            I, Grace B. Hou, declare as follows:

2            1.      I am over the age of 18, competent to testify as to the matters herein

3 and make this declaration based on my personal knowledge.

4            2.      I submit this Declaration in support of the State of Illinois' litigation

5 against the United States Department of Homeland Security regarding the

6 recently issued rule entitled Inadmissibility on Public Charge Grounds (Final

7 Rule). I have compiled the information in the statements set forth below either

8 through personal knowledge, through the Illinois Department of Human Services

9 (IDHS) personnel who have assisted me in gathering this information, or on the

10 basis of documents that I have reviewed. I have also familiarized myself with the

11 Final Rule in order to understand its immediate impact upon IDHS.

12            3.      I have served as the Secretary for the IDHS since March 2019. Prior

13 to that, I served as the president of Woods Fund Chicago, a grant-making

14 foundation that funds organizations that draw on the power of communities to

15 fight the brutality of poverty and structural racism. From 2003 to 2012, I served

16 as the Assistant Secretary at the IDHS with responsibility for the oversight of the

17 agency's program areas. During that time, I was a key leader in the creation and

18 implementation of the state's nationally acclaimed Immigrant Integration New

19 American's Executive Order. I previously served as executive director of Chinese

20 Mutual Aid Association and have been a vocal advocate for immigrant rights. I

21 earned a Master of Public Administration from the University of Illinois

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP

1

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    Springfield and a Bachelor of Science in journalism from the University of

2    Illinois at Urbana-Champaign.

3         4.    As Secretary, I work directly with the heads of the Illinois

4    Department of Healthcare and Family Services (HFS), the Illinois Department on

5    Aging, the Illinois Housing Development Authority, and the Illinois Department of

6    Public Health (among others) on high-level policy and strategic issues. I lead

7    IDHS, which includes 165 office locations, nearly 13,000 staff members, and a

8    wide range of programs and projects. IDHS oversees a broad portfolio of services

9    and works extensively with state, local, and community partners to improve the

10   health of all Illinois residents. The annual budget for IDHS in fiscal year 20 is

11   $6.9 billion, including $1.853 billion in federal funding.

12        5.    IDHS administers the Supplemental Nutrition Assistance Program

13   (SNAP) and Temporary Assistance for Needy Families (TANF) Programs. IDHS

14   also shares eligibility and enrollment responsibilities with HFS for medical

15   assistance programs, including Medicaid and the Children's Health Insurance

16   Program (CHIP). IDHS jointly administers the enrollment systems for these

17   programs with HFS and the Illinois Department of Innovation and Technology;

18   employs and supervises the staff at the local agency sites for customers, the Family

19   and Community Resource Centers; is responsible for communications with

20   customers; and shares responsibility for eligibility guidance to caseworkers with

21   HFS.

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP

2

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

6. In addition to the programs noted above, IDHS delivers a broad array of services to individuals, families and communities through five major program divisions: Family and Community Services, Rehabilitation Services, Developmental Disabilities, Mental Health, and Substance Use Prevention and Recovery.

7. I understand that the U.S. Department of Homeland Security (DHS) has issued a new regulation on the public charge ground of inadmissibility under the Immigration and Nationality Act, which I have reviewed. As I understand it, the Final Rule would allow the federal government to expand its consideration of a person's past use of public benefits and future need for public assistance in determining whether someone should be eligible for lawful permanent residency, a new visa, or for an extension of stay or change of stay from an existing visa. I understand that DHS would consider use of one of several specific benefits for a duration of 12 months within a 36 month period to be a heavily weighted negative factor in a public charge determination. Most critically, these factors include programs crucial to residents' health and basic needs, such as SNAP, TANF, and Medicaid benefits.

8. As a result of that change, I believe the Final Rule will cause immigrants to forego public benefits that are included within the list specified by the Final Rule so as to avoid adverse immigration consequences, despite such benefits being allowed under federal and state law. I also believe that several

DECLARATION OF GRACE B. HOU
NO. 4:19-CV-05210-RMP

3

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   groups of immigrants will withdraw from public benefits despite not being

2   actually covered by the Final Rule, including: (i) immigrants who are not subject

3   to the public charge test, such as refugees, and (ii) immigrants who are

4   disenrolling even from services that are not included in the public charge

5   determination.

6   **Description of Relevant Program(s)**

7   9.   As stated above, IDHS administers—solely or in coordination with

8   HFS—the SNAP, TANF, Medicaid, and CHIP programs (among others). IDHS

9   also administers or co-administers state-funded programs, including but not

10  limited to, Emergency Medical Coverage for Non-Citizens Not Meeting

11  Immigrant Requirements (Emergency Medical) and Cash and Food Assistance

12  for Victims of Trafficking, Torture or Other Serious Crimes (VTTC).

13  10.   All of the programs listed in Paragraph 9 serve non-citizens and

14  immigrants with varying eligibility requirements.

15  11.   In fiscal year 2018, over 3 million Illinoisans were enrolled in an

16  Illinois' medical assistance program—including Medicaid and CHIP.

17  12.   In fiscal year 2018, over 916,000 households received SNAP

18  benefits.

19  13.   In fiscal year 2018, over 23,000 households received TANF

20  benefits.

21  14.   Emergency Medical generally covers emergency medical treatment

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP

4

for non-citizens who do not meet the immigrant eligibility criteria for Medicaid
and have a certified medically urgent condition requiring hospitalization or need
renal dialysis services. Emergency Medical is funded by both federal and state
funds. VTTC provides cash and food assistance to victims of trafficking, torture
or other serious crimes and is state-funded.

15. We expect that Illinois residents who are served by the programs
listed in Paragraph 9 will be detrimentally impacted by the Final Rule. Illinois
residents may not be aware of whether the program is state or federally funded
and will be chilled and discouraged from enrolling in and receiving needed
coverage and services from these programs as a result of the Final Rule. In
addition, even if the non-citizen or immigrant resident is receiving coverage or
services from a solely state-funded program or portion of a state administered
program, the medical conditions suffered by enrollees in these programs (e.g.,
renal failure, cancer, and injury requiring hospitalization) are extremely serious
and would be considered a negative factor in the public charge test, especially in
light of the fact that the enrollee may not be covered by private insurance.

**Harms to Agency Mission or Broader Harms**

16. The Final Rule will have a significant negative impact on IDHS's
mission. The public charge rule interferes with the ability of IDHS to comply
with our statutory and regulatory goals and obligations to the residents of Illinois
to provide assistance to needy individuals and their families including vital basic

DECLARATION OF GRACE B. HOU
NO. 4:19-CV-05210-RMP

5

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    needs such as cash assistance, food, and medical coverage and treatment.

2        17.   IDHS administration, staff, and customers will be adversely affected

3    by the administrative burden of administering the public charge rule; by the need

4    to counsel eligible enrollees and recipients of their rights to receive benefits; and

5    by the expected loss of enrollees and recipients who are entitled to receive

6    benefits and services.

7        18.   As a result of the direct impact of the Final Rule on Illinois non-

8    citizens and their families as well as the chilling effect of the rule on immigrant

9    communities as a whole, I expect that Illinois will experience other detrimental

10    impacts including but not limited to higher rates of communicable diseases due

11    to lower rates of immunizations, higher emergency room usage due to lower rates

12    of health care coverage, increased homelessness due to disenrollment in cash

13    assistance programs, and poorer health conditions and outcomes from a lack of

14    nutrition and health services.

15        19.   The Final Rule will also likely increase demand for other state-

16    funded social services such as non-Medicaid behavioral health services,

17    emergency food assistance, and other safety net resources.

18    **Pecuniary or Direct Harms to Agency**

19        20.   IDHS has incurred significant costs to support the needs of

20    immigrant-serving community organizations in responding to the fear and

21    confusion created by this and other public charge rules. For the fiscal year 2019,

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP

6

1    IDHS funded $1.3 million in grants to establish capacity within community

2    organizations across the state to conduct community education and individual

3    and family counseling.

4         21.    Illinois will also suffer detrimental economic loss from the impact

5    of the Final Rule on our communities. For example, the loss of SNAP dollars in

6    local communities due to the chilling effect of this rule will be significant. The

7    average monthly SNAP benefit per person in Illinois is $132.37. Using estimates

8    of disenrollment due to the chilling effect stated in Paragraph 25, Illinois could

9    lose between $53-$123M of SNAP benefits a year, which could in turn cause the

10   loss of nearly 1,700 jobs.

11        22.    The estimated impact on the cost of medical care is even more dire.

12   Using the average annual Medicaid spending per enrollee in Illinois of $5,012, I

13   estimate that uncompensated care costs borne by Illinois' healthcare providers

14   could range from $293-$683M annually, which could in turn result in the loss of

15   nearly 9,500 jobs in Illinois. The impact will be worsened by the loss of federal

16   Medicaid match on healthcare spending.

17        23.    In addition, the fiscal stimulus provided by these programs will be

18   measurably lessened by the chilling effect of this rule. For example, the Food

19   Assistance National Input-Output Multiplier Model (FANIOM) measures the

20   effect of the SNAP fiscal stimulus on the economy. The U.S. Department of

21   Agriculture calculates a multiplier of 1.79, meaning that $1.80 of economic

22

DECLARATION OF GRACE B.          7          ATTORNEY GENERAL OF WASHINGTON
HOU                                              8127 W. Klamath Court, Suite A
NO. 4:19-CV-05210-RMP                                Kennewick, WA 99336
                                                       (509) 734-7285

1    activity is generated from $1 of SNAP benefits (rounding off). By applying this

2    multiplier to the estimated value of lost SNAP benefits due to the chilling effect,

3    I estimate a withdrawal of $95-$222M of economic stimulus from the Illinois

4    economy.

