**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **COOK COUNTY, ILLINOIS,** *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> **KEVIN K. McALEENAN,** in his official capacity as Acting Secretary of U.S. Department of Homeland Security, *et. al.*, <br><br> *Defendants*. | Civil Action No. 1:19-cv-06334 <br><br> Hon. Gary S. Feinerman |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

ARGUMENT ......................................................................................................................... 6

I. STANDARD OF REVIEW ........................................................................................6

II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
CLAIMS. ....................................................................................................................7

 A. Plaintiffs Have Not Established Standing or Ripeness. ...........................................7

 B. Plaintiffs Are Outside The Zone Of Interests Regulated By The Rule..................12

 C. Plaintiffs' Substantive Claims Lack Merit............................................................13

  1. The Rule Is Consistent With The Plain Meaning Of "Public Charge."......13

  2. The Plain Meaning of Public Charge Does Not Require Permanent Receipt
Of Government Benefits Or That Such Benefits Be Paid In Cash ...........18

  3. The Rule Exercises Interpretive Authority That Congress Delegated To
The Executive Branch, A Delegation Congress Has Maintained. .............22

  4. The Rule Is Not Arbitrary And Capricious................................................24

   a. The Rule Meets The Standards Required For An Agency To Change
Its Position Through Notice-and-Comment Rulemaking. ................24

   b. DHS Adequately Responded to Comments. ...................................26

   c. The Rule Reasonably Preserved The Totality of The Circumstances
Analysis For Public Charge Inadmissibility Determinations And
Reasonably Adopted The 12/36 Standard.......................................31

   d. The Rule Does Not Violate The Rehabilitation Act, The Welfare
Reform Act, or SNAP. .....................................................................33

III. PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM. ...................................35

IV. THE REMAINING EQUITABLE FACTORS REQUIRE DENIAL OF PLAINTIFFS'
MOTION..................................................................................................................39

V. ANY RELIEF SHOULD BE CAREFULLY TAILORED TO IRREPARABLE
INJURIES DEMONSTRATED BY PLAINTIFFS.........................................................42

CONCLUSION..................................................................................................................... 43

i

# TABLE OF AUTHORITIES

**Cases**

*Air Courier Conference v. American Postal Workers Union*,
498 U.S. 517 (1991) ............................................................................................. 12

*Am. Sec. & Tr. Co. v. Utley*,
382 F.2d 451 (D.C. Cir. 1967) ........................................................................... 20

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981) ............................................................................................. 27

*Am. Trucking Ass'ns v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ............................................................................. 7

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012) ........................................................................... 26

*Baker v. Johnston*,
21 Mich. 319 (Mich. 1870) ................................................................................. 14

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) ........................................................................................ 40

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ........................................................................... 38

*Boston v. F.W. Capen*,
61 Mass. 116 (Mass. 1851) ................................................................................. 19

*Brotherhood of Maintenance of Way Employees v. CSX Transp., Inc.*,
478 F.3d 814 (7th Cir. 2007) ........................................................................ 33, 35

*Brumfield v. City of Chicago*,
735 F.3d 619 (7th Cir. 2013) .............................................................................. 33

*Cachillo v. Insmed*,
638 F.3d 401 (2d Cir. 2011) ................................................................................. 7

*Cascade Natural Gas Corp. v. FERC*,

   955 F.2d 1412 (10th Cir. 1992) ............................................................................ 15

*Chevron, U.S.A., Inc. v. NRDC*,

   467 U.S. 837 (1984) ............................................................................... 22, 24

*Christian Legal Soc'y v. Walker*,

   453 F.3d 853 (7th Cir. 2006) ................................................................................ 6

*City & Cty. of San Francisco v. Whitaker*,

   357 F. Supp. 3d 931 (N.D. Cal. 2018) .................................................................. 9

*City & Cty. of San Francisco v. Trump*,

   897 F.3d 1225 (9th Cir. 2018) ............................................................................ 42

*Clapper v. Amnesty Int'l USA*,

   568 U.S. 398 (2013) ............................................................................................ 9

*Clarke v. Sec. Indus. Ass'n*,

   479 U.S. 388 (1987) ..................................................................................... 12, 13

*Colo. River Indian Tribes v. Parker*,

   776 F.2d 846 (9th Cir. 1988) .............................................................................. 36

*Common Cause Indiana v. Lawson*,

   No. 18-2491, 2019 WL 4022177 (7th Cir. Aug. 27, 2019) .............................. 9, 10

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,

   863 F.3d 911 (D.C. Cir. 2017) ........................................................................... 24

*Consumer Elecs. Ass'n v. FCC*,

   347 F.3d 291 (D.C. Cir. 2003) ..................................................................... 28, 29

*Cronin v. USDA*,

   919 F.2d 439 (7th Cir. 1990) ............................................................................... 7

*D.U. v. Rhoades*,

   825 F.3d 331 (7th Cir. 2016) .......................................................................... 6, 37

*Davis v. Pension Benefit Guaranty Corp,*

    571 F.3d 1288 (D.C. Cir. 2009) ........................................................................ 6

*Defs. of Wildlife v. Zinke,*

    856 F.3d 1248 (9th Cir. 2017) ......................................................................... 29

*Derby & Co, Inc. v. Dep't of Energy,*

    524 F. Supp. 398 (S.D. N.Y. 1981) ................................................................... 11

*E. Bay Sanctuary v. Barr,*

    934 F.3d 1026 (9th Cir. 2019) .................................................................... 40, 42

*Entergy Corp. v. Riverkeeper, Inc.,*

    556 U.S. 208 (2009) .......................................................................................... 27

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*

    733 F.3d 393 (2d Cir. 2013) ............................................................................ 10

*Ex Parte Horn,*

    292 F. 455 (W.D. Wash. 1923) ........................................................................ 17

*Ex Parte Mitchell,*

    256 F. 229 (N.D.N.Y. 1919) ............................................................................ 17

*Ex Parte Pugliese,*

    209 F. 720 (W.D.N.Y. 1913) ........................................................................... 22

*Ex Parte Sakaguchi,*

    277 F. 913 (9th Cir. 1922) .............................................................................. 20

*FCC v. Fox Television Stations, Inc.,*

    556 U.S. 502 (2009) .................................................................................... 24, 29

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*

    93 F.3d 897 (D.C. Cir. 1996) ........................................................................... 13

*Food & Water Watch, Inc. v. Vilsack,*

    808 F.3d 905 (D.C. Cir. 2015) ......................................................................... 10

*Foster v. Andersen*,

    No. 96 C 5961, 1997 WL 802106 (N.D. Ill. Dec. 29, 1997) .................................................. 33

*Gegiow v. Uhl*,

    239 U.S. 3 (1915) ................................................................................................................ 17

*Gill v. Whitford*,

    138 S. Ct. 1916 (2018) ........................................................................................................ 42

*Greater Yellowstone Coal, Inc. v. Servheen*,

    665 F.3d 1015 (9th Cir. 2011) ............................................................................................ 28

*Guilford v. Inhabitants of Abbott*,

    17 Me. 335 (Me. 1840) ....................................................................................................... 20

*H.O.P.E., Inc. v. Eden Mgmt. LLC*,

    128 F. Supp. 3d 1066 (N.D. Ill. 2015) ................................................................................ 9

*Harris v. FCC*,

    776 F.3d 21 (D.C. Cir. 2015) ............................................................................................. 19

*Havens Realty Corp. v. Coleman*,

    455 U.S. 363 (1982) ............................................................................................................. 9

*Howe v. United States*,

    247 F. 292 (2d Cir. 1917) .................................................................................................... 17

*In re: Application for Temporary Resident Status*,

    USCIS AAO, 2009 WL 4983092 (Sept. 14, 2009) .............................................................. 34

*In re MTBE Prods. Liability Litig.*,

    725 F.3d 65 (2d Cir. 2013) .................................................................................................. 11

*Inhabitants of Guilford v. Inhabitants of Abbott*,

    17 Me. 335 (Me. 1840) ....................................................................................................... 20

*INS v. Jong Ha Wang*,

    450 U.S. 139 (1981) ............................................................................................................. 22

*INS v. Legalization Assistance,*

    *Proj.*, 510 U.S. 1301 (1993) ........................................................................ 12, 13

*Int'l Union, Allied Indus. Workers of Am., AFL-CIO v. Local Union No. 589, Allied Indus.*

    *Workers of America, AFL-CIO,*

    ("Local 589"), 693 F.2d 666 (7th Cir. 1982) ........................................................ 41

*Inv. Co. Inst. v. CFTC,*

    720 F.3d 370 (D.C. Cir. 2013) ...................................................................... 29

*Jackson v. Blitt & Gaines, P.C.,*

    833 F.3d 860 (7th Cir. 2016) ........................................................................ 14

*Judge v. Quinn,*

    612 F.3d 537 (7th Cir. 2010) ........................................................................ 36

*Keep Chicago Livable v. City of Chicago,*

    913 F.3d 618 (7th Cir. 2019) ......................................................................... 9

*Knapp v. Northwestern U.,*

    101 F.3d 473 (7th Cir. 1996) ........................................................................ 34

*Knutzen v. Eben Ezer Lutheran Hous. Ctr.,*

    815 F.2d 1343 (10th Cir. 1987) ..................................................................... 34

*Lam Fung Yen v. Frick,*

    233 F. 393 (6th Cir. 1916) ..................................................................... 17, 20

*Lawson Prods., Inc., v. Avnet, Inc.,*

    782 F.2d 1429 (7th Cir. 1986) ....................................................................... 41

*Lewis v. Thompson,*

    252 F.3d 567 (2d Cir. 2001)...................................................................... 26, 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*

    572 U.S. 118 (2014)................................................................................ 12

*Lujan v. Defs. of Wildlife,*

    504 U.S. 555 (1992)................................................................................. 7

*Madsen v. Women's Health Ctr., Inc.*,

    512 U.S. 753 (1994)...................................................................................... 43

*Majorica, S.A. v. R.H. Macy*,

    762 F.2d 7 (2d Cir. 1985)............................................................................. 41

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

    567 U.S. 209 (2012)...................................................................................... 12

*Matter of Harutunian*,

    14 I. & N. Dec. 583 (BIA 1974) ............................................................ 21, 23

*Matter of Martinez-Lopez*,

    10 I. & N. Dec. 409 (A.G. 1962) .................................................................. 21

*Matter of Perez*,

    15 I. & N. Dec. 136 (BIA 1974) .................................................................. 24

*Matter of Vindman*,

    16 I. & N. Dec. 131 (BIA 1977) .................................................................. 23

*Mazurek v. Armstrong*,

    520 U.S. 968 (1997)........................................................................................ 6

*Menominee Indian Tribe of Wisc. v. Thompson*,

    161 F.3d 449 (7th Cir. 1998) ....................................................................... 15

*Michigan v.EPA*,

    135 S. Ct. 2699 (2015).................................................................................. 28

*Michigan v. U.S. Army Corps of Engineers*,

    667 F.3d 765 (7th Cir. 2011) ....................................................................... 37

*Munaf v. Geren*,

    553 U.S. 674 (2008).................................................................................... 6, 7

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

    545 U.S. 967 (2005)...................................................................................... 24

*NRDC v. EPA*,

    822 F.2d 104 (D.C. Cir. 1987) .................................................................. 27

*Ohio Forestry Ass'n v. Sierra Club*,

    523 U.S. 726 (1998) ............................................................................... 11

*Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*,

    23 N.J.L. 169 (N.J. 1851) ................................................................. 16, 33

*People ex rel. Durfee v. Comm'rs of Emigration*,

    27 Barb. 562 (N.Y. Gen. Term 1858) ..................................................... 19

*Plotkin v. Ryan*,

    No. 99 C 53, 1999 WL 965718 (N.D. Ill. Sept. 29, 1999),

*aff'd*, 239 F.3d 882 (7th Cir. 2001) ........................................................... 10

