UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COOK COUNTY, ILLINOIS, an Illinois governmental entity, and ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC., | ) ) ) | 19 C 6334 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| KEVIN K. McALEENAN, in his official capacity as Acting Secretary of U.S. Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency, KENNETH T. CUCCINELLI II, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services, and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*,

Cook County and Illinois Coalition for Immigrant and Refugee Rights, Inc. ("ICIRR") challenge

the legality of the Department of Homeland Security's ("DHS") final rule, Inadmissibility on

Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pt. 103,

212-14, 245, 248). Doc. 1. The Final Rule has an effective date of October 15, 2019. Cook

County and ICIRR move for a temporary restraining order and/or preliminary injunction under

Civil Rule 65, or a stay under § 705 of the APA, 5 U.S.C. § 705, to bar DHS (the other

defendants are ignored for simplicity's sake) from implementing and enforcing the Rule in the

State of Illinois. Doc. 24. At the parties' request, briefing closed on October 10, 2019, and oral

argument was held on October 11, 2019. Docs. 29, 81. The motion is granted, and DHS is

enjoined from implementing the Rule in the State of Illinois absent further order of court.

## Background

Section 212(a)(4) of the Immigration and Nationality Act ("INA") states: "Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4). The public charge provision has a long pedigree, dating back to the Immigration Act of 1882, ch. 376, §§ 1-2, 22 Stat. 214, 214, which directed immigration officers to refuse entry to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." The provision has been part of our immigration laws, in various but nearly identical guises, ever since. *See* Immigration Act of 1891, ch. 551, 26 Stat. 1084, 1084; Immigration Act of 1907, ch. 1134, 34 Stat. 898, 899; Immigration Act of 1917, ch. 29 § 3, 39 Stat. 874, 876; INA of 1952, ch. 477, § 212(a)(15), 66 Stat. 163, 183; Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546, 3009-674-75 (1996).

Prior to the rulemaking resulting in the Final Rule, the federal agency charged with immigration enforcement last articulated its interpretation of "public charge" in a 1999 field guidance document. *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (May 26, 1999). The field guidance defined a "public charge" as a person "primarily dependent on the government for subsistence," and instructed immigration officers to ignore non-cash public benefits in assessing whether an individual was "likely at any time to become a public charge." *Ibid.* That definition and instruction never made their way into a regulation.

On October 10, 2018, DHS published a Notice of Proposed Rulemaking, Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018), which was followed by a sixty-

day public comment period.  Some ten months later, DHS published the Final Rule, which addressed the comments, revised the proposed rule, and provided analysis to support the Rule. *See* Inadmissibility on Public Charge Grounds, *supra*.  As DHS described it, the Rule "redefines the term 'public charge' to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)."  84 Fed. Reg. at 41,295.

By adopting a duration-based standard, the Rule covers aliens who receive only minimal benefits so long as they receive them for the requisite time period.  As the Rule explains: "DHS may find an alien inadmissible under the standard, even though the alien who exceeds the duration threshold may receive only hundreds of dollars, or less, in public benefits annually."  *Id.* at 41,360-61.  The Rule "defines the term 'public benefit' to include cash benefits for income maintenance, SNAP, most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher (HCV) Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing."  *Ibid.*  The Rule sets forth several nonexclusive factors DHS must consider in determining whether an alien is likely to become a public charge, including "the alien's health," any "diagnosed … medical condition" that "will interfere with the alien's ability to provide and care for himself or herself," and past applications for the enumerated public benefits.  *Id.* at 41,502-04.  The Rule provides that persons found likely to become public charges are ineligible "for a visa to come the United States temporarily or permanently, for admission, or for adjustment of status to that of a lawful permanent resident."  *Id.* at 41,303.  The Rule also "potentially affect[s] individuals applying for an extension of stay or change of status because these individuals would have to demonstrate that they have not received, since obtaining

the nonimmigrant status they are seeking to extend or change, public benefits for" more than the allowed duration. *Id*. at 41,493.

Cook County and ICIRR challenge the Rule's legality and seek to enjoin its implementation. Cook County operates the Cook County Health and Hospitals System ("CCH"), one of the largest public hospital systems in the Nation. Doc. 27-1 at p. 326, ¶ 5. ICIRR is a membership-based organization that represents nonprofit organizations and social and health service providers throughout Illinois that deliver and seek to protect access to health care, nutrition, housing, and other services for immigrants regardless of immigration status. *Id*. at pp. 341-342, ¶¶ 3-10. Cook County and ICIRR maintain that the Rule will cause immigrants to disenroll from public benefits—or to not seek benefits in the first place—which will in turn generate increased costs and cause them to divert resources from their existing programs meant to aid immigrants and safeguard public health. Doc. 27-1 at pp. 330-338, ¶¶ 25-52; *id*. at pp. 342-350, ¶¶ 11-42. Cook County and ICIRR argue that the Rule exceeds the authority granted to DHS under the INA and that DHS acted arbitrarily and capriciously in promulgating the Rule.

## Discussion

"To win a preliminary injunction, the moving party must establish that (1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2) legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). "If the moving party makes this showing, the court balances the harms to the moving party, other parties, and the public." *Ibid*. "In so doing, the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more need [the balance] weigh in [its] favor." *Valencia v. City of Springfield*, 883 F.3d 959,

966 (7th Cir. 2018) (alteration and internal quotation marks omitted). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012) (internal quotation marks omitted). "Stated another way, the district court sits as would a chancellor in equity and weighs all the factors, seeking at all times to minimize the costs of being mistaken." *Ibid.* (alteration and internal quotation marks omitted). A request for a temporary restraining order is analyzed under the same rubric, *see Carlson Grp., Inc. v. Davenport*, 2016 WL 7212522, at *2 (N.D. Ill. Dec. 13, 2016), as is a request for a stay under 5 U.S.C. § 705, *see Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990) ("The standard is the same whether a preliminary injunction against agency action is being sought in the district court or a stay of that action [under 5 U.S.C. § 705] is being sought in [the appeals] court.").

