**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COOK COUNTY, ILLINOIS,<br><br>                    et al.,<br><br>        Plaintiffs,<br><br>        vs.<br><br>CHAD F. WOLF, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                    et al.,<br><br>        Defendants. | Case No. 19-cv-6334<br><br>Judge Gary Feinerman |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

LEGAL STANDARD ............................................................................................................. 3

ARGUMENT .......................................................................................................................... 4

   I.    Plaintiffs Have Established Standing and Ripeness. ...................................................... 5

      A.   Plaintiffs Maintain Article III Standing. ................................................................. 5

      B.   Plaintiffs' Claims Remain Ripe for Review.............................................................. 7

      C.   Plaintiffs Fall Within the INA's "Zone of Interests." ............................................. 8

   II.   Count I States a Valid Claim for Relief. ....................................................................... 10

      A.   The Final Rule Exceeds DHS's Statutory Authority Because It Is Contrary to the Plain Meaning of the Text. ............................................................................................................. 10

      B.   The Final Rule Also Fails Under *Chevron* Step Two. ............................................ 19

   III.   Count II States a Valid Claim for Relief........................................................................ 21

      A.   The Final Rule Violates Section 504 of the Rehabilitation Act................................ 21

      B.   The Final Rule Contravenes PRWORA.................................................................... 23

      C.   The Final Rule Violates the SNAP Statute. ............................................................. 25

   IV.   Count III States a Valid Claim for Relief...................................................................... 27

   V.   ICIRR Has Stated a Valid Claim for Violation of the Equal Protection Clause. ......................... 31

CONCLUSION ..................................................................................................................... 37

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alston v. City of Madison*,
    853 F.3d 901 (7th Cir. 2017) ...................................................32

*Am. Airlines, Inc. v. Transp. Sec. Admin.*,
    665 F.3d 170 (D.C. Cir. 2011) .................................................25

*Am. Fed'n of Gov't Employees, Local 2119 v. Cohen*,
    171 F.3d 460 (7th Cir. 1999) .....................................................9

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) .................................................28

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
    572 F.3d 440 (7th Cir. 2009) .....................................................3

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................3, 4

*Bank of America Corporation v. City of Miami*,
    137 S. Ct. 1296 (2017)...............................................................8

*Bankers Life & Cas. Co. v. United States*,
    142 F.3d 973 (7th Cir. 1998) ...................................................20

*Batalla Vidal v. Nielsen*,
    291 F. Supp. 3d 260 (E.D.N.Y. 2018) .....................................36

*Bonte v. U.S. Bank, N.A.*,
    624 F.3d 461 (7th Cir. 2010) .....................................................3

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014).................................................................23

*CASA de Md., Inc. v. Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) .........................................37

*Chavez v. Ill. State Police*,
    251 F.3d 612 (7th Cir. 2001) ...................................................32

*City & County of San Francisco v. U.S. Citizenship & Immig. Servs.*,
    944 F.3d 773 (9th Cir. 2019) .........................................5, 13, 14

*City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*,
   982 F.2d 1086 (7th Cir. 1992) ...........................................................................6

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)......................................................................................9, 10

*Common Cause Indiana v. Lawson*,
   937 F.3d 944 (7th Cir. 2019) ..........................................................................6, 7

*Contreras v. City of Chicago*
   119 F.3d 1286 (7th Cir. 1997) ..........................................................................37

*Doe, 1 v. Fed. Election Comm'n*,
   920 F.3d 866 (D.C. Cir. 2019)...........................................................................23

*Eli Lilly & Co. v. Arla Foods Inc.*,
   No. 17-C-703, 2017 WL 2976697 (E.D. Wis. July 11, 2017) .................................4

*Emergency Servs. Billing Corp. v. Allstate Ins. Co.*,
   668 F.3d 459 (7th Cir. 2012) ............................................................................15

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018).....................................................................................24

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)....................................................................................30, 31

*Flying J Inc. v. City of New Haven*,
   549 F.3d 538 (7th Cir. 2008) ..............................................................................3

*Franco-Gonzalez v. Holder*,
   No. 10-CV-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) ...................22, 23

*Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*,
   865 F.3d 630 (D.C. Cir. 2017) ..........................................................................30

*Gegiow v. Uhl*,
   239 U.S. 3 (1915)........................................................................................ *passim*

*Getty v. Fed. Sav. & Loans Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) ........................................................................28

*Gooderham v. Adult & Family Services Div.*,
   667 P.2d 551 (Ore. App. 1983)........................................................................26

*Gundy v. United States*,
   139 S. Ct. 2116 (2019)....................................................................................16

*Hernandez v. Woodard*,
   714 F. Supp. 963 (N.D. Ill. 1989) ...................................................................33

*Ex Parte Horn*,
   292 F. 455 (W.D. Wash. 1923) .....................................................................12

*Cal. ex rel. Imperial County Air Pollution Control Dist. v. United States DOI*,
   No. 09-cv-2233 AJB, 2012 WL 1155831 (S.D. Cal. Apr. 6, 2012) ...........................6

*Innovative Health Sys., Inc. v. City of White Plains*,
   117 F.3d 37 (2d Cir. 1997)............................................................................36

*INS v. Jong Ha Wang*,
   450 U.S. 139 (1981)....................................................................................15

*United States ex rel. Iorio v. Day*,
   34 F.2d 920 (2d Cir. 1929)......................................................................12, 13

*Johnson v. Wickersham*,
   No. 13-13672, 2014 WL 4897387 (E.D. Mich. Sept. 11, 2014)..............................4

*Leary v. Daeschner*,
   228 F.3d 729 (6th Cir. 2000) .........................................................................4

*Lovell v. Chandler*,
   303 F.3d 1039 (9th Cir. 2002) ......................................................................22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012)................................................................................8, 10

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)................................................................................27, 28

*Michigan v. EPA*,
   135 S. Ct. 2699.....................................................................................29, 30

*Miller v. Johnson*,
   515 U.S. 900 (1995)....................................................................................34

*Moral-Salazar v. Holder*,
   708 F.3d 957 (7th Cir. 2013) .......................................................................18

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005)....................................................................................14

*New York v. U.S. Dep't. of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019)..............................................................34

*New York v. U.S. Dep't of Homeland Sec.*,
  No. 19 Civ. 777 (GBD), 2019 WL 5100372 (S.D.N.Y. Oct. 11, 2019) ................................20

*Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*,
  893 F.3d 1017 (7th Cir. 2018) ................................................................................28

*Our Country Home Enters., Inc. v. Comm'r of Internal Revenue*,
  855 F.3d 773 (7th Cir. 2017) ................................................................................19

*Owner-Operator Indep. Drivers Ass'n, Inc.v. Fed. Motor Carrier Safety Admin.*,
  656 F.3d 580 (7th Cir. 2011) ................................................................................7

*Ramos v. Nielsen*,
  321 F. Supp. 3d 1083 (N.D. Cal. 2018) ................................................................35

*Rush Univ. Med. Ctr. v. Burwell*,
  763 F.3d 754 (7th Cir. 2014) ................................................................................15

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................................35

*J.E.C.M. ex rel. Saravia v. Lloyd*,
  352 F. Supp. 3d 559 (E.D. Va. 2018) ................................................................21

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017) ................................................................................34

*Silha v. ACT, Inc.*,
  807 F.3d 169 (7th Cir. 2015) ................................................................................3, 6

*St. James Hosp. v. Heckler*,
  760 F.2d 1460 (7th Cir. 1985) ................................................................................30

*Stevens v. Interactive Fin. Advisors, Inc.*,
  No. 11 C 2223, 2012 WL 689265 (N.D. Ill. Mar. 2, 2012) ........................................3

*Swanson v. Citibank, N.A.*,
  614 F.3d 400 (7th Cir. 2010) ................................................................................33

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ................................................................................34

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 ................................................................................ *passim*

*H.P. ex rel. W.P. v. Naperville Cmty. Unit Sch. Dist. #203*,
  910 F.3d 957 (7th Cir. 2018) ................................................................................21

*Wis. Cent. Ltd. v. United States*,
    138 S. Ct. 2067 (2018) ............................................................................14, 15

*Whitman v. American Trucking Ass'n*,
    531 U.S. 457 (2001) ...............................................................................17, 20

*Yeftich v. Navistar, Inc.*,
    722 F.3d 911 (7th Cir. 2013) .........................................................................3

*Zivotofsky v. Kerry*,
    135 S. Ct. 2076 (2015) ................................................................................34

**Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................................21, 27

7 U.S.C. § 2011 ...........................................................................................................27

7 U.S.C. § 2017(b) .................................................................................................25, 26

8 U.S.C. § 1182 ............................................................................................................1

8 U.S.C. § 1182(a)(4)(A), (B) ...................................................................................20

8 U.S.C. § 1182(a)(4)(B) ...........................................................................................24

8 U.S.C. § 1182(a)(4)(B)(ii) ......................................................................................18

8 U.S.C. § 1182(a)(4)(C) ...........................................................................................19

8 U.S.C. § 1182(a)(4)(D) ...........................................................................................19

8 U.S.C. §§ 1183(a)(2)-(3) .........................................................................................19

8 U.S.C § 1182(s) .......................................................................................................17

8 U.S.C. §§ 1601(3)-(5) ..............................................................................................24

8 U.S.C. § 1601(7) ......................................................................................................24

8 U.S.C. § 1611(b) ......................................................................................................24

8 U.S.C. § 1612(b)(1) .................................................................................................24

8 U.S.C. § 1613 ...........................................................................................................24

8 U.S.C. § 1621(b) ......................................................................................................24

29 U.S.C. § 794(a) ......................................................................................................21

42 U.S.C. § 12102(1)(A)..............................................................................................22

1996 Illegal Immigration Reform and Immigrant Responsibility Act............................18

Administrative Procedure Act...........................................................................................1

Freedom of Information Act ...........................................................................................36

IIRIRA .................................................................................................................19, 21, 27

Immigration and Nationality Act of 1952, 82nd Cong. ch. 477, section 212(a)(15),
    66 Stat. 163, 183 (1952)...........................................................................................23

Immigration Control and Financial Responsibility Act..................................................20

Immigration and Nationality Act .....................................................................................1

