UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COOK COUNTY, ILLINOIS, an Illinois governmental entity, and ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC., | ) ) ) | 19 C 6334 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| CHAD F. WOLF, in his official capacity as Acting Secretary of U.S. Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency, KENNETH T. CUCCINELLI II, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services, and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Cook County and Illinois Coalition for Immigrant and Refugee Rights, Inc. ("ICIRR") allege in this suit that the Department of Homeland Security's ("DHS") final rule, *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("Final Rule" or "Rule"), violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and ICIRR alleges that the Rule violates the equal protection component of the Fifth Amendment's Due Process Clause. Doc. 1. The court preliminarily enjoined DHS from enforcing the Rule on the ground that it likely violates the APA—specifically, that it likely is incompatible with the meaning of the term "public charge" in the governing statute, 8 U.S.C. § 1182(a)(4)(A). Docs. 85, 87, 106 (reported at 417 F. Supp. 3d 1008 (N.D. Ill. 2019)). DHS appealed, *Cook Cnty. v. Wolf*, No. 19-

1

3169 (7th Cir.) (argued Feb. 26, 2020), and the Supreme Court stayed the preliminary injunction

pending appeal, *Wolf v. Cook Cnty.*, 140 S. Ct. 681 (2020) (mem.).

Meanwhile, the case proceeds on the merits here. *See Wis. Mut. Ins. Co. v. United States*,

441 F.3d 502, 504 (7th Cir. 2006) ("[A]n appeal taken from an interlocutory decision does not

prevent the district court from finishing its work and rendering a final decision.").  Before the

court are two matters.  The first is DHS's motion under Civil Rules 12(b)(1) and 12(b)(6) to

dismiss the suit.  Doc. 124.  (DHS does not mention Rule 12(b)(1), but that is the proper vehicle

for its standing and ripeness arguments.  *See Swanigan v. City of Chicago*, 881 F.3d 577, 582

(7th Cir. 2018).)  The second concerns whether ICIRR is entitled to discovery beyond the

administrative record for its equal protection claim.  Doc. 95 at 6-7; Docs. 111, 113, 118-119,

121, 137, 140-141, 146.

The court denies DHS's motion to dismiss insofar as it submits that Plaintiffs lack

standing or fall outside the pertinent zone of interests, that this suit is not ripe, or that the APA

claims fail as a matter of law.  The court addressed those issues in its preliminary injunction

opinion, 417 F. Supp. 3d at 1016-28, and the Seventh Circuit will have a chance to weigh in

when it resolves DHS's appeal.  Until then, this court adheres to the views articulated in its

opinion.  DHS of course may renew under Rule 12(c) any arguments on those issues once the

Seventh Circuit rules.  *See* Fed. R. Civ. P. 12(h)(2)(B).

That leaves DHS's Rule 12(b)(6) motion to dismiss ICIRR's equal protection claim and,

if the motion is denied, the question regarding extra-record discovery on that claim.

## Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-

pleaded factual allegations, though not its legal conclusions.  *See Zahn v. N. Am. Power & Gas*,

*LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in ICIRR's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) ("Materials or elaborations in [the plaintiff's] brief opposing dismissal may be considered, so long as those materials or elaborations are consistent with the pleadings.") (internal quotation marks omitted); *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992) ("[A] plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment."). The court must set forth the facts as favorably to ICIRR as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A.     Statutory and Regulatory Background

Before getting to the factual background, a few words are in order about the Final Rule and its governing statute. Section 212(a)(4) of the Immigration and Nationality Act ("INA") states: "Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A). The public charge provision has a long pedigree, dating back to the

Immigration Act of 1882, ch. 376, §§ 1-2, 22 Stat. 214, 214, which directed immigration officers to refuse entry to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." The provision has been part of our Nation's immigration statutes, in various but nearly identical forms, ever since. *See* Immigration Act of 1891, ch. 551, § 1, 26 Stat. 1084, 1084; Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 899; Immigration Act of 1917, ch. 29, § 3, 39 Stat. 874, 876; INA of 1952, ch. 477, § 212(a)(15), 66 Stat. 163, 183; Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546, 3009-674 to -675 (1996).

Prior to the rulemaking that yielded the Final Rule, the federal agency charged with immigration enforcement last articulated its understanding of the term "public charge" in a 1999 field guidance document. Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999). The field guidance defined a "public charge" as a person "primarily dependent on the government for subsistence," and instructed immigration officials to ignore non-cash public benefits in assessing whether a person was "likely at any time to become a public charge." *Id*. at 28,689.

In October 2018, DHS published a Notice of Proposed Rulemaking, Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018). Some ten months later, DHS issued the Final Rule, which addressed comments, revised the proposed rule, and provided analysis to support the Rule. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. at 41,292. As DHS described it, the Rule "redefines the term 'public charge' to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)." *Id*. at 41,295.

4

By adopting a largely duration-based standard, the Rule deems aliens who receive only modest benefits to be public charges so long as they receive those benefits for the requisite time period. As the Rule explains: "DHS may find an alien inadmissible … even though the alien who exceeds the duration threshold may receive only hundreds of dollars, or less, in public benefits annually." *Id*. at 41,360-61. The Rule "defines the term 'public benefit' to include cash benefits for income maintenance, [the Supplemental Nutrition Assistance Program], most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher (HCV) Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing." *Id*. at 41,295. The Rule sets forth several nonexclusive factors DHS must consider in making a public charge determination, including "the alien's health," any "diagnosed … medical condition" that "will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work," and past applications for enumerated public benefits. *Id*. at 41,502-04. The Rule also requires DHS to consider "[w]hether the alien is proficient in English," and deem it a "[h]eavily weighted positive factor[]" if the "alien's household has income, assets, … resources, and support … of at least 250 percent of the Federal Poverty Guidelines." *Id*. at 41,504.

