UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COOK COUNTY, ILLINOIS,<br><br>    et al.,<br><br>  Plaintiffs,<br><br>  vs.<br><br>CHAD F. WOLF, in his official capacity as Acting Secretary of U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>    et al.,<br><br>  Defendants. | Case No. 19-cv-6334<br><br>Judge Gary Feinerman |

**PLAINTIFF ICIRR'S REPLY IN SUPPORT OF ITS
MOTION FOR EXPEDITED DISCOVERY ON EQUAL PROTECTION CLAIM**

Does a "strong showing" under our Constitution that the federal government—*today*—is denying rights to non-whites *because they are not white* warrant a concerted and quick effort to get to the truth, or should we all act like this is just another civil case? (*See* Dkt. 150 at 26.)

Six months after briefing on this issue was completed, Defendants are attempting to relitigate whether discovery concerning racial animus is warranted at all, claiming that such discovery intrudes on executive decisionmaking and that it is futile because the equal protection claim has no merit. (*See*, *e.g.*, Opp. at 2–4, 8–9.) This Court already has decided these questions. Based on all of the indicia of racial animus available even *without* discovery, this Court found that this case is one of those rare circumstances in which discovery into executive motivation is necessary in order to conduct the constitutional inquiry required by *Arlington*

1

*Heights*.[1] (Dkt. 150 at 20.) Indeed, even with respect to particular individuals, this Court already has held that Mr. Cuccinelli's statements reflecting animus against non-whites are "unquestionably pertinent" and, in the strongest terms, that Mr. Miller was a key decisonmaker here: "There is no need to draw inferences in ICIRR's favor to deduce from those emails who answered to whom." (*Id.* at 17.)

The only question the Court has not addressed is *when* that discovery should occur. Defendants raise only two real objections to that question. Each is easily answered.

First, contrary to Defendants' position, Plaintiffs—and many others—are suffering irreparable harm as a result of the Final Rule. Defendants' opposition appears to be yet another attempt to delay proceedings while that harm continues apace. This attempt at delay is particularly galling in light of this Court's finding of a "strong showing" that senior federal government officials were motivated by racial animus—and the fact that the underlying Rule (though enjoined by this Court and the Seventh Circuit) nonetheless is still in effect as a result of the stay Defendants sought and obtained in the Supreme Court.

Second, Defendants suggest that it would be "burdensome" to move quickly here. (Opp. at 1.) But any supposed "burdens" on government lawyers pale in comparison to the "strong

---

[1] A plurality of the Supreme Court reaffirmed the *Arlington Heights* standard this morning. *Dep't of Homeland Security, et al. v. Regents of the Univ. of California*, No. 18-587, Slip Op. at 27 (June 18, 2020) (holding that, under *Arlington Heights*, courts should consider disparate impact on a particular group, procedural irregularity, and "contemporary statements by members of the decisionmaking body" to evaluate animus). Although the Court held that the allegations at issue in *Regents* were insufficient to state an equal protection claim, the allegations addressed statements of bias that had far less to do with the challenged agency action than the statements of bias supporting ICIRR's claim here. In *Regents*, Plaintiffs relied solely on statements by the President about Latinos that were "remote in time and made in unrelated contexts." *Id*. at 28. Here, by contrast, ICIRR has alleged—and this Court already has acknowledged—both temporal and contextual proximity between key decisionmakers' statements reflecting racial animus and the public charge rule itself. (Dkt. 150 at 12–13.)

showing" of unconstitutional discrimination that already has been found and the ongoing irreparable harm to Plaintiffs. Access to evidence of intentional racial discrimination by our government under these circumstances should not be shielded or delayed for any reason, much less the reasons advanced in Defendants' opposition.

## ARGUMENT

I. <u>ICIRR Has Shown in Numerous Ways That the Final Rule Imposes Irreparable, Ongoing Harm.</u>

As ICIRR pointed out in its opening brief, this Court already has held that ICIRR has "amply establish[ed]" irreparable harm from the Final Rule. (Mtn. at 3.) Defendants essentially have no answer for this, nor any answer for the Seventh Circuit's affirmation of the preliminary injunction, which itself depended on a finding of irreparable harm. *Cook County, et al. v. Wolf*, No. 19-3169, Dkt. No. 129 (7th Cir. June 10, 2020).

