**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC., | |
| Plaintiff, | Case No. 19-cv-6334 |
| v. | Judge Gary Feinerman |
| ALEJANDRO MAYORKAS, in his official capacity as Secretary of U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| et al., | |
| Defendants. | |

## PLAINTIFFS' RESPONSE TO STATES' MOTIONS TO INTERVENE AND FOR RELIEF FROM JUDGMENT PURSUANT TO RULE 60(b)

## TABLE OF CONTENTS

I.  The Motion to Intervene Should Be Denied. ...............................................................2

  A.  The Intervenor States' Generalized Grievances Cannot Satisfy the
Seventh Circuit's Threshold Standing Requirement. ........................................... 2

  B.  The Intervenor States Cannot Satisfy Rule 24(a)(2). .......................................... 4

    1.  The Intervenor States' Rule 24(a)(2) Is Untimely. ........................................ 4

    2.  The Intervenor States Fail to Identify A Sufficient Interest In
This Case Or Any Impairment Of An Interest That Could
Justify Intervention As Of Right................................................................... 12

  C.  The Intervenor States Cannot Satisfy Rule 24(b)(1)(B)..................................... 14

II.  The Intervenor States' Rule 60(b) Motion Should Be Denied. ..........................................16

  A.  The Intervenor States Cannot Obtain Rule 60(b) Relief as Non-
Parties. ............................................................................................................... 16

  B.  The Intervenor States' Request For Rule 60(b) Relief Is Not Timely. .............. 18

  C.  The Intervenor States Have Identified No Basis for Granting Relief
Under Rule 60(b)(6). ......................................................................................... 19

    1.  The Court Should Not Reconsider Its Judgment............................................ 20

    2.  There Are No Exceptional Circumstances That Would Justify
Rule 60(b)(6) Relief. .................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelson v. Ocwen Fin. Corp.*,
    621 F. App'x 348 (7th Cir. 2015) ........................................................................2, 17

*Am. Foreign Serv. Ass'n* v. *Garfinkel*,
    490 U.S. 153 (1989) (per curiam)................................................................................16

*Amador County v. U.S. DOI*,
    772 F.3d 901 (D.C. Cir. 2014)......................................................................................5

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997)................................................................................................2, 13

*Arrieta v. Battaglia*,
    461 F.3d 861 (7th Cir. 2006) ......................................................................................18

*Banks v. Chi. Bd. Of Educ.*,
    750 F.3d 663 (7th Cir. 2014) ......................................................................................19

*Barefoot v. Estelle*,
    463 U.S. 880 (1983) (Marshall, J., dissenting) ............................................................22

*Bond v. Utreras*,
    585 F.3d 1061 (7th Cir. 2009) ......................................................................................3

*Bridgeport Music, Inc. v. Smith*,
    714 F.3d 932 (6th Cir. 2013) ......................................................................................17

*Casa de Md., Inc. v. Joseph Biden, Jr.*,
    Case No. 19-2222, ECF No. 211 (4th Cir., Mar. 11, 2021)........................................22

*Casa de Md., Inc. v. Trump*,
    981 F.3d 311 (4th Cir. 2020) ......................................................................................21

*Cavelle v. Chi. Transit Auth.*,
    No. 17-cv-5409, 2020 U.S. Dist. LEXIS 211436 (N.D. Ill. Nov. 12, 2020) ..............14

*CE Design, Ltd. v. King Supply Co., LLC*,
    No. 09 C 2057, 2012 U.S. Dist. LEXIS 101310 (N.D. Ill. July 20, 2012) ...................7

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)................................................................................22, 23, 26, 27

*City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
    981 F.3d 742 (9th Cir. 2020) .................................................................21

*City of Chicago v. Fed. Emergency Mgmt. Agency*,
    660 F.3d 980 (7th Cir. 2011) ...................................................................2

*Cook County v. Wolf*,
    962 F.3d 208 (7th Cir. 2020) ...............................................3, 14, 22, 27

*Cunningham Charter Corp. v. Learjet, Inc.*,
    592 F.3d 805 (7th Cir. 2010) .................................................................15

*Diamond v. Charles*,
    476 U.S. 54 (1986)...................................................................................3

*Doe v. Reed*,
    130 S. Ct. 2811 (2010) ...........................................................................22

*Doe v. Reed*,
    130 S. Ct. 486 (2009)..............................................................................22

*EEOC v. United Air Lines*,
    No. 73 C 972, 1995 U.S. Dist. LEXIS 2581 (N.D. Ill. Mar. 3, 1995) ...................................8, 10

*EME Homer City Generation, L.P v. EPA*,
    795 F.3d 118 (D.C. Cir. 2015)...............................................................25

*Environment Protection Agency v. New Jersey*
    (No. 08-512) (2008)................................................................................24

*Flying J, Inc. v. Van Hollen*,
    578 F.3d 569 (7th Cir. 2011) ........................................................ *passim*

*Gonzalez v. Crosby*,
    545 U.S. 524 (2005)................................................................................26

*Grace v. Bank Leumi Trust Co.*,
    443 F.3d 180 (2d Cir. 2006)..............................................................17, 18

*Heartwood, Inc. v. U.S. Forest Serv., Inc.*,
    316 F.3d 694 (7th Cir. 2003) ....................................................4, 8, 10, 15

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013)..............................................................................2, 3

*Illinois DOT v. Hinson*,
    122 F.3d 370 (7th Cir. 1997) ..................................................................4

*Illinois v. City of Chicago*,
 912 F.3d 979 (7th Cir. 2019) .................................................................................7

*Ind. State Police Pension Tr. v. Chrysler LLC*,
 556 U.S. 960 (2009) (per curiam) .........................................................................22

*Ingram v. Merrill Lynch, Pierce, Penner & Smith, Inc.*,
 371 F.3d 950 (7th Cir. 2004) ...............................................................................18

*Key v. Sullivan*,
 925 F.2d 1056 (7th Cir. 1991) .............................................................................20

*Larson v. JPMorgan Chase & Co.*,
 530 F.3d 578 (7th Cir. 2008) ...............................................................................12

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ................................................................................................3

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) ..............................................................................................15

*Meridian Homes Corp. v. Nicholas W. Prassas & Co.*,
 683 F.2d 201 (7th Cir. 1982) .........................................................................13, 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) (Rehnquist, J., concurring in part and dissenting in part) .........................23

*Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*,
 545 U.S. 967 (2005) ..............................................................................................27

*Neuberg v. Michael Reese Hosp. Found.*,
 123 F.3d 951 (7th Cir. 1997) ...............................................................................19

*New York v. U.S. Dep't of Homeland Sec.*,
 969 F.3d 42 (2d Cir. 2020) ...................................................................................22

*Nissei Sangyo Am., Ltd. v. United States*,
 31 F.3d 435 (7th Cir. 1994) ............................................................................8, 11

*Pennsylvania v. Devos*,
 No. 1:20-cv-01468-CNJ, Dkt. 130-1 (D.D.C. Jan. 19, 2021) ..........................8, 12

*People Who Care v. Rockford Bd. of Ed.*,
 68 F.3d 172 (7th Cir. 1995) ...................................................................................4

*Planned Parenthood of Wis., Inc. v. Kaul*,
 942 F.3d 793 (7th Cir. 2019) ....................................................................4, 12, 15

*Sandifer v. U.S. Steel Corp.*,
    678 F.3d 590 (7th Cir. 2012) .................................................................24

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ..............................................................20

*Sokaogon Chippewa Cmty. v. Babbitt*,
    214 F.3d 941 (7th Cir. 2000) ...................................................4, 5, 8, 15

*In re Taylor*,
    575 B.R. 390 (N.D. Ill. 2017) ...............................................................20

*Texas v. Cook County*,
    No. 20A150 (filed Apr. 9, 2021)......................................................13, 28

*United States v. Kirschenbaum*,
    156 F.3d 784 (7th Cir. 1998) .................................................................17

