**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

COOK COUNTY, ILLINOIS et al,

  *Plaintiffs,*

v.

WOLF et al.,

          *Defendants.*

No. 1:19-cv-06334

---

**REPLY IN SUPPORT OF OPPOSED MOTIONS TO INTERVENE AND FOR
RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(B)**

**INTRODUCTION**

Plaintiffs and the United States opposed each other vigorously in this litigation for over a year—including at the Supreme Court, where the United States obtained a stay of this Court's preliminary injunction invalidating the Public Charge Rule (the "Rule"). *Wolf v. Cook County*, 140 S. Ct. 681 (2020). Indeed, the United States obtained either a stay or reversal—from a court of appeals or the Supreme Court—of every order invalidating the Rule. In granting multiple stays of orders invalidating the Rule, the Supreme Court necessarily concluded that there was "a fair prospect that a majority of the Court will conclude that the decision below was erroneous." *Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009) (Ginsburg, J. in chambers). And it did so time and again. Despite over a year of litigation at every level of the federal judiciary involving numerous challenges, the Rule remained in effect until the United States decided to "throw the case" by dismissing every pending appeal and acceding to this Court's partial summary judgment. *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 572 (7th Cir. 2009).

Now that the United States has switched sides, Plaintiffs and the United States each insist that erstwhile adversaries leveraging this Court's partial summary judgment into a nationwide vacatur of the Rule is not a cause of concern. Never mind that the Supreme Court had granted review to determine the validity of the Rule, *Dep't of Homeland Sec. v. New York*, 141 S. Ct. 1370 (2021); or that the United States vacated the Rule "without the normal notice and comment typically needed to change rules," *City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 992 F.3d 742, 743 (9th Cir. 2021) (VanDyke, J., dissenting); or that the United States ignored the well-worn and "traditional route of asking the courts to hold . . . cases in abeyance" pending notice-and-comment rulemaking, *id.* at 751; or that no one can point to another instance where the United States has intentionally *agreed* to nationwide prospective relief issued

by a single district court. Plaintiffs and the United States contend that nothing extraordinary has occurred here at all, and that the State Intervenors lack standing and are entitled neither to intervene nor to seek relief from the judgment.

That is incorrect. The State Intervenors have standing. Vacatur of the Rule causes them classic pocketbook injuries that are fairly traceable to that vacatur. And they likewise have been deprived of the procedural rights that they would have had to comment on and challenge repeal of the Rule under any other circumstance. For similar reasons, the States are entitled to intervene. They moved to vindicate their interests in the Rule as soon as the United States abandoned its defense of it, they have ample interests to justify intervention that will be impaired absent intervention, and those interests are now completely unrepresented by the parties, as their filings in opposition amply demonstrate.

The State Intervenors are also entitled to relief under Federal Rule of Civil Procedure 60(b). While "extraordinary circumstances" are required for relief under Rule 60(b)(6), *Pearson v. Target Corp.*, 893 F.3d 980, 984 (7th Cir. 2018) (quoting *Buck v. Davis*, 137 S. Ct. 759, 777–78 (2017)), the United States' conduct in this litigation has been at least extraordinary—indeed, wholly unprecedented. This Court should grant the State Intervenors' motions to intervene and to obtain relief under Rule 60(b)(6).

## ARGUMENT

### I.     The State Intervenors Have Standing To Defend the Rule.

The State Intervenors need to show only that at least one of them has standing. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). "A plaintiff has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *California v. Texas*, Nos. 19-840 & 19-1019, 2021 WL 2459255, at *4 (U.S. June 17, 2021) (citation omitted). But "States are not normal litigants for the

2

purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518. States instead are "entitled to special solicitude in [the] standing analysis" when, as here, the States have both a procedural right and a "quasi-sovereign interest[]" at stake. *Id.* at 520. Here, even without that special solicitude, the State Intervenors have standing. Because the parties colluded to prevent effective review of this Court's judgment, the State Intervenors face increased numbers of admitted aliens enrolling in social services, including Medicaid and other public benefits offered by the States—causing classic pocketbook injuries.

