UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COOK COUNTY, ILLINOIS, an Illinois governmental entity, and ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC., | ) ) ) | 19 C 6334 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| ALEJANDRO MAYORKAS, in his official capacity as Secretary of U.S. Department of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency, UR M. JADDOU, in her official capacity as Director of U.S. Citizenship and Immigration Services, and U.S. CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Cook County and Illinois Coalition for Immigrant and Refugee Rights, Inc. ("ICIRR")

alleged in this suit that the Department of Homeland Security's ("DHS") final rule,

*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("Final Rule"

or "Rule"), was unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et*

*seq*., and the equal protection component of the Fifth Amendment's Due Process Clause. Doc. 1.

In November 2020, after over a year of proceedings (detailed below) at all three levels of the

judiciary, this court entered a partial final judgment under Civil Rule 54(b) vacating the Rule

under the APA while allowing ICIRR's equal protection claim to proceed. Docs. 221-223

(reported at 498 F. Supp. 3d 999 (N.D. Ill. 2020)). DHS appealed the judgment, Doc. 224, but

then dismissed its appeal, Docs. 249-250, and on March 11, 2021, the parties stipulated to the

dismissal of the equal protection claim, Doc. 253, ending the case, Doc. 254.

Two months later, after stops at the Seventh Circuit and the Supreme Court, the States of Texas, Alabama, Arizona, Arkansas, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Ohio, Oklahoma, South Carolina, and West Virginia (collectively, "States") appeared in this court and moved to intervene under Rule 24 and for relief from the judgment under Rule 60(b)(6). Docs. 255-256, 259. Their motions are denied.

## Background

Cook County and ICIRR claimed that the Final Rule violated the APA, and ICIRR alone brought an equal protection claim. Doc. 1 at ¶¶ 140-188. On October 14, 2019, this court issued a preliminary injunction, limited to the State of Illinois, enjoining DHS from enforcing the Rule on the ground that it likely violated the APA by interpreting the term "public charge" in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(4)(A), in a manner incompatible with its statutory meaning. Docs. 85, 87, 106 (reported at 417 F. Supp. 3d 1008 (N.D. Ill. 2019)).

DHS appealed. Doc. 96. The Seventh Circuit denied DHS's motion to stay the preliminary injunction pending appeal, No. 19-3169 (7th Cir.), ECF No. 41 (Dec. 23, 2019), but the Supreme Court issued a stay, 140 S. Ct. 681 (2020) (mem.). This court then denied DHS's motion to dismiss Plaintiffs' claims and granted ICIRR's request for extra-record discovery on its equal protection claim, which alleged that racial animus toward nonwhite immigrants motivated the Rule's promulgation. Docs. 149-150 (reported at 461 F. Supp. 3d 779 (N.D. Ill. 2020)). Shortly thereafter, the Seventh Circuit affirmed the preliminary injunction, reasoning that the Rule likely violated the APA, though on grounds different from those articulated by this court. 962 F.3d 208 (7th Cir. 2020). DHS filed a petition for a writ of certiorari at the Supreme Court. No. 20-450 (U.S. filed Oct. 7, 2020).

Meanwhile, Plaintiffs moved for summary judgment on their APA claims. Doc. 200. In its opposition brief, DHS conceded that the Seventh Circuit's opinion in the preliminary injunction appeal effectively required this court to grant Plaintiffs' motion. Doc. 209 at 7 ("Defendants do not dispute that the Seventh Circuit's legal conclusions concerning the Rule may justify summary judgment for Plaintiffs on their APA claims here."); Doc. 219 at 1 ("Plaintiffs have argued, and Defendants do not dispute, that the Court may grant Plaintiffs' pending [summary judgment motion] in light of the Seventh Circuit's decision affirming the Court's preliminary injunction order."). On November 2, 2020, this court granted Plaintiffs' motion, entering a partial final judgment under Rule 54(b) that vacated the Rule under the APA and allowing ICIRR's equal protection claim to proceed. 498 F. Supp. 3d at 1007-10.

DHS appealed the judgment that day. Doc. 224. The Seventh Circuit stayed the judgment pending appeal, and it stayed briefing on the appeal pending the Supreme Court's resolution of DHS's petition for certiorari challenging its affirmance of the preliminary injunction. No. 20-3150 (7th Cir.), ECF No. 21 (Nov. 19, 2020).

Discovery continued in this court on ICIRR's equal protection claim. Docs. 232, 236, 238. DHS asserted the deliberative process privilege as to certain documents, and ICIRR countered that the privilege did not apply. Doc. 214 at 2-13; Doc. 232 at 3. In December 2020, the court held that *in camera* review was necessary to resolve the privilege dispute. Docs. 234-235 (reported at 2020 WL 7353408 (N.D. Ill. Dec. 15, 2020)). On January 22, 2021, days after the change in presidential administration, the court sought DHS's views as to whether a live dispute remained concerning the documents. Doc. 240. In particular, the court asked DHS to file a status report by February 4 addressing whether it planned to pursue its appeal before the

Seventh Circuit and its certiorari petition before the Supreme Court, and whether it would continue to assert the deliberative process privilege. *Ibid*.

On February 2, President Biden issued an Executive Order that, among other things, directed DHS to review the Final Rule. *See* Exec. Order No. 14,012, *Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans*, 86 Fed. Reg. 8277 (Feb. 5, 2021). Section 1 of the Order declared:

> Consistent with our character as a Nation of opportunity and of welcome, it is essential to ensure that our laws and policies encourage full participation by immigrants, including refugees, in our civic life; that immigration processes and other benefits are delivered effectively and efficiently; and that the Federal Government eliminates sources of fear and other barriers that prevent immigrants from accessing government services available to them.

*Id*. at 8277. Section 4, titled "Immediate Review of Agency Actions on Public Charge Inadmissibility," directed the Secretary of DHS and other officials to "consider and evaluate the current effects of [the Final Rule] and the implications of [its] continued implementation in light of the policy set forth in [S]ection 1 of this order." *Id*. at 8278.

The next day, DHS notified the court that, in light of the Executive Order, it "intend[ed] to confer with [ICIRR] over next steps in this litigation," and that it "continue[d] to assert the deliberative process privilege over the documents submitted to the Court for in camera review." Doc. 241 at 2 & n.1. DHS sought an extension of time to file its status report, *id*. at 2, which the court granted, Doc. 244. On February 19, in a joint status report, ICIRR objected to a stay of proceedings on its equal protection claim, arguing that it should be allowed to continue probing through discovery the motivations behind the Final Rule. Doc. 245 at 3. ICIRR and DHS agreed, however, to a two-week stay to "provide DHS and DOJ with additional time to assess how they wish to proceed." *Id*. at 3-4. DHS stated that "further developments during that time period may … moot [ICIRR's] equal protection claim." *Id*. at 4. In a March 5 joint status report,

4

ICIRR objected to any further stay because DHS at that point was continuing to seek reversal of the judgment vacating the Rule under the APA.  Doc. 247 at 2.

Four days later, on March 9, 2021, DHS moved to voluntarily dismiss its appeal of this court's judgment, and the Seventh Circuit promptly granted the motion and issued its mandate, thereby dissolving the stay it had imposed on this court's vacatur of the Rule.  No. 20-3150 (7th Cir.), ECF Nos. 23-24 (Mar. 9, 2021).  Also that day, the parties filed a joint stipulation dismissing DHS's petition for certiorari before the Supreme Court, and the petition was dismissed.  Joint Stipulation to Dismiss, No. 20-450 (U.S. Mar. 9, 2021).  In a public statement, DHS explained that during its review of the Rule pursuant to the Executive Order, it concluded that continuing to defend the Rule was "neither in the public interest nor an efficient use of government resources."  Press Release, Dep't of Homeland Sec., DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility (Mar. 9, 2021) (reproduced at Doc. 252-1).  DHS also announced that, in compliance with this court's judgment, it would no longer enforce the Rule.  Press Release, Dep't of Homeland Sec., DHS Secretary Statement on the 2019 Public Charge Rule (Mar. 9, 2021) (reproduced at Doc. 252-2).

DHS notified this court of those developments the next day.  Doc. 252.  On March 11, the parties filed a joint stipulation dismissing ICIRR's equal protection claim with prejudice under Rule 41(a)(1)(A)(ii).  Doc. 253.  Because "a Rule 41(a)(1)(A) notice of dismissal is self-executing and effective without further action from the court," *Kuznar v. Kuznar*, 775 F.3d 892, 896 (7th Cir. 2015), the court simply noted the stipulation and closed the case, Doc. 254.