5        24.    The loss of federal funds to the State of Illinois will be substantial

6    and includes the loss of SNAP dollars and federal Medicaid match.

7    **Harms to Individuals Served by Agency**

8        25.    I believe that the Final Rule will have a chilling effect on many

9    individuals and families regardless of whether they are directly impacted by the

10    rule. The Kaiser Family Foundation has estimated that the chilling effect could

11    lead to disenrollment of eligible individuals in immigrant families by a rate of

12    15% to 35%. Samantha Artiga et al., *Potential Effects of Public Charge Changes*

13    *on Health Coverage for Citizen Children*, Henry J. Kaiser Family Foundation,

14    May 18, 2018.

15        26.    Based on March 2019 enrollment data, Illinois' medical assistance

16    programs have 389,554 enrollees who live in households with one more or

17    noncitizens; 95,093 of these enrollees are lawfully present noncitizens. Illinois'

18    SNAP program has 222,259 enrollees who live in households with one more or

19    noncitizens; 52,691 of these enrollees are lawfully present noncitizens.

20        27.    Applying the disenrollment rates to the Illinois SNAP and Medical

21    program enrollment data from March 2019 for eligible individuals in a household

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP

8

1   with one or more non-citizens, IDHS analysis suggests that between 58,443 and

2   136,344 eligible Illinois residents could disenroll from medical coverage and

3   33,339 to 77,791 could disenroll from SNAP. In total, I anticipate that between

4   61,584 and 143,696 eligible residents will lose vital benefits because of this rule;

5   three out of four of those individuals are U.S. citizens.

6   **Administrative Challenges**

7       28.    The administrative burden the Final Rule places on IDHS is

8   significant. Of particular concern is USCIS Form I-944, *Declaration of Self-*

9   *Sufficiency*, section 3, questions 9–11. The scope and level of detail required—

10  such as type, amount, and dates of benefits *ever* applied for or received—makes

11  it highly unlikely that any declarant will be able to complete the form without

12  intensive consultation with caseworkers, potentially in multiple states and

13  administering agencies. As referenced above, IDHS administers 72 Family and

14  Community Resource Centers across the state, staffed by approximately 2,700

15  caseworkers who process eligibility for SNAP and Medical programs.

16  Widespread concern among customers, service providers, and community

17  partners has already increased demand for caseworker services. I expect this

18  demand to increase now that the Final Rule has been published, potentially

19  driving more than 100,000 customers to our offices during the 60-day grace

20  period.

21      29.    The amount of work needed to prepare for and meet this demand is

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP

9

1    overwhelming: IDHS will need to expedite the development and delivery of

2    caseworker training and customer education materials. The expense of training

3    caseworkers alone is estimated to cost more than 2,700 person-hours and

4    $91,000. Caseworkers will need to provide information and services to

5    individuals seeking to disenroll from benefits. The estimated administrative cost

6    would range from 61,500 to 143,500 person-hours and $2-5 million. Caseworkers

7    will also need to work with individuals completing USCIS I-944. I anticipate that

8    approximately 900 individuals will be directly impacted and required to complete

9    the form, with an estimated administrative cost of 1,800 person-hours and

10    $61,000.

11        I declare under penalty of perjury under the laws of the State of

12    Washington and the United States that the foregoing is true and correct.

13        DATED this _30_ day of August 2019, at _Chicago_, _IL_ .

14

15        _Grace B. Hou_ _____

16    Grace B. Hou
Secretary of the Illinois Department of Human

17    Services

18

19

20

21

22

DECLARATION OF GRACE B.
HOU
NO. 4:19-CV-05210-RMP
    10    
ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    **<u>DECLARATION OF SERVICE</u>**

2    I hereby declare that on this day I caused the foregoing document to be

3    electronically filed with the Clerk of the Court using the Court's CM/ECF System

4    which will serve a copy of this document upon all counsel of record.

5    DATED this 6th day of September, 2019, at Tumwater, Washington.

6

7    */s/ Sara M. Cearley*
     SARA M. CEARLEY
     Paralegal
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DECLARATION OF GRACE B.             11          ATTORNEY GENERAL OF WASHINGTON
HOU                                                   8127 W. Klamath Court, Suite A
NO. 4:19-cv-05210-RMP                                   Kennewick, WA 99336
                                                          (509) 734-7285

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; and **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**KEVIN K. McALEENAN**, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; **KENNETH T. CUCCINELLI II,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; and **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency,<br><br>**Defendants.** | Civ. Action No. |

Pursuant to Title 28 U.S.C. Section 1746, I, Katharine Chan, hereby declare and state as follows:

1.      I am over 18 years of age. I have personal knowledge of the facts set forth herein, and I am competent to testify thereto.

2.      I submit this Declaration in support of Cook County's litigation against the United States Department of Homeland Security regarding the recently issued rule entitled Inadmissibility on Public Charge Grounds (the "Final Rule"). I have compiled the information in the statements set forth below either through personal knowledge, through the Cook County Health ("CCH") personnel who have assisted me in gathering this information, or on the basis of documents kept in the regular course of CCH's business that I have reviewed. I am very familiar with the proposed and Final Rule. I was the principle author of Cook County's comments to the

proposed rule. As part of my role at CCH, I also familiarized myself with the Final Rule in order to understand its immediate and long-term impacts on CCH.

3.　　I am the Director of Policy for CCH, and have served in this capacity since 2013. As Director of Policy, I provide leadership on policy activities and initiatives, including monitoring and analyzing state and federal health care policies, developing and implementing short- and long-term advocacy efforts, and initiating and strengthening relationships with a variety of external stakeholders, including elected officials, government agency staff, advocates, and community-based partners. I also play a role in several projects and partnerships that seek to identify and address social determinants among CCH, including food insecurity and a medical-legal partnership that responds to health-harming legal needs. I earned my bachelor's degree from Northwestern University and was trained as an organizer with Green Corps immediately following college graduation. I worked for the Illinois Maternal and Child Health Coalition (now known as EverThrive Illinois) from May 2002 through June 2006 on a project that sought to maximize enrollment of children and parents into Medicaid and other public health insurance programs.

4.　　I served as Associate Director and Director of Policy at EverThrive Illinois from 2007-2013, where I helped develop and carry out state, local, and national policy priorities. Prior to that, I worked at the Illinois Department of Healthcare and Family Services to help implement the All Kids health insurance program and other special projects related to Medicaid. For four years (March 2014-March 2018), I served as the elected Chair of the Medicaid Advisory Committee (MAC); I was also a general member of the MAC for four years prior to serving as Chair. I have served as the Chair of the MAC Public Education Subcommittee for nearly a decade, and was appointed Chair of the MAC Opioid Use Disorder Withdrawal Management

Subcommittee in May 2019. Additionally, I have served as a general member of the MAC Quality Care Subcommittee since June 2011. I am a co-chair of the Benefits Access Working Group of the Illinois Commission to End Hunger and a co-chair of the Health Subcommittee of the Integration and Alignment Committee, which is part of the Governor's Early Learning Council. I was recently appointed to the Board of Directors of the Michael Reese Health Trust and also serve on the boards of the Midwest Access Project and the Alliance to End Homelessness in Suburban Cook County.

5.     CCH is one of the largest public hospital systems in the nation, serving the residents of the second most populous county in America. For over 180 years, Cook County and its health system have provided care to all Cook County residents, regardless of their ability to pay, insured status, or immigration status.

6.     Pursuant to the "Ordinance Establishing the Cook County Health and Hospital Systems" (the "Enabling Ordinance"), CCH "*shall*: (1) Provide integrated health services with dignity and respect, regardless of a patient's ability to pay..." Ord. No. 08-O-35, 5-20-2008, Sec. 38-71(a)(1) (emphasis added).

7.     While CCH receives public funding in connection with its correctional health and public health functions, its hospitals and ambulatory clinics rely on patients who present with insurance to sustain our operations, with Medicaid serving as the dominant payor source for CCH patients who have insurance. Therefore, a decrease in Medicaid reimbursement and an increase in uncompensated care expenses caused by the Final Rule's chilling effect on Cook County's residents that CCH serves would be devastating to the financial viability of the CCH

system. Indeed, as I describe below, CCH is anticipating an annual loss of $30 million in Medicaid reimbursement alone as a result of the Final Rule.

8.     CCH delivers its patient services at a number of different locations, including hospitals, regional outpatient centers, community-based health centers, a comprehensive HIV and infectious disease center, and the Cook County Jail and Juvenile Temporary Detention Center. CCH also includes the Cook County Department of Public Health, which serves most of suburban Cook County, and CountyCare, the largest Medicaid managed care plan serving Cook County Medicaid beneficiaries.

9.     Based on self-reported data, CCH serves a diverse population: 51% are African-America/Black, 12% are White, 3% are Asian, 2% are American Indian/Native Alaskan, and 32% are Other/Unable to Determine.    Additionally, 32% of our patents self-report as Hispanic/Latino.