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville*,

    5 Pa. Super. 516 (Pa. Super. Ct. 1897) .................................................. 19

*Pub. Citizen, Inc. v. FAA*,

    988 F.2d 186 (D.C. Cir. 1993) .................................................................. 27

*Retired Chicago Police Ass'n v. City of Chicago*,

    7 F.3d 584 (7th Cir. 1993) ...................................................................... 10

*Ridge Gold Std. Liquors, Inc. v. Seagram & Sons*,

    572 F. Supp. 1210 (N.D. Ill. 1983) ......................................................... 41

*Sanders v. Jackson*,

    209 F.3d 998 (7th Cir. 2000) .......................................................... 13, 14, 15

*Sandifer v. U.S. Steel*,

    134 S. Ct. 870 (2014) ............................................................................... 14

*Serlin v. Arthur Andersen*,

    3 F.3d 221 (7th Cir. 1993) ...................................................................... 40

*Simpson v. Young*,

    854 F.2d 1429 (D.C. Cir. 1988) .............................................................. 30

*Stokely-Van Camp v. Coca-Cola*,

　2 U.S.P.Q.2d 1225, 1987 WL 6300 (N.D. Ill. 1987) ............................................................... 42

*Summers v. Earth Island Inst.*,

　555 U.S. 488 (2009) .................................................................................................................... 7

*Texas v. EPA*,

　829 F.3d 405 (5th Cir. 2016) ...................................................................................................... 44

*Town of Chester v. Laroe Estates, Inc.*,

　137 S. Ct. 1645 (2017) ................................................................................................................ 43

*Town of Hartford v. Town of Hartland*,

　19 Vt. 392 (Vt. 1847) .................................................................................................................. 19

*Tripp v. Smart*,

　2016 WL 4379876 (S.D. Ill. Aug. 17, 2016) .............................................................................. 41

*Turnell v. CentiMark Corp.*,

　796 F.3d 656 (7th Cir. 2015) ............................................................................................... *passim*

*U.S. v. F.J. Vollmer*,

　1 F.3d 1511 (7th Cir. 1993) ........................................................................................................ 15

*U.S. v. Lipkis*,

　56 F. 427 (S.D.N.Y. 1893) .......................................................................................................... 19

*United Air Lines, Inc. v. Air Line Pilots Ass'n., Int'l*,

　2008 WL 4936847 (N.D. Ill. Nov. 17, 2008),

*aff'd* 563 F.3d 257 (7th Cir. 2009) ................................................................................................ 7

*Univ. of Notre Dame v. Sebelius*,

　743 F.3d 547 (7th Cir. 2014) ...................................................................................................... 38

*Venckiene v. United States*,

　328 F. Supp. 3d 845 (N.D. Ill. 2018)

*aff'd*, 929 F.3d 843 (7th Cir. 2019) .............................................................................................. 40

ix

*Vill. of Barrington v. Surface Transp. Bd.*,

    636 F.3d 650 (D.C. Cir. 2011) ................................................................ 27

*Wallis v. U.S. ex rel. Mannara*,

    273 F. 509 (2d Cir. 1921) ...................................................................... 23

*Weinberger v. Romero-Barcelo*,

    456 U.S. 305 (1982) .............................................................................. 44

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*,

    858 F.3d 1034 (7th Cir. 2017) ................................................... 37, 38, 40

*Whitmore v. Ark.*,

    495 U.S. 149 (1990) ................................................................................ 7

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) ........................................................................ 6, 16, 43

*Wisc. Central, Ltd. v. U.S.*,

    138 S. Ct. 2067 (2018) .......................................................................... 13

**Statutes**

5 U.S.C. § 705 .................................................................................................. 44

7 U.S.C. § 2017(b) ........................................................................................... 35

8 U.S.C. § 1103(a)(3) ....................................................................................... 23

8 U.S.C. § 1182(a)(4) .................................................................. 1, 3, 22, 31, 32

8 U.S.C. § 1182(s) ............................................................................................ 35

8 U.S.C. § 1227(a)(7) ....................................................................................... 21

8 U.S.C. § 1252 .......................................................................................... 11, 12

8 U.S.C. § 1443(h) ........................................................................................... 13

8 U.S.C. § 1601 .................................................................... 3, 26, 27, 28, 29

8 U.S.C. § 1601(2) .................................................................................. 3, 18, 26

8 U.S.C. § 1641(b) ........................................................................................... 35

29 U.S.C. § 794(a) ............................................................................................ 33, 34

55 ILCS 5/3-9005(a)(1) ........................................................................................... 41

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA")

    Pub. L. No. 104-208, 110 Stat. 3009 (1996).............................................................. 1

Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA")

    Pub. L. No. 104-193, 110 Stat. 2105 (1996)............................................................ 4

Immigration Act of 1882, 47th Cong. ch. 376, 22 Stat. 214 (1882).......................................... 3, 4

Immigration Act of 1891, 51st Cong. ch. 551, 26 Stat. 1084 (1891) ............................ 3, 4, 16, 17

Immigration Act of 1907, 59th Cong. ch. 355, 34 Stat. 898 (1907)........................................... 3

Immigration Act of 1917, 64th Cong. ch. 29, 39 Stat. 874 (1917)................................... 3, 17, 18

INA of 1952, 82nd Cong. Ch. 477, 66 Stat. 163 (1952).................................................. 3

### Legislative Materials

26 Cong. Rec. 657 (1894).................................................................................... 16

H.R. Doc. No. 64-886 (1916) ........................................................................ 14, 17, 26

H.R. Rep. No. 104-828 (1996) (Conf. Rep.)............................................................... 1

S. Rep. 64-352 (1916).......................................................................................... 17

S. Rep. No. 81-1515 (1950) ....................................................................... 22, 23, 24

### Regulations

6 C.F.R. § 15.30 ............................................................................................. 33

47 C.F.R. § 54.409 ........................................................................................... 36

*Adjustment of Status for Certain Aliens*

    52 Fed. Reg. 16205 (May 1, 1987) ....................................................................... 21

*Inadmissibility and Deportability on Public Charge Grounds* ("1999 NPRM")

    64 Fed. Reg. 28676 (May 26, 1999) ............................................................. 4, 22, 24

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"), 64 Fed. Reg. 28689 (May 26, 1999)............................................................*passim*

*Inadmissibility on Public Charge Grounds* ("NPRM") 83 Fed. Reg. 51114 (Oct. 10, 2018)..................................................................*passim*

*Inadmissibility on Public Charge Grounds* ("Rule") 84 Fed. Reg. 41292 (Aug. 14, 2019)..................................................................*passim*

**Other Authorities**

Arthur Cook, *et al.*, Immigration Laws of the U.S. (1929)................................................. 14, 16, 18

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References to Authorities (1882) .................................... 14, 15

Century Dictionary & Cyclopedia (1911)..................................................................................... 16

Deuteronomy 15:7-8 ...................................................................................................................... 15

E.P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 (1981)........................................................................................................................ 4

Frederic Jesup Stimson, Glossary of the Common Law (1881) ..................................................... 14

Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935) ........................................................................ 17

J.S. Mill, Principles of Political Economy (1865) ........................................................................ 15

Michael Nolan, A Treatise of the Laws for the Relief and Settlement of the Poor (1805) .......................................................................................................................... 15

Calvin Woodard, *Reality and Social Reform*, 72 Yale L.J. 286 (1962) .......................................................................................................... 15

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ................................................. 14, 15

**INTRODUCTION**

For over 135 years, Congress has restricted the admissibility of aliens who are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public. For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustments of status to lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. 104-828, at 240-241 (1996); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the INS with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective

immigrants, and the public with nothing more than an interim guidance document to specify how the factors are being implemented.

The Rule revises an anomalous definition of "public charge" set forth for the first time in that 1999 interim guidance to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. In addition, the Rule has a limited scope: it does not apply to naturalization applications for lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

This Court should deny the motion. Plaintiffs, who are Cook County and Illinois Coalition for Immigrant and Refugee Rights ("ICIRR") (an organization of organizations serving immigrants), rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes, and Plaintiffs' disagreements are ultimately with the wisdom of the policy, a judgment allocated to the political branches. Moreover, whereas States such as Illinois and municipalities such as New York City and Santa Clara immediately filed lawsuits and served preliminary injunction motions to attempt to litigate this policy disagreement in an orderly fashion, Cook County and ICIRR stalled, delaying their filings until they could unnecessarily declare an "emergency." In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into emergency

2

relief.[1]

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id*. § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id*. Relatedly, "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id*. § 1601(2)(B). Remarkably, Plaintiffs' 54-page memorandum in this case fails to even *mention* these important provisions of immigration law. *See generally* Pls. Mem. in Supp. of Mot. for TRO ("Mot."), ECF no. 23-1; *id*. at viii-ix (Table of Authorities).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). An unbroken line of predecessor statutes going back to at least 1882 have contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, 47th Cong. ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1907, 59th Cong. ch. 1134, 34 Stat. 898 ("1907 Act"); Immigration Act of 1917, 64th Cong. ch. 29 § 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, 82nd Cong. ch. 477, section 212(a)(15), 66 Stat. 163, 183. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the

---

[1] This memorandum exceeds the default page limitation under the Local Rules, as permitted by the Court during the September 27, 2019 presentment hearing.

alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch to determine who constitutes a public charge.

The longstanding denial of admission of aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act at 214 (excluding any immigrant "unable to take care of himself or herself without becoming a public charge"); 1891 Act § 11 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened the enforcement of the public charge inadmissibility ground in several ways. Besides codifying mandatory factors for immigration officers to consider, *see supra*, it raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in formal rulemaking to guide immigration officers, aliens, and the public in understanding public charge determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed.

Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("Field Guidance"). The Interim Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," and by barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See id.* at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of its decision. Among the Rule's major components are provisions defining "public charge" and "public benefit" (which are not defined in the statute), an enumeration of factors to be considered in the totality of the circumstances when making a public charge determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining nonimmigrant status. The Rule supersedes the Interim Field Guidance definition of "public charge," establishing a new definition based on a minimum time threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within a 36-month period. *Id.* at 41297. Such

5

"public benefits" are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. *Id*. at 41501-02. The Rule also enumerates a non-exclusive list of factors for assessing whether an alien is likely at any time to become a public charge and explains how DHS officers should apply these factors as part of a totality-of-the-circumstances determination.[2]

## ARGUMENT

## I. STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). A preliminary injunction is "never . . . awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), and "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 870 (7th Cir. 2006) (Wood, J., dissenting) (citing *Mazurek*). The Seventh Circuit "employs a 'sliding scale' approach in deciding whether to grant or deny preliminary relief," but that "approach is limited by the plaintiff first demonstrating 'at least' a negligible chance of success on the merits." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) (citations omitted).[3] A plaintiff cannot prevail without a showing on each of the four factors. *See Winter*,

---

[2] A correction to the Rule was published in the Federal Register on October 2, 2019. *See* https://www.federalregister.gov/documents/2019/10/02/2019-21561/inadmissibility-on-public-charge-grounds-correction.