## I.     Likelihood of Success on the Merits

### A.     Standing

DHS argues at the outset that Cook County and ICIRR lack Article III standing. Doc. 73 at 20-23. "To assert [Article III] standing for injunctive relief, [a plaintiff] must show that [it is] under an actual or imminent threat of suffering a concrete and particularized 'injury in fact'; that this injury is fairly traceable to the defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

On the present record, Cook County has established its standing. In *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979), where a municipality alleged under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, that real estate brokers had engaged in racial steering, the Supreme Court held for Article III purposes that "[a] significant reduction in property values

directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Id*. at 110-11. That was so even though the causal chain resulting in the municipality's injury involved independent decisions made by non-parties; as the Court explained, "racial steering effectively manipulates the housing market" by altering homebuyers' decisions, which "reduce[s] the total number of buyers in the … housing market," particularly where "perceptible increases in the minority population … precipitate an exodus of white residents." *Id*. at 109-10. That reduction in buyers, in turn, meant that "prices may be deflected downward[,] … directly injur[ing] a municipality by diminishing its tax base." *Id*. at 110-11.

Applying *Gladstone*, the Seventh Circuit in *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, 982 F.2d 1086 (7th Cir. 1992), held that Chicago had standing in a similar FHA case, reasoning that "racial steering leads to resegregation" and to "[p]eople … becom[ing] panicked and los[ing] interest in the community," generating "destabilization of the community and a corresponding increased burden on the City in the form of increased crime and an erosion of the tax base." *Id*. at 1095. The Seventh Circuit added that Chicago's standing also rested on the fact that its "fair housing agency ha[d] to use its scarce resources to ensure compliance with the fair housing laws" rather than to "perform its routine services." *Ibid*.

The Supreme Court's decision earlier this year in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), is of a piece with *Gladstone* and *Matchmaker*. In a challenge to the Department of Commerce's addition of a citizenship question to the census, the Court held that the plaintiff States had shown standing by "establish[ing] a sufficient likelihood that the reinstatement of a citizenship question would result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted and

lead to" injuries to the States such as "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources." *Id*. at 2565. In so holding, the Court explained that the fact that a "harm depends on the independent action of third parties," even when such actions stem from the third parties' "unfounded fears," does not make an injury too "speculative" to confer standing. *Id*. at 2565-66.

Cook County asserts injuries at least as concrete, imminent, and traceable as did the government plaintiffs in *Gladstone*, *New York*, and *Matchmaker*. As the parties agree, the Final Rule will cause immigrants to disenroll from, or refrain from enrolling in, critical public benefits out of fear of being deemed a public charge. Doc. 27-1 at pp. 330-332, ¶¶ 25, 30; *id*. at pp. 344-345, ¶¶ 19-20, 23; 84 Fed. Reg. at 41,300 ("The final rule will … result in a reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program."); *id*. at 41,485 (same). Cook County adduces evidence showing, consistent with common sense, that where individuals lack access to health coverage and do not avail themselves of government-provided healthcare, they are likely to forgo routine treatment—resulting in more costly, uncompensated emergency care down the line. Doc. 27-1 at pp. 331-333, 335-337, ¶¶ 30-32, 41-50. Additionally, because uninsured persons who do not seek public medical benefits are less likely to receive immunizations or to seek diagnostic testing, the Rule increases the risk of vaccine-preventable and other communicable diseases spreading throughout the County. *Id*. at pp. 329-330, 333, ¶¶ 20-21, 33; *id*. at pp. 358-359, ¶¶ 29, 32. Both the costs of community health epidemics and of uncompensated care are likely to fall particularly hard on CCH, which already provides approximately half of all charity care in Cook County, *id*. at pp. 335-336, ¶¶ 42-43, including to non-citizens regardless of their immigration status, *id*. at p. 327, ¶ 11. Indeed, DHS itself recognizes that the Rule will cause

"[s]tate and local governments … [to] incur costs" stemming from "changes in behavior caused by" the Rule. 84 Fed. Reg. at 41,389; *see also id*. at 41,300-01 ("DHS estimates that the total reduction in transfer payments from the Federal and State governments will be approximately $2.47 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits."); *id*. at 41,469 ("DHS agrees that some entities, such as State and local governments or other businesses and organizations, would incur costs related to the changes."). DHS specifically noted that "hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households" will suffer financial harm from the Rule's implementation. *Id*. at 41,469-70.

Given its operation of and financial responsibility for CCH, that is more than enough to establish Cook County's standing under the principles set forth in *Gladstone*, *New York*, and *Matchmaker*. DHS's contrary arguments fail to persuade.

First, DHS suggests that it is "inconsistent" for Cook County to maintain both that immigrants will forgo treatment and that they will come to rely more on uncompensated care from CCH. Doc. 73 at 21. But as Cook County observes, Doc. 80 at 14, there is no inconsistency: immigrants will "avoid seeking treatment for cases other than emergencies," Doc. 1 at ¶ 109, and the emergency treatment they seek will involve additional reliance on uncompensated care from CCH, Doc. 27-1 at p. 330, ¶ 21 ("When individuals are uninsured, they avoid seeking routine care and instead risk worse health outcomes and use costly emergency services."). The Rule itself acknowledges as much. 84 Fed. Reg. at 41,384 ("DHS acknowledges that increased use of emergency rooms and emergent care as a method of primary healthcare due to delayed treatment is possible and there is a potential for increases in uncompensated care.").

Second, DHS argues that because some non-citizen residents of Cook County have already disenrolled from benefits and are unlikely to re-enroll, the County cannot rely on their disenrollment as showing that others will follow suit. Doc. 73 at 21. That argument ignores the plain logic of Cook County's position—if the mere prospect of the Rule's promulgation after the Notice of Proposed Rulemaking in October 2018 prompted some immigrants to disenroll, it is likely that the Rule's going into effect will prompt others to do so as well. Again, the Rule itself acknowledges that disenrollment is a likely result of the Rule's implementation. 84 Fed. Reg. at 41,300-01.

Third, DHS argues that Cook County's invocation of its need to divert resources is a "novel" and unsupported extension of organizational "standing from the private organizations to whom it has always been applied to a local government entity." Doc. 73 at 22. Even if this argument were correct, it would not speak to the injuries to the County arising from CCH's provision of uncompensated care. But the argument is wrong, as municipal entities and private organizations alike may rely on the need to divert resources to establish standing. *See Matchmaker*, 982 F.2d at 1095 (holding that Chicago had Article III standing because its "fair housing agency has to use its scarce resources to ensure compliance with the fair housing laws … [and] cannot perform its routine services … because it has to commit resources against those engaged in racial steering"); *see also City of Milwaukee v. Saxby*, 546 F.2d 693, 698 (7th Cir. 1976) ("In any case where a municipal corporation seeks to vindicate the rights of its residents, there is no reason why the general rule on organizational standing should not be followed.").