Patient Protection and Affordable Care Act ...................................................................23

PRWORA ...........................................................................................................23, 24, 25

Rehabilitation Act .............................................................................................21, 22, 23, 27

Religious Freedom Restoration Act.................................................................................23

**Other Authorities**

7 C.F.R. § 245.6(b)(1).....................................................................................................27

7 C.F.R. § 273.10(e)(2)(ii)(C).........................................................................................26

8 C.F.R. § 213a.1 .............................................................................................................19

28 C.F.R. § 41.51(b)(3)....................................................................................................21

47 C.F.R. § 54.409 ...........................................................................................................27

142 Cong. Rec. S11872 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl).................21

64 Fed. Reg. 28,678 .........................................................................................................31

65 Fed. Reg. 49,994, 49,994–95 (Aug. 16, 2000)..........................................................19

84 Fed. Reg. at 41,292, 41,463 .........................................................................................5

84 Fed. Reg. at 41,295 ...............................................................................................20, 30

84 Fed. Reg. at 41,295, 41,375 .......................................................................................26

84 Fed. Reg. at 41,300, 41,485 ...........................................................................28

84 Fed. Reg. at 41,307, 41,312 ...........................................................................23

84 Fed. Reg. at 41,335 ........................................................................................17

84 Fed. Reg. at 41,349, 41,504 ...........................................................................26

84 Fed. Reg. at 41,360–61 ..................................................................................31

84 Fed. Reg. at 41,369 ..........................................................................................2

84 Fed. Reg. at 41,389, 41,469 .............................................................................9

84 Fed. Reg. at 41,397 ........................................................................................19

84 Fed. Reg. at 41,448 ........................................................................................18

84 Fed. Reg. at 41,469–70 ..............................................................................6, 29

84 Fed. Reg. at 41,501–04 ..................................................................................24

84 Fed. Reg. at 41,502–04 ..................................................................................25

84 Fed. Reg. at 41,504 ........................................................................................22

84 Fed. Reg. at 41500, 41502–04 .......................................................................22

84 Fed. Reg. at 41504 .........................................................................................22

2020 MINIMUM ALLOTMENTS (Oct. 1, 2019), https://fns-
     prod.azureedge.net/sites/default/files/media/file/FY20-Minimum-
     Allotments.pdf .........................................................................................31

Center (Nov. 25, 2019), https://www.splcenter.org/hatewatch/2019/11/25/emails-
     confirm-millers-twin-obsessions-immigrants-and-crime.; ......................35

Federal Rule of Civil Procedure 12(b)(1) ............................................................3

Federal Rule of Civil Procedure 12(b)(6) ........................................................3, 4

H.R. Doc. No. 64-886 (1916) .............................................................................11

https://www.politico.com/story/2019/08/02/stephen-miller-green-card-
     immigration-1630406 ...............................................................................36

ILL. DEPT. OF HUMAN SERV., SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM –
     SNAP (Oct. 1, 2019), https://www.dhs.state.il.us/page.aspx?item=30357 ............................31

*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ........................1

Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019) ........................................................................................35

Michael Edison Hayden, *Emails Confirm Miller's Twin Obsessions: Immigrants and Crime*................................................................................................................................35

*Notice of Proposed Rulemaking, Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114, 51,270 (Oct. 10, 2018)................................................................................2

S. Rep. No. 113-40 (2013) .........................................................................................................21

Ted Hesson, *Emails Show Stephen Miller Pressed Hard to Limit Green Cards*..........................36

Plaintiffs Cook County and the Illinois Coalition for Immigrant and Refugee Rights ("ICIRR") filed suit challenging the efforts of Defendant agencies Department of Homeland Security ("DHS") and United States Citizenship and Immigration Services ("USCIS") to circumvent the legislative branch through administrative rulemaking. Plaintiffs maintain standing to sue, fall within the zone of interests protected by the Immigration and Nationality Act ("INA"), and present ripe, plausible, and well-pleaded claims under the Administrative Procedure Act ("APA") and, as to ICIRR, the United States Constitution. Defendants' motion to dismiss should be denied.

## INTRODUCTION

Defendants seek a third review of issues this Court already has decided. The INA provides the means for lawful immigration to the United States, and in doing so excludes limited categories of "inadmissible" individuals—terrorists, human traffickers, serious criminals, and individuals who threaten foreign policy interests. 8 U.S.C. § 1182. This same provision also excludes individuals "likely at any time to become a public charge." *Id.* at § 1182(a)(4)(A). For more than a century, courts and agency officials have defined individuals as "public charges" *only* when an applicant was deemed likely to become primarily dependent on the government for long-term support and subsistence.

In the Final Rule, DHS departs from the text of the INA and this settled meaning of public charge in an attempt, beyond its authority, to make new law. *See Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (the "Final Rule" or "Rule"). The Final Rule discards the primarily dependent definition of public charge, turning it instead into a wealth test that penalizes the use, or even projected use, of temporary, *de minimis*, supplemental non-cash

1

benefits. Likewise, the Final Rule introduces benefits and wealth-focused weighted factors to the totality-of-the-circumstances test. *Id*. at 41,294–95; Compl. ¶ 54.

Through these changes, DHS has stripped the term "public charge" of its settled definition and shoehorned into the INA a new category of people it wishes now to bar: immigrants DHS deems not "self-sufficient" for lawfully having availed themselves of, or for being projected to be likely in the future to avail themselves of, temporary public benefits. Compl. ¶ 55; 84 Fed. Reg. at 41,369. As discussed below, the Final Rule is inconsistent with the plain meaning of the statutory text, and DHS does not, and cannot, offer justification for this transformation of well-settled law.

This departure will impose significant costs. DHS admits, for example, that the Final Rule will lead to adverse health outcomes and increased prevalence of communicable disease. *Notice of Proposed Rulemaking, Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114, 51,270 (Oct. 10, 2018). By DHS's own estimates, the Rule will cause immigrants to disenroll from public benefits, or not to seek benefits in the first place, out of fear of being deemed a public charge— even if they are not subject to the Rule. *See id.* at 51,269 & Table 53. As this Court already found, both evidence and common sense indicate that such disenrollment will harm Cook County through its County Health and Hospitals System ("CCH"), as well as force ICIRR to divert resources to prevent frustration of its programs' missions and decrease the amount of reimbursement money ICIRR receives for benefits enrollment. Compl. ¶¶ 89, 94–99, 112, 115–131; *see* Dkt. 106 ("Mem. Op.") at 10.

This Court already has recognized that Congress did not create a boundless definition of "public charge." Mem. Op. at 16, 27–28. The Final Rule usurps Congress's legislative function, and Defendants' motion to dismiss must be denied.

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Mot. at 5. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must construe a complaint in the light most favorable to plaintiffs, accept as true all well-pleaded facts, and draw all reasonable inferences in their favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010).

In addition, Defendants move to dismiss Plaintiffs' claims for lack of Article III standing and ripeness, Mot. at 5–11, challenges arising under Rule 12(b)(1), rather than 12(b)(6). *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (standing); *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 544 (7th Cir. 2008) (ripeness). Where, as here, a defendant argues that a complaint has not sufficiently alleged a basis for subject matter jurisdiction, *see, e.g.*, Mot. at 6, "[c]ourts must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

For a claim to demonstrate facial plausibility under both Rules 12(b)(1) and 12(b)(6), Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Silha*, 807 F.3d at 174 ("[T]he *Twombly-Iqbal* facial plausibility requirement for pleading a claim is incorporated into the standard for pleading subject matter jurisdiction"). "The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits." *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2012 WL 689265, at *2 (N.D. Ill. Mar. 2, 2012).

**ARGUMENT**

This Court already has decided most of the key issues presented by Defendants' motion, including standing, ripeness, and the meaning of the statutory term "public charge." In granting Plaintiffs' motion for preliminary injunction, this Court engaged in a detailed analysis, ultimately finding Plaintiffs "likely to prevail on the merits of their challenge to the Final Rule." Mem. Op. at 28. Where Plaintiffs already have prevailed at the more rigorous preliminary injunction stage, so too should they prevail on a motion to dismiss. *See, e.g.*, *Eli Lilly & Co. v. Arla Foods Inc.*, No. 17-C-703, 2017 WL 2976697, at *2-3 (E.D. Wis. July 11, 2017) (denying defendant's motion to dismiss because the court already "concluded at the preliminary injunction stage that [plaintiff] has Article III standing and has successfully stated claims"); *see also Johnson v. Wickersham*, No. 13-13672, 2014 WL 4897387, at *3 (E.D. Mich. Sept. 11, 2014) ("[T]he evidentiary threshold for obtaining preliminary injunctive relief is much higher than that required to survive summary judgment, and certainly higher than the *Iqbal* standard of merely showing a 'plausible claim.'"); *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("We note that the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion") (collecting cases). And although the Court has not yet had the opportunity to weigh in on the balance of Plaintiffs' claims, they are equally well-pleaded. As demonstrated below, Plaintiffs have sufficiently stated claims for relief under both Rules 12(b)(1) and 12(b)(6).

## I.    Plaintiffs Have Established Standing and Ripeness.

### A.    Plaintiffs Maintain Article III Standing.

This Court twice has determined that Plaintiffs have demonstrated Article III standing. Mem. Op. at 5–11; Dkt. 109 at 26–27.[1] Defendants now seek another bite at the apple, yet fail to offer any new legal argument as to why Plaintiffs lack Article III standing.

With respect to the County, for example, this Court already found that the Complaint contains "more than enough" allegations to establish Article III standing under well-settled Seventh Circuit and Supreme Court precedent. Mem. Op. at 5–8 (citing *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979), and *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086 (7th Cir. 1992)). Defendants, however, argue that the Court erred in its conclusion, as the plaintiffs to which it analogized alleged "predictable" injuries not "based on a long chain of uncertain, intervening events." Mot. at 7. But Plaintiffs' causal chain consists of just one foreseeable link: when DHS implements the Rule, individuals will disenroll from, or decline to enroll in, benefits. Compl. ¶¶ 69–76; 84 Fed. Reg. at 41,292, 41,463. This chilling effect will result in: (1) a decline in preventative routine treatment that will create costly, uncompensated emergency care, Compl. ¶¶ 69–76; (2) a decline in individuals receiving immunizations or seeking diagnostic testing that will increase the risk of communicable diseases, *id*. at ¶ 79; and (3) a loss in Medicaid reimbursement revenues and an increase in uncompensated care costs, *id.* at ¶ 92. All of these predictable consequences will, in turn, create increased costs that CCH, as a major charity care provider, will have to bear. *Id*. at ¶¶ 93–94, 99.