The Rule provides that a person found likely to become a public charge is ineligible "for a visa to come to the United States temporarily or permanently, for admission, or for adjustment of status to that of a lawful permanent resident." *Id*. at 41,303. The Rule also "potentially affect[s] individuals applying for an extension of stay or change of status because these individuals would have to demonstrate that they have not received, since obtaining the nonimmigrant status they are seeking to extend or change, public benefits for" more than the permitted duration. *Id*. at 41,493.

**B.     ICIRR's Allegations Concerning the Effect of and Motivation for the Final Rule**

"The Final Rule will disproportionately disqualify non-white immigrants from adjusting their status."  Doc. 1 at ¶ 132.  "Of the 25.9 million immigrants who will be affected by the Final Rule, 23.3 million are non-white."  *Id*. at ¶ 133.  "The Final Rule's weighted circumstances test favors white immigrants, and thus disfavors non-white immigrants.  Sixty percent of green card applicants from Mexico and Central America and 41 percent from Asia between 2014 and 2016 had two or more negative factors, whereas only 27 percent of immigrants from Europe, Canada, and Oceania (primarily Australia and New Zealand) have two or more negative factors."  *Id*. at ¶ 136.  "Immigrants from Europe, Canada, and Oceania are the least likely to be affected by the Final Rule's changes to public charge because they are generally wealthier, more educated, and more likely to speak English."  *Ibid*.  "[I]mmigrants from regions with predominantly white populations have the highest proportion of recent lawful permanent residents with family income above 250 percent of the federal poverty guideline," which, as noted, is "a heavily weighted positive factor under the Final Rule."  *Id*. at ¶¶ 132, 136.

According to ICIRR, this disparate impact was intentional, with DHS adopting the Rule as part of its "broader agenda to vilify immigrants from majority non-white countries[,] … to suppress immigration and those seeking citizenship from those countries," and to "exclude certain (predominantly non-white) immigrants."  *Id*. at ¶¶ 3, 173.  "This agenda has manifested" in the President's "statements that Haiti, El Salvador, and unspecified African nations are 's[hit]hole countries,'" descriptions of "Mexican immigrants as 'drug dealers, criminals, [and] rapists' and migrants from Central America as 'animals,'" and suggestion that "40,000 Nigerians would never 'go back to their huts' in Africa after seeing the United States."  *Id*. at ¶ 173.  Moreover, in a television interview conducted the day after the Rule's promulgation, then-Acting

Director of U.S. Citizenship and Immigration Services ("USCIS") Kenneth Cuccinelli II—an official capacity defendant who leads the DHS component "primarily responsible for the immigration services functions of the United States"—stated in response to the suggestion that the Rule undermined the values articulated in *The New Colossus*, the Emma Lazarus poem inscribed on the Statue of Liberty, that "of course that poem was referring back to people coming from Europe." *Id*. at ¶¶ 17-18, 174; CNN, *Burnett challenges Cuccinelli on new immigration rule*, YouTube (Aug. 13, 2019), http://www.youtube.com/watch?v=Ks6t4eTegqU&feature=youtu.be&t=281. Cuccinelli then observed that the poem was written the "same exact time" Congress enacted the first public charge statute in 1882 and was inscribed on the Statue of Liberty the year Congress amended the statute. CNN, *Burnett challenges Cuccinelli on new immigration rule*, *supra*.

ICIRR alleges that DHS promulgated the Final Rule knowing that it "would have a disparate impact on Latino immigrants and immigrants of color" and with the "inten[t] to target [such] immigrants … as part of [its] broader effort to reduce immigration by people of color into the United States." Doc. 1 at ¶ 182. DHS "use[d] facially neutral but pre-textual concerns about self-sufficiency in an effort to cloak [its] discriminatory intent against non-white people. Although people of color account for approximately 36% of the total U.S. population, approximately 90% of those chilled from seeking public services [because of the Rule] would be immigrants of color (70% of whom are Latino)." *Id*. at ¶ 183. "The purpose of the Final Rule is to discriminate against non-white immigrants. [DHS] knew that the Final Rule would have a targeted, disproportionate impact on people from non-white countries." *Id*. at ¶ 184.

ICIRR further alleges that Stephen Miller, the President's principal immigration advisor, was the "architect of the Final Rule," *id*. at ¶ 180, and its "driving" force, Doc. 133 at 48. In a

June 2018 email to L. Francis Cissna, Cuccinelli's predecessor at USCIS, Miller asked, "[W]here are we on regs?  Public charge?  Asylum?  Etc."  Emails between Stephen Miller, Senior Policy Advisor to the President, and DHS Officials (June 8, 2018) (on file at http://www.politico.com/f/?id=0000016c-5349-de87-affd-7bc9eff20001).  Cissna responded, "I'm told that staff working on the public charge reg"—the rest of Cissna's email is redacted, but it is clear from context that he said the process would take months—and Miller forwarded Cissna's response to USCIS's chief counsel, stating, "Months!  This needs to be days or weeks!!"  *Ibid*.  The chief counsel wrote to Miller, "We'll do what we can to quickly move it back up to the Department and then OMB (hopefully this month)," and Miller replied, "Mick [Mulvaney] promised the president."  *Ibid*.  In another email to Cissna that day, this time copying then-Office of Management and Budget ("OMB") Director Mick Mulvaney and then-DHS Chief of Staff (and current DHS Secretary) Chad Wolf, Miller wrote:

> Francis -- the timeline on public charge is unacceptable.  The public charge reg has been in the works for a year and a half.  This is time we don't have.  I don't care what you need to do to finish it on time. …
>
> It's an embarrassment that we've been here for 18 months and USCIS hasn't published a single major reg.
>
> Adding Mick [Mulvaney] and Chad [Wolf] to this email.

*Ibid*.