First and foremost, this Court already has held that both Plaintiffs—ICIRR and Cook County—have suffered and will continue to suffer irreparable harm every day that the Final Rule remains in effect. Dkt. 106 at 28–29. The Final Rule is, by design, chilling immigrants from using public benefits and seeking medical care based on those benefits. That chilling effect translates into irreparable harm for both ICIRR and Cook County: when immigrants disenroll from benefits as a result of the Rule, Cook County is forced to provide more costly, uncompensated emergency care, and ICIRR is forced to divert its resources to educate individuals about the Final Rule. *See Cook County*, No. 19-3169, Dkt. No. 129 at 10–11 (7th Cir. June 10, 2020) ("The Rule already has caused ICIRR to divert resources from its core programs to new efforts designed to educate immigrants and staff about the Rule's effects and to mitigate the Rule's chilling impact on immigrants who are not covered by the Rule but who nonetheless fear immigration consequences based on their receipt of public benefits.").

Moreover, the irreparable harm to the individuals ICIRR serves—and thus its own diversion of resources to counter that harm—has only been further exacerbated by the ongoing COVID-19 pandemic and USCIS's confusing website alert. Mtn. ¶ 11; Dkt. 157-1 ¶¶ 7, 8, 12, 13. This ongoing irreparable harm weighs strongly in favor of expedited discovery.[2]

Second, the harm imposed by racial discrimination by the government goes well beyond harm to any one individual; it is an assault on the core of our system of justice. *Cf. Johnson v. California*, 543 U.S. 499, 510–11 (2005) ("[C]ompliance with the Fourteenth Amendment's ban on racial discrimination … bolsters the legitimacy of the entire criminal justice system. Race discrimination is especially pernicious in the administration of justice. And public respect for our system of justice is undermined when the system discriminates based on race.") (quotation and citation omitted); *Winston v. Boatwright*, 649 F.3d 618, 622 (7th Cir. 2011) ("Intentional discrimination by any participant in the justice system undermines the rule of law and, by so doing, harms the parties … and the public as a whole."). And that harm is connected directly to the expedited discovery sought here. Contrary to Defendants' assertion, it is not "entirely speculative" to infer that evidence of discrimination will be uncovered that could be used to obtain an injunction against the rule. (Opp. at 6.) This Court already has ruled that ICIRR has made a "strong showing" that it "will find material in the agency's possession indicative of bad faith or an incomplete record," and, indeed has already "unearthed" evidence indicative of racial

---

[2] Contrary to Defendants' assertion, ICIRR did not delay, but sought discovery even before a motion to dismiss was filed. (Dkt. 111.) Defendants opposed that effort at every turn. Moreover, Defendants have demonstrated through their own conduct—namely, producing an incomplete administrative record and refusing even to *begin* to produce a privilege log until ordered to do so in another case (they have produced all of *three pages* to date)—that absent a court-imposed schedule, they likely will continue delaying to preserve the status quo as long as possible.

animus. (Dkt. 150 at 25–27.) The other side of this coin is that the *absence* of discovery may well allow further evidence of discriminatory animus to "remain concealed." (Dkt. 150 at 25.)

Finally, Defendants' attempts to spin their defeat in the Seventh Circuit to their advantage are unavailing, to say the least. As an initial matter, contrary to Defendants' position (Opp. at 5–6), the Seventh Circuit has made it absolutely clear that the Supreme Court stay does *not* mean that there is no harm to ICIRR: "There would be no point in the merits stage if an issuance of a stay must be understood as a *sub silentio* disposition of the underlying dispute." *Cook County*, No. 19-3169, Dkt. No. 129 at 40. Indeed, if there were any doubt about this, the Supreme Court's affirmative and express invitation for Plaintiffs to continue to pursue further relief in the District Court makes it quite clear. *Chad Wolf, et al. v. Cook County, Illinois, et al.*, Case No. 19A905 (Apr. 24, 2020) ("This order does not preclude a filing in the District Court as counsel considers appropriate.").