**Statutes**

5 U.S.C. § 553(b)(3)(B) ................................................................................25

5 U.S.C. § 706(2)(A).....................................................................................24

8 U.S.C. § 403, 110 ................................................................................3, 13

8 U.S.C. § 1613 ......................................................................................3, 13

28 U.S.C. § 530D(a)(1)(B)(ii)........................................................................24

**Other Authorities**

84 Fed. Reg. 41,292 ......................................................................................13

86 Fed. Reg. 14,221 (Mar. 15, 2021)......................................................16, 25

Adam Liptak, *Trump's Legal U-Turns May Test Supreme Court's Patience*, N.Y.
    TIMES (Aug. 28, 2017) ..........................................................................24

DHS/USCIS, Announcement of Advance Notice of Proposed Rulemaking in
    Unified Agenda, Inadmissibility on Public Charge Grounds, RIN 1615-AC74
    (June 11, 2021)........................................................................11, 16, 26

Executive Order 14012, 86 Fed. Reg. 8277, 8277 (Feb. 2, 2021) ...............6, 26

Fed. R. App. P. 42(b) ....................................................................................23

Fed. R. Civ. P. 24 ................................................................................. *passim*

Fed. R. Civ. P. 60(b) .................................................................................. *passim*

Fed. R. Civ. P. 60(c)(1) ................................................................................18

Josh Blackman, *Presidential Maladministration*, 2018 U. Ill. L. Rev. 397, 405 ...........................24

Low-Income Immigrant Families Opted Out Of Benefits In 2020, Citing
   Immigration Concerns, May 21, 2021 ......................................................14

President, *The Biden Plan for Securing Our Values as a Nation of Immigrants*,..........................5, 6

**INTRODUCTION**

The latest attempt to defend the Public Charge Rule comes far too late. Plaintiffs Cook County, Illinois, and Illinois Coalition for Immigrant & Refugee Rights ("ICIRR") (collectively, "Plaintiffs") filed suit more than a year and a half ago, in November 2019. President-Elect Biden announced his intention to reverse the Public Charge Rule ("the Rule" or "Vacated Rule") well in advance of his election in November 2020 and inauguration in January 2021. By February 3, 2021, Defendant Department of Homeland Security ("DHS") stated publicly that it was reevaluating its approach to this case and to the Seventh Circuit appeal of this Court's final judgment order. The proposed intervenors even concede (as they must) that they "have been aware of their interests in the Rule for some time." Dkt. 257 at 5. Nevertheless, Texas and the thirteen additional states (the "Intervenor States") declined to act in this case until March 11, 2021, at which point they improperly moved to intervene in the Seventh Circuit after it had issued the mandate pursuant to Seventh Circuit Rule 41. Now, still months later, the Intervenor States ask this Court to resurrect the case before this Court in which: (1) the parties stipulated to an agreed dismissal; (2) Plaintiff ICIRR agreed to dismiss, with prejudice, its equal protection claim in reliance on Defendants' decision to dismiss their appeal; and (3) Defendants have indicated that they will engage in new rulemaking related to the public charge provision within the year.

Under these circumstances, the Intervenor States' motion for intervention must fail. As an initial matter, the Intervenor States decline even to discuss, much less establish, the threshold Article III standing requirement as mandated by the Seventh Circuit. *See, e.g.*, *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571, 573 (7th Cir. 2011) (explaining that Article III standing is required for both intervention as of right and permissive intervention). And, most critically, the Intervenor States' motion is untimely given their delay and the resulting prejudice to the original parties. For

these reasons, and for several additional reasons discussed below, the Intervenor States cannot satisfy the requisite factors under Rule 24(a)(2) or Rule 24(b)(1)(B) for intervention.

With respect to the Intervenor States' Rule 60(b) motion, relief is available only to "a party or its legal representative." Fed. R. Civ. P. 60(b); *see also Adelson v. Ocwen Fin. Corp.,* 621 F. App'x 348, 351 (7th Cir. 2015) ("By its own terms Rule 60(b) applies only to parties and their legal representatives."). Because the Intervenor States are not parties, and for the further reasons discussed *infra*—including that the Seventh Circuit already has held, consistent with the Second and Ninth Circuits, that the Rule is invalid—they should not be permitted to reopen and relitigate this dismissed case.

## ARGUMENT

### I. The Motion to Intervene Should Be Denied.

#### A. The Intervenor States' Generalized Grievances Cannot Satisfy the Seventh Circuit's Threshold Standing Requirement.

The Seventh Circuit requires intervenors to demonstrate Article III standing. *City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 984–85 (7th Cir. 2011) (explaining that intervenors must have standing even if the original parties remain in the case); *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571, 573 (7th Cir. 2011) (holding that intervenors must establish standing under both Rule 24(a)(2) and Rule 24(b)(1)(B)). A generalized, ideological grievance is insufficient. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 64–65 (1997) ("The decision to seek review is not to be placed in the hands of concerned bystanders, persons who would seize it as a vehicle for the vindication of value interests." (internal quotations omitted)). Instead, the Intervenor States must identify a concrete, particularized, and imminent harm. *See, e.g.*, *Bond v. Utreras*, 585 F.3d 1061, 1072–73 (7th Cir. 2009).

2

Here, the Intervenor States fail even to address their standing. The only interest they assert in this litigation is a general desire to "conserv[e] their Medicaid and related social-welfare budgets," which they speculate might be impacted if more immigrants who would have been deemed "public charges" under the Vacated Rule are now admitted and granted adjustment of status. Dkt. 257 at 6–7. But the Intervenor States provide no evidence whatsoever of the *actual* effects of the Rule. *See id* at 6.[1] The Intervenor States set forth the state of Texas's total Medicaid expenditures, but they do not allege—much less establish with evidence—any immediate, tangible, predicted harm; their theorized harm may or may not come to pass, and if it ever does, it will be at least five years or more in the future (after immigrants admitted now become eligible to obtain Medicaid, 8 U.S.C. § 403, 110 Stat. at 2265–67 (codified as amended at 8 U.S.C. § 1613)), and will be impacted by many forces and decisions unrelated to the Vacated Rule. *Id.* at 6–7. This is the very definition of an attenuated, speculative, non-obvious harm, which is insufficient to support standing. *Hollingsworth*, 570 U.S. at 705–06; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Diamond v. Charles*, 476 U.S. 54, 66 (1986) (rejecting "unadorned speculation" that enforcing an anti-abortion law would result in more fee-paying patients, thus providing the intervenor pediatrician standing to defend the law). For this threshold reason the Intervenor States, like other "kibitzers," lack Article III standing and cannot advance their policy

---

[1] The Intervenor States say only that "the exact amount of Texas's Medicaid budget spent on immigrants who would otherwise be inadmissible under the Rule has varied," Dkt. 257 at 6, but do not say what that amount is or was. The single source they cite, Tex. Health & Human Servs. Comm'n, Texas Medicaid and CHIP in Perspective 179 (11th ed. 2017), https://hhs.texas.gov/reports/2017/02/texas-medicaidchip-perspective-eleventh-edition, does not address the question. In stark contrast, the Plaintiffs established their standing to challenge the Vacated Rule based on the immediate, tangible, predicted consequences of the Vacated Rule's chilling effect. Dkt. 106 at 12; *Cook County v. Wolf*, 962 F.3d 208, 218–19 (7th Cir. 2020). These harms were well-documented in record evidence. *See* Dkt. 106 at 7–8, 10–11.

3

preferences through this case. *Ill. DOT v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997). This alone ends the Intervenor States' efforts before they begin.

### B.  The Intervenor States Cannot Satisfy Rule 24(a)(2).

A party seeking to intervene as of right under Rule 24(a)(2) must establish four elements: (1) a timely application; (2) an interest relating to the subject matter of the action; (3) the potential impairment of that interest by the disposition of the action; and (4) a lack of adequate representation of the interest by the existing parties to the action. *Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019); *see also Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 945–46 (7th Cir. 2000). The proposed intervenor bears the burden of establishing each of these four elements, and "the lack of even one requires that the court deny the motion." *Planned Parenthood*, 942 F.3d at 797 (citing *Vollmer v. Publishers Clearing House*, 248 F.3d 698, 705 (7th Cir. 2001)). Here, the Intervenor States' application is not timely, they do not have sufficient interest in the subject matter of this case, and even if there were a sufficient interest, there would be no impairment of that interest that could justify intervention.