*First*, Plaintiffs and the United States concede that the Rule was outcome-determinative in multiple immigration adjudications. Pls.' Resp. at 12–13, 28 (citing Gov't Resp. Br. at 23–24, *Texas v. Cook County*, No. 20A150 (U.S. Apr. 26, 2021)). That means that the United States applied the Rule to deny either admission or a change of immigration status to multiple aliens after concluding that they were "likely at any time to become a public charge," 8 U.S.C. § 1182(a)(4)(A), specifically by "receiv[ing] one or more public benefits"—such as Medicaid and other services offered by the State Intervenors—"for more than 12 months in the aggregate within any 36-month period," Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292, 41,501 (Aug. 14, 2019). Revocation of the Rule means that fewer individuals who require public benefits will be denied admission or a change of status. Even one such instance leading to increased public spending by the States Intervenors would be sufficient to establish their standing: Article III standing does not turn on the size of an alleged injury. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797–800 (2021) (concluding that nominal damages can satisfy Article III); *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir. 2008). That injury can be traced to the Rule and would be redressed by a judgment affirming the Rule's validity, as the application of the Rule prevented the admission or change of status of those aliens.

Those harms have already occurred and will continue to occur. Such future harms independently "suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (citation omitted). Even where intervening third parties are motivated by "unfounded fears" or themselves

"violate their legal duty," "fairly traceable" injury is present based on "the predictable effect of Government action on the decisions of third parties." *Id.* at 2565–66. Vacatur of the Rule satisfies that standard: some number of aliens will be admitted because of the Rule's vacatur, and the State Intervenors will predictably be subject to increased costs when those aliens receive Medicaid and other social services. This will occur simply by virtue of individuals taking advantage of social services to which they are entitled and is a completely "predictable effect." *Id.* at 2566. The State Intervenors thus have pocketbook injuries establishing standing, even without considering the "special solicitude" they are due. *Massachusetts*, 549 U.S. at 520.

*Second*, the Intervenor States have standing because the United States' use of collusive litigation tactics to remove the Rule from the Federal Register without going through the notice-and-comment process, *see* Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221 (Mar. 15, 2021), denied the State Intervenors a procedural right to protect their quasi-sovereign interests: the right to participate in the APA-mandated notice and comment process that would normally be required for the United States to rescind the Rule. Normally a Rule adopted through notice-and-comment rulemaking can be rescinded only through notice-and-comment rulemaking. *Cf. Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S 29, 36–37, 41 (1983). As part of that process, parties whose interests would be negatively impacted by rescission of the Rule—including the State Intervenors—would have had the right to submit input, 5 U.S.C. § 553, and ultimately to challenge the final outcome of the regulatory process in court, *Dep't of Commerce,* 139 S. Ct. at 2569–70. But by voluntarily dismissing its appeals of the challenges to the Rule while leaving this Court's judgment in place, the United States has deprived the Intervenor States of these rights in a brazen attempt to end-run around both the APA's notice-and-comment requirements as well as judicial review from any final agency action.

The deprivation of that procedural right establishes standing. A party does not lack standing because a favorable ruling would cure some, but not all of the plaintiff's harm. *Larson v. Valente*, 456 U.S. 228, 242–43 (1982). Where a party has "a procedural right to protect his concrete

interests," denial of that procedural right itself establishes standing. *Massachusetts*, 549 U.S. at 517. Here, that procedural right protects the State Intervenors' quasi-sovereign interest in immigration. *Texas v. United States*, 809 F.3d 134, 153–54 (5th Cir. 2015) ("When the states joined the union, they surrendered some of their sovereign prerogatives over immigration. . . . [The states] now rely on the federal government to protect their interests."), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam); *cf. Arizona v. United States*, 567 U.S. 387, 397 (2012) ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States.").

Because the State Intervenors have been deprived of a procedural right to protect their concrete interests, they need not "meet[] all the normal standards for redressability and immediacy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992). "This principle does not mean that parties claiming a deprivation of procedural rights afforded by statute must establish that the agency would have reached a different conclusion had they been allowed to participate." *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 953 (7th Cir. 2005). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518. Here, there is at least a possibility that the United States would not rescind the Rule if it followed the normal procedures set forth under the APA. *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 [of the APA] would be a dead letter.").[1]

---

[1] The States also satisfy the APA's requirement that the interests they assert be "arguably within the zone of interests to be protected or regulated by the statute" at issue here—the Immigration and Nationality Act. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted). As the Fifth Circuit concluded in the DAPA case, "[t]he interests the [State Intervenors] seek to protect fall within the zone of interests of the INA." *Texas*, 809 F.3d at 163; *see also* 8 U.S.C. § 1601(2) ("It continues to be the immigration policy of the United States that . . . aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations . . . .").