On March 15, DHS promulgated a direct final rule, without notice and comment, striking the Final Rule's text from the Code of Federal Regulations.  *See Inadmissibility on Public Charge Grounds; Implementation of Vacatur*, 86 Fed. Reg. 14,221, 14,227-29 (Mar. 15, 2021)

("Vacatur Rule"). The Vacatur Rule's preamble stated that "[b]ecause [the Vacatur Rule] simply implements the district court's vacatur of the [Final Rule] … DHS is not required to provide notice and comment or delay the effective date of [the Vacatur Rule]." *Id*. at 14,221. In support, DHS cited its authority under the APA to forgo notice and comment "when the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

Meanwhile, on March 11, two days after the Seventh Circuit dismissed DHS's appeal and issued the mandate and hours after the parties stipulated to the dismissal with prejudice of ICIRR's equal protection claim, the States filed motions in the Seventh Circuit to recall the mandate, to reconsider its order dismissing the appeal, and for leave to intervene as defendants to support the lawfulness of the Final Rule. No. 20-3150 (7th Cir.), ECF No. 25. On March 15, the Seventh Circuit denied the motions in a one-sentence order. *Id*., ECF No. 26.

On March 19, the States applied to the Supreme Court for a stay of this court's judgment pending their filing of a certiorari petition or, in the alternative, for summary reversal of the Seventh Circuit's denial of their motions. Application for Leave to Intervene and for a Stay of the Judgment Issued by the United States District Court for the Northern District of Illinois, *Texas v. Cook Cnty.*, No. 20A150 (U.S. filed Mar. 19, 2021). In support, the States argued that DHS had violated the APA by dismissing its appeal of this court's judgment and issuing the Vacatur Rule without engaging in notice-and-comment rulemaking, reasoning that "[b]ecause the Rule was made through formal notice-and-comment procedures, it can only be unmade the same way." *Id*. at 21. The Supreme Court denied the States' application without prejudice. *Texas v. Cook Cnty.*, __ S. Ct. __, 2021 WL 1602614 (U.S. Apr. 26, 2021) (mem.). The Court's order expressly noted the States' argument that DHS's actions violated the APA:

>In 2019, the Department of Homeland Security promulgated through notice and comment a rule defining the term "public charge." The District Court in this case vacated the rule nationwide, but that judgment was stayed pending DHS's appeal to the United States Court of Appeals for the Seventh Circuit. On March 9, 2021, following the change in presidential administration, DHS voluntarily dismissed that appeal, thereby dissolving the stay of the District Court's judgment. And on March 15, DHS relied on the District Court's now-effective judgment to remove the challenged rule from the Code of Federal Regulations without going through notice and comment rulemaking. Shortly after DHS had voluntarily dismissed its appeal, a group of States sought leave to intervene in the Court of Appeals. When that request was denied, the States filed an application for leave to intervene in this Court and for a stay of the District Court's judgment. The States argue that DHS has prevented enforcement of the rule while insulating the District Court's judgment from review. The States also contend that DHS has rescinded the rule without following the requirements of the Administrative Procedure Act. We deny the application, without prejudice to the States raising this and other arguments before the District Court, whether in a motion for intervention or otherwise. After the District Court considers any such motion, the States may seek review, if necessary, in the Court of Appeals, and in a renewed application in this Court. …

*Id*. at *1.

On May 12, the States appeared in this court, represented by the Attorney General of Texas. Doc. 255. They move to intervene under Rule 24 and for relief from judgment under Rule 60(b)(6). Docs. 256, 259. Plaintiffs and DHS oppose the motions. Docs. 267, 269. In the course of litigating the motions, the States abandoned their argument that DHS violated the APA by dismissing its appeal and rescinding the Final Rule without undertaking notice-and-comment rulemaking. Doc. 282 at 33:3-6 ("THE COURT: … So, are you saying that the federal government violated the APA by doing what it did in this case? [STATES]: No, your Honor, but we do not think we have to prove … that.").

## Discussion

## I. Standing

Plaintiffs and DHS argue that the States lack Article III standing and therefore cannot intervene. Doc. 267 at 9-11; Doc. 269 at 8-9, 22-25; Doc. 279 at 1-4. The court addresses that

argument first. *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016) (holding that, where the original defendant does not appeal but intervenors seek to appeal, a court "cannot decide the merits of this case unless the intervenor[s] … have standing"); *Bond v. Utreras*, 585 F.3d 1061, 1071 (7th Cir. 2009) ("[I]ntervenors must show standing if there is otherwise no live case or controversy in existence."). The States acknowledge that, although they seek to intervene as defendants, they "need to show … that at least one of them has standing" to pursue their motions. Doc. 278 at 3.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). The States argue that the Final Rule's vacatur will increase the fiscal burden imposed on their budgets by Medicaid and other public benefits programs because more noncitizens will be allowed to remain in the United States, either as noncitizens or new citizens, and use public benefits while here. Doc. 257 at 8-9; Doc. 260 at 15; Doc. 278 at 4-5. Plaintiffs respond that the States' claimed injury is "an attenuated, speculative, non-obvious harm, which is insufficient to support standing." Doc. 267 at 10. DHS contends that the conjectural nature of the States' claimed injuries is demonstrated by evidence showing that the United States Citizenship and Immigration Services ("USCIS") denied only three status adjustment applications based solely on the Rule. Doc. 269 at 22-23 (citing Doc. 269-1 at ¶ 8).

DHS's evidence supports rather than negates the States' standing. A measurable financial cost, even a minor one, qualifies as an injury in fact under Article III. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). DHS admits that the Final Rule caused some status adjustment applications to be denied, and it is not speculative that at least one such applicant (now granted status because of the Rule's vacatur) will use public benefits in one of the States. Indeed, the Rule's fiscal *costs* were precisely the injuries that conferred standing on Cook County to challenge it. Cook County argued that noncitizens would forgo Medicaid coverage out of fear of being deemed a public charge, ultimately requiring its public hospital to pay for uncompensated health care costs. Doc. 27 at 34-35. This court held that the County showed standing on that basis, 417 F. Supp. 3d at 1017, and the Seventh Circuit affirmed, 962 F.3d at 218-19. Cook County and the States point to different financial costs and benefits of the Rule, respectively, but both qualify as injuries in fact.

As for traceability and redressability, the Rule's vacatur causes the States' injuries, and restoring the Rule would redress them. DHS admits that, without the Rule, some number of additional noncitizens will become eligible for public benefits by achieving lawful permanent resident status. Doc. 269 at 22-23. A predictable consequence of that eligibility is that those noncitizens will obtain public benefits. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (holding that there is traceability where "third parties will likely react in predictable ways" to a legal change). Indeed, the States' asserted causal link between denials of status under the Rule, on the one hand, and benefits to their treasuries, on the other, may be as direct as the County's asserted causal link between the Rule's chilling effect on noncitizens' willingness to seek public health benefits, on the one hand, and fiscal costs to the County, on the other.

The clear link between denials of status under the Rule and fiscal benefits to the States distinguishes this case from *California v. Texas*, 141 S. Ct. 2104 (2021). There, the Supreme Court held that certain States challenging the constitutionality of the minimum essential coverage provision, 26 U.S.C. § 5000A(a), of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), failed to show an injury traceable to that provision. As the Court explained, Congress had eliminated the penalty for non-compliance with the provision, 141 S. Ct at 2112, and "the States [had] not demonstrated that an unenforceable mandate will cause their residents to enroll in valuable benefits programs that they would otherwise forgo," *id*. at 2119. The Court thus concluded that the States lacked standing because the causal link between the challenged provision and any injury to them "rest[ed] on a 'highly attenuated chain of possibilities.'" *Ibid*. (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). The link here is far more direct, warranting a different result.

## II.    Motion to Intervene

With standing secure, the court may consider the States' motion to intervene. The States seek intervention as a matter of right under Rule 24(a)(2) and by permission under Rule 24(b)(1)(B). Doc. 257 at 5. A motion under either subsection must be "timely." Fed. R. Civ. P. 24(a), (b)(1); *see NAACP v. New York*, 413 U.S. 345, 365 (1973) ("Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.'"). Timeliness is "determined from all the circumstances," *NAACP*, 413 U.S. at 366, and that determination is "committed to the sound discretion of the district judge," *South v. Rowe*, 759 F.2d 610, 612 (7th Cir. 1985).