10.     CCH is the largest safety-net provider of health care in the region, providing care for hundreds of thousands of patients. In fiscal year 2018, patient volumes at CCH included 142,735 Emergency Department visits; 29,117 inpatient observation visits; 873,822 outpatient registrations,     including     217,152     primary     care     visits     and     334,901     specialty care/diagnostic/procedure visits; and 93,435 correctional health visits.

11.     As part of CCH's obligation and commitment to serve all who need care, regardless of their ability to pay, insurance status, or immigration status, CCH serves a substantial number of uninsured and underinsured patients, including hundreds of millions of dollars per year in charity care.

12.     In fiscal year 2018, 42.5% of our patients were uninsured, while only 4.4% of our patients were commercially insured.  Another 35.4% of our patients were covered by Medicaid and 15.9% were covered by Medicare, with another 1.8% covered by other sources.

13.     Since 2013, CCH has operated CountyCare, the largest Medicaid Managed Care program in Cook County, with 330,782 enrollees in 2018.  While CountyCare has allowed CCH to reduce its rate of uncompensated care, CCH still provides upwards of $500 million dollars of uncompensated care, including nearly half of all charity care provided in Cook County.

14.     CCH also operates CareLink, a financial assistance program for uninsured or underinsured Cook County residents who do not have access to affordable health insurance.  CareLink provides free or discounted care to qualified enrollees.  CareLink is part of CCH's mission and longstanding commitment to provide care to all Cook County residents.  As of June 30, 2019, CareLink had 33,037 enrollees.

15.     CCH's direct experience providing health services and peer-reviewed research demonstrates that Medicaid coverage improves health outcomes.  Studies have shown that states with expanded Medicaid have seen decreased mortality rates compared to those without Medicaid expansion.

16.     This gap has been especially pronounced with cardiovascular deaths.  One study found that counties in states that expanded Medicaid saw 4.3 fewer deaths per 100,000 residents than counties in states that did not expand Medicaid.[1]

---

[1] Khatana, Sameed; et al. "Association of Medicaid Expansion with Cardiovascular Mortality," *JAMA Cardiology*, June 2019. doi: 10.1001/jamacardio.2019.1651.

17.     Additionally, Medicaid expansion has enabled a greater number of people to have stable access to care.  One study found that after expanding Medicaid in Arkansas and Kentucky, residents affected by Medicaid expansion were 41% more likely to have regular access to care and 23% more likely to report excellent health.[2]

18.     As CCH's Director of Policy, I am aware that the U.S. Department of Homeland Security ("DHS") issued a new regulation on the public charge ground of inadmissibility under the Immigration and Nationality Act, which I reviewed in the regular course of my role with CCH.  The Final Rule would allow the federal government to expand its consideration of a person's past use of public benefits and future needs for public assistance in determining whether someone should be eligible for lawful permanent residency, a new visa, or for an extension of stay or change of stay from an existing visa.  Under the Final Rule, DHS would consider the use of one of several specific benefits for a duration of 12 months within a 36 month period to be a heavily weighted negative factor in a public charge determination.

19.     Critical to CCH, among the public benefits that could lead to ineligibility for legal status in the United States is Medicaid.  As a result, CCH is extremely concerned about DHS's Final Rule and the resulting impact on our patients, the residents of Cook County, and of course CCH's own financial sustainability.

20.     Specifically, CCH is concerned that the new public charge rule will result in fewer people being enrolled in Medicaid and decreased use of preventive and ongoing health care, both of which will negatively impact the health outcomes of immigrant families in Cook County and the public health of all communities in our service area.

---

[2]Sommers, B. D., Maylone, B., Blendon, R. J., et al. Three-Year Impacts of the Affordable Care Act: Improved Medical Care and Health Among Low-Income Adults. Health Affairs, 36(6), 1119-1128; 2017. https://doi.org/10.1377/hlthaff.2017.0293.

21.     A preventive approach to health care is vital to keeping someone healthy and productive through regular screenings, physicals, and immunizations, as well as doctor visits when mild symptoms first develop.  In contrast, delaying care can result in higher costs and worse outcomes. When individuals are uninsured, they avoid seeking routine care and instead risk worse health outcomes and use costly emergency services.

22.     Pregnant women are particularly vulnerable to the new public charge rule.  While pregnant women's use of Medicaid is excluded from the new public charge test, the "chilling effect" caused by the new public charge rule is likely to result in a greater number of pregnant women who avoid applying for Medicaid.

23.     At a time when there are broad-based local and national efforts trying to address the nation's unacceptably high rate of maternal and infant mortality, any rule that results in fewer women obtaining prenatal care would move Cook County in the wrong direction and lead to higher medical costs over the long term.

24.     Indeed, Medicaid plays a particularly important role for pregnant women in Illinois, as nearly half of all births in Illinois are covered by Medicaid.

25.     The new public charge rule threatens to damage the health and well-being of families, children, and their communities. By penalizing immigrants who receive public benefits, many Cook County residents will be put in the difficult position of having to choose between programs and services that grant them access to essential health services and their own immigration status.  Rather than jeopardize their ability to live and work in this country, we expect that many of our immigrant patients will forgo, or dis-enroll from these benefits, which include Medicaid and the Supplemental Nutrition Assistance Program ("SNAP").

26.     While children's use of Medicaid is also excluded from the new public charge rule, CCH expects that because of the "chilling effect" caused by the rule, many children will forgo needed medical care for fear that such care will negatively impact a family's immigration status.

27.     Following the passage of federal welfare reform laws in 1996, which barred new immigrants from public benefits, participation in Medicaid by those who were eligible decreased by 3 percentage points,[3] and SNAP enrollment for households with at least one U.S. citizen child dropped by nearly 31 percent.[4]

28.     We know that children's well-being is inseparable from their parents' and families' well-being.  Children thrive when their parents can access needed health or mental health care and when their families have enough to eat and a roof over their heads.  Conversely, a parent who cannot access health care or food may experience stress and other challenges that can affect their caregiving abilities and undermine children's development.

29.     Accordingly, as a consequence of the new public charge rule, children of immigrants who live legally in the United States stand to be severely punished by this rule, with the costs borne by their health and development.

30.     Providers are already witnessing the impact of the "chilling effect" brought on by confusion, fear, and misunderstanding by many in the immigrant community and by providers

---

[3] Kandula, N.R., Grogan, C.M., Rathouz, P. J., Lauderdale, D. S. (2004). The Unintended Impacts of Welfare Reform on the Medicaid Enrollment of Eligible Immigrants. *Health Services Research*, 39(5), 1509-1526. doi: 10.1111/j.1475-6773.2004.00301.

[4] Fix, M.E., Passel, J.S. Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform 1994-97.  (1999).  Retrieved  from  The  Urban  Institute,  available  at https://www.urban.org/research/publication/trends-noncitizens-and-citizens-use-public-benefits-following-welfare-reform.

who cannot provide certainty about the future for immigrant families. Immigrants have already expressed concern and hesitancy to CCH staff when applying for Medicaid and other public benefit programs, including programs that are not part of the final rule, such as the Women, Infant and Children program and the AIDS Drug Assistance Program. The "chilling effect" of the Final Rule has already caused CCH to offer technical assistance and create resources to educate patients and staff about the Final Rule, and CCH anticipates devoting additional resources and training to help mitigate the negative impact of the Final Rule and its associated "chilling effect."

31.    In fact, comparing the first eight months of 2018 with the same period of time in 2019:

    a.  there has been an across-the-board increase in ambulatory, observation, emergency and inpatient patients who are "self-pay" instead of covered by a third party payment source, such as private or public insurance;

    b.  there has been a corresponding increase in the percentage of uninsured patients; and

    c.  there has been a corresponding decrease in the percentage of Medicaid-covered patients.

32.    The new public charge rule has the potential to adversely impact all residents of Cook County. Reductions in health insurance coverage will lead to increased utilization of emergency rooms by individuals who do not have access to primary care, resulting in increased uncompensated care among health care providers and longer waits in emergency departments. Public health experts foresee worsening overall health outcomes, particularly among immigrants,

as a result of delayed treatment, inability to obtain prescription medication, and lack of access to preventive and primary care.

33.     Individuals with health insurance are nearly three times more likely to be vaccinated compared to those who are uninsured.[5]  Lower rates of vaccination can lead to an increase in vaccine preventable diseases, raising the concern of communicable disease outbreaks that can affect everyone, regardless of immigration status.

34.     CCH's Cook County Department of Public Health is responsible for communicable disease surveillance and prevention in most of suburban Cook County, a task that is tremendously complicated by the environment of fear and suspicion among the immigration community caused by the new public charge rule.

35.     The past decade has witnessed an industry-wide shift in health care towards a focus on the social determinants of health, based on the intuitive observation, after multiple studies revealed that an individual's health outcomes depend more on lifestyle and environmental factors than on clinical care.  The University of Wisconsin Population Health Institute has posited that perhaps only 20% of life expectancy and health status is attributable to clinical care, while social and economic factors, health behaviors, and environmental factors play a much more important role.[6]

36.     CCH has devoted an increasing number of resources to identify and address social determinants.  Over the past several years, CCH has formed various partnerships to address food

---

[5] Lu Lu, P. J., O'Halloran, A., Williams, W. W. (2015). Impact of health insurance status on vaccination coverage among adult populations. *American Journal of Preventive Medicine*, 48(6), 647-61. DOI: 10.1016/j.amepre.2014.12.008.