[3] Other courts have called into question the appropriateness of applying this "sliding scale" approach. *See, e.g.*, *Davis v. Pension Benefit Guaranty Corp*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("In light of the Supreme Court's recent decisions, I tend to agree with Judge Fernandez's opinion for the Ninth Circuit that the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, or vice versa—is 'no longer controlling, or even

6

555 U.S. at 23-24. Where, as here, there are serious questions as to the Court's jurisdiction, it is "more *unlikely*" that the plaintiff can establish a "'likelihood of success on the merits.'" *Munaf*, 553 U.S. at 690. In the alternative, Plaintiffs seek a stay of the effective date of the Rule under Section 705 of the APA. As they correctly observe, "The standard is the same whether a preliminary injunction against agency action . . . or a stay of that action is being sought." Mot. at 20 (quoting *Cronin v. USDA*, 919 F.2d 439, 446 (7th Cir. 1990)).

## II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A. Plaintiffs Have Not Established Standing or Ripeness.

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be certainly impending to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). Where, as here, "the plaintiff is not [itself] the object of the government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562. "When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Cachillo v. Insmed*, 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks omitted).

Here, the Rule governs DHS personnel and certain aliens. It "neither require[s] nor forbid[s] any action on the part of" Plaintiffs, *Summers*, 555 U.S. at 493, nor does it expressly interfere with any of their programs applicable to aliens. Plaintiffs instead largely rely on

---

viable.'" (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

speculative injuries that rely on the independent decisions of third-parties not before the Court. Cook County, in particular, alleges that its health care system CCH will suffer an injury since aliens in Cook County will forgo public benefits, relying more on uncompensated health care from CCH, and depriving CCH of Medicaid funds. As a threshold matter, this allegation is inconsistent with Cook County's allegations that aliens will forgo health care services altogether. *See*, *e.g.*, Compl. ¶ 79, ECF No. 1 (immigrants may "fail to seek . . . treatment"); *id.* ¶ 109 (the Rule will create tension between immigrants and CCH, immigrants will not attend appointments and will "avoid seeking treatment"). Indeed, since Cook County provides a certain amount of uncompensated care now, *see id.* ¶ 88, it is plausible that the Rule will result in a *net savings* for Cook County. Cook County's allegation that it will see a net increase in uncompensated care is speculative. Additionally, this alleged harm is also speculative since it is unclear whether a material number of aliens that use *CCH* in particular will forgo Medicaid benefits and rely on uncompensated care. Cook County primarily relies on across-the-board figures concerning alien benefit use in general, not with respect to Cook County in particular. *See* Mot. at 14.

Although Plaintiffs claim that the alleged actions of "Cook County residents" in "disenroll[ing] from . . . public benefits . . . in anticipation of the implementation of the announced Final Rule," (as long ago as "January 2017," before the NPRM was even published) render the "impact of the agency action . . . more . . . certain," Mot. at 24, the opposite is true. Those who purportedly disenrolled "in anticipation," particularly those who did so anticipating the possible content of a final rule they had never seen, are *not* currently enrolled. It is pure speculation, and defies logic, to suggest that such individuals would re-enroll during the pendency of emergency or preliminary relief. Further, such individuals would logically be the most sensitive to the content of the Rule and those who most heavily value the possibility that they may someday obtain success in their pursuit of the "discretionary decision" of adjustment of status. Because Plaintiffs allege that these individuals have already disenrolled, they cannot rely on such individuals as demonstrating that *others* will disenroll absent the grant of emergency or preliminary relief.

Cook County also alludes to an organizational standing theory. It claims that the Rule will frustrate its mission and force it to divert funds towards training and education concerning the

8

Rule. Generally, for an organization to have standing, the challenged conduct must "perceptibly impair[]" the "organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The alleged "drain on . . . resources" must have "a clear nexus to [a] legally-protected right or interest of the organization." *Keep Chicago Livable v. City of Chicago*, 913 F.3d 618, 625 (7th Cir. 2019). The challenged policy or conduct must "disrupt[]" plaintiffs' activities, and create "additional or new burdens" that make any new expenditure "warranted" and "require[d]." *Common Cause Indiana v. Lawson*, No. 18-2491, 2019 WL 4022177, at *8 (7th Cir. Aug. 27, 2019). Additionally, a plaintiff "must point to a concrete and demonstrable injury to [its] activities; a mere setback to its abstract social interests is not sufficient." *H.O.P.E., Inc. v. Eden Mgmt. LLC*, 128 F. Supp. 3d 1066, 1077 (N.D. Ill. 2015).

Here, Cook County cannot satisfy this standard. To start, Cook County provides no authority supporting the novel extension of this theory of standing from the private organizations to whom it has always been applied to a local government entity. *See City & Cty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 944 (N.D. Cal. 2018) ("Government entities and private organizations are not necessarily interchangeable for standing purposes"—*e.g.*, private organizations may claim purely associational standing but governments may not—"and therefore it is unclear that a *Havens* [organizational standing] analysis is even appropriate" for the City and County of San Francisco). Additionally, Cook County fails to explain how the Rule directly disrupts any of its current activities. Thus, its decision to invest resources into countering the purported effects of the Rule was not "warranted" or "require[d]" to rectify any alleged harm to its activities. This investment is voluntary, and constituting a self-inflicted injury insufficient to establish standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("Respondents cannot manufacture standing merely by inflicting harm on themselves").

ICIRR's standing theory fails for a similar reason. It asserts that its mission is to "promote the rights of immigrants," and that it channeled resources into creating a new organization—PIF-IL—to counteract the Rule. Mot. at 15, 26-27. But ICIRR likewise does not allege that the Rule will disrupt any of its current programs, thus *requiring* a diversion of resources into PIF-IL. ICIRR alleges only that it has chosen to commit resources to educating aliens about the new regulation,

which, for ICIRR, is "business as usual." *Common Cause*, 2019 WL 4022177 at *8; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) ("an organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended"). *Common Cause*, on which Plaintiffs rely, is distinguishable. There, the plaintiffs were organizations that helped register voters. *Common Cause*, 2019 WL 4022177 at *5. They alleged that the challenged voter registration policy would result in the State improperly "removing eligible voters from the rolls without notice," which would directly inhibit plaintiffs' pre-existing voter registration efforts. *Id.* Thus, the plaintiffs were "*forced* to spend resources cleaning up the mess" allegedly created by the new State law. *Id.* (emphasis added). Here, by contrast, ICIRR does not allege that it created PIF-IL to remedy any disruption to its current programs; ICIRR was not "*require[d]* . . . to change or expand [its] activities." *Id.* at *8 (emphasis added). It simply elected to do so.[4] *Cf. Plotkin v. Ryan*, No. 99 C 53, 1999 WL 965718, at *5 (N.D. Ill. Sept. 29, 1999) (Plaintiff may have "diverted certain . . . resources into its investigative program from the other programs" in response to the challenged policy, "but it is not alleged that the defendants' actions have themselves impaired [plaintiff's] ability to perform its work. . . . [plaintiff] cannot convert its ordinary programming costs into an injury in fact."), aff'd, 239 F.3d 882 (7th Cir. 2001).

"Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary" and serves as another prerequisite of justiciability. *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013). Ripeness "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Id.* Here, the gravamen of Plaintiffs' claims is that individual aliens—not the Plaintiffs themselves—may be erroneously determined as "likely at any time to

---

[4] ICIRR's associational standing theory fails for a similar reason: it claims only that its members have standing because they likewise elected to expend resources in response to the Rule. *See* Mot. at 27-28. But ICIRR does not allege that its member organizations' activities were disrupted, and that a new expenditure was required to eliminate the harms caused to these pre-existing activities. ICIRR thus cannot satisfy the first requirement for associational standing. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 600 (7th Cir. 1993) (an organization's "members" must "have standing to sue in their own right").

10

become a public charge" under the totality of the circumstances test set forth in the Rule. Plaintiffs' claims therefore present the precise circumstance in which ripeness precludes review: resolving questions about the application of "public charge" in the context of an "actual dispute" over application of that ground of inadmissibility is needed to avoid "constructing generalized legal rules" in a "vacuum." *Id.*; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them).

Prudential ripeness also counsels against consideration of Plaintiffs' claims. This doctrine is "'an important exception to the usual rule that where jurisdiction exists a federal court must exercise it,' and allows a court to determine 'that the case will be better decided later.'" *In re MTBE Prods. Liability Litig.*, 725 F.3d 65, 110 (2d Cir. 2013). "In determining whether a claim is prudentially ripe," courts examine "whether the claim is fit for judicial resolution" and "whether and to what extent the parties will endure hardship if decision is withheld." *Id.* (cleaned up). Fitness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Plaintiffs' claims are all premised on hypothesizing about the potential future applications of the Rule to individuals, speculation about the effects of the Rule on individual decision-making, and disagreement with DHS's predictions based on the available evidence. In such a context, "judicial appraisal . . . is likely to stand on a much surer footing in the context of a specific application" of the Rule, rather than "in a factual vacuum." *Derby & Co, Inc. v. Dep't of Energy*, 524 F. Supp. 398, 408 (S.D.N.Y. 1981) (internal quotations omitted).

In addition, withholding judicial consideration of Plaintiffs' claims will not cause them any significant hardship. With respect to the Plaintiffs bringing this case, the Rule "do[es] not create adverse effect of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm," and therefore cannot serve as the basis for a ripe claim. *Ohio Forestry Ass'n*, 523 U.S. at 733. Instead, the harms alleged are possible cumulative side effects of third party individuals'

decisions to take action not required by the Rule or the Plaintiffs' own decisions to spend money in response to the Rule, so they do not create a ripe facial challenge.

**B. Plaintiffs Are Outside The Zone Of Interests Regulated By The Rule.**

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interests are . . . marginally related to or inconsistent with the purposes implicit in the statute," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and as Plaintiffs acknowledge, "the relevant statute" for this analysis "is the statute whose violation is the gravamen of the complaint." Mot. at 29 (quoting *Air Courier Conference v. American Postal Workers Union*, 498 U.S. 517, 529 (1991)); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds. By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not a municipality or an organization serving other organizations, who "fall within the zone of interests protected" by any limitations implicit in § 1182(a)(4)(A) and § 1183, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them). *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions

12

were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal help to immigrants]," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

Cook County contends that it falls within the "zone of interests regulated by the . . . Rule," Mot. at 28, ignoring that the relevant zone of interests is that regulated by "the statute." *Clarke*, 479 U.S. at 399. So although the Rule discusses "administrative burden," and monetary and health impacts, Mot. at 29-30, those are merely the costs and benefits associated with changes to the interpretation of the statutory standards governing *admissibility of aliens*. Cook County's "burdens" have no relation to that question. ICIRR claims that it falls within the zone of interests because a different provision of the INA authorizes it to "broadly distribute information" about the law. Mot. at 30 (quoting 8 U.S.C. § 1443(h)). But as Justice O'Connor recognized, the zone of interests of the INA are to be construed far more narrowly: to the "interests of [the] aliens" affected by the particular provision, and not to organizations that assist the aliens with those interests. *Legalization Assistance*, 510 U.S. at 1305.