As for ICIRR, the Supreme Court held in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), that if a private organization shows that a defendant's "practices have perceptibly impaired" its ability to undertake its existing programs, "there can be no question that the

organization has suffered injury in fact." *Id*. at 379; *see also Common Cause Ind.*, 937 F.3d at 954 ("Impairment of [an organization's] ability to do work within its core mission [is] enough to support standing."). ICIRR adduces evidence that its existing programs include efforts within immigrant communities to increase access to care, improve health literacy, and reduce reliance on emergency room care. Doc. 27-1 at pp. 341-342, ¶ 4-10. ICIRR further shows that the Rule is likely to decrease immigrants' access to health services, food, and other programs. *Id*. at p. 344-345, ¶¶ 19-20, 23. Indeed, ICIRR already has expended resources to prevent frustration of its programs' missions, to educate immigrants and staff about the Rule's effects, and to encourage immigrants not covered by but nonetheless deterred by the Rule to continue enrolling in benefit programs. *Id*. at pp. 343-345, ¶¶ 14-15, 22. If the Rule goes into effect, those consequences are likely to intensify and ICIRR's diversion of resources likely to increase. *Id*. at pp. 343-347, ¶¶ 16, 18, 23-31. ICIRR's standing is secure. *See Common Cause Ind.*, 937 F.3d at 964 (Brennan, J., concurring) ("[I]f a defendant's actions compromise an organization's day-to-day operations, or force it to divert resources to address new issues caused by the defendant's actions, an Article III injury exists.").

In pressing the contrary result, DHS contends that ICIRR "does not allege that the Rule will disrupt any of its current programs," and therefore that ICIRR is not "required" to alter its activities but instead "simply elected to do so." Doc. 73 at 22-23. But the evidence adduced by ICIRR suggests a "concrete and demonstrable injury to the organization's activities," not "simply a setback to [its] abstract social interests." *Havens*, 455 U.S. at 379. That is enough to establish standing, for "[w]hat matters is whether the organization['s] activities were undertaken because of the challenged law, not whether they were voluntarily incurred or not." *Common Cause Ind.*, 937 F.3d at 956 (internal quotation marks omitted).

## B.     Ripeness

DHS next contends that this case is not ripe.  Doc. 73 at 23-25.  Suits directed at agency

action "are appropriate for judicial resolution" where the challenged action is final and the issues

involved are legal ones, provided that the plaintiff shows that the action's impact on it "is

sufficiently direct and immediate." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-52 (1967).  The

challenged agency action here is the Final Rule's promulgation, the issues involved (as discussed

below) are purely legal challenges to DHS's implementation of the public charge provision

enacted by Congress, and—as shown above and addressed below in the discussion of irreparable

harm—Cook County and ICIRR allege a direct and immediate impact of the Rule on them.

Under these circumstances, the suit is ripe.  *See OOIDA v. FMCSA*, 656 F.3d 580, 586-87 (7th

Cir. 2011) (rejecting a federal agency's ripeness challenge, which posited that the "petitioners

[we]re not currently under a remedial directive," because "the threat of enforcement is sufficient"

to show hardship under *Abbott Laboratories*); *id.* at 586 ("Where … a petition involves purely

legal claims in the context of a facial challenge to a final rule, a petition is presumptively

reviewable.") (internal quotation marks omitted).

DHS retorts that this suit will not be ripe until the Rule is applied to actual admissibility

or adjustment determinations.  Doc. 73 at 23-24.  At most, DHS's argument pertains to any

individual non-citizen's challenge to the Rule.  It is far from clear that ripeness would pose an

impediment even to claims by affected individuals.  *See OOIDA*, 656 F.3d at 586 ("[T]he threat

of enforcement is sufficient" to make a suit ripe "because the law is in force the moment it

becomes effective and a person made to live in the shadow of a law that she believes to be

invalid should not be compelled to wait and see if a remedial action is coming.").  In any event,

certain of Cook County's and ICIRR's injuries—like their need to respond to the Rule's chilling

effect on benefits enrollment, or to divert resources to educate immigrants about the Rule—result from the Rule's promulgation.  It follows that their claims are ripe.

## C.    Zone of Interests

DHS next argues that Cook County and ICIRR fall outside the "zone of interests" protected by the INA.  Doc. 73 at 25-26.  "[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest … assert[ed] must be 'arguably within the zone of interests to be protected or regulated by the statute'" that the agency action allegedly violated.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).  "Whether a plaintiff comes within the 'zone of interests' is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (internal quotation marks omitted).  The question here is whether Cook County and ICIRR "fall[] within the class of plaintiffs whom Congress has authorized to sue under" the relevant statutes.  *Ibid*.

"[I]n the APA context, … the [zone of interests] test is not 'especially demanding.'"  *Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225).  As the Supreme Court explained, it has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff" and the test does not require any "indication of congressional purpose to benefit the would-be plaintiff."  *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225 (internal quotation marks omitted); *see also Lexmark*, 572 U.S. at 130 (reaffirming *Match-E-Be-Nash-She-Wish Band* and distinguishing non-APA cases).  Accordingly, the zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot

reasonably be assumed that Congress intended to permit the suit." *Math-E-Be-Nash-She-Wish Band*, 567 U.S. at 225 (internal quotation marks omitted). The appropriate frame of reference here is not only the public charge provision, but the immigration laws as a whole. *See Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 401 (1987) (holding that the court should "consider any provision that helps [it] to understand Congress' overall purposes in the" relevant statutes); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 186 (D.C. Cir. 2012) ("Importantly, in determining whether a petitioner falls within the zone of interests to be protected by a statute, we do not look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an integral relationship.") (internal quotation marks omitted). And even if an APA plaintiff is not among "those who Congress intended to benefit," the plaintiff nonetheless falls within the zone of interests if it is among "those who in practice can be expected to police the interests that the [relevant] statute protects." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998); *see also Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) ("[T]he salient consideration under the APA is whether the challenger's interests are such that they in practice can be expected to police the interests that the statute protects.") (internal quotation marks omitted); *ALPA Int'l v. Trans States Airlines, LLC*, 638 F.3d 572, 577 (8th Cir. 2011) (same).