---

[1] Indeed, none of the courts across the country evaluating claims brought by similar governmental or associational entities have accepted Defendants' argument challenging those plaintiffs' Article III standing. *See, e.g.*, *City & County of San Francisco v. U.S. Citizenship & Immig. Serv's.*, 944 F.3d 773, 786–88 (9th Cir. 2019).

Defendants cannot, and do not, argue that these allegations lack facial plausibility. *Silha*, 807 F.3d at 174. Rather, they proceed down the same path of speculation that this Court rejected at the preliminary injunction stage. *Compare* Mot. at 6–8 *with* Dkt. 73 at 7–9. For example, Defendants again maintain that CCH cannot yet determine whether a "material number of aliens" will rely upon it for uncompensated emergency care. Mot. at 6. But Defendants' quibbling, particularly at the motion to dismiss stage, cannot refute Plaintiffs' allegations, much less the actual *evidence* of harm already submitted by the County and recognized by this Court. *See, e.g.*, Mem. Op. at 7–8. Indeed, the Final Rule's stated purpose is to reduce enrollment in benefits, and DHS *concedes* in that Rule that this reduction will cause local entities like the County to incur additional costs as a result. *See, e.g.*, 84 Fed. Reg. at 41,469–70 (The Final Rule will cause "hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households" to suffer financial harm); *id*. at 41,389 (predicting state and local governments will incur costs). Thus, the link between the Final Rule and the County's harm is not only foreseeable, but fully anticipated by Defendants.[2]

Defendants' renewed challenge to ICIRR's standing fares no better. Again, Defendants fail even to *address* the facial plausibility of ICIRR's standing allegations. *See* Mot. at 8–9. Rather, they dispute—for the third time—this Court's interpretation of *Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). *Id.* at 9. Fully consistent with *Common Cause*, this Court determined

---

[2] Here, as with Plaintiffs' motion for preliminary injunction, Defendants argue that the County's allegations concerning its diverted resources cannot satisfy an organizational standing theory. Mot. at 8. Again, the County notes that it has never "allude[d] to an organizational standing theory," and instead relies upon the Final Rule's harm to its concrete, proprietary interests. *See, e.g.*, *Cal. ex rel. Imperial County Air Pollution Control Dist. v. United States DOI*, No. 09-cv-2233 AJB, 2012 WL 1155831, at *5 (S.D. Cal. Apr. 6, 2012) (local governments have standing to protect proprietary interests such as land ownership or participation in a business venture) (citing *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601–02 (1982)). Defendants' argument is, in any event, incorrect. *See Matchmaker*, 982 F.2d at 1095 (City of Chicago had Article III standing because its fair housing agency had to divert "scarce resources" to combat those engaged in racial steering).

that the Final Rule will frustrate and divert resources away from ICIRR's day-to-day operations: the Final Rule will decrease immigrants' access to health services, food, and other programs, thus directly interfering with ICIRR's mission to increase access to care, improve health literacy, and reduce reliance on emergency room care. Mem. Op. at 10; *see also* Compl. ¶¶ 111, 115–16, 118–20; *see also id*. at ¶ 122 (explaining that because ICIRR obtains revenue by helping immigrants enroll for public benefits, declining benefit enrollment will directly reduce ICIRR's funding). Moreover, ICIRR's efforts to educate the immigrant population about the Final Rule's effects and encourage immigrants to continue enrolling in public benefits, Compl. ¶ 115, align directly with the Seventh Circuit's determination in *Common Cause* that "[a]ny work to undo a frustrated mission is, by definition, something in furtherance of that mission." 937 F.3d at 954. Since DHS has failed to articulate anything this Court has not already considered, "ICIRR's standing is [still] secure." Mem. Op. at 10.

### B. Plaintiffs' Claims Remain Ripe for Review.

Defendants rehash their argument that this suit will not be ripe until the Final Rule is applied to actual admissibility or adjustment determinations. Mot. at 9–10; Dkt. 73 at 23–24. But as this Court already has explained, "[a]t most, DHS's argument pertains to any individual non-citizen's challenge to the Rule." Mem. Op. at 11. Here, Plaintiffs direct their suit at agency action—specifically, the Final Rule's promulgation. Because the issues involved thus constitute purely legal challenges to DHS's implementation of the Final Rule, and because Plaintiffs allege that the Final Rule threatens direct and immediate harm to their interests, the suit is ripe for review. *See Owner-Operator Indep. Drivers Ass'n, Inc.v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011) (where a petition involves purely legal claims in the context of a facial challenge to a final rule, a petition is "presumptively reviewable").

And with respect to prudential ripeness, the record is replete with the hardships Plaintiffs have faced, and will continue to face, absent judicial intervention. Indeed, the Court found that the Rule *already* has caused ICIRR to expend resources to avoid frustration of its mission. Mem. Op. at 10; *see also* Compl. ¶¶ 110–131. And delaying review will only exacerbate the County's funding impact and increased administrative costs. Compl. ¶¶ 89–109. This Court found this case sufficiently ripe for review in issuing a preliminary injunction. Defendants request that this Court reverse course, yet offer no basis to justify doing so.

### C.  Plaintiffs Fall Within the INA's "Zone of Interests."

Similarly, this Court twice has concluded that both Cook County and ICIRR satisfy the APA's "zone-of-interests" test. Mem. Op. at 12–15; Dkt. 109 at 27. Now, Defendants recycle their unsuccessful argument that only immigrants deemed inadmissible under a public charge determination can challenge the Rule. Mot. at 11–13. Absent any new legal argument, and at the *less rigorous* motion to dismiss stage, this theory again must fail.

As to the County, Defendants continue to insist that this Court has misread *Bank of America Corporation v. City of Miami*, 137 S. Ct. 1296 (2017). Mot. at 13. In particular, they contend that the INA must include specific language "suggesting that Congress intended for a [ ] broad class of plaintiffs to enforce the public charge provision." Mot. at 13. But the APA contains no such "language" requirement. Rather, Defendants continue to ignore the relevant zone-of-interests standard: "The interest . . . assert[ed] must be 'arguably within the zone of interests to be protected or regulated by the statute'" that the agency action allegedly violated. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) ("Match-E-Be") (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). Here, the County's financial harm is inextricably related to the statute, which aims to prevent immigrants from imposing a

8

severe burden on governmental entities through primary dependence on government benefits. In fact, Section 1183 of the INA specifically entitles "the proper law officers" of "any State, territory, district, county, town, or municipality in which [an] alien becomes a public charge" to bring a lawsuit against any individual who sponsored an immigrant's visa to enforce the Affidavit of Support. 8 U.S.C. § 1183. CCH challenges the Final Rule precisely because it will increase immigrants' reliance on charity care benefits that CCH provides and, in turn, increase costs to CHH, rather than allowing CCH to recoup from the sponsor the cost of an immigrant's use of benefits. Compl. ¶¶ 93–94, 99; *see also* 84 Fed. Reg. at 41,389, 41,469 (acknowledging that the County will be forced to "incur costs" as a result of the Rule). This harm places the County squarely within the INA's zone of interests. *Am. Fed'n of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460, 469 (7th Cir. 1999).

With respect to ICIRR, Defendants note that this Court found that ICIRR "fell within the zone-of-interests of the public charge provision because ICIRR's interest in providing health, social, and legal services to immigrants is 'consistent with the statutory purpose' of 'ensur[ing] that only certain aliens could be determined inadmissible on the public charge ground.'" Mot. at 12 (quoting Mem. Op. at 13). According to Defendants, having an interest that is merely "consistent" with a statutory purpose cannot suffice under the zone-of-interests test. *Id*. But this Court found that ICIRR's interests are not only "consistent" with the INA, but also that the organization provided "ample evidence" that it is "precisely the type of organization that would reasonably be expected to 'police the interests that the statute protects.'" Mem. Op. at 14 (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004)). Again, Defendants overlook that the zone-of-interests test encompasses not just the public charge provision, but immigration laws as a whole. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987). Accordingly, this Court identified

9

*five* separate INA provisions in which Congress gave organizations such as ICIRR a role in helping immigrants navigate immigration procedures. Mem. Op. at 14. Given the APA's "generous review" standard, *Clarke*, 479 U.S. at 395, these provisions place ICIRR "at least arguably" within the zone of interests protected by the INA. *Match-E-Be*, 567 U.S. at 224. Here, as at the preliminary injunction stage, Defendants' zone-of-interests challenge fails.

## II.    Count I States a Valid Claim for Relief.

In granting the preliminary injunction, this Court already has held that Plaintiffs are likely to prevail as to Count I because the settled meaning of the statutory term "public charge" is "contrary to DHS's position in the Final Rule." Mem. Op. at 27. Plaintiffs thus already have cleared a far higher bar than the *Twombly*/*Iqbal* "plausibility" standard for a motion to dismiss. *See supra* at 4–5. DHS's motion as to Count I is dead on arrival.

### A.  The Final Rule Exceeds DHS's Statutory Authority Because It Is Contrary to the Plain Meaning of the Text.

#### 1.      This Court Has Already Rejected DHS's Reading of the Statute.

Based on its in-depth analysis of the statutory text and authorities interpreting that text, this Court already has determined that "public charge" has meant primary, long-term reliance on government support for subsistence ever since the term entered the statutory lexicon in 1882. Mem. Op. at 18, 24. As this Court explained, "the Supreme Court told us just over a century ago what 'public charge' meant in the relevant era, and thus what it means today." *Id.* (citing *Gegiow v. Uhl*, 239 U.S. 3 (1915)). In particular, the Court emphasized:

> *Gegiow* teaches that 'public charge' does not, as DHS maintains, encompass persons who receive benefits, whether modest or substantial, due to being temporarily unable to support themselves entirely on their own. Rather, as Cook County and ICIRR maintain, *Gegiow* holds that 'public charge' encompasses only persons who—like 'idiots' or persons with 'a mental or physical defect of a nature to affect their ability to make a living'—would be substantially, if not entirely, dependent on government assistance on a long-term basis.