As ICIRR sees it, Miller's role as the Rule's "architect" confirms the complaint's allegation that it was designed to discriminate against nonwhite immigrants.  Doc. 133 at 48-49.  In 2015, shortly before joining the President's presidential campaign, Miller sent emails that "repeatedly cited to materials from websites espousing white nationalist and anti-immigration viewpoints, including the portrayal of non-white immigrants as violent or threatening."  Doc. 111 at 5.  Miller sent those emails to Katie McHugh, who wrote anti-immigration pieces from a white

nationalist perspective for *Breitbart*. *See*, *e.g.*, Katie McHugh, *'Mohammed,' 'Juan' Most Likely Names to Donate to Hillary Clinton*, Breitbart (Apr. 21, 2016),

http://www.breitbart.com/politics/2016/04/21/mohammed-juan-likely-names-donate-hillary-clinton ("Beginning with the 1965 Immigration and Nationality Act, the nation's population has shifted far from its British settler roots and successive waves of non-British European migrants. Federal policy now welcomes Third World migration waves … ."); Katie McHugh, *Imported Rape Culture: Somalian Refugee Charged with Rape of 10-Year-Old Girl*, Breitbart (Oct. 13, 2015), http://www.breitbart.com/politics/2015/10/13/imported-rape-culture-somalian-refugee-charged-with-rape-of-10-year-old-girl ("Transplanting Somalis en-masse has only perpetuated the rape crisis, and worse, made it average Americans' problem. … Islam … endorses the rape of infidels and since its founding has engaged in centuries-long, continents-wide account of nonstop sexual predation … .") (alteration and internal quotation marks omitted).

In an email expressing concern that persons from Mexico would receive temporary protected status in the United States due to Hurricane Patricia, Miller sent McHugh a link to a piece from VDARE on the subject and urged her to make the issue "the weekend's BIG story" on *Breitbart*. *Trump immigration adviser Stephen Miller linked to white nationalist views in new emails*, Chi. Trib. (Nov. 14, 2019), http://www.chicagotribune.com/nation-world/ct-nw-stephen-miller-racism-20191114-rncu7iihujcqbpu65ymdtwdfpq-story.html. VDARE is a website, founded and edited by Peter Brimelow, that promotes a white nationalist perspective on immigration. *See* Peter Brimelow, *Trump's Immigration Patriotism, His High-Concept Campaign, Pascal's Wager: Peter Brimelow Talks to Alan Colmes*, VDARE (Sept. 3, 2016), http://vdare.com/articles/trump-s-immigration-patriotism-his-high-concept-campaign-pascal-s-wager-peter-brimelow-talks-to-alan-colmes ("Well, I think the U.S. *is* a white nation.  It was a

white nation when it was founded and it still remains a state that represents a white majority.  So,

when you have a situation like you have now with the 1965 Immigration Act, where the

government is essentially Electing A New People, importing a whole new cast of characters, who

are going to drive the whites into a minority by 2040 … .").  The VDARE piece Miller sent

McHugh lamented that the hurricane could result in the federal government "invit[ing] into the

United States a lot of Mexicans."  Steve Sailer, *Never Let a Crisis Go to Waste: Mexico's*

*Hurricane Patricia and 'Temporary Protected Status'*, VDARE (Oct. 23, 2015),

http://vdare.com/posts/never-let-a-crisis-go-to-waste-mexico-s-hurricane-patricia-and-

temporary-protected-status.

　　　　In another email, Miller commended *The Camp of the Saints* to McHugh in the course of

a discussion regarding nonwhite students' standardized test scores and the Pope's encouragement

of Western nations to accept more refugees.  *Trump immigration adviser Stephen Miller linked*

*to white nationalist views in new emails*, Chi. Trib., *supra*.  *The Camp of the Saints* is a dystopian

French novel, popular among white nationalists, whose plot centers on a flotilla of nonwhite

refugees from India—led by an individual called the "turd eater"—who descend on France, are

naively welcomed by the French, and proceed to rampage, kill, and wreak general havoc.  *See*

Shikha Dalmia, *The dystopian, anti-immigration book* The Camp of the Saints *is really racist*,

The Week (Mar. 17, 2016), http://tinyurl.com/yaqs3jwa.  The success of the Indians in France

emboldens people from China and Pakistan to move in large numbers to other Western nations,

resulting (by the author's lights) in the subjugation of white persons by nonwhite persons and the

destruction of white civilization and culture.  *Ibid*.

　　　　The authenticity of Miller's emails to McHugh—those discussed above are just two

examples of many plausibly tinged with white nationalist sentiment—is undisputed.  McHugh,

who has since renounced her white nationalist views and who was responsible for the emails' public release, stated that when she was introduced to Miller, "[i]t was understood that I would take editorial direction from him." *Former Breitbart Editor Katie McHugh On Stephen Miller And White Supremacy*, Nat'l Pub. Radio (Dec. 15, 2019),

http://www.npr.org/2019/12/15/788195178/former-breitbart-editor-katie-mchugh-on-stephen-miller-and-white-supremacy. For his part, Miller stated that "[t]here's nothing wrong in any of my emails [to McHugh], there's nothing wrong in anything I said," adding that, for those who criticized his emails, "being pro-American … is a thought crime." Fox Business, *Stephen Miller responds to white nationalism allegations against him*, YouTube (Dec. 30, 2019), http://www.youtube.com/watch?v=IE1bkeisPZ0.

## Discussion

### I.     DHS's Motion to Dismiss ICIRR's Equal Protection Claim

As ICIRR acknowledges, the Final Rule is facially neutral, meaning that it does not draw express distinctions based on race or ethnicity. Because "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause," a facially neutral law "will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). Rather, "[a] facially neutral law … warrants strict scrutiny [under the Equal Protection Clause] only if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (citations and internal quotation marks omitted). "Discriminatory purpose means more than simple knowledge that a particular outcome is the likely consequence of an action; rather, discriminatory purpose requires a defendant to have selected a particular course of action at least in part because of … its adverse

11

effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (internal quotation marks omitted) (alteration in original). "The task of assessing … motivation … is not a simple matter; on the contrary, it is an inherently complex endeavor, one requiring the trial court to perform a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Hunt*, 526 U.S. at 546 (quoting *Arlington Heights*, 429 U.S. at 266).