Similarly, the Seventh Circuit's decision that it did not need to decide whether ICIRR was in the "zone of interests" for purposes of the APA challenge does not, contrary to Defendant's assertion, mean that ICIRR may not seek relief. (Dkt. 163 at 17–18.) Indeed, the Seventh Circuit expressly stated that it was *not* ruling on that point. *Cook County*, No. 19-3169, Dkt. No. 129 at 14. The Seventh Circuit also stated plainly that ICIRR had a cognizable injury sufficient to establish Article III standing. *Id.* at 10–11. In any event, the zone-of-interests test applies only to statutory claims, not constitutional claims like the equal protection claim asserted here. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("Whether a plaintiff comes within 'the "zone of interests"' is an issue that requires us to determine, using traditional tools of *statutory* interpretation, whether a *legislatively conferred* cause of action encompasses a particular plaintiff's claim." (emphasis added) (citation omitted));

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) ("[T]he 'zone of interest' inquiry . . . is not a test of universal application").[3]

Most disingenuously, in their motion for an interlocutory appeal, Defendants suggest that the equal protection claim is somehow beside the point, because Plaintiffs' claims have "largely been resolved by the Seventh Circuit's recent ruling, and certainly can be resolved in this Court without the need for discovery beyond the administrative record." (Dkt. 163 at 5.) If Defendants are ready to concede liability on Plaintiffs' APA claims, then the parties can proceed to a final judgment by consent. And if that's what the Defendants want to do to avoid public scrutiny of additional evidence of racial animus, that's understandable. But if that is not Defendants' position, then any suggestion that the issues are "resolved" rings false.

II.     The Balance Of Harms Weighs In Favor Of Expedited Discovery

Defendants have not identified any harms to them that support delaying discovery. Most of Defendants' arguments on burdens relate to whether discovery should occur at all—an issue this Court already has decided—and not the schedule on which discovery should proceed. Defendants argue, for instance, that "Plaintiff's proposed 'inquiry into "executive

---

[3] Tellingly, all of the cases Defendants cite in their certification motion on this point involve statutory claims. (Dkt. 163 at 17.) *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153–55 (1970) (discussing the zone-of-interests test in the context of Article III standing and applying the test to the Bank Services Corporation Act of 1962); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (applying the zone-of-interests test to § 702 of the APA); *Clarke*, 479 U.S. at 399–401 (applying the zone-of-interests test to the National Banking Act). Indeed, the test's statutory emphasis is apparent from the very passages that Defendants quote, once Defendants' selective editing is removed. *See Lujan*, 497 U.S. at 883 ("[T]he plaintiff must establish that the injury [it] complains of ([its] aggrievement, or the adverse effect upon [it]) falls within the 'zone of interests' sought to be protected by the *statutory provision* whose violation forms the legal basis for [its] complaint.") emphasis added)); *Clarke*, 479 U.S. at 399 (explaining that a plaintiff falls outside the zone of interests when its "interests are . . . marginally related to or inconsistent with the purposes implicit in the *statute*" (emphasis added)).

motivation," … represents "a substantial intrusion" into the workings of another branch of Government [that] should normally be avoided.'" (Opp. at 3 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).) Defendants made this same argument, quoting these same words from *Department of Commerce*, when they opposed ICIRR's request for any kind of discovery on the equal protection claim. (Dkt. 113 at 4.) This Court considered the argument and rejected it, recognizing that "there is a 'narrow exception to the general rule against inquiring into the mental processes of administrative decisionmakers,'" namely when the plaintiff makes "a strong showing of bad faith or improper behavior.'" (Dkt. 150 at 20 (quoting *Dep't of Commerce*, 139 S. Ct. at 2573–74).)

Elsewhere, Defendants cite *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), for the proposition that "Plaintiff's proposed discovery raises significant issues relating to the separation of powers and executive privilege, which deserve appropriate time for briefing." (Opp. at 4.) This, too, is an untimely argument that no discovery should occur at all—not an argument against expedition. It was no mystery six months ago that ICIRR sought information concerning Mr. Miller and Mr. Cuccinelli. And in any event, *Cheney* does not support Defendants: the case turned on (a) the extreme breadth of the plaintiffs' discovery requests, and (b) the fact that plaintiffs sought discovery into advice given to the President— factors not present here.

Unlike ICIRR's requests, the *Cheney* plaintiffs' discovery requests "ask[ed] for everything under the sky" on a legal theory that had not been tested. 542 U.S. at 387. The plaintiffs' substantive claim was that the Vice President had failed to disclose information required under the Federal Advisory Committee Act (FACA), and the Court noted that plaintiffs' discovery requests were so broad as to "provide [plaintiffs] all the disclosure to which they

7

would be entitled in the event they prevail on the merits, and much more besides." *Id.* at 388. What is more, it was unclear whether the FACA required *any disclosures at all*, and the Court bemoaned the absence of any mechanism for "filter[ing] out insubstantial legal claims" before such discovery was ordered. *Id.* at 386. *Cheney* was concerned with "meritless claims against the Executive Branch" by plaintiffs seeking "civil damages." *Id.* at 386.