### 1.  The Intervenor States' Rule 24(a)(2) Is Untimely.

Courts determine whether a motion to intervene is untimely based upon four factors: (1) the length of time the potential intervenors knew or should have known of their interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice caused to the proposed intervenors if the motion is denied; and (4) any other unusual circumstances. *Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003). Together, these factors require a "reasonableness inquiry" such that potential intervenors must be "reasonably diligent in learning of a suit that might affect their rights, and upon learning of such a suit, to act to intervene reasonably promptly." *People Who Care v. Rockford Bd. of Ed.*, 68 F.3d 172, 175 (7th Cir. 1995). Here, the Intervenor States' delay renders their request for intervention untimely under Rule

4

24(a)(2) and thus disposes of their motion at this first step. *See, e.g.*, *Amador County v. U.S. DOI*, 772 F.3d 901, 903 (D.C. Cir. 2014) ("If the motion [for intervention] is untimely, the explicit language of the rule dictates that 'intervention must be denied.'" (quoting *NAACP v. New York*, 413 U.S. 345, 365 (1973))).

> i. *The Intervenor States' delay in filing their motion has made their intervention untimely.*

A proposed intervenor must file "as soon as he knows or has reason to know that his interests might be adversely affected by the outcome of the litigation." *Sokaogon*, 214 F.3d at 949. Here, the Intervenor States themselves concede that they were aware of their interest in the Vacated Rule "for some time" prior to their first intervention attempt on March 11, 2021. The Intervenor States cite *Flying J*, for the proposition that intervention after appeal by nonparties whose alleged interests were previously protected may still be timely when there was "nothing to indicate" that the party would take a different direction by withdrawing its appeal. 578 F.3d at 572; Dkt. 257 at 4–5. That is not the case here; in this instance, *every* indication suggested that the new administration planned not to defend the rule, so the Intervenor States were on notice since the election, and certainly by the inauguration, that they could not rely on the federal government to keep fighting for the Rule.

For more than a year before his inauguration, then-Candidate Biden and subsequently President-Elect Biden campaigned on the assurance that his administration would "[r]everse [the] public charge rule" within its first 100 days. *See* Biden for President, *The Biden Plan for Securing Our Values as a Nation of Immigrants*, https://joebiden.com/immigration/ (last visited June 1, 2021) [hereinafter *Biden Plan*]. Since at least December 2019,[2] the Biden Plan has stated that the

---

[2] The internet archive confirms that this statement has been posted publicly since at least December 2019. *See* https://web.archive.org/web/20191212040308/https://joebiden.com/immigration/.

Vacated Rule "runs counter to our values as Americans and the history of our nation," and that the Vacated Rule's penalization of Medicaid and SNAP "and other discriminatory criteria undermines America's character as a land of opportunity that is open and welcoming to all, not just the wealthy." *Id*. So Intervenor States were aware not only of the incoming administration's position, but *also* the timeline within which it would be implemented.

On February 2, 2021, the new administration issued an Executive Order directing federal agencies to "eliminate[ ] sources of fear and other barriers that prevent immigrants from accessing government services available to them." Executive Order 14012, 86 Fed. Reg. 8,277, 8,277 (Feb. 2, 2021) (the "Executive Order"). Specifically, the Executive Order called upon federal agencies to evaluate their "public charge policies," identify "appropriate agency actions . . . to address concerns about the current public charge policies[ ]," and submit a report to the President on these matters within 60 days. *Id.* at 8,278. Consistent with this review, DHS stated in several public filings with this Court that it was evaluating whether to continue its appeal of the vacatur order in light of the Executive Order. *See* Dkt. 241 at 2 (Feb. 3, 2021); Dkt. 245 at 3 (Feb. 19, 2021); Dkt. 247 at 1 (Mar. 5, 2021).

The Intervenor States were well aware of these public statements. Indeed, in response to questioning by the Court, counsel for Texas acknowledged that they "were keeping tabs on the litigation," were aware that the new administration held a negative view of the Vacated Rule, and knew the administration was "planning on looking at it within the first 100 days." *See* Ex. A, May 18, 2021 Hr. Tr. 11:10–12, 12:2-6, 12:13–14. Accordingly, when DHS publicly concluded that "continuing to defend" the Vacated Rule on appeal was "neither in the public interest nor an

efficient use of limited government resources,"[3] the Intervenor States had known for *months* that their interests in the outcome of this litigation were no longer adequately protected by the existing parties. *See CE Design, Ltd. v. King Supply Co., LLC*, No. 09 C 2057, 2012 U.S. Dist. LEXIS 101310, at *17 (N.D. Ill. July 20, 2012) ("[D]istrict courts should measure timeliness from the point when the potential intervenors learn that their interest 'might be impaired'") quoting *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995))). The Intervenor States' decision to delay filing their motion to intervene and to instead rely on the Defendants (Dkt. 257 at 5) to vindicate a rule that the administration found to be "discriminatory" and antithetical to American values fails the standard of diligence and timeliness to which would-be intervenors are held.

The Intervenor States' remaining justifications cannot excuse their delay. They argue, for example, that they could not have intervened until after March 9, 2021, because that was when the Intervenor States first learned of Defendants' specific intention to "withdraw its defense of the Rule in courts across the country and repeal the Rule by stipulation in litigation." Dkt. 257 at 5. But where, as here, the intervenor knows its interests are contrary to the parties, "the mere fact that the precise outcome of the litigation was unexpected does not restart the timeliness analysis." *Illinois v. City of Chicago*, 912 F.3d 979, 986 (7th Cir. 2019).

Moreover, the Intervenor States' belief that their interests were adequately represented until March 9, 2021, Dkt. 257 at 5, is contradicted by their actions in other litigation. Before President Biden's inauguration, Texas moved to intervene in another case in which it had, until that point, been aligned with federal government defendants in order to preserve Texas's opportunity to defend an agency rule after the change in presidential administrations. Ex. B,

---

[3] U.S. Dep't of Homeland Sec., *DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility* (Mar. 9, 2021), https://www.dhs.gov/news/2021/03/09/dhs-statement-litigation-related-public-charge-ground-inadmissibility [hereinafter "DHS Statement"].

*Pennsylvania v. Devos*, No. 1:20-cv-01468-CNJ, Dkt. 130-1 at 6, 10–11 (D.D.C. Jan. 19, 2021), *granted by minute order* (D.D.C. Feb. 4, 2021); *see id.* at 6 (arguing that its motion for intervention was timely because "Texas's addition will avert a potential disruption to the case should the federal government withdraw its support of the Final Rule and refuse to defend it"). Consistent with *Pennsylvania v. Devos*, the Intervenor States could have intervened in a timely manner in this case. They did not.

> ii.   *The Intervenor States' delay will substantially prejudice the original parties.*

When assessing timeliness, the "most important consideration . . . is whether the delay in moving for intervention will prejudice the existing parties to the case." *Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 439 (7th Cir. 1994). It is well recognized that a "tardy intervenor" creates prejudice to the original parties when its intervention would "derail[] a lawsuit within sight of the terminal," *Sokaogon*, 214 F.3d at 949, including by upsetting the parties' settlement of their dispute, *EEOC v. United Air Lines*, No. 73 C 972, 1995 U.S. Dist. LEXIS 2581, at *7 (N.D. Ill. Mar. 3, 1995) ("It is well-settled that it is prejudicial to allow intervention in a case after the original parties have invested time and effort into settling a case." (citing *Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991), *cert. denied*, 112 S. Ct. 879 (1992))); *see also Heartwood*, 316 F.3d at 701 ("Prompt filing of a motion to intervene after the settlement does not indicate timeliness, particularly where there is evidence that the intervenor should have known the suit could impact its interests for some time prior to that settlement.").