The Supreme Court's recent decision in *California v. Texas*, Nos. 19-840 & 19-1019, 2021 WL 2459255 (U.S. June 17, 2021), does not affect the standing analysis here. In that case, the Supreme Court concluded that "the States have not demonstrated that an unenforceable mandate will cause their residents to enroll in valuable benefits programs that they would otherwise forgo." *Id.* at *9. The burden there was higher because, according to the majority opinion, "neither logic nor intuition" supported the prediction that individuals would acquire healthcare coverage that they did not otherwise want based on a mandate without a penalty. *Id.* at *8; *see id.* ("[W]ithout a penalty, what incentive could the provision provide?").

There is nothing counterintuitive, however, about the idea that, in the absence of the Rule, individuals who would otherwise be ineligible for admission to the United States will be admitted. Plaintiffs admit as much. Pls.' Resp. at 12, 28. And those individuals can be expected to take advantage of social services like Medicaid. By definition, aliens that would be excluded or denied a change in immigration status under the Rule are "likely at any time to become a public charge," 8 U.S.C. § 1182(a)(4)(A), specifically by "receiv[ing] one or more public benefits"—such as Medicaid and other services offered by the State Intervenors—"for more than 12 months in the aggregate within any 36-month period," 84 Fed. Reg. at 41,501–02. *See Dep't of Commerce*, 139 S. Ct. at 2566. The INA recognizes as much, while also emphasizing that "[i]t continues to be the immigration policy of the United States that . . . aliens within the Nation's borders not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

Moreover, the *California* Court focused on the traceability and redressability prongs of the standing analysis—aspects of the standing analysis that are easily met here because the State Intervenors "ha[ve] been accorded a procedural right to protect [their] concrete interests." *Lujan*, 504 U.S. at 572 n.7. *California* did not purport to overturn this aspect of *Lujan*, under which the State Intervenors have standing.

**II.    The Court Should Grant the State Intervenors Motion to Intervene.**

The State Intervenors also have grounds to intervene. They promptly moved to intervene after the United States announced its change in position. The parties' collusive agreement to leverage this Court's summary judgment will impair the State Intervenors' control over their own budgets as well as their right to participate in the rulemaking process. The United States' reading of Rule 24 is unjustified by its context and inconsistent with prior caselaw.

**A.    The State Intervenors' motion to intervene was timely.**

Within days of learning that the United States had abandoned its prior practices and abandoned its defense of the Rule, the State Intervenors moved to intervene in multiple courts of appeals where challenges to the Rule were pending. *E.g.*, Motion to Recall Mandate to Permit Intervention, *Cook County v. Wolf*, No. 20-3150 (7th Cir. Mar. 11, 2021). When those motions were denied, the State Intervenors sought relief from the Supreme Court. Although Plaintiffs argued that the States' attempts to intervene were untimely, Opposition to Application for Leave To Intervene and for a Stay of the Judgment at 9, 20, *Texas v. Cook County*, No. 20A150 (U.S. Apr. 26, 2021), the Supreme Court all but instructed the State Intervenors to raise their argument that the United States "rescinded the rule without following the requirements of the Administrative Procedure Act" in this Court—"whether in a motion for intervention or otherwise." *Texas v. Cook County*, No. 20A150 (U.S. Apr. 26, 2021). The State Intervenors then promptly did so. Their motion to intervene was timely.

To argue that the State Intervenors' motion was untimely, Plaintiffs look back to December 2019 to statements made by then-candidate Biden, made nearly a year before the 2020 election even took place. Pls.' Resp. at 5. But it would be absurd to require the State Intervenors to attempt to intervene based on the policy wish list of a primary candidate who had no guarantee of winning his party's nomination, much less the general election.