Four factors govern whether an intervention motion is timely: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any

other unusual circumstances." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 945, 949 (7th Cir. 2000); *see also Illinois v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019) (same). That four-part standard, first articulated by the Fifth Circuit in *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977), was adopted by the Seventh Circuit in *United States v. Kemper Money Market Fund, Inc.*, 704 F.2d 389, 391 (7th Cir. 1983). Many other circuits have adopted the *Stallworth* standard. *See Culbreath v. Dukakis*, 630 F.2d 15, 20 (1st Cir. 1980); *United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987); *Mich. Ass'n for Retarded Citizens v. Smith*, 657 F.2d 102, 105 (6th Cir. 1981); *Sanguine, Ltd. v. Dep't of Interior*, 736 F.2d 1416, 1418 (10th Cir. 1984); *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1516 (11th Cir. 1983). The standards articulated by other circuits employ slightly different language, but like *Stallworth*, they focus attention on the length of the proposed intervenor's delay in seeking intervention, the prejudice to existing parties of the delay, and any mitigating reasons for the delay. *See Wallach v. Eaton Corp.*, 837 F.3d 356, 371 (3d Cir. 2016); *Alt v. EPA*, 758 F.3d 588, 591 (4th Cir. 2014); *In re Wholesale Grocery Prods. Antitrust Litig.*, 849 F.3d 761, 767 (8th Cir. 2017); *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016); *Amador Cnty. v. Dep't of Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014). The result here, denial of intervention on timeliness grounds, would be the same regardless of which circuit's standard is used.

A.      **Length of the Delay**

The first factor directs attention to the delay between the time the States should have known of their interest in this case and the time they moved to intervene. *See Sokaogon Chippewa*, 214 F.3d at 949. This factor requires a would-be intervenor to "move promptly to intervene as soon as it *knows or has reason to know* that its interests *might be adversely affected* by the outcome of the litigation." *Heartwood, Inc. v. U.S. Forest Serv.*, 316 F.3d 694, 701 (7th Cir. 2003) (emphases added).

11

The emphasized language conveys two important points. First, the phrase "knows or has reason to know" imposes an objective "reasonableness standard," asking whether potential intervenors were "reasonably diligent in learning of a suit." *Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 438 (7th Cir. 1994). This means that potential intervenors cannot claim subjective ignorance of a case's effect on their interests if ordinary diligence would have alerted them of the need to intervene. *See Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 798 (7th Cir. 2013) (denying intervention where the potential intervenor "could have missed the implications for his [interests] only if he was willfully blind to them"). Second, the phrase "might be adversely affected"—and, in particular, the word "might"—requires prompt intervention when the reasonable possibility, not just a certainty, of an adverse effect on the proposed intervenor's interests arises. The Seventh Circuit has emphasized that point time and again. *See Illinois v. Chicago*, 912 F.3d at 985 ("[W]e measure from when the applicant has reason to know its interests *might* be adversely affected, not from when it knows for certain that they will be.") (emphasis in original); *Heartwood*, 316 F.3d at 701 ("A prospective intervenor must move promptly to intervene as soon as it knows or has reason to know that its interests might be adversely affected by the outcome of the litigation."); *Sokaogon Chippewa*, 214 F.3d at 949 ("As soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene.") (citation omitted); *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) ("[W]e determine timeliness from the time the potential intervenors learn that their interest might be impaired."); *City of Bloomington v. Westinghouse Elec. Corp.*, 824 F.2d 531, 535 (7th Cir. 1987) (holding that a motion to intervene was untimely because the movant "had knowledge that its interests could be affected more than 11 months prior to the time it sought intervention").

12

As noted, the States' claimed interest in this litigation is that the Final Rule reduced their spending on public benefits programs and that the Rule's demise will increase that spending. Doc. 257 at 8-9. The States thus had reason to know that their interests "might be adversely affected by the outcome of the litigation," *Heartwood*, 316 F.3d at 701, from the moment this suit was filed in September 2019. That said, the outset of this suit almost certainly would have been an *in*appropriate time for the States to seek intervention, as there was no prospect at that point, or for the first ten-plus months of 2020, that DHS would cease defending the Rule. *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 799 (7th Cir. 2019) ("Where the prospective intervenor and the named party have the same goal … there is a rebuttable presumption of adequate representation that requires a showing of some conflict to warrant intervention.") (internal quotation marks omitted). The pertinent question, then, concerns when the States had reason to know that DHS might abandon its defense of the Rule and thus no longer adequately represent their interests. *See Illinois v. Chicago*, 912 F.3d at 985 ("[I]ntervention may be timely where the movant promptly seeks intervention upon learning that a party is not representing its interests.").

In December 2019, during the presidential campaign, then-candidate Joe Biden publicly committed that his administration, "[i]n the first 100 days," would "[r]everse [the] public charge rule, which runs counter to our values as Americans and the history of our nation." The Biden Plan for Securing Our Values as a Nation of Immigrants (Dec. 12, 2019), https://web.archive.org/web/20191212040308/https://joebiden.com/immigration. That promise remained on candidate Biden's website throughout the campaign. *See* The Biden Plan for Securing Our Values as a Nation of Immigrants (Nov. 3, 2020), https://web.archive.org/web/20201103023048/https://joebiden.com/immigration. Plaintiffs

argue that candidate Biden's promise put the States on clear notice that, should he be elected, they could no longer rely on DHS to defend the Rule. Doc. 267 at 12-13.

Plaintiffs garner support for their position from an unlikely ally: the State of Texas. In June 2020, a coalition of States led by Pennsylvania filed suit to challenge a certain Department of Education ("DOE") regulation. *Pennsylvania v. DeVos*, No. 20-cv-1468 (D.D.C. filed June 4, 2020). On January 19, 2021, the day before Inauguration Day, Texas moved to intervene to defend the DOE regulation. *Id.*, ECF No. 130 (reproduced at Doc. 267-2). In support, Texas cited President-elect Biden's condemnation of the DOE regulation on his campaign website—the same website that condemned the Final Rule—and another campaign statement expressing opposition to the regulation. Doc. 267-2 at 10, 12, 21 & n.8. Texas argued that, given the President-elect's views, it could "no longer rely on [DOE] to adequately represent its interests in defending [the DOE regulation]," and it predicted that DOE's position would shift "when the President-elect is inaugurated into office." *Id.* at 10-11. Texas pointed to candidate Biden's statements as "evidence of an unavoidable, fundamental divide between Texas and [DOE] under the President-elect's incoming administration." *Id.* at 21. Texas added that its motion was "timely because it was filed close in time to the change in circumstances requiring intervention: President-elect Biden's inauguration on January 20." *Id.* at 13. As Texas ably summed up the situation it faced and the reasons its motion was timely:

> During the [current administration], Texas had no reason to intervene. Like Texas, the [current] administration defended the [challenged DOE regulation] … . The President-elect, however, has expressed open and adamant hostility to the [regulation], necessitating Texas' intervention if it is to protect its interests. [DOE] will cease adequately representing Texas' interests only after January 20, 2021 when the new administration takes over and begins implementing its own policies. This is not an occasion where a non-party sat on its rights. Texas has actively monitored the present action from the beginning and exhibited proper diligence in bringing its motion.

*Id.* at 14 (citations omitted).

14

That reasoning was perfectly sensible: Under the administration that soon would leave office, Texas could count on DOE to defend the challenged regulation; candidate Biden expressed strong opposition to the regulation during the campaign; so, because candidate Biden had won the election and soon would become President, Texas must be allowed to intervene to ensure the regulation's continued defense. Texas faced the same situation here: From the inception of this suit through much of 2020, Texas could count on DHS to continue to defend the Rule; candidate Biden expressed strong opposition to the Rule during the campaign, promising to "[r]everse" it "[i]n the first 100 days" of his administration; so, because candidate Biden had won the election and soon would become President, Texas needed to take action to ensure the Rule's continued defense, both in this court (as to ICIRR's equal protection claim) and in the Seventh Circuit (as to the appeal of this court's judgment).