[6] Booske, B. C., Athens, J. K., Kindig, D. A., Park, H., Remington, P. L. (2010). Different perspectives for assigning weights to determinants of health. Retrieved from County Health Rankings and Roadmaps, available at https://www.countyhealthrankings.org/sites/default/files/differentPerspectivesForAssigningWeightsToDeterminantsOfHealth.pdf.

insecurity and housing instability, both of which have a significant impact on how well our patients can attain and maintain health.

37.     As a result, CCH is also concerned about how the new public charge rule will decrease enrollment in SNAP and federal housing programs, which will negatively impact immigrant families in Cook County. Though SNAP and housing are not traditional health programs, these benefits also play an important role in ensuring the health of Cook County residents.

38.     The final public charge rule will likely push many non-citizens to forgo vital public benefits that provide needed support to address health, hunger, and housing.  If the link between a parent's health and a child's well-being is intuitive, it is equally obvious that when a non-citizen resident loses access to affordable housing and food, the entire family – including U.S. citizen children – suffers.

39.     CCH would expect to see worse health outcomes for many of our patients due to a loss in access to health insurance, as well as lack of access to healthy food and adequate, affordable housing.  Nearly 14% of CCH's adult primary care patients report food insecurity.

40.     In addition to harming immigrants and their families and overall public health in Cook County, the new public charge rule could be devastating for the finances of safety net health systems like CCH.  Of the CCH patients who have insurance, Medicaid is the dominant form of coverage. Medicaid expansion has provided a majority of CCH patients with insurance for the first time in their adult lives and given CCH the ability to become more financially stable. Based on an analysis that was prepared on behalf of America's Essential Hospitals and other trade associations by Manatt Health, and per CCH's subsequent discussions with America's

Essential Hospitals, the effects of a public charge rule and the accompanying chilling effects are estimated to result in an annual loss of $30 million in Medicaid reimbursement to CCH.[7] Further, it is significantly more expensive to provide health care for individuals who are housing insecure. Housing insecure individuals make more frequent use of emergency departments, have long stays when admitted and have higher rates of readmission, all of which lead to increased health care costs.[8]

41.     Given CCH's historical role and our status as the largest safety-net provider in the region, we expect the new public charge rule to negatively affect us in two ways: (1) through direct losses in Medicaid reimbursements; and (2) by increasing the amount of uncompensated care CCH will be required to provide.  As such, the new public charge rule represents nothing short of a transfer of the cost of caring for our nation's most vulnerable from the federal government to local governments and public safety-net systems, like Cook County and CCH.

42.     CCH is by far the largest provider of charity care to the County's most vulnerable populations, and we anticipate that our share of charity care will increase and Medicaid reimbursements will decrease following implementation of the new public charge rule. CountyCare is the largest provider of Medicaid-managed care within Cook County, with its membership constituting approximately one third of all Medicaid managed care members in the County. Thus, statistically, one third of all eligible persons who disenroll or elect not to enroll in Medicaid managed care would be CountyCare members, and CCH will lose the per member/per month capitation payment from the State for those members. With respect to patients who

---

[7] Mann, C., Grady, A., Orris, A. (2018). Medicaid Payments at Risk for Hospitals Under the Public Charge Proposed Rule.  Retrieved from Manatt, available at https://www.manatt.com/insights/newsletters/health-update/public-charge-proposed-rule-hospital-medicaid.

[8] Kushel, M. B., Vittinghoff, E., Haas, J. S. (2001). Factors Associated with the Health Care Utilization of Homeless Persons. *Journal of the American Medical Association*, 285(2), 200-206. doi: 10.1001/jama.285.2.200.

express fear that the benefits to which they are entitled will impact their immigration status, CCH also expects to expend more time and resources convincing them to apply for, or continue, those benefits.

43.     As CCH also provides approximately 50% of all charity care in Cook County, there is a 50% chance uninsured patients will seek their medical care from CCH, with no reasonable ability to pay for it. Thus, CCH will lose revenue from not being able to enroll those members, and will still wind up expending funds to treat a significant portion of those patients without having a source to reimburse it for their care.

44.     CCH estimates that if 20 percent of potentially affected Medicaid enrollees were to drop their health insurance, over 7,300 individuals who receive their case from CCH or coverage from CCH would become uninsured and CCH would face a significant financial loss as a result in the first year of the Final Rule being in effect, both from a loss in Medicaid reimbursement and an increase in uncompensated care expenses.

45.     By the end of the current fiscal year, which ends on November 30, 2019, CCH estimates that it will spend $544 million on uncompensated care, which is an 8% increase from the last fiscal year, a 73% increase from 2014, and the highest expenditure since early expansion of Medicaid in Cook County began in 2012/2013.

46.     Cook County Health's ability to provide high-quality care to all is inextricably connected to its ability to bill patients who have insurance for services. A decrease in the number of insured patients, combined with an increase in the number of uninsured patients, will damage the financial stability Cook County Health has achieved as a result of the Affordable Care Act

and Medicaid expansion, and jeopardize the ability to continue serving its mission, including the operation of and recent enhancements to the CareLink program.

47.     Because Medicaid and other health insurance programs offered through the marketplace have made health insurance more affordable, the number of uninsured residents of Cook County has decreased. In 2012, the uninsured rate was 19% percent—in 2018, the rate was 10%. The Final Rule will reverse this progress.

48.     Medicaid provides families access to preventive and primary care, including prenatal care, as well as care for chronic conditions. In addition, Medicaid offers families financial protection from high medical costs. By enabling families to meet their health care needs, Medicaid supports families' ability to work and care for their children, and to remain healthy and productive residents.

49.     For more than 180 years, Cook County's core mission has been to deliver health care services with dignity and respect regardless of a patient's ability to pay. As acknowledged by the DHS in the new public charge rule, the new public charge test would likely result in fewer people accessing primary and preventive care and lead to increased reliance on expensive emergency care.

50.     We expect that the Final Rule will result in many of our patients declining participation in Medicaid and becoming sicker when they do ultimately come to CCH for care. CCH expects that its patients will be more likely to become dependent on public services, the very opposite of the intent of the DHS's primary objective as stated in the reason for proposing this new rule.

51.    CCH will continue its mission to provide health care to all Cook County residents who need it, but the new public charge rule will lead to financial challenges for our system and other safety net systems in the region.

52.    The Final Rule creates unnecessary and unwelcome tension between immigrant patients and CCH as a health care provider. It will create fear of registering for programs and reporting to appointments, thereby causing many immigrants to avoid seeking treatment for cases other than emergencies. Inspiring fear and distrust among immigrant communities will wreak havoc on one of the country's largest public hospital systems. The likely decline in preventive treatment and increase in costly emergency services will have detrimental effects on the health system for immigrants and non-immigrants alike.

I, Katharine Chan, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23 day of September, 2019 in Chicago, Cook County, Illinois.


Katharine Chan
Director of Policy
Cook County Health

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; and **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.,**<br><br>**Plaintiffs,**<br><br>      vs.<br><br>**KEVIN K. McALEENAN,** in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; **KENNETH T. CUCCINELLI II,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; and **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency,<br><br>**Defendants.** | Case No. 19 cv 6334 |

**DECLARATION OF LAWRENCE BENITO IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Lawrence Benito, Executive Director of the Illinois Coalition for Immigrant and Refugee Rights (ICIRR), declare as follows:

**Background**

1.  I am over the age of 18, competent to testify as to the matters herein and make this declaration based on my personal knowledge.

2. In my role as the Executive Director of ICIRR, I am responsible for running all facets of the organization including the leadership of our membership and coalitions.

3. ICIRR is a non-profit organization located in Chicago, Illinois.

4. ICIRR is dedicated to promoting the rights of immigrants and refugees to full and equal participation in the civic, cultural, social, and political life of our diverse society in Illinois and beyond.

5. ICIRR is a membership-based organization, representing nearly 100 nonprofit organizations and social and health service providers throughout Illinois, many of which provide health care, nutrition, housing, and other services for immigrants, including immigrants of color, regardless of their immigration status or financial means.

6. A core mission of ICCIR and its member organizations is to provide health and social services to immigrant Illinoisans.

7. ICIRR Member organizations include community health centers, health and nutrition programs, social service providers and other organizations that work to ensure immigrants receive the supports they need to be successful.

8. Created in 1986, ICIRR has been at the forefront of helping immigrants realize and contribute to the dream that is America. In that time, ICIRR won establishment of an Office of New Americans within the Governor's office (2005) and the Office of the Mayor of the City of Chicago (2011); created the New Americans Initiative (2005), which has helped 534,000 people gain access to citizenship and assisted 105,394 immigrants prepare applications for citizenship; created the Immigrant Family Resource Project ("IFRP") (1999), which has connected more than 500,000 individuals and

families to safety net services; and led efforts to create the Cook County Direct Access Program, which has expanded healthcare services to over 25,000 individuals.