### C. Plaintiffs' Substantive Claims Lack Merit.

#### 1. The Rule Is Consistent With The Plain Meaning Of "Public Charge."

"The cardinal rule" in statutory interpretation is that "words used in statutes must be given their ordinary and plain meaning," *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000), and the definition of "public charge" in the Rule is consistent with the plain meaning of the statutory text. "[I]n particular," courts "look at how a phrase was defined at the time the statute was drafted and enacted." *Id.*; *see Wisc. Central, Ltd. v. U.S.*, 138 S. Ct. 2067, 2070 (2018) (a court's "job is to interpret the words consistent with their "ordinary meaning . . . at the time Congress enacted the statute"). Courts "often [] refer[] to dictionaries" as the key sources for this analysis, *id.*, and

because the court is interpreting "the meaning at the time the statute was enacted," it is dictionaries from that time on which courts rely. *See Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016) (citing *Sandifer v. U.S. Steel*, 134 S. Ct. 870, 876 (2014)). Since 1882, Congress has consistently provided for the inadmissibility (or, in the parlance of earlier versions of the statute, "exclusion") of indigent aliens determined by the Executive Branch as likely to become "public charges," as the "chief measure of protection in the law . . . intended to reach economic . . . objections to the admission" of aliens. *See* Letter from Sec. of Labor to House Comm. on Immig. and Naturalization, H.R. Doc. No. 64-886, at 3 (Mar. 11, 1916) ("1916 Letter"); NPRM at 51125. This makes the late 19th century the key time to consider. *See Sanders*, 209 F.3d at 1000.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," such dictionaries explain the term "public" as meaning "[t]he whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community." Rapalje 1888.[5] Together, these early definitions make clear that an alien becomes a "public charge" when his inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body of the citizens" to provide for his basic necessities, as reflected in early legal sources addressing the term "public charge." *See* Arthur Cook *et al.*, Immigration Laws of the U.S., § 285 (1929) ("Public charge means any maintenance, or financial assistance, rendered from public funds"). Rather than engage these sources, Plaintiffs cite to the definition of "charge" in a present-day online dictionary, entirely ignoring that the *same dictionary* contains a definition of the full term "public charge"—"one that is supported at public expense"—that makes no reference to "primary" support or dependency and thereby supports the Rule's interpretation. *Compare* Mot. at 32 *with* http://www.merriam-webster.com/dictionary/public%20charge (last

---

[5] *See also* C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References . . ., 501 (1882) ("Winfield 1882") ("Public" means "not any corporation like a city, town, or county but the body of the people at large." (quoting *Baker v. Johnston*, 21 Mich. 319, 335 (Mich. 1870)).

visited Sept. 26, 2019).[6]

It is true, as the Court suggested at the presentment hearing, that language such as "obligation" on "the body of the citizens" and "any maintenance . . . rendered from public funds" can be read broadly, but that does not mean that the plain meaning of the statute is limitless. The 1882 Winfield dictionary provides an explanation of "obligation" as "synonymous with *duty*. . . . a tie which binds us to pay or do something agreeably to the laws or customs of the country." Winfield 1882 at 430; *see also* Rapalje 1888 (defining "liability" as the condition of being "actually or potentially subject to an obligation"). The relevant "duty" at issue is informed by the historical context. *See Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 459 (7th Cir. 1998); *Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412, 1418 (10th Cir. 1992). In the late 19th century, as reflected in the context in which "public charge" arises in any every instance, there existed a generally-recognized moral and legal obligation to assist the poor with the basic necessities for living. *See generally* Michael Nolan, A Treatise of the Laws for the Relief and Settlement of the Poor, Vol. 1 at 1-6 (1805 ed.); J.S. Mill, Principles of Political Economy 585 (Peoples ed. 1865), as reprinted in Calvin Woodard, *Reality and Social Reform*, 72 Yale L.J. 286, 300-01 (1962) ("The state must act by general rules. It cannot undertake to discriminate between the deserving and the undeserving indigent. It owes no more than [subsistence] to the first, and can give no less to the last"); *cf. Deuteronomy* 15:7-15:8.[7]

Nothing about the plain meaning of this term suggests "primarily and permanently

---

[6] Other present-day dictionaries likewise support the Rule's definition of "public charge." For example, "Black's Law Dictionary (6th ed.) . . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" NPRM at 51158. In any event, the definitions provided by Defendants from "the time the statute was drafted and enacted" are much more probative of the meaning of the term. *Sanders*, 209 F.3d at 1000.

[7] This context—that "public charge" concerns the obligation to assist the poor—explains why many types of public benefits, particularly those that are not means-tested, have no bearing on whether a person would be considered a public charge under the statutory definition. Further, it is apparent on the face of the statute that "public charge" is intended to describe a discrete class of persons who will be inadmissible and not every applicant. This precludes a reading that would encompass public benefits afforded to *every* individual in society, as doing so would render all other classes of admissibility irrelevant. *See U.S. v. F.J. Vollmer*, 1 F.3d 1511, 1516 (7th Cir. 1993) ("[S]tatutes are to be construed so as to give meaning to every word in them").

dependent" on public benefits, as Plaintiffs contend. Mot. at 5; *see id*. at 32. When Congress originally enacted the public charge inadmissibility ground, the term "pauper," not "public charge," was in common use for a person so impoverished they would be expected to be permanently dependent on public support. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"); *see also Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp*., 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). In fact, although Plaintiffs assert that the "primarily dependent" standard they describe has been "a consistent understanding . . . trac[ing] back to the 1882 Act," Mot. at 32-33, they identify no source—and Defendants are aware of none—that defines "public charge" using those words or their cognates prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means any maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285; *see also* 26 Cong. Rec. 657 (1894) (statement of Rep. Warner) (explaining that under the public charge inadmissibility ground, "[i]t will not do for [an alien] [to] earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge").

Plaintiffs' analysis of the plain meaning of "public charge" as being equivalent to "pauper" is further undercut by Congress' decision to provide a *separate* inadmissibility ground for paupers in early versions of the statute. *See, e.g.*, 1891 Act.[8] Congress thereby made "clear that the term 'persons likely to become a public charge' is *not* limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (emphasis added). This was a deliberate decision, moreover, as underscored by the response of the Executive Branch and Congress to a 1916 Supreme Court opinion reasoning that the term

---

[8] The 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes." 1891 Act at 1094.

"public charge" must be read as "generically similar" to terms "mentioned before and after" (such as "pauper"). *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915). Shortly after the decision, the Secretary of Labor sent a letter to Congress, requesting that the statute be amended to supersede the Supreme Court's ruling. *See* 1916 Letter at 3-4 (Mar. 11, 1916). The Secretary defined "public charge" in accordance with its plain meaning at the time: as "a charge (an economic burden) upon the community" in which an alien intends to reside. The Secretary then explained that the Court's opinion in *Gegiow* had highlighted a never-before recognized "defect in . . . the arrangement of the wording," which, if left uncorrected, would "materially reduce[] the effect of the clause" in protecting the public fisc. Congress acted. The 1917 Act relocated the "public charge" inadmissibility provision and explained why: "The purpose of this change [is to overcome recent decisions of the courts limiting the meaning of the description of the excluded class because of its position between other descriptions conceived to be of the same general and generical nature. (See especially Gegiow v. Uhl)." S. Rep. No. 64-352, at 5 (1916);[9] *see also* 1917 Act § 3 n.5; as reprinted in Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935) (explaining that "[t]his clause . . . has been shifted . . . to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons" and "overcoming the decision of the Supreme Court in *Gegiow*"). Subsequent authorities recognized that this alteration negated the Court's interpretation in *Gegiow* by underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"); *accord* Arthur Cook, *et al.*, Immigration Laws of the U.S., §§ 128-34 (1929); *but see Ex Parte Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919) (declining to give effect to relocation of "public charge" within the 1917 Act).[10]

---

[9] In *Gegiow*, the Court analyzed the terms adjacent to "public charge" in the statute to conclude that the "overstocked" "state of the labor market" in the plaintiffs' destination city could not serve as the basis for exclusion. 239 U.S. at 9-10. Although issued after enactment of the 1917 Act, the question before the Second Circuit in *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917)—also relied on by Plaintiffs, see Mot. at 5—involved an interpretation of the 1907 Act and the court relied on the adjacency of "pauper" and "public charge," citing *Gegiow*.

[10] The 1917 Act listed, *inter alia*, "idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . persons with chronic alcoholism; paupers; professional beggars; vagrants; persons

For these reasons, the plain meaning of "public charge," as understood through its consistent inclusion as a ground of inadmissibility in immigration statutes dating to 1882, is that it refers to an alien who obligates the body of the people to provide for his basic needs. This interpretation of "public charge" conforms perfectly with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

### 2. The Plain Meaning of Public Charge Does Not Require Permanent Receipt Of Government Benefits Or That Such Benefits Be Paid In Cash

An alien's temporary receipt of public benefits constitutes an obligation on the public to support the basic necessities of life, and is therefore encompassed by the plain meaning of public charge. Both administrative practice and the analysis in early cases confirm that the plain meaning of "public charge" is not limited to an alien who "relies . . . permanently" on "long-term" public aid, as Plaintiffs assert. *See* Mot. at 32-33.

First, as the NPRM in this case explained, short-term receipt has been "a relevant factor under the [previous] guidance with respect to covered benefits." NPRM at 51165 & n.304 ("In assessing the probative value of past receipt of public benefits, 'the length of time . . . is a significant factor'") (quoting 1999 Interim Field Guidance at 28690). In fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash benefits for an extended period for the totality of the circumstances to trigger a public charge determination and set no minimum period below which the receipt of such benefits would be less meaningful. 1999 Interim Field Guidance at 28690. Nothing in the 1999 standard would ensure that an alien who received, in the previous 36 months, 12 months of a public benefit considered relevant under that guidance (such as Supplemental Security Income) would not be treated as a public charge. And nothing in the plain meaning of "public charge" precludes DHS from clarifying the standard by adopting a

---

afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability . . . to earn a living; [felons]; polygamists . . . ; anarchists, or persons . . . who advocate . . . the unlawful destruction of property; prostitutes . . .; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons deported [within the previous year]; stowaways," and others. 1917 Act at 875-76

recognizable and meaningful threshold for receipt of public benefits in a given period. *Cf. Harris v. FCC*, 776 F.3d 21, 28–29 (D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule.").

DHS's treatment of recurring, but non-permanent, receipt of public relief is also consistent with early case law. For example, a lower court in New York in the mid-nineteenth century recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." *People ex rel. Durfee v. Comm'rs of Emigration*, 27 Barb. 562, 569-70 (N.Y. Gen. Term 1858). Similarly, in *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. 516, 520-24 (Pa. Super. Ct. 1897). Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under the specific facts of the case, she was "without notice or knowledge" that receipt even of limited assistance would "place[] [her] on the poor book." *Id.* at 527-28; *see also Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (Vt. 1847) (widow and children with a house, furniture, and a likely future income of $12/year from the lease of a cow were nonetheless public charges after receiving relief in "the amount of some five dollars"). The inclusion of short-term relief is also consistent with case law suggesting, in dicta, that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute.