Cook County and ICIRR both satisfy the zone of interests test. As DHS observes, the principal interests protected by the INA's "public charge" provision are those of "aliens improperly determined inadmissible." Doc. 73 at 25. ICIRR's interests in ensuring that health and social services remain available to immigrants and in helping them navigate the immigration process are consistent with the statutory purpose, as DHS describes it, to "ensure[] that only certain aliens could be determined inadmissible on the public charge ground." *Ibid.* There is

ample evidence that ICIRR's interests are not merely marginal to those of the aliens more directly impacted by the public charge provision. Not only is ICIRR precisely the type of organization that would reasonably be expected to "police the interests that the statute protects," *Amgen*, 357 F.3d at 109, but the INA elsewhere gives organizations like ICIRR a role in helping immigrants navigate immigration procedures generally, *see*, *e.g.*, 8 U.S.C. § 1101(i)(1) (requiring that potential T visa applicants be referred to nongovernmental organizations for legal advice); *id.* § 1184(p)(3)(A) (same for U visa applicants); *id.* § 1228(a)(2), (b)(4)(B) (recognizing a right to counsel for aliens subject to expedited removal proceedings); *id.* § 1229(a)(1), (b)(2) (requiring that aliens subject to deportation proceedings be provided a list of pro bono attorneys and advised of their right to counsel); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process). Especially given the APA's "generous review provisions," *Clarke*, 479 U.S. at 395 (internal quotation marks omitted), these considerations place ICIRR's claims "at the least[] 'arguably within the zone of interests'" protected by the INA, *Bank of Am. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (quoting *Data Processing*, 397 U.S. at 153).

In pressing the contrary result, DHS relies principally on Justice O'Connor's in-chambers opinion in *INS v. Legalization Assistance Project of Los Angeles County*, 510 U.S. 1301 (1993). Doc. 73 at 25-26. That reliance is misplaced. As an initial matter, Justice O'Connor's opinion is both non-precedential and concededly "speculative." *Legalization Assistance Project*, 510 U.S. at 1304. In any event, the opinion predates the Court's articulation in *Match-E-Be-Nash-She-Wish Band* and *Lexmark* of the current, more flexible understanding of the zone of interests test in APA cases.

Cook County satisfies the zone of interests test as well.  In *City of Miami*, the Supreme Court held that Miami's allegations of "lost tax revenue and extra municipal expenses" placed it within the zone of interests protected by the FHA, which allows "any person who … claims to have been injured by a discriminatory housing practice" to file a civil action for damages.  137 S. Ct. at 1303 (internal quotation marks omitted).  Cook County asserts comparable financial harms from the Final Rule.  True enough, Cook County is not itself threatened with an improper admissibility or status adjustment determination, but neither did Miami itself suffer discrimination under the FHA.  In both *City of Miami* and here, the consequences of the challenged action generate additional costs for the municipal plaintiff.  If such injuries place a municipality within the FHA's zone of interests in a non-APA case like *City of Miami*, they certainly do so in this APA case.

### D.    *Chevron* Analysis

The APA provides for judicial review of final agency decisions.  *See* 5 U.S.C. §§ 702, 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.").  The question here is whether DHS exceeded its authority in promulgating the Final Rule.  Under current precedent, which this court must follow, resolution of that question is governed by the framework set forth in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984).

"At *Chevron*'s first step, [the court] determine[s]—using ordinary principles of statutory interpretation—whether Congress has directly spoken to the precise question at issue." *Coyomani–Cielo v. Holder*, 758 F.3d 908, 912 (7th Cir. 2014).  If "Congress has directly spoken to the precise question at issue … the court … must give effect to the unambiguously expressed intent of Congress," *Indiana v. EPA*, 796 F.3d 803, 811 (7th Cir. 2015) (quoting *Chevron*, 467

U.S. at 842-43) (alterations in original) (internal quotation marks omitted), and end the inquiry there, *see Coyomani–Cielo*, 758 F.3d at 912. "If, however, 'the statute is silent or ambiguous with respect to the specific issue,'" *Chevron*'s second step, at which "a reviewing court must defer to the agency's interpretation if it is reasonable," comes into play. *Indiana*, 796 F.3d at 811 (quoting *Chevron*, 467 U.S. at 843-44). As shown below, because the pertinent statute is clear, there is no need to go beyond *Chevron*'s first step.

"When interpreting a statute, [the court] begin[s] with the text." *Loja v. Main St. Acquisition Corp.*, 906 F.3d 680, 683 (7th Cir. 2018). "Statutory words and phrases are given their ordinary meaning." *Singh v. Sessions*, 898 F.3d 720, 725 (7th Cir. 2018); *see also United States v. Titan Int'l, Inc.*, 811 F.3d 950, 952 (7th Cir. 2016). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Brumfield v. City of Chicago*, 735 F.3d 619, 628 (7th Cir. 2013); *see also LaPlant v. N.W. Mut. Life Ins. Co.*, 701 F.3d 1137, 1139 (7th Cir. 2012) ("We try to give the statutory language a natural meaning in light of its context.").

Congress has expressed in general terms that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes," 8 U.S.C. § 1601(1), that "[t]he immigration policy of the United States" provides that "aliens within the Nation's borders not depend on public resources to meet their needs," *id.* § 1601(2)(A), and that "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States," *id.* § 1601(2)(B). But those provisions express only general policy goals without specifying what it means for non-citizens to be "[s]elf-sufficient" or to "not depend on public resources to meet their needs." *Cf. NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992) ("You cannot discover how far a statute goes by observing the

direction in which it points. Finding the meaning of a statute is more like calculating a vector (with direction and length) than it is like identifying which way the underlying 'values' or 'purposes' point (which has direction alone).") (internal quotation marks omitted). The public charge provision is intended to implement those general policy goals—yet in none of its iterations since its original enactment in 1882 did Congress define the term "public charge."

This lack of a statutory definition gives rise to the interpretative dispute that divides the parties. Cook County and ICIRR submit that the term "public charge" includes only "those who are likely to become *primarily and permanently dependent* on the government for *subsistence*." Doc. 27 at 15 (emphasis in original). DHS submits that the term is broad enough to include any non-citizen "who receives" a wide range of "designated public benefits for more than 12 months in the aggregate within a 36-month period," Doc. 73 at 18-19—including, as the Final Rule acknowledges, those who "receive only hundreds of dollars, or less, in public benefits annually" for any twelve months in a thirty-six month period, 84 Fed. Reg. at 41,360-61. As Cook County and ICIRR contend, and as DHS implicitly concedes through its silence, if Cook County and ICIRR are correct about what "public charge" means, the Final Rule fails at *Chevron* step one, as there would be "no ambiguity for the agency to fill." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

Settled precedent governs how to ascertain the meaning of a statutorily undefined term like "public charge." "[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary … meaning … at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (alterations in original and internal quotation marks omitted). As noted, the term "public charge" entered the statutory lexicon in 1882 and has been included in nearly identical inadmissibility provisions ever since.