10

*Id.* at 18–19. Each time Congress reenacted the "public charge" provision—retaining the statutory term without change—Congress reincorporated this same meaning. *Id.* at 27–28.

DHS attempts to undercut this Court's statutory analysis based on arguments and authorities that this Court already has rejected. For example, still working to evade the inevitable effect of *Gegiow*, DHS argues that the case should be limited to its facts—*i.e.*, as disallowing "an approach centered on general labor conditions" rather than "on the alien's own circumstances." Mot. at 21. But this Court already considered and rejected the same argument. *See* Hr'g Tr., Dkt. No. 109 at 29 ("DHS appears to be trying to limit *Gegiow* to its facts as a case dealing only with . . . the labor market[.]"). As the Court explained, *Gegiow*'s holding is broader than DHS asserts: "in deciding whether Mr. Gegiow and his co-plaintiffs were public charges, the Court articulated and applied a more generally applicable principle, which is that . . . what public charge means are those who have a more permanent personal condition that precludes them from supporting themselves." *Id.*

DHS also rehashes its argument that this Court "erred in concluding that Congress approved" the *Gegiow* Court's definition of the term "public charge," citing the 1917 amendment to the INA. Mot. at 21. This, too, the Court declined to accept, explaining that while "there was some change in 1917," it nevertheless "wasn't a change that affects the particular issue that's before us today," and thus was "not a change that helps, that advances the ball for DHS." *See* Hr'g Tr., Dkt. No. 109 at 28; *see also* Mem. Op. at 20–23. And DHS's own authorities make clear that there is no reason to disturb the Court's conclusion.

DHS points once again to a letter from the Secretary of Labor that supported the 1917 amendment. Mot. 21–22 (citing H.R. Doc. No. 64-886 (1916)). But that Letter simply clarifies that "public charge" was intended not just to cover those with a "diseased or disabled condition," but

also to take account of non-health-related circumstances that rendered an individual substantially reliant on long-term governmental support. H.R. Doc. No. 64-886 at 3–4 (1916). This understanding is consistent with judicial interpretations of "public charge" after the 1917 amendment. *See* Mem. Op. at 21–22; Hr'g Tr., Dkt. No. 109 at 30–31. When courts in the years after the amendment explained, for example, that the term "public charge" is "differentiated from the application in *Gegiow*," they described an expansion in the *types* of conditions that could render an applicant a public charge—from primarily "sanitary" conditions to economic ones as well. *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923); *see also United States ex rel. Iorio v. Day*, 34 F.2d 920, 922 (2d Cir. 1929) (explaining that the Act "is certainly now intended to cover cases like *Gegiow*," which deal with economic circumstances). But in all of these cases, as in *Gegiow*, individuals deemed "public charges" were "largely, if not entirely, dependent on government assistance for their sustenance"; these authorities thus do not "help DHS in this case because in order for DHS to win this case, 'public charge' has to ... include people who are temporarily dependent on even a modest amount of public benefits." Hr'g Tr., Dkt No. 109 at 31. DHS does not identify any new authority that would support a different conclusion. Instead, it repeats its prior authorities without identifying a single error in the Court's earlier reasoning. *See* Mot. at 18 (citing the 1929 Cook treatise that this Court previously explained was "wrong," Mem. Op. at 24); Mot. at 18 (citing the remarks of Representative Warner in an 1894 House speech on an unrelated bill, which this Court said "have no value," Mem. Op. at 27).

Finally, DHS suggests that "public charge" cannot mean "a person so impoverished they would be expected to be permanently dependent on public support," because that type of individual was covered by use of the term "pauper" in the original public charge statute. Mot. at 18–19. Thus, DHS says, if "public charge" is to be distinguished from "pauper," it must "encompass individuals

partially or temporarily dependent on public support." *Id.* at 18. True, the term "public charge," "however construed, overlaps other provisions; e.g. paupers, vagrants, and the like." *Day*, 34 F.2d at 922 (2d Cir. 1929). But this overlap does not support DHS's interpretation. To the contrary, the common thread that links these terms remains that "[t]he persons enumerated in short are to be excluded on the ground of *permanent personal objections accompanying them*." *Gegiow*, 239 U.S. at 10 (emphasis added). DHS's interpretation of the term would make "public charge" alone apply to individuals with fleeting or minimal needs. As Justice Holmes wrote in *Gegiow*, traditional canons of statutory interpretation do not allow a conclusion that "the one phrase before us is directed to different considerations than any other of those with which it is associated." *Id.* This Court's prior interpretation stands.

### 2. DHS's New Arguments Do Not Support Any Departure from the Court's Prior Ruling.

DHS offers two new theories for departing from the settled statutory definition this Court already identified. Neither is persuasive.

#### a. The Final Rule's Redefinition of "Public Charge" Is Not "Permissible."

First, relying heavily on a Ninth Circuit order staying two preliminary injunctions of DHS's Final Rule—one of which enjoined the Rule nationwide, *City and County of San Francisco v. United States Citizenship and Immigration Services*, 944 F.3d 773 (9th Cir. 2019)—DHS argues that the Final Rule's construction of "public charge" is at least "permissible" because the term is "capable of a range of meanings." Mot. at 15. The Ninth Circuit's stay order does not support a change of course here, where Plaintiffs' APA violations remain adequately pleaded.[3]

---

[3] Notably, on December 23, 2019, the Seventh Circuit declined to stay this Court's preliminary injunction *after* the Ninth Circuit issued its stay order, and after DHS brought the Ninth Circuit order to the Seventh Circuit's attention. *See* Appellants' Reply in Support of Motion for a Stay Pending Appeal, Docket No. 29, Case No. 19-3169 (7th Cir. filed Dec. 10, 2019) (attaching the Ninth Circuit Stay Order as an exhibit). DHS

In significant ways, the Ninth Circuit's interpretation of "public charge" is consonant with this Court's interpretation. The Ninth Circuit recognized, for example, that as of 1882, Congress "did not consider an alien a 'public charge' if the alien received merely *some* form of public assistance," 944 F.3d at 793 (emphasis added)—*i.e.*, the definition that DHS now advances. The Ninth Circuit also acknowledged that in *Gegiow*, the Supreme Court interpreted the statute to require substantial and lasting dependence on government support, as was true of the other categories designated for exclusion in the statute. *Id.* at 794. But rather than adhere to the Supreme Court's interpretation of the unambiguous statute, the Ninth Circuit pointed to historical changes in how the government supports the needy and a perceived evolution in agency interpretations of "public charge" to conclude: "we are unable to discern one fixed understanding of 'public charge' that has endured since 1882." *Id.* at 796. This conclusion, however, paid insufficient heed to *Gegiow*, which interpreted the statutory language to provide *unambiguously* that "'public charge' encompasses only persons who . . . would be substantially, if not entirely, dependent on government assistance on a long-term basis." Mem. Op. at 19; *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction … if the prior court decision holds that its construction follows from the unambiguous terms of the statute."). The *Gegiow* Court rejected the interpretation proposed by DHS—calling it "an amazing claim of power" for the agency—precisely because that interpretation was insufficiently solicitous of the statutory text. 239 U.S. at 10. Although societal approaches to alleviating poverty may have shifted, the fundamental meaning of the term "public charge" as requiring long-term and primary dependence on government aid has not. *See Wis. Cent.*

---

did not seek a stay of this Court's preliminary injunction in the Supreme Court at that time. On January 28, 2020, DHS filed a Renewed Motion for Stay, which the Seventh Circuit denied on February 10. On February 13, DHS applied to the Supreme Court for a stay of this Court's preliminary injunction, and Plaintiffs filed their opposition to that application today, on February 19.

*Ltd. V. United States*, 138 S. Ct. 2067, 2074 (2018) (explaining that "every statute's *meaning* is fixed at the time of enactment," and although "new *applications* may arise in light of changes in the world," such changes do not give an agency license to rewrite the text because "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences")

DHS attempts to bolster the Ninth Circuit's reasoning by arguing that the word "opinion" in the statute gives the agency "considerable discretion" to define the term "public charge," and that "Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms." Mot. at 15, 26. But DHS's argument and the Ninth Circuit's order conflate discretion to *apply* the term "public charge" with discretion to *define* the term in a way that conflicts with the term's settled meaning. In particular, the fact that the statute does not expressly define "public charge" does not imply that Congress "delegate[d] interpretive authority to the Executive Branch[.]" Mot. at 26. Rather, when Congress wants to give an agency discretion to define a term, it says so explicitly. *See, e.g.*, *Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 760 (7th Cir. 2014) (holding that Congress expressly delegated to the agency the power to define the key term at issue where it included the word "define[]" in the statutory text) (quoting 42 U.S.C. § 1395ww(d)(5)(B)(x)(II)); *see also Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 466 (7th Cir. 2012) (explaining that even though "Congress was silent as to the meaning" of a statutory term, that did not imply that the court "must turn to the [Agency's] definition" because "the lack of a statutory definition [ ] does not render a term ambiguous"). Far from authorizing DHS to define the term as it pleases, Congress consistently reinstated a statutory term that has a longstanding, settled meaning; one which has been subjected to myriad judicial interpretations, including by the Supreme Court. The "public charge" statute thus is patently unlike the statute at

issue in *INS v. Jong Ha Wang*, on which DHS relies. Mot. at 26. There, Congress authorized the agency to define the statutory term "in the first instance." *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981). Although DHS undoubtedly has discretion to determine whether an individual applicant's circumstances indicate likelihood to become a public charge, that discretion is not unbounded. Rather, it is cabined by the settled meaning of the term that Congress has entrusted DHS to apply.