In seeking dismissal, DHS does not dispute ICIRR's allegation that the Final Rule will have a disproportionate negative impact on nonwhite immigrants. Indeed, DHS effectively acknowledged as much. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. at 41,369 ("DHS recognizes that it is possible that the inclusion of benefits such as SNAP and Medicaid may impact in greater numbers communities of color, including Latinos and [Asian Americans and Pacific Islanders], … and therefore may impact the overall composition of immigration with respect to these groups."). Instead, DHS argues that "ICIRR's allegations do not suggest that DHS issued the Rule 'because of' any alleged 'adverse effects upon an identifiable' racial or ethnic group." Doc. 126 at 51.

DHS's argument fails, as ICIRR expressly and plausibly alleges that DHS issued the Rule knowing and intending that it would have a disproportionate negative impact on nonwhite immigrants. Doc. 1 at ¶¶ 132-133, 136, 182-184. To support the allegation's plausibility, ICIRR points to statements by the President that reasonably could be understood as expressing animus toward nonwhite immigrants. *Id*. at ¶ 173. ICIRR points as well to then-USCIS Acting Director Cuccinelli's statements, made while defending the Rule from the charge that it runs contrary to the values conveyed by the Lazarus poem, that the poem "of course … was referring back to people coming from Europe" and that the poem's origins and history are enmeshed with those of the public charge statute. *Id*. at ¶ 174; CNN, *Burnett challenges Cuccinelli on new immigration*

12

*rule*, *supra*.  At this stage, ICIRR is entitled to the reasonable inference that Cuccinelli's statements revealed (perhaps inadvertently) his understanding that the Rule was intended to favor white immigrants and disproportionately harm nonwhite immigrants.  *See Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1164-65 (7th Cir. 1994) (denying summary judgment where the decisionmaker's statements were susceptible to both discriminatory and benign interpretations, reasoning that their meaning and significance presented a question "for the finder of fact").

ICIRR also points to Miller's central role in pressing for and crafting the Rule.  Doc. 1 at ¶ 180; Doc. 133 at 48-49.  ICIRR is entitled at this stage to the reasonable inference that Miller's having recently recommended white nationalist content like *The Camp of the Saints* to a white nationalist commentator—and his characterizing his messages to her as "pro-American"— reflects his belief that nonwhite immigration to the United States should be suppressed.  ICIRR is entitled to the further reasonable inference that Miller, having become the President's principal immigration advisor, would seek to advance his beliefs by pressing for a regulation that suppresses nonwhite immigration.  *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative."); *Arlington Heights*, 429 U.S. at 268 (recognizing that "contemporary statements by members of the decisionmaking body" are "highly relevant" to determining whether the body acted with discriminatory intent); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 111 (2d Cir. 2019) ("[E]vidence [of discriminatory purpose] may include the series of events leading up to a … decision, the context in which the decision was made, … [and] statements made by the decisionmaking body … .") (internal quotation marks omitted).

Given all this, ICIRR's allegation that the Final Rule's disproportionate impact on nonwhite immigrants motivated its promulgation is eminently plausible. ICIRR's equal protection claim accordingly survives dismissal.

Citing *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), DHS contends that the Rule is subject to only rational basis review—not strict scrutiny—because it concerns immigration. Doc. 126 at 51; Doc. 144 at 32. DHS's contention overreads *Hawaii*. The Court in *Hawaii* held that the "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications" for an executive order restricting entry into the United States by nationals of certain predominately Muslim countries was "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Hawaii*, 138 S. Ct. at 2409. The statute in question was Section 212(f) of the INA, which provides for expansive discretion to be exercised by the President. *See* 8 U.S.C. § 1182(f) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."); *Hawaii*, 138 S. Ct. at 2408 ("By its terms, § 1182(f) exudes deference to the President in every clause."). The Final Rule, by contrast, arises from an agency's interpretation of Section 212(a)(4), which is not entitled to the expansive discretion given the President under Section 212(f). *See Abourezk v. Reagan*, 785 F.2d 1043, 1051 (D.C. Cir. 1986) ("[Section 212(a)] does not commit to unguided agency discretion the decision to exclude an alien. … [T]he Immigration Act emphatically did not commit the decision to exclude an alien to standardless agency discretion; the statute lists thirty-three distinctly delineated categories that conspicuously provide standards to guide the

Executive in its exercise of the exclusion power.") (citing 8 U.S.C. § 1182(a)), *aff'd by an equally divided court*, 484 U.S. 1 (1987).

Of equal if not greater importance, the Court in *Hawaii* held that the "sphere" in which executive power is shielded from "searching inquiry" is "the President['s] adopt[ion of] 'a preventive measure … in the context of international affairs and national security,'" not the *entire* realm of immigration law. *Hawaii*, 138 S. Ct. at 2409 (alteration in original) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010)); *see also id*. at 2419 ("[The] narrow standard of review [articulated in *Kleindienst v. Mandel*, 408 U.S. 753 (1972),] has particular force in admission and immigration cases that overlap with the area of national security.") (internal quotation marks omitted); *id*. at 2422 ("While we of course 'do not defer to the Government's reading of the First Amendment,' the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'") (quoting *Humanitarian Law Project*, 561 U.S. at 33-34). By contrast to the President's national security and international relations justifications for the executive order in *Hawaii*, DHS justified and continues to justify the Final Rule solely on economic grounds. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. at 41,294-95 ("DHS is revising its interpretation of 'public charge' to … better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient, *i.e.*, do not depend on public resources to meet their needs, but rather rely on their own capabilities, as well as the resources of family members, sponsors, and private organizations."); Doc. 126 at 51 (DHS arguing: "The Rule's preamble … thoroughly explains the Rule's non-discriminatory justifications, including the need to facilitate self-sufficiency among immigrants."). *Hawaii*

15

therefore does not warrant displacing *Arlington Heights*-style strict scrutiny in this case with the rational basis review deployed in *Hawaii*.