In stark contrast, ICIRR is pursuing a non-monetary claim that the Executive Branch has violated the Constitution. Indeed, ICIRR made a "strong showing … that the Rule was developed and promulgated 'at least in part because of' … the Rule's disproportionate 'adverse effects upon' nonwhite immigrants." (Dkt. 150 at 27.) And, unlike the *Cheney* plaintiffs, ICIRR does not seek "everything under the sky," but rather narrow discovery targeted to evidence of racial animus that otherwise would remain concealed. (Dkt. 150 at 24–26.) The only particular discovery request quoted by Defendants (Opp. at 11–12) relates to documents *specifically* concerning national origin, race, or ethnic group—illustrating that ICIRR's discovery is not the "unbounded in scope" discovery rejected in *Cheney*. *Id.* at 388.

Moreover, ICIRR has not requested the collection of any records in the custody of the President or Vice President (Dkt. 157-2 Appendix A)—another factor critical to the *Cheney* Court's decision. *See* 542 U.S. at 382 (noting special circumstances of a case "involving the President or the Vice President"); *see also id.* at 384 (same). However "difficult" the "questions of separation of powers and checks and balances" were in *Cheney* (*see* Opp. at 4), they are quite straightforward here: DHS may not shield from discovery those records showing that the Rule was motivated by racially discriminatory animus.

Nor are high-ranking executive officials shielded from being deposed where, as here, they were *directly involved* in the allegedly unlawful action. As Defendants' own authority

8

recognizes, high-ranking executive officials may be required to provide testimony in "extraordinary circumstances" like this "where the official has first-hand knowledge related to the claim being litigated." *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *see also, e.g.*, *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) ("[T]o depose a high-ranking government official, a party must demonstrate exceptional circumstances justifying the deposition—for example, that the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means.").[4] This is just such a case. Here, this Court already has held that Mr. Miller, Mr. Cissna, and Mr. Cuccinelli were directly involved in the public charge rule and, further, that both Mr. Miller and Mr. Cuccinelli have expressed racist sentiments against non-white immigrants that plausibly reflect the motivation behind the Final Rule. (Dkt. 150 at 6–8, 17–19.) Two other proposed deponents—Mr. Feere and Ms. Kovarik— were allies of Mr. Miller who had weekly immigration policy meetings with him and are known to have been involved in the public charge rule. *See In The Documents: Stephen Miller's Emails With Top ICE Official*, American Oversight (Jan. 6, 2020), https://www.americanoversight.org/in-the-documents-stephen-millers-emails-with-top-ice-official; Deposition Tr. of Kathy Nuebel Kovarik, ECF No. 96-18 at 13–15, *Ramos, et al. v. Nielsen, et al.*, No. 18-cv-1554 (Aug. 3, 2018), available online at https://www.nationaltpsalliance.org/wp-content/uploads/2018/10/2018-08-23-Doc-96-018-Exhibit-18-235276811_1.pdf (admitting that she had standing weekly immigration policy meetings with Miller and others). As a result, these individuals all have first-hand knowledge regarding the extent to which the Rule was motivated by

---

[4] Critically, none of the cases Defendants cite involve allegations—let alone a strong showing—of discriminatory animus by the very high level executive officials sought to be deposed.

discriminatory animus, and ICIRR cannot obtain evidence of their racial animus from alternative witnesses.

What little Defendants say about the burdens from *expediting* discovery—as distinct from engaging in discovery at all—falls flat. Defendants say they cannot produce documents "within 14 days, or anything close to that timeframe." (Opp. at 9.) But DHS reported to the Washington District Court just last week that: (1) it already had collected email records for approximately fifty custodians, including most of the proposed custodians attached to ICIRR's requests for production[5]; (2) it already had processed and batched out for review the email records for 37 of those custodians; and (3) it already had reviewed more than 1,500 documents. (Ex. 2, Report Pursuant to May 13, 2020 Order, *Washington v. Dep't of Homeland Security, et al.*, No. 19-cv-5210, ECF No. 232 (E.D. Wa. June 12, 2020).) In this Court, Defendants submit declarations to support their supposed inability to comply with an expedited discovery schedule, but they fail to address what share of the review already has been completed in connection with the other public charge cases. (*See* Dkt. 165-2, Decl. of Stephen Bell, Jr. ¶ 14 (acknowledging that "USCIS has already collected some email records for certain custodians, in connection with proceedings in a similar case challenging the public charge rule," but saying nothing about what proportion of the discovery sought by ICIRR remains to be done)). Moreover, Defendants' declarations demonstrate that at least some constraints on Defendants' ability to respond are of their own making. (*See id.* ¶ 16 (noting that only "four USCIS OCC attorneys [are] assigned to directly work on this matter"); Dkt. 165-4, Decl. of David Palmer ¶ 10 ("DHS HQ currently has three