Allowing intervention here would have such a prejudicial effect. Judgment was entered, and the existing parties have resolved what remained of their dispute—meaning that the lawsuit is not just "within sight of the terminal," but well and fully terminated. Moreover, it was not merely Defendants' appeal of the Court's judgment as to the APA claims that was dismissed, but also

ICIRR's separate equal protection claim, which remained pending in this Court and potentially offered a separate avenue for relief. *See* Dkt. 253. ICIRR voluntarily dismissed that claim, *with prejudice*, in reliance on the final judgment on the APA claims and the dismissal of Defendants' appeal. Dkt. 253 (voluntarily dismissing still-pending equal protection claim "[i]n light of Defendants' decision to voluntarily dismiss its appeal of this Court's final judgment . . . and because the Rule challenged in this lawsuit is therefore no longer in effect"). ICIRR has thus taken concrete and binding steps in reliance on the finality of this Court's judgment and the termination of the appeal therefrom. These are reliance interests that were wholly absent in *Flying J*, and the potential unraveling of these settled expectations due to the Intervenor States' delay prejudices the original parties. Accordingly, allowing the Intervenor States to reopen the case at this late stage would fundamentally alter the terms of the parties' stipulation at ICIRR's expense.

In addition, allowing intervention would resurrect the Vacated Rule's well-documented harms to the Plaintiffs and their communities. This Court already found that the fear of being deemed a "public charge," even by immigrants not subject to the Rule, would cause immigrants to disenroll from, or refrain from enrolling in, critical public benefits. Dkt. 106 at 7. It determined that, consistent with common sense and the Defendant agency's own concessions, this decline in enrollment would result in: (1) a decrease in preventative routine treatment that will create costly, uncompensated emergency care; (2) a decline in individuals receiving immunizations or seeking diagnostic testing that will increase the risk of communicable diseases; and (3) a loss in Medicaid reimbursement revenues and an increase in uncompensated care costs. *Id.* at 7–8. Allowing the Intervenor States to reopen this case would revive its chilling effect *immediately*, throwing immigrant communities back into the fear and confusion wreaked by the Vacated Rule, and again would result in the withdrawal from benefits and services that caused the harms to the County that

were pled from the outset of the litigation. And because Cook County's Health & Hospital System ("CCH") already provides approximately half of all charity care in Cook County, CCH would bear a disproportionate share of the costs that would follow from disenrollment. *Id.*

Similarly, this Court already determined that by decreasing immigrants' access to health services, food, and other programs, implementation of the Vacated Rule would directly interfere with and frustrate ICIRR's mission to increase access to care, improve health literacy, and reduce reliance upon emergency room care. *Id.* at 10. Accordingly, ICIRR once again would face these hardships if the Intervenor States were permitted to intervene and thus renew the Rule's chilling effect.

The Intervenor States counter that intervention will not prejudice Plaintiffs because they faced the possibility of protracted appellate litigation until March 9, 2021. Dkt. 257 at 5. But the harm of reopening and prolonging this case encompasses more harm than the typical burdens and costs of appellate litigation. Rather, upending this Court's final judgment and the parties' stipulated dismissal would sow confusion among immigrants and exacerbate the Vacated Rule's well-documented harms. For example, ICIRR already has "had to commit significant resources to continually responding to the fluctuating nature of the public charge rule's application, and the need to update training and outreach materials accordingly." Ex. C, Benito Declaration ¶ 7. After this case concluded and the Biden administration announced its intention to reverse the Rule, ICIRR committed substantial resources to outreach to inform partners and community members that the Vacated Rule would no longer be in effect. *Id.* ¶ 11. Reopening this settled case now would dramatically increase confusion surrounding the Vacated Rule, and thus further exacerbate the Rule's harmful chilling effect. It also would require ICIRR to commit yet additional resources to

re-re-educate community members about the status of the Vacated Rule and to encourage immigrants again to get the care and support they are entitled to receive, without fear.

> iii.    *The Intervenor States will not be prejudiced if their motion is denied.*

Intervenor States, in contrast, will not be prejudiced if this Court denies their motion under Rule 24. Their argument rests solely upon the assumption—unsupported by evidence—that the Vacated Rule would have reduced their future Medicaid services budget by an unspecified amount. Dkt. 257 at 5–6. But as discussed in detail below, *see infra* at pp 12–13, 27–28, this unsupported, speculative harm cannot outweigh the well-documented prejudice that excusing Intervenor States' delay would inflict upon the original parties. *See Nissei*, 31 F.3d at 438.

Intervenor States also overstate their allegations of procedural harms in light of DHS's plans to engage in new rulemaking regarding the public charge provision within the year. DHS has publicly announced that it intends to engage in notice-and-comment "rulemaking to define the term public charge and identify considerations relevant to the public charge inadmissibility determination." *See* DHS/USCIS, Announcement of Advance Notice of Proposed Rulemaking in Unified Agenda, Inadmissibility on Public Charge Grounds, RIN 1615-AC74 (June 11, 2021), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC74. Specifically, DHS has indicated that it plans to issue an Advance Notice of Proposed Rulemaking ("ANPRM") by a target date of August 2021. *Id.* Thus, in short order, the Intervenor States will have the opportunity to articulate their policy preferences in the notice-and-comment process and through any subsequent legal challenge they deem appropriate. *See* Dkt. 260 at 8.

> iv.    *The Intervenor States cannot rely upon "unusual circumstances" to excuse their delay.*

Finally, no "unusual circumstances" support excusing the Intervenor States' untimeliness. As discussed above, Texas's actions in *Pennsylvania v. Devos* demonstrate its recognition that a

new administration would likely exercise different litigation strategies, *see* Ex. B, and counsel for the Intervenor States has admitted that they were aware that such a change would likely occur in this case as well, *see* Ex. A, May 18, 2021 Hr. Tr. 11:10–12. Had Texas intervened in *this* case before or promptly after the inauguration, it might have prevented the very disruption it sought to avert in *Devos*—and ICIRR would not have voluntarily dismissed its remaining equal protection claim with prejudice. In other words, to the extent this case presents unusual circumstances, it does so only because of the Intervenor States' own delay. *See, e.g.*, *Larson v. JPMorgan Chase & Co.*, 530 F.3d 578, 583–84 (7th Cir. 2008) (affirming the district court's finding of untimeliness in part because the intervenor "appear[ed] to have acted for strategic reasons").

      2.    <u>The Intervenor States Fail to Identify A Sufficient Interest In This Case Or Any Impairment Of An Interest That Could Justify Intervention As Of Right.</u>

The Intervenor States independently must demonstrate an interest relating to the subject matter of this action and the potential impairment, as a practical matter, of that interest by the disposition of this case. *Planned Parenthood*, 942 F.3d at 797. Indeed, the Seventh Circuit requires "more than the minimum Article III interest" to warrant intervention as of right. *Id.* at 798 (quoting *Flying J*, 578 F.3d at 571). A "mere economic interest," for example, "is not enough." *Flying J*, 578 F.3d at 571 (internal quotations omitted). The Intervenor States offer nothing more.

The Intervenor States' alleged budgetary interest in this matter is precisely the type of "economic interest" that cannot justify intervention as of right. According to the Intervenor States, they spend an unspecified amount of their Medicaid budgets on immigrants. Dkt. 257 at 6. By admitting fewer immigrants who require Medicaid into the United States, they argue that the Vacated Rule "would reduce that burden." *Id.* at 6–7. Notwithstanding the Intervenor States' total lack of evidentiary support, this speculation is belied by the fact that while the Vacated Rule was in effect, it impacted only five cases. *See* Gov't Resp. Br. at 23–24, *Texas v. Cook County*, No.