More fundamentally, now-President Biden's "assurance that his administration would '[r]everse [the] public charge rule' within its first 100 days," *id.* (alterations in original) (citation

7

omitted), hardly provided the State Intervenors notice that the United States would "intentionally avoid[] the APA entirely" by settling with its former opponents, "acquiescing in a final district court judgment[,] and altering the federal regulations by unilaterally reinstating the 1999 field guidance." *City & County of San Francisco*, 992 F.3d at 751 (VanDyke, J., dissenting). Instead, the State Intervenors reasonably believed that the United States would "follow[] the traditional route of asking the courts to hold the public charge cases in abeyance, rescinding the rule per the APA, and then promulgating a new rule through notice and comment rulemaking." *Id.*

That belief is all the more reasonable in light of the United States' concession that it did not take a definitive position regarding whether it would continue to defend the Rule—even as it purportedly continued to enforce it—until the day it dismissed its appeal from this Court's partial summary judgment. U.S. Resp. at 7–9. The United States nonetheless faults the State Intervenors for not predicting that the United States would "throw the case," *Flying J, Inc.*, 578 F.3d at 572, weeks earlier. U.S. Resp. at 20–21. But the United States does not dispute that it would have opposed intervention at that time as untimely, too—likely because it has repeatedly done so in similar cases. *See, e.g.*, Defendants' Brief in Opposition to Texas's Motion to Intervene at 1, 3–4, *Pennsylvania v. Rosenfelt*, No. 1:20-cv-01468 (D.D.C. Feb. 2, 2021).[2] The United States' position thus appears to be that a motion to intervene is untimely unless it is filed at the start of the litigation. *See id.* at 3–4. That is not the law. *See Flying J, Inc.*, 578 F.3d at 572; *see also United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980) (noting that a post-judgment motion to intervene was not untimely when "inadequate representation" of the intervenors' interests "in the decision whether to appeal created special circumstances that made post-judgment intervention appropriate and timely"). Because the State Intervenors acted immediately upon learning that the United States would no longer protect their interests, their motion is timely.

---

[2] Texas's intervention in *Pennsylvania v. Rosenfelt*, No. 1:20-cv-01468 (D.D.C.), does not make the State Intervenors' intervention here untimely. *Contra* Pls.' Resp. at 7–8, 11–12. The United States had not even filed an answer in that case. Here, the State Intervenors had reason to believe the United States would continue its years-long defense of the Rule—or at least ask the courts in which it was defending the Rule to hold those challenges in abeyance pending future rulemaking.

The United States argues that it had good cause to dismiss its appeal and rescind the Rule without going through the APA's notice-and-comment procedures because of the COVID-19 pandemic. U.S. Resp. at 14–15. But this reason cannot support the United States' decision to collusively settle this litigation because it does not appear in the rescission of the Rule: the United States simply pointed to "the court's order vacating the rule" and "the agency's immediate need to implement the now-effective final judgment." 86 Fed. Reg. at 14221. So not only did the United States admit in the Federal Register that it used its collusive settlement to "bypass[] any otherwise applicable requirements of notice and comment and a delayed effective date," *id.*, but the United States also declined to invoke the COVID-19 pandemic as an alternative ground for doing so.

Finally, Plaintiffs' and the United States' arguments about the allegedly prejudicial effects of unsettling the judgment miss the mark. Plaintiffs' complain that a claim brought by one of them was voluntarily dismissed with prejudice in reliance on the parties' collusive settlement, Pls.' Resp. at 9, 12, but that dismissal could easily be undone under Rule 60(b). As for the other claims, neither Plaintiffs nor the United States contest that Plaintiffs "could not have assumed that, if [they] won in the district court, there would be no appeal." *Flying J, Inc.*, 578 F.3d at 573.

Plaintiffs' and the United States insist that "confusion" may arise if the State Intervenors are allowed to intervene, Pls.' Resp. at 9–10; U.S. Resp. at 14–15, and Plaintiffs complain that they might have to "re-re-educate community members" about status of the Rule, Pls.' Resp. at 10–11. But that confusion exists only because Plaintiffs and the United States collusively settled this case, abandoning the normal and orderly process of replacing a rule promulgated through notice-and-comment rulemaking through additional notice-and-comment rulemaking. If Plaintiffs and the United States now face any prejudice from this litigation continuing to an appeal, they have only themselves and their collusive settlement to blame.

**B.    The States Intervenors interests more than justify intervention, and the disposition of this action will impair those interests.**

Although (as Plaintiffs' and the United States note) an interest sufficient to give a party Article III standing may not be a sufficient interest to support intervention as of right under Rule

24(a)(2), "[t]hat's not a problem in this case." *Flying J*, 578 F.3d at 572. The key "dimension of the 'interest' required for intervention as a matter of right . . . is that the suitor be someone whom the law on which his claim is founded was intended to protect." *Id.* That is plainly the case here.