But Texas did not follow here the course it took in *Pennsylvania v. DeVos*, and the excuses it offers for not doing so are diametrically opposed to its submissions in that case. Here, Texas argues that it would be "absurd" to "look back to … statements made by then-candidate Biden" to evaluate its interest in intervening and the timeliness of its intervention motion. Doc. 278 at 8. And here, Texas argues that the States could not possibly have known of the need to intervene until March 9, when DHS dismissed its appeal of this court's judgment. Doc. 257 at 7; Doc. 278 at 8-9. Those arguments cannot be reconciled, on any level, with the position it took in *Pennsylvania v. DeVos*.

At the motion hearing, this court engaged with Texas about the conflict between its position in *Pennsylvania v. DeVos* and its position here. Doc. 282 at 46:4-52:9. In an effort to justify not pursuing here the course it took in *Pennsylvania v. DeVos*, Texas stated that it had been "denied relief in that case." *Id*. at 47:5-6. In fact, the court in that case granted Texas's

motion to intervene.  *See Pennsylvania v. DeVos*, No. 20-cv-1468 (D.D.C. Feb. 4, 2021).  After

this court reminded Texas of that fact, Texas observed that it had been denied intervention in a

different case challenging the same DOE regulation, *Victim Rights Law Center v. DeVos*,

No. 20-cv-11104 (D. Mass filed June 10, 2020).  Doc. 282 at 50:1-5.  But that ruling is

unsurprising, for Texas moved to intervene in *Victim Rights* on April 30, 2021, months after it

had moved in *Pennsylvania v. DeVos*.  *See* Texas' Motion to Intervene as Defendant, *Victim

Rights*, ECF No. 164.  And, indeed, Texas's motion in *Victim Rights* was denied as untimely.

*Id*., ECF No. 170 (May 12, 2021).  Finally, when this court asked Texas whether it would "stand

by all the arguments that it made in its intervention motion in" *Pennsylvania v. DeVos*, Texas

responded that it was "not prepared to say whether we stand behind them or not."  Doc. 282 at

51:19-52:2.

Granted, Texas does attempt in a footnote to distinguish the situation it faced in

*Pennsylvania v. DeVos* from the situation it (and the other States) faced here, observing that this

case had proceeded to final judgment when they sought intervention while *Pennsylvania v.

DeVos* was at an earlier stage when Texas sought intervention.  Doc. 278 at 9 n.2.  But that

distinction cuts against Texas, not in its favor, as the judgment vacating the Final Rule made

prompt action to intervene even more crucial here than it was in *Pennsylvania v. DeVos*.  *See

United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395-96 (1977) (holding that the "critical

inquiry" on a motion for "post-judgment intervention for the purpose of appeal" is "whether in

view of all the circumstances the intervenor acted promptly after the entry of final judgment");

*Bond*, 585 F.3d at 1071 ("[I]ntervention postjudgment—which necessarily disturbs the final

adjudication of the parties' rights—should generally be disfavored.").

Accordingly, as it pertains to timeliness of intervention, Texas was right in *Pennsylvania v. DeVos* and is wrong here. Under settled precedent, Texas and the other States were required to intervene when a reasonable possibility arose of an adverse effect on their interests. *See Illinois v. Chicago*, 912 F.3d at 985; *Heartwood*, 316 F.3d at 701. It became not just a reasonable possibility, but likely, that the States' and DHS's respective interests in the Final Rule would diverge—and that DHS would cease its defense of the Rule—when it became likely that candidate Biden would become President Biden. That puts front and center the question of when after the election it became reasonably possible, if not likely, that there would be a change in presidential administration.

The best answer to that question is November 7, 2020, a few days after the election, when all creditable news organizations declared candidate Biden the winner. *See, e.g.*, Jonathan Lemire *et al.*, *Biden defeats Trump for White House*, Associated Press (Nov. 7, 2020), https://apnews.com/article/joe-biden-wins-white-house-ap-fd58df73aa677acb74fce2a69adb71f9; Paul Steinhauser *et al.*, *Biden wins presidency*, Fox News (Nov. 7, 2020), https://www.foxnews.com/politics/biden-wins-presidency-trump-fox-news-projects. At the motion hearing, Texas resisted that proposition, stating that "there was significant amounts of litigation" to come after November 7. Doc. 282 at 49:19-24.

True enough, several dozen lawsuits concerning the presidential election were brought in state and federal courts across the country, among the more prominent being Texas's effort to pursue an original action in the Supreme Court against Georgia, Michigan, Pennsylvania, and Wisconsin. *See* Motion for Leave to File Bill of Complaint, *Texas v. Pennsylvania*, No. 22O155 (U.S. filed Dec. 7, 2020). Regardless of whether Texas knew or should have known with certainty the fate that would befall its suit and the others, Texas surely knew or should have

17

known from the exceptionally able lawyers on its Attorney General's staff, most particularly its then-Solicitor General and his staff, that it was reasonably possible, if not likely, that the suits would fail and that candidate Biden would become President Biden. *See*, *e.g.*, *Trump v. Wis. Elections Comm'n*, 506 F. Supp. 3d 620 (E.D. Wis. 2020), *aff'd*, 983 F.3d 919 (7th Cir. 2020); *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899 (M.D. Pa. 2020), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Penn.*, 830 F. App'x 377 (3d Cir. 2020). At the very latest, Texas knew or should have known that fact by December 11, 2020, when the Supreme Court rejected its suit in a one-paragraph order. *See Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020) (mem.). Texas acknowledged as much at the motion hearing. Doc. 282 at 49:23-50:1 ("Your Honor, there was significant amounts of litigation, but yes, I will generally agree that by December, there was certainty about that candidate Biden would be elected.").

By November 7, 2020, the States thus knew or should have known of the need to intervene in this case, based on the impending inauguration of a presidential candidate who was widely acknowledged to have won the election and who had promised to reverse the Final Rule in the first 100 days of his administration. At the very latest, the States knew or should have known by December 11, 2020, of their need to intervene. And had the States intervened at any point during the several weeks preceding January 4, 2021, they could have joined this suit in time to file a timely notice of appeal of the judgment vacating the Rule, without having to seek intervention directly in the Seventh Circuit. *See* Fed. R. App. P. 4(a)(1)(B) ("The notice of appeal may be filed by any party within 60 days after the entry of the judgment or order appealed from if one of the parties is … a United States agency [or] a United States officer or employee sued in an official capacity … ."); Fed. R. App. P. 26(a) (rules for computing time); *Anderson v. Dep't of Agric.*, 604 F. App'x 513, 516-17 (7th Cir. 2015) (holding that a private litigant "had 60

days to file his notice [of appeal after the district court entered judgment] because a United States agency is a party") (citing Fed. R. App. P. 4(a)(1)(B)); *Satkar Hosp., Inc. v. Fox Television Holdings*, 767 F.3d 701, 706 (7th Cir. 2014) (holding that the deadlines set by Appellate Rule 4(a)(1) apply to Civil Rule 54(b) judgments).

The discussion could stop there, but it bears mention that the Executive Order issued by President Biden on February 2, 2021 confirmed (or should have confirmed) for the States their need to quickly intervene. As noted, the Executive Order directed DHS to review the Final Rule and condemned its basic premises in clear terms. 86 Fed. Reg. at 8277 (declaring that immigrants should be encouraged to "access[] government services available to them"); *id*. at 8278 (directing DHS to review the Rule in light of that policy). On February 3, DHS notified this court of the Executive Order and that it might influence the "next steps in this litigation." Doc. 241 at 2. Any reasonable observer would have known at that point that intervention had become extremely urgent for anyone who wished to ensure the Rule's continued defense here and in the Seventh Circuit. Had the States intervened in this court in February, they would have been unable to file a timely notice of appeal of the judgment vacating the Rule, but they would have had a much stronger claim to intervene in the Seventh Circuit, well before DHS dismissed the appeal and the Seventh Circuit issued the mandate. *See Sierra Club, Inc. v. EPA*, 358 F.3d 516, 517-18 (7th Cir. 2004) (applying Civil Rule 24 in deciding whether to allow a non-party to intervene on appeal).

Yet the States did not move to intervene until March 11, 2021—in the Seventh Circuit, not here. No. 20-3150 (7th Cir.), ECF No. 25. That was over four months past November 7, exactly three months past December 11, and over five weeks past February 2, in a case where judgment had already been entered.