9. ICIRR also operates the Immigrant Healthcare Access Initiative ("IHAI"), which works to increase access to care and improve health literacy for tens of thousands of low-income uninsured immigrants in Illinois, in order to reduce their reliance on emergency room care and to improve the overall public health of the community. As a part of IHAI, ICIRR leads the Illinois Alliance for Welcoming Healthcare, an alliance comprised of 25 healthcare providers, including clinics and hospitals, and 20 community-based organizations that convene to create and share best practices in the provision of healthcare services to immigrants and their families.

10. ICIRR also leads the Healthy Communities Cook County ("HC3") coalition, which seeks to address and mitigate barriers to accessing healthcare for the uninsured, regardless of immigration status, through policy and systems change.

**Response to the Proposed and Final Rule**

11. In spring 2018, in direct response to the threat of the Proposed and Final Rule and the growing fear and confusion within immigrant communities, ICIRR co-founded the Protecting Immigrant Families-Illinois coalition ("PIF-IL").

12. PIF-IL was created specifically to (1) resist the proposed changes to the public charge rule; and (2) provide assistance to and accurate information to immigrant communities seeking to safely make use of public benefits for which they are eligible. In addition to serving on PIF-IL's Steering and Executive Committees, ICIRR co-chairs the Outreach Subcommittee. ICIRR has dedicated substantial resources to urging units of local government to adopt resolutions that call upon the Department of Homeland Security to

immediately withdraw the proposed changes to the rule because of the harm that the proposed changes have caused, and that the Final Rule will continue to cause.

13. As a PIF-IL founding member, ICIRR has had to divert resources from other work to devote substantial resources to, among other efforts, educating individuals, service providers, elected officials, and other constituencies about the public charge test and the related rule through numerous trainings and briefings.

14. Specifically, ICIRR staff have had to redirect their work planning, budgets, and staff time—amounting to more than two hundred and thirty-five hours —away from ICIRR's proactive mission and instead towards defensive PIF-IL activities to (1) educate immigrant communities about the Proposed Final Rule and the Final Rule in an attempt to prevent immigrant households from foregoing benefits and services out of fear and misunderstanding of the Final Rule; (2) expand its outreach and education to immigrant communities to encourage people unaffected by the Final Rule to continue to enroll in TANF, SNAP and Medicaid benefits for which they are eligible; and (3) to train IFRP case managers on the changes to the public charge test so that they can provide accurate information to people concerning the potential impact of public benefits on their ability to successfully adjust to LPR status.

15. ICIRR estimates that the value of staff time and resources diverted to date to public charge activities amounts to $100,000, including the costs of paying unplanned overtime; conducting over 50 trainings; and holding other community education events.

16. ICIRR will continue to divert a comparable amount of resources in the future to mitigate the harm caused by the Final Rule once implemented.

17. ICIRR has also had to provide overtime pay to staff who give public education trainings so that the communities ICIRR serves receive sufficient and accurate information about the Proposed Final Rule and the Final Rule.

18. In this manner, the Final Rule has already forced, and will continue to force, ICIRR and its members to divert resources from planned work.

**Specific Responses to the Chilling Effect**

19. Immigrant families whom ICIRR and its members serve have been disenrolling from public benefit programs, such as TANF, SNAP and Medicaid, since the initial leaks about changes to the public charge test in January 2017, based on fears that using those programs will affect their future immigration relief options.

20. Individuals have refrained and will continue to refrain from seeking health services, food, and other programs for themselves and their children, based on fears that using those benefits will prevent them from adjusting status.

21. As a direct result, ICIRR staff work plans have had to change, and staff have spent considerable time developing fact sheets, slide presentations, and other materials for community members, service providers, immigration attorneys, and other constituencies. ICIRR staff have also spent significant time coordinating with partners to ensure that immigrant families and the agencies that serve them are educated about the Final Rule and have spent considerable time to responding to questions about the Final Rule and concerns about enrolling in or remaining enrolled in public benefits.

22. ICIRR has had to forego time spent on healthcare trainings that inform immigrants about their rights to health care and other public benefits such as SNAP, and ICIRR now has diminished ability to provide individualized assistance to immigrants seeking health care

and SNAP consistent with its mission. ICIRR has had to spend time and resources fundraising to support its work responding to the Proposed Final Rule and the Final Rule, and has had to reallocate existing resources to cover the costs of these new activities in response to the Proposed Final Rule and Final Rule, including paying certain staff overtime pay.

23. If the Final Rule is implemented, ICIRR expects even more immigrants to refrain from seeking Medicaid and other necessary health services, food, and other programs for themselves and its children, based on fears that using those benefits will prevent them from adjusting status. Losing access to critical health and nutrition services will have long-term harms for the clients of ICIRR and its member organizations, frustrating the mission of ICIRR and its member organizations to enable immigrants to reach their full capacity to participate in the economic, civic, cultural, social, and political life of our state.

24. To mitigate this harm, ICIRR and its members will therefore be forced to continue to divert their limited resources to address the broad chilling effect on public benefits enrollment that the Final Rule is designed to effect.

25. This work is particularly time-consuming and difficult because the Final Rule provides virtually no clear guidance on difficult decisions such as whether to pursue public benefits to meet an individual's needs; how to mitigate the Final Rule's negative view of an individual who has a medical condition and/or disability; how to mitigate the Final Rule's negative treatment of an individual of limited English proficiency; how to mitigate the Final Rule's negative treatment of an individual who, despite working full-time, has a household income of less than 125 percent of the FPG; whether to spend money on necessities or to allocate earnings to asset building; or even whether to have another child

or welcome a family member into its household since adding the financial responsibility of an additional family member under the Final Rule may jeopardize their ability to pursue a permanent place in the United States.

26. Furthermore, the contradictions between the weighted factors and the totality of the circumstances aspects of the public charge test under the Final Rule (as opposed to the test under the 1999 Field Guidance which involved only two types of benefits--cash assistance and publicly-funded institutional care---and which could be overcome with a sponsor's affidavit), make it virtually impossible for entities such as ICIRR to help our clients and members understand how the agency will apply the test and therefore how to make informed decisions about benefits use.

27. The amount of resources marshalled to this issue are and will continue to cause ICIRR and its members to serve fewer clients and work less on issues connected to its mission but instead to challenging and responding to the harmful effects of the Final Rule.

28. The Final Rule's destructive and discriminatory consequences has already detrimentally impacted the ability of ICIRR and its member organizations' missions to provide health and social services to immigrant Illinoisans.

29. For example, as indicated above,, in partnership with the Illinois Department of Human Services, ICIRR operates IFRP, working with 36 partner organizations in FY19, to educate immigrants about their public benefit eligibility, assist with interpretation at public aid offices, and manage cases of immigrant families who apply for benefits. ICIRR's IFRP partner organizations are paid through depending upon the number of clients they serve in case management and benefits enrollment. ICIRR also receives a percentage of the overall grant for administration.

30. Indeed, within ICIRR's IFRP, declines in immigrant public benefits enrollment have already occurred. These declines have, in turn, strained the resources of the IFRP because it is funded on a reimbursement model. ICIRR and the IFRP are at the same time facing an overwhelming increase in requests for assistance with disenrollment from public benefits.

31. Case managers at ICIRR and its member organizations have had to increase its outreach and education to immigrant communities to encourage them to still enroll in TANF, SNAP and Medicaid. ICIRR and its members also have had to train case managers on public charge so that they can provide accurate information to clients concerned that the receipt of public benefits will deem them a public charge.

**ICIRR Member Survey and Harm**

32. In June 2019, ICIRR conducted a survey of its member organizations to document the impact of the Proposed Final Rule on its organizations and the individuals they serve. From responses to that survey, ICIRR ascertained the following:

33. The Illinois Migrant Council is a member of ICIRR that works to enroll immigrants in public benefits programs. On an average monthly basis, the Illinois Migrant Council has seen 21-30 of its clients disenroll from SNAP, Medicaid, and WIC out of fear that proposed changes to the public charge doctrine will harm their immigration status and options. To deal with the fallout from the Final Rule's promulgation, the Illinois Migrant Council has had to devote three staff members to spend ten hours per week on public charge.

34. YWCA Northwestern Illinois is another member of ICIRR that has experienced and will continue to experience direct harm due to the chilling effect of the Proposed Final Rule and the Final Rule. YWCA Northwestern Illinois assists clients with public benefits such as

TANF, SNAP, and Medicaid. YWCA Northwestern Illinois has seen an average of one to five of their clients per month disenroll or choose not to enroll in benefits such as TANF, SNAP, and Medicaid as a result of proposed public charge changes. This is a significant decrease given that YWCA Northwestern Illinois historically files four new applications per month. To deal with this fallout, staff members at YWCA Northwestern Illinois have had to spend additional time explaining public charge to its clients and have faced additional difficulties when assisting immigrants who wish to access public benefits to improve their chances to gain or sustain employment.

35. Erie Neighborhood House is a member of ICIRR that has experienced and will continue to experience direct harm due to the chilling effect of the Proposed Final Rule and Final Rule. Erie Neighborhood House assists clients with public benefits such as SNAP and Medicaid and has seen on average one to five of its clients per month disenroll from or choose not to enroll in SNAP or Medicaid (for themselves and its children) as a result of proposed public charge rule changes. Erie Neighborhood House has had five staff members devote approximately five hours per week to dealing with the fallout from the Final Rule and prior proposals, for a total of about 1,000 staff hours thus far.