Plaintiffs' reliance on *Boston v. F.W. Capen*, 61 Mass. 116 (Mass. 1851), to suggest that "public charge" requires long-term receipt of benefits is misplaced. *See* Mot. at 33. As an initial

19

matter, the court's analysis in *Capen* equated "paupers" with "public charges" under state law: "Secondly, for those who have been paupers in a foreign land; that is, for those who have been a public charge in another country; and not merely destitute persons, who, on their arrival here, have no visible means of support; the word 'paupers' being used . . . in its legal, technical sense." 61 Mass. at 121. Congress's separate exclusions for "paupers" and "public charges," *Frick*, 233 F. at 396, by contrast, demonstrates that Congress did not adopt a definition equating "pauper" and "public charge." Further, other contemporaneous state law cases demonstrate that "public charges" had a far broader definition than Plaintiffs' constricted view limiting it to "wards of the state" Mot. at 33. The Maine Supreme Court, for example, identified as "likely to become chargeable" to a town to which he had travelled a person who required only "a small amount" of assistance, based on his "age and infirmity." *Inhabitants of Guilford v. Inhabitants of Abbott*, 17 Me. 335, 335-36 (Me. 1840) (reaching conclusion despite recognizing that, at "the time of filing the complaint he . . . had strength to perform some labor, [] was abundantly able to travel from town to town," and had a "house provided for him" in another town").[11]

Nor does anything in the plain meaning of "public charge" suggest a distinction between non-cash benefits and services and "cash assistance," as Plaintiffs suggest. *See* Mot. at 33. Both types of assistance create an obligation on the part of the public and both equally relieve recipients from the conditions of poverty. For this reason, consideration of an alien's receipt of public benefits for "housing, food and medical care," as "examples of the obvious basic necessities of life," falls within the reasonable parameters of determining whether that person creates a liability on the body of the public. *Am. Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967). Plaintiffs do not contest that receipt of in-kind services like food and housing should make a person a public charge when that person is "institutionaliz[ed] at government expense." Mot. at 33. But Plaintiffs fail to explain why, absent institutionalization, a person's receipt of those same in-kind

_____

[11] *Ex Parte Sakaguchi*, 277 F. 913 (9th Cir. 1922), also relied on by Plaintiffs, provides no support to their position. That case does not discuss the length of receipt of aid at all, stating merely that immigration officials lacked "any evidence" supporting a public charge determination for a person "expected to support herself independently after a while," but needing short-term assistance from her "well-to-do" family members. *Id.* at 915-16.

services should be irrelevant.

Plaintiffs' contention that a pair of agency decisions supports their cramped view of the meaning of public charge fares no better. *See* Mot. at 6 (misleadingly characterizing Plaintiffs' *legal analysis* of various cases under the rubric of "Facts"). In *Matter of Martinez-Lopez*, for example, then-Attorney General Robert F. Kennedy explained that a "specific circumstance," which he described as any "fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public," is the standard for demonstrating a likelihood to become a public charge. 10 I. & N. Dec. 409, 421 (A.G. 1964) (rejecting argument that an alien's misrepresentation of an offer of employment was sufficient to render the alien deportable). Similarly, the agency in *Matter of Harutunian*, 14 I & N Dec. 583, 589 (BIA 1974), explained that "public charge" in the context of inadmissibility did *not* need to be construed "as narrowly as in the deportation section," a separate statutory provision codified today at 8 U.S.C. § 1227(a)(7). Although that opinion referenced a "destitute" alien, the public charge description it sets forth is broad: "a money charge upon or an expense to the public for support and care." *Id.*[12]

Finally, although the 1999 Interim Field Guidance and the 1999 NPRM adopted a different interpretation regarding non-cash benefits than the Rule, *see* Mot. at 9, those documents provide further support for DHS's determination that inclusion of such benefits in the Rule is consistent with the plain meaning of "public charge." Both documents describe the exclusion of "non-cash public benefits" at that time as "reasonable," confirming that although they did not conclude that the meaning of "public charge" required consideration of such benefits, they also did not conclude that the meaning of public charge foreclosed their consideration. 1999 NPRM at 28677; *see id.* at 28678 ("It has never been [the] policy that the receipt of any public service or benefit must be considered."). Indeed, the only examples of prior exclusion of non-cash benefits from consideration that the drafters of the interim guidance could identify were: (1) broadly-available

---

[12] The 1987 INS rule cited by plaintiffs interprets a different provision of law altogether, a special amnesty for aliens enacted in the Immigration Reform and Control Act of 1986 ("IRCA"). *See* 52 Fed. Reg. 16,205. That legislation reflected special "concerns for certain aliens who have been residing illegally in the United States," including by providing a "special rule for determination of public charge." *Id.* at 16205, 16216.

public benefits such as "public schools"; and (2) the exclusion of food stamps (*i.e.*, "SNAP") under State Department guidance that apparently did not exclude other forms of non-cash benefits. *See, e.g.*, 1999 Interim Field Guidance at 28692.

### 3. The Rule Exercises Interpretive Authority That Congress Delegated To The Executive Branch, A Delegation Congress Has Maintained.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws." Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the reasonable limits of the plain meaning of the statutory term. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). Congress has long recognized this implicit delegation of authority to interpret the meaning of "public charge." *See, e.g.*, S. Rep. No. 81-1515, at 349 (1950) (stating that because "there is no definition of the term [public charge] in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). This delegation is reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). The expansive delegation of authority by Congress grants DHS wide latitude to interpret "public charge" within the reasonable limits set by the broad, plain meaning of the term itself.[13]

Congress's comprehensive delegation of interpretive authority is well-established in precedent dating back to the early public charge statutes. *See, e.g.*, *Ex Parte Pugliese*, 209 F. 720, 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even

---

[13] These delegations of authority specific to the public charge ground of inadmissibility are reinforced by the explicit overall delegation of authority by Congress to the Secretary of Homeland Security the authority to "establish such regulations . . . as he deems necessary for carrying out" the INA, 8 U.S.C. § 1103(a)(3). Congress has also provided the Secretary with specific responsibility to carry out the INA and to make public charge inadmissibility decisions, as spelled out in detail in the NPRM and Rule. *See* NPRM at 51124; Rule at 41295.

if "evidence to the contrary [is] very strong"). It is also recognized in Executive Branch practice. Administrative decisions have explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied." *Harutunian*, 14 I. & N. Dec. at 588-90 (quoting S. Rep. No. 81-1515 at 349 (1950)) (holding that alien's receipt of "old age assistance benefits" in California was sufficient to render the alien a "public charge")); *see also Matter of Vindman*, 16 I. & N. Dec. 131, 132 (BIA 1977) (citing regulations in the visa context, and explaining that the "elements constituting likelihood of an alien becoming a public charge are varied . . . [and] are determined administratively").[14]

The long history of congressional delegation of definitional authority over the meaning of "public charge" demonstrates the error in Plaintiffs' claim that Congress has, by choosing not to impose a definition of "public charge" when revising the statute, "bar[red] DHS from enacting a Final Rule" that interprets the meaning of "public charge." Mot. at 34. To the contrary, by its inaction in 1996 and 2013, the occasions Plaintiffs cite, *see id.*, Congress left the public charge provision unchanged. This inaction cannot plausibly be read to withdraw the longstanding delegation to the Executive Branch to exercise definitional authority over the "varied" elements of the meaning of "public charge." S. Rep. No. 81-1515, at 349. Certainly the INS, when it adopted the 1999 Interim Field Guidance and proposed to issue a sweeping new definition of "public charge" through notice-and-comment rulemaking in 1999, did not understand Congress's 1996 action to have altered the statute by withdrawing the long-understood delegation. *See* 1999 NPRM at 28677 ("[T]he proposed rule provides a definition for the ambiguous statutory term 'public charge'").

At a minimum, the likelihood that Congress intended to preserve the delegation means that, under the circumstances, "[c]ongressional inaction lacks persuasive significance" because competing "inferences may be drawn from such inaction." *Competitive Enter. Inst. v. U.S. Dep't*

---

[14] Plaintiffs themselves rely on the existence of this delegated interpretive authority when they herald the 1999 NPRM as relevant to the meaning of public charge, *see* Mot. at 9, and seek to preserve this prior exercise of delegated interpretive authority by requiring DHS "to keep in place [the] regulatory regime that has governed"—*i.e.*, the "primarily dependent" standard that appeared for the first time in the 1999 Interim Field Guidance and simultaneous 1999 NPRM. *See* Mot. at 53.

*of Transp.*, 863 F.3d 911, 917 (D.C. Cir. 2017). And the more plausible of the competing inferences is that Congress intended for DHS to retain the authority delegated to it to analyze the "totality of the alien's circumstances" to make "a prediction" about the likelihood that an alien will become a public charge, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974), including the delegated authority for DHS to adopt further procedures to guide its officers, aliens, and the public at large in understanding the application of the public charge ground of inadmissibility.

### 4. The Rule Is Not Arbitrary And Capricious.

#### a. The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking.

There is "no basis in the Administrative Procedure Act . . . for a requirement . . . [of] more searching review" when an agency changes its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). This is particularly true here, where the "settled course" to which the Plaintiffs seek to revert, Mot. at 36, is nonbinding guidance that could not possibly foreclose DHS from adopting a different reasonable interpretation through notice-and-comment rulemaking. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005).[15] As the Supreme Court explained in *Fox*, all that DHS was required to do to permissibly change course from the 1999 Interim Field Guidance was to acknowledge that the Rule is adopting a policy change, provide a reasoned explanation for the change, and explain how it believes the new interpretation is reasonable. *See generally Fox*, 556 U.S. 514-16. The Rule readily meets these standards, and so DHS is entitled to full deference to its changed interpretations, consistent with its obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64 (recognizing agencies receive deference to a "changed . . . interpretation of [a] term").

First, the NPRM and Rule acknowledged that DHS was changing course. In the former, DHS announced it was proposing "major changes," *see, e.g.*, NPRM at 51116, and that these

---

[15] As explained *supra*, the standards of "primary dependency" (or "primarily dependent") and exclusion of non-cash benefits were newly-adopted by the 1999 Interim Field Guidance, and thus, Plaintiffs are incorrect to suggest that the Rule is inconsistent with how public charge determinations were made for "over a century." Mot. at 1.

changes included "a new definition of public charge." *Id.* at 51158; *see also id.* at 51163 (describing DHS's intent to make "a change from the standard" of "primary dependence" set forth in the 1999 Interim Field Guidance). DHS also stated that it would change and "improve upon the 1999 Interim Field Guidance" by changing the treatment of non-cash benefits. *Id.* at 51123. In the Rule, DHS "agree[d] with commenters that the public charge inadmissibility rule constitutes a change in interpretation from the 1999 Interim Field Guidance," Rule at 41319, and repeatedly explained that it was "redefin[ing]" public charge, and adopting a "new definition" of "public benefit" that would be "broader" than before. *Id.* at 41295, 41297, 41333; *see also id.* at 41347 (explaining that the agency may justifiably change course).

Second, DHS explained the reasons for the change in course. DHS described how the "focus on cash benefits" in the 1999 Interim Field Guidance had proved "to be insufficiently protective of the public budget, particularly in light of significant public expenditures on non-cash benefits." NPRM at 51164. DHS quantified the "significant federal expenditure on low-income individuals" specifically associated with "benefits directed toward food, housing and healthcare." *Id*. at 51160; *see id*. at Table 10. Recognizing that these benefits are provided to citizens and aliens alike, DHS also examined the substantial participation rate among foreign-born aliens for these programs. *See id*. at 51161 & Table 11. In this analysis, DHS found that public benefits programs provide, on average, thousands of dollars of "assistance to those who are not self-sufficient" and who are aliens, *id*. at 51163, and that millions of aliens receive such benefits: 3.1 million receive Medicaid alone. *Id*. at 51161-62 & Table 12. These statistics reasonably support DHS's conclusion that, under the 1999 Interim Field Guidance, the agency was failing to carry out the principles mandated by Congress that "aliens . . . not depend on public resources to meet their needs," and instead "rely on their own capabilities" and support from families, sponsors, and private organizations. 8 U.S.C. § 1601; *see also* Rule at 41308, 41319 (explaining that the prior guidance "failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective"). Consistent with the long-understood purpose of the public charge ground of inadmissibility as the "chief measure of protection in the law" for the public fisc, *see* 1916 Letter

at 3, DHS's analysis demonstrates the reasonableness of the decision to exercise delegated authority to adopt a new definition and approach for public charge inadmissibility determinations.