For this reason, the court agrees with DHS's foundational point that, given the "unbroken line of predecessor statutes going back to at least 1882 [that] have contained a similar inadmissibility ground for public charges," Doc. 73 at 16, "the late 19th century [is] the key time to consider" for determining the meaning of the term "public charge," *id*. at 27.

Fortunately, the Supreme Court told us just over a century ago what "public charge" meant in the relevant era, and thus what it means today. In *Gegiow v. Uhl*, 239 U.S. 3 (1915), several Russian nationals brought suit after they were denied admission to the United States on public charge grounds because, the immigration authorities reasoned, they were bound for Portland, Oregon, where the labor market would have made it impossible for them to obtain employment. *Id*. at 8-9. In holding that the aliens could not be excluded on that ground, the Court observed that in the statute identifying "who shall be excluded, 'Persons likely to become a public charge' [we]re mentioned between paupers and professional beggars, and along with idiots, persons dangerously diseased, persons certified by the examining surgeon to have a mental or physical defect of a nature to affect their ability to earn a living, convicted felons, prostitutes, and so forth." *Id*. at 10. In light of the statutory text, the Court held that "[t]he persons enumerated … are to be excluded on the ground of *permanent personal objections accompanying them* irrespective of local conditions unless the … phrase ['public charge'] … is directed to different considerations than any other of those with which it is associated. Presumably [the phrase 'public charge'] is to be read as generically similar to the other[ phrase]s mentioned before and after." *Ibid*. (emphasis added).

*Gegiow* teaches that "public charge" does not, as DHS maintains, encompass persons who receive benefits, whether modest or substantial, due to being temporarily unable to support themselves entirely on their own. Rather, as Cook County and ICIRR maintain, *Gegiow* holds

that "public charge" encompasses only persons who—like "idiots" or persons with "a mental or physical defect of a nature to affect their ability to make a living"—would be substantially, if not entirely, dependent on government assistance on a long-term basis. That is what *Gegiow* plainly conveys—DHS does not contend otherwise—and that is how courts of that era read the decision. *See United States ex rel. De Sousa v. Day*, 22 F.2d 472, 473-74 (2d Cir. 1927) ("In the face of [*Gegiow*] it is hard to say that a healthy adult immigrant, with no previous history of pauperism, and nothing to interfere with his chances in life but lack of savings, is likely to become a public charge within the meaning of the statute."); *United States ex rel. La Reddola v. Tod*, 299 F. 592, 592-93 (2d Cir. 1924) (holding that an alien who "suffer[ed] from an insanity" from which "recovery [was] impossible … was a public charge" while institutionalized, "for he was supported by public moneys of the state of New York and nothing was paid for his maintenance by him or his relatives"); *Ng Fung Ho v. White*, 266 F. 765, 769 (9th Cir. 1920) (holding that "the words 'likely to become a public charge' are meant to exclude only those persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future"), *rev'd on other grounds* 259 U.S. 276 (1922); *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917) (holding that "Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future"); *Ex parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) ("The record is conclusive that the petitioner was not likely to become a public charge, in the sense that he would be a 'pauper' or an occupant of an almshouse for want of means of support, or likely to be sent to an almshouse for support at public expense.") (citations omitted).

In an attempt to evade *Gegiow*'s interpretation of "public charge," DHS argues that Congress, through amendments enacted in the Immigration Act of 1917, "negated the Court's

interpretation in *Gegiow*." Doc. 73 at 30-31. That argument fails on two separate grounds. The first is that DHS maintained (correctly) that "the late 19th century [is] the key time to consider" in ascertaining the meaning of the term "public charge," *id*. at 27, and therefore cannot be heard to contend that the pertinent timeframe is, on second thought, 1917. The second is that, even putting aside DHS's arguable waiver, the 1917 Act did not change the meaning of "public charge" in the manner urged by DHS.

As relevant here, the 1917 Act moved the phrase "persons likely to become a public charge" from between the terms "paupers" and "professional beggars" to much later in the (very long) list of excludable aliens. 1917 Act, 39 Stat. at 875-76. The Senate Report states that this change was meant "to overcome recent decisions of the courts limiting the meaning of the description of the excluded class because of its position between other descriptions conceived to be of the same general and generical nature. (See especially Gegiow v. Uhl, 239 U.S., 3.)." S. Rep. No. 64-352, at 5 (1916). The value of any committee report in ascertaining a statute's meaning is questionable. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[J]udicial reliance on legislative materials like committee reports … may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text."); *Covalt v. Carey Can. Inc.*, 860 F.2d 1434, 1438 (7th Cir. 1988) ("Even the contemporaneous committee reports may be the work of those who could not get their thoughts into the text of the bill."). And the value of this particular Senate Report is further undermined by its opacity, as it does not say in which way its author(s) believed that court decisions had incorrectly limited the statute's breadth. *See Azar v. Allina*

*Health Servs.*, 139 S. Ct. 1804, 1815 (2019) (holding that "murky legislative history … can't overcome a statute's clear text and structure").

Later commentary on the 1917 Act—which DHS cites as authoritative, but the origin of which DHS fails to identify, Doc. 73 at 30—explained that the public charge provision "has been shifted from its position in sec. 2 of the Immigration Act of 1907 to its present position in sec. 3 of this act in order to indicate the intention of Congress that aliens shall be excluded upon said ground *for economic as well as other reasons* and with a view to overcoming the decision of the Supreme Court in Gegiow v. Uhl, 239 U.S. 3 (S. Rept. 352, 64th Cong., 1st sess.)." U.S. Dep't of Labor, Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935), at 25 n.5. This explanation suggests that Congress understood *Gegiow*, given its exclusive focus on an alien's economic circumstances, to have held that aliens may be deemed public charges only if there were *economic* reasons for their dependence on government support, and further that Congress wanted aliens dependent on government support for *noneconomic* reasons, like imprisonment, to be included as well.