Indeed, if DHS's interpretation of "public charge" were correct, then the statute would raise serious non-delegation concerns. On DHS's reading, "public charge" includes any person who contributes to any "charge" or "liability" on the public fisc—meaning that every person in America who draws on public funds in any way could be deemed a "public charge." So read, the statute would impose virtually no limit on DHS's power to pick and choose among the myriad forms of government goods and services (e.g., public benefits or tax breaks) conferred or allegedly likely to be conferred, for any duration, and in any amount, and would provide no intelligible principle to cabin the agency's discretion. *See Gundy v. United States*, 139 S. Ct. 2116, 2123–24 (2019). As *Gegiow* makes clear, the statutory text cannot sustain such an "amazing claim of power." *Gegiow*, 239 U.S. at 10.

### b. Broad Policy Considerations Cannot Redefine the Term "Public Charge."

Second, DHS again argues that the Final Rule's definition of "public charge" is valid because it is broadly consistent with U.S. immigration policy as established in the 1996 amendments to the INA. But as this Court explained, general observations about broad statutory objectives do not speak to the precise definition at issue in this case. *See* Mem. Op. at 16–17 (rejecting arguments based on the goal of "self-sufficiency" because "those provisions express only general policy goals without specifying what it means for non-citizens to be '[s]elf-sufficient'

16

or to 'not depend on public resources to meet their needs'"). Moreover, DHS already has conceded on the record that the 1996 statute "didn't mark a significant departure in terms of what 'public charge' has meant." Hr'g Tr., Dkt. No. 109 at 18–19; *see also, id*. at 20–21 (conceding that the 1996 Act did not "change[] fundamentally the underlying term or the meaning of 'public charge'"). And this concession was correct: nothing in the 1996 statute supports DHS's reading of "public charge."

In its Motion to Dismiss, DHS points to two new unrelated statutory provisions as supposedly shedding light on the meaning of "public charge," but neither helps DHS. First, DHS cites 8 U.S.C § 1182(s), which instructs consular officers not to consider the past receipt benefits on the part of certain abuse victims. Mot. at 15. According to DHS, this provision demonstrates that consideration of receipt of *any* benefits is generally permissible as part of the public charge determination. *Id.* But it does not follow that DHS can consider immigrants' *past* and *future* use of all forms of cash *and* non-cash public benefits simply because Congress chose to protect abuse victims from public charge determinations based upon their *past* use of benefits. In other words, the exception here cannot establish the rule—Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001). Second, as noted in the Final Rule, abuse victims are exempted from the public charge determination altogether. 84 Fed. Reg. at 41,335. DHS's argument has no limit; under Defendants' theory, they could argue that because DHS does not count public benefits use against U.S. citizens (another group exempt from the public charge, *id.* at 41,309), *all* public benefits can be counted against those who are subject to the determination.

17

Next, DHS points to the statutory requirement that some categories of aliens obtain affidavits of support, again attempting to stretch a specific statutory provision to a general lesson about the meaning of "public charge." DHS argues that this provision indicates that "the mere *possibility* that an alien might obtain unreimbursed, means-tested public benefits in the future [i]s sufficient to render that alien inadmissible on public charge ground[s]." Mot. at 17. But as the Final Rule acknowledges, the affidavit-of-support provision applies only in certain circumstances. *See* 84 Fed. Reg. at 41,448 ("Not all aliens are required to submit the affidavit of support."). As the Final Rule explains, the affidavit-of-support provision is limited primarily to one type of applicant: a person who has a family sponsor. *See id.* ("Congress mandated the presence of an affidavit of support in certain cases as a separate requirement, but did not establish submission of the affidavit of support as a mandatory factor in all public charge inadmissibility determinations."); *see also*, 8 U.S.C. § 1182(a)(4)(B)(ii) (providing that the agency "shall" consider five factors, and that it "*may* also consider any affidavit of support") (emphasis added). If anything, the affidavit-of-support provision suggests Congress knew how to impose this heightened requirement on all immigrants if it wanted to, yet intentionally omitted such a requirement from the general "public charge" provision. *See Moral-Salazar v. Holder*, 708 F.3d 957, 961 (7th Cir. 2013) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted) (quoting *Kucana v. Holder*, 558 U.S. 233, 248–49 (2010)).

The Final Rule also runs directly counter to other aspects of the affidavit-of-support provision, further illustrating that the Rule is contrary to the INA itself, including the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). In general, the affidavit-of-

18

support provision represents Congress's desire to balance the goal of family re-unification against concern for the public fisc. Congress anticipated immigrants' future benefit use in certain cases and addressed its concerns by tightening who can serve as a sponsor and making a sponsor's contractual obligation enforceable only after an immigrant has been admitted. 8 U.S.C. §§ 1182(a)(4)(C), 1182(a)(4)(D), 1183(a)(2)-(3). But now, DHS has dismantled that Congressional solution by instituting a bar against immigrants *at admission* who are considered likely at any time in the future to receive even modest benefits. The Final Rule's test ignores Congress's balanced approach in favor of broad inadmissibility. Indeed, the Final Rule's new definition of "public charge" would apply to *any* applicant, would be applied *before* their admission, and would consider any benefits they *might* receive during their life, including time periods well beyond the period when Congress decided affidavits of support should be enforceable. 84 Fed. Reg. at 41,397. The Final Rule's test thus directly contravenes the affidavit's purpose of allowing admissibility on the promise of repayment. And, more specifically, Congress excluded HUD-administered housing benefits from the repayment obligation in the affidavit-of-support, but the Final Rule includes them. *See* 8 C.F.R. § 213a.1; 84 Fed. Reg. at 41,501. Defendants' arguments about the affidavit of support demonstrate how the Final Rule has undone Congress's careful balancing in the INA and IIRIRA.

### B. The Final Rule Also Fails Under *Chevron* Step Two.

Even if the Court were now to reverse course and hold that the statute is ambiguous, the Final Rule still would not be entitled to deference because it is an unreasonable interpretation of the statute. Under *Chevron*'s step two, courts must determine whether "the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843. Put another way, the court "asks whether [the agency's] interpretation of the statute is reasonable." *Our Country*

*Home Enters., Inc. v. Comm'r of Internal Revenue*, 855 F.3d 773, 787 (7th Cir. 2017). To do so, the court "determines whether the regulation harmonizes with the language, origins, and purpose of the statute," and unlike step one, it may consider, among other things, legislative history. *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 983 (7th Cir. 1998).

For many of the same reasons highlighted in the *Chevron* step one analysis, the agency's interpretation cannot be considered a permissible construction of the statute. *Cf. Whitman*, 531 U.S. at 481 (holding a policy unlawful even though the statute was ambiguous because "the agency's interpretation goes beyond the limits of what is ambiguous and contradicts what in our view is quite clear"). Moreover, independent reasons exist to find that DHS's construction of "public charge" is unreasonable. Most notably, while the statute mandates that DHS "shall" consider "at a minimum" five characteristics—age, health, family status, assets, and education/skills—to determine whether an individual is likely to become a public charge, 8 U.S.C. § 1182(a)(4)(A), (B), the Rule does not call for a totality-of-the-circumstances test (despite its insistence otherwise). Instead, the Rule creates a strict test: use of public benefits. In DHS's words, the Rule "redefines the term 'public charge' to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)." 84 Fed. Reg. at 41,295; *see* Mot. at 4 (calling this "requirement" the "12/36 standard"). Put differently, "if a DHS officer believes that an individual is likely to have benefits for 12 months out of a 36-month period, the inquiry ends there, and the individual is *automatically* considered a public charge." *New York v.*

*U.S. Dep't of Homeland Sec.*, No. 19 Civ. 777 (GBD), 2019 WL 5100372, at *8 (S.D.N.Y. Oct. 11, 2019) ("[R]eceipt of such benefits is not *one* of the factors considered; it is *the* factor.").[4]

## III.    Count II States a Valid Claim for Relief.

Plaintiffs plausibly allege in Count II that the Final Rule must be stricken under the APA as not in accordance with law. 5 U.S.C. § 706(2)(A). Compl. ¶¶ 148-155. "[W]here an agency's decision does not comport with governing statutes or regulations, that decision is 'not in accordance with law' and must be set aside." *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018). The Final Rule is contrary to the INA, Rehabilitation Act of 1973, Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), IIRIRA, and the Supplemental Nutrition Aid Program (SNAP) statute. The conflicts with the INA and IIRIRA are addressed *supra*, the remaining conflicts are addressed below.

### A.  The Final Rule Violates Section 504 of the Rehabilitation Act.

Plaintiffs have plausibly alleged that the Final Rule violates Section 504 of the Rehabilitation Act, as the Final Rule has the "purpose or effect" of excluding immigrants, or preventing them from adjusting status, based upon their disability. 29 U.S.C. § 794(a); *see also* 28 C.F.R. § 41.51(b)(3). Specifically, the Rule considers health, disability, lack of private health insurance, and the receipt of Medicaid as negative factors *per se*. 84 Fed. Reg. at 41,368, 41,406, 41,379. Further, it considers the lack of a medical condition as one of just a few positive factors.

---

[4] Additionally, to the extent it should be considered at all, legislative history makes clear Congress has repeatedly rejected DHS's reading of "public charge." *See* Immigration Control and Financial Responsibility Act ("ICFRA"), H.R. Rep. 104-469, pt. 1, at 266–67 (1996) (rejecting definition of "public charge" that would have encompassed those who received almost any public benefits for more than one year, including non-cash benefits); 142 Cong. Rec. S11872 (daily ed. Sept. 30, 1996) (statement of Sen. Kyl) (considering and rejecting a proposed definition of "public charge" that would have covered those who received "Federal public benefits for an aggregate of 12 months over a period of 7 years"); S. Rep. No. 113-40, at 42 (2013) (rejecting attempt to broaden the definition of "public charge" to exclude immigrants who were likely to qualify "even for non-cash employment supports").

*Id.* at 41,428. In other words, "but for their disability," many persons with disabilities could satisfy the public charge test. *Id*. at 41,502–04; *see also, e.g., H.P. ex rel. W.P. v. Naperville Cmty. Unit Sch. Dist. #203,* 910 F.3d 957, 960–61 (7th Cir. 2018) (explaining that the Rehabilitation Act requires proof of causation, *i.e.* that "but for" a disability, a plaintiff "would have been able to access the services or benefits desired").