DHS next argues that the Final Rule passes equal protection muster because it was promulgated after "an extensive notice-and-comment process" and is supported by a preamble offering "non-discriminatory justifications." Doc. 126 at 51-52; *see also* Doc. 144 at 32-33. When ruling on a Rule 12(b)(6) motion, the court must "draw all reasonable inferences in [the plaintiff's] favor." *Pierce*, 818 F.3d at 277. DHS's articulation of nondiscriminatory grounds for the Rule does not render unreasonable the contrary inferences, set forth above, that ICIRR asks the court to draw regarding the motivation behind the Rule. Accordingly, although it is possible that DHS ultimately may show that the Rule was motivated solely by nondiscriminatory goals, it cannot prevail on that ground at this stage. *See Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) ("So long as a plaintiff alleges a plausible prima facie claim of discrimination, a court may not dismiss that claim—even if the defendant advances a nondiscriminatory alternative explanation for its decision, and even if that alternative appears more probable."); *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018) ("At the pleading stage, [the plaintiff's] allegations need only create the plausible inference of intentional … discrimination; although alternative non-discriminatory explanations for the defendants' behavior may exist, that possibility does not [warrant dismissal]."); *Woods v. City of Greensboro*, 855 F.3d 639, 649 (4th Cir. 2017) ("The question is not whether there are more likely explanations for the City's action, … but whether the City's impliedly proffered reason … is so obviously an irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation that it renders [the plaintiff's] claim of pretext implausible.").

Finally, DHS argues that because ICIRR's equal protection challenge "relies almost exclusively on alleged public statements by non-DHS officials that have no express connection to the Rule," ICIRR cannot explain "how these statements reveal that *DHS* harbored an improper motive in implementing the Rule." Doc. 126 at 52-53. As a general rule, statements of public officials bear on whether a "discriminatory purpose was a motivating factor" for government action only if the statements are made "by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268. One of the persons whose statements ICIRR cites, Cuccinelli, was the official who led the DHS component (USCIS) responsible for promulgating and implementing the Final Rule, so his statements are unquestionably pertinent in evaluating whether ICIRR has a plausible equal protection claim.

The President and Miller are two other persons whose statements are cited by ICIRR. DHS does not deny that the President and Miller made the statements attributed to them, nor, for purposes of its motion to dismiss, does DHS deny ICIRR's allegation that those statements show that the President and Miller harbor discriminatory animus toward nonwhite immigrants. Instead, DHS contends that because the President and Miller are "non-DHS personnel," their statements "have no bearing on why DHS issued the Rule." Doc. 144 at 33. That contention cannot be reconciled with ICIRR's allegations, which DHS does not contest for purposes of this motion, that Miller was the Final Rule's "architect," Doc. 1 at ¶ 180, and "driving" force, Doc. 133 at 48. Nor can DHS's contention be reconciled with Miller's emails to Cissna (Cuccinelli's predecessor) inquiring about progress on the public charge regulation and, when the answer displeased him, demanding quicker action and criticizing what he saw as unacceptable delay. There is no need to draw inferences in ICIRR's favor to deduce from those emails who answered to whom. As for the President's involvement, Miller copied OMB Director Mulvaney on an

email criticizing Cissna and, in an exchange where the USCIS chief counsel promised to "do what we can to quickly move it back up to the Department and then OMB," Miller stated that Mulvaney had "promised the President."

DHS's contention that Miller's and the President's statements are irrelevant to the motivation behind the Rule also cannot be reconciled with the Government's understanding of how the Executive Branch works. As the Solicitor General explained in a Supreme Court brief filed less than a month before DHS filed the present motion to dismiss:

> Article II of the Constitution provides that "[t]he executive Power shall be vested" in the President alone, U.S. Const. Art. II, § 1, Cl. 1, who is obligated to "take Care that the Laws be faithfully executed," Art. II, § 3. "The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known." *Printz v. United States*, 521 U.S. 898, 922 (1997). The Framers "sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many." *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring in the judgment). "Energy in the executive," Hamilton explained, "is a leading character in the definition of good government," and is essential to "the steady administration of the laws." *The Federalist No. 70*, at 471 (Hamilton) (Jacob Ernest Cooke ed., 1961). Unity of authority is a necessary "ingredient[]." *Id*. at 472. And the Constitution vests that unified authority in an elected President to ensure that a "dependence on the people" is the "primary controul on the government." *The Federalist No. 51*, at 349 (Madison) (Jacob Ernest Cooke ed., 1961).

Brief for Respondent Supporting Vacatur at 10-11, *Seila Law LLC v. CFPB* (U.S. 2019) (No. 19-7), 2019 WL 6727094, at *10-11 (alterations in original); *accord* Attorney General William P. Barr, 19th Annual Barbara K. Olson Memorial Lecture at the Federalist Society's 2019 National Lawyers Convention (Nov. 15, 2019), http://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-19th-annual-barbara-k-olson-memorial-lecture (stating that "the Executive's powers of internal management … are the powers necessary for the President to superintend and control the Executive function," and that "[t]he idea of the unitary executive …

is that, whatever the Executive powers may be, they must be exercised under the President's supervision").

Given what the Solicitor General, speaking to the Supreme Court on the Government's behalf, described as the President's unitary role in supervising the Executive Branch, DHS's argument that the views of the President and his principal immigration advisor "have no bearing on why DHS issued the Rule," Doc. 144 at 33, cannot be credited. And putting aside as-yet unanswered questions regarding the outer bounds of the President's Article II authority, the Supreme Court has made clear that the President exercises ultimate control over the actions of agencies like DHS. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019) (holding that "agencies … are subject to the supervision of the President"); *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 501 (2010) ("The President has been given the power to oversee executive officers; he is not limited, as in Harry Truman's lament, to 'persuad[ing]' his unelected subordinates 'to do what they ought to do without persuasion.' In its pursuit of a 'workable government,' Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.") (citation omitted) (alterations in original); *see also Mistretta v. United States*, 488 U.S. 361, 417 n.2 (1989) (Scalia, J., dissenting) ("An executive agency can, of course, be created with no power other than the making of rules, as long as that agency is subject to the control of the President and the President has executive authority related to the rulemaking. In such circumstances, the rulemaking is ultimately ancillary to the President's executive powers."). It necessarily follows that DHS cannot brush off the President's and Miller's statements regarding nonwhite immigrants as irrelevant to the motivation behind the Final Rule. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018) (considering government decisionmakers' "expressions of hostility to religion" in deciding whether their action violated the Free Exercise Clause).