---

[5] Several of ICIRR's proposed custodians appear in the privilege log that Defendants produced on June 12. (Ex. 1, Privilege Log produced in *Washington v. Dep't of Homeland Security, et al.*, No. 19-5210 (June 12, 2020) (listing Cuccinnelli, Mitnick, Zadrozny, Kovarik, and others).)

employees who work on … fulfilling data search requests for all of DHS HQ"). Defendants' staffing preferences cannot outweigh the urgency that ICIRR has demonstrated applies here.

Defendants also complain that they "would need to confer with Plaintiffs to ascertain Plaintiff's intended meaning," and argue that ICIRR must pursue "appropriate processes to attempt to obtain documents from non-parties." (Opp. at 12.) Of course the parties must meet and confer, but the purported need to clarify a document request or issue a subpoena to some theoretically separate part of the executive cannot justify discovery delayed or discovery denied, much less the resulting delay or denial of a challenge to an invalid Rule engineered to suppress nonwhite immigration.

Defendants know how to move quickly when they want to. Indeed, Defendants had no qualms about "demanding immediate attention" from the Supreme Court in this case. *See Chad Wolf, et al. v. Cook County, Illinois, et al.*, Case No. 19A905 (Feb. 21, 2020) (Sotomayor, J., dissenting from the grant of the stay). "Months!"[6] was not an acceptable answer for Stephen Miller, nor should it suffice for this Court.

## CONCLUSION

For the foregoing reasons, ICIRR's motion for expedited discovery should be granted.

Dated: June 18, 2020 

Respectfully submitted,

*/s/* David A. Gordon
David A. Gordon
Tacy F. Flint

---

[6] Ted Hesson, *Emails show Stephen Miller pressed hard to limit green cards*, Politico (Aug. 2, 2019), https://www.politico.com/story/2019/08/02/stephen-miller-green-card-immigration-1630406.

11

Marlow Svatek
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000 (Telephone)
(312) 853-7036 (Facsimile)
dgordon@sidley.com
tflint@sidley.com
msvatek@sidley.com

Yvette Ostolaza (*pro hac vice*)
Texas Bar No. 00784703
Robert S. Velevis (*pro hac vice*)
Texas Bar No. 24047032
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, Texas 75201
(214) 981-3300 (Telephone)
(214) 981-3400 (Facsimile)
Yvette.ostolaza@sidley.com
rvelevis@sidley.com


*/s/* Caroline Chapman
Caroline Chapman
Meghan P. Carter
LEGAL COUNCIL FOR HEALTH JUSTICE
17 N. State, Suite 900
Chicago, IL 60602
Phone: (312) 605-1958
Fax: (312) 427-8419
cchapman@legalcouncil.org
mcarter@legalcouncil.org

*/s/* Katherine E. Walz
Katherine E. Walz
Andrea Kovach
Militza M. Pagan
SHRIVER CENTER ON POVERTY LAW
67 E. Madison, Suite 2000
Chicago, IL 60603
Phone: (312) 368-2679
Fax: (312) 263-3846
katewalz@povertylaw.org
andreakovach@povertylaw.org
militzapagan@povertylaw.org

*Counsel for Illinois Coalition For Immigrant and Refugee Rights, Inc.*

13

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on June 18, 2020, she caused the attached **Plaintiff ICIRR's Motion for Expedited Discovery on Equal Protection Claim** to be served via the Court's ECF system and by email upon:

Keri L. Berman (Keri.L.Berman@usdoj.gov)

Kuntal Cholera (Kuntal.Cholera@usdoj.gov)

Joshua Kolsky (Joshua.kolsky@usdoj.gov)

Eric Soskin (Eric.Soskin@usdoj.gov)

Tom Walsh (thomas.walsh2@usdoj.gov)

/s/ Marlow Svatek