20A150 (filed Apr. 9, 2021); *see also infra* at pp 27–28. And even if the Intervenor States could establish that the Vacated Rule would have affected admissions to the United States, *compare* Dkt. 257 at 7, *with* 84 Fed. Reg. 41,292 at 41,493 ("DHS cannot estimate with any degree of certainty the extent to which" the Rule "would result in fewer individuals being admitted to the United States"), any reductions in Medicaid spending could not have accrued for at least five years. 8 U.S.C. § 403, 110 Stat. at 2265–67 (codified as amended at 8 U.S.C. § 1613) (implementing the five-year bar on federal means-tested public benefits). The Seventh Circuit sought to avoid precisely this type of remote speculation when it clarified: "the fact that you might anticipate a benefit from a judgment in favor of one of the parties to a lawsuit . . . does not entitle you to intervene in their suit." *Flying J*, 578 F.3d at 571; *accord Meridian Homes Corp. v. Nicholas W. Prassas & Co*., 683 F.2d 201, 204 (7th Cir. 1982) (affirming denial of motion to intervene as the would-be intervenors' economic interest in profits from the partnership at issue did not suffice to establish a direct, substantial, and legally protectable interest for intervention).

Further, the Seventh Circuit's interest inquiry also requires that an intervenor "be someone whom the law on which [their] claim is founded was intended to protect." *Flying J*, 578 F.3d at 572. The Intervenor States identify no unique interest in immigration policy that would warrant intervention; to the contrary, the federal government's dominant role in setting immigration policy is "well settled." *Arizona*, 567 U.S. at 395. Moreover, in promulgating the Vacated Rule, DHS explained that it would have no direct effect on State budgets. 84 Fed. Reg. at 41,492. As this Court and others recognized, the Vacated Rule's alleged cost savings were *indirect* and resulted not from barring people currently eligible for benefits (a *de minimis* number), nor from barring those eligible in the future (a speculative harm), but from people not subject to the Rule who immediately abstained from benefits out of fear. *See* Dkt. 106 at 7–8; *Cook County v. Wolf*, 962

13

F.3d 208, 231 (7th Cir. 2020). This is the "chill" at the root of the Vacated Rule, and it came at great cost to people, communities, hospital systems, cities, and counties, including those in the Intervenor States. *See* Elizabeth Trovall, Houston Public Media, Report: 1 In 3 Low-Income Immigrant Families Opted Out Of Benefits In 2020, Citing Immigration Concerns, May 21, 2021, https://www.houstonpublicmedia.org/articles/news/politics/immigration/2021/05/26/399024/des pite-financial-hardships-during-covid-immigrant-families-opt-out-of-food-and-health-benefits-citing-immigration-fears/ ("In Houston, benefits navigators reported cases of cancer patients and single mothers opting out due to concerns it could impact their immigration status, even if that wasn't true."). The Intervenor States have no cognizable interest in preserving State resources through the perpetuation of fear.

Even if the Intervenor States could identify a sufficient interest in this matter, the existence of an "impairment" of that interest "depends on whether the decision of a legal question involved in [this] action would as a practical matter foreclose rights of the proposed intervenors in a subsequent proceeding." *Cavelle v. Chi. Transit Auth.*, No. 17-cv-5409, 2020 U.S. Dist. LEXIS 211436, at *11–12 (N.D. Ill. Nov. 12, 2020) (citing *Meridian Homes*, 683 F.2d at 204). As is discussed *infra* at pp 26–27, the Intervenor States will have the opportunity to raise these same arguments again, particularly when DHS engages in notice-and-comment rulemaking later this year; nothing about this case impairs their ability to do that. *Meridian*, 683 F.2d at 204–05 (finding no impairment of any interest where the litigation did not jeopardize would-be intervenors' future ability to vindicate their rights). Absent any non-speculative interest or impairment related to this case, intervention as of right is inappropriate.

C.   The Intervenor States Cannot Satisfy Rule 24(b)(1)(B).

A court may permit intervention under Rule 24(b) only if the movant can show: (1) a claim or defense that shares with the main action a common question of law or fact; (2) that their request

is timely; and (3) an independent basis for subject matter jurisdiction. *See Sokaogon*, 214 F.3d at 949; *see also Heartwood*, 316 F.3d at 701. In addition to these requirements, the court also must "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Heartwood*, 316 F.3d at 701 (citing Fed. R. Civ. P. 24(b)). When evaluating permissive intervention requests, the district court retains broad discretion. *See Planned Parenthood*, 942 F.3d at 803 ("The decision to permit intervention is wholly discretionary . . . ." (internal quotations omitted)).

Here, the Intervenor States' motion for permissive intervention must fail for the same reasons as their request for intervention as of right: their request is untimely, *see supra* at pp. 5–8, would unduly prejudice the original parties, *see supra* at pp. 8–11, and they lack standing, *see supra* at pp. 2–4.

In addition, permissive intervention should be denied because this case is over. It is well-settled "that no justiciable 'controversy' exists when . . . the question sought to be adjudicated has been mooted by subsequent developments." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007); *see also, e.g.*, *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010) (explaining that cases can lose subject matter jurisdiction "where a case becomes moot in the course of the litigation"). Several developments have since mooted the issues in this case: this Court has entered a final judgment vacating the Rule, DHS has determined that pursuing litigation surrounding the Vacated Rule is no longer in the public interest, and the original parties have dismissed the previously-filed appeal and remaining equal protection claim before this Court. Moreover, DHS has issued a new final rule implementing this Court's vacatur order, 86 Fed. Reg. 14,221 (Mar. 15, 2021), and has publicly stated that it intends to engage in new rulemaking regarding the public charge provision within the year. *See* DHS/USCIS,

15

Announcement of Advance Notice of Proposed Rulemaking in Unified Agenda, Inadmissibility

on Public Charge Grounds, RIN 1615-AC74 (June 11, 2021), available at

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC74.

In light of the foregoing developments, granting the Intervenor States permissive

intervention would prolong this litigation to no meaningful end. *See Am. Foreign Serv. Ass'n* v.

*Garfinkel*, 490 U.S. 153, 158–59 (1989) (per curiam) (finding a regulatory challenge moot where

the agency withdrew the regulation at issue during the case's pendency before the Court). The

Intervenor States have no basis to reopen this case for the purpose of relitigating a vacated, soon-

to-be-replaced rule.

## II.     The Intervenor States' Rule 60(b) Motion Should Be Denied.

The Intervenor States' motion for relief from judgment under Rule 60(b) should also be

denied for several independent reasons. First, only "parties" may seek relief under Rule 60(b). The

Intervenor States are not parties, and they should not be permitted to intervene as parties for the

reasons explained *supra*. Moreover, even if the Intervenor States were permitted to intervene as

parties, their motion for relief under Rule 60(b) would be untimely and would severely prejudice

Plaintiffs. Finally, even if the Intervenor States were allowed to intervene as parties and were

deemed to have brought a timely request, they still would not have met their burden of showing

the extraordinary circumstances required to disturb a final judgment. For all these reasons, the

Rule 60(b) motion must be denied.

### A.     The Intervenor States Cannot Obtain Rule 60(b) Relief as Non-Parties.

As discussed above, the Intervenor States have not established their ability to intervene—

either as of right under Rule 24(a) or permissively under Rule 24(b). For that reason alone, the

States' Rule 60(b) motion must be denied. The text of Rule 60(b) is clear: "On motion and just

terms, the court may relieve *a party or its legal representative* from a final judgment, order, or

proceeding." Fed. R. Civ. P. 60(b) (emphasis added); *see also Adelson v. Ocwen Fin. Corp.,* 621 F. App'x 348, 351 (7th Cir. 2015) ("By its own terms Rule 60(b) applies only to parties and their legal representatives.").

The Intervenor States assert that they may seek relief under Rule 60(b) even as a nonparty because their interests are directly affected by the judgment. Dkt. 260 at 6. As a preliminary matter, the Intervenor States cite no Seventh Circuit authority recognizing this exception. The lone Seventh Circuit case they do cite, *United States v. Kirschenbaum*, 156 F.3d 784 (7th Cir. 1998), is inapposite. In *Kirschenbaum*, the court held that a non-party whose conduct was enjoined by a district court's restraining order was permitted to "bring an appeal rather than face the possibility of a contempt proceeding." *Id.* at 794. The court did not discuss Rule 60(b), and it did not hold that non-parties who, like the Intervenor States here, are *not* bound by a district court's decision— but merely dislike the outcome—may obtain relief under that Rule.