Congress has explained that "[i]t continues to be the immigration policy of the United States that . . . aliens within the Nation's borders not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A). To further that policy, Congress made any alien who is "likely at any time to become a public charge . . . inadmissible." *Id*. § 1182(a)(4)(A). The Rule clarifies that an alien can become a public charge by "receiv[ing] one or more public benefits"—such as Medicaid and other services offered by the State Intervenors—"for more than 12 months in the aggregate within any 36-month period." 84 Fed. Reg. at 41,501–02.

The State Intervenors thus are the Rule's "direct beneficiaries," *Flying J*, 578 F.3d at 572, because they must bear the burden of admitted aliens residing in their borders who become public charges. *See supra* at 3–5; *cf. Texas*, 809 F.3d at 163 ("The interests the [State Intervenors] seek to protect fall within the zone of interests of the INA."). And as discussed above, the State Intervenors have a quasi-sovereign interest in immigration, including the admission of aliens likely to enroll in the State Intervenors' public benefits programs. *See supra* at 5.

Plaintiffs wrongly assert that the State Intervenors will have the opportunity to protect their interests when the United States "engages in notice-and-comment rulemaking later this year." Pls.' Resp. at 14. Although the United States may intend to start the notice-and-comment process sometime this year, there is no guarantee that it will follow through. Indeed, it would not be the first time this administration has promised to take further action on immigration but failed to do so. *See* Brief of Appellant State of Florida at 17, 27, *Florida v. United States*, No. 21-11715 (11th Cir. June 14, 2021) (noting that the United States had "blown past" its self-imposed deadline to promulgate new immigration enforcement priorities).

But even if the United States promulgates new rules on this subject, that rulemaking process will take place in a regulatory framework that has been fundamentally changed by the United States' extraordinary collusive litigation tactics. But for the United States' removal of the

10

Rule from the Federal Register based on its collusive settlement with Plaintiffs, any rulemaking on this subject would have had to address *why* the government saw fit to abandon the Rule. In other words, the United States would have had to explain why it thought it should admit immigrants who are likely to "receive[] one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period,'" 84 Fed. Reg. at 41,501. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Now, the United States can say the outcome of this litigation ties its hands—even though the United States tied the knot. *See City & County of San Francisco*, 992 F.3d at 743 (VanDyke, J., dissenting).

In short, the State Intervenors are entitled to intervene as of right under Rule 24(a)(2).

### C. Alternatively, the Court should permit the State Intervenors to intervene under Federal Rule of Civil Procedure 24(b)(1)(B).

Plaintiffs largely rely on their arguments against the State Intervenors' motion to intervene as of right to respond to the State Intervenors' alternative request for permissive intervention under Rule 24(b)(1)(B), Pls.' Resp. at 14–15, so the State Intervenors will incorporate their arguments above and in earlier briefing to respond to those arguments. (The United States did not present any arguments unique to the State Intervenor's request for permissive intervention.)

The only unique argument Plaintiffs offer is that "[s]everal developments have since mooted the issues in this case." *Id.* at 15–16. But most of those developments are intrinsic to this case. *Id.* at 15 ("[T]his Court has entered a final judgment vacating the Rule, DHS has determined that pursuing litigation surrounding the Vacated Rule is no longer in the public interest, and the original parties have dismissed the previously-filed appeal and remaining equal protection claim before this Court."). As such, those developments are irrelevant for purposes of intervention. *Cf. Flying J*, 578 F.3d at 572 (allowing a nonparty to intervene even though it did not move to intervene "until the district judge had entered his final judgment").

That the United States has rescinded the Rule is likewise irrelevant, *contra* Pls.' Resp. at 15, because the sole basis for that rescission would be eliminated if this Court's judgment is set aside or overturned. *See* 86 Fed. Reg. at 14221 ("[T]his rule simply implements the district court's

11

vacatur . . . ."). Also irrelevant is the United States' public pronouncement that it intends to engage in new rulemaking on this subject, *contra* Pls.' Resp. at 15, because there is no guarantee that any such rulemaking will actually happen. *Supra* at 10.

Failing intervention as of right, this Court should exercise its discretion to permit the State Intervenors to intervene to defend their interests in the Rule that will otherwise go unprotected.