There is no simple formula for determining how long a delay is too long.  In *NAACP v. New York*, the Supreme Court held that a 17-day delay—from March 21, 1972, when the proposed intervenors learned of the suit, to April 7, when they moved to intervene—rendered untimely their intervention motion.  413 U.S. at 360-61, 367.  The Court reasoned that the plaintiff's summary judgment motion had been pending on March 21, and that the defendant had consented to the entry of judgment before April 7.  *Id*. at 360, 367-68.  In such circumstances, the Court explained, the potential intervenors needed "to take immediate affirmative steps to protect their interests," *id*. at 367, but failed to do so.  That said, the Seventh Circuit has held that a three-month delay did not render a motion untimely where the intervenor was from Hong Kong and had to retain a United States lawyer before it could move to intervene.  *See Nissei*, 31 F.3d at 439.  That seventeen days could be too long in some circumstances, and three months timely in others, reflects that "intervention cases are highly fact specific and tend to resist comparison to prior cases," with the ultimate determination "essentially one of reasonableness."  *ABC/York-Estes Corp.*, 64 F.3d at 321.

The States' delay in seeking intervention was plainly unreasonable under the circumstances of this case.  This suit concerned a major immigration regulation and was subject to significant media and other attention; indeed, the States do not dispute that they were aware of their interests in the Final Rule during "the previous Administration."  Doc. 257 at 7; *see NAACP v. New York*, 413 U.S. at 366 (observing that the potential intervenors "knew or should have known of the pendency" of the suit in light of news coverage and "public comment by community leaders").  Likewise, the events that imperiled the States' interests were common knowledge: then-candidate Biden's criticism of and promise to jettison the Rule, the wide recognition of his success in the election and the failure of Texas's suit in the Supreme Court,

and (placing a cherry atop an already iced cake) President Biden's issuance of the Executive Order. The States were perfectly capable of seeking intervention in reaction to those events, as demonstrated by the fact that Texas did so in *Pennsylvania v. DeVos*. Given all this, and with a judgment vacating the Rule already having been entered, four months, three months, or even five weeks was too long for the States to wait to seek intervention.

Opposing this conclusion, the States rely heavily on *Flying J, Inc. v. Van Hollen*, 578 F.3d 569 (7th Cir. 2009), which held that a motion to intervene filed less than thirty days after the entry of judgment, during the window to file a notice of appeal, was timely. *Id*. at 570-72; *see* Doc. 257 at 6-7; Doc. 278 at 9-10. *Flying J* has some surface similarities to this case: The district court invalidated a Wisconsin statute, the Attorney General of Wisconsin declined to appeal, and a trade association sought to intervene so that it could pursue an appeal in the Attorney General's stead. 578 F.3d at 570-71. *Flying J* illustrates the principle, disputed by no party here, that an intervention motion can be timely even after entry of judgment. *See United Airlines*, 432 U.S. at 395-96 (holding that prompt intervention after judgment can be timely).

*Flying J* is easily distinguished from this case, however, because the trade association there had no prior notice that the Attorney General of Wisconsin planned to forgo an appeal; as the Seventh Circuit observed, "there was *nothing* to indicate that the attorney general was planning to throw the case—until he did so by failing to appeal." 578 F.3d at 572 (emphasis added). The trade association in *Flying J* thus took prompt action at the earliest possible moment. Here, by contrast, there was ample basis for months before March 9, when DHS dismissed its appeal, to expect that DHS might and likely would cease its defense of the Final Rule. The States failed to act on that knowledge with the promptness required by Rule 24.

Finally, the States argue that they reasonably believed that DHS would seek to reverse the Final Rule through notice-and-comment rulemaking, not by dismissing its appeal, and therefore that they understandably did not realize until March 9 that intervention was necessary. Doc. 278 at 8-9. This argument sounds in a different register, as it concedes that President-elect Biden, upon taking office, would fulfill his promise to jettison the Rule, and focuses solely on the mechanism by which he would do so. To support their point, the States rely exclusively on a dissent from the Ninth Circuit's denial of a motion to intervene that they (except for Kentucky and Ohio) filed in consolidated appeals challenging preliminary injunctions entered by district courts in California and Washington against enforcing the Rule. *City & Cnty. of San Francisco v. USCIS*, 992 F.3d 742, 743-55 (9th Cir. 2021) (VanDyke, J., dissenting). Specifically, the dissent asserted that DHS's dismissal of its appeal of this court's judgment was "quite extraordinary," allowing DHS "to dodge the pesky requirements of the APA" and "deliberately evad[e] the administrative process," when it should have pursued the "traditional route" of "asking the courts to hold the public charge cases in abeyance … and then promulgating a new rule through notice and comment." *Id*. at 743, 749, 751. The dissent further asserted that "every administration before" "the current administration" would have followed that abeyance and notice-and-comment approach. *Id*. at 754.

The dissent did not favor those assertions with citation to any legal authority. In fact, although the States argued in March to the Supreme Court that "[b]ecause the Rule was made through formal notice-and-comment procedures, it can only be unmade the same way," Application for Leave to Intervene and for a Stay, at 21, *Texas v. Cook Cnty.*, No. 20A150 (U.S.), the States now admit that the APA does *not* prohibit an agency from taking the course that DHS took here, Doc. 282 at 33:3-6 ("THE COURT: … So, are you saying that the federal

government violated the APA by doing what it did in this case? [STATES]: No, your Honor, but we do not think we have to prove … that."). Moreover, as DHS observes, Doc. 269 at 19; Doc. 282 at 58:22-59:8, federal agencies regularly choose to forego appeal, or to dismiss their appeals, of district court judgments that invalidate regulations. *See, e.g.*, *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 572 (D. Md. 2020) ("*CSPI*") (invalidating a Department of Agriculture rule) (no appeal taken); *Burt Lake Band of Ottawa & Chippewa Indians v. Bernhardt*, __ F. Supp. 3d __, 2020 WL 1451566, at *12 (D.D.C. Mar. 25, 2020) (remanding a Department of Interior rulemaking to the agency), *appeal dismissed*, 2020 WL 3635122 (D.C. Cir. June 29, 2020); *Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1033 (N.D. Cal. 2019) (vacating a DOE rule), *appeal dismissed*, 2019 WL 4656199 (9th Cir. Aug. 13, 2019); *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 56 (D.D.C. 2019) (vacating a DOE rule), *appeal dismissed*, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 10 (D.D.C. 2020) (setting aside two USCIS directives), *judgment entered*, 2020 WL 1905063 (D.D.C. Apr. 16, 2020), *appeal dismissed*, 2020 WL 5358686 (D.C. Cir. Aug. 25, 2020). This should not be news to the States, as five of them (including Texas) were *amici curiae* in one of those cases. *See CSPI v. Perdue*, No. 19-cv-1004 (D. Md.), ECF Nos. 40 (Sept. 6, 2019), 58 (Apr. 13, 2020).

Thus, it was far from unprecedented, and in fact was entirely foreseeable, particularly given candidate Biden's promise to reverse the Final Rule during the first 100 days of his administration, that DHS would dismiss its appeal of the judgment vacating the Rule. The States were required to react promptly to that reasonable possibility, even if they could not predict with certainty that DHS would take that course or precisely when. *See Illinois v. Chicago*, 912 F.3d at

985; *Heartwood*, 316 F.3d at 701. It follows that the first factor of the timeliness analysis, length of the delay, weighs heavily against the States.

### B.       Prejudice to Plaintiffs and DHS of the States' Delay

The second timeliness factor is the prejudice caused to the original parties by the potential intervenor's delay in seeking intervention. *See Sokaogon Chippewa*, 214 F.3d at 949. As the Seventh Circuit has observed, "'the mere lapse of time by itself does not make an application untimely,' [but] instead the [district court] 'must weigh the lapse of time in the light of all the circumstances of the case.'" *Crowe ex rel. Crowe v. Zeigler Coal Co.*, 646 F.3d 435, 444 (7th Cir. 2011) (quoting 7C Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1916 (3d ed. 2010)).

One type of prejudice that Plaintiffs identify concerns the harms the Final Rule itself inflicted on them and the risk of confusion among the immigrants that ICIRR serves should the Rule be reinstated. Doc. 267 at 16-18. Those are not relevant considerations under Rule 24. As the Fifth Circuit explained in *Stallworth*, "the prejudice to the original parties to the litigation that is relevant to the question of timeliness is only that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he knew or reasonably should have known about his interest in the action." 558 F.2d at 265; *see also Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 390 (7th Cir. 2019) (holding that no prejudice arose from a delay in filing the motion to intervene where "the burden to the parties of reopening the litigation … would have been the same" no matter the motion's timing). The effects of the Rule, should it be reinstated, would flow not from the States' delay in seeking intervention, but from the mere fact of intervention, which does not factor in the timeliness inquiry.