36. HANA Center is another member of ICIRR that has experienced and will continue to experience direct harm due to the Final Rule. HANA Center's mission is to empower Korean American, immigrant, and multi-ethnic communities through social services, education, culture, and community organizing to advance human rights. HANA Center assists clients with benefits enrollment issues including for SSI, WIC, SNAP, Medicaid, CHIP, MSP, LIS, LIHEAP, Weatherization, and Unemployment Compensation. On average, one to five such clients per month have been withdrawing from or choosing not

to enroll in benefits; this is in contrast with the typical monthly average of 34 new applications usually filed by HANA each month. Because of the Final Rule, the HANA Center has had to cut programs and services, such as its Breast Cancer Early Detection Program, so that its staff can spend more time working to address client concerns about the Proposed Final Rule and now the Final Rule. Additionally, in the HANA Center's Senior Health and Public Benefit Department, staff workloads have increased by 20% due to time spent in trainings and meetings, and answering client questions regarding the Proposed Final Rule and the Final Rule.

37. Hispanic American Community Education and Services ("HACES") is a member of ICIRR that has experienced and will continue to experience direct harm due to the promulgation of the Final Rule. HACES's mission as an organization is to assist immigrant community members with achieving their individual and collective goals and to foster their prosperity and harmony with the larger community. HACES assists clients with public benefits programs and has seen 11 to 20 clients each month disenroll from or choose not to enroll in Medicaid, SNAP, WIC, TANF, or subsidized housing due to the proposed public charge changes. To deal with the fallout from the Final Rule's promulgation, HACES has had to have at least three staff members spend extra time conducting outreach and educational sessions to inform the community about the Proposed Final Rule and the Final Rule.

**Diversion of Resources and Frustration of ICIRR's Mission**

38. The Final Rule will further frustrate ICIRR's mission by directly restricting the number of immigrants from less-developed, majority non-white countries who will be able to adjust to lawful permanent resident (green card) status or maintain or change their non-immigrant immigration status due to the new public charge test, thus eliminating essential pathways

for this population to reunite with their families, pursue economic opportunity, and fully participate in the civic, cultural, social, and political life of our state.

39. Overall, the proposed and Final Rule have forced ICIRR to spend less time on its other areas of work and to reduce the overall number of projects the organization can take on.

40. As a direct result of Defendants' actions, ICIRR has had to withdraw staff resources from its Healthy Communities Cook County coalition to address the harmful effects of the Proposed Final rule and the Final Rule, reducing the progress the coalition has been able to make in expanding access to health coverage in Cook County. ICIRR expects this resource redirection to continue in the future.

41. ICIRR has also had to withdraw staff resources from the Alliance from Welcoming Healthcare in order to deploy those resources to combat the impact of the Proposed Final Rule and the Final Rule and expects this diversion to continue in the future.

42. The frustration of mission and diversion of resources experienced by ICIRR and its members and its members will only increase if the Final Rule goes into effect, forcing ICIRR and its members to spend less time on work that helps immigrant communities to become fully integrated, self-sufficient members of society and more time dealing with the fear, confusion, anxiety and other impacts of the Final Rule. Because of limited resources, ICIRR and its members will need to scale back on or eliminate projects related to its missions.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 24, 2019 in Cook County, Illinois.

_____

Lawrence Benito

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.,** | |
| **Plaintiffs,** | |
| vs. | Civ. Action No. 19-cv-06334 |
| **KEVIN K. McALEENAN**, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; | |
| **KENNETH T. CUCCINELLI II,** in his official capacity as Director of U.S. Citizenship and Immigration Services; | |
| **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency, | |
| **Defendants.** | |

## DECLARATION OF JOHN PELLER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, John Peller, hereby declare and state as follows:

1

1. I am over 18 years of age. I have personal knowledge of the facts set forth in this declaration, except where a fact may be stated on information and belief, and, if called as a witness, could and would testify competently to the matters set forth below.

2. I submit this declaration in support of Cook County, Illinois (the "County" or "Cook County") and the Illinois Coalition for Immigrant and Refugee Rights, Inc.'s ("ICIRR") Motion for Preliminary Injunction. I have compiled the information in the statements set forth below either through personal knowledge, through AIDS Foundation of Chicago personnel who have assisted me in gathering this information, or on the basis of documents that I have reviewed.

3. In this declaration, I explain how the Notice of Proposed Rule Making on Inadmissibility on Grounds of Public Charge (83 Fed. Reg. 51114) ("Proposed Rule") and Final Rule on Inadmissibility on of Public Charge (84 Fed. Reg. 41292) ("Final Rule") have impacted and will further impact AIDS Foundation of Chicago clients in a manner that could severely tax our resources and impact our ability to serve our clients. Specifically, as a leader for effective HIV policies and a national expert on the impact of health care reform on people living with HIV, I fear that the Final Rule will cause patients to forego assistance critical to their physical health and economic wellbeing, worsening the HIV epidemic and leading to the increased transmission of a serious communicable disease in the community.

**Background**

4. I am John Peller of the AIDS Foundation of Chicago ("AFC").

5. I am the President and CEO of AFC.

6. For over 30 years, AFC has worked to transform the systems that contribute to HIV prevention, awareness, and access to lifesaving care and services. AFC leads the largest

coordinated HIV case management system in the country, ensuring that over 6,000 clients receive medical and supportive services every year.

7. AFC is headquartered in Cook County, Illinois, and is one of the largest AIDS service organizations in Cook County. AFC serves more than 6,000 clients annually in Cook County, with a total of 35 subcontractor clinical service and support/administrative sites and over 100 case managers.

8. I first joined AFC in 2005 and became its President and CEO in 2014. In my current capacity, I lead the organization's programs, policy, communications, strategy and fundraising work.

9. Prior to my position as President and CEO, I served as AFC's at Vice President of Policy from 2011-2014. During that time, I worked on issues across a variety of practice areas, including implementation of the Affordable Care Act nationally and in Illinois.

10. I graduated from The Johns Hopkins University in 1994 with a BS in political science and history and from the University of Chicago in 2000 with a Master's in Public Policy.

11. Over the last five years, I have supervised staff who enroll clients in benefits, such as Medicaid, SNAP, Medicare, Ryan White HIV/AIDS Program (RWHAP) and the AIDS Drug Assistance Program (ADAP). I currently oversee the network of 100 case managers funded by the RWHAP that work in over 30 agencies. These case managers also enroll clients in benefits, such as Medicaid, SNAP, Medicare, RWHAP and ADAP.

12. Over the past 15 years working at the AIDS Foundation of Chicago, I have developed a close relationship and deep knowledge of the HIV community in Cook County and an understanding of the legal and health issues facing these communities. In particular, I have developed an expertise in Medicaid and health insurance.

13. To demonstrate the way that the Proposed and Final Rules regarding public charge have impacted and will impact AFC in the future, I provide information known to me as a longtime CEO and staff member at AFC. By making this declaration, I do not waive any attorney-client privilege or client confidentiality.

**AIDS Foundation of Chicago Clients**

14. Through the networks AFC has built and continues to fund and lead, it helps support thousands of people living with or vulnerable to HIV along a continuum of care that includes prevention services, primary medical care, housing, emergency support and basic needs, as well as engaging individuals and organizations in vital advocacy efforts.

15. Since it was founded in 1985, AFC has delivered its services in a culturally and linguistically appropriate manner to address the needs of the diverse community it serves, regardless of its clients' immigration status or ability to pay.

16. AFC serves immigrant individuals who may seek to extend or adjust their immigration status, and whose immigration applications will be subject to the Final Rule.

17. Many AFC clients receive Illinois Medicaid, SNAP, and other public benefits.

18. A significant number of AFC's clients are low-income and have either limited skills or education. Many AFC clients also reside in large households.

19. AFC's clients are predominantly people of color. Approximately 23 percent of patients are Latino and 58 percent are African American.

20. AFC's primary client intake is through a hotline staffed by intake staff, who perform eligibility screening and provide referrals to case managers who provide advice on a wide range of issues, including matters related to Illinois Medicaid, RWHAP, ADAP, SNAP, and other programs.

4

21. AFC intake staff handle over 20,000 calls and 9,000 client visits per year, over 1,450 of which involve an immigrant client (including naturalized citizens) or a mixed-status household.

**Expertise in Navigating Complex Health Care System**

22. People living with HIV ("PLWH") face a number of challenges in accessing health care services, particularly if they are immigrants, speak limited English, or have low incomes. PLWH must navigate a complex web of safety-net programs, including Medicaid and the RWHAP and ADAP, which have different eligibility standards and requirements. RWHAP and ADAP can "wrap around" Medicaid, filling in gaps in Medicaid benefits. For example, ADAP can cover HIV medications that are not covered by a Medicaid managed care plan.

23. AFC's case managers have developed expertise in navigating these programs, including enrollment, renewing eligibility and ensuring clients get all benefits to which they are entitled that will help to maintain their health. While AFC funds over 100 case managers, they are a finite resource, and time spent helping one client is time that cannot be spent helping another.

**Public Charge Rule Has a Dangerous Chilling Effect on HIV patients**

24. Untreated HIV is a debilitating, life-threatening communicable disease that devastates an individual's immune system. Today, however, with early and continuous treatment, PLWH can experience near-normal lifespans. HIV medications are central to treatment and are generally easy-to-take with minimal side effects. With access to treatment, PLWH can be productive members of society.