DHS also adequately explained how the new approach reasonably advances the stated purposes, including by "implement[ing] the public charge ground of inadmissibility consistent with . . . [Congress's goal of] minimiz[ing] the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits." Rule at 41305 (citing 8 U.S.C. § 1601(2)(B)). Although most aliens may face a five-year waiting period prior to eligibility for public benefits, they can be expected to base their present decisions on the availability of those future benefits. *Cf. Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (Congress could reasonably "believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits").

Plaintiffs' only response is to brush off the Rule's "ultimate aim" of "self-sufficiency" as immaterial. *See* Mot. at 37. As noted above, Plaintiffs' brief entirely ignores the existence of 8 U.S.C. § 1601 and Congress's reminder therein that self-sufficiency has always "been a basic principle of United States immigration law" and Congress's command making "the immigration policy of the United States [be] that . . . aliens . . . not depend on public resources to meet their needs." 8 U.S.C. § 1601. Unlike Plaintiffs in their brief, DHS does not have the option of disregarding Congress's clear direction. For specific purposes of the public charge inadmissibility ground, Congress's intent is "that aliens should be self-sufficient before they seek admission or adjustment of status," not that they should someday attain self-sufficiency by drawing on public resources to improve their financial condition. Rule at 41308; *see* 8 U.S.C. § 1601.

### b. DHS Adequately Responded to Comments.

Plaintiffs insist that DHS did not adequately respond to certain comments but fail to show any deficiency in DHS's responses. An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted

26

to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

Plaintiffs first attack the Rule on that ground that the majority of the comments opposed it. Mot. at 10. Plaintiffs cite no precedent supporting this novel head-counting approach to rulemaking, and the D.C. Circuit rejected an analogous argument decades ago: "The substantial-evidence standard has never been taken to mean that an agency rulemaking is a democratic process by which the majority of commenters prevail by sheer weight of numbers." *NRDC v. EPA*, 822 F.2d 104, 122 n.17 (D.C. Cir. 1987). Plaintiffs' argument deserves a similar fate.

Plaintiffs then criticize DHS's cost-benefit analysis. *See* Mot. at 37. The APA, standing alone, does not require a detailed cost-benefit analysis. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009) (upholding agency choice to seek "only to avoid extreme disparities between costs and benefits"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510-12 & n.30 (1981) ("Congress uses specific language when intending that an agency engage in cost-benefit analysis."); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011) (rejecting argument that "the APA's arbitrary and capricious standard alone requires an agency to engage in cost-benefit analysis"). While the Supreme Court noted in *Michigan v. EPA* that "reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions," 135 S. Ct. 2699, 2707 (2015), it did not require the agency "to conduct a formal cost-benefit analysis," leaving it up to the agency "to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id*. at 2711.

Next, it is untrue that Defendants summarily "dismissed" comments concerning disenrollment by individuals not subject to the Rule, as Plaintiffs claim. Mot. at 38 (discussing DHS's treatment of "unwarranted choices"). DHS did consider that potential impact of the Rule and reasonably decided that it did not support abandoning the Rule. DHS correctly noted that it is "difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule" and explained that it would not amend the Rule because of the potential that these people might choose to disenroll. Rule at 41313. It is not "sound policy to ignore the longstanding self-sufficiency goals set forth by Congress" because of the potential for disenrollment. *Id*. at 41314. Thus, DHS did not ignore potential harms; rather, it found those harms insufficient to

override the legitimate policy goals of the Rule, such as the self-sufficiency policy mandated by Congress. *Id*. at 41312 (the "rule's overriding consideration, *i.e.*, the Government's interest [as set forth in 8 U.S.C. § 1601] . . . is a sufficient basis to move forward"). DHS's decision to move forward notwithstanding potential, unquantifiable harms is a quintessential exercise of the agency's policymaking function and is neither arbitrary nor capricious. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) ("When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive."). Plaintiffs may not agree with DHS's weighing of the costs and benefits, but that does not mean that DHS ignored costs or that the Rule is arbitrary and capricious.

Plaintiffs also contend that DHS did not adequately consider comments about potential negative health consequences from disenrollment in public benefits (what Plaintiffs call a "chilling effect"). *See* Mot. at 38-39. The record, however, reveals not only that DHS considered such comments, but that it modified the Rule in response. Rule at 41310-14, 41471. DHS explained why the Rule was justified despite these potential harms. The "rule's overriding consideration, i.e., the Government's interest . . . is a sufficient basis to move forward." *Id*. at 41312 (explaining that the relevant Government interests are those set forth in PRWORA and codified at 8 U.S.C. § 1601). DHS has the "authority to take past, current, and likely future receipt of public benefits into account, even where it may ultimately result in discouraging aliens from receiving public benefits." *Id*. Moreover, DHS made a number of changes to the Rule to mitigate some of the concerns raised regarding disenrollment impacts, such as excluding certain benefits from the scope of the Rule. *Id*. at 41313-14, 41471. This process—full consideration of the issues and the evidence on both sides, the adoption of changes in response, and an articulated statement of the reasons for the agency's ultimate decision—was neither arbitrary nor capricious.[16]

Nor is it the case that DHS failed to adequately consider comments about vaccinations, as

---

[16] *Greater Yellowstone Coal, Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011), is inapposite. *See* Mot. at 38 (citing *Servheen*). DHS did not "merely recite the terms 'substantial uncertainty' as a justification for its actions." *Servheen*, 655 F.3d at 1028. Rather, DHS explained why the Rule was justified, notwithstanding the potential disenrollment impact. Rule at 41312-14.

Plaintiffs contend. *See* Mot. at 39-40. Not only did DHS consider these comments, *see* Rule at 41471, based in part on its consideration of such comments, DHS decided to exclude receipt of Medicaid by aliens under the age of 21 or by pregnant women from the definition of public benefits. *See id*.; *id.* at 41384. DHS explained that this change alone should significantly mitigate the concern that children will forgo vaccinations as a result of the Rule. *See id.* at 41384. In addition, DHS noted that "[v]accinations obtained through public benefits programs are not considered public benefits" and "local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income." *Id.* at 41384-85. For these reasons, DHS concluded "that vaccines would still be available for children and adults even if they disenroll from Medicaid." *Id.* at 41385.[17] This treatment met, and indeed, exceeded the standard governing an agency's response to comments. *See Simpson v. Young*, 854 F.2d 1429, 1435 (D.C. Cir. 1988) ("The agency need only state the main reasons for its decision and indicate it has considered the most important objections.").

Plaintiffs also take issue with the Rule's conclusions regarding overall public health, asserting that its conclusion is "bar[red]" because the 1999 Field Guidance reached a different conclusion. *See* Mot. at 40. Notably, Plaintiffs nowhere take issue with DHS's conclusion that the "primary benefit" of the Rule is to better ensure that certain aliens "will be self-sufficient, *i.e.*, will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations." Rule at 41301. Instead, Plaintiffs question only a corollary to that conclusion – that the Rule will "ultimately strengthen public safety, health, and nutrition . . . by denying admission or adjustment of status to aliens who are not likely to be self-sufficient." *Id.* at

---

[17] To the extent that Plaintiffs' glancing reference to other "public health effects" at the end of its paragraph on vaccines is intended to embody a broader critique of the fact that DHS did not carry out some unspecified study of the "American public" and all components of "public health," *see* Mot. at 40, this claim also fails. The APA does not require agencies to "obtain[] the unobtainable," *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 519 (2009), or "measure the immeasurable." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action was not arbitrary and capricious notwithstanding agency's "failure to quantify" effects). "When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003).

41314. DHS's explanation makes good sense—it is reasonable to conclude that excluding aliens lacking self-sufficiency and encouraging aliens already present in the United States to become capable of funding their health care, dietary requirements, etc.—will strengthen public safety, health, and nutrition overall. Further, DHS's position is not inconsistent with the 1999 Interim Field Guidance. Just as the 1999 Guidance noted that disenrollment from public benefits can have an adverse impact on public health, the Rule similarly acknowledged that potential. Rule at 41488 (listing "adverse health effects" as potential cost).[18] But the possibility of adverse health effects from disenrollment does not negate DHS's conclusion that other aspects of the Rule will foster public health benefits.

DHS also adequately responded to comments concerning the Rule's effects on elderly and disabled individuals. As a threshold matter, the Rule's treatment of disabled individuals is not discriminatory, for the reasons discussed in Section II.D, nor does it mean that "virtually every person with any type of significant disability" will be subject to the public charge inadmissibility ground, as Plaintiffs claim. Mot. at 41. The Rule does not deny any alien admission into the United States or adjustment of status simply because he or she is disabled. Only if an alien, disabled or not, is likely to use one or more covered federal benefits for the specified period of time will that individual be found inadmissible as a public charge. DHS will consider an alien's health as one factor among many under the totality of the circumstances. *See* Rule at 41368. Plaintiffs also suggest it is somehow improper for the Rule to consider receipt of Medicaid benefits by a disabled individual because Medicaid provides "services that assist them" in attaining what Plaintiffs characterize as "self-sufficiency." Mot. at 42. But an individual who relies on Medicaid benefits for an extended period of time is not self-sufficient. Plaintiffs' argument also ignores that Congress's goal of ensuring that aliens do not rely on public resources is not identical to the goal of self-sufficiency for those enrolled in public benefit programs. For aliens, Congress's intent is

---

[18] The 1999 Interim Field Guidance appears not to have relied any specific data or research as the basis for identifying the "adverse impact" on public health, and made less effort to "quantify" this impact than DHS did here. *See* 1999 Interim Field Guidance at 28692. Nothing in that nonbinding guidance provides any support for Plaintiffs' assertion that it constitutes the "agency's reasoned expert position" or is "based on . . . evidence." Mot. at 40.

"that aliens should be self-sufficient before they seek admission or adjustment of status," Rule at 41308, not that they be able to work through the assistance of public benefits.

### c. The Rule Reasonably Preserved The Totality of The Circumstances Analysis For Public Charge Inadmissibility Determinations And Reasonably Adopted The 12/36 Standard.

Congress required DHS to consider "at a minimum" certain specified factors in determining whether an alien is inadmissible as a public charge. 8 U.S.C. § 1182(a)(4)(B). Consistent with the statute, the Rule adopts a totality of the circumstances test that considers each of these statutorily required factors as well as other relevant information. Rule at 41295.

Plaintiffs claim that the Rule is "irrational" because a person who uses a "minimal amount" of benefits allegedly "would be judged a public charge." Mot. at 43. But Plaintiffs have misread the Rule. As the Rule plainly states, "current receipt or past receipt of more than 12 months of public benefits, in the aggregate, in any 36-month period will not necessarily be dispositive in the inadmissibility determination . . . but will be considered a heavily weighted negative factor in the totality of the alien's circumstances." Rule at 41358; *see also id.* at 41398 (describing circumstances in which positive factors might outweigh the recent receipt of public benefits). Moreover, the Rule's definition of "public charge" includes a durational requirement; only if the alien is likely to receive benefits for more than 12 months in the aggregate in a 36-month period will the public charge test be met. Rule at 41295. It was entirely reasonable for DHS to conclude that an individual who relies on public assistance for a lengthy amount of time to meet his or her basic needs should be defined as a public charge, particularly where Congress's statutory requirement that the inadmissibility ground apply to a person determined likely "at any time" to become a public charge indicates concern even with short periods of reliance on public assistance. *See* 8 U.S.C. § 1182(a)(4)(A); Rule at 41421-22.