That is precisely how many cases of the era understood the 1917 Act. *See United States ex rel. Medich v. Burmaster*, 24 F.2d 57, 59 (8th Cir. 1928) ("The fact that the appellant confessed to a crime punishable by imprisonment in the federal prison, and the very fact that he was actually incarcerated for a period of 18 months was sufficient to support the allegation in the warrant of deportation that he was likely 'to become a public charge.'"); *Ex parte Horn*, 292 F. at 457 (holding that although "the petitioner was not likely to become a public charge, in the sense that he would be a 'pauper' or an occupant of an almshouse for want of means of support, or likely to be sent to an almshouse for support at public expense," he was, as a convicted felon, a public charge because he was "a person committed to the custody of a department of the

government by due course of law") (citations omitted); *Ex parte Tsunetaro Machida*, 277 F. 239, 241 (W.D. Wash. 1921) ("[A] public charge [is] a person committed to the custody of a department of the government by due course of law.").  Other cases disagreed, holding that noneconomic dependence on the government for basic subsistence did not make one a public charge.  *See Browne v. Zurbrick*, 45 F.2d 931, 932-33 (6th Cir. 1930) (rejecting the proposition "that one who is guilty of crime, and therefore likely to be convicted for it and to be imprisoned at the public expense, is ipso facto likely to become a public charge"); *Coykendall v. Skrmetta*, 22 F.2d 120, 121 (5th Cir. 1927) (holding that "it cannot well be supposed that the words in question were intended to refer to anything other than a condition of dependence on the public for support," and therefore that the public charge provision did not include the public expense imposed by imprisonment); *Ex Parte Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919) ("The court holds expressly that the words 'likely to become a public charge' are meant to exclude only those 'persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future.'").  The divergence between those two lines of precedent is immaterial here, for DHS cites no case holding that the 1917 Act upended *Gegiow*'s holding that an alien could be deemed a public charge on economic grounds only if that person's dependence on public support was of a "permanent" nature.  *Gegiow*, 239 U.S. at 10.  Nor does DHS cite any case holding that an alien could be deemed a public charge based on the receipt, or anticipated receipt, of a modest quantum of public benefits for short periods of time.

DHS's contrary view rests upon an obvious misreading of *Ex parte Horn*.  DHS cites *Ex parte Horn* for the proposition that post-1917 cases "recognized that" the 1917 Act's transfer of the public charge provision to later in the list of excludable persons "negated the Court's interpretation of *Gegiow* by underscoring that the term 'public charge' is 'not associated with

paupers or professional beggars.'"  Doc. 73 at 30 (quoting *Ex parte Horn*, 292 F. at 457).  But *Ex parte Horn* involved not an alien whose economic circumstances were less dire than a pauper's or professional beggar's and thus who might have needed only modest government benefits for a short period of time; rather, the case involved a person who had committed crimes and was likely to be imprisoned.  292 F. at 458.  Thus, in saying that "[t]he term 'likely to become a public charge' is not associated with paupers or professional beggars, idiots, and certified physical and mental defectives," *id*. at 457, *Ex parte Horn* held not that the 1917 Act ousted *Gegiow*'s view regarding the severity and duration of the economic circumstances that could result in an alien being deemed a public charge; rather, it held that the 1917 Act expanded the meaning of "public charge" to include persons who would be totally dependent on the government for noneconomic reasons like imprisonment.  *See id*. at 458 ("When he was convicted he became a public charge, and a tax, duty, and trust was imposed upon the government by his conduct; and at the time of his entry he was likely to become a public charge by reason of the crime which he had committed.") (internal quotation marks omitted).  *Ex parte Horn* thus faithfully implements the change that, as shown above, DHS's own historical authority suggests the amendment was intended to effect.

DHS has three other arrows in its quiver, but none hits its mark.  The first is a 1929 treatise stating that "public charge" means "any maintenance, or financial assistance, rendered from public funds, or funds secured by taxation."  Arthur Cook et al., *Immigration Laws of the United States* § 285 (1929).  The treatise is wrong.  It does not address *Gegiow* in expressing its understanding of "public charge."  And the sole authority it cites, *Ex parte Kichmiriantz*, 283 F. 697 (N.D. Cal. 1922), does not support its view.  *Ex parte Kichmiriantz* concerned an alien "committed to the Stockton State Hospital for the insane" for dementia, who, without care,

"would starve to death within a short time." *Id*. at 697-98. Thus, although *Ex parte Kichmiriantz* observes that "the words 'public charge,' as used in the Immigration Act, mean just what they mean ordinarily; … a money charge upon, or an expense to, the public for support and care," *id*. at 698 (citation omitted), the context in which the court made that observation shows that it had in mind a person who was totally and likely permanently dependent on the government for subsistence. The case therefore aligns with Cook County and ICIRR's understanding of the term, not DHS's.

DHS's second arrow consists of a mélange of nineteenth century dictionaries and state court cases addressing whether one municipality or another was responsible for providing public assistance to a particular person under state poor laws. Doc. 73 at 29, 32-33. Those authorities, which address the meaning of the words "public," "charge," and "chargeable" and the term "public charge," would be material to the court's interpretative enterprise but for one thing: The Supreme Court told us in *Gegiow* what the statutory term "public charge" meant in that era. The federal judiciary is hierarchical, so in deciding here whether the Final Rule faithfully implements the statutory "public charge" provision, this court must adhere to the Supreme Court's understanding of the term regardless of what nineteenth century dictionaries and state court cases might have said. *See Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 792 (7th Cir. 2014); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 393 (7th Cir. 2010) (Easterbrook, J., dissenting).

As it happens, the dictionaries and state court cases do not advance DHS's cause. An 1888 dictionary cited by DHS defines "charge" as "an obligation or liability," but the only *human* example it offers of a "charge" is "a *pauper* being chargeable to the parish or town."