DHS attempts to minimize this violation of law by asserting that the INA authorizes DHS to ask about health. As such, DHS characterizes the Rule's health inquiry as just one factor in an unpredictable kaleidoscope of considerations that could lead to a range of outcomes for people with disabilities. Mot. at 30. But under its newly defined health inquiry, the Final Rule violates Section 504 by expressly weighting a person's disability as a negative factor. *See* 84 Fed. Reg. at 41500, 41502–04 (inquiring if a person has a medical condition that "will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status"). In doing so, the Final Rule turns the health factor into an explicit disability inquiry; the presence or absence of a disability is the dispositive test for the "health" factor. *Compare* 84 Fed. Reg. at 41504, quoted *supra*, *with* 42 U.S.C. § 12102(1)(A) (defining a disability under the ADA as "a physical or mental impairment that substantially limits one or more major life activities of such individual"). Moreover, the Final Rule considers a lack of private health insurance and use of Medicaid—which people with disabilities rely upon when private health insurance fails to meet their needs—as additional, heavily weighted negative factors. *See* 84 Fed. Reg. at 41,504. Thus, far outside the confines of INA's health consideration, the Final Rule renders a person's disability the but-for cause of an inadmissibility determination in direct contravention of Section 504 of the Rehabilitation Act. *See Franco-Gonzalez v. Holder*, No. 10-CV-02211, 2013 WL 3674492, at *4 (C.D. Cal. Apr. 23, 2013) (finding a prima facie violation of Section 504 for

denial of appointment of representatives for disabled immigrants in detention or removal proceedings who were "unable to meaningfully access the benefit offered…because of their disability"); *see also Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002) (finding a section 504 violation where "but for their disability," plaintiffs would have received Medicaid).

DHS also argues that the INA's requirement that "health" be considered for public charge purposes nullifies Section 504's anti-discrimination mandate. Mot. at 30. But the INA does not define the health factor in a way that expressly implicates disability. When Section 504 was first enacted in 1973 the INA's public charge provision did not yet include a health factor. *See* Immigration and Nationality Act of 1952, 87 Cong. Ch. 477, section 212(a)(15), 66 Stat. 163, 183 (1952). And even when the health factor was added to the public charge provision in 1996, no conflict existed between Section 504 and the public charge provision. *Franco-Gonzalez*, 2013 WL 3674492, at *4. Rather, DHS is responsible for creating this conflict by promulgating a Final Rule that equates "health" with "disability." When a federal regulation like the Final Rule sits in conflict with an act of Congress, including an unrelated federal statute such as Section 504, the regulation is invalid. *See Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 736 (2014) (invalidating Patient Protection and Affordable Care Act regulations that conflicted with the Religious Freedom Restoration Act). Here, the Final Rule requires officials to target and exclude individuals based upon their disability. It thus runs afoul of the Rehabilitation Act and is contrary to law.

### B. The Final Rule Contravenes PRWORA.

"It is hornbook law that an agency cannot grant itself power via regulation that conflicts with plain statutory text." *Doe, 1 v. Fed. Election Comm'n*, 920 F.3d 866, 874 (D.C. Cir. 2019) (Henderson, J. concurring in part, dissenting in part). Here, the Final Rule does exactly that. In promulgating the Final Rule, DHS relies heavily on the self-sufficiency principle articulated in

PRWORA. *See e.g.*, Mot. at 3; 17–18; 84 Fed. Reg. at 41,307, 41,312. But the Final Rule contradicts the statute's substantive provisions. Indeed, under the Final Rule, DHS creates a paradox: it grants itself the power to exclude immigrants as not "self-sufficient" when they receive benefits that Congress, by statute, permitted immigrants to lawfully receive, allegedly in furtherance of that very "self-sufficiency" policy. 8 U.S.C. § 1612(b)(1); Compl. ¶ 151.

This paradox is not in accordance with the law. In enacting PRWORA, Congress set out a detailed scheme governing immigrants' self-sufficiency. In doing so, Congress amended public benefits rules to allow some immigrants to use public benefits at any time, and restrict others from using benefits until they have spent five years as lawful permanent residents. 8 U.S.C. §§ 1601(3)-(5), 1611(b), 1613, 1621(b). In fact, Congress stated explicitly that these eligibility standards are "the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy." 8 U.S.C. § 1601(7). The Final Rule thus "threatens to undo rather than honor legislative intentions" by authorizing DHS to bar applicants who receive (or even who are likely to receive) the very benefits that Congress found consistent with self-sufficiency. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018).

Defendants counter that use of public benefits is merely one circumstance to be considered "as part of the totality-of-the-circumstances analysis required by 8 U.S.C. § 1182(a)(4)(B)." Mot. at 31. But Defendants ignore that: (1) the Final Rule *redefines* public charge explicitly in terms of public benefits use (a public charge is "an alien who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period"); and (2) the "totality of the circumstances" factors are now calibrated to determine current or likely future benefits use. 84 Fed. Reg. at 41,501–04. Absent any statutory provision authorizing DHS to penalize benefits use

24

approved under PRWORA, the Final Rule contradicts PRWORA's self-sufficiency provision and remains not in accordance with the law.

Second, DHS disavows any conflict with PRWORA because the Final Rule does not alter the statute's eligibility provisions. Instead, according to DHS, an immigrant "may choose, for a variety of reasons related or unrelated to the Rule" to forgo the benefits they are entitled to receive. Mot. at 31. But whether immigrants actually make this Solomon's choice and "choose" to use their lawful benefits does not end the inquiry; *just being eligible under PRWORA* puts them at risk of DHS determining they are "more likely than not" to receive public benefits for 12 of 36 months "at any time in the future," and thus being judged inadmissible as a public charge. Mot. at 31; 84 Fed. Reg. at 41,502–04. Given this plain contradiction between PRWORA and the Final Rule, Plaintiffs have adequately pleaded that the Rule is not in accordance with the law and must be vacated. Compl. ¶¶ 61–65, 151; *see also Am. Airlines, Inc. v. Transp. Sec. Admin.*, 665 F.3d 170, 176 (D.C. Cir. 2011) (explaining that "a regulation contrary to a statute is void") (internal quotation marks omitted) (citing *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009)).

### C. The Final Rule Violates the SNAP Statute.

The SNAP statute prohibits DHS from considering SNAP benefits as income or resources for "*any purpose* under any Federal . . . laws . . ." 7 U.S.C. § 2017(b) (emphasis added). Because the Final Rule negatively considers use of SNAP benefits, it violates this statutory provision.

DHS asserts that it may designate the receipt of SNAP benefits as a heavily weighted negative factor under § 2017(b) because the Rule does not consider the "value" of SNAP benefits as "income or resources," only the fact of receipt of such benefits. Mot. at 32–33. But DHS cannot untether the monetary value of SNAP from the fact of receipt. First, SNAP has a readily definable minimum monetary value due to the fixed minimum allotment for recipients. 7 C.F.R.

25

§ 273.10(e)(2)(ii)(C). Second, Defendants' value versus receipt hairsplitting is also contradicted by DHS's stated motivation for the Final Rule: to "[revise] its interpretation of 'public charge' to incorporate consideration of such [non-cash] benefits (like SNAP and Medicaid)" because "these [SNAP] benefits account for significant Federal expenditure on low-income individuals." 84 Fed. Reg. at 41,295, 41,375. And in any event, the Final Rule explicitly considers the value of SNAP benefits by deeming the receipt of SNAP for more than 12 months in the aggregate within any 36-month period a heavily weighted negative factor "sufficient to render a person a public charge." *See* 84 Fed. Reg. at 41,349, 41,504.

Courts have rejected similar efforts. In *Gooderham v. Adult & Family Services Div.,* 667 P.2d 551 (Ore. App. 1983), the State of Oregon proposed rules eliminating the special diet allowance program except for diets deemed more costly but medically necessary. *Id.* at 551–53. To determine which diets required increased costs, the state developed a formula that considered the average food stamp allotment of both recipients and applicants. *Id.* at 551–53, 557. In striking down the rule for violating § 2017(b), the court relied in part on a 1977 House committee report from when § 2017(b) was enacted, which stated: "The bill makes crystal clear current law preventing state or local governments from reducing benefits provided [to] food stamp recipients under other laws (Federal, state, or local, but especially general assistance) because of their *receipt* of food stamps." *Id.* at 557 (quoting H.R. Rep. No. 95-464, at 247 (1977) (emphasis added) (citation omitted). *Gooderham* therefore demonstrates that polices such as the Final Rule that consider the value, receipt, and even future eligibility for SNAP benefits violate Section 2017(b).

DHS also claims that its treatment of SNAP benefits aligns with the statute because the *fact of receipt* of SNAP benefits is considered in other federal programs. Mot. at 32–33; *see also* 47 C.F.R. § 54.409 (using receipt of SNAP benefits as a proxy for qualification as a "low-income"

26

household). However, in those contexts, SNAP receipt is used to expedite eligibility for other programs that support SNAP recipients consistent with the goals of SNAP—to promote general welfare, safeguard public health, and increase the purchasing power of low-income families—not to support a characterization of the recipient that has significant negative legal consequences. 7 U.S.C. § 2011; *see also, e.g.*, 7 C.F.R. § 245.6(b)(1) (children who are members of a household receiving SNAP are automatically eligible for free and reduced priced school lunches).

Thus, Plaintiffs have more than adequately alleged that the Final Rule is not in accordance with the law and contrary to Section 504, the SNAP Statute, PWRORA, INA, and IIRIRA.

## IV. Count III States a Valid Claim for Relief.

Separate and apart from Plaintiffs' *Chevron* claim, Plaintiffs have sufficiently alleged in Count III that the Rule is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). *See* Compl. ¶¶ 156–169. According to DHS, Plaintiffs fail to state a plausible claim because the Rule simply carries out Congress's alleged interest in ensuring that immigrants "not depend on public resources to meet their needs" and instead "rely on their own capabilities." Mot. at 34–35. But Defendants underestimate the APA's scope of review. While an arbitrary and capricious analysis provides for a "narrow review," it nonetheless requires an agency to "engage in reasoned decisionmaking" and "articulate a satisfactory explanation for its action." *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 53 (1983). An agency action qualifies as arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 43. With this framework in mind, Plaintiffs' position is simple and adequately pleaded: in promulgating the Rule, Defendants failed to address, justify, or meaningfully evaluate the significant harms identified by commenters, as well as harms identified in the text of the Final Rule itself. Compl. ¶¶ 159–161. Specifically, DHS concedes that the Rule will cause members of mixed-status households, including U.S. citizens, to disenroll from or otherwise decline to enroll in public benefits. 84 Fed. Reg. at 41,300, 41,485. Nevertheless, DHS declined to address the harms that it acknowledges will result from this chilling effect, stating:

> DHS believes that it would be unwarranted for U.S. citizens and aliens exempt from public charge inadmissibility to disenroll from a public benefit program or forgo enrollment in response to this rule when such individuals are not subject to this rule. DHS will not alter this rule to account for such unwarranted choices.