## II.     ICIRR's Request for Extra-Record Discovery on Its Equal Protection Claim

If there were only APA claims and no equal protection claim in this case, the rules governing discovery would be clear.  "In reviewing agency action [under the APA], a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). "That principle reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided."  *Ibid*. (quoting *Arlington Heights*, 429 U.S. at 268 n.18). However, there is a "narrow exception to the general rule against inquiring into the mental processes of administrative decisionmakers.  On a strong showing of bad faith or improper behavior, such an inquiry may be warranted and may justify extra-record discovery."  *Id*. at 2573-74 (internal quotation marks and citation omitted).

Neither the Supreme Court nor the Seventh Circuit has articulated the rules governing discovery where, as here, a plaintiff brings a substantive constitutional challenge to agency action.  Other courts have split on that question.  Some courts hold that the ordinary rules for APA claims apply, with discovery limited to the administrative record unless the plaintiff meets the "strong showing of bad faith or improper behavior" standard.  *See*, *e.g.*, *Chang v. USCIS*, 254 F. Supp. 3d 160, 161-62 (D.D.C. 2017); *N. Arapaho Tribe v. Ashe*, 92 F. Supp. 3d 1160, 1171 (D. Wyo. 2015).  Other courts hold that extra-record discovery is presumptively available, at least where the constitutional challenge does not mirror or substantially overlap with an APA challenge.  *See*, *e.g.*, *J.L. v. Cissna*, 2019 WL 2224851, at *1 (N.D. Cal. Mar. 8, 2019); *Grill v. Quinn*, 2012 WL 174873, at *2 (E.D. Cal. Jan. 20, 2012); *Tafas v. Dudas*, 530 F. Supp. 2d 786, 802 (E.D. Va. 2008).

DHS incorrectly argues that the Supreme Court resolved that split in *Department of Commerce v. New York*, *supra*. Doc. 118 at 4-5. The plaintiffs there challenged on both APA and equal protection grounds the Department of Commerce's addition of a citizenship question to the 2020 census questionnaire. *See New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766 (S.D.N.Y. 2018). The district court allowed extra-record discovery, reasoning that the plaintiffs "had made a strong preliminary or *prima facie* showing that they will find material beyond the Administrative Record indicative of bad faith." *New York v. U.S. Dep't of Commerce*, 339 F. Supp. 3d 144, 147 (S.D.N.Y. 2018) (internal quotation marks omitted). On review of the district court's judgment that the Department violated the APA, the Supreme Court held that while the district court "should not have ordered extra-record discovery when it did," material later added to the administrative record satisfied the "strong showing" standard, thereby justifying that discovery. *Dep't of Commerce*, 139 S. Ct. at 2574.

Contrary to DHS's submission, Doc. 113 at 3-7; Doc. 118 at 4-7, the Supreme Court did not hold, either explicitly or implicitly, that ordinary APA discovery rules govern constitutional challenges to agency action. As the above-quoted passage of the district court's opinion makes clear, the district court granted extra-record discovery not on the ground that discovery for the equal protection claim is not subject to the "strong showing" standard for APA claims, but on the ground that the plaintiffs had satisfied that standard. *Dep't of Commerce*, 339 F. Supp. 3d at 147; *see also New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (S.D.N.Y. July 20, 2018), ECF No. 205 at 82 ("Finally, I agree with the plaintiffs that there is a solid basis to permit discovery of extra-record evidence in this case. To the extent relevant here, a court may allow discovery beyond the record where 'there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decision-makers.' *National Audubon Society v.*

21

*Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). Without intimating any view on the ultimate issues in this case, I conclude that plaintiffs have made such a showing here for several reasons."). Having concluded that the plaintiffs ultimately satisfied the "strong showing" standard, the Supreme Court had no occasion to, and in fact did not, expressly address whether extra-record discovery could have been justified on the ground that the plaintiffs had brought an equal protection claim along with their APA claim. Indeed, by the time the case reached the Court, the equal protection claim had been dismissed. *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 502, 669-71 (S.D.N.Y. 2019). That sequence of events likely is why DHS's attorney acknowledged on the record here that the Supreme Court's discussion of extra-record discovery in *Department of Commerce* pertained only to the APA claim. Doc. 109 at 13 ("THE COURT: But [the Supreme Court's discussion of extra-record discovery] was only for – the discovery was for purposes of the APA claim, and there was no equal protection claim? [DHS Counsel]: Yes, your Honor.").

DHS next argues that Section 706(2)(B) of the APA provides that ordinary APA discovery rules govern constitutional challenges like ICIRR's equal protection claim. Doc. 118 at 2-3. Section 706(2)(B) provides that a party may challenge agency action as "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and requires a court addressing such a challenge to "review the whole record or those parts of it cited by a party," 5 U.S.C. § 706. The statute does not advance DHS's cause, for its text conveys merely that the court should review the administrative record in evaluating a constitutional challenge, not that the court (subject to the "strong showing" exception) may review *only* the administrative record. *See Matter of Am. Reserve Corp.*, 840 F.2d 487, 492 (7th Cir. 1998) ("Why should we infer from

the list of ways to do something that there are no others? … A list of four ways may imply only

that Congress has yet to consider whether there should be others.").