The Intervenor States also point to a Sixth Circuit decision recognizing an exception to the rule that nonparties cannot seek relief under Rule 60(b) where the nonparty's interests are "strongly affected" by the judgment. *See Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940–41 (6th Cir. 2013). But this exception is "exceedingly narrow." *Id.* at 941 (quoting *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 189 (2d Cir. 2006)). Indeed, the two examples that *Bridgeport* discusses demonstrate that the Intervenor States come nowhere near fitting within the exception. In *Grace*, the Second Circuit held that a third-party was "strongly affected" by a judgment and thus entitled to bring a Rule 60(b) motion "where plaintiffs enter[ed] into a settlement agreement with a judgment-proof, pro se defendant with the intent at the time of the settlement to collect from a third party that allegedly received fraudulent conveyances, and further, they attempt[ed] to use the judgment as a predicate for a fraudulent conveyance action against the third party." 443 F.3d at

188. And in *Dunlop v. Pan Am. World Airways, Inc.*, the Second Circuit held that nonparties were "sufficiently connected and identified" with a lawsuit where they were prevented from bringing their own action based on a prior judgment to which they were not a party. 672 F.2d 1044, 1052 (2d Cir. 1982). Unlike the third parties in *Grace* and *Dunlop*, the Intervenor States have no direct connection to the issue at hand. *See supra* at pp. 12–15.

> ### B. The Intervenor States' Request For Rule 60(b) Relief Is Not Timely.

A party must raise a motion under Rule 60(b) "within a reasonable time." Fed. R. Civ. P. 60(c)(1); *see also Arrieta v. Battaglia*, 461 F.3d 861, 865 (7th Cir. 2006) ("A motion under the 'catchall' provision contained in Rule 60(b)(6) also must be made 'within a reasonable time.'"). "[W]hat constitutes 'reasonable time' for a filing under Rule 60(b) depends on the facts of each case," and courts take into account "the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and the consideration of prejudice, if any, to other parties." *Ingram v. Merrill Lynch, Pierce, Penner & Smith, Inc.*, 371 F.3d 950, 952 (7th Cir. 2004) (quoting *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986)). Each of these factors counsels that the Intervenor States' motion for Rule 60(b) relief is untimely for the same reasons that its motion to intervene is untimely.

First, the interest in finality and the consideration of prejudice to the other parties weighs heavily against relief under Rule 60(b). This Court entered its final judgment order more than six months ago. Dkt. 222. Since that time, all claims at issue have been fully and finally resolved. Undoing the Court's final judgment now would impose substantial prejudice on Plaintiffs. *See supra* at pp 8–11. Had the Intervenor timely sought relief under Rule 60(b), ICIRR would still be litigating its equal protection claim and pursuing its Court-authorized discovery requests. Dkt. 150. Additionally, if the Court were to grant the Intervenor States' motion and reconsider its vacatur order, the irreparable harm caused by the Rule—and specifically, its chilling effect and confusion

18

among immigrant communities—would be exacerbated just from the specter of the return of this harmful rule. *See supra* at pp. 9–11.

On the other side of the ledger, the Intervenor States have little basis to justify their delay. As already discussed with respect to the motion for intervention, *see supra* at pp. 5–7, the Intervenor States failed to move to intervene or to challenge the partial final judgment before now even though they concede that they were "aware of their interests in the Rule for some time" Dkt. 257 at 5, and even though counsel admitted at the May 18 hearing that the Intervenor States were "keeping tabs on the litigation" and were aware that the new administration had a negative view of the Rule. May 18, 2021 Hr. Tr. 11:10-12, 12:2-6. It was incumbent on the Intervenor States to act expeditiously as soon as they became aware that the new administration was unlikely to support the rule—and thereby minimize prejudice to Plaintiffs. Having failed to seek Rule 60(b) relief at the earliest opportunity, the Intervenor States' motion now comes too late.

C. The Intervenor States Have Identified No Basis for Granting Relief Under Rule 60(b)(6).

Because the Intervenor States cannot satisfy any of the enumerated grounds for relief from a final judgment listed in Rule 60(b), they exclusively rely upon Rule 60(b)'s catchall provision. *See* Fed. R. Civ. P. 60(b)(6). In this circuit, "[r]elief under this provision is an 'extraordinary remedy' and should be granted only in 'exceptional circumstances.'" *Banks v. Chi. Bd. Of Educ.*, 750 F.3d 663, 668 (7th Cir. 2014) (quoting *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 750 F.3d 845, 848 (7th Cir. 2009)); *accord Neuberg v. Michael Reese Hosp. Found.*, 123 F.3d 951, 955 (7th Cir. 1997) (calling Rule 60(b)(6) an "even more highly circumscribed exception in [a] rule already limited to exceptional circumstances"). "The burden is on the movant to establish that hers are the exceptional circumstances that clear the bar." *In re Taylor*, 575 B.R. 390, 394 (N.D. Ill. 2017). The Intervenor States cannot meet that burden.

19

1.     <u>The Court Should Not Reconsider Its Judgment.</u>

The basic premise of the Intervenor States' request for relief from the Court's judgment is that the judgment is wrong, and when the Rule is "[o]nce again properly defended, challenges to the Rule will likely fail." Dkt. 260 at 10. The Intervenor States are incorrect. The Seventh Circuit has already held that the rule is invalid, and the Intervenor States identify no basis for this Court to depart from the appellate court's ruling.

As both DHS and this Court recognized at summary judgment, the Seventh Circuit's ruling affirming this Court's entry of a preliminary injunction is determinative in favor of summary judgment on Plaintiffs' APA claims. In its brief on summary judgment, "DHS forthrightly concede[d] that the Seventh Circuit's opinion affirming the preliminary injunction effectively resolves the APA claims on the merits in Plaintiffs' favor." Dkt. 222 at 2 (citing Dkt. 209 at 7). When it made that unavoidable concession, DHS was—as the State Intervenors now acknowledge—still "ably" and "vigorously defend[ing] the Rule." Dkt. 260 at 8. This Court likewise found DHS's concession to be "appropriate given the Seventh Circuit's conclusion that the Final Rule is both substantively and procedurally defective under the APA." *Id.* at 3 (citing *Cook County*, 962 F.3d at 222–33). Nothing that has occurred since that time would support departing from the Seventh Circuit's ruling now. To the contrary, even the Intervenor States acknowledge that "the Seventh Circuit's holding likely establishes the law of the case." Dkt. 260 at 7; *see also Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991); *Sherley v. Sebelius*, 689 F.3d 776, 782–83 (D.C. Cir. 2012) (an appellate ruling on a preliminary injunction is law of the case if—as here—it "was established in a definitive, fully considered legal decision based on a fully developed factual record and a decisionmaking process that included full briefing and argument without unusual time constraints" (collecting cases)).

20

That should be the end of the matter. The State Intervenors, DHS, and Plaintiffs agree that the Seventh Circuit's decision controls. Relief from the Court's judgment applying that decision is, therefore, unavailable.