### D. The Court should reject the United States' overly literal reading of Rule 24(c).

The United States faults the State Intervenors for "seek[ing] only to advance the *Government's* defense" instead of "assert[ing] their *own* defense based on their *own* legally protected interest." U.S. Resp. at 19. And it faults the State Intervenors for failing to cite a case in which "the intervenor seeks only to pursue a defense belonging to an existing party." *Id.* The United States relies on an overly literal reading of Rule 24(c), and it fails to cite a case supporting that reading. Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). The State Intervenors complied with that requirement, adopting many of the responses and since-abandoned defenses in the United States' Answer. State Intervenors' Answer. *Compare id.*, *with* U.S. Answer. Rule 24(c) requires nothing more, and neither of the cases the United States cites, *Donaldson v. United States*, 400 U.S. 517 (1971), and *Schevlin v. Schewe*, 809 F.2d 447 (7th Cir. 1987), says otherwise. Indeed, it is not uncommon for a nonparty to intervene to assume the defense of a government action that the government no longer wishes to defend. *See, e.g.*, *California*, 2021 WL 2459255, at *3 ("Although nominally defendants to the suit, the United States took the side of the plaintiffs. Therefore California, along with 15 other States and the District of Columbia (state intervenors), intervened in order to defend the Act's constitutionality, as did the U.S. House of Representatives at the appellate stage.") (citations omitted)); *Flying J*, 578 F.3d at 573 (allowing a nonparty to intervene when that party "want[ed] to present the same defense that the defendants presented.").

**III.     The State Intervenors Are Entitled to Relief Under Rule 60(b).**

Plaintiffs addressed both of the State Intervenors' motions in a single response, as did the United States, and many of their arguments in response to the State Intervenors' Rule 60(b) motion overlap with the arguments one or both of them made in response to the State Intervenors' motion to intervene. The State Intervenors thus incorporate by reference the arguments they have made above and in prior briefing about timeliness, *contra* Pls.' Resp. at 18–19; the extraordinary nature and effect of the United States' use of a collusive settlement agreement to avoid the APA's requirements, *contra id.* at 23–24; U.S. Resp. at 13–14; the insufficiency of future rulemaking to protect the State Intervenors' interests, *contra* Pls.' Resp. at 26; whether the United States had good cause to abandon its defense of the Rule and rescind the Rule, *contra id.* at 24–25; U.S. Resp. at 14–15; and whether the State Intervenors have shown a sufficient interest to justify intervention, *contra* Pls.' Resp. at 27–28; U.S. Resp. at 16–17. The few additional arguments that Plaintiffs and United States assert are no more meritorious.

*First*, Plaintiffs argue that the State Intervenors cannot seek Rule 60(b) relief as a nonparty. Pls.' Resp. at 17–18. Multiple circuit courts have rejected this argument and allowed nonparties to seek Rule 60(b) relief. *See Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013) (citing, *e.g.*, *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 188–89 (2d Cir. 2006); *Binker v. Pennsylvania*, 977 F.2d 738, 745 (3d Cir. 1992); *Dunlop v. PanAm World Airways, Inc.*, 672 F.2d 1044, 1051–52 (2d Cir. 1982); *Eyak Native Village v. Exxon Corp.*, 25 F.3d 773, 777 (9th Cir. 1994)). As the Sixth Circuit explained, "[s]everal courts have . . . allowed a nonparty to seek relief under Rule 60(b) where its interests were directly or strongly affected by the judgment." *Id.* As explained above, the State Intervenors' quasi-sovereign interests in immigration as well as their interests in the allocation of their funds for Medicaid and other public-welfare programs are directly and strongly affected by this Court's judgment, which is in part the product of the United States' collusive settlement with Plaintiffs. As a result, the State Intervenors can request Rule 60(b) relief even if their motion to intervene is denied.

13

*Second*, the United States argues that the State Intervenors have failed to show that this Court's judgment is sufficiently "unjust towards the States" to justify Rule 60(b) relief. U.S. Resp. at 12. But there is considerable "risk of injustice," *id.* at 11, in allowing the United States to use collusive litigation tactics to skirt the APA's requirements to rescind a rule that impacts States' quasi-sovereign interests.