That said, Plaintiffs and DHS did incur reliance costs due to the States' delay that would not have accrued had the States timely sought intervention. First, DHS expended resources

reformulating national policy to reflect the new administration's views long after the States had notice of the need to intervene. The States had such notice by November 7, 2020, when the presidential candidate who had promised to jettison the Final Rule was widely recognized as the winner—and surely by December 11, 2020, when the Supreme Court rejected Texas's suit—well before the time to appeal the judgment ran on January 4, 2021. And then, shortly after he took office, President Biden directed DHS in the Executive Order to re-examine the Rule. 86 Fed. Reg. at 8278. As described by the parties' February 2021 status reports, DHS had undertaken by that time a process to evaluate its next steps regarding the Rule and this litigation—a process clearly premised on all the circumstances, including that no other party had appealed or taken any steps to intervene to defend the Rule. Doc. 241 at 2 (Feb. 3, 2021) (explaining that DHS had been ordered "to review agency actions related to implementation of the public charge ground of inadmissibility" and that it would "confer with [ICIRR] over next steps in this litigation"); Doc. 245 at 3 (Feb. 19, 2021) ("DHS is currently reviewing the … Rule, and the Department of Justice ('DOJ') is likewise assessing how to proceed with its appeals in relevant litigations in light of the aforementioned Executive Order."). DHS's process culminated in a considered decision in March 2021 that continued defense of the Rule was "neither in the public interest nor an efficient use of government resources." Doc. 252-1 at 2.

Federal agencies like DHS have a vital interest in conserving government resources, including by conducting litigation efficiently. *See Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) ("Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government."); *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (noting "the Government's interest, and hence that of the public, in

conserving scarce fiscal and administrative resources").  Allowing the States to intervene at this point would squander the resources that DHS invested, during the critical period when the States knew of their need to seek intervention yet did not do so, in deciding how to proceed with the Final Rule and this case.  If the States had sought intervention before the time to appeal elapsed, or at least immediately after the Executive Order issued, DHS could have taken the States' involvement into account in its deliberations as to the best and most efficient course.

The States' delay also impacted DHS's decision to cease enforcing the Final Rule on March 9, when it dismissed its appeal, and all the reliance costs thereby accrued.  When this court's judgment went into effect that day with the lifting of the Seventh Circuit's stay, DHS announced that it was no longer enforcing the Rule in accordance with the judgment, Doc. 252-2, and days later the Vacatur Rule formalized that change, 86 Fed. Reg. 14,221.  Had the States moved to intervene in time to appeal this court's judgment—or had they done so after January 4, either here, in the Seventh Circuit, or both—DHS would have known of the possible need to preserve the Rule pending further review and might have taken a different approach.  Allowing intervention now could "require DHS to again shift [the] public charge guidance" it issued in light of the Rule's vacatur, Doc. 269 at 28, a back-and-forth that could have been avoided if the States had acted promptly.  Agencies and the public have an interest in the consistent and predictable implementation of federal policy.  *See Wis. Elec. Power Co. v. Costle*, 715 F.2d 323, 327 (7th Cir. 1983) (holding that "the benefits of a stable, consistent administrative policy" counseled against considering post-decision information on judicial review of agency action); *Reyes-Arias v. INS*, 866 F.2d 500, 503 (D.C. Cir. 1989) (observing that "agencies in the modern administrative state" have "a keen interest in securing the orderly disposition of the numerous claims" under their purview).

A third type of reliance cost arises from the *de facto* settlement that Plaintiffs and DHS reached during the period of the States' delay. From July 2020 through the stipulated dismissal in March 2021, the parties were engaged in discovery disputes concerning ICIRR's equal protection claim. In July 2020, DHS opposed including any White House officials as document custodians, Doc. 181 at 6, 8-9, and the court resolved that dispute in part in ICIRR's favor, Doc. 190 at 2-3. The court then ordered the parties to meet and confer about deponents and the timing of depositions. Doc. 192. The parties also disputed whether DHS could withhold certain documents from production under the deliberative process privilege, a disagreement that persisted even after the Executive Order issued in February 2021. Docs. 214, 232, 236, 238, 245, 247; *see* Doc. 241 at 2 n.1 (confirming that DHS "will currently continue to assert the deliberative process privilege"). After DHS dismissed its appeal, ICIRR agreed to dismiss its equal protection claim, Doc. 253, thereby eliminating the risks to DHS that it would lose the privilege battle and that former high-ranking officials would be deposed. Doc. 269 at 14 (DHS observing that discovery was "likely [to] include depositions of former, high ranking Government officials").

Although not a formal settlement, that series of events plainly reflected a negotiated compromise to end the litigation. If the States were allowed to intervene, ICIRR would move to revive its equal protection claim, Doc. 282 at 17:20-18:3, a motion that likely would be granted, subjecting DHS once again to the risk of losing the privilege battles and having to present former administration officials for deposition. Unraveling the parties' compromise by allowing the States to intervene would thus greatly prejudice the parties, particularly DHS, providing further reason to deny intervention. *See Sokaogon Chippewa*, 214 F.3d at 950 ("To allow a tardy intervenor to block the settlement agreement after all that effort would result in the parties'

combined efforts being wasted completely"); *Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991) ("Once parties have invested time and effort into settling a case it would be prejudicial to allow intervention."); *Bloomington*, 824 F.2d at 535 ("[I]ntervention at this time would render worthless all of the parties' painstaking negotiations because negotiations would have to begin again and [the potential intervenor] would have to agree to any proposed consent decree.").

### C.     Prejudice to the States of Denying Intervention

The States argue that denying intervention would prejudice them for the very reasons they support the Final Rule: They spend "billions of dollars on Medicaid services and other public benefits," and "the Rule would have helped to reduce such expenditures."  Doc. 257 at 7-8.  This argument is unpersuasive because the States have a readily available path to demand that DHS re-promulgate the Rule: a petition for rulemaking.  *See* 5 U.S.C. § 553(e) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.").  The States may submit a petition at any time, and if DHS denies it, the denial would be reviewable in court.  *See Auer v. Robbins*, 519 U.S. 452, 459 (1997) ("The proper procedure … is set forth explicitly in the APA: a petition to the agency for rulemaking, § 553(e), denial of which must be justified by a statement of reasons, § 555(e), and can be appealed to the courts, §§ 702, 706.").

It follows that the marginal prejudice to the States of denying intervention here is not the loss of the Final Rule itself, but rather the shift in the procedural posture of their effort to obtain the Rule's reinstatement.  If allowed to intervene as defendants in this court and appellants in the Seventh Circuit, the States would enjoy the benefit of defending an already-promulgated regulation, which under current precedent receives deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  In contrast, a potential future decision by DHS to deny a petition by the States to re-promulgate the Rule would be reviewed

28

"under the deferential arbitrary-and-capricious standard." *Hadson Gas Sys., Inc. v. FERC*, 75 F.3d 680, 684 (D.C. Cir. 1996).

The States therefore must be understood as claiming an interest in preserving for themselves a favorable legal standard, and thus in improving their chances of achieving the Rule's reinstatement. Different legal standards of course can affect litigation. But it would be odd for a court to apply the label of "prejudice" to the petition right that Congress conferred in 5 U.S.C. § 553(e), or to recognize a cognizable interest in application of the *Chevron* doctrine. Litigants have no right to the best possible forum in which to present their claims. *Cf. Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 821 (7th Cir. 2015) (rejecting a plaintiff's asserted "right to forum shop").

The D.C. Circuit's decision in *Hadson Gas* illustrates the point. A gas company argued that FERC had to undertake notice-and-comment procedures before vacating a certain regulation. 75 F.3d at 681. There was no question that FERC had the legal authority to forgo notice and comment, as Congress had repealed the regulation's enabling statute. *Id*. at 683. But the company argued that certain collateral consequences of the regulation's vacatur made notice-and-comment procedures necessary. *Id*. at 684. The D.C. Circuit held that the company's remedy lay instead in a petition under § 553(e), even though judicial review of any FERC denial of such a petition would be deferential. *Ibid*.