25. In 2017, 39,842 PLWH resided in the state of Illinois, 23,835 of whom were residents of Chicago, and thus Cook County.

26. HIV/AIDS treatment, known as anti-retroviral therapy (ART), is prohibitively expensive in the United States. Many people, including AFC clients, with private insurance or certain employer-based insurance have no choice but to apply for government subsidies for the substantial portion of cost that their insurance plan does not cover.

27. Health care coverage allows AFC clients and PLWH generally to receive the care and treatment they need to stay healthy and to suppress the virus, reducing treatment costs over time and improving their individual health. PLWH whose viral load is undetectable cannot transmit HIV sexually; it is therefore essential that PLWH have uninterrupted access to appropriate HIV medications to prevent transmission of HIV to their loved ones and in the community.

28. Under the proposed rule, immigration applicants living with HIV and others with chronic health conditions would be required to purchase private, "non-subsidized medical insurance" to avoid the Final Rule's effect or rely solely on the incomplete coverage provided by the RWHAP. Thus, the Final Rule would force people living with and vulnerable to HIV to choose between life-saving services or an adjustment of immigration status.

29. Based on my experience, I believe that the public charge rule also will incentivize PLWH— even U.S. citizens or permanent residents not affected by the public charge rule—to terminate their subsidized health care, including Medicaid, out of fear of that enrollment will prevent them from adjusting their status and from petitioning for status for family

members living abroad. Disenrollment will jeopardize their own health and could result in new HIV transmissions in the community.

30. Based on my experience, I further believe the public charge rule will incentivize PLWH—even U.S. citizens or permanent residents not affected by the public charge rule—to terminate assistance or not enroll in programs that are not impacted by the public charge rule, such as RWHAP and ADAP.

31. RWHAP and ADAP provide coverage that is incomplete compared to Medicaid. RWHAP does not cover emergency department visits, surgeries and hospital stays, or specialty care not related to HIV. Thus RWHAP cannot cover treatment for common illnesses, such as cancer or heart disease not related to HIV. Without Medicaid coverage, PLWH with only RWHAP could face thousands of dollars in medical bills for treatment or go without care.

32. The confusing language of the public charge rule, as well as inadequate public education by the government about which benefits the rule includes, will cause some PLWH to be fearful of enrolling in government benefits and other non-governmental assistance programs, or caused them to disenroll altogether. This chilling effect will jeopardize the health of PLWH and could lead to increased HIV transmissions in the community as PLWH go without treatment.

33. In fact, in my experience as President and CEO, I have observed that the Proposed Rule has already caused needless fear. I and those under my supervision who handle client intake and phone calls have seen an increase in inquiries from clients, the general public, and community-based organizations concerned that the public charge rule will cause people to dis-enroll from essential health programs out of fear for their immigration status.

34.  Among the sorts of public charge concerns our staff has handled are clients who are afraid to enroll in RWHAP and ADAP, hospital charity care programs, pharmaceutical company patient assistance programs, and other programs that are not affected by the Final Rule because they are confused and don't trust what case managers and doctors tell them.

35. The public charge rule has caused some of our clients living with HIV to be willing only to enroll in ADAP and not other programs. They will not enroll in any other benefits for which they are eligible, even if that enrollment will not impact their ability to later adjust their status. As a result, they are not able to receive medical care and other services paid for by the Ryan White Program of Medicaid, which could lead to debilitating and costly illness. One client will only pay for medical services with his credit card, a situation that is financially unsustainable

36. The public charge rule has also caused clients to be wary of enrolling in non-governmental programs that are not impacted by the final rule, such as hospital charity care programs and pharmaceutical manufacturer assistance programs. As a result, these clients will go without lab tests or specialty health care that will detect, prevent and treat HIV and other serious chronic conditions. Furthermore, they may go without otherwise free medications that would treat these conditions. Clients may face serious illness as a result.

37.  Furthermore, access to support services and necessities for daily living improve the health outcomes of PLWH. Many PLWH rely on benefits like SNAP to tolerate medicine, stay healthy, and live productive lives. For example, PLWH are less likely to be virally suppressed if they do not have access to food. Nutritious food is also necessary for PLWH to maintain healthy weight, better absorb medication, and reduce side effects. Having adequate access to food has also been shown to decrease medical costs and increased

adherence to ARVs. Disenrollment from food-based public benefits programs could have devastating consequences for PLWH.

38.  AFC has already encountered a client who is an immigrant and is afraid that SNAP benefits would impact their immigration status and refuses to apply.

39.  Moreover, approximately 35 percent of AFC's HIV clients experience unstable housing. Stable housing is critical for the health and well-being of PLWH. The public charge rule's chilling effect could deter PLWH from seeking housing assistance, compromising their health. The Housing Opportunities for People with AIDS (HOPWA) program is not subject to the public charge rule, AFC expects that some clients may be unwilling to apply out of fear that the benefit will make them a public charge.

40. I and the staff working under my supervision regularly reassure many of our exempt clients that they should not be subject to the Final Rule and can receive the aid they need without fear of immigration consequences. But our clients regularly inform us that they are still afraid or unwilling to access the health benefits for which they might otherwise qualify.

**Impact of Public Charge Rule on AFC**

41.  AFC has diverted resources since the Proposed Rule's publication in order to respond to the volume of inquiries and matters related to public charge. Our limited staff has had to juggle additional client inquiries related to public charge, while at the same time dedicating significant resources to reviewing the complex draft and final versions of the public charge rule, reviewing legal analyses of the public charge rule, and meeting the demand for trainings and technical assistance by public and private sector service providers. These staff members would otherwise have been available to assist clients with a broader array of problems. An inordinate amount of time is spent trying to convince clients that they can in

fact receive benefits, such as RWHAP or ADAP, which are not subject to the public charge rule.

42. Prior to the publication of the Proposed Rule, public charge was rarely a concern for individuals seeking out our services. But now, we are regularly receiving client inquiries about the rule.

**Conclusion**

43. AFC's resources have been diverted and taxed because of the upsurge in inquiries from individuals and communities afraid about the public charge rule's implications. We are regularly responding to inquiries from people who should not be directly impacted by the rule—including citizens, LPRs, and humanitarian immigrants—but who are nonetheless afraid. My direct impressions based upon the nature and type of legal inquiries we are receiving from the general public, community organizations, and from other non-profits is that the number of people who will dis-enroll from benefits is much higher than USCIs' 2.5% estimate.

44. I believe this chilling effect will cause PLWH to go without the healthcare and other forms of assistance they need to survive and live healthy lives. Without access to these public benefits, AFC clients' long-term physical and economic wellbeing will be irreparably harmed, and our community may be harmed by an increase in HIV transmissions from people who go without treatment.

I, John Peller, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

10

Executed this 24 day of September 2019 in Chicago, Cook County, Illinois.

_____

John Peller

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **COOK COUNTY, ILLINOIS**, an Illinois governmental entity; **ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC.,** | |
| **Plaintiffs,** | Civ. Action No. 19-cv-06334 |
| vs. | |
| **KEVIN K. McALEENAN,** in his official capacity as Acting Secretary of U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY,** a federal agency; | |
| **KENNETH T. CUCCINELLI II,** in his official capacity as Director of U.S. Citizenship and Immigration Services; | |
| **U.S. CITIZENSHIP AND IMMIGRATION SERVICES,** a federal agency, | |
| **Defendants.** | |

### DECLARATION OF CATHERINE NICOLE LONGKUMER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Title 28 U.S.C. Section 1746, I, Catherine Nicole Longkumer, declare as follows:

1

1.      I am over 18 years of age. I have personal knowledge of the facts set forth in this declaration, except where a fact may be stated on information and belief, and, if called as a witness, could and would testify competently to the matters set forth below.

2.      I submit this declaration in support of Cook County, Illinois (the "County" or "Cook County") and the Illinois Coalition for Immigrant and Refugee Rights, Inc.'s ("ICIRR") Motion for Preliminary Injunction.

3.      In this declaration, I explain how the Notice of Proposed Rule Making on Inadmissibility on Grounds of Public Charge (83 Fed. Reg. 51114) ("Proposed Rule") and Final Rule on Inadmissibility on of Public Charge (84 Fed. Reg. 41292) ("Final Rule") have impacted the Legal Aid Society of Metropolitan Family Service's clients in a manner that has severely taxed its resources and impacted our ability to serve our clients.

**Background**

4.      I am the Managing Attorney for the Individual Rights and Social Justice Practice Group at the Legal Aid Society ("LAS") of Metropolitan Family Services (MFS). The Legal Aid Society is part of a large social service agency, Metropolitan Family Services. As one of the largest not-for-profits in Illinois, MFS serves more than 79,000 children, youth, adults, and senior citizens each year. MFS uses a community-centered service delivery model to provide high quality, accredited services in four strategic areas: education, empowerment, economic stability, and wellness; serving residents of the city of Chicago, suburban Cook County, and DuPage County.