As Plaintiffs observe, some individuals may qualify for public benefits even though they have incomes above the threshold that is considered a positive factor under the Rule (125% of federal poverty guidelines). *See* Mot. at 43. That does not make the Rule unreasonable. The fact

that an individual must rely on public assistance to support himself or herself, notwithstanding his or her income level, indicates a weakness in the alien's overall financial status. At bottom, Plaintiffs' argument reflects nothing more than the unsurprising fact that certain regions of the country, including parts of Illinois such as Cook County, have costs-of-living above the national average and that the income caps to qualify for certain benefits also may be higher in those regions. In any case, Plaintiffs' example underscores the reasonableness of DHS's retention of the totality-of-the-circumstances test, under which the fact that the alien has such an income is taken into account as a positive factor alongside the alien's receipt of public benefits.

Plaintiffs also insist that the Rule lists "factors that are . . . directly at odds[] with the . . . Rule's . . . purpose." Mot. at 42. The examples Plaintiffs identify, however, are each highly relevant in assessing an individual's likelihood of becoming at any time a public charge. As to family size, *see* Mot. at 43, Congress has imposed an express statutory requirement that DHS consider "family status" in determining whether an alien is inadmissible on public charge grounds. 8 U.S.C. § 1182(a)(4)(B)(i)(III).[19] Likewise, an application for benefits, though "not the same as receipt," is "indicative of an alien's intent to receive such a benefit." Rule at 41422. The fact that an alien believed he or she needed public assistance to support his or her basic needs, though not dispositive on its own, is a relevant factor when considering the likelihood that that person will become a public charge. *See id.* ("The fact that an alien has in the past applied for . . . public benefits . . . would never be dispositive on its own, but would be relevant to assessing an alien's likelihood of becoming at any time in the future a public charge.").[20] DHS therefore reasonably incorporated these factors into the public charge inadmissibility analysis.

---

[19] The Rule also explains why the data cited by Plaintiffs, *see* Mot. at 43, is not statistically significant. *See* Rule at 41395. Other data that *was* statistically significant suggested a higher rate of non-cash benefit use as family size increases, *id.*, which supports the commonsense understanding that financial strains increase as families grow in size.

[20] Consideration of an application for public benefits is also consistent with early case law discussing the standard for identifying a person as a public charge. *See Princeton Twp.*, 23 N.J.L. at 169, 179 (Carpenter, J., concurring) ("The probability of [a person] becoming chargeable is sufficiently shown by his application for relief").

### D. The Rule Does Not Violate The Rehabilitation Act, The Welfare Reform Act, or SNAP.

Plaintiffs note that the Rule requires DHS to consider an alien's "medical condition" in the public charge inquiry, and claim, incorrectly, that the Rule "violates . . . the prohibition on discrimination against disabled individuals that is set forth in Section 504 of the Rehabilitation Act." Mot. at 19, 44-45. That section provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a) (emphasis added); *see also* 6 C.F.R. § 15.30 (DHS implementing regulation). The Rehabilitation Act imposes a "solely by reason of" standard of causation unique to this statute, *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013), which is "meaningful . . . it means that plaintiffs must show that no other factor besides disability played a role." *Foster v. Andersen*, No. 96 C 5961, 1997 WL 802106 at *5, n.6. Plaintiffs cannot satisfy this standard.

As a threshold matter, the INA explicitly lists "health" as a factor that an officer "shall . . . consider" in making a public charge determination. 8 U.S.C. § 1182(a)(4)(B)(i). "Health" certainly includes an alien's medical conditions, and it is therefore Congress, not the Rule, that requires DHS to take this factor into account. *See*, *e.g.*, *In Re: Application for Temporary Resident Status*, USCIS AAO, 2009 WL 4983092, at *5 (Sept. 14, 2009) (considered application for disability benefits in public charge inquiry). A specific, later statutory command, such as that contained in the INA, supersedes section 504's general proscription to the extent the two are in conflict (which they are not, as explained below). *See*, *e.g.*, *Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1353 (10th Cir. 1987) ("[A] general . . . statute, § 504" may not "revoke or repeal . . . a much more specific statute . . . absent express language by Congress[.]" (internal quotation marks omitted)); *Brotherhood of Maintenance of Way Employees v. CSX Transp., Inc.*, 478 F.3d 814, 817-18 (7th Cir. 2007) ("A specific statute takes precedence over a more general statute, and a later enacted statute may limit the scope of an earlier statute.").

In any event, the Rule is fully consistent with section 504 of the Rehabilitation Act. The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by

reason of" disability. All covered aliens, disabled or not, are subject to the same inquiry: whether they are likely to use one or more covered federal benefits for the specified period of time. Although an alien's medical condition is one factor (among many) that may be considered, it is not dispositive, and is relevant only to the extent that an alien's particular medical condition tends to show that he is "more likely than not to become a public charge" at any time. Rule at 41368. Further, any weight assigned to this factor may be counterbalanced by other factors, including "[an] affidavit of support," "employ[ment]," "income, assets, and resources," and "private health insurance." *Id.* Thus, any public charge determination cannot be based "solely" on an applicant's disability. Moreover, to fall within the coverage of the Rehabilitation Act, an individual must be "otherwise qualified," 29 U.S.C. § 794(a), which means that the individual must be "able to meet all of a program's requirements in spite of his handicap." *Knapp v. Northwestern U.*, 101 F.3d 473, 482 (7th Cir. 1996). An alien who is likely to become a public charge because of his or her medical condition is not otherwise qualified for admission or adjustment of status. *See id.* (explaining that institutions are not required "to disregard the disabilities of disabled persons" because "the disability is not thrown out when considering if the person is qualified").

The Rule's consideration of non-cash public benefits also is not inconsistent with PRWORA's authorization of "qualified aliens" to receive certain public benefits five years after entry, contrary to Plaintiffs' brief suggestion otherwise. *See* Mot. at 45. First, there is no inconsistency because many of the "qualified aliens" to whom that authorization applies would generally not be subject to the public charge ground of inadmissibility. *See* 8 U.S.C. § 1641(b) ("qualified alien" includes, *inter alia*, lawful permanent residents, asylum recipients, and refugees). Moreover, the Rule does not *prohibit* or "disqualif[y]" anyone from receiving benefits to which they are entitled, Mot. at 46, but rather appropriately takes such receipt into consideration among many other factors in assessing an individual's likelihood of becoming a public charge. *See* Rule at 41365-66. Notably, Congress implicitly recognized that past receipt of public benefits *can* be considered in determining the likelihood of someone becoming a public charge when it prohibited consideration of past benefits for certain "battered aliens." 8 U.S.C. § 1182(s).

Congress, therefore, understood and accepted DHS's consideration of past receipt of benefits in other circumstances.

Finally, the Rule does not violate 7 U.S.C. § 2017(b), as Plaintiffs allege. *See* Mot. at 46. That statute provides that:

> The value of benefits that may be provided under [SNAP] shall not be considered income or resources for any purpose under any Federal, State, or local laws, including, but not limited to, laws relating to taxation, welfare, and public assistance programs, and no participating State or political subdivision thereof shall decrease any assistance otherwise provided an individual or individuals because of the receipt of benefits under this chapter.

7 U.S.C. 2017(b). The context of this full version, rather than the abbreviated quotation relied on by Plaintiffs, reveals the error in Plaintiffs' argument. The Rule does not consider the "value" of SNAP benefits as "income or resources," only the *fact of receipt*. *See* Rule at 41375 ("The rule explicitly excludes the value of public benefits including SNAP from the evidence of income to be considered" and "[a]ssets and resources do not include SNAP benefits"). Nothing in Section 2017(b) precludes this use of the fact of receipt of SNAP. *Compare, e.g.*, 47 C.F.R. § 54.409 (providing eligibility for consumer telephone or Internet subsidies based on fact of receipt of SNAP benefits). Moreover, Section 2017(b) predates the current version of the public charge statute "and a later enacted statute may limit the scope of an earlier statute." *Brotherhood of Maintenance*, 478 F.3d at 817-18.

## III. PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM.

"It is not enough for the plaintiffs to show a likelihood of success on the merits . . . they must also show why they will suffer irreparable harm if the preliminary injunction they want does not issue." *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). The Seventh Circuit employs a two-step analysis for preliminary injunctive relief. First, the moving party "must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). Second, if the threshold inquiry is satisfied, the court "considers: (4) the irreparable harm

35

the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Id.* at 662. Neither of the Plaintiffs have sufficiently demonstrated the required threshold of immediate irreparable harm and therefore their motion for preliminary injunction must be denied.

The County alleges that as a result of the Rule, it will suffer (1) increased health care costs from a loss of federal funding and an increase in emergency and uncompensated care, (2) harms to public health, and (3) harms to the county economy. None of these alleged harms satisfy the irreparable harm standard. First, some of the harms alleged by the County are not even cognizable injuries. The County has provided no support for its assertion that it is entitled to federal Medicaid reimbursements for individuals who do not use Medicaid. *See* Mot. at 48. Similarly, the County has not explained why it believes it is entitled to any economic side effects from benefits that independent third parties, the intended beneficiaries, choose not to use. *See* Mot. at 51.[21]

Second, the County's allegations of harm from increased emergency and uncompensated care and public health harms including the spread of communicable disease, are speculative. The County has alleged nothing more than a possibility that such harms will develop, as discussed in detail in Part I, *supra*, these alleged harms are founded on an attenuated chain of inferences, and contingent on the aggregate choices of independent third parties to take action not required by the Rule. Assuming the County is correct that some individuals will forgo enrollment or disenroll from federal benefits as a result of the Rule, the County must still demonstrate a likelihood that such disenrollment will occur at a sufficiently high rate and be associated with a concomitant take-up of local benefits to cause harm to local level, as opposed to individual, interests. The County has not provided any evidence of the number of disenrollments necessary to create these alleged

---

[21] Additionally, to the extent the County alleges that it will be irreparably harmed by a decline in the health of its individual residents as opposed to downstream effects to the County, it lacks standing to assert those claims. *See, e.g., Colorado River Indian Tribes v. Parker*, 776 F.2d 846, 848 (9th Cir. 1985) ("[P]olitical subdivisions . . . cannot sue *parens patriae* because their power is derivative and not sovereign.").

effects, nor has it meaningfully alleged harm to the interest of the County specifically. *See generally* Hou Decl., ECF No. 23-1, Ex. 2 (making all projections as to the state of Illinois as a whole).

This falls far short of the showing required to meet the irreparable harm standard. A mere possibility of future harm is insufficient to justify preliminary injunctive relief. *D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown.") (citation omitted). Indeed, the County's own motion and supporting declarations acknowledge the speculative nature of these claims and explicitly use the language of possibility rather than probability. *See* Mot. at 50-51 ("[T]he lack of needed food assistance *could* impact reading and math skills and even the likelihood of high school graduation.") (emphasis added); Chan Decl., ECF No. 23-1, Ex. 3, ¶ 20 ("[D]elaying care *can* result in higher costs and worse outcomes.") (emphasis added); *id.* ¶ 28; *id.* ¶ 33 ("Lower rates of vaccination *can* lead to an increase in vaccine preventable diseases, raising the concern of communicable disease outbreaks.") (emphasis added).