Dictionary of Am. and English Law 196 (1888) (emphasis added).  An 1889 dictionary defines "charge" in the context of a person as one who is "committed to another's custody, care, concern, or management," Century Dictionary of the English Language 929 (1889), and an 1887 dictionary likewise defines "charge" as "[t]he person or thing committed to the care or management of another," Webster's Condensed Dictionary of the English Language 85 (3d ed. 1887).  Those definitions are consistent with *Gegiow*'s understanding of "public charge" and do nothing to support DHS's view that the term is broad enough to include those who temporarily receive modest public benefits.  The same holds for state court cases from the era.  *See Cicero Twp. v. Falconberry*, 42 N.E. 42, 44 (Ind. App. 1895) ("The mere fact that a person may occasionally obtain assistance from the county does not necessarily make such person a pauper or a public charge."); *City of Boston v. Capen*, 61 Mass. 116, 121-22 (Mass. 1851) (holding that "public charge" refers "not [to] merely destitute persons, who … have no visible means of support," but rather to those who "by reason of some permanent disability, are unable to maintain themselves" and "might become a heavy and long continued charge to the city, town or state"); *Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*, 23 N.J.L. 169 (N.J. 1851) (repeatedly equating "paupers" with being "chargeable, or likely to become chargeable").

As it did with *Ex parte Horn*, DHS misreads the state court cases upon which it relies. According to DHS, *Poor District of Edenburg v. Poor District of Strattanville*, 5 Pa. Super. 516 (1897), held that a person who temporarily received "some assistance" while ill was not "chargeable to" the public solely because she was "without notice or knowledge" that her receiving the assistance would "place[] [her] on the poor book," and not because the public assistance was temporary. Doc. 73 at 32 (quoting *Edenburg*, 5 Pa. Super. at 520-24, 527-28). But it is plain that the court's holding rested in large part on the fact that the person had

economic means and was only temporarily on the poor rolls. *See Edenburg*, 5 Pa. Super. at 526 (noting that the person "had for sixteen years been an inhabitant of the borough and for twelve years the undisputed owner by fee simple title of unincumbered real estate, and household goods of the value of $300 in the district," and that she "had fully perfected her settlement by the payment of taxes for two successive years"). DHS characterizes *Inhabitants of Guilford v. Inhabitants of Abbott*, 17 Me. 335 (Me. 1840), as holding that a person was "likely to become chargeable" based on his receipt of "'a small amount' of assistance" and "'his age and infirmity.'" Doc. 73 at 33 (quoting *Guilford*, 17 Me. at 335-36). To be sure, DHS's brief quotes words that appear in the decision, but as DHS fails to acknowledge, the court observed that the person "for many years had no regular or stated business, … was at one time so furiously mad, that the public security required him to be confined," had "occasionally since that time, … been deranged in mind," and at a later time "was insane, roving in great destitution." *Guilford*, 17 Me. at 335. DHS describes *Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (Vt. 1847), as holding that a "widow and children with a house, furniture, and a likely future income of $12/year from the lease of a cow were nonetheless public charges." Doc. 73 at 32. But DHS fails to mention the court's explanation that the widow's "mother claimed to own some part of the furniture, … that her brother … claimed a lien upon the cow," and that the $12 annual lease income—which, incidentally, was for the house, not the cow—was past due for the preceding year with no reason to expect payment in the future. *Hartford*, 19 Vt. at 394. Accordingly, contrary to DHS's treatment of those state court cases, they align with *Gegiow*'s—and Cook County and ICIRR's—conception of what it means to be a public charge.

DHS's third arrow is an 1894 floor speech in which Representative Warner, objecting to a bill to support "industrial paupers" or "deadbeat industries"—what today might be called

corporate welfare—drew a rhetorical comparison with his constituents' view that, because the immigration laws would bar admission of an alien who "earn[s] half his living or three-quarters of it," they had "no sympathy … with the capitalist who offers to condescend to do business in this country provided this country will tax itself in order to enable him to make profits."  26 Cong. Rec. 657 (1894) (statement of Rep. Warner) (cited at Doc. 73 at 29).  Representative Warner's remarks have no value.  They only obliquely reference the immigration laws, and he had every incentive to exaggerate the harshness of immigration law to support his opposition to the industrial assistance under consideration.

To sum up: As DHS argues, interpretation of the statutory term "public charge" turns on its meaning in the late nineteenth century.  The Supreme Court in *Gegiow* interpreted the term in a manner consistent with Cook County and ICIRR's position and contrary to DHS's position in the Final Rule.  The Immigration Act of 1917 did not undermine *Gegiow*'s understanding of the severity of the economic circumstances that would lead an alien to be deemed a public charge.  Contemporaneous dictionaries and state court cases are immaterial and, even if they were material, are consistent with *Gegiow.*  DHS cites no case from any era holding that the public charge provision covers noncitizens who receive public benefits—let alone modest public benefits—on a temporary basis.  And against that statutory and case law backdrop, Congress retained the "public charge" language in the INA of 1952 and the IIRIRA of 1996.  *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) (holding that Congress "presumptively was aware of the longstanding judicial interpretation of the phrase [included in a newly enacted statute] and intended for it to retain its established meaning").  It follows, based on the arguments and authorities before the court at this juncture, that Cook County and ICIRR are likely to prevail on the merits of their challenge to the Final Rule.

## II. Adequacy of Legal Remedies and Irreparable Harm

Although a party seeking a preliminary injunction must show "more than a mere possibility of harm," the harm need not "actually occur before injunctive relief is warranted" or "be certain to occur before a court may grant relief on the merits." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017). "Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial." *Ibid.* (internal quotation marks omitted).

The final relief potentially available to Cook County and ICIRR is circumscribed by the APA's limited waiver of sovereign immunity: it waives the sovereign immunity of the United States only to the extent that the suit "seek[s] relief other than money damages." 5 U.S.C. § 702. Thus, if Cook County and ICIRR show that, in the absence of a preliminary injunction, they will suffer injury that would ordinarily be redressed by money damages, that will suffice to show irreparable harm, as "there is no adequate remedy at law" to rectify that injury. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

Cook County and ICIRR have made the required showing. As set forth in the discussion of standing, Cook County has shown that the Rule will cause immigrants to disenroll from, or refrain from enrolling in, medical benefits, in turn leading them to forgo routine treatment and rely on more costly, uncompensated emergency care from CCH. Doc. 27-1 at pp. 330-333, 335-337, ¶¶ 25, 30-32, 41-50; *id.* at pp. 344-345, ¶¶ 19-20, 23. In addition, because uninsured persons who forgo public medical benefits are less likely to receive immunizations or to seek diagnostic testing, the Rule increases the entire County's risk of vaccine-preventable and other communicable diseases. *Id.* at pp. 329-330, 333, ¶¶ 20-21, 33; *id.* at pp. 358-359, ¶¶ 29, 32. And as also shown above, ICIRR will have to divert resources away from its existing programs to respond to the effects of the Final Rule. *Id.* at pp. 343-347, ¶¶ 16, 18, 23-31. Given the

unavailability of money damages, those injuries are irreparable, satisfying the adequacy of legal remedies and irreparable harm requirements of the preliminary injunction standard.