*Id*. at 41,313. In other words, instead of meaningfully grappling with the harms that it predicts will occur, DHS maintains that it "found that other policy interests outweighed the interests in avoiding potential disenrollment impacts of the Rule." Mot. at 36.

But "[s]tating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loans Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Indeed, the law *requires* agencies to "adequately analyze … the consequences" of its actions, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017), and provide more than "conclusory statements" to prove it "consider[ed] [the relevant] priorities." *Getty*, 805 F.2d at 1057; *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1024 (7th Cir. 2018) (emphasizing that the "APA requires meaningful review") (citing *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)).

Here, DHS points to no such analysis or real "weighing of the costs and benefits." Mot. at 36. Instead, DHS indicates that any costs resulting from disenrollment remain "unclear" or "unquantifiable." *See, e.g.*, *id*. (citing 84 Fed. Reg. at 41,463–41,477) (explaining, for example, that while "DHS has provided an estimate of the number of individuals that may choose to disenroll

28

. . . it is unclear how long such individuals would remain disenrolled"). But the harms of widespread disenrollment are not "unclear"; Cook County identified a $30 million cost stemming from Medicaid disenrollment. Compl. ¶ 97. The Rule itself delineates the exact harm that will occur. *See, e.g.*, 84 Fed. Reg. at 41,469–70 (noting that "hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households' will suffer financial harm from the Rule's implementation); *id.* at 41,469 (recognizing that the Rule will cause "[s]tate and local governments to … incur costs" stemming from "changes in behavior caused by" the Rule); *id.* at 41,300–01 ("DHS estimates that the total reduction in transfer payments from Federal and State governments will be approximately $2.47 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits."); *see also id.* at 41,313 (recognizing the "potential nexus between public benefit enrollment reduction and food insecurity, housing scarcity, public health and vaccinations, education health-based services, reimbursement to health providers, and increased costs to states and localities"). DHS failed to adequately consider these significant costs in pursuing its agenda. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (an agency must "pay[] attention to the advantages and disadvantages of [its] decisions").

In short, Defendants cannot obtain dismissal of Plaintiffs' claim based upon feigned ignorance of harms they concede will occur. Rather, the law requires that DHS consider, and grapple with, these repercussions. *See, e.g.*, *Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017) (finding agency determination was deficient due to a "complete failure to reasonably reflect upon the information contained in the record and grapple with contrary evidence—disregarding entirely the need for reasoned decisionmaking"); *Michigan,* 135 S. Ct. at 2707 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily

29

requires paying attention to the advantages *and* disadvantages of agency decisions.") (emphasis in original); *see also St. James Hosp. v. Heckler*, 760 F.2d 1460, 1470 (7th Cir. 1985) ("The opportunity under the APA to comment on proposed rules is 'meaningless unless the agency responds to significant points raised by the public.'") (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)).

In this same fashion, DHS failed to provide the requisite "detailed justification" for its decision to redefine the term public charge. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); 84 Fed. Reg. at 41,295 ("This rule redefines the term 'public charge'"). While an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one" when it changes course, it nonetheless must "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 503. Indeed, this requirement is heightened where a "new policy rests upon factual findings that contradict those which underlay its prior policy," as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

Here, DHS's prior policy—interpreting the term "public charge" to refer only to those primarily and permanently dependent upon the government for long-term support—rested upon factual findings that contradict the purpose of the new policy. In its 1999 field guidance, DHS explicitly rejected the notion that an immigrant who used non-cash benefits would not be capable of supporting him or herself:

> [I]t is extremely unlikely that an individual or family could subsist on a *combination* of non-cash support benefits or services alone. . . . HHS is unable to conceive of a situation where an individual, other than someone who permanently resides in a long-term care institution, could support himself or his family solely on non-cash benefits so as to be primarily dependent on the government.

64 Fed. Reg. 28,676, 28,678 (May 26, 1999). Yet as discussed above, DHS fails to provide the requisite "detailed justification" for departing from these previous findings. *Fox*, 556 U.S. at 515. Rather, the Rule is replete with examples of arbitrary cut-offs that directly oppose the Rule's purported purpose of self-sufficiency. The Rule's 12/36-month threshold, for example, instructs that a person who receives about 50 cents per day in food assistance—a standard SNAP benefit amount for recipients at the higher end of income eligibility—qualifies as a public charge. Indeed, a person receiving that level of benefit could receive less than 1 percent of their annual income from the federal government, yet still be deemed a public charge under the Final Rule.[5] *See also* 84 Fed. Reg. at 41,360–61 ("In other cases, DHS may find an alien inadmissible under the standard, even though the alien who exceeds the duration threshold may receive only hundreds of dollars, or less, in public benefits annually."). Absent any sort of justification for this contradictory approach, much less a detailed one, DHS's motion to dismiss Count III must fail.

Plaintiffs have more than sufficiently alleged that the Final Rule is arbitrary and capricious. While Defendants disagree with that conclusion, that disagreement is not a basis for dismissal. Rather, that disagreement will be resolved at summary judgment or trial.

## V.     ICIRR Has Stated a Valid Claim for Violation of the Equal Protection Clause.

ICIRR has properly stated a claim for violation of the equal protection clause, sufficiently alleging that that the defendants "were motivated by a discriminatory purpose" in promulgating

---

[5] The minimum SNAP monthly allotment for a household of 1–2 people is $16/month for fiscal year 2020, or approximately 52-53 cents per day. USDA, SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP) FISCAL YEAR (FY) 2020 MINIMUM ALLOTMENTS (Oct. 1, 2019), https://fns-prod.azureedge.net/sites/default/files/media/file/FY20-Minimum-Allotments.pdf. In Illinois, a household on the high end of the income eligibility scale—for example, a senior or a person with a disability making $2,082 per month or $24,984 annually—would receive just $16 per month (or $192 annually) in SNAP benefits. ILL. DEPT. OF HUMAN SERV., SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM – SNAP (Oct. 1, 2019), https://www.dhs.state.il.us/page.aspx?item=30357. This equates to about .7% of their annual income.

the Final Rule that DHS knew would have "a discriminatory effect." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). To show a discriminatory purpose, a plaintiff must allege that a defendant possessed "more than simple knowledge that a particular outcome is the likely consequence of an action" and "at least in part" selected a "particular course of action because of … its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (internal citations and quotation marks omitted). Although courts generally invalidate agency or legislative action only if it is "arbitrar[y] or irrational[]"—*i.e.*, rational basis review—once a plaintiff shows that "a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263–66 (explaining that courts generally give legislators and administrators wide latitude to "balanc[e] numerous competing considerations," but "racial discrimination is not just another competing consideration").

ICIRR easily meets this showing. It alleges that the Final Rule was motivated by a discriminatory purpose: to disparately harm, deny a change in status to, and exclude immigrants of color and Latinos. Compl. ¶¶ 171–187. ICIRR has alleged that Defendants and the Administration sought inaccurately to paint immigrants of color as a population disproportionately reliant on public benefits, and not included within the class of white European immigrants welcomed in the United States. *Id*. ¶¶ 173–180. Further, ICIRR has alleged that the Defendants knew that the Final Rule would overwhelmingly harm non-white immigrants. *Id*. ¶¶ 173, 182, 184. ICIRR also has alleged that the Final Rule was among a long list of policies by the Administration and Defendants also aimed at discriminating against and excluding from this country immigrants of color and Latino immigrants. *Id*. ¶ 181. Finally, ICIRR has plausibly pleaded that the promulgation of the Rule *already* has had the discriminatory effect sought by the Defendants and

that harm will only continue. *Id.* ¶¶ 133–36. These allegations more than adequately support ICIRR's claim that Defendants acted with discriminatory purpose in advancing the Final Rule, as "the dots [are] connected" between the protected classes harmed and Defendants' motivation to deem them public charges. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010). Further, ICIRR need not prove that every action or motive by the Defendants was discriminatory. Government action that is motivated, *even in part*, by the type of discriminatory intent that ICIRR has alleged violates the Equal Protection Clause. *Arlington Heights*, 429 U.S. at 265.

In a failed attempt to secure rational basis review by claiming that ICIRR alleges only disparate impact, Defendants assert that ICIRR's recognition that the Final Rule is facially neutral means that ICIRR has failed to make a showing of discriminatory intent. Mot. at 40. Not so. ICIRR alleged that Defendants presented a facially neutral Rule, but that the Defendants' true agenda is to exclude immigrants of color from the United States. Compl. ¶¶ 182, 183. That is sufficient to state a claim, regardless of the facial neutrality of the Rule. Indeed, "[t]ime and again" this Court has held that a facially neutral law "may run afoul of the Equal Protection Clause if [it is] enacted or enforced with a discriminatory intent." *Hernandez v. Woodard*, 714 F. Supp. 963, 970 (N.D. Ill. 1989). Because ICIRR has pleaded facts alleging that DHS acted with discriminatory purpose in promulgating this rule, heightened scrutiny applies. *Miller v. Johnson,* 515 U.S. 900, 913 (1995) (holding that a statute is "subject to strict scrutiny under the Equal Protection Clause not just when [it] contain[s] express racial classification, but also when, though race neutral on [its face, it was] motivated by a racial purpose or object"); *Arlington Heights*, 429 U.S. at 265–66 (explaining that a "sensitive inquiry" into  potential animus is required even when a statute is neutral on its face).