Because neither *Department of Commerce* nor the APA's text expressly answers whether

the "strong showing" standard governs discovery for constitutional challenges to agency action,

the question turns on whether the Supreme Court's rationale for that standard applies here. In

the course of addressing whether extra-record discovery was justified in *Department of*

*Commerce*, the Supreme Court began by observing that, "in order to permit meaningful judicial

review, an agency must disclose the basis of its action." *Dep't of Commerce*, 139 S. Ct. at 2573

(internal quotation marks omitted). The Court then noted that, "in reviewing agency action, a

court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the

existing administrative record." *Ibid*. "That principle," the Court explained, "reflects the

recognition that further judicial inquiry into 'executive motivation' represents 'a substantial

intrusion' into the workings of another branch of Government and should normally be avoided."

*Ibid*. (quoting *Arlington Heights*, 429 U.S. at 268 n.18). The Court added:

> [A] court may not reject an agency's stated reasons for acting simply because
> the agency might also have had other unstated reasons. Relatedly, a court
> may not set aside an agency's policymaking decision solely because it might
> have been influenced by political considerations or prompted by an
> Administration's priorities. Agency policymaking is not a rarified
> technocratic process, unaffected by political considerations or the presence of
> Presidential power. Such decisions are routinely informed by unstated
> considerations of politics, the legislative process, public relations, interest
> group relations, foreign relations, and national security concerns (among
> others).

*Ibid*. (internal quotation marks and citations omitted).

The Court's rationale in *Department of Commerce* for presumptively limiting discovery

to the administrative record sounds in the register of a prototypical APA challenge to agency

action on the ground that it is arbitrary and capricious, an abuse of discretion, or unsupported by

the evidence. *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (in a case examining whether an agency decision "was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" holding that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court") (quoting 5 U.S.C. § 706(2)(A)).  That rationale is a mismatch for an equal protection challenge alleging that an agency adopted a regulation that, while facially race-neutral, is intended to disadvantage certain races and succeeds in doing so.

Most people know by now that the quiet part should not be said out loud.  *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority.").  Racial animus is not among the "political considerations" or "Administration[] priorities" that, being permitted to "routinely inform[]" agency "policymaking," lay beyond a court's proper scrutiny.  *Dep't of Commerce*, 139 S. Ct. at 2573; *see Arlington Heights*, 429 U.S. at 265-66 ("[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.  But racial discrimination is not just another competing consideration.  When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.").  So if a facially neutral agency action is motivated by racial animus, that animus almost certainly will not be "disclose[d]" in the agency's "contemporaneous explanation" for that action.  *Dep't of Commerce*, 139 S. Ct. at 2573.  And because evidence of racial animus (if any) will reside outside the administrative record, presumptively limiting discovery to the record can allow the racial motivations

24

underlying racially motivated policymaking to remain concealed. Given all this, and particularly given that its equal protection claim survives dismissal, ICIRR is entitled to discovery on that claim regardless of whether it can satisfy the "strong showing" standard applicable to APA claims. *Cf. Kuang v. U.S. Dep't of Defense*, 2019 WL 293379, at *3 (N.D. Cal. Jan. 23, 2019) (applying the "strong showing" standard because "the gravamen of Plaintiffs' claim is that the [agency] policy lacks a rational basis, not that it was motivated by xenophobic animus").

ICIRR satisfies the "strong showing" standard in any event. That standard has been "variously described as a strong, substantial, or prima facie showing … that [the plaintiff] will find material in the agency's possession indicative of bad faith or an incomplete record." *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487-88 (D.C. Cir. 2011); *accord Citizens for Appropriate Rural Rds. v. Foxx*, 815 F.3d 1068, 1081-82 (7th Cir. 2016) ("An exception exists [to the rule limiting discovery in APA cases to the administrative record] if a plaintiff seeking discovery can make a significant showing that it will find material in the agency's possession indicative of bad faith or an incomplete record.") (citing *Air Transp. Ass'n*, 663 F.3d at 487-88). The Supreme Court in *Department of Commerce* held that the standard was met by materials suggesting that the rationale stated in the administrative record for adding a citizenship question to the census questionnaire was a pretext, not the Department's true rationale. *See Dep't of Commerce*, 139 S. Ct. at 2574.

The circumstances here present at least as strong a case for extra-record discovery as the case presented in *Department of Commerce*. Although DHS found it important enough in the Final Rule to reference its communications with officials outside DHS, *see* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. at 41,324 ("DHS is working and will continue to work with [the State Department] to ensure consistent application of the public charge ground of

inadmissibility."); *id*. at 41,460 ("Interagency discussions are a part of the internal deliberative process associated with the rulemaking."); *id*. at 41,461 ("DHS is collaborating with other departments and agencies with regard to the regulatory changes promulgated by this final rule[]."), and although Miller's emails with high-ranking DHS officials show his involvement with the Rule, the administrative record includes no such communications. DHS's attorney could not offer a plausible explanation for this gap in the record, Doc. 121, and no such explanation is apparent. ICIRR therefore has made "a significant showing that it will find material in [DHS's] possession indicative of … an incomplete record," which entitles it to extra-record discovery. *Citizens for Appropriate Rural Rds.*, 815 F.3d at 1081-82; *see also Air Transp. Ass'n of Am.*, 663 F.3d at 487-88. This is so regardless of whether there is a causal link between (i) the absence of any communications to or from Miller in the administrative record, which was filed on December 3, 2019, Doc. 110, and (ii) the public release three weeks earlier of Miller's emails to McHugh.

Although ICIRR's strong showing of an incomplete administrative record suffices to justify extra-record discovery, ICIRR also makes a strong showing that DHS's stated reason for promulgating the Final Rule—protecting the fisc—obscures what ICIRR alleges is the real reason—disproportionately suppressing nonwhite immigration. It is far from fanciful for ICIRR to submit that Miller's emails to McHugh commending white nationalist content like *The Camp of the Saints* reflect animus toward nonwhite immigration, or that the President's statements, quoted above, reflect a similar animus. The same holds for ICIRR's submission that Miller was the Rule's "architect," a submission finding strong support in his June 2018 emails with high-ranking USCIS officials, which reflect a keen interest—both his and the President's—in what would become the Rule and a deep impatience with what he viewed as delay in its development.