Unsurprisingly, none of the reasons given in the Intervenor States' motion for relief under Rule 60(b)(6) can overcome the insurmountable obstacle of the Seventh Circuit's decision. The Intervenor States point to panel opinions from the Fourth and Ninth Circuits supporting the validity of the Rule. Dkt. 260 at 10 (citing *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773 (9th Cir. 2019); *Casa de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020)). This Court is, of course, bound by the decisions of the *Seventh* Circuit, not the Fourth or the Ninth. But in any event, the State Intervenors ignore the subsequent history of the panel decisions on which they rely. While a panel of the Ninth Circuit in 2019 stayed two preliminary injunctions of the Rule issued by district courts, a subsequent panel of the Ninth Circuit in December 2020 *affirmed* the Northern District of California preliminary injunction and vacated only the portion of the Eastern District of Washington injunction making it applicable nationwide, otherwise affirming the injunction. *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020). And although a panel of the Fourth Circuit initially reversed a preliminary injunction of the Rule, the court subsequently granted rehearing en banc, vacating the panel opinion. *Casa de Md., Inc. v. Trump*, 981 F.3d 311 (Mem) (4th Cir. 2020); *see also* 4th Cir. R. 35(c).[4] The State Intervenors' survey of other circuits' case law also ignores the decision of the Second Circuit affirming preliminary injunctions of the Rule. *New York v. U.S. Dep't of Homeland*

---

[4] The Fourth Circuit appeal was voluntarily dismissed before the *en banc* Court ruled. *See* Order, *Casa de Md., Inc. v. Joseph Biden, Jr.*, Case No. 19-2222, ECF No. 211 (4th Cir., Mar. 11, 2021).

*Sec.*, 969 F.3d 42 (2d Cir. 2020), *cert. dismissed*, No. 20-449, 2021 WL 1081216 (U.S. Mar. 9, 2021). The circuits are thus aligned: The Rule is invalid.

The Intervenor States also point to the Supreme Court's orders granting stays. Dkt. 260 at 10. But the stay orders—unaccompanied by any supporting opinion—were not "merits ruling[s]" and have no precedential effect. *Cook County*, 962 F.3d at 233; *see also Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009) (per curiam) (emphasizing that decision to grant or deny stay is "not a decision on the merits of the underlying legal issues"); *Barefoot v. Estelle*, 463 U.S. 880, 907 n.5 (1983) (Marshall, J., dissenting) ("the denial of a stay can have no precedential value"); *compare also, e.g.*, *Doe v. Reed*, 130 S. Ct. 486 (2009) (granting stay against disclosure requirements), *with Doe v. Reed*, 130 S. Ct. 2811 (2010) (upholding disclosure requirements on the merits against facial challenge).

Finally, the Intervenor States rehash various arguments that the actual parties have extensively presented, and this Court and the Seventh Circuit have carefully weighed, regarding the proper interpretation of the public charge statute. *See* Dkt. 260 at 10–12. Notably, however, the Intervenor States say nothing about the Seventh Circuit's decision holding the Rule procedurally invalid on the ground that it was arbitrary and capricious. *Cook County*, 962 F.3d at 229–33. The Seventh Circuit's ruling on procedural grounds is an independent basis for invalidating the Rule, in addition to and separate from its interpretation of the statute under *Chevron* step two. *See id.* ("even if we are wrong about step two," the Rule "has numerous unexplained serious flaws" that make it "likely to fail the 'arbitrary and capricious' standard"). Thus, even if this Court were free to adopt all of the State Intervenors' arguments notwithstanding the Seventh Circuit's prior statutory interpretation, that *still* could not support Rule 60(b)(6) relief

for the Intervenor States. The Rule would still be invalid due to its "numerous and unexplained" procedural flaws—and this Court's vacatur order would stand.

### 2. There Are No Exceptional Circumstances That Would Justify Rule 60(b)(6) Relief.

The Intervenor States' failure to put forth a meritorious challenge to the Court's prior ruling is sufficient to deny their request for relief. But they also have failed to carry their burden to establish the exceptional circumstances that are necessary to justify the extraordinary relief they seek under Rule 60(b)(6).

The Intervenor States' primary argument is that the federal Defendants committed "unusual and extraordinary litigation conduct" by voluntarily dismissing their appeal under Federal Rule of Appellate Procedure 42(b). Dkt. 260 at 6; *see also id.* at 8 (accusing the United States of "colluding with now-aligned plaintiffs to dismiss this action"). This argument is baseless. Far from being "unusual and extraordinary," it is commonplace for an agency, after a change in presidential administration, to shift its policies and positions—including in litigation. Indeed, this is the ordinary working of our system of government and courts. "A change in administration . . . is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its . . . regulations," as well as a reevaluation of its "priorities in light of the philosophy of the administration." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865–66 (1984) (noting that the "incumbent administration" makes policy choices with regard to ambiguous congressional directives "in light of everyday realties").[5] Thus, it is "commonplace" for "the incumbent

---

[5] This prospect is so far from "unusual and extraordinary" that the U.S. Code explicitly addresses the prospect that the Department of Justice will "determine[] . . . not to appeal or request review

administration [to] abandon[] a previous administration's interpretation of a statute," and such changes "are not always implemented through the formal notice-and-comment process," but instead can be implemented in a variety of ways, including through legal briefs. Josh Blackman, *Presidential Maladministration*, 2018 U. Ill. L. Rev. 397, 405[6]; *see also* Adam Liptak, *Trump's Legal U-Turns May Test Supreme Court's Patience*, N.Y. TIMES (Aug. 28, 2017), https://www.nytimes.com/2017/08/28/us/politics/trump-supreme-court.html (discussing the Trump administration's position changes); *cf. Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 599 (7th Cir. 2012) (noting that "oscillation" in views from administration to administration is "a normal phenomenon of American politics").

The Intervenor States also suggest that the stipulated dismissal in this case was improper because the agency instead was required to "rescind[] the rule per the APA, and then promulgat[e] a new rule through notice and comment rulemaking." Dkt. 260 at 6. Indeed, the Intervenor States go so far as to describe the dismissal as an "end-run around the APA." *Id.* at 9. Not so. The APA's remedial scheme expressly enlists federal courts to check agency decisions and provides that reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That is precisely what the Court did in this case. Dkt. 222 at 2–7.

The APA does not require an agency to provide a notice-and-comment period to rescind the Rule. To the contrary, the APA instructs that notice and comment is not required when an

---

of any judicial, administrative, or other determination" holding a federal rule or regulation unconstitutional. 28 U.S.C. § 530D(a)(1)(B)(ii).

[6] For example, the Bush Administration filed a petition for writ of certiorari in *Environment Protection Agency v. New Jersey* (No. 08-512) in August 2008, and in February 2009, just before the petition would have been distributed for conference, the Obama Administration's Acting Solicitor General moved to dismiss the petition. Blackman, *supra*, at 414. The Court granted the motion and dismissed the petition. *Id.*

agency for good cause finds that compliance would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). On March 15, 2021, DHS issued a final rule removing the Vacated Rule from the Code of Federal Regulations. *See* 86 Fed. Reg. 14,221. In that final rule, DHS stated that it had determined good cause existed to bypass the notice and comment requirement based on the need to implement this Court's vacatur order immediately. *Id.* Consistent with this finding, courts have affirmed the "good cause" exception where, as here, "rulemaking without notice and comment is 'a reasonable and perhaps inevitable response to' a 'court order.'" *EME Homer City Generation, L.P v. EPA*, 795 F.3d 118, 134 (D.C. Cir. 2015) (quoting *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981)). In short, rather than constituting "extraordinary circumstances," the Court's vacatur order, followed by DHS's subsequent rescission of the Rule for good cause, represent the course of events envisioned by the APA.

Next, the Intervenor States argue that they "have not had opportunity to participate in either this litigation or the regulatory process." Dkt. 260 at 7. As an initial matter, the Intervenor States could have submitted comments when the Rule was first proposed in 2018, but appear to have declined to do so. Moreover, the Intervenor States claim they "did not have the opportunity" to appeal at an earlier stage in this litigation "because the United States would have objected on the ground that it adequately represented the [Intervenor] States' interests." *Id.* at 9. But the Intervenor States do not assert at any point that they asked the United States whether it would have objected, *see* Dkt. 260, and counsel for Texas represented to the Court that she did not know whether the Intervenor States had asked. Ex. A, May 18, 2021 Hr. Tr. 15:9–15. The Intervenor States took no step to timely participate in this case, even though they knew then-Candidate Biden's position on the Rule prior to the election (*id.* 12:2–6), knew that then-President Elect Biden planned to

eliminate the Rule within his first 100 days (*id.* 12:7–14), and knew that the Executive Order instructed Defendants to reexamine the Rule (*id.* 11:19–25). *See also supra* at pp. 5–7. This "lack of diligence" further confirms that the current administration's decision "is not an extraordinary circumstance justifying relief from the judgment" under Rule 60(b)(6), but instead the predictable, logical consequence of a presidential election. *See Gonzalez v. Crosby*, 545 U.S. 524, 537 (2005).