*Third*, the United States also argues that Rule 60(b) cannot be used to excuse a failure to timely appeal. *Id.* at 17–18. But that is only a general rule. *Local 332, Allied Indus. Workers of Am. v. Johnson Controls, Inc.*, 969 F.2d 290, 292 (7th Cir. 1992) ("[T]his rule is not inflexible."). This is the type of "unusual case[]" that justifies an exception to that rule, *id.* (citation omitted), because the United States' conduct is exceptional. After all, the State Intervenors did not fail to take an appeal: they did not have the opportunity because the United States continued to defend the State Intervenors interests—here and in the Supreme Court—until after the time for filing an appeal had already run. And in any event, the State Intervenors are following the Supreme Court's instruction to seek relief in this case "whether in a motion for intervention or otherwise." *Texas*, No. 20A150 (Apr. 26, 2021).

*Fourth*, the United States argues that there is nothing unusual in declining to pursue an appeal or dismissing an appeal after pursuing one. U.S. Resp. at 13-14. But none of those cases involved the United States defending a challenged rule on the merits in multiple district courts and courts of appeals while obtaining a stay of every adverse judgment—including from the Supreme Court—and ultimately obtaining Supreme Court review before dismissing every appeal nationwide. The United States may sometimes decide not to appeal an adverse judgment, but for the United States to decide strategically to dismiss appeals and settle cases across the country— after more than a year of successful and vigorous defense—to leverage a single adverse judgment to require vacatur of a rule promulgated through notice-and-comment rulemaking is "quite extraordinary." *City & County of San Francisco*, 992 F.3d at 743 (VanDyke, J., dissenting).

*Finally*, Plaintiffs and the United States argue that this Court's grant of partial summary judgment was dictated by the law of the case. Pls.' Resp. at 20–21; *see also* U.S. Resp. at 12. That

14

may be. But the Supreme Court granted a stay in this case, *Wolf*, 140 S. Ct. 681, meaning the Court necessarily concluded that there was "a fair prospect that a majority of the Court will conclude that the decision below was erroneous," *Conkright*, 556 U.S. at 1402 (Ginsburg, J. in chambers); *see also CASA de Md., Inc. v. Trump*, 971 F.3d 220, 229 (acknowledging that the Supreme Court's decision to grant a stay "would have been improbable if not impossible had the government, as the stay applicant, not made a strong showing that it was likely to succeed on the merits" (citation and internal quotation marks omitted)), *vacated for reh'g en banc*, 981 F.3d 311 (4th Cir. 2020) (dismissed Mar. 11, 2021); *Cook County v. Wolf*, 962 F.3d 208, 234 (7th Cir. 2020) (the Supreme Court's "stay provides an indication that the Court thinks that there is at least a fair prospect that DHS should prevail and faces a greater threat of irreparable harm than the plaintiffs"), *cert. dismissed sub nom. Mayorkas v. Cook County*, 141 S. Ct. 1292 (2021).

And after granting that stay, the Supreme Court all but invited the State Intervenors to raise its argument that the United States "rescinded the rule without following the requirements of the Administrative Procedure Act" in this Court—"whether in a motion for intervention or otherwise." *Texas*, No. 20A150 (Apr. 26, 2021). That is precisely what the State Intervenors have done. "After the District Court considers any such motion," the Court continued, "the States may seek review, if necessary, in the Court of Appeals, and in a renewed application in this Court." *Id.* If necessary, that is precisely what the State Intervenors will do.

## CONCLUSION

For the reasons set forth in this Reply and in their prior briefing, the State Intervenors request this Court grant the State Intervenors' motions to intervene for relief from the Court's memorandum opinion and order and partial final judgment entered on November 2, 2020.

Dated July 1, 2021

Steve Marshall
Attorney General of Alabama

Mark Brnovich
Attorney General of Arizona

Leslie Rutledge
Attorney General of Arkansas

Todd Rokita
Attorney General of Indiana

Derek Schmidt
Attorney General of Kansas

Daniel Cameron
Attorney General of Kentucky

Jeff Landry
Attorney General of Louisiana

Lynn Fitch
Attorney General of Mississippi

Austin Knudsen
Attorney General of Montana

Dave Yost
Attorney General of Ohio

Mike Hunter
Attorney General of Oklahoma

Alan Wilson
Attorney General of South Carolina

Patrick Morrisey
Attorney General of West Virginia

Mindy Wetzel
Assistant Attorney General

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ Judd E. Stone II
Judd E. Stone II
Solicitor General
*Admitted pro hac vice.*

Lanora C. Pettit
Principal Deputy Solicitor General
*Admitted pro hac vice.*

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for State Intervenors

16

**Certificate of Service**

On July 1, 2021, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ Judd E. Stone II
Judd E. Stone II