The situation here is analogous, although no statutory amendment is involved. The States no longer argue that the APA prohibited DHS from dismissing its appeal and implementing the Vacatur Rule without undertaking notice-and-comment procedures, but they protest the effects of DHS's actions on them. Doc. 282 at 33:10-15 ("I don't think it would be technically correct to say that [DHS is] violating the APA. What I would say, however, is that their actions have

29

impinged upon the procedural rights that we would have under the APA … .").  But the APA already provides a route to vindicate the States' rights—a petition for rulemaking under § 553(e)—and it does not prejudice the States to require them to follow that route.

The States suggested at one point that they had a procedural right under the APA for DHS to proceed via notice-and-comment rulemaking before vacating the Final Rule.  Doc. 257 at 9; Doc. 278 at 5-6, 11-12; Doc. 260 at 16.  That argument is now waived because, as noted, when asked whether DHS violated the APA by dismissing its appeal, the States conceded that it had not.  Doc. 282 at 33:3-15.  In any event, the Vacatur Rule was itself premised on DHS's view that it was excused from notice-and-comment procedures by this court's judgment.  *See* 86 Fed. Reg. at 14,221 (citing 5 U.S.C. § 553(b)(B)).  The States easily could have presented their APA argument through a court challenge to the Vacatur Rule.  *See* 5 U.S.C. § 702 (providing for judicial review of all "agency action"); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 92-95 (D.C. Cir. 2012) (vacating an interim rule promulgated without notice-and-comment procedures, reasoning that § 553(b)(B) did not apply).  With that avenue having been available, no prejudice can be said to result from denying the States the ability to intervene and make the same argument here.

Finally, the States argue that this court's judgment vacating the Final Rule will cast a "shadow" over future rulemakings concerning the INA's public charge provision and, in fact, will "preclude the next Administration from re-adopting the Rule *even with* notice-and-comment rulemaking."  Doc. 260 at 16.  To support their argument, the States rely on assertions in the above-referenced Ninth Circuit dissent that DHS's dismissal of its appeal of the judgment would "ensur[e] not only that the [R]ule was gone faster than toilet paper in a pandemic, but [also] that it could effectively never, ever be resurrected, even by a future administration."  *San Francisco*, 992 F.3d at 743 (VanDyke, J., dissenting); *see also id*. at 749 (asserting that DHS's dismissal of

30

its appeal "ensure[s] that it will be very difficult for any future administration to promulgate another rule like the 2019 rule"); *id*. at 753 ("They really have smashed Humpty Dumpty into pieces spread across the nation, and there isn't a single court (or future administration) that can do much about it.").  As with its assertion that APA notice-and-comment rulemaking is required when an agency decides not to pursue an appeal of a judgment vacating a regulation, the dissent did not favor its assertions with any citation to legal authority—unless overwrought metaphors invoking nursery rhymes and global pandemics can now be said to qualify as legal authority.

In an effort to fill the gap left by the dissent, the States cite *National Cable and Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 982-83 (2005).  Doc. 260 at 16.  The States do not explain how *Brand X* justifies their fears about the supposed shadow cast by this court's judgment on future rulemakings, but the portion of the opinion they cite reads:

> The better rule is to hold judicial interpretations [of the statute underlying the challenged regulation] contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gaps for the agency to fill, displaces a conflicting agency construction.

545 U.S. at 982-83.  *Brand X* does not apply here for two independent reasons.  First, a district court decision does not qualify as precedent.  *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."); *Matheny v. United States*, 469 F.3d 1093, 1097 (7th Cir. 2006) ("[D]istrict court opinions do not have precedential authority."); *see also Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 115 (D.D.C. 2019) (holding that an agency was free to continue applying its preferred interpretation of a regulation despite an adverse district court ruling).  Second, this court's holding that the

Rule violated the APA rests exclusively on the Seventh Circuit's opinion affirming the preliminary injunction, 498 F. Supp. 3d at 1004-05, and the Seventh Circuit grounded its analysis in *Chevron* step two, not step one, 962 F.3d at 226-29. *See Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 759 (7th Cir. 2014) ("*Brand X* thus directs us to return to our [earlier] decision to determine whether it was, in essence, a *Chevron* step-one decision.").

Accordingly, this court's vacatur of the Final Rule does not preclude DHS in the future from promulgating a public charge regulation identical to the Rule, nor does it preclude the States from petitioning DHS to do so. The States will suffer no prejudice for Rule 24 purposes if their motion to intervene is denied.

### D. Other Unusual Circumstances

Finally, the court must consider any other unusual circumstances relevant to the timeliness inquiry. *See Sokaogon Chippewa*, 214 F.3d at 949. For example, "a convincing justification for [the potential intervenor's] tardiness" might permit intervention where it would otherwise be untimely. *Stallworth*, 558 F.2d at 266. As to this factor, the States reiterate their view that it was unprecedented and improper for DHS to cease defending the Final Rule, and therefore that it was reasonable for them to rely on DHS's continued defense until the moment it dismissed its appeal. Doc. 257 at 7. That argument fails for the reasons set forth above. And it again bears mention that the States themselves knew from *CSPI v. Perdue* that agencies can decide not to pursue appeals of district court decisions that vacate regulations, and they knew from *Pennsylvania v. DeVos* that they could seek intervention before a successful presidential candidate who expressed deep hostility to a regulation assumes office.

\*     \*     \*

Considering all the pertinent circumstances, the States' motion to intervene is untimely. The States inexplicably delayed filing their motion for months after it had become not just

reasonably possible, by highly likely, that candidate Biden, who had promised to reverse the Final Rule within the first 100 days of his administration, would become President Biden—and, at an absolute minimum, for five weeks after President Biden issued the Executive Order. The States' unreasonable delay in seeking intervention would cause substantial prejudice to the original parties, particularly DHS, and denying intervention causes no cognizable prejudice to the States because they have alternative forums in which to assert their interests. Because the States' motion to intervene is untimely, there is no need to consider Rule 24's other requirements. *See Illinois v. Chicago*, 912 F.3d at 989 (affirming denial of a motion to intervene solely on the ground that it was untimely).

### III. Motion for Relief from the Judgment

The States also move for relief from judgment under Rule 60(b)(6). Doc. 260 at 8, 11. The States are correct that only a successful Rule 60(b) motion could resuscitate this case. The deadline for appealing the judgment vacating the Final Rule—January 4, 2021—had long since passed when they filed their motion. Nor is a Rule 59(e) motion to alter the judgment an option, as such a motion had to be filed even sooner, "no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e).

But because the States are not parties, they cannot seek Rule 60(b)(6) relief. Rule 60(b) permits a court to "relieve *a party or its legal representative* from a final judgment." Fed. R. Civ. P. 60(b) (emphasis added). The natural reading of the Rule's text, and the one adopted by the Seventh Circuit, is that only parties or their privies can file Rule 60(b) motions. *See Pearson v. Target Corp.*, 893 F.3d 980, 984 (7th Cir. 2018) (holding that an absent class member "must count as a 'party' to bring the [Rule 60(b)] motion"); *United States v. 8136 S. Dobson St., Chi., Ill.*, 125 F.3d 1076, 1082 (7th Cir. 1997) ("The person seeking relief [under Rule 60(b)] must have been a party."); *Nat'l Acceptance Co. of Am., Inc. v. Frigidmeats, Inc.*, 627 F.2d 764,

766 (7th Cir. 1980) ("It is well-settled that … 'one who was not a party lacks standing to make (a 60(b)) motion.'") (quoting 11 Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2865 (1973)). The States note that some circuits have been more permissive, allowing Rule 60(b) motions by non-parties whose "interests were directly or strongly affected by the judgment." Doc. 260 at 8 (quoting *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013)); Doc. 278 at 14. But this court must follow Seventh Circuit precedent. So, the States cannot seek Rule 60(b) relief, as "intervention is the requisite method for a nonparty to become a party to a lawsuit," *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009), and their intervention motion has been denied.

To evaluate the States' Rule 60(b)(6) motion on the merits, then, the court will assume for the sake of argument that they are entitled to intervene. *See Bunge Agribusiness Sing. Pte. Ltd. v. Dalian Hualiang Enter. Grp. Co.*, 581 F. App'x 548, 551 (7th Cir. 2014) ("[T]he question whether one may intervene logically precedes whether one may do so to reopen a judgment."). And granting the States that assumption, their Rule 60(b)(6) motion is denied.