5.      Legal Aid Society (LAS), a program of MFS, was founded in 1886 and is the oldest provider of legal services to low-income people in Chicago, and the second oldest in the

nation. Over its 132-year history, LAS and MFS have provided holistic representation in family, housing, consumer and elder law to low-income residents of Metropolitan Chicago. Its mission is to protect and strengthen individuals and families by providing equal access to justice to the most vulnerable citizens, including those who are impoverished, the elderly, victims of human trafficking, immigrant victims of crime, and victims of domestic violence. In addition, staff and pro bono volunteers provide legal assistance and education to client groups through "Know Your Rights" clinics, as well as training and technical assistance to multi-disciplinary groups working to enhance survivor safety. LAS promotes the self-sufficiency of over 12,600 low-income families annually.

6.        LAS and MFS have been a combined agency for over 100 years, addressing issues of poverty in Cook and DuPage counties. According to the United States Census, approximately 813,925[1] people in DuPage & Cook County live in poverty.

7.        With 7 community centers and nearly 30 physical locations in Cook & DuPage counties, MFS and LAS protects and advances the rights of low-income families and immigrants through services and programs which focus on education, economic stability, emotional wellness, and empowerment. MFS has nearly 1,000 staff members. LAS has 36 staff members, including 23 attorneys and 7 paralegals, and 6 additional staff members including intake, support staff, and outreach workers who provide services primarily in Cook and DuPage counties.

8.        LAS' primary client intake is through our intake line. These hotlines are staffed by trained intake workers who perform eligibility screening, including gathering client

---

[1] According to the U.S. Census, approximately 756,352, or 93%, of these individuals reside in Cook County.

demographic data and providing referrals for clients who do not qualify for services through LAS.

9.      LAS handles over 2,000 cases annually, and our intake units handle nearly 4,000 calls per year. We also reach over 3,500 additional individuals through outreach and engagement events.

10.      I have served at LAS since 2012. I originally started as an Equal Justice Works Fellow launching our human trafficking initiative. Over the last 7 years, the project has grown into the Individual Rights and Social Justice Practice Group, which currently consists of nine full time staff members including attorneys, paralegals, a licensed clinical counselor, and outreach coordinator, all of whom I supervise. The practice group primarily serves survivors of human trafficking and immigrant victims of crime, providing free legal services and free wrap around support services. We serve survivors of human trafficking throughout Illinois and immigrant victims of crime living in Cook and the collar counties. Our services include representation in immigration law, crime victim rights, crime victim advocacy, assisting them in applying for public benefits, orders of protection, and others.

11.      Over the past 7 years working in legal aid, I have developed close ties to low income individuals throughout Cook and the collar counties and an understanding of the legal issues facing these communities. In particular, I have developed an expertise in laws around human trafficking, crime-based immigration relief, the benefits that these survivors are eligible to access, and the ways in which these public benefit programs interact with immigration law. I graduated from the University of Michigan in 2011, as a Doctor of Law (J.D.). I have 7 years of experience working with immigrant families.

12.     To demonstrate the way that the Proposed and Final Rules regarding public charge have impacted LAS, I provide information known to me as a legal aid attorney and as a the Managing Attorney of the Individual Rights and Social Justice Practice Group at LAS. By making this declaration, I do not waive any attorney-client privilege or client confidentiality.

**Expertise in the Intersection of Public Benefits Law and Immigration Law**

13.     My colleagues at LAS and I have developed an expertise in the intersection between public benefits and immigration law, and specifically in the way that public charge rules affect low-income immigrant communities.

14.     LAS conducts a large number of trainings and outreach events targeted directly at low-income immigrant communities. Our attorneys and advocates visit locations such as MFS centers, community centers, and work sites, among others, to both provide legal education and gain a deeper understanding of the needs and challenges faced by the communities we represent.

15.     Most of the immigrant clients LAS assists in public benefits are also survivors of human trafficking or qualify for other forms of humanitarian visas. The LAS case manager assists these clients in applying for public benefits for which they qualify. LAS also handles a number of calls from MFS staff members who have immigrant clients in their programs with questions about their immigration status and their ability to participate in programming or access benefits and services.

16.     While LAS does not have a specific public benefits practice, LAS has had to become familiar with public benefits because immigrant survivors of human trafficking are

5

allowed to access public benefits that are restricted to most immigrants, and these public benefits are vital to helping survivors recover from their victimization.

17. Understanding public benefits law requires familiarity with a wide variety of programs that exist within each category of aid (e.g., SNAP and the Women, Infants and Children Nutrition Program within food assistance, or SSI and TANF within cash assistance), and an understanding of how the programs interact with each other and with related social insurance programs like Medicare and Social Security.

18.      LAS provides wrap-around legal services to low-income survivors of inter-personal violence, including survivors of domestic violence, sexual assault, and human trafficking. MFS also has court advocate programs which assist self-represented individuals applying for orders of protection against their abusers. Survivors come to LAS seeking help with housing, domestic violence restraining orders, family law, and immigration, among other legal issues. Survivors often have more than one legal need. Many of the survivors we help are immigrants of varying status.

19.      Economic dependence on the abuser is one of the primary reasons that our clients consistently cite as a barrier to escaping abuse and exploitation, whether in the domestic violence or human trafficking setting. Access to safety net programs, including TANF, Medicaid, SNAP, and the related job training and child care services they can provide, make it possible for a survivor to safely leave an abuser without facing the impossible choice between safety from abuse and becoming homeless or going hungry.

20.      Understanding these complicated safety net programs can be critical to assessing public charge risk for immigrants; for example, an immigrant who receives certain Illinois Medicaid programs which use federal funding streams may be subject to exclusion under

the Final Rule, while the same immigrant might get an Illinois Medicaid program that is restricted to a certain age group or type of services, or that uses only state funding streams, and would not be subject to exclusion.

**Public Charge Rule Has a Dangerous Chilling Effect**

21.     As explained above, there are multiple iterations of multiple categories of public benefits programs, and it requires extreme technical proficiency to parse through which versions of which aid programs might trigger a presumption that a person is a "public charge," and which do not. There also exists a wide variety of different categories of immigration status, some of which are categorically exempted from the public charge exclusion rule, and others of which are at risk of being deemed a public charge if they receive aid.  To complicate things further, many families have members with different immigration statuses and eligibility for benefits, and thus different risks of being deemed a public charge if they receive aid.  As a result, most immigrants—and most immigration advocates—do not know whether they will put their immigration status at risk if they apply for food aid or medical care that their families need.

22. In my experience as Managing Attorney for the Individual Rights and Social Justice practice group at LAS, I have observed that the recently enacted public charge rule has caused a chilling effect, preventing needy immigrants from getting the food and medical care essential for survival.  In my position, I have heard from several managers, supervisors, and program staff at MFS who have questions and concerns about the Public Charge rule, and struggle to understand its implications. MFS has seen clients disenroll from services, for which clients are eligible, because of the fear and misunderstanding of the Proposed Rule. The Proposed Rule has had this effect even for families who are eligible

for aid and exempt from the public charge rule, and for whom immigration status would be unaffected by receiving aid. This is because the public charge rule is extremely confusing—both for advocates and for immigrants less familiar with our legal system, and who may have limited English proficiency.

23.     For our humanitarian immigrant clients who are fleeing abuse or exploitation, being denied the ability to adjust their immigration status, and therefore having to return to their country of origin, would create devastating effects. Clients who are asylees and refugees may face persecution, war, and deadly threats if they return, while survivors of domestic violence or human trafficking may face recurrent abuse, loss of the legal protections from their abuser or trafficker, and retaliation for having cooperated with American law enforcement. In short, for many of these immigrants, risking their ability to stay in the United States means risking death.

24.     Applications for humanitarian immigration status can take years, prolonging the period of uncertainty during which immigrants must make decisions about accessing needed services. For example, the anticipated wait time for a non-citizen survivor of domestic violence to have a U visa adjudicated can take more than seven years, and it can take another six or more years after receiving the U visa before that same immigrant is eligible to apply for LPR status and have their adjustment of status adjudicated.

**Impact of Public Charge Rule on LAS**

25.     LAS, like many of our sister organizations, has diverted significant resources since the Proposed Rule's publication in order to respond to the volume of inquiries in matters related to public charge. Our limited staff of immigration attorneys and paralegals has had to juggle a surge in inquiries related to public charge from clients and MFS staff members,

while at the same time dedicating significant resources to reviewing the complex draft and final versions of the public charge rule, reviewing legal analyses of the public charge rule, and working with partner agencies on community wide education and response.

**Conclusion**

26.    LAS' resources have been diverted and taxed because of the upsurge in inquiries from individuals and communities afraid about the public charge rule's implications. We are regularly responding to inquiries from clients who should not be directly impacted by the rule—but who are nonetheless afraid. We also are hearing from MFS staff members, who are not experts in the law, but are regularly being asked by clients about the impact of this rule. Clients are fearful and staff are unsure how to respond and unsure what would make someone ineligible or put them are risk in the future. We have been told by MFS staff that this uncertainty and fear has lead clients to stop vital services.

27.    I believe this chilling effect will cause LPRs, domestic violence survivors, survivors of human trafficking, and U.S. citizen children with immigrant parents to go without the healthcare, nutrition assistance, and housing assistance, and other benefits and services they need to survive a temporary crisis. Without access to these public benefits, I believe these individuals' long-term physical and economic wellbeing will be irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 19, 2019 in Cook County.

Catherine Nicole Longkumer

9