However, even if any of the County's alleged harms were cognizable and sufficiently concrete to establish standing, the County has not met its burden to show that such injuries are irreparable nor that they are sufficiently immediate to justify preliminary relief. "The moving party must also demonstrate that he has no adequate remedy at law should the preliminary injunction not issue." *Whitaker*, 858 F.3d at 1046; *see also Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 553-54 (7th Cir. 2014) ("[I]f the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process.") (citation omitted). The County has made no more than conclusory assertions that any of its alleged harms are irreparable, and it has therefore failed to carry its burden to establish irreparable harm. Similarly, the County's allegations that these alleged harms will develop imminently is entirely unsupported in its brief and in the record. To satisfy the irreparable harm standard, Plaintiffs must demonstrate that in the absence of injunctive relief, they

"will suffer irreparable harm in the interim prior to a final resolution." *Turnell*, 796 F.3d at 662. The County has alleged no facts in support of its conclusory assertions that the economic and public health harms it alleges would likely develop before a decision on the merits could be rendered. Such harms, if they ever developed, would be downstream cumulative effects of the independent decisions of thousands of individual third parties over the course of many months and years. The County offers no prediction about when these harms might arise and why the Rule's effective date must be enjoined until summary judgment on the administrative record could be rendered, given that such briefing could occur in a matter of months. Nor has the County alleged any facts in support of its assumption that all of the individuals it projects will disenroll from federal benefits would do so simultaneously, that those individuals would take such steps immediately upon the Rule's effective date, or that the impact of such individuals taking such steps would be immediately felt by the County's economy or public health system. Indeed, the County's own motion and declarations acknowledge that the speculative and attenuated alleged public health impacts of the Rule, such as worse health outcomes caused by avoidance of preventative care, would necessarily develop over time. *See* Mot. at 49 ("These several consequences will each create a sicker and less productive population by reducing access to preventative care and causing delays in treatment…."); *id.* at 51 ("Children who grow up with resulting higher rates of disease and malnutrition will likely need to rely on health care provided by state governments, and thus care provided by CCH, to treat these long-term issues."); Chan Decl. ¶¶ 32, 50.

ICIRR has also failed to establish that it will suffer irreparable harm in the absence of preliminary relief. As discussed in detail *supra*, ICIRR has failed to establish ICIRR's standing, and thus by definition it has not established a sufficient injury to meet the irreparable harm standard. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (To establish irreparable harm "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."). ICIRR has established not that ICIRR has suffered a frustration of its core mission, but rather only that it has diverted resources from one set of priorities and

activities to another in service of its same core mission to provide immigration support services. *See* Benito Decl. at ¶¶ 4, 8, 14, 21. This is insufficient to establish irreparable harm. ICIRR also has not provided any support for its assertion that it has a cognizable injury because it is entitled to reimbursement funding for individuals who choose not to enroll in public benefits. Mot. at 52. Moreover, ICIRR has failed in any way to meet its burden of demonstrating how any of its alleged harms could not be "prevented or fully rectified by the final judgment after trial." *Whitaker*, 858 F.3d at 1045 (citation omitted).

## IV.  THE REMAINING EQUITABLE FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *Turnell*, 796 F.3d at 661-62. These two factors merge when the government is a party, *Venckiene v. United States*, 328 F. Supp. 3d 845, 858 (N.D. Ill. 2018), but Plaintiffs have not made a sufficient showing to meet the standard for either factor.

Here, multiple equitable factors counsel against an entry of injunctive relief for Plaintiffs. First, as the Court raised at the presentment hearing on this motion, Cook County's effort to obtain a statewide injunction in Illinois represents a duplicative effort by the State and one of its administrative subdivisions to obtain identical relief. *See Washington et al. v. DHS, et al.*, Case No. 4:19-cv-05210-RMP (E.D. Wash., filed Aug. 14, 2019) (including the State of Illinois as one of the Plaintiffs); Mot. for Prelim. Injunct., *id.* at ECF No. 34 (filed Sept. 5, 2019) ("*Washington* PI Mot."). The Seventh Circuit has repeatedly encouraged district courts to exercise "wise judicial administration" in rejecting efforts by parties to maintain "duplicative" litigation where "the claims, parties, and available relief do not significantly differ between the two actions." *Serlin v. Arthur Andersen*, 3 F.3d 221, 223 (7th Cir. 1993). As explained below, this standard is met here, and because it is, the equitable balance tips decisively against preliminary relief.

There is no doubt here that this action and *Washington* present nearly identical claims.

*Compare* Mot. *with Washington* PI Mot. The relief that Cook County seeks, moreover, is entirely subsumed in the relief Illinois has sought: although Illinois' request for a *nationwide* preliminary injunction is improper, *see, e.g.*, *East Bay Sanctuary v. Barr*, 934 F.3d 1026, 1029-30 (9th Cir. 2019), the fallback position that Illinois would no doubt seek for relief if a nationwide injunction is (properly) denied would be a statewide injunction as to Illinois. And although Illinois and Cook County are not *identical* units of government, they are surely overlapping; as to identity of parties, courts are "obligated to exalt substance over form when determining whether [an] action is duplicative." *Ridge Gold Std. Liquors, Inc. v. Seagram & Sons*, 572 F. Supp. 1210, 1214 (N.D. Ill. 1983). As in *Ridge Gold*, Cook County and all Illinoisans "are fully and effectively represented in the proceedings before" the court in Washington. Indeed, the same is true here: the Illinois legislature has authorized the State's attorney to litigate "all actions . . . in which the people of *the State* or county may be concerned," 55 ILCS 5/3-9005(a)(1), as well as to "assist the attorney general whenever it may be necessary." *Id.* 9005(a)(8).

Further tipping the equitable balance in Defendants' favor is the decision by Plaintiffs to tarry in filing their request for emergency relief, which shifts the balance in Defendants' favor. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). This is because "preliminary injunctions are an equitable, interlocutory form of relief," *Lawson Prods., Inc., v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986), and "[e]quity aids only the vigilant, [such that] injunctive relief will be denied to those who slumber upon their rights." *International Union, Allied Indus. Workers of America, AFL-CIO v. Local Union No. 589, Allied Indus. Workers of America, AFL-CIO* ("Local 589"), 693 F.2d 666, 674 (7th Cir. 1982). Indeed, "[l]ack of diligence, standing alone" may be sufficient to "preclude the granting of preliminary injunctive relief." *Majorica, S.A. v. R.H. Macy*, 762 F.2d 7, 8 (2d Cir. 1985); *accord Tripp v. Smart*, 2016 WL 4379876, at *9 (S.D. Ill. Aug. 17, 2016) ("diligence has considerable relevance in the preliminary injunction context"). Here, even as other cities and states raising similar claims diligently filed complaints and arranged for the orderly briefing of preliminary injunction motions, Plaintiffs sat on their hands for nearly six weeks before

rushing to this Court just three weeks before the effective date and claiming an "emergency." Mot. at 1. Plaintiffs' delay, in turn, has prejudiced both Defendants and this Court, the former in their ability to offer a careful defense of the Rule tailored to the arguments raised by Plaintiffs in their lengthy brief, and the latter in the time available for it to contemplate the parties' arguments in an orderly fashion. Plaintiffs should not be rewarded for their lethargy. Rather, because their delay "indicates a lack of need" for the "extraordinary remedy" of a temporary restraining order, Plaintiffs' motion should be denied. *Stokely-Van Camp v. Coca-Cola*, 2 U.S.P.Q.2d 1225, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987) (finding delay of three months as "weigh[ing] against granting [a] preliminary injunction").

Finally, Plaintiffs' allegation that the balance of equities "tips overwhelmingly in [their] favor" is unsupported. Mot. at 53. Plaintiffs allege that the balance favors injunction because "the Final Rule is already causing serious injury to the public health and economic prosperity" and also "degrading the ability of Plaintiffs to continue offering important services," whereas a preliminary injunction "would cause no harm to Defendants" because it would maintain the previous public charge regime. *Id.*[22]

Plaintiffs' analysis is facially incorrect and self-serving. As explained in detail *supra*, Plaintiffs' purported public health and economic harms, to the extent they may be cognizable, are wholly speculative, and there is no support for their assertions that these harms will be either immediate or irreparable. Similarly, Plaintiffs have not alleged any cognizable harms to their organizational missions. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have made the assessment in their expertise that the prior regime referred to by Plaintiffs is ineffective or

---

[22] Plaintiffs also allege that the balance of equities favors them because it is in the public interest for government agencies to comply with the law. Mot. at 53. However, the interests of the Defendants, as federal regulators, are also served by proper APA compliance, which was undertaken in this case. Thus this factor is merely neutral in the balance.

insufficient to serve the purposes of proper immigration enforcement. Therefore, imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to continue before a determination on the merits would significantly harm Defendants.

Plaintiffs' speculative harms have no weight in the balance of hardships compared to the Defendants' interest in avoiding roadblocks to administering the national immigration system. *See Turnell*, 796 F.3d at 666. Consequently, Plaintiffs have failed to demonstrate that the balance of hardships tips in their favor or that the public interest favors injunction. On this ground alone their motion for preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

## V. ANY RELIEF SHOULD BE CAREFULLY TAILORED TO IRREPARABLE INJURIES DEMONSTRATED BY PLAINTIFFS.

Further, were the Court to order emergency relief or a stay of the effective date, it should be limited to redressing only any *established* injuries to Cook County and ICIRR. Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Plaintiffs have requested either a TRO, preliminary injunction, or stay of the effective date of the regulation on a statewide basis, but equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Here, such relief should be limited to specific irreparable harms the Court finds will occur to Cook County and specific individual members of ICIRR suffering such harms. It is settled law that "all injunctions – even ones involving national policies – must be 'narrowly tailored to remedy the specific harm shown.'" *East Bay*, 934 F.3d at 1029 (quoting *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).

Relief under 5 U.S.C. § 705 is similarly limited, as that provision permits a court to stay the effective date of an agency action only "to the extent necessary to prevent irreparable injury." *Id*. Although Plaintiffs have requested a stay of the effective date of the Rule without limitation,

narrower relief is both available under § 705 and required by equitable principles applicable to extraordinary forms of relief. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (indicating that courts should consider any "brief[ing] [regarding] how [to] craft a limited stay"); 5 U.S.C. § 705 (Courts "may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review process." (emphasis added)). Plaintiffs acknowledge that relief under § 705 is governed by equitable principles under the "same" standards as govern preliminary injunctions, Mot. at 20, and nothing in § 705 speaks clearly enough to work "a major departure from the long tradition of equity practice." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.


Dated:  October 8, 2019                                        Respectfully submitted,


                                                      JOSEPH H. HUNT
                                                      Assistant Attorney General

                                                      ALEXANDER K. HAAS
                                                      Director, Federal Programs Branch

                                                      /s/ *Joshua M. Kolsky*
                                                      ERIC J. SOSKIN
                                                      Senior Trial Counsel
                                                      KERI L. BERMAN
                                                      KUNTAL V. CHOLERA
                                                      JOSHUA M. KOLSKY, DC Bar No. 993430
                                                      U.S. Dept. of Justice, Civil Division,
                                                      Federal Programs Branch
                                                      1100 L Street, N.W., Rm. 12002
                                                      Washington, DC 20001
                                                      Phone: (202) 305-7664
                                                      Fax: (202) 616-8470
                                                      Email: joshua.kolsky@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2019, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Joshua M. Kolsky*
JOSHUA M. KOLSKY