## III.     Balance of Harms and Public Interest

In balancing the harms, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (internal quotation marks omitted). As discussed above, Cook County and ICIRR have shown that the Final Rule is likely to impose on them both financial and programmatic consequences for which there is no effective remedy at law. On the other side of the balance, DHS asserts that it has "a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so." Doc. 73 at 54. A temporary delay in implementing the Rule undoubtedly would impose some harm on DHS. But absent any explanation of the practical consequences of the delay and whether those consequences are irreparable, it is clear—at least on the present record—that the balance of harms favors Cook County and ICIRR.

As for the public interest, DHS makes no argument beyond the public interest in its unimpeded administration of national immigration policy. *Id*. at 54-55. But at the same time, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Given the court's holding that Cook County and ICIRR are likely to succeed on the merits of their challenge to the Final Rule, given that the balance of harms otherwise favors preliminary relief, and bearing in mind the

public health risks to Cook County if the Final Rule were allowed to take effect, entry of a preliminary injunction satisfies the public interest.

DHS raises two other equitable points. First, it argues that an ongoing challenge to the Final Rule in the Eastern District of Washington in which the State of Illinois is a party, and in which the court last Friday granted a preliminary injunction, *see Washington v. U.S. Dep't of Homeland Sec.*, No. 19-5210 (E.D. Wash. Oct. 11, 2019), ECF No. 162, renders this case duplicative. Doc. 73 at 52-53. Relatedly, DHS contends that the Eastern District of Washington's injunction, as well as a nationwide preliminary injunction issued last Friday by the Southern District of New York, *see New York v. U.S. Dep't of Homeland Sec.*, __ F. Supp. __, 2019 WL 5100372, at *8 (S.D.N.Y. Oct. 11, 2019), renders moot this court's consideration of the present motion. Doc. 82. While recognizing the federal courts' general aversion to duplicative litigation, *see Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223-24 (7th Cir. 1993), the court concludes that the pendency of those other cases and the preliminary injunction orders entered therein do not moot the present motion or otherwise counsel against its consideration.

Neither the parties nor this court have any power over or knowledge of whether and, if so, when those two preliminary injunctions will be lifted or modified. Even a temporary lag between the lifting of both injunctions and the entry of a preliminary injunction by this court would entail some irreparable harm to Cook County and ICIRR. Indeed, the federal government in other litigation earlier this year maintained, correctly, that "[t]he possibility that [a nationwide] injunction may not persist is sufficient reason to conclude that … appeal" of an injunction entered elsewhere was "not moot." Supplemental Brief for the Federal Appellants at 152, *California v. U.S. Dep't of Health and Human Servs.*, No. 19-15072 (9th Cir. May 20, 2019), ECF No. 152.

Second, DHS argues that Cook County and ICIRR's "[l]ack of diligence, standing alone," is sufficient to "preclude the granting of preliminary injunctive relief." Doc. 73 at 53 (quoting *Majorica, S.A. v. R.H. Macy*, 762 F.2d 7, 8 (7th Cir. 1982)). Cook County and ICIRR's delay in bringing this suit relative to when the New York and Washington suits were brought, while not trivial, is not sufficiently severe to justify denying them equitable relief, particularly because any delay "goes primarily to the issue of irreparable harm," which they have otherwise amply established. *See Majorica*, 762 F.2d at 8. In any event, because DHS was already preparing substantially similar briefs in the other cases challenging the Final Rule, the effect of the delay on its ability to contest the present motion was minimal.

Finally, DHS asks that any preliminary injunction be limited "to Cook County and specific individual members of ICIRR." Doc. 73 at 55. But because the record shows that ICIRR "represent[s] nearly 100 nonprofit organizations and social and health service providers *throughout Illinois*," Doc. 27-1 at p. 341, ¶ 5 (emphasis added), it is appropriate for the preliminary injunction to cover the entire State.

## Conclusion

The parties (to a lesser extent) and their *amici* (to a greater extent) appeal to various public policy concerns in urging the court to rule their way. To be sure, this case has important policy implications, and the competing policy views held by parties and their *amici* are entitled to great respect. But let there be no mistake: The court's decision today rests not one bit on policy. The decision reflects no view whatsoever of whether the Final Rule is consistent or inconsistent with the American Dream, or whether it distorts or remains faithful to the Emma Lazarus poem inscribed on the Statue of Liberty. *Compare New York*, 2019 WL 5100372, at *8 (asserting that the Final Rule "is repugnant to the American Dream of the opportunity for

prosperity and success through hard work and upward mobility"), *with* Jason Silverstein,

"Trump's top immigration official reworks the words on the Statue of Liberty," CBS News

(Aug. 14, 2019, 4:25 AM), http://www.cbsnews.com/news/statue-of-liberty-poem-emma-

lazarus-quote-changed-trump-immigration-official-ken-cuccinelli-after-public-charge-law

(quoting the acting director of the Citizenship and Immigration Services suggesting in defense of

the Final Rule that the Lazarus poem conveys this message: "Give me your tired and your poor

who can stand on their own two feet, and who will not become a public charge.").  The court

certainly takes no position on whether, as DHS suggests, the Old Testament sheds light on the

historical backdrop of Congress's enactment of the 1882 Act.  Doc. 73 at 28 (citing

*Deuteronomy* 15:7-15:8).

 Today's decision, rather, rests exclusively on a dry and arguably bloodless examination

of the authorities that precedent requires courts to examine—and the deployment of the legal

tools that precedent requires courts to use—when deciding whether executive action complies

with a federal statute.  *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1357-58 (2018) ("Each side

offers plausible reasons why its approach might make for the more efficient policy.  But who

should win that debate isn't our call to make.  Policy arguments are properly addressed to

Congress, not this Court.  It is Congress's job to enact policy and it is this Court's job to follow

the policy Congress has prescribed.").  And having undertaken that examination with the

appropriate legal tools, the court holds that Cook County and ICIRR are likely to succeed on the

merits of their challenge to the Final Rule, that the other requirements for preliminary injunctive

relief are met, and that the Final Rule shall not be implemented or enforced in the State of Illinois absent further order of court.

October 14, 2019

_____
United States District Judge