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018), does not help Defendants here. Mot. at 41. The Court applied a deferential standard of review in that case because the Executive Order's stated

purpose was to address national security concerns, and it involved the entry of noncitizens from outside the United States, an area in which courts have granted deference to the Executive Branch. *Id*. at 2419–20; *but see Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) (explaining that "it is Congress that makes laws" and "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue"). Here, DHS's Final Rule solely impacts immigrants who have already entered the United States, and DHS's stated purpose for the rule is not national security, but to promote self-sufficiency and conserve the public fisc. Mot. at 36. Indeed, DHS has never invoked a national security rationale for the Final Rule—either in the text of the Final Rule itself or in this litigation. Nor (even rationally) could it, given that every individual who is subject to DHS's public charge rule has already entered the United States.

To the extent DHS suggests that *all* equal protection challenges to agency or legislative action relating to immigration are subject to rational basis review, that is simply not correct. *See, e.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689–90 (2017) (applying *Arlington Heights* heightened scrutiny to gender-based discrimination in the immigration context); *New York v. U.S. Dep't. of Commerce,* 351 F. Supp. 3d 502, 666–67 (S.D.N.Y. 2019) (applying heightened scrutiny to the Department of Commerce's decision to add a citizenship question to the Census); *Ramos v. Nielsen,* 321 F. Supp. 3d 1083, 1125 (N.D. Cal. 2018) (applying heightened scrutiny to DHS's decision to end Temporary Protected Status for El Salvador, Nicaragua, Haiti, and Sudan, where the nine plaintiffs from those countries lived and worked in the United States); *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) (applying heightened scrutiny to DHS's decision to end Temporary Protected Status for Haiti, where plaintiffs were 11 individuals from Haiti living in the United States and one organization that provided wrap-around social services for Haitian families).

DHS also acknowledges that contemporary statements are relevant to a determination of discriminatory intent, Mot. at 42, but nonetheless claims that the cited discriminatory statements do not relate to the Final Rule and are not for the most part from DHS officials. *Id.* at 42–43. But ICIRR in fact alleges discriminatory statements about the Final Rule from DHS officials and others involved in advancing it. For example, in the roll-out of the Final Rule *itself*, Defendant and USCIS Secretary Cuccinelli said that the Emma Lazarus quote on the Statue of Liberty, welcoming immigrants to the United States, was only meant to refer to "people coming from Europe." Compl. ¶ 174. Moreover, shortly after the complaint was filed, the Southern Poverty Law Center published a summary of some 900 messages from White House Senior Advisor and reported architect of the Final Rule, Stephen Miller. Mr. Miller's messages repeatedly cited to materials from websites espousing white nationalist and anti-immigrant viewpoints, including the portrayal of non-white immigrants as violent or threatening.[6] In addition to reflecting or promoting white nationalist sentiments, other emails produced in response to a Freedom of Information Act request by Politico show Mr. Miller pressuring former USCIS director Francis Cissna to issue the public charge rule as soon as possible, demonstrating that Mr. Miller himself was driving the Final Rule.[7] This evidence further cements ICIRR's allegations that the Final Rule was designed with a discriminatory purpose. In any event, even statements that are not "directly connected" to a specific policy in question can be evidence that official action was motivated by unlawful discriminatory purposes. *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018).

---

[6] Michael Edison Hayden, *Emails Confirm Miller's Twin Obsessions: Immigrants and Crime*, Southern Poverty Law Center (Nov. 25, 2019), https://www.splcenter.org/hatewatch/2019/11/25/emails-confirm-millers-twin-obsessions-immigrants-and-crime.; *see also* Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.
[7] Ted Hesson, *Emails Show Stephen Miller Pressed Hard to Limit Green Cards*, Politico (August 2, 2019, 4:19 PM), https://www.politico.com/story/2019/08/02/stephen-miller-green-card-immigration-1630406.

In addition, under *Arlington Heights,* a plaintiff can allege animus not only through the "contemporary statements by members of the decisionmaking body," but also more broadly by "the historical background of the decision" and "the specific sequence of events leading up to the challenged decision." *Arlington Heights*, 429 U.S. at 267–68. ICIRR also has met that burden by plausibly alleging that the discriminatory statements by President Trump, then-Acting Immigration and Customs Enforcement Director Mark Morgan, and White House senior advisor Stephen Miller were part of a broad anti-immigrant agenda that led to the creation of the Rule and directly influenced the Defendants. Compl. ¶¶ 173, 175–81. *See Batalla Vidal*, 291 F. Supp. 3d at 277 (holding that "racially charged" statements by President Trump, where he was alleged to have exerted influence over the agency decision at issue, were sufficient to show discriminatory intent to survive a motion to dismiss); *cf. Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter."). Essentially, the discriminatory motives of senior officials who influenced the creation of the Final Rule "cannot be laundered" through DHS officials and their process. *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018). So long as ICIRR alleges, as it has done here, that racial animus is part of the causal chain in Defendants' decision, Defendants may not "cure[]" that action of "discriminatory taint" by presenting an "unprejudiced decision-maker" when the decisionmaker has been "manipulated or controlled by another who is motivated by discriminatory intent." *Id.* at 325 (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 413, (2011)).[8]

---

[8] ICIRR does not concede, however, that the decisionmakers here lacked racial animus.

DHS's reliance on *Contreras v. City of Chicago* is misplaced. 119 F.3d 1286 (7th Cir. 1997). In *Contreras*, the evidence was unclear as to whether the city was even aware of the discriminatory animus of two community members against a restaurant's Mexican employees when it took its own action against the restaurant's white owner, so it could not have been vulnerable to their influence. *Id.* at 1293. To the contrary here, Defendants' actions represent a broad and very public agenda to reduce the number of immigrants of color in the United States Compl. ¶ 173.

Finally, DHS's stated rationale for the rule, promoting self-sufficiency, is an effort to cloak discriminatory animus against non-white immigrants. Compl. ¶ 183. But even if self-sufficiency were part of the reason for the Rule, the Rule *still* would be unlawful because a discriminatory purpose is in the mix. A plaintiff need not show that the discriminatory purpose is the "sole[]" or even a "primary" motive for the action, just that it was "a motivating factor." *Arlington Heights*, 429 U.S. at 265–66. An agency may consider a broad array of competing considerations when reaching a decision—but "racial discrimination is not just another competing consideration." *Id.* at 265.

## CONCLUSION

DHS has exploited the term "public charge" to issue the Final Rule to bar a new category of immigrants. Compl. ¶ 56. The Final Rule's new definition of public charge converts a narrow statutory bar to admission into a broad tool to exclude and deter thousands of immigrants from entry and/or obtaining permanent status, and from applying for the benefits Congress authorized them to receive. Defendants' actions harm the Plaintiffs and violate the APA and the Constitution.

For all these reasons, the motion to dismiss should be denied. The case should proceed to litigation on the merits of the Plaintiffs' claims.

Dated:  February 19, 2020

Respectfully submitted,

KIMBERLY M. FOXX
*Cook County Illinois State's Attorney*

COOK COUNTY, ILLINOIS

By /s/ Lauren E. Miller
    Jessica M. Scheller, Assistant State's
    Attorney Chief; Advice, Business &
    Complex Litigation Division
    Lauren E. Miller, Special Assistant
    State's Attorney
    Civil Actions Bureau
    500 W. Richard J. Daley Center Place,
    Suite 500
    Chicago, IL 60602
    Phone : (312) 603-6934
    Phone: (312) 603-4320
    Jessica.Scheller@cookcountyil.gov
    Lauren.Miller@cookcountyil.gov

    */s/* David E. Morrison
    David E. Morrison
    Steven A. Levy
    A. Colin Wexler
    Takayuki Ono
    Juan C. Arguello
    Goldberg Kohn Ltd.
    Special Assistant State's Attorneys
    55 E. Monroe St., Suite 3300
    Chicago, IL 60603
    Phone: (312) 201-4000
    Fax: (312) 332-2196
    david.morrison@goldbergkohn.com
    steven.levy@goldbergkohn.com
    colin.wexler@goldbergkohn.com
    takayuki.ono@goldbergkohn.com
    juan.arguello@goldbergkohn.com

*Counsel for Cook County, Illinois*

ILLINOIS COALITION FOR IMMIGRANT
AND REFUGEE RIGHTS, INC.

By */s/* David A. Gordon
    David A. Gordon
    Tacy F. Flint

38

Marlow Svatek
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000 (Telephone)
(312) 853-7036 (Facsimile)
dgordon@sidley.com
tflint@sidley.com
msvatek@sidley.com

Yvette Ostolaza (*pro hac vice*)
Texas Bar No. 00784703
Robert S. Velevis (*pro hac vice*)
Texas Bar No. 24047032
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, Texas 75201
(214) 981-3300 (Telephone)
(214) 981-3400 (Facsimile)
Yvette.ostolaza@sidley.com
rvelevis@sidley.com

By */s/* Caroline Chapman
Caroline Chapman
Meghan P. Carter
Shelmun Dashan
LEGAL COUNCIL FOR HEALTH
JUSTICE
17 N. State, Suite 900
Chicago, IL 60602
Phone: (312) 605-1958
Fax: (312) 427-8419
cchapman@legalcouncil.org
mcarter@legalcouncil.org
sdashan@legalcouncil.org

By */s/* Katherine E. Walz
Katherine E. Walz
Andrea Kovach
Militza M. Pagan
SHRIVER CENTER ON POVERTY
LAW
67 E. Madison, Suite 2000
Chicago, IL 60603
Phone: (312) 368-2679
Fax: (312) 263-3846

katewalz@povertylaw.org
andreakovach@povertylaw.org
militzapagan@povertylaw.org

*Counsel for Illinois Coalition For
Immigrant and Refugee Rights, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on February 19, 2020, she caused the attached **Brief in Opposition to Defendants' Motion to Dismiss** to be served via the Court's ECF system and by email upon:

Keri L. Berman (Keri.L.Berman@usdoj.gov)

Kuntal Cholera (Kuntal.Cholera@usdoj.gov)

Joshua Kolsky (Joshua.kolsky@usdoj.gov)

Eric Soskin (Eric.Soskin@usdoj.gov)

Tom Walsh (thomas.walsh2@usdoj.gov)

<u>/s/ Marlow Svatek</u>