And the same holds for ICIRR's submission that Cuccinelli's remarks regarding the Lazarus poem revealed his understanding that the Rule was intended to favor white immigrants and disproportionately suppress nonwhite immigration.

Given what has been unearthed thus far, ICIRR makes a strong showing that the Rule was developed and promulgated "at least in part because of" a substantial and impermissible reason not reflected in the administrative record—the Rule's disproportionate "adverse effects upon" nonwhite immigrants. *Alston*, 853 F.3d at 907; *see also Arlington Heights*, 429 U.S. at 265-66 ("[The Equal Protection Clause] does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. … When there is a proof that a discriminatory purpose has been a motivating factor in the decision, … judicial deference is no longer justified."). Extra-record discovery is justified on this ground as well. *See Dep't of Commerce*, 139 S. Ct. at 2574-75 (holding that materials suggesting that the agency's action was motivated by concerns not reflected in the administrative record justified extra-record discovery); *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989) (Breyer, J.) ("The fact that review sometimes or often focuses on the initial administrative record does not mean it must, or always, will do so. It could happen that a particular instance of judicial review of an [agency action] raises a 'genuine' and 'material' dispute of facts that requires a trial: Did the agency know, for example, about some important matter that the [administrative record] ignored … [?] Or, did the agency improperly rely upon some other important, but secret information not part of the record?") (citations omitted). (DHS does not

argue in the alternative that, in lieu of allowing extra-record discovery, the court should order that the administrative record be supplemented, thereby forfeiting the point.)

In pressing the opposite result, DHS contends that ICIRR relies on "only generic statements by various Government officials, none of which specifically reference the Rule." Doc. 113 at 5. But as already noted, Cuccinelli expressly referenced the Rule in his statements. DHS retorts that Cuccinelli's statements are irrelevant because the Rule "was promulgated by the DHS Secretary." Doc. 113 at 3. That argument fails: The Rule's docket number is USCIS-2010-0012; its caption lists USCIS as the DHS component responsible for the Rule; and it states that the proposed rule was published by "DHS, USCIS." Inadmissibility on Public Charge Grounds, 84 Fed. Reg. at 41,292, 41,304. Thus, although the DHS Secretary issued the Rule as a formal matter, ICIRR makes a strong showing that Cuccinelli, as USCIS Acting Director, played a substantial role in its development.

As for Miller, DHS contends that "there is no indication that [his] viewpoints materially influenced the Rule's design." Doc. 118 at 9. To the contrary, and as also already noted, there is a strong indication from Miller's June 2018 email traffic with DHS officials that he took a deep interest in the Rule, so much so that he pointedly criticized Cuccinelli's predecessor for delays in its development and took care to note that the matter was on the President's radar. The premise underlying DHS's contention—that the President's principal immigration advisor would have no substantive input into the Rule—is weak. This is particularly so given that Miller's emails to McHugh, sent shortly before he joined the President's staff, arguably manifest significant hostility toward nonwhite immigration, and that, as all parties agree at this stage, the Rule will have a disproportionate negative impact on nonwhite immigrants.

Taking issue with this assessment, DHS maintains that although Miller's emails to McHugh may cite white nationalist content, they "do not indicate that [he] himself harbors th[o]se viewpoints." Doc. 118 at 9. True enough, the mere fact that somebody shares material written by others does not necessarily imply endorsement of that material. So, if Miller's emails had manifested some level of disagreement or discomfort with the white nationalist content he sent McHugh, DHS might have had a point. But Miller's emails on their face embrace without reservation the white nationalist content he sent McHugh. In one email, Miller urged McHugh to "point out the parallels to *Camp of the Saints*" when suggesting that she write about the Pope's encouraging Western nations to accept more refugees. *Trump immigration adviser Stephen Miller linked to white nationalist views in new emails*, Chi. Trib., *supra*. In another email, Miller forwarded McHugh a VDARE article in urging her to make "the weekend's BIG story" on *Breitbart* the prospect of temporary protective status for people from Mexico fleeing Hurricane Patricia. *Ibid*. (Again, those two emails are illustrative of many others he sent to McHugh.) Given how Miller presented the white nationalist materials to McHugh, the court at this stage cannot accept DHS's submission that his emails do not indicate that he shared the viewpoints reflected in those materials.

### Conclusion

DHS's motion to dismiss is denied, and ICIRR is entitled to extra-record discovery on its equal protection claim. DHS's request for a discovery stay pending its appeal of the preliminary injunction, Doc. 118 at 10 n.7, is denied. The appeal concerns only Plaintiffs' APA claims—recall that the preliminary injunction rests solely on the APA challenge—and ICIRR's equal protection claim may proceed regardless of the APA claims' merits. *See Webster v. Doe*, 486 U.S. 592, 601-04 (1988) (holding that the APA did not "preclude consideration of colorable

29

constitutional claims arising out of" government actions taken under Section 102(c) of the National Security Act of 1947, even though the discretionary "language and structure" of Section 102(c) "preclude[d] judicial review … under the APA"). Granted, there are two issues on appeal that could impact the equal protection claim—ICIRR's standing to challenge the Final Rule, and ripeness—but, in the court's view, there is little chance of reversal on those issues in light of governing Seventh Circuit precedent. 417 F. Supp. 3d at 1018-19 (citing, *e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019), and *OOIDA v. FMCSA*, 656 F.3d 580, 586-87 (7th Cir. 2011)); Doc. 109 at 27.

Two observations before concluding. First, as to DHS's motion to dismiss the equal protection claim, the court holds only that the claim survives dismissal, not that ICIRR is entitled to judgment. Second, as to extra-record discovery on that claim, the court has not addressed the nature and extent of the discovery to which ICIRR is entitled. *See Webster*, 486 U.S. at 604 (holding that "the District Court has the latitude to control any discovery process which may be instituted so as to balance [the plaintiff's] need for access to proof which would support a colorable constitutional claim against" the agency's legitimate interests and needs).

May 19, 2020

_____

United States District Judge