Moreover, the Intervenor States will have the opportunity to participate in the notice-and-comment process set to begin when DHS issues its ANPRM later this summer. DHS/USCIS, Announcement of Advance Notice of Proposed Rulemaking in Unified Agenda, Inadmissibility on Public Charge Grounds, RIN 1615-AC74 (June 11, 2021), available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202104&RIN=1615-AC74. The Intervenor States therefore will not "lose their procedural right to defend their interests," Dkt. 260 at 13, as they can participate in the regulatory process in support of their preferred rule going forward at that time.

There is also no merit to the Intervenor States' contention that they are harmed because the district court's holding could hamstring future rulemaking. Dkt. 260 at 14. The Intervenor States assert that "this Court's memorandum opinion and order . . . is somewhat ambiguous as to whether it held that the current Rule violated *Chevron* Step 1 or *Chevron* Step 2." *Id.* (citing Dkt. 222 at 3 & n.*). According to the Intervenor States, "[u]nder the Supreme Court's current precedent, a holding based on a conclusion that the statute was [un]ambiguous would preclude the next Administration from re-adopting the Rule *even with* notice-and-comment rulemaking." *Id.* (citing *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005)).

But this Court's decision was not remotely ambiguous. While it initially granted Plaintiffs' motion for a preliminary injunction based on *Chevron* step one, Dkt. 106 at 15–28, the Seventh

Circuit disagreed with that holding. *Cook County*, 962 F.3d at 226 ("This case cannot be resolved at *Chevron* step one."). The Seventh Circuit explained that it could nevertheless "affirm the district court's issuance of a preliminary injunction on any basis in the record," and went on to hold that the preliminary injunction was properly issued because the Vacated Rule fails at *Chevron* step two. *Id.* at 226, 229 ("We find that the interpretation reflected in the Rule falls outside the boundaries set by the statute."). Only *after* the Seventh Circuit issued its preliminary injunction opinion did this Court grant summary judgment and vacate the Rule—*based on the Seventh Circuit's binding decision*. Dkt. 222 at 2–3 ("the Seventh Circuit's opinion affirming the preliminary injunction effectively resolves the APA claim on the merits in Plaintiffs' favor"); *see also* Ex. A, May 18, 2021 Hr. Tr. 14:4–6 ("[W]hat we have here is a district court decision under *Chevron II*, because what I did was basically adopted the Seventh Circuit's analysis, as I was required to do."). Accordingly, as the Intervenor States conceded at the May 18 hearing on this motion, their *Brand X* concern must "fall away." Ex. A, May 18, 2021 Hr. Tr. 13–15.

Additionally, the Intervenor States provide no evidentiary support for their contention that they "will be required to budget for and expend many millions of dollars in additional aid through Medicaid and other programs that would otherwise not have been required." Dkt. 260 at 13. And the Intervenor States maintain that these funds will "never be recoverable" despite explaining their precise avenue for recovery—i.e., seeking reimbursement from a sponsor—just two pages earlier. *Id.* at 11, 13. To follow the Intervenor States' attenuated logic, their harm stems from a circumstance in which: (1) an immigrant is admitted to the United States who would have otherwise been denied under the Vacated Rule; (2) that particular immigrant resides in Texas or one of the other the Intervenor States at the end of five years after admission; that same individual (3) meets all the eligibility criteria under federal and very restrictive state law; (4) that person is

27

not otherwise insured; (5) that immigrant chooses to avail themselves of Medicaid; and (6) the Intervenor State does not recover reimbursement from the immigrant's sponsor. The Intervenor States argue that they will spend unquantified "millions" on Medicaid-eligible immigrants who would have been denied an adjustment of status or admission to the U.S. under the Vacated Rule, *id*. at 11, while overlooking the fact that during the year that the Vacated Rule was in place, only five cases were affected by the public charge rule change. *See* Gov't Resp. Br. at 23–24, *Texas v. Cook County*, No. 20A150 (filed Apr. 9, 2021). Such speculative assertions are not grounds for Rule 60(b)(6) relief.

Finally, as discussed above, the Plaintiffs will suffer significant harm if the Rule 60(b) motion is granted. *See supra* at pp. 8–11. Absent any specific, non-speculative harm to the Intervenor States, and in light of the well-established harms that the Vacated Rule inflicts upon Plaintiffs, the motion for relief pursuant to Rule 60(b) must be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny the Intervenor States' motions for intervention, Dkt. 256, and relief from judgment pursuant to Federal Rule of Civil Procedure 60(b), Dkt. 259.

Dated: June 15, 2021                    Respectfully Submitted,

*/s/* David A. Gordon
David A. Gordon
Tacy F. Flint
Marlow Svatek
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000 (Telephone)
(312) 853-7036 (Facsimile)
dgordon@sidley.com
tflint@sidley.com
msvatek@sidley.com

Yvette Ostolaza (*pro hac vice*)
Texas Bar No. 00784703
Robert S. Velevis (*pro hac vice*)
Texas Bar No. 24047032
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, Texas 75201
(214) 981-3300 (Telephone)
(214) 981-3400 (Facsimile)
Yvette.ostolaza@sidley.com
rvelevis@sidley.com

*/s/* Caroline Chapman
Caroline Chapman
Meghan P. Carter
LEGAL COUNCIL FOR HEALTH JUSTICE
17 N. State, Suite 900
Chicago, IL 60602
Phone: (312) 605-1958
Fax: (312) 427-8419
cchapman@legalcouncil.org
mcarter@legalcouncil.org

*/s/* Militza Pagán
Militza M. Pagán
Andrea Kovach
Nolan Downey
SHRIVER CENTER ON POVERTY LAW
67 E. Madison, Suite 2000
Chicago, IL 60603
Phone: (312) 690-5907

Fax: (312) 263-3846
militzapagan@povertylaw.org
andreakovach@povertylaw.org
nolandowney@povertylaw.org

/s/ Katherine E. Walz
Katherine E. Walz
NATIONAL HOUSING LAW PROJECT
1663 Mission Street, Suite 460
San Francisco, CA 94103
Phone: (415) 546-7000
Fax: (415) 432-5701
kwalz@nhlp.org

*Counsel for Illinois Coalition For Immigrant
and Refugee Rights, Inc.*

/s/ Lauren E. Miller
Jessica M. Scheller, Assistant State's Attorney
Chief; Advice, Business & Complex
Litigation Division
Lauren E. Miller, Special Assistant State's
Attorney
Civil Actions Bureau
500 W. Richard J. Daley Center Place, Suite
500
Chicago, IL 60602
Phone: (312) 603-6934
Phone: (312) 603-4320
Jessica.Scheller@cookcountyil.gov
Lauren.Miller@cookcountyil.gov

/s/ David E. Morrison
David E. Morrison
Steven A. Levy
A. Colin Wexler
Takayuki Ono
GOLDBERG KOHN LTD.
Special Assistant State's Attorneys
55 E. Monroe St., Suite 3300
Chicago, IL 60603
Phone: (312) 201-4000
Fax: (312) 332-2196
david.morrison@goldbergkohn.com
steven.levy@goldbergkohn.com
colin.wexler@goldbergkohn.com

takayuki.ono@goldbergkohn.com

*Counsel for Cook County, Illinois*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on June 15, 2021, he caused the foregoing

Plaintiffs' Response to States' Motions to Intervene and for Relief from Judgment Pursuant to

Rule 60(b) to be served via the Court's ECF system upon all counsel of record.


<u>/s/ David A. Gordon</u>
David A. Gordon