Rule 60(b) enumerates five specific reasons for relief from a judgment, *see* Fed. R. Civ. P. 60(b)(1)-(5), none of which applies here. So the States are left to invoke the catch-all category in Rule 60(b)(6): "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). "[R]elief under Rule 60(b)(6) requires the movant to establish that 'extraordinary circumstances' justify upsetting a final decision." *Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 754 (7th Cir. 2015) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005)). "In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, 'the risk of injustice to the parties' and 'the risk of

undermining the public's confidence in the judicial process.'" *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

The States' Rule 60(b)(6) motion faces insurmountable obstacles analogous to those that defeated their motion to intervene. As for timing, "[a] motion under Rule 60(b) must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1). Much like the Rule 24 timeliness inquiry, "what constitutes 'reasonable time' for a filing under Rule 60(b) depends on the facts of each case." *Ingram v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 371 F.3d 950, 952 (7th Cir. 2004). The pertinent timeliness factors for a Rule 60(b) motion include "the interest in finality, the reasons for the delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and the consideration of prejudice, if any, to other parties." *Ibid*. (quoting *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 610 (7th Cir. 1986)).

Those factors weigh heavily against the States. There were no good reasons for the States' delay, and they knew of their interests in this suit and the reasonably possible, in fact likely, consequences for the Final Rule of the impending presidential transition. Reopening the judgment at this juncture would prejudice Plaintiffs and, in particular, DHS because of the costs they incurred in reliance on their resolution of this suit. The States' Rule 60(b)(6) motion accordingly is untimely. *See Diaz v. Tr. Territory of the Pac. Islands*, 876 F.2d 1401, 1405 n.1 (9th Cir. 1989) (noting the parallel between the timeliness inquiries under Rules 24 and 60(b)(6)); *Bunge Agribusiness Sing. Pte. Ltd. v. Dalian Hualiang Enter. Grp. Co.*, 2013 WL 3274218, at *2 (N.D. Ill. June 27, 2013) (finding that a filing was untimely if construed as a Rule 24 motion and not made within a reasonable time if construed as a Rule 60(b) motion), *aff'd in part, appeal dismissed in part*, 581 F. App'x 548 (7th Cir. 2014). Denial of the States' Rule 60(b) motion is warranted on this ground alone. *See Kagan*, 795 F.2d at 610-11 (holding

that a Rule 60(b) motion filed "nearly six months after the court's dismissal of the case" and "more than three months after the plaintiff … learned of the dismissal" was not filed within a reasonable time and thus was correctly denied).

In addition, the "extraordinary circumstances" for Rule 60(b)(6) relief asserted by the States strongly resemble their failed arguments for intervention. The States contend that they had "no notice" that DHS might dismiss its appeal, that the dismissal improperly evaded the APA's notice-and-comment procedures, and that this supposedly unexpected turn "warrants relief under Rule 60(b)(6)." Doc. 260 at 10-11. As explained above, the States had ample notice that what came to pass in DHS's handling of this suit and the Final Rule might come to pass. They admit that "by December [2020], there was certainty … that candidate Biden would be elected," Doc. 282 at 49:24-50:1, after he had promised to jettison the Rule. The States also now admit that DHS did not violate the APA by dismissing its appeal of this court's judgment without first engaging notice-and-comment procedures. *Id*. at 33:3-12. As noted, federal agencies regularly decide—presumably for a variety of reasons—to dismiss appeals of judgments invalidating regulations or to not appeal in the first place. It is not this court's role to scrutinize those reasons and label some "extraordinary" for purposes of Rule 60(b)(6), unless there is some hint of illegality or impropriety. *See United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (holding that "the Attorney General has plenary discretion … to settle litigation to which the federal government is a party" unless "he settled the lawsuit in a manner that he was not legally authorized to do"); Auth. of the U.S. to Enter Settlements Limiting the Future Exercise of Exec. Branch Discretion, 23 Op. O.L.C. 126, 135 (1999) ("The [Attorney General's] settlement power is sweeping, but the Attorney General must still exercise her discretion in conformity with her obligation to enforce the Acts of Congress.") (quotation marks omitted).

And the States can live to fight another day by pressing for reinstatement of the Rule, or a regulation like it, using the mechanisms described above.

The States' Rule 60(b)(6) motion is therefore denied on two independent grounds: it is untimely, and there are no extraordinary circumstances to justify upsetting this court's judgment.

It bears mention that yet another reason for denial is that granting Rule 60(b)(6) relief would improperly allow the States to use Rule 60(b) as a substitute for a timely appeal. *See Browder v. Dir., Dep't of Corr. of Ill.*, 434 U.S. 257, 263 n.7 (1978) ("[A]n appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review."); *Mendez v. Republic Bank*, 725 F.3d 651, 659 (7th Cir. 2013) ("Rule 60(b) relief is appropriately denied when a party fails to file a timely appeal and the relief sought could have been attained on appeal."); *Stoller v. Pure Fishing Inc.*, 528 F.3d 478, 480 (7th Cir. 2008) ("A Rule 60(b) motion is not a substitute for appeal … ."); *Instrumentalist Co. v. Marine Corps League*, 694 F.2d 145, 154 (7th Cir. 1982) ("Rule 60(b) is clearly *not* a substitute for appeal and must be considered with the obvious need for the finality of judgments.") (quotation marks omitted). Arguments that could and should have been made against a judgment through a timely appeal are not fodder for a Rule 60(b) motion. *See Banks v. Chi. Bd. of Educ.*, 750 F.3d 663, 668 (7th Cir. 2014) ("Far from presenting any 'extraordinary circumstances' that might warrant relief under Rule 60(b)(6), [the plaintiff] presented only arguments suitable for a direct appeal for which we do not have jurisdiction … ."); *Gleash v. Yuswak*, 308 F.3d 758, 761 (7th Cir. 2002) ("A contention that the judge erred with respect to the materials in the record is not within Rule 60(b)'s scope, else it would be impossible to enforce time limits for appeal."). A successful movant under Rule 60(b) must instead point to something unknown or unnoticed at the time of final judgment that undermines the judgment's integrity. *See Bell v. McAdory*, 820 F.3d 880, 883 (7th Cir. 2016)

("Instead of trying to relitigate the merits through Rule 60(b), a litigant has to come up with something *different*—perhaps something overlooked before, perhaps something new."); *Gleash*, 308 F.3d at 761 ("[Rule 60(b)] is designed to allow modification in light of factual information that comes to light only after the judgment, and could not have been learned earlier.").

The States point to nothing unknown or unnoticed at the time judgment was entered that undermines the judgment's integrity. The APA claims were decided based on a closed administrative record and turned largely on the application of legal principles to that record. 498 F. Supp. 3d at 1004. As DHS acknowledged even before the change of presidential administration, this court had no choice but to rule in Plaintiffs' favor under the APA because of the Seventh Circuit's ruling in the preliminary injunction appeal. *Id*. at 1005 ("Given [the Seventh Circuit's] holdings, DHS is right to acknowledge that this court should grant summary judgment to Plaintiffs on their APA claims."). The States in fact "agree that the Seventh Circuit's holding likely establishes the law of the case for this Court." Doc. 260 at 9. (It is circuit precedent as well.) As no one disputes, this court cannot hold, whether on a Rule 60(b) motion or otherwise, that the Final Rule complies with the APA.

So what exactly are the States seeking through their Rule 60(b) motion? They "ask this Court to vacate its judgment to allow the State Intervenors to defend the Rule, as the United States previously did on appeal." Doc. 260 at 9. But the States cannot be asking this court to vacate its judgment and then *uphold* the Rule, because nothing has changed and because the Seventh Circuit's decision prohibits upholding the Rule. Although they do not say it outright, the States must want the court to vacate the judgment and then simply re-enter it in identical form so that they can appeal. That use of Rule 60(b) would violate the tenet that "[a] collateral attack on a final judgment is not a permissible substitute for appealing the judgment within the

[required] time." *Bell v. Eastman Kodak Co.*, 214 F.3d 798, 801 (7th Cir. 2000). In *Flying J*, by contrast, the trade association sought to intervene *before* the time for appeal had run, 578 F.3d at 570-71, so there was no need for a Potemkin relief from judgment meant solely to reset the appeal clock. The States do not identify a single case where a district court used Rule 60(b) in that artificial manner, and they offer no good reason why this court should be the first.

But, no matter, even putting that point aside, the States' Rule 60(b)(6) motion fails because it is untimely and because there are no extraordinary circumstances warranting relief from this court's judgment.

### Conclusion

The States' Rule 24 motion to intervene and Rule 60(b)(6) motion for relief from judgment are denied. This case remains closed.

August 17, 2021

_